**Fill in this information to identify the case:**

United States Bankruptcy Court for the:

_____ District of Delaware
(State)

Case number *(if known)*: _____  Chapter __11__

☐ Check if this is an
amended filing

Official Form 201

# Voluntary Petition for Non-Individuals Filing for Bankruptcy

04/16

If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write the debtor's name and the case number (if known). For more information, a separate document, *Instructions for Bankruptcy Forms for Non-Individuals*, is available.

| | | |
|---|---|---|
| 1. | **Debtor's Name** | BL Restaurants Holding, LLC |

| | | |
|---|---|---|
| 2. | **All other names debtor used in the last 8 years** | Bar Louie |
| | Include any assumed names, trade names, and *doing business as* names | |

| | | |
|---|---|---|
| 3. | **Debtor's federal Employer Identification Number (EIN)** | 27-1546665 |

4. **Debtor's address**

| Principal place of business | Mailing address, if different from principal place of business |
|---|---|
| **4550 Beltway Drive** | |
| Number        Street | Number        Street |
| | P.O. Box |
| **Addison, TX 75001** | |
| City                State    Zip Code | City                State    Zip Code |
| | **Location of principal assets, if different from principal place of business** |
| **Dallas County, TX** | |
| County | Number        Street |
| | City                State    Zip Code |

| | | |
|---|---|---|
| 5. | **Debtor's website** (URL) | https://www.barlouie.com |

| | | |
|---|---|---|
| 6. | **Type of debtor** | ☒ Corporation (including Limited Liability Company (LLC) and Limited Liability Partnership (LLP)) |
| | | ☐ Partnership (excluding LLP) |
| | | ☐ Other. Specify: _____ |

| Debtor | BL Restaurants Holding, LLC | Case number *(if known)* | |
|---|---|---|---|
| | Name | | |

**7. Describe debtor's business**

A. *Check One:*

☐ Health Care Business (as defined in 11 U.S.C. § 101(27A))

☐ Single Asset Real Estate (as defined in 11 U.S.C. § 101(51B))

☐ Railroad (as defined in 11 U.S.C. § 101(44))

☐ Stockbroker (as defined in 11 U.S.C. § 101(53A))

☐ Commodity Broker (as defined in 11 U.S.C. § 101(6))

☐ Clearing Bank (as defined in 11 U.S.C. § 781(3))

☒ None of the above

B. *Check all that apply:*

☐ Tax-exempt entity (as described in 26 U.S.C. § 501)

☐ Investment company, including hedge fund or pooled investment vehicle (as defined in 15 U.S.C. § 80a-3)

☐ Investment advisor (as defined in 15 U.S.C. § 80b-2(a)(11))

C. NAICS (North American Industry Classification System) 4-digit code that best describes debtor. See http://www.uscourts.gov/four-digit-national-association-naics-codes .

**7225 - Restaurants and Other Eating Places**

**8. Under which chapter of the Bankruptcy Code is the debtor filing?**

*Check One:*

☐ Chapter 7

☐ Chapter 9

☒ Chapter 11.  *Check all that apply:*

☐ Debtor's aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates) are less than $2,566,050 (amount subject to adjustment on 4/01/19 and every 3 years after that).

☐ The debtor is a small business debtor as defined in 11 U.S.C. § 101(51D).  If the debtor is a small business debtor, attach the most recent balance sheet, statement of operations, cash-flow statement, and federal income tax return, or if all of these documents do not exist, follow the procedure in 11 U.S.C. § 1116(1)(B).

☐ A plan is being filed with this petition.

☐ Acceptances of the plan were solicited prepetition from one or more classes of creditors, in accordance with 11 U.S.C. § 1126(b).

☐ The debtor is required to file periodic reports (for example, 10K and 10Q) with the Securities and Exchange Commission according to § 13 or 15(d) of the Securities Exchange Act of 1934.  File the *Attachment to Voluntary Petition for Non-Individuals Filing for Bankruptcy under Chapter 11* (Official Form 201A) with this form.

☐ The debtor is a shell company as defined in the Securities Exchange Act of 1934 Rule 12b-2.

☐ Chapter 12

**9. Were prior bankruptcy cases filed by or against the debtor within the last 8 years?**

If more than 2 cases, attach a separate list.

☒ No

☐ Yes.

| District | _____ | When | _____ MM/DD/YYYY | Case number | _____ |
| District | _____ | When | _____ MM/DD/YYYY | Case number | _____ |

**10. Are any bankruptcy cases pending or being filed by a business partner or an affiliate of the debtor?**

List all cases.  If more than 1, attach a separate list.

☐ No

☒ Yes.

| Debtor | **See Rider 1** | Relationship | **Affiliate** |
| District | **District of Delaware** | When | **01/27/2020** MM / DD / YYYY |
| Case number, if known | _____ | | |

Voluntary Petition for Non-Individuals Filing for Bankruptcy

Debtor    BL Restaurants Holding, LLC                                    Case number *(if known)*
          Name

---

**11. Why is the case filed in *this* district?**

*Check all that apply:*

☒ Debtor has had its domicile, principal place of business, or principal assets in this district for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other district.

☐ A bankruptcy case concerning debtor's affiliate, general partner, or partnership is pending in this district.

---

**12. Does the debtor own or have possession of any real property or personal property that needs immediate attention?**

☒ No

☐ Yes.  Answer below for each property that needs immediate attention.  Attach additional sheets if needed.

**Why does the property need immediate attention?** (*Check all that apply.*)

☐ It poses or is alleged to pose a threat of imminent and identifiable hazard to public health or safety.

What is the hazard? _____

☐ It needs to be physically secured or protected from the weather.

☐ It includes perishable goods or assets that could quickly deteriorate or lose value without attention (for example, livestock, seasonal goods, meat, dairy, produce, or securities-related assets or other options).

☐ Other _____

**Where is the property?**

_____
Number          Street

_____
City                               State      Zip Code

**Is the property insured?**

☐ No

☐ Yes.    Insurance agency    _____

Contact name    _____

Phone    _____

---

### Statistical and administrative information

**13. Debtor's estimation of available funds**

*Check one:*

☒ Funds will be available for distribution to unsecured creditors.

☐ After any administrative expenses are paid, no funds will be available for distribution to unsecured creditors.

**14. Estimated number of creditors (on a consolidated basis)**

| | | |
|---|---|---|
| ☐ 1-49 | ☐ 1,000-5,000 | ☐ 25,001-50,000 |
| ☐ 50-99 | ☒ 5,001-10,000 | ☐ 50,001-100,000 |
| ☐ 100-199 | ☐ 10,001-25,000 | ☐ More than 100,000 |
| ☐ 200-999 | | |

**15. Estimated assets (on a consolidated basis)**

| | | |
|---|---|---|
| ☐ $0-$50,000 | ☐ $1,000,001-$10 million | ☐ $500,000,001-$1 billion |
| ☐ $50,001-$100,000 | ☐ $10,000,001-$50 million | ☐ $1,000,000,001-$10 billion |
| ☐ $100,001-$500,000 | ☒ $50,000,001-$100 million | ☐ $10,000,000,001-$50 billion |
| ☐ $500,001-$1 million | ☐ $100,000,001-$500 million | ☐ More than $50 billion |

---

| Debtor | BL Restaurants Holding, LLC | Case number *(if known)* | |
|---|---|---|---|
| | Name | | |

**16. Estimated liabilities**
    **(on a consolidated**
    **basis)**

- ☐ $0–$50,000
- ☐ $50,001–$100,000
- ☐ $100,001–$500,000
- ☐ $500,001–$1 million
- ☐ $1,000,001–$10 million
- ☐ $10,000,001–$50 million
- ☐ $50,000,001–$100 million
- ☒ $100,000,001–$500 million
- ☐ $500,000,001–$1 billion
- ☐ $1,000,000,001–$10 billion
- ☐ $10,000,000,001–$50 billion
- ☐ More than $50 billion

## Request for Relief, Declaration, and Signatures

**WARNING --** Bankruptcy fraud is a serious crime. Making a false statement in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

**17. Declaration and signature of authorized representative of debtor**

The debtor requests relief in accordance with the chapter of title 11, United States Code, specified in this petition.

I have been authorized to file this petition on behalf of the debtor.

I have examined the information in this petition and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on    <u>01/27/2020</u>
                    MM/ DD / YYYY

✗   <u>/s/ Howard Meitiner</u>            **Howard Meitiner**
      Signature of authorized representative of debtor     Printed name

Title   <u>**Chief Restructuring Officer**</u>

**18. Signature of attorney**

✗   <u>/s/ Domenic E. Pacitti</u>      Date   <u>01/27/2020</u>
      Signature of attorney for debtor              MM/ DD/YYYY

**Domenic E. Pacitti**
Printed name

**Klehr Harrison Harvey Branzburg LLP**
Firm name

**919 North Market Street, Suite 1000**
Number          Street

**Wilmington**             **DE**       **19801-3062**
City                  State        ZIP Code

**302-426-1189**          **dpacitti@klehr.com**
Contact phone            Email address

**3989**             **DE**
Bar number           State

**Fill in this information to identify the case:**

United States Bankruptcy Court for the:

_____
District of Delaware
(State)

Case number *(if known):* _____    Chapter ___11___

☐ Check if this is an
amended filing

### Rider 1
### Pending Bankruptcy Cases Filed by the Debtor and Affiliates of the Debtor

On the date hereof, each of the entities listed below (collectively, the "Debtors") filed a petition in the United States Bankruptcy Court for the District of Delaware for relief under chapter 11 of title 11 of the United States Code.

1.    BL Restaurants Holding, LLC

2.    BL Restaurant Operations, LLC

3.    BL Restaurant Franchises, LLC

4.    BL Hunt Valley, LLC

Rider 1

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| BL RESTAURANTS HOLDING, LLC, *et al.*,[1] | ) | Case No. 20-(_____) (___) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**LIST OF EQUITY SECURITY HOLDERS OF**
**BL RESTAURANTS HOLDING, LLC[2]**

| Debtor | Equity Holders | Percentage of Equity Held |
|---|---|---|
| BL Restaurants Holding, LLC | BL Restaurants Group Holding Corp. | 100% |

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each of the Debtors' respective federal tax identification numbers, are as follows: BL Restaurants Holding, LLC (6665); BL Restaurant Operations, LLC (7062); BL Restaurant Franchises, LLC (6923); and BL Hunt Valley, LLC (9513). The Debtors' headquarters and mailing address is: 4550 Beltway Drive, Addison, TX 75001.

[2]   This list serves as the disclosure required to be made by the debtor pursuant to rule 1007 of the Federal Rules of Bankruptcy Procedure.  All equity positions listed are as of the date of commencement of this chapter 11 case.

Rider 1

Fill in this information to identify the case and this filing:

| | |
|---|---|
| Debtor Name | BL Restaurants Holding, LLC |
| United States Bankruptcy Court for the: | District of Delaware |
| | (State) |
| Case number (If known): | |

## Official Form 202

## Declaration Under Penalty of Perjury for Non-Individual Debtors          12/15

An individual who is authorized to act on behalf of a non-individual debtor, such as a corporation or partnership, must sign and submit this form for the schedules of assets and liabilities, any other document that requires a declaration that is not included in the document, and any amendments of those documents. This form must state the individual's position or relationship to the debtor, the identity of the document, and the date. Bankruptcy Rules 1008 and 9011.

WARNING -- Bankruptcy fraud is a serious crime. Making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

### Declaration and signature

I am the president, another officer, or an authorized agent of the corporation; a member or an authorized agent of the partnership; or another individual serving as a representative of the debtor in this case.

I have examined the information in the documents checked below and I have a reasonable belief that the information is true and correct:

☐  *Schedule A/B: Assets-Real and Personal Property (Official Form 206A/B)*

☐  *Schedule D: Creditors Who Have Claims Secured by Property (Official Form 206D)*

☐  *Schedule E/F: Creditors Who Have Unsecured Claims (Official Form 206E/F)*

☐  *Schedule G: Executory Contracts and Unexpired Leases (Official Form 206G)*

☐  *Schedule H: Codebtors (Official Form 206H)*

☐  *Summary of Assets and Liabilities for Non-Individuals (Official Form 206Sum)*

☐  Amended Schedule

☐  *Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders (Official Form 204)*

☒  Other document that requires a declaration_____     List of Equity Security Holders_____

I declare under penalty of perjury that the foregoing is true and correct.

Executed on

| | |
|---|---|
| **01/27/2020** | ☒  */s/ Howard Meitiner* |
| MM/ DD/YYYY | Signature of individual signing on behalf of debtor |
| | **Howard Meitiner** |
| | Printed name |
| | **Chief Restructuring Officer** |
| | Position or relationship to debtor |

Official Form 202          **Declaration Under Penalty of Perjury for Non-Individual Debtors**

PHIL1 8627045v.1

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| BL RESTAURANTS HOLDING, LLC, *et al.*,[1] | ) Case No. 20-(_____) (___) |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) |

**CORPORATE OWNERSHIP STATEMENT OF**
**BL RESTAURANTS HOLDING, LLC**

In accordance with Rules 1007(a)(1) and 7007.1 of the Federal Rules of Bankruptcy Procedure, the above-captioned Debtor in this case submits the following information:

| Corporate Equity Holder | Address of Corporate Equity Owner | Interest |
|---|---|---|
| BL Restaurants Group Holding Corp. | 4550 Beltway Drive Addison, TX 75001 | 100% |

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each of the Debtors' respective federal tax identification numbers, are as follows: BL Restaurants Holding, LLC (6665); BL Restaurant Operations, LLC (7062); BL Restaurant Franchises, LLC (6923); and BL Hunt Valley, LLC (9513). The Debtors' headquarters and mailing address is: 4550 Beltway Drive, Addison, TX 75001.

Fill in this information to identify the case and this filing:

Debtor Name       BL Restaurants Holding, LLC

United States Bankruptcy Court for the:     District of Delaware

                                            (State)

Case number (If known):

## Official Form 202
## Declaration Under Penalty of Perjury for Non-Individual Debtors    12/15

An individual who is authorized to act on behalf of a non-individual debtor, such as a corporation or partnership, must sign and submit this form for the schedules of assets and liabilities, any other document that requires a declaration that is not included in the document, and any amendments of those documents. This form must state the individual's position or relationship to the debtor, the identity of the document, and the date. Bankruptcy Rules 1008 and 9011.

WARNING -- Bankruptcy fraud is a serious crime. Making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

### █ Declaration and signature

I am the president, another officer, or an authorized agent of the corporation; a member or an authorized agent of the partnership; or another individual serving as a representative of the debtor in this case.

I have examined the information in the documents checked below and I have a reasonable belief that the information is true and correct:

☐   *Schedule A/B: Assets-Real and Personal Property (Official Form 206A/B)*

☐   *Schedule D: Creditors Who Have Claims Secured by Property (Official Form 206D)*

☐   *Schedule E/F: Creditors Who Have Unsecured Claims (Official Form 206E/F)*

☐   *Schedule G: Executory Contracts and Unexpired Leases (Official Form 206G)*

☐   *Schedule H: Codebtors (Official Form 206H)*

☐   *Summary of Assets and Liabilities for Non-Individuals (Official Form 206Sum)*

☐   Amended Schedule

☐   *Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders (Official Form 204)*

☒   Other document that requires a declaration_____Corporate Ownership Statement_____

I declare under penalty of perjury that the foregoing is true and correct.

Executed on

          **01/27/2020**                  */s/ Howard Meitiner*

          MM/ DD/YYYY                Signature of individual signing on behalf of debtor

                                              **Howard Meitiner**

                                              Printed name

                                              **Chief Restructuring Officer**

                                              Position or relationship to debtor

Official Form 202       **Declaration Under Penalty of Perjury for Non-Individual Debtors**

Fill in this information to identify the case:

Debtor Name:    BL Restaurants Holding, LLC

United States Bankruptcy Court for the:    District of Delaware

Case Number (If known):    20-

☐ Check if this is an
amended filing

# Official Form 204

## Chapter 11 or Chapter 9 Cases: Consolidated List of Creditors Who Have the 30 Largest Unsecured Claims and Are Not Insiders
12/15

A consolidated list of creditors holding the 30 largest unsecured claims must be filed in a Chapter 11 or Chapter 9 case. Include claims which the debtor disputes. Do not include claims by any person or entity who is an insider, as defined in 11 U.S.C. § 101(31). Also, do not include claims by secured creditors, unless the unsecured claim resulting from inadequate collateral value places the creditor among the holders of the 30 largest unsecured claims.

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 1 | SYSCO 1390 ENCLAVE PARKWAY HOUSTON, TX  77077 | CONTACT: THOMAS BENE, CEO PHONE: 281-584-1390 DAY.ANGELA@CORP.SYSCO.COM | TRADE PAYABLE | | | | $3,046,275.52 |
| 2 | A&Z AUBURN HILLS LLC 6630 OAKHILLS DR BLOOMFIELD HILLS, MI  48301 | CONTACT: ANTHONY MAROUGI AMAROUGI@AOL.COM | NOTE | | | | $2,870,245.00 |
| 3 | A&Z NOVI LLC 6630 OAKHILLS DR BLOOMFIELD HILLS, MI  48301 | CONTACT: ANTHONY MAROUGI AMAROUGI@AOL.COM | NOTE | | | | $2,870,245.00 |
| 4 | AMERICAN EXPRESS TRAVEL RELATED SERVICES CO 200 VESSEY ST NEW YORK, NY  10285 | CONTACT: AUDREY HENDLEY, PRESIDENT PHONE: 212-640-2000 | TRADE PAYABLE | | | | $837,037.71 |
| 5 | EDWARD DON AND COMPANY 9801 ADAM DON PARKWAY WOODRIDGE, IL  60517 | CONTACT: JOHN FAHEY, CEO PHONE: 708-883-8362 JOHNFAHEY@DON.COM | TRADE PAYABLE | | | | $423,734.41 |
| 6 | PRODUCE ALLIANCE LLC 230 W HURON ST UNIT 200 CHICAGO, IL  60654 | CONTACT: ROB FELDGREBER, CFO & GENERAL COUNSEL PHONE: 847.808.3230 FAX: 312-573-7611 | TRADE PAYABLE | | | | $371,217.09 |
| 7 | ELFRINK CUSTOM CONSTRUCTION INC 726 ONSLOW AVE OVIEDO, FL  32765-8806 | CONTACT: CHRISTOPHER L. ELFRINK PHONE: 407-365-8809 CHRIS@ELFRINKCUSTOM.COM | TRADE PAYABLE | | | | $214,402.12 |

Debtor: BL Restaurants Holding, LLC                    Case Number (if known): 20-

| Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 8  UNITED HEALTHCARE OF TEXAS 9900 BREN RD E MINNETONKA, MN  55343 | CONTACT: TOM ROOS, SR. VP AND CHIEF ACCOUNTING OFFICER PHONE: 952-833-7100 | TRADE PAYABLE | | | | $205,997.15 |
| 9  IPFS CORPORATION 1055 BROADWAY BLVD, STE 11TH KANSAS CITY, MO  64105 | CONTACT: BRYAN ADRES, CHIEF FINANCIAL OFFICER PHONE: 816-627-0500 LISA.CHANDLER@IPFS.COM | TRADE PAYABLE | | | | $201,975.32 |
| 10  DIRECTV 2230 E IMPERIAL HWY FL 10 EL SEGUNDO, CA  90245-3504 | CONTACT: RANDALL STEPHENSON, CEO PHONE: 310-964-5000 FAX: 310-535-5225 | TRADE PAYABLE | | | | $147,465.02 |
| 11  COMMONWEALTH OF PA - MOP 1601 ELMERTON AVE HARISBURG, PA  17110 | CONTACT: TOM WOLF, GOVERNOR PHONE: 717-787-2500 RA-OAONEHREMPBANKREV@PA.GOV | TRADE PAYABLE | | | | $139,867.95 |
| 12  RESTAURANT TECHNOLOGIES INC 12962 COLLECTIONS CENTER DRIVE CHICAGO, IL  60693 | CONTACT: JEFFREY R. KIESEL, CEO PHONE: 651-795-1678 MSMITH@RTI-INC.COM | TRADE PAYABLE | | | | $130,773.87 |
| 13  SOUTHERN GLAZER - FINTECH 14911 QUORUM DRIVE, STE 150 DALLAS, TX  75254 | CONTACT: WAYNE CHAPLIN, CEO PHONE: 972-392-8255 | TRADE PAYABLE | | | | $129,632.52 |
| 14  NCR CORPORATION 3095 SATELLITE BLVD DULUTH, GA  30096 | CONTACT: MICHAEL HAYFORD, CEO PHONE: 678-808-7661 SR185135@NCR.COM | TRADE PAYABLE | | | | $105,574.69 |
| 15  INFOSYNC SERVICES LLC 1938 N WOODLAWN, STE 110 WICHITA, KS  67208 | CONTACT: DALE HOYER, CEO PHONE: 316-685-1622 | TRADE PAYABLE | | | | $103,858.34 |
| 16  MISSOURI TABLE AND CHAIR PO BOX 6827 LEES SUMMIT, MO  64064 | CONTACT: WILLIAM R CHIPMAN PHONE: 816-246-4040 FAX: 816 - 246 - 7910 SALES@GOTABLE.COM | TRADE PAYABLE | | | | $90,256.43 |
| 17  JACKSON LEWIS 75 PARK PLAZA BOSTON, MA  02116 | CONTACT: JEFFREY BRODY PHONE: 617-367-0025 FAX: 617-367-2155 JEFFREY.BRODY@JACKSONLEWIS.COM | TRADE PAYABLE | | | | $80,848.96 |
| 18  ARAMARK UNIFM CAREER APPRL INC 115 N FIRST ST BURBANK, CA  91502 | CONTACT: MIKE FADDEN, PRESIDENT PHONE: 888-999-6780 M.FADDEN@UNIFORM.ARAMARK.COM | TRADE PAYABLE | | | | $59,414.52 |
| 19  PANDORA MEDIA INC 25601 NETWORK PLACE CHICAGO, IL  60673 | CONTACT: ROGER LYNCH, CEO PHONE: 510-451-4100 | TRADE PAYABLE | | | | $50,561.81 |
| 20  CINTAS CORPORATION NO 2 6800 CINTAS BLVD CINCINNATI, OH  45262 | CONTACT: THOMAS E FROOMAN, VP PHONE: 513-754-3584 | TRADE PAYABLE | | | | $49,070.72 |

Debtor: BL Restaurants Holding, LLC                    Case Number (if known): 20-

| Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 21  BEVERAGE DIST FINTECH 3109 W. DR. MLK JR. BLVD SUITE 200 TAMPA, FL 33607 | CONTACT: TAD PHELPS, CEO PHONE: 800-572-0854 INFO@FINTECH.COM | TRADE PAYABLE | | | | $47,736.99 |
| 22  PRO-MOTION TECHNOLOGY GROUP LLC 29755 BECK ROAD WIXOM, MI 48393 | CONTACT: LYNN MATSON, CEO PHONE: 248-668-3100 LYNN.MATSON@PROMOTION.TECH | TRADE PAYABLE | | | | $47,663.55 |
| 23  JBG WOODBRIDGE REIT LLC 4747 BETHESDA AVE SUITE 200 BETHESDA, MD 20814 | CONTACT: W MATTHEW KELLY, CEO PHONE: 240-333-3600 MEDIA@JBGSMITH.COM | TRADE PAYABLE | | | | $38,141.31 |
| 24  ENTERCOM COMMUNICATIONS CORP 1220 OLIVE STREET ST LOUIS, MO 63103 | CONTACT: DAVIDE FIELD, CEO PHONE: 484-270-6337 MIKE.WEIL@ENTERCOM.COM | TRADE PAYABLE | | | | $37,911.50 |
| 25  REPUBLIC NATIONAL - FINTECH 4901 SAVARESE  CIR N TAMPA, FL 33634 | CONTACT: H ALAN ROSENBERG, GEN CNSL PHONE: 813-885-3200 | TRADE PAYABLE | | | | $36,209.91 |
| 26  EGON ZEHNDER INTERNATIONAL INC 350 PARK AVE 8TH FLOOR NEW YORK, NY 10022 | CONTACT: EDILSON CAMARA, CEO PHONE: 212-519-6000 NEWYORK@EGONZEHNDER.COM | TRADE PAYABLE | | | | $35,840.00 |
| 27  MAJOR BRANDS  FINTECH 6701 SOUTHWEST ST. LOUIS, MO 63143 | CONTACT: SCOTT JOHNSON, PRESIDENT PHONE: 314-645-1843 FAX: 314-647-0027 INFO@MAJORBRANDS.COM | TRADE PAYABLE | | | | $34,842.16 |
| 28  NUCO2, LLC 2800 SE MARKET PLACE STUART, FL 34997 | CONTACT: GERALD MILLER, PRESIDENT PHONE: 772-221-1754 FAX: 772-781-3500 | TRADE PAYABLE | | | | $32,386.31 |
| 29  K & L GATES LLP STATE STREET FINANCIAL CENTER 1 LINCOLN ST BOSTON, MA 02111 | CONTACT: MICHAEL S. CACCESE, CHAIRMAN PHONE: 617-261-3100 FAX: 617-261-3175 MICHAEL.CACCESE@KLGATES.COM | TRADE PAYABLE | | | | $30,630.50 |
| 30  WIRTZ BEVERAGE IL - FINTECH 333 SOUTH LARAMIE AVE CICERO, IL 60804 | CONTACT: GREG BAIRD, CEO PHONE: 708-293-333 | TRADE PAYABLE | | | | $30,489.75 |

Fill in this information to identify the case and this filing:

| | |
|---|---|
| Debtor Name | BL Restaurants Holding, LLC |
| United States Bankruptcy Court for the: | District of Delaware |
| | (State) |
| Case number (If known): | |

## Official Form 202

## Declaration Under Penalty of Perjury for Non-Individual Debtors          12/15

An individual who is authorized to act on behalf of a non-individual debtor, such as a corporation or partnership, must sign and submit this form for the schedules of assets and liabilities, any other document that requires a declaration that is not included in the document, and any amendments of those documents. This form must state the individual's position or relationship to the debtor, the identity of the document, and the date. Bankruptcy Rules 1008 and 9011.

WARNING -- Bankruptcy fraud is a serious crime. Making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

### Declaration and signature

I am the president, another officer, or an authorized agent of the corporation; a member or an authorized agent of the partnership; or another individual serving as a representative of the debtor in this case.

I have examined the information in the documents checked below and I have a reasonable belief that the information is true and correct:

☐   *Schedule A/B: Assets-Real and Personal Property (Official Form 206A/B)*

☐   *Schedule D: Creditors Who Have Claims Secured by Property (Official Form 206D)*

☐   *Schedule E/F: Creditors Who Have Unsecured Claims (Official Form 206E/F)*

☐   *Schedule G: Executory Contracts and Unexpired Leases (Official Form 206G)*

☐   *Schedule H: Codebtors (Official Form 206H)*

☐   *Summary of Assets and Liabilities for Non-Individuals (Official Form 206Sum)*

☐   Amended Schedule

☒   *Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders (Official Form 204)*

☒   Other document that requires a declaration_____    Certification of Creditor Matrix_____

I declare under penalty of perjury that the foregoing is true and correct.

Executed on

| | |
|---|---|
| **01/27/2020** | */s/ Howard Meitiner* |
| MM/ DD/YYYY | Signature of individual signing on behalf of debtor |
| | **Howard Meitiner** |
| | Printed name |
| | **Chief Restructuring Officer** |
| | Position or relationship to debtor |

Official Form 202          **Declaration Under Penalty of Perjury for Non-Individual Debtors**

PHIL1 8627045v.1

## BL RESTAURANTS HOLDING, LLC
## AND SUBSIDIARIES

## JOINT WRITTEN CONSENT IN LIEU OF SPECIAL MEETINGS

### January 26, 2020

The undersigned, being (i) the sole managing member (the "Holding Member") of **BL Restaurants Holding, LLC**, a Delaware limited liability company ("Holding"), (ii) the sole managing member (the "Operations Member") of **BL Restaurant Operations, LLC**, a Delaware limited liability company ("Operations"), (iii) the sole managing member (the "Franchises Member") of **BL Restaurant Franchises, LLC**, a Delaware limited liability company ("Franchises"), and (iv) the sole managing member (the "Hunt Member" and collectively with the Holding Member, the Operations Member, and the Franchises Member, the "Members") of **BL Hunt Valley, LLC**, a Maryland limited liability company ("BL Hunt" and collectively with Holding, Operations, and Franchises, the "Companies" and each, a "Company"), in lieu of holding special meetings of the Members, hereby take the following actions and adopt the following resolutions by written consent pursuant to (A) with respect to Holding, that certain Amended and Restated Limited Liability Company Agreement, dated April 26, 2011 and effective December 11, 2009 (the "Holding LLC Agreement"), (B) with respect to Operations, that certain Second Amended and Restated Limited Liability Company Agreement, dated April 26, 2011 and effective December 11, 2009 (the "Operations LLC Agreement"), (C) with respect to Franchises, that certain Second Amended and Restated Limited Liability Company Agreement, dated April 26, 2011 and effective December 11, 2009 (the "Franchises LLC Agreement"), and (D) with respect to BL Hunt, that certain Operating Agreement, dated August 22, 2014 (the "BL Hunt Operating Agreement", and collectively with the Holding LLC Agreement, the Operations LLC Agreement and the Franchises LLC Agreement, the "Operating Agreements"), and Section 18-302(d) of the Delaware Limited Liability Company Act, and Section 4A-403(d) of the Maryland Limited Liability Company Act, as applicable, effective as of the date set forth above:

### Chapter 11 Filing

**WHEREAS**, the Members considered presentations by the management and the financial and legal advisors of the Companies regarding the financial situation of the Companies, the strategic alternatives available to them, and the effect of the foregoing on the Companies' businesses; and

**WHEREAS**, the Members have had the opportunity to consult with the management and the financial and legal advisors of the Companies and fully consider each of the strategic alternatives available to the Companies.

**NOW, THEREFORE, BE IT:**

**RESOLVED**, that in the judgment of the Members, it is desirable and in the best interests of the Companies, their creditors, and other parties in interest, that each of the Companies shall be, and hereby is, authorized to file or cause to be filed a voluntary petition for relief (such voluntary

petitions to be filed by the Companies are collectively referred to herein as the "Chapter 11 Cases") under the provisions of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"); and it is

**FURTHER RESOLVED**, that any duly appointed manager or officer of the Companies, as applicable (collectively, including, but not limited to, the Chief Executive Officer, the Chief Financial Officer, and the Chief Restructuring Officer, the "Authorized Officers"), acting alone or with one or more other Authorized Officers be, and each of them hereby is, authorized, empowered, and directed to execute and file on behalf of the Companies all petitions, schedules, lists, and other motions, objections, replies, applications, papers, or documents, and to take any and all action that they deem necessary or proper to obtain such relief, including, without limitation, any action necessary or proper to maintain the ordinary course operation of the Companies' businesses or to assist the Companies in the Chapter 11 Cases and in carrying out their respective duties under the provisions of the Bankruptcy Code; and it is

### Debtor-In-Possession Financing, Cash Collateral, and Adequate Protection

**RESOLVED**, that each of the Companies will obtain benefits from: (i) the use of collateral, including cash collateral, as that term is defined in section 363(a) of the Bankruptcy Code (the "Cash Collateral"), which is security for certain prepetition secured lenders (collectively, the "Secured Lenders") party to that certain Credit Agreement, among Operations, as borrower, the other credit parties thereto, Antares Capital LP, as agent, and the lenders party thereto from time to time; and (ii) certain debtor-in-possession financing (the "DIP Financing") provided by certain of the Secured Lenders or their affiliates; and it is

**FURTHER RESOLVED**, that to use and obtain the benefits of the Cash Collateral, and in accordance with section 363 of the Bankruptcy Code, the Companies will provide certain adequate protection to the Secured Lenders (the "Adequate Protection Obligations"), as documented in a proposed interim order (the "Interim DIP Order") and submitted for approval to the Bankruptcy Court; and it is

**FURTHER RESOLVED**, that in the business judgment of the Members, it is desirable and in the best interests of the Companies, their respective stakeholders, creditors, and other parties in interest, for Holding, Operations and Franchises to enter into a certain new debtor-in-possession credit agreement, in substantially the form set forth as Exhibit A attached hereto (the "DIP Credit Agreement"); and it is

**FURTHER RESOLVED**, that the form, terms, and provisions of the DIP Credit Agreement (including the borrowing of money, granting of liens on substantially all assets of Holding, Operations and Franchises, and the guaranty of obligations reflected therein), and the form, terms, and provisions of such other agreements, certificates, schedules, and instruments contemplated thereby (including the DIP Credit Agreement, collectively, the "DIP Credit Agreement Documents") be, and hereby are, authorized, adopted, and approved, and each of the Authorized Officers of the Companies be, and hereby is, authorized and empowered, in the name of and on behalf of the Companies, to take such actions and negotiate or cause to be prepared and negotiated and to execute, deliver, perform, and cause the performance of the DIP Credit Agreement Documents, and incur and pay or cause to be paid all fees and expenses and engage

-2-

such persons, in each case, in the form or substantially in the form thereof submitted to the Members, with such changes, additions, and modifications thereto as the Authorized Officers executing the same shall approve, such approval to be conclusively evidenced by such officers' execution and delivery thereof; and it is

**FURTHER RESOLVED**, that the form, terms, and provisions of the Interim DIP Order to which the Companies are or will be subject, and the actions and transactions contemplated thereby be, and hereby are, authorized, adopted, and approved, and each of the Authorized Officers of the Companies be, and hereby are, authorized and empowered, in the name of and on behalf of the Companies, to take such actions and negotiate or cause to be prepared and negotiated and to execute, deliver, perform, and cause the performance of, the Interim DIP Order, and such other agreements, certificates, instruments, receipts, petitions, motions, objections, replies, or other papers or documents to which any of the Companies is or will be a party, including, but not limited to, any term sheet, credit agreement, security and pledge agreement, or guaranty agreement (collectively with the Interim DIP Order and the DIP Credit Agreement Documents, the "DIP Documents"), and incur and pay or cause to be paid all fees and expenses and engage such persons, in each case, in the form or substantially in the form thereof submitted to the Members, with such changes, additions, and modifications thereto as the Authorized Officers executing the same shall approve, such approval to be conclusively evidenced by such officers' execution and delivery thereof; and it is

**FURTHER RESOLVED**, that each Company, as debtor and debtor-in-possession under the Bankruptcy Code be, and hereby is, authorized to incur the Adequate Protection Obligations and certain secured claims pursuant to the DIP Credit Agreement Documents (the "DIP Obligations") and to undertake any and all related transactions on substantially the same terms as contemplated under the DIP Credit Agreement Documents (collectively, the "Adequate Protection Transactions"); and it is

**FURTHER RESOLVED**, that the Authorized Officers of the Companies be, and they hereby are, authorized and directed, and each of them acting alone hereby is, authorized, directed, and empowered in the name of, and on behalf of, the Companies, as debtor and debtor-in-possession, to take such actions as in their discretion is determined to be necessary, desirable, or appropriate and execute the Adequate Protection Transactions, including delivery of: (a) the DIP Documents and such agreements, certificates, instruments, guaranties, notices, and any and all other documents, including, without limitation, any amendments to any DIP Documents (collectively, the "Adequate Protection Documents"); (b) such other instruments, certificates, notices, assignments, and documents as may be reasonably requested by the Agent (as defined in the DIP Credit Agreement); and (c) such forms of deposit account control agreements, officer's certificates, and compliance certificates as may be required by the DIP Documents or any other Adequate Protection Document; and it is

**FURTHER RESOLVED**, that each of the Authorized Officers of the Companies be, and hereby is, authorized, directed, and empowered in the name of, and on behalf of, the Companies to file or to authorize the Agent to file any Uniform Commercial Code (the "UCC") financing statements, any other equivalent filings, any intellectual property filings and recordation and any necessary assignments for security or other documents in the name of the Companies that the Agent deems necessary or appropriate to perfect any lien or security interest granted under the

Interim DIP Order, including any such UCC financing statement containing a generic description of collateral, such as "all assets," "all property now or hereafter acquired" and other similar descriptions of like import, and to execute and deliver, and to record or authorize the recording of, such mortgages and deeds of trust in respect of real property of the Companies and such other filings in respect of intellectual and other property of the Companies, in each case as the Agent may reasonably request to perfect the security interests of the Agent under the DIP Documents; and it is

**FURTHER RESOLVED**, that each of the Authorized Officers of the Companies be, and hereby is, authorized, directed, and empowered in the name of, and on behalf of, the Companies to take all such further actions, including, without limitation, to pay or approve the payment of all fees and expenses payable in connection with the Adequate Protection Transactions and all fees and expenses incurred by or on behalf of the Companies in connection with the foregoing resolutions, in accordance with the terms of the Adequate Protection Documents, which shall in their sole judgment be necessary, proper, or advisable to perform any of the Companies' obligations under or in connection with the Interim DIP Order or any of the other Adequate Protection Documents and the transactions contemplated therein and to fully carry out the intent of the foregoing resolutions; and it is

## Retention Of Professionals

**RESOLVED**, that each of the Authorized Officers be, and hereby is, authorized and directed to employ the law firm of Klehr Harrison Harvey Branzburg LLP, under a classic retainer as general bankruptcy counsel, to represent and assist the Companies in carrying out their duties under the Bankruptcy Code, and to take any and all actions to advance each of the Companies' rights and obligations, including filing any motions, objections, replies, applications, or pleadings; and in connection therewith, each of the Authorized Officers, with power of delegation, is hereby authorized and directed to execute appropriate retention agreements, pay appropriate retainers, and to cause to be filed an appropriate application for authority to retain the services of Klehr Harrison Harvey Branzburg LLP; and it is

**FURTHER RESOLVED**, that each of the Authorized Officers be, and hereby is, authorized and directed to employ the firm of Configure Partners, LLC, as investment banker, to represent and assist the Companies in carrying out their duties under the Bankruptcy Code, and to take any and all actions to advance the Companies' rights and obligations; and in connection therewith, each of the Authorized Officers is, with power of delegation, hereby authorized and directed to execute appropriate retention agreements, pay appropriate retainers, and to cause to be filed an appropriate application for authority to retain the services of Configure Partners, LLC; and it is

**FURTHER RESOLVED**, that each of the Authorized Officers be, and hereby is, authorized and directed to employ the firm of Carl Marks Advisory Group LLC, as restructuring advisor, to provide a Chief Restructuring Officer for the Companies, to provide additional personnel, to provide financial advisory and restructuring-related services to the Companies, and to otherwise represent and assist the Companies in carrying out their duties under the Bankruptcy Code, and to take any and all actions to advance each of the Companies' rights and obligations; and in connection therewith, each of the Authorized Officers is, with power of delegation, hereby

-4-

authorized and directed to execute appropriate retention agreements, pay appropriate retainers, and to cause to be filed an appropriate application for authority to retain the services of Carl Marks Advisory Group LLC; and it is

**FURTHER RESOLVED**, that each of the Authorized Officers be, and hereby is, authorized and directed to employ the firm of Epiq Bankruptcy Solutions, Inc. as notice, claims, and balloting agent to represent and assist the Companies in carrying out their duties under the Bankruptcy Code, and to take any and all actions to advance the Companies' rights and obligations; and in connection therewith, each of the Authorized Officers, with power of delegation, is hereby authorized and directed to execute appropriate retention agreements, pay appropriate retainers, and to cause to be filed an appropriate application for authority to retain the services of Epiq Bankruptcy Solutions, Inc.; and it is

**FURTHER RESOLVED**, that each of the Authorized Officers be, and hereby is, authorized and directed to employ any other professionals to assist the Companies in carrying out their duties under the Bankruptcy Code; and in connection therewith, each of the Authorized Officers, with power of delegation, is hereby authorized and directed to execute appropriate retention agreements, pay appropriate retainers, and to cause to be filed an appropriate application for authority to retain the services of any other professionals as necessary; and it is

**FURTHER RESOLVED**, that each of the Authorized Officers be, and hereby is, with power of delegation, authorized, empowered, and directed to execute and file all petitions, schedules, motions, objections, replies, applications, pleadings, lists, and other papers and, in connection therewith, to employ and retain all assistance by legal counsel, accountants, investment bankers, financial advisors, restructuring advisors, and other professionals and to take and perform any and all further acts and deeds that each of the Authorized Officers deem necessary, proper, or desirable in connection with the Chapter 11 Cases, with a view to the successful prosecution of the cases; and it is

### Sale of Assets

**FURTHER RESOLVED**, the Members have determined that it is advisable and in the best interest of the Companies, as sellers, to enter into an Asset Purchase Agreement with BLH Acquisition Co., LLC, a Delaware limited liability company (the "Purchaser"), in substantially the form attached hereto as Exhibit B (the "Purchase Agreement"); and it is

**FURTHER RESOLVED**, that the form and terms of the Purchase Agreement are hereby approved, adopted and ratified in all respects; that subject to the Sales Procedures referenced below, the Companies are hereby authorized to execute, deliver and perform such Purchase Agreement and to consummate the transactions contemplated thereby; and that each of the Authorized Officers is hereby authorized and directed to execute and deliver, in the name and on behalf of the Companies, the Purchase Agreement, in substantially the form hereby approved, with such changes as any Authorized Officer shall approve on behalf of the Companies, such approval to be conclusively established by the execution and delivery thereof; and it is

**FURTHER RESOLVED**, that the form and terms of (i) the Sales Procedures, (ii) the Procedures Order, (iii) the Bill of Sale, (iv) the Sale Order, (v) the Assignment and Assumption

-5-

Agreement, (vi) the Recordable Trademark Assignment, (vii) the Recordable Copyright Assignment, (viii) the Escrow Agreement, (ix) the Assignment and Assumption of Leases and Related Agreements, and (x) the Domain Name Assignment (collectively, the "Purchase Agreement Ancillary Documents") with respect to the Purchase Agreement, substantially in the forms presented to the Members, are hereby approved, adopted and ratified in all respects; that the Companies are hereby authorized to execute, deliver and perform such Purchase Ancillary Documents and to consummate the transactions contemplated thereby; and that each Authorized Officer is hereby authorized and directed to execute and deliver, in the name and on behalf of the Companies, such Purchase Agreement Ancillary Documents in substantially the forms hereby approved, with such changes as any Authorized Officer shall approve on behalf of the Companies, such approval to be conclusively established by the execution and delivery thereof; and it is

**FURTHER RESOLVED**, that the form and terms of any and all other documents to be delivered by the Companies to the Purchaser in connection with the consummation of the transactions contemplated by the Purchase Agreements, including all exhibits and schedules thereto (the "Supplemental Documents") in the forms approved by any Authorized Officer after the date hereby, are hereby approved, adopted and ratified in all respects; that the Companies are hereby authorized to execute, deliver and perform such Supplemental Documents and to consummate the transactions contemplated thereby; and that each Authorized Officer is hereby authorized and directed to execute and deliver, in the name and on behalf of the Companies, such Supplemental Documents in substantially the forms hereby approved, with such changes as any Authorized Officer shall approve on behalf of the Companies, such approval to be conclusively established by the execution and delivery thereof; and it is

### General

**RESOLVED**, that in addition to the specific authorizations heretofore conferred upon the Authorized Officers, each of the Authorized Officers (and their designees and delegates) be, and hereby is, authorized and empowered, in the name of and on behalf of the Companies, to take or cause to be taken any and all such other and further action, and to execute, acknowledge, deliver, and file any and all such agreements, certificates, instruments, and other documents and to pay all expenses, including but not limited to filing fees, in the case as in such officer's or officers' judgment, shall be necessary, advisable, or desirable in order to fully carry out the intent and accomplish the purposes of the resolutions adopted herein; and it is

**FURTHER RESOLVED**, that each of the Members have received sufficient notice of the actions and transactions relating to the matters contemplated by the foregoing resolutions, as may be required by the organizational documents of the Companies, or hereby waives any right to have received such notice; and it is

**FURTHER RESOLVED**, that all acts, actions, and transactions relating to the matters contemplated by the foregoing resolutions done in the name of and on behalf of the Companies, which acts would have been approved by the foregoing resolutions except that such acts were taken before the adoption of these resolutions, are hereby in all respects approved and ratified as the true acts and deeds of the Companies with the same force and effect as if each such act, transaction, agreement, or certificate has been specifically authorized in advance by resolution of the Members; and it is

**FURTHER RESOLVED**, that facsimile, PDF or photostatic copies of signatures to this consent shall be deemed to be originals and may be relied on to the same extent as the originals; and it is

**FURTHER RESOLVED**, the actions taken by this Joint Written Consent In Lieu Of Special Meetings shall have the same force and effect as if taken at a special meeting of the Members duly called and constituted pursuant to the Operating Agreements of the Companies and the laws of the State of Delaware or the State of Maryland, as applicable.

[SIGNATURES FOLLOW]

PHIL1 8600289v.12

IN WITNESS WHEREOF, the undersigned has executed this Joint Written Consent In Lieu Of Special Meetings effective as of the day and year first written above.

BL RESTAURANTS GROUP HOLDING CORP.,
a Delaware corporation

By: _____
    Name:  Thomas S. Fricke
    Title:  Chief Executive Officer


*Constituting the sole Managing Member of BL Restaurants Holding, LLC*


BL RESTAURANTS HOLDING, LLC,
a Delaware limited liability company

By: _____
    Name: Thomas S. Fricke
    Title: Chief Executive Officer


*Constituting the sole Managing Member of BL Restaurant Operations, LLC*


BL RESTAURANT OPERATIONS, LLC,
a Delaware limited liability company

By: _____
    Name: Thomas S. Fricke
    Title: Chief Executive Officer


*Constituting the sole Managing Member of BL Restaurant Franchises, LLC*

BL RESTAURANT OPERATIONS, LLC,
a Delaware limited liability company

By: _____
        Name: Thomas S. Fricke
        Title: Chief Executive Officer

*Constituting the sole Managing Member of BL
Hunt Valley, LLC*

## Exhibit A

### Form of DIP Credit Agreement

See attached.

**SENIOR SECURED PRIMING AND SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT**

**Dated as of January 27, 2020**

**by and among**

**BL RESTAURANT OPERATIONS, LLC,**

**as Debtor, Debtor-in-Possession and the Borrower,**

**THE OTHER PERSONS PARTY HERETO THAT ARE DESIGNATED AS CREDIT PARTIES,**
**as Debtors and Debtors-in-Possession,**

**ANTARES CAPITAL LP**
**as Agent for all Lenders,**

**THE OTHER FINANCIAL INSTITUTIONS PARTY HERETO**

**as Lenders,**

**and**

**ANTARES CAPITAL LP,**
**as Sole Lead Arranger and Bookrunner**

# TABLE OF CONTENTS

ARTICLE I THE CREDITS ............................................................................................2
    1.1    Amounts and Terms of Commitments ..................................................2
    1.2    Prior Letters of Credit .........................................................................6
    1.3    Rollup .................................................................................................10
    1.4    Evidence of Loans; Notes ..................................................................11
    1.5    Interest ...............................................................................................11
    1.6    Loan Accounts ...................................................................................12
    1.7    Procedure for DIP Revolving Credit Borrowing ...............................13
    1.8    Conversion and Continuation Elections..............................................13
    1.9    Optional Prepayments and Reductions in DIP Revolving Loan Commitments ....14
    1.10    Mandatory Prepayments of Loans .....................................................15
    1.11    Fees ....................................................................................................16
    1.12    Payments by the Borrower..................................................................18
    1.13    Payments by the Lenders to Agent; Settlement .................................20
    1.14    Grant of Lien; Super Priority Nature of Obligations and Lenders' Liens ............25
    1.15    Guaranty.............................................................................................26
    1.16    Contribution ......................................................................................26
    1.17    Authorization; Other Agreement .......................................................26
    1.18    Guaranty Absolute and Unconditional...............................................27
    1.19    Waivers ..............................................................................................28
    1.20    Reliance..............................................................................................28

ARTICLE II CONDITIONS PRECEDENT ...............................................................28
    2.1    Conditions of Initial Loans ................................................................28
    2.2    Conditions to All Borrowings ............................................................30

ARTICLE III REPRESENTATIONS AND WARRANTIES .....................................31
    3.1    Corporate Existence and Power .........................................................31
    3.2    Corporate Authorization; No Contravention .....................................32
    3.3    Governmental Authorization ..............................................................32
    3.4    Binding Effect....................................................................................32
    3.5    Litigation............................................................................................32
    3.6    No Default...........................................................................................33
    3.7    ERISA Compliance............................................................................33
    3.8    Use of Proceeds; Margin Regulations................................................33
    3.9    Ownership of Property; Liens ............................................................33
    3.10    Taxes ..................................................................................................34
    3.11    Financial Condition............................................................................34
    3.12    Environmental Matters.......................................................................35
    3.13    Regulated Entities ..............................................................................36
    3.14    [Intentionally Omitted] ......................................................................36
    3.15    Labor Relations ..................................................................................36
    3.16    Intellectual Property...........................................................................36
    3.17    Brokers' Fees; Transaction Fees ........................................................36

US-DOCS\112887106.9

3.18    Insurance ...................................................................................................36
3.19    Ventures, Subsidiaries and Affiliates; Outstanding Stock .........................37
3.20    Jurisdiction of Organization; Chief Executive Office ...............................37
3.21    Deposit Accounts and Other Accounts .....................................................37
3.22    Bonding......................................................................................................37
3.23    Status of Holdings......................................................................................37
3.24    Subordinated Debt .....................................................................................37
3.25    Full Disclosure ..........................................................................................38
3.26    Foreign Assets Control Regulations and Anti-Money Laundering ...........38
3.27    Patriot Act ..................................................................................................38
3.28    Bankruptcy Matters ...................................................................................38

ARTICLE IV AFFIRMATIVE COVENANTS ..........................................................39
4.1    Financial Statements..................................................................................39
4.2    Certificates; Other Information ..................................................................40
4.3    Notices .......................................................................................................42
4.4    Preservation of Corporate Existence, Etc. ................................................44
4.5    Maintenance of Property............................................................................44
4.6    Insurance ....................................................................................................44
4.7    Payment of Obligations..............................................................................45
4.8    Compliance with Laws ..............................................................................46
4.9    Inspection of Property and Books and Records.........................................46
4.10    Use of Proceeds..........................................................................................46
4.11    [Intentionally Omitted] ..............................................................................46
4.12    [Intentionally Omitted] ..............................................................................46
4.13    Further Assurances.....................................................................................46
4.14    Environmental Matters...............................................................................47
4.15    [Intentionally Omitted] ..............................................................................47
4.16    [Intentionally Omitted] ..............................................................................48
4.17    Bankruptcy Court Filings ..........................................................................48
4.18    Bankruptcy Covenants...............................................................................48
4.19    Chapter 11 Cases........................................................................................48
4.20    Sales Process Timeline ..............................................................................48
4.21    Other Sale-Related Matters........................................................................49

ARTICLE V NEGATIVE COVENANTS ..................................................................49
5.1    Limitation on Liens....................................................................................49
5.2    Disposition of Assets .................................................................................51
5.3    Consolidations and Mergers ......................................................................52
5.4    Loans and Investments...............................................................................52
5.5    Limitation on Indebtedness........................................................................53
5.6    Transactions with Affiliates.......................................................................54
5.7    Management Fees and Compensation ........................................................55
5.8    Use of Proceeds..........................................................................................55
5.9    Contingent Obligations..............................................................................55
5.10    Compliance with ERISA............................................................................56
5.11    Restricted Payments...................................................................................56

ii

5.12    Change in Business ................................................................................56
5.13    Change in Structure ...............................................................................56
5.14    Changes in Accounting, Name and Jurisdiction of Organization ..........56
5.15    Amendments to Subordinated Indebtedness .........................................57
5.16    No Negative Pledges ..............................................................................57
5.17    OFAC; Patriot Act .................................................................................58
5.18    Sale-Leasebacks .....................................................................................58
5.19    Hazardous Materials ..............................................................................58
5.20    [Intentionally Omitted] ..........................................................................58
5.21    New Restaurants .....................................................................................58
5.22    KEIP Plan ...............................................................................................58
5.23    Chapter 11 Claims ..................................................................................58
5.24    The DIP Orders .......................................................................................58
5.25    Critical Vendor and Other Payments ....................................................58

ARTICLE VI FINANCIAL  COVENANTS AND BUDGET COMPLIANCE ...........................59
6.1    Approved Budget Compliance .................................................................59

ARTICLE VII EVENTS OF DEFAULT ...............................................................................59
7.1    Event of Default ......................................................................................59
7.2    Remedies .................................................................................................64
7.3    Rights Not Exclusive ..............................................................................65
7.4    Cash Collateral for Letters of Credit ......................................................65

ARTICLE VIII AGENT ..........................................................................................................66
8.1    Appointment and Duties .........................................................................66
8.2    Binding Effect .........................................................................................67
8.3    Use of Discretion ....................................................................................67
8.4    Delegation of Rights and Duties .............................................................68
8.5    Reliance and Liability .............................................................................68
8.6    Agent Individually ..................................................................................69
8.7    Lender Credit Decision ...........................................................................70
8.8    Expenses; Indemnities; Withholding ......................................................70
8.9    Resignation of Agent or L/C Issuer ........................................................72
8.10    Release of Collateral or Guarantors ......................................................72
8.11    Additional Secured Parties .....................................................................73

ARTICLE IX MISCELLANEOUS .........................................................................................74
9.1    Amendments and Waivers .......................................................................74
9.2    Notices ....................................................................................................75
9.3    Electronic Transmissions ........................................................................76
9.4    No Waiver; Cumulative Remedies ..........................................................77
9.5    Costs and Expenses ................................................................................78
9.6    Indemnity ................................................................................................78
9.7    Marshaling; Payments Set Aside ............................................................79
9.8    Successors and Assigns ...........................................................................80
9.9    Assignments and Participations; Binding Effect ....................................80

iii

9.10    Non-Public Information; Confidentiality................................................83
9.11    Set-off; Sharing of Payments..............................................................85
9.12    Counterparts; Facsimile Signature......................................................86
9.13    Severability..........................................................................................86
9.14    Captions...............................................................................................87
9.15    Independence of Provisions................................................................87
9.16    Interpretation.......................................................................................87
9.17    No Third Parties Benefited..................................................................87
9.18    Governing Law and Jurisdiction.........................................................87
9.19    Waiver of Jury Trial............................................................................88
9.20    Entire Agreement; Release; Survival...................................................88
9.21    Patriot Act............................................................................................89
9.22    Replacement of Lender........................................................................89
9.23    Joint and Several..................................................................................90
9.24    Creditor-Debtor Relationship..............................................................90
9.25    Keepwell...............................................................................................90
9.26    Parties Including Trustees; Bankruptcy Court Proceedings ................90
9.27    Inconsistency........................................................................................91
9.28    Pre-Petition Lender Consent................................................................91
9.29    Lender Consent to Credit Bid..............................................................91

ARTICLE X TAXES, YIELD PROTECTION AND ILLEGALITY ...........................91
10.1    Taxes.....................................................................................................91
10.2    Illegality...............................................................................................94
10.3    Increased Costs and Reduction of Return............................................95
10.4    Funding Losses.....................................................................................96
10.5    Inability to Determine Rates................................................................97
10.6    Reserves on LIBOR Rate Loans..........................................................98
10.7    Certificates of Lenders.........................................................................98

ARTICLE XI DEFINITIONS...................................................................................99
11.1    Defined Terms......................................................................................99
11.2    Other Interpretive Provisions.............................................................124
11.3    Accounting Terms and Principles.......................................................125
11.4    Payments.............................................................................................126

iv

# SCHEDULES

Schedule 1.1(b)        DIP Revolving Loan Commitments
Schedule 1.2           Prior Letters of Credit
Schedule 3.5           Litigation
Schedule 3.7           ERISA
Schedule 3.8           Margin Stock
Schedule 3.9           Real Estate
Schedule 3.10          Taxes
Schedule 3.12          Environmental
Schedule 3.15          Labor Relations
Schedule 3.17          Brokers' and Transaction Fees
Schedule 3.19          Ventures, Subsidiaries and Affiliates; Outstanding Stock
Schedule 3.20          Jurisdiction of Organization; Chief Executive Office
Schedule 3.21          Deposit Accounts and Other Accounts
Schedule 3.22          Bonding
Schedule 5.1           Liens
Schedule 5.4           Investments
Schedule 5.5           Indebtedness
Schedule 5.9           Contingent Obligations
Schedule 11.1(b)       Fiscal Periods
Schedule 11.1(c)       Fiscal Quarters
Schedule 11.1(d)       Fiscal Years

# EXHIBITS

Exhibit 1.1(c)         Form of L/C Request
Exhibit 1.2(b)         Notice of Issuance
Exhibit 1.8            Form of Notice of Conversion/Continuation
Exhibit 2.1            Closing Checklist
Exhibit 4.2(b)         Form of Compliance Certificate
Exhibit 11.1(a)        Form of Assignment
Exhibit 11.1(b)        Form of Availability Certificate
Exhibit 11.1(c)        Form of Notice of Borrowing
Exhibit 11.1(d)        Form of DIP Revolving Note
Exhibit 11.1(g)        Interim Order

# ANNEXES

Annex A                Franchise Seller Notes

## SENIOR SECURED PRIMING AND SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT

This SENIOR SECURED PRIMING AND SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT (including all exhibits and schedules hereto, as the same may be amended, modified and/or restated from time to time, this "**Agreement**") is entered into as of January 27, 2020, by and among BL Restaurant Operations, LLC, a Delaware limited liability company, as debtor and debtor-in-possession (the "**Borrower**"), the other Persons party hereto that are designated as a "Credit Party", as debtors and debtors-in-possession, Antares Capital LP (in its individual capacity, "**Antares**"), as Agent for the several financial institutions from time to time party to this Agreement (including any financial institution party to this Agreement as a "Pre-Petition Lender", collectively, the "**Lenders**" and individually each a "**Lender**") and for itself as a Lender and such Lenders.

W I T N E S S E T H :

WHEREAS, on January 27, 2020 ("**Petition Date**"), the Credit Parties filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code with the Bankruptcy Court;

WHEREAS, from and after the Petition Date, the Credit Parties are continuing to operate their business and manage their properties as debtors in possession under Sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, the Credit Parties have requested, and the Lenders have agreed to make available to the Borrower, a $22,000,000 DIP revolving credit facility (including a letter of credit subfacility for letters of credit issued from and after the Closing Date) subject to the terms and conditions set forth in this Agreement, the proceeds of which facility and subfacility will be used in accordance with Section 4.10 hereof; provided that until the Final Order shall have been entered by the Bankruptcy Court, no loans, advances or letters of credit under the DIP revolving credit facility shall be made or issued, other than DIP revolving credit loans and letters of credit in an aggregate principal amount or face amount, as applicable, not to exceed the amount permitted by the Interim Order;

WHEREAS, the Borrower, the Persons named therein as credit parties, Antares, as agent, and the financial institutions party thereto as lenders are parties to that certain Credit Agreement dated as of March 27, 2014 (as amended or otherwise modified on or prior to the Petition Date, the "**Pre-Petition Credit Agreement**");

WHEREAS, the Borrower desires to secure all of its Obligations under the Loan Documents by granting to Agent, for the benefit of the Secured Parties, a security interest in and lien upon substantially all of its Property, as provided herein and in the DIP Orders;

WHEREAS, BL Restaurants Holding, LLC, a Delaware limited liability company that directly owns all of the Stock and Stock Equivalents of the Borrower ("**Holdings**"), is willing to guaranty all of the Obligations and to pledge to Agent, for the benefit of the Secured Parties, all

1

of the Stock and Stock Equivalents of the Borrower and substantially all of its other Property to secure the Obligations, as provided herein and in the DIP Orders;  and

WHEREAS, subject to the terms hereof, each Subsidiary of Holdings (other than the Borrower) is willing to guaranty all of the Obligations of the Borrower and to grant to Agent, for the benefit of the Secured Parties, a security interest in and lien upon substantially all of its Property, as provided herein and in the DIP Orders.

NOW, THEREFORE, in consideration of the mutual agreements, provisions and covenants contained herein, the parties hereto agree as follows:

ARTICLE I

THE CREDITS

1.1     <u>Amounts and Terms of Commitments</u>.

(a)     [Intentionally Omitted].

(b)     <u>The DIP Revolving Loans</u>.  Subject to the terms and conditions of this Agreement and in reliance upon the representations and warranties of the Credit Parties contained herein, each DIP Revolving Lender severally and not jointly agrees to make Loans to the Borrower (each such Loan, a "**DIP Revolving Loan**") from time to time on any Business Day during the period from the Closing Date through the Final Availability Date, in an aggregate amount not to exceed at any time outstanding the amount set forth opposite such Lender's name in <u>Schedule 1.1(b)</u> under the heading "DIP Revolving Loan Commitments" (such amount as the same may be reduced or increased from time to time in accordance with this Agreement, being referred to herein as such Lender's "**DIP Revolving Loan Commitment**"); provided, however, that, after giving effect to any Borrowing of DIP Revolving Loans, the aggregate principal amount of all outstanding DIP Revolving Loans shall not exceed the Maximum DIP Revolving Loan Balance; provided, further, that the Borrower shall not request any DIP Revolving Loan unless the Borrower has reasonably determined that the sum of (i) the principal amount of the DIP Revolving Loan being requested, plus (ii) the cash that the Credit Parties then have on hand as reflected on the books and records of the Credit Parties, plus (iii) the cash receipts that the Credit Parties reasonably expect to receive during the next five (5) Business Day period, does not exceed the sum of (i) the cash disbursements that the Credit Parties reasonably expect to make during the next five (5) Business Day period plus (ii) $500,000.  Subject to the other terms and conditions hereof, amounts borrowed under this Section 1.1(b) may be repaid and reborrowed from time to time.  The "**Maximum DIP Revolving Loan Balance**" from time to time will be (i) at any time prior to the effectiveness of the Final Order, the lesser of (a) the Aggregate DIP Revolving Loan Commitment then in effect and (b) $8,000,000, in each case <u>less</u> the sum of the aggregate amount of DIP Letter of Credit Obligations <u>less</u> Reserves, and (ii) from and after the effectiveness of the Final Order, the Aggregate DIP Revolving Loan Commitment then in effect <u>less</u> the sum of the aggregate amount of DIP Letter of Credit Obligations <u>less</u> Reserves.  If at any time the then outstanding principal balance of DIP

2

Revolving Loans exceeds the Maximum DIP Revolving Loan Balance, then the Borrower shall immediately prepay outstanding DIP Revolving Loans in an amount sufficient to eliminate such excess.

      (c)    <u>DIP Letters of Credit</u>.

          (i)    <u>Conditions</u>.  On the terms and subject to the conditions contained herein, the Borrower may request that one or more L/C Issuers Issue, in accordance with such L/C Issuers' usual and customary business practices, and for the account of any Credit Party, DIP Letters of Credit (denominated in Dollars) from time to time on any Business Day during the period from the Closing Date through the Final Availability Date; provided, however, that no L/C Issuer shall Issue any DIP Letter of Credit upon the occurrence of any of the following or, if after giving effect to such Issuance:

              (A)    (i) Availability would be less than zero, or (ii) the Letter of Credit Obligations for all DIP Letters of Credit would exceed $500,000 (the "**L/C Sublimit**");

              (B)    the expiration date of such DIP Letter of Credit (i) is not a Business Day, (ii) is more than one year after the date of Issuance thereof or (iii) is later than seven (7) days prior to the date specified in clause (a) of the definition of DIP Revolving Termination Date; provided, however, that any DIP Letter of Credit with a term not exceeding one year may provide for its renewal for additional periods not exceeding one year as long as (x) each of the Borrower and such L/C Issuer have the option to prevent such renewal before the expiration of such term or any such period and (y) neither such L/C Issuer nor the Borrower shall permit any such renewal to extend such expiration date beyond the date set forth in clause (iii) above; or

              (C)    (i) any fee due in connection with, and on or prior to, such Issuance has not been paid, (ii) such DIP Letter of Credit is requested to be Issued in a form that is not reasonably acceptable to such L/C Issuer or (iii) such L/C Issuer shall not have received, each in form and substance reasonably acceptable to it and duly executed by the Borrower on behalf of the Credit Parties, the documents that such L/C Issuer generally uses in the Ordinary Course of Business for the Issuance of letters of credit of the type of such DIP Letter of Credit (collectively, the "**L/C Reimbursement Agreement**").

Furthermore, Antares as an L/C Issuer may elect only to Issue DIP Letters of Credit in its own name and may only Issue DIP Letters of Credit to the extent permitted by Requirements of Law, and such DIP Letters of Credit may not be accepted by certain beneficiaries such as insurance companies.  For each Issuance, the applicable L/C Issuer may, but shall not be required to, determine that, or take notice whether, the conditions precedent set forth in Section 2.2 have

been satisfied or waived in connection with the Issuance of any DIP Letter of Credit; provided, however, that no DIP Letters of Credit shall be Issued during the period starting on the first Business Day after the receipt by such L/C Issuer of notice from Agent or the Required DIP Revolving Lenders that any condition precedent contained in Section 2.2 is not satisfied and ending on the date all such conditions are satisfied or duly waived.

Notwithstanding anything else to the contrary herein, if any Lender is a Non-Funding Lender or Impacted Lender, no L/C Issuer shall be obligated to Issue any DIP Letter of Credit unless (w) the Non-Funding Lender or Impacted Lender has been replaced in accordance with Section 9.9 or 9.22, (x) the DIP Letter of Credit Obligations of such Non-Funding Lender or Impacted Lender have been cash collateralized, (y) the DIP Revolving Loan Commitments of the other Lenders have been increased by an amount sufficient to satisfy Agent that all future DIP Letter of Credit Obligations will be covered by all DIP Revolving Lenders that are not Non-Funding Lenders or Impacted Lenders, or (z) the DIP Letter of Credit Obligations of such Non-Funding Lender or Impacted Lender have been reallocated to other DIP Revolving Lenders in a manner consistent with Section 1.13(e)(iii).

(ii)     Notice of Issuance.  The Borrower shall give the relevant L/C Issuer and Agent a notice of any requested Issuance of any DIP Letter of Credit, which shall be effective only if received by such L/C Issuer and Agent not later than 2:00 p.m. on the third Business Day prior to the date of such requested Issuance.  Such notice shall be made in a writing or Electronic Transmission substantially in the form of Exhibit 1.1(c) duly completed or in any other written form acceptable to such L/C Issuer (an "**L/C Request**").

(iii)     Reporting Obligations of L/C Issuers.  Each L/C Issuer agrees to provide Agent, in form and substance reasonably satisfactory to Agent, each of the following on the following dates: (A) (i) on or prior to any Issuance of any DIP Letter of Credit by such L/C Issuer, (ii) immediately after any drawing under any such DIP Letter of Credit or (iii) immediately after any payment (or failure to pay when due) by the Borrower of any related DIP L/C Reimbursement Obligation, notice thereof, which shall contain a reasonably detailed description of such Issuance, drawing or payment and Agent shall provide copies of such notices to each DIP Revolving Lender reasonably promptly after receipt thereof; (B) upon the request of Agent (or any DIP Revolving Lender through Agent), copies of any DIP Letter of Credit Issued by such L/C Issuer and any related L/C Reimbursement Agreement and such other documents and information as may reasonably be requested by Agent; and (C) on the first Business Day of each calendar week, a schedule of the DIP Letters of Credit Issued by such L/C Issuer, in form and substance reasonably satisfactory to Agent, setting forth the DIP Letter of Credit Obligations for such DIP Letters of Credit outstanding on the last Business Day of the previous calendar week.

4

(iv)     Acquisition of Participations.  Upon any Issuance of a DIP Letter of Credit in accordance with the terms of this Agreement resulting in any increase in the DIP Letter of Credit Obligations, each DIP Revolving Lender shall be deemed to have acquired, without recourse or warranty, an undivided interest and participation in such DIP Letter of Credit and the related DIP Letter of Credit Obligations in an amount equal to its Commitment Percentage of such DIP Letter of Credit Obligations.

(v)     Reimbursement Obligations of the Borrower.   The Borrower agrees to pay to the L/C Issuer of any DIP Letter of Credit, or to Agent for the benefit of such L/C Issuer, each DIP L/C Reimbursement Obligation owing with respect to such DIP Letter of Credit no later than the first Business Day after the Borrower receives notice from such L/C Issuer or from Agent that payment has been made under such DIP Letter of Credit or that such DIP L/C Reimbursement Obligation is otherwise due (the "**DIP L/C Reimbursement Date**") with interest thereon computed as set forth in clause (A) below.  In the event that any DIP L/C Reimbursement Obligation is not repaid by the Borrower as provided in this clause (v) (or any such payment by the Borrower is rescinded or set aside for any reason), such L/C Issuer shall promptly notify Agent of such failure (and, upon receipt of such notice, Agent shall notify each DIP Revolving Lender) and, irrespective of whether such notice is given, such DIP L/C Reimbursement Obligation shall be payable on demand by the Borrower with interest thereon computed (A) from the date on which such DIP L/C Reimbursement Obligation arose to the DIP L/C Reimbursement Date, at the interest rate applicable during such period to DIP Revolving Loans that are Base Rate Loans and (B) thereafter until payment in full, at the interest rate specified in Section 1.5(c) to past due DIP Revolving Loans that are Base Rate Loans (regardless of whether or not an election is made under such Section).

(vi)     Reimbursement Obligations of the DIP Revolving Credit Lenders.

(1)     Upon receipt of the notice described in the second sentence of clause (v) above from Agent, each DIP Revolving Lender shall pay to Agent for the account of such L/C Issuer its Commitment Percentage of such DIP Letter of Credit Obligations (as such amount may be increased pursuant to Section 1.13(e)(iii)).

(2)     By making any payment described in clause (vi)(1) above, such Lender shall be deemed to have made a DIP Revolving Loan to the Borrower, which, upon receipt thereof by Agent for the benefit of such L/C Issuer, the Borrower shall be deemed to have used in whole to repay such DIP L/C Reimbursement Obligation.  Any such payment that is not deemed a DIP Revolving Loan shall be deemed a funding by such Lender of its participation in the applicable DIP Letter of Credit and the DIP Letter of Credit Obligation in respect of the related DIP L/C Reimbursement Obligations.  Such participation shall not otherwise be required to be funded.  Following receipt by any L/C Issuer of any

5

payment from any Lender pursuant to this clause (vi) with respect to any portion of any DIP L/C Reimbursement Obligation, such L/C Issuer shall promptly pay to Agent, for the benefit of such Lender, all amounts received by such L/C Issuer (or to the extent such amounts shall have been received by Agent for the benefit of such L/C Issuer, Agent shall promptly pay to such Lender all amounts received by Agent for the benefit of such L/C Issuer) with respect to such portion.

(vii)    <u>Obligations Absolute</u>.  The obligations of the Borrower and the DIP Revolving Lenders pursuant to clauses (iv), (v) and (vi) above shall be absolute, unconditional and irrevocable and performed strictly in accordance with the terms of this Agreement irrespective of (A) (i) the invalidity or unenforceability of any term or provision in any DIP Letter of Credit, any document transferring or purporting to transfer a DIP Letter of Credit, any Loan Document (including the sufficiency of any such instrument), or any modification to any provision of any of the foregoing, (ii) any document presented under a DIP Letter of Credit being forged, fraudulent, invalid, insufficient or inaccurate in any respect or failing to comply with the terms of such DIP Letter of Credit or (iii) any loss or delay, including in the transmission of any document, (B) the existence of any setoff, claim, abatement, recoupment, defense or other right that any Person (including any Credit Party) may have against the beneficiary of any DIP Letter of Credit or any other Person, whether in connection with any Loan Document or any other Contractual Obligation or transaction, or the existence of any other withholding, abatement or reduction, (C) in the case of the obligations of any DIP Revolving Lender, (i) the failure of any condition precedent set forth in Section 2.2 to be satisfied (each of which conditions precedent the DIP Revolving Lenders hereby irrevocably waive) or (ii) any adverse change in the condition (financial or otherwise) of any Credit Party and (D) any other act or omission to act or delay of any kind of Agent, any Lender or any other Person or any other event or circumstance whatsoever, whether or not similar to any of the foregoing, that might, but for the provisions of this clause (vii), constitute a legal or equitable discharge of any obligation of the Borrower or any DIP Revolving Lender hereunder.  No provision hereof shall be deemed to waive or limit the Borrower's right to seek repayment of any payment of any DIP L/C Reimbursement Obligations from the L/C Issuer under the terms of the applicable L/C Reimbursement Agreement or applicable law.

1.2    <u>Prior Letters of Credit</u>.  Schedule 1.2 contains a schedule describing the letters of credit Issued prior to the Closing Date pursuant to the Pre-Petition Credit Agreement  (the "**Prior Letters of Credit**").  Effective upon the effectiveness of this Agreement and the Final Order, without any further action by any party to this Credit Agreement, the Bankruptcy Court or any other Person, to the extent set forth in the Final Order, (i) each Prior Letter of Credit shall automatically and without further action be deemed to have been issued pursuant to this Section 1.2 for the account of the applicable Credit Party and subject to the provisions hereof and the DIP Orders and, for this purpose, the fees applicable to Prior Letters of Credit specified in this Section 1.2 and Section 1.11(c) shall be payable (in substitution for any fees set forth in the original letter of credit reimbursement agreement or application relating to the Prior Letters of

Credit) pursuant to the terms of this Agreement, (ii) Antares shall be deemed to be the L/C Issuer of each such letter of credit, (iii) the face amount of such letter of credit shall be included in the calculation of Prior Letter of Credit Obligations, (iv) all advances by L/C Issuers with respect to Prior Letters of Credit shall constitute Prior L/C Loans and (v) all liabilities of the Credit Parties with respect to the Prior Letters of Credit shall constitute Obligations.  The sum of the interests and participations in Prior LIFO Letters of Credit and Prior LIFO Letter of Credit Obligations held by each Prior Revolving Lender under the Pre-Petition Credit Agreement is set forth on Schedule 1.2 hereto (such amount, as the same may be reduced or increased from time to time in accordance with this Agreement, being referred to herein as such Prior Revolving Lender's "**Prior LIFO L/C Loan Commitment**").  The sum of the interests and participations in Prior Original Letters of Credit and Prior Original Letter of Credit Obligations held by each Prior Revolving Lender under the Pre-Petition Credit Agreement is set forth on Schedule 1.2 hereto (such amount, as the same may be reduced or increased from time to time in accordance with this Agreement, being referred to herein as such Prior Revolving Lender's "**Prior Original L/C Loan Commitment**").

(a)    On the terms and subject to the conditions contained herein, the Borrower may request that one or more L/C Issuers renew or extend, in accordance with such L/C Issuers' usual and customary business practices, and for the account of the Credit Parties, Prior Letters of Credit (denominated in Dollars) from time to time on any Business Day during the period from the Closing Date through the Final Availability Date; provided, however, that no L/C Issuer shall renew or extend any Prior Letter of Credit upon the occurrence of any of the following or, if after giving effect to such renewal or extension:

(i)    the expiration date of such Prior Letter of Credit (A) is not a Business Day, (B) is more than one year after the Issuance thereof or (C) is later than seven (7) days prior to the date specified in clause (a) of the definition of DIP Revolving Termination Date; provided, however, that any Prior Letter of Credit with a term not exceeding one year may provide for its renewal for additional periods not exceeding one year as long as (x) the applicable Credit Party and such L/C Issuer have the option to prevent such renewal before the expiration of such term or any such period and (y) neither such L/C Issuer nor any Credit Party shall permit any such renewal to extend such expiration date beyond the date set forth in clause (C) above; or

(ii)    any fee due in connection with, and on or prior to, such renewal or extension has not been paid.

All Letters of Credit Issued pursuant to this Agreement after the Closing Date (other than the Issuance of a Prior Letter of Credit which is a renewal or extension of any Prior Letters of Credit) shall be DIP Letters of Credit.  All Letters of Credit Issued prior to the Closing Date shall be Prior Letters of Credit, all Letters of Credit Issued after the Closing Date which are renewals or extensions of any Prior LIFO Letters of Credit shall be Prior LIFO Letters of Credit and all Letters of Credit Issued after the Closing Date which are renewals or extensions of any Prior Original Letters of Credit shall be Prior Original Letters of Credit.  Furthermore, Antares as a L/C Issuer may elect only to renew or extend Prior Letters of Credit in its own name and may only renew or extend Prior

Letters of Credit to the extent permitted by Requirements of Law, and such Prior Letters of Credit may not be accepted by certain beneficiaries such as insurance companies.

(b)     Notice of Issuance.  The Borrower shall give the relevant L/C Issuer and Agent a notice of any requested renewal or extension of any Prior Letter of Credit, which shall be effective only if received by such L/C Issuer and Agent not later than 2:00 p.m. on the third Business Day prior to the date of such requested renewal or extension.  Such notice shall be made in a writing or Electronic Transmission substantially in the form of Exhibit 1.2(b) duly completed or in any other written form acceptable to such L/C Issuer (a "**Prior L/C Request**").

(c)     Reporting Obligations of L/C Issuers.  Each L/C Issuer agrees to provide Agent, in form and substance reasonably satisfactory to Agent, each of the following on the following dates: (A) (i) on or prior to any Issuance of any Prior Letter of Credit by such L/C Issuer, (ii) immediately after any drawing under any such Prior Letter of Credit or (iii) immediately after any payment (or failure to pay when due) by any Credit Party of any related Prior L/C Reimbursement Obligation, notice thereof, which shall contain a reasonably detailed description of such Issuance, drawing or payment and Agent shall provide copies of such notices to each Prior Revolving Lender reasonably promptly after receipt thereof; (B) upon the request of Agent (or any Prior Revolving Lender through Agent), copies of any Prior Letter of Credit Issued by such L/C Issuer and any related L/C Reimbursement Agreement and such other documents and information as may reasonably be requested by Agent; and (C) on the first Business Day of each calendar week, a schedule of the Prior Letters of Credit Issued by such L/C Issuer, in form and substance reasonably satisfactory to Agent, setting forth the Prior Letter of Credit Obligations for such Prior Letters of Credit outstanding on the last Business Day of the previous calendar week.

(d)     Acquisition of Participations.  Prior to the Petition Date, and in accordance with the Pre-Petition Credit Agreement, each Prior Revolving Lender acquired (i) an undivided interest and participation in each Prior LIFO Letter of Credit and the related Prior LIFO Letter of Credit Obligations in the amounts equal to their respective Prior LIFO L/C Loan Commitments and (ii) an undivided interest and participation in each Prior Original Letter of Credit and the related Prior Original Letter of Credit Obligations in the amounts equal to their respective Prior Original L/C Loan Commitments.  By execution of this Agreement, each such Prior Revolving Lender acknowledges and agrees that such acquired undivided interests and participations remain outstanding and that such interests and participations shall be governed by the terms of this Agreement.

(e)     Reimbursement Obligations of the Borrower.  The Borrower agrees to pay to the L/C Issuer of any Prior Letter of Credit, or to Agent for the benefit of such L/C Issuer, each Prior L/C Reimbursement Obligation owing with respect to such Prior Letter of Credit no later than the first Business Day after the Borrower receives notice from such L/C Issuer or from Agent that payment has been made under such Prior Letter of Credit or that such Prior L/C Reimbursement Obligation is otherwise due with interest thereon computed as set forth below.  In the event that any Prior L/C Reimbursement Obligation is not repaid by the Borrower as provided in this clause (e) (or any such

payment by the Borrower is rescinded or set aside for any reason), such L/C Issuer shall promptly notify Agent of such failure (and, upon receipt of such notice, Agent shall notify each applicable Prior Revolving Lender) and, irrespective of whether such notice is given, such Prior L/C Reimbursement Obligation shall be payable on demand by the Borrower with interest thereon computed from the date on which such Prior L/C Reimbursement Obligation arose until payment in full at the interest rate applicable during such period to Prior L/C Loans that are Base Rate Loans.

(f)     Reimbursement Obligations of the Prior Revolving Credit Lenders.

(i)     Upon receipt of the notice described in clause (e) above from Agent with respect to any Prior LIFO Letter of Credit Obligations, each Prior Revolving Lender shall pay to Agent for the account of such L/C Issuer its Commitment Percentage of such Prior LIFO Letter of Credit Obligations (as such amount may be increased pursuant to subsection 1.13(e)(ii)). Upon receipt of the notice described in clause (e) above from Agent with respect to any Prior Original Letter of Credit Obligations, each Prior Revolving Lender shall pay to Agent for the account of such L/C Issuer its Commitment Percentage of such Prior Original Letter of Credit Obligations (as such amount may be increased pursuant to subsection 1.13(e)(ii)).

(ii)     By making any payment described in clause (i) above with respect to any Prior LIFO Letter of Credit Obligations, such Lender shall be deemed to have made a Prior LIFO L/C Loan to the Borrower, which, upon receipt thereof by Agent for the benefit of such L/C Issuer, the Borrower shall be deemed to have used in whole to repay such Prior L/C Reimbursement Obligation. By making any payment described in clause (i) above with respect to any Prior Original Letter of Credit Obligations, such Lender shall be deemed to have made a Prior Original L/C Loan to the Borrower, which, upon receipt thereof by Agent for the benefit of such L/C Issuer, the Borrower shall be deemed to have used in whole to repay such Prior L/C Reimbursement Obligation. Any such payment that is not deemed a Prior L/C Loan shall be deemed a funding by such Lender of its participation in the applicable Prior Letter of Credit and the Prior Letter of Credit Obligation in respect of the related Prior L/C Reimbursement Obligations. Such participation shall not otherwise be required to be funded. Following receipt by any L/C Issuer of any payment from any Lender pursuant to this clause (f) with respect to any portion of any Prior L/C Reimbursement Obligation, such L/C Issuer shall promptly pay to Agent, for the benefit of such Lender, all amounts received by such L/C Issuer (or to the extent such amounts shall have been received by Agent for the benefit of such L/C Issuer, Agent shall promptly pay to such Lender all amounts received by Agent for the benefit of such L/C Issuer) with respect to such portion.

(g)     Obligations Absolute. The obligations of the Borrower and the Prior Revolving Lenders pursuant to clauses (d), (e) and (f) above shall be absolute, unconditional and irrevocable and performed strictly in accordance with the terms of this Agreement irrespective of (A) (i) the invalidity or unenforceability of any term or

US-DOCS\112887106.9

provision in any Prior Letter of Credit, any document transferring or purporting to transfer a Prior Letter of Credit, any Loan Document or any Pre-Petition Loan Document (including the sufficiency of any such instrument), or any modification to any provision of any of the foregoing, (ii) any document presented under a Prior Letter of Credit being forged, fraudulent, invalid, insufficient or inaccurate in any respect or failing to comply with the terms of such Prior Letter of Credit or (iii) any loss or delay, including in the transmission of any document, (B) the existence of any setoff, claim, abatement, recoupment, defense or other right that any Person (including any Credit Party) may have against the beneficiary of any Prior Letter of Credit or any other Person, whether in connection with any Loan Document or any other Contractual Obligation or transaction, or the existence of any other withholding, abatement or reduction, (C) in the case of the obligations of any Prior Revolving Lender, any adverse change in the condition (financial or otherwise) of any Credit Party and (D) any other act or omission to act or delay of any kind of Agent, any Lender or any other Person or any other event or circumstance whatsoever, whether or not similar to any of the foregoing, that might, but for the provisions of this clause (g), constitute a legal or equitable discharge of any obligation of the Borrower or any Prior Revolving Lender hereunder.  No provision hereof shall be deemed to waive or limit the Borrower's right to seek repayment of any payment of any Prior L/C Reimbursement Obligations from the L/C Issuer under the terms of the applicable L/C Reimbursement Agreement or applicable law.

1.3     Rollup.  Effective upon the occurrence of the Roll-Up Effective Time, without any further action by any party to this Credit Agreement, the Bankruptcy Court or any other Person, to the extent set forth in the Final Order:

(a)     all Pre-Petition LIFO Obligations (including any Prior Letter of Credit Obligations relating to Prior LIFO Letters of Credit to the extent not already constituting Obligations hereunder) owing to each Secured Party at the Roll-Up Effective Time shall be rolled-up into and constitute Obligations hereunder and shall be deemed loans made hereunder (such amounts, collectively, the "**Rollup LIFO Loans**") and shall constitute a portion of the outstanding amount of the Obligations owing to the Secured Parties hereunder.  The amount of Rollup LIFO Loans owing to each Lender under the Pre-Petition Credit Agreement is referred to herein as such Lender's "**Rollup LIFO Commitment**"; and

(b)     all Pre-Petition Other Obligations (including any Prior Letter of Credit Obligations relating to Prior Letters of Credit that are not Prior LIFO Letters of Credit, to the extent not already constituting Obligations hereunder, and including, without limitation, all Pre-Petition Obligations arising under Pre-Petition Secured Rate Contracts) owing to each Secured Party at the Roll-Up Effective Time shall be rolled-up into and constitute Obligations hereunder and shall be deemed loans made hereunder (such amounts, collectively, the "**Rollup Original Loans**") and shall constitute a portion of the outstanding amount of the Obligations owing to the Secured Parties hereunder.  The amount of Rollup Original Loans owing to each Lender under the Pre-Petition Credit Agreement is referred to herein as such Lender's "**Rollup Original Commitment**".

1.4     Evidence of Loans; Notes.    The DIP Revolving Loans made by each DIP Revolving Lender are evidenced by this Agreement and, if requested by such Lender, a DIP Revolving Note payable to such Lender in an amount equal to such Lender's DIP Revolving Loan Commitment.

1.5     Interest.

(a)     Subject to Sections 1.5(c) and 1.5(d), each Loan shall bear interest on the outstanding principal amount thereof from the date when made at a rate per annum equal to LIBOR or the Base Rate, as the case may be, plus the Applicable Margin.    Each determination of an interest rate by Agent shall be conclusive and binding on the Borrower and the Lenders in the absence of manifest error.    All computations of fees and interest (other than interest accruing on Base Rate Loans) payable under this Agreement shall be made on the basis of a 360-day year and actual days elapsed.    All computations of interest accruing on Base Rate Loans payable under this Agreement shall be made on the basis of a 365-day year (366 days in the case of a leap year) and actual days elapsed. Interest and fees shall accrue during each period during which interest or such fees are computed from the first day thereof to the last day thereof.

(b)     Interest on each Loan (other than any Rollup Original Loan or Prior Original L/C Loan) shall be paid in cash in arrears on each Interest Payment Date. Interest on each Rollup Original Loan and Prior Original L/C Loan will be paid in kind on each Interest Payment Date by adding the accrued interest due and payable with respect to such Rollup Original Loan and Prior Original L/C Loan on such Interest Payment Date to the outstanding principal amount of such Rollup Original Loan and Prior Original L/C Loan, as applicable, and thereafter such capitalized amount shall bear interest in accordance with Section 1.3(a).    Interest on the Loans shall also be paid in cash on the DIP Revolving Termination Date.

(c)     At the election of Agent or the Required DIP Revolving Lenders while any Event of Default exists (or automatically while any Event of Default under Section 7.1(a) exists), the Borrower shall pay interest (after as well as before entry of judgment thereon to the extent permitted by law) on the DIP Revolving Loans from and after the date of occurrence of such Event of Default, at a rate per annum which is determined by adding two percent (2.00%) per annum to the Applicable Margin then in effect for such DIP Revolving Loans (plus the LIBOR or Base Rate, as the case may be).    All such interest shall be payable on demand of Agent or the Required DIP Revolving Lenders.

(d)     Anything herein to the contrary notwithstanding, the obligations of the Borrower hereunder shall be subject to the limitation that payments of interest shall not be required, for any period for which interest is computed hereunder, to the extent (but only to the extent) that contracting for or receiving such payment by the respective Lender would be contrary to the provisions of any law applicable to such Lender limiting the highest rate of interest which may be lawfully contracted for, charged or received by such Lender, and in such event the Borrower shall pay such Lender interest at the highest rate permitted by applicable law ("**Maximum Lawful Rate**"); provided, however, that if at any time thereafter the rate of interest payable hereunder is less than the Maximum

11

Lawful Rate, the Borrower shall continue to pay interest hereunder at the Maximum Lawful Rate until such time as the total interest received by Agent, on behalf of Lenders, is equal to the total interest that would have been received had the interest payable hereunder been (but for the operation of this paragraph) the interest rate payable since the Closing Date as otherwise provided in this Agreement.

1.6    Loan Accounts.

(a)    Agent, on behalf of the Lenders, shall record on its books and records the amount of each Loan made, the interest rate applicable, all payments of principal and interest thereon and the principal balance thereof from time to time outstanding.  Agent shall deliver to the Borrower on a monthly basis a loan statement setting forth such record for the immediately preceding calendar month.  Such record shall, absent manifest error, be conclusive evidence of the amount of the Loans made by the Lenders to the Borrower and the interest and payments thereon.  Any failure to so record or any error in doing so, or any failure to deliver such loan statement shall not, however, limit or otherwise affect the obligation of the Borrower hereunder (and under any Note) to pay any amount owing with respect to the Loans or provide the basis for any claim against Agent.

(b)    Agent, acting as a non-fiduciary agent of the Borrower solely for tax purposes and solely with respect to the actions described in this Section 1.6(b), shall establish and maintain at its address referred to in Section 9.2 (or at such other address as Agent may notify the Borrower) (A) a record of ownership (the "**Register**") in which Agent agrees to register by book entry the interests (including any rights to receive payment hereunder) of Agent, each Lender and each L/C Issuer in the DIP Revolving Loans, L/C Reimbursement Obligations, Letter of Credit Obligations, Prior L/C Loans and Rollup Loans, each of their obligations under this Agreement to participate in each Loan, Letter of Credit, Letter of Credit Obligation and L/C Reimbursement Obligation, and any assignment of any such interest, obligation or right and (B) accounts in the Register in accordance with its usual practice in which it shall record (1) the names and addresses of the Lenders and the L/C Issuers (and each change thereto pursuant to Sections 9.9 and 9.22), (2) the Commitments of each Lender, (3) the amount of each Loan and each funding of any participation described in clause (A) above, and for LIBOR Rate Loans, the Interest Period applicable thereto, (4) the amount of any principal or interest due and payable or paid, (5) the amount of the L/C Reimbursement Obligations due and payable or paid in respect of Letters of Credit and (6) any other payment received by Agent from the Borrower and its application to the Obligations.

(c)    Notwithstanding anything to the contrary contained in this Agreement, the Loans (including any Notes evidencing such Loans and, in the case of DIP Revolving Loans, the corresponding obligations to participate in DIP Letter of Credit Obligations) and the L/C Reimbursement Obligations are registered obligations, the right, title and interest of the Lenders and the L/C Issuers and their assignees in and to such Loans or L/C Reimbursement Obligations, as the case may be, shall be transferable only upon notation of such transfer in the Register and no assignment thereof shall be effective until recorded therein.  This Section 1.6 and Section 9.9 shall be construed so that the Loans

and L/C Reimbursement Obligations are at all times maintained in "registered form" within the meaning of Sections 163(f), 871(h)(2) and 881(c)(2) of the Code.

(d)     The Credit Parties, Agent, the Lenders and the L/C Issuers shall treat each Person whose name is recorded in the Register as a Lender or L/C Issuer, as applicable, for all purposes of this Agreement.  Information contained in the Register with respect to any Lender or any L/C Issuer shall be available for access by the Borrower, Agent, such Lender or such L/C Issuer during normal business hours and from time to time upon at least one Business Day's prior notice.  No Lender or L/C Issuer shall, in such capacity, have access to or be otherwise permitted to review any information in the Register other than information with respect to such Lender or L/C Issuer unless otherwise agreed by Agent.

1.7     <u>Procedure for DIP Revolving Credit Borrowing</u>.

(a)     Each Borrowing of a DIP Revolving Loan shall be made upon the Borrower's irrevocable (subject to Section 10.5) written notice delivered to Agent substantially in the form of a Notice of Borrowing or in a writing in any other form reasonably acceptable to Agent, which notice must be received by Agent prior to 2:00 p.m. (i) on the date which is three (3) Business Days prior to the requested Borrowing date in the case of each LIBOR Rate Loan, and (ii) on the date which is one (1) Business Day prior to the requested Borrowing date of each Base Rate Loan.  Such Notice of Borrowing shall specify:

(i)     the amount of the Borrowing (which shall be in an aggregate minimum principal amount of $100,000);

(ii)     the requested Borrowing date, which shall be a Business Day;

(iii)     whether the Borrowing is to be comprised of LIBOR Rate Loans or Base Rate Loans;

(iv)     if the Borrowing is to be comprised of LIBOR Rate Loans, the Interest Period applicable to such Loans; and

(v)     Availability after giving effect to the requested Borrowing.

(b)     Upon receipt of a Notice of Borrowing, Agent will promptly notify each DIP Revolving Lender of such Notice of Borrowing and of the amount of such Lender's Commitment Percentage of the Borrowing.

(c)     Unless Agent is otherwise directed in writing by the Borrower, the proceeds of each requested Borrowing after the Closing Date will be made available to the Borrower by Agent by wire transfer of such amount to the Borrower pursuant to the wire transfer instructions specified on the signature page hereto.

1.8     <u>Conversion and Continuation Elections</u>.

(a)     The Borrower shall have the option to (i) request that any DIP Revolving Loan be made as a LIBOR Rate Loan, (ii) convert at any time all or any part of outstanding Loans from Base Rate Loans to LIBOR Rate Loans, (iii) convert any LIBOR Rate Loan to a Base Rate Loan, subject to Section 10.4 if such conversion is made prior to the expiration of the Interest Period applicable thereto, or (iv) continue all or any portion of any Loan as a LIBOR Rate Loan upon the expiration of the applicable Interest Period.  Any Loan or group of Loans having the same proposed Interest Period to be made or continued as, or converted into, a LIBOR Rate Loan must be in a minimum amount of $1,000,000.  Any such election must be made by Borrower by 2:00 p.m. on the third Business Day prior to (1) the date of any proposed DIP Revolving Loan which is to bear interest at LIBOR, (2) the end of each Interest Period with respect to any LIBOR Rate Loans to be continued as such, or (3) the date on which the Borrower wishes to convert any Base Rate Loan to a LIBOR Rate Loan for an Interest Period designated by the Borrower in such election.  If no election is received with respect to a LIBOR Rate Loan by 2:00 p.m. on the third Business Day prior to the end of the Interest Period with respect thereto, that LIBOR Rate Loan shall be converted to a Base Rate Loan at the end of its Interest Period.  The Borrower must make such election by notice to Agent in writing, including by Electronic Transmission.  In the case of any conversion or continuation, such election must be made pursuant to a written notice (a "**Notice of Conversion/Continuation**") substantially in the form of Exhibit 1.8 or in a writing in any other form reasonably acceptable to Agent.  No Loan shall be made, converted into or continued as a LIBOR Rate Loan, if an Event of Default has occurred and is continuing and Agent or Required DIP Revolving Lenders have determined not to make or continue any Loan as a LIBOR Rate Loan as a result thereof.

(b)     Upon receipt of a Notice of Conversion/Continuation, Agent will promptly notify each Lender thereof.  In addition, Agent will, with reasonable promptness, notify the Borrower and the Lenders of each determination of LIBOR; provided that any failure to do so shall not relieve the Borrower of any liability hereunder or provide the basis for any claim against Agent.  All conversions and continuations shall be made pro rata according to the respective outstanding principal amounts of the Loans held by each Lender with respect to which the notice was given.

(c)     Notwithstanding any other provision contained in this Agreement, after giving effect to any Borrowing, or to any continuation or conversion of any Loans, there shall not be more than seven (7) different Interest Periods in effect.

1.9     Optional Prepayments and Reductions in DIP Revolving Loan Commitments.

(a)     Optional Prepayments Generally.  The Borrower may at any time prepay the DIP Revolving Loans in whole or in part without penalty or premium except as provided in Section 10.4.  Unless the outstanding amount of DIP Revolving Loans has been reduced to zero ($0) at the time of such prepayment, the Borrower shall not prepay the Prior L/C Loans or Rollup Loans.  Solely to the extent the outstanding amount of DIP Revolving Loans has been reduced to zero ($0) at the time of such prepayment, the Borrower may prepay the Prior L/C Loans and Rollup Loans, pro rata, in whole or in part without penalty or premium except as provided in Section 10.4.  All prepayments of

14

Rollup Loans shall be applied first to repayment of Rollup LIFO Loans until all Rollup LIFO Loans have been repaid in full and then to repayment of Rollup Original Loans. All prepayments of Prior L/C Loans shall be applied first to repayment of Prior LIFO L/C Loans until all Prior LIFO L/C Loans have been repaid in full and then to repayment of Prior Original L/C Loans.

(b)    Reductions in DIP Revolving Loan Commitments.  The Borrower may at any time upon at least two (2) Business Days' (or such shorter period as is reasonably acceptable to Agent) prior written notice by the Borrower to Agent permanently reduce the Aggregate DIP Revolving Loan Commitment; provided that such reductions shall be in an amount greater than or equal to $500,000.  All reductions of the Aggregate DIP Revolving Loan Commitment shall be allocated pro rata among all Lenders with a DIP Revolving Loan Commitment.  A permanent reduction of the Aggregate DIP Revolving Loan Commitment shall not require a corresponding pro rata reduction in the L/C Sublimit; provided that the L/C Sublimit shall be permanently reduced by the amount thereof in excess of the Aggregate DIP Revolving Loan Commitment.

(c)    Notices.  Notice of prepayment or commitment reduction pursuant to clauses (a) and (b) above shall not thereafter be revocable (except if it is delivered in connection with a refinancing of the Loans in whole (a "**Refinancing Facility**") in relation to which the conditions precedent to the Refinancing Facility are not satisfied) by the Borrower and Agent will promptly notify each Lender thereof and of such Lender's Commitment Percentage of such prepayment or reduction.   The payment amount specified in a notice of prepayment shall be due and payable on the date specified therein. Together with each prepayment under this Section 1.9, the Borrower shall pay any amounts required pursuant to Sections 1.11 and 10.4.

1.10    Mandatory Prepayments of Loans.

(a)    [Intentionally Omitted].

(b)    DIP Revolving Loans.  The Borrower shall repay to the Lenders in full all Loans on the date specified in clause (a) of the definition of "DIP Revolving Termination Date".

(c)    Asset Dispositions; Events of Loss.  If a Credit Party or any Subsidiary of a Credit Party shall at any time or from time to time:

(i)    make a Disposition; or

(ii)    suffer an Event of Loss;

and the aggregate amount of the Net Proceeds received by the Credit Parties and their Subsidiaries in connection with such Disposition or Event of Loss and all other Dispositions and Events of Loss occurring during the Fiscal Year exceeds $150,000, then (A) the Borrower shall promptly notify Agent of such proposed Disposition or Event of Loss (including the amount of the estimated Net Proceeds to be received by a Credit Party and/or such Subsidiary in respect thereof) and (B) promptly upon receipt by a

15

Credit Party and/or such Subsidiary of the Net Proceeds of such Disposition or Event of Loss, the Borrower shall deliver, or cause to be delivered, such Net Proceeds to Agent for distribution to the Lenders as a prepayment of the Loans, which prepayment shall be applied in accordance with Section 1.10(f) hereof.

(d)    <u>Incurrence of Debt; Issuance of Securities</u>.  (i)  Immediately upon receipt by any Credit Party or any Subsidiary of any Credit Party of the Net Issuance Proceeds of the incurrence of Indebtedness (other than Net Issuance Proceeds from the incurrence of Indebtedness permitted hereunder), the Borrower shall deliver, or cause to be delivered, to Agent an amount equal to such Net Issuance Proceeds, in each instance, for application to the Loans in accordance with Section 1.10(f).

(ii)    Immediately upon the receipt by any Credit Party or any Subsidiary of any Credit Party of the Net Issuance Proceeds of a public offering of Stock or Stock Equivalents pursuant to an effective registration statement filed with the Securities and Exchange Commission or any successor or similar Governmental Authority, the Borrower shall deliver, or cause to be delivered, to Agent an amount equal to 50% of such Net Issuance Proceeds for application to the Loans in accordance with Section 1.10(f).

(e)    [Intentionally Omitted].

(f)    <u>Application of Prepayments</u>.  Subject to Section 1.12(c), any prepayments pursuant to Section 1.10(c), 1.10(d) or 1.10(e) shall be applied <u>first</u> to prepay outstanding DIP Revolving Loans, <u>second</u> to cash collateralize any outstanding DIP Letters of Credit, and <u>third</u>, to the extent permitted by any DIP Order or any other order of the Bankruptcy Court, to cash collateralize any outstanding Prior Letters of Credit, to pay outstanding Rollup Loans and to pay other Obligations owing hereunder, on a pro rata basis among all such other Obligations.  To the extent permitted by the foregoing sentence, amounts prepaid shall be applied first to any Base Rate Loans then outstanding and then to outstanding LIBOR Rate Loans with the shortest Interest Periods remaining.  Together with each prepayment under this Section 1.10, the Borrower shall pay any amounts required pursuant to Section 10.4 hereof.

(g)    <u>No Implied Consent</u>.  Provisions contained in this Section 1.10 for the application of proceeds of certain transactions shall not be deemed to constitute consent of the Lenders to transactions that are not otherwise permitted by the terms hereof or the other Loan Documents.

1.11    <u>Fees</u>.

(a)    <u>Fees</u>.  The Borrower shall pay (i) to Agent, for the benefit of Antares for the services of Antares, a non-refundable arranger fee equal to $50,000, which arranger fee is fully earned on the date hereof and due and payable in immediately available funds in cash on the date hereof, and (ii) to Agent, for the account of each DIP Revolving Lender, a non-refundable closing fee in an amount equal to 3.0% of such DIP Revolving Lender's DIP Revolving Loan Commitment on the date hereof (the "**Closing Fee**"),

which Closing Fee is fully earned on the date hereof and due and payable in immediately available funds in cash on the date hereof.

(b)     Unused Commitment Fee.    The Borrower shall pay to Agent a fee (the "**Unused Commitment Fee**") for the account of each DIP Revolving Lender in an amount equal to

(i)      the average daily balance of the DIP Revolving Loan Commitment of such DIP Revolving Lender during the preceding calendar month, less

(ii)     the sum of (x) the average daily balance of all DIP Revolving Loans held by such DIP Revolving Lender plus (y) the average daily amount of DIP Letter of Credit Obligations held by such DIP Revolving Lender, in each case, during the preceding calendar month,

(iii)    multiplied by one percent (1.0%) per annum.

The total Unused Commitment Fee paid by the Borrower will be equal to the sum of all of the Unused Commitment Fees due to the Lenders, subject to Section 1.13(e)(vi).  Such fee shall be payable monthly in arrears on the first day of the calendar month following the date hereof.  The Unused Commitment Fee provided in this Section 1.11(b) shall accrue at all times from and after the execution and delivery of this Agreement.

(c)     Prior Letter of Credit Fee. The Borrower agree to pay to Agent for the ratable benefit of the Prior Revolving Lenders, as compensation to such Lenders for Prior Letter of Credit Obligations hereunder, (i) without duplication of costs and expenses otherwise payable to Agent or Lenders hereunder or fees otherwise paid by the Borrower, all reasonable costs and expenses incurred by Agent or any Lender on account of such Letter of Credit Obligations, and (ii) for each calendar month during which any Prior Letter of Credit Obligation shall remain outstanding, a fee (the "**Prior Letter of Credit Fee**") in an amount equal to the product of the average daily undrawn face amount of all Prior Letters of Credit Issued, guarantied or supported by risk participation agreements multiplied by a per annum rate equal to the Applicable Margin with respect to Prior L/C Loans which are LIBOR Rate Loans.  Such fee shall be paid to Agent for the benefit of the Prior Revolving Lenders in arrears, on the first day of each calendar month and on the date on which all Prior L/C Reimbursement Obligations have been discharged; provided, however, that any fees payable with respect to Prior Original Letters of Credit will be paid in kind by adding the amount of such fees to the principal balance of the applicable Prior Original L/C Loans, and thereafter such capitalized amounts shall bear interest in accordance with Section 1.3(a).  In addition, the Borrower shall pay to Agent, any L/C Issuer or any prospective L/C Issuer, as appropriate, on demand, such L/C Issuer's or prospective L/C Issuer's customary fees at then prevailing rates, without duplication of fees otherwise payable hereunder (including all per annum fees), charges and expenses of such L/C Issuer or prospective L/C Issuer in respect of the application for, and the Issuance, negotiation, acceptance, amendment, transfer and payment of, each Prior Letter of Credit or otherwise payable pursuant to the application and related documentation under which such Prior Letter of Credit is Issued.

17

(d)     DIP Letter of Credit Fee.  The Borrower agrees to pay to Agent for the ratable benefit of the DIP Revolving Lenders, as compensation to such Lenders for DIP Letter of Credit Obligations incurred hereunder, (i) without duplication of costs and expenses otherwise payable to Agent or Lenders hereunder or fees otherwise paid by the Borrower, all reasonable costs and expenses incurred by Agent or any Lender on account of such DIP Letter of Credit Obligations, and (ii) for each calendar quarter during which any DIP Letter of Credit Obligation shall remain outstanding, a fee (the "**DIP Letter of Credit Fee**") in an amount equal to the product of the average daily undrawn face amount of all Letters of Credit Issued, guarantied or supported by risk participation agreements multiplied by a per annum rate equal to the Applicable Margin with respect to DIP Revolving Loans which are LIBOR Rate Loans; provided, however, at Agent's or Required DIP Revolving Lenders' option, while an Event of Default exists (or automatically while an Event of Default under Section 7.1(a) exists), such rate shall be increased by two percent (2.00%) per annum.  Such fee shall be paid to Agent for the benefit of the DIP Revolving Lenders in arrears, on the first day of the applicable calendar quarter and on the date on which all DIP L/C Reimbursement Obligations have been discharged.  In addition, the Borrower shall pay to Agent, any L/C Issuer or any prospective L/C Issuer, as appropriate, on demand, such L/C Issuer's or prospective L/C Issuer's customary fees at then prevailing rates, without duplication of fees otherwise payable hereunder (including all per annum fees), charges and expenses of such L/C Issuer or prospective L/C Issuer in respect of the application for, and the Issuance, negotiation, acceptance, amendment, transfer and payment of, each DIP Letter of Credit or otherwise payable pursuant to the application and related documentation under which such DIP Letter of Credit is Issued.

1.12    Payments by the Borrower.

(a)     All payments (including prepayments) to be made by each Credit Party on account of principal, interest, fees and other amounts required hereunder shall be made without set-off, recoupment, counterclaim or deduction of any kind, shall, except as otherwise expressly provided herein, be made to Agent (for the ratable account of the Persons entitled thereto) at the address for payment specified in the signature page hereof in relation to Agent (or such other address as Agent may from time to time specify in accordance with Section 9.2), including payments utilizing the ACH system, and shall be made in Dollars and by wire transfer or ACH transfer in immediately available funds (which shall be the exclusive means of payment hereunder), no later than 2:00 p.m. on the date due. Any payment which is received by Agent later than 2:00 p.m. may in Agent's discretion be deemed to have been received on the immediately succeeding Business Day and any applicable interest or fee shall continue to accrue.  The Borrower and each other Credit Party hereby irrevocably waives the right to direct the application during the continuance of an Event of Default of any and all payments in respect of any Obligation and any proceeds of Collateral.  The Borrower hereby authorizes Agent and each Lender to make a DIP Revolving Loan (which shall be a Base Rate Loan) to pay (i) interest, principal, L/C Reimbursement Obligations, agent fees, Unused Commitment Fees and Letter of Credit Fees, in each instance, on the date due, or (ii) after five (5) days' prior notice to the Borrower, other fees, costs or expenses payable by the Borrower or any of its Subsidiaries hereunder or under the other Loan Documents.

18

(b)     Subject to the provisions set forth in the definition of "Interest Period" herein, if any payment hereunder shall be stated to be due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day, and such extension of time shall in such case be included in the computation of interest or fees, as the case may be.

(c)     During the continuance of an Event of Default, Agent may, and shall upon the direction of Required DIP Revolving Lenders, apply any and all payments received by Agent in respect of any Obligation in accordance with clauses first through eleventh below.  Notwithstanding any provision herein to the contrary, all payments made by Credit Parties to Agent after any or all of the Obligations have been accelerated (so long as such acceleration has not been rescinded), including all proceeds of Collateral shall be applied as follows:

first, to payment of costs and expenses, including Attorney Costs, of Agent payable or reimbursable by the Credit Parties under the Loan Documents;

second, to payment of Attorney Costs of Lenders payable or reimbursable by the Borrower under this Agreement;

third, to payment of all accrued unpaid interest on the DIP Revolving Loans and fees owed to Agent, Lenders and L/C Issuers in connection therewith and in connection with any DIP Letters of Credit;

fourth, to payment of principal of the DIP Revolving Loans including, without limitation, DIP L/C Reimbursement Obligations owing with respect to any DIP Letters of Credit then due and payable and cash collateralization of unmatured DIP L/C Reimbursement Obligations relating to DIP Letters of Credit to the extent not then due and payable;

fifth, to payment of all accrued and unpaid interest on the Rollup LIFO Loans and Prior LIFO L/C Loans and fees owed to Agent and the Lenders in connection therewith and in connection with any Prior LIFO Letters of Credit;

sixth, to payment of principal of the Rollup LIFO Loans and Prior LIFO L/C Loans including, without limitation, Prior L/C Reimbursement Obligations owing with respect to any Prior LIFO Letters of Credit then due and payable and cash collateralization of unmatured Prior L/C Reimbursement Obligations relating to Prior LIFO Letters of Credit to the extent not then due and payable;

seventh, to payment of any other amounts owing with respect to the Rollup LIFO Loans, Prior LIFO L/C Loans or Prior LIFO Letters of Credit, in each case to the extent constituting Obligations;

eighth, to payment of all accrued unpaid interest on the Obligations and fees owed to Agent, Lenders and L/C Issuers;

ninth, to payment of principal of the Obligations, including, without limitation, Prior L/C Reimbursement Obligations then due and payable, and cash collateralization of unmatured Prior L/C Reimbursement Obligations to the extent not then due and payable;

tenth, to payment of any other amounts owing constituting Obligations; and

eleventh, any remainder shall be for the account of and paid to whoever may be lawfully entitled thereto.

In carrying out the foregoing, (i) amounts received shall be applied in the numerical order provided until exhausted prior to the application to the next succeeding category, (ii) each of the Lenders or other Persons entitled to payment shall receive an amount equal to its pro rata share of amounts available to be applied pursuant to clauses third, fourth, fifth, sixth, seventh, eighth, ninth and tenth above and (iii) no payments by a Guarantor and no proceeds of Collateral of a Guarantor shall be applied to Excluded Rate Contract Obligations of such Guarantor.

1.13    Payments by the Lenders to Agent; Settlement.

(a)     Agent may, on behalf of Lenders, disburse funds to the Borrower for Loans requested.  Each Lender shall reimburse Agent on demand for all funds disbursed on its behalf by Agent, or if Agent so requests, each Lender will remit to Agent its Commitment Percentage of any Loan before Agent disburses same to the Borrower.  If Agent elects to require that each Lender make funds available to Agent prior to disbursement by Agent to the Borrower, Agent shall advise each Lender by telephone or fax of the amount of such Lender's Commitment Percentage of the Loan requested by the Borrower no later than the Business Day prior to the scheduled Borrowing date applicable thereto, and each such Lender shall pay Agent such Lender's Commitment Percentage of such requested Loan, in same day funds, by wire transfer to Agent's account, as set forth on Agent's signature page hereto, no later than 12:00 p.m. on such scheduled Borrowing date.   Nothing in this Section 1.13(a) or elsewhere in this Agreement or the other Loan Documents, including the remaining provisions of Section 1.13, shall be deemed to require Agent to advance funds on behalf of any Lender or to relieve any Lender from its obligation to fulfill its Commitments hereunder or to prejudice any rights that Agent any Lender or the Borrower may have against any Lender as a result of any default by such Lender hereunder.

(b)     At least once each calendar week or more frequently at Agent's election (each, a "**Settlement Date**"), Agent shall advise each Lender by telephone or fax of the amount of such Lender's Commitment Percentage of principal, interest and fees paid for the benefit of Lenders with respect to each applicable Loan.  Agent shall pay to each Lender such Lender's Commitment Percentage (except as otherwise provided in Section 1.1(c)(vi), 1.2(f) and Section 1.13(e)(v)) of principal, interest and fees paid by the Borrower since the previous Settlement Date for the benefit of such Lender on the Loans held by it; provided, however, that in the case of any payment of principal received by

Agent from the Borrower in respect of any Rollup Loan prior to 12:00 p.m. on any Business Day, Agent shall pay to each applicable Lender such Lender's Commitment Percentage of such payment on such Business Day, and, in the case of any payment of principal received by Agent from the Borrower in respect of any Rollup Loan later than 12:00 p.m. on any Business Day, Agent shall pay to each applicable Lender such Lender's Commitment Percentage of such payment on the next Business Day.  Except as provided in the preceding proviso with respect to Rollup Loan payments, such payments shall be made by wire transfer to such Lender) not later than 1:00 p.m. on the next Business Day following each Settlement Date.

(c)     Availability of Lender's Commitment Percentage.  Agent may assume that each DIP Revolving Lender will make its Commitment Percentage of each DIP Revolving Loan available to Agent on each Borrowing date.  If such Commitment Percentage is not, in fact, paid to Agent by such DIP Revolving Lender when due, Agent will be entitled to recover such amount on demand from such DIP Revolving Lender without setoff, counterclaim or deduction of any kind.  If any DIP Revolving Lender fails to pay the amount of its Commitment Percentage forthwith upon Agent's demand, Agent shall promptly notify the Borrower and the Borrower shall immediately repay such amount to Agent.  Nothing in this Section 1.13(c) or elsewhere in this Agreement or the other Loan Documents shall be deemed to require Agent to advance funds on behalf of any DIP Revolving Lender or to relieve any DIP Revolving Lender from its obligation to fulfill its Commitments hereunder or to prejudice any rights that the Borrower may have against any DIP Revolving Lender as a result of any default by such DIP Revolving Lender hereunder.  Without limiting the provisions of Section 1.13(b), to the extent that Agent advances funds to the Borrower on behalf of any DIP Revolving Lender and is not reimbursed therefor on the same Business Day as such advance is made, Agent shall be entitled to retain for its account all interest accrued on such advance from the date such advance was made until reimbursed by the applicable DIP Revolving Lender.

(d)     Return of Payments.

(i)     If Agent pays an amount to a Lender under this Agreement in the belief or expectation that a related payment has been or will be received by Agent from the Borrower and such related payment is not received by Agent, then Agent will be entitled to recover such amount from such Lender on demand without setoff, counterclaim or deduction of any kind.

(ii)     If Agent determines at any time that any amount received by Agent under this Agreement or any other Loan Document must be returned to any Credit Party or paid to any other Person pursuant to any insolvency law or otherwise, then, notwithstanding any other term or condition of this Agreement or any other Loan Document, Agent will not be required to distribute any portion thereof to any Lender.  In addition, each Lender will repay to Agent on demand any portion of such amount that Agent has distributed to such Lender, together with interest at such rate, if any, as Agent is required to pay to the Borrower or such other Person, without setoff, counterclaim or deduction of any kind, and Agent will be entitled

US-DOCS\112887106.9

to set-off against future distributions to such Lender any such amounts (with interest) that are not repaid on demand.

(e)     <u>Non-Funding Lenders</u>.

(i)     <u>Responsibility</u>.  The failure of any Non-Funding Lender to make any DIP Revolving Loan or Prior L/C Loan, as applicable, or to fund any purchase of any participation to be made or funded by it (including with respect to any Letter of Credit), or to make any payment required by it under any Loan Document on the date specified therefor shall not relieve any other Lender of its obligations to make such loan, fund the purchase of any such participation, or make any other such required payment on such date, and neither Agent nor, other than as expressly set forth herein, any other Lender shall be responsible for the failure of any Non-Funding Lender to make a loan, fund the purchase of a participation or make any other required payment under any Loan Document.

(ii)     <u>Reallocation Regarding Prior Revolving Lenders</u>.  If any Prior Revolving Lender is a Non-Funding Lender, all or a portion of such Non-Funding Lender's Prior LIFO Letter of Credit Obligations (unless such Lender is the L/C Issuer that Issued such Prior LIFO Letter of Credit) shall, at Agent's election at any time or upon any L/C Issuer's written request delivered to Agent (whether before or after the occurrence of any Default or Event of Default), be reallocated to and assumed by the applicable Prior Revolving Lenders that are not Non-Funding Lenders or Impacted Lenders pro rata in accordance with their Commitment Percentages of the Aggregate Prior LIFO L/C Loan Commitment (calculated as if the Non-Funding Lender's Commitment Percentage was reduced to zero and each other Prior Revolving Lender's Commitment Percentage had been increased proportionately), provided that no Prior Revolving Lender shall be reallocated any such amounts or be required to fund any amounts that would cause the sum of its outstanding Prior LIFO L/C Loans and outstanding Prior LIFO Letter of Credit Obligations to exceed its Prior LIFO L/C Loan Commitment.  If any Prior Revolving Lender is a Non-Funding Lender, all or a portion of such Non-Funding Lender's Prior Original Letter of Credit Obligations (unless such Lender is the L/C Issuer that Issued such Prior Original Letter of Credit) shall, at Agent's election at any time or upon any L/C Issuer's written request delivered to Agent (whether before or after the occurrence of any Default or Event of Default), be reallocated to and assumed by the applicable Prior Revolving Lenders that are not Non-Funding Lenders or Impacted Lenders pro rata in accordance with their Commitment Percentages of the Aggregate Prior Original L/C Loan Commitment (calculated as if the Non-Funding Lender's Commitment Percentage was reduced to zero and each other Prior Revolving Lender's Commitment Percentage had been increased proportionately), provided that no Prior Revolving Lender shall be reallocated any such amounts or be required to fund any amounts that would cause the sum of its outstanding Prior Original L/C Loans and outstanding Prior Original Letter of Credit Obligations to exceed its Prior Original L/C Loan Commitment.

US-DOCS\112887106.9

(iii)    <u>Reallocation Regarding DIP Revolving Lenders</u>.    If any DIP Revolving Lender is a Non-Funding Lender, all or a portion of such Non-Funding Lender's DIP Letter of Credit Obligations (unless such Lender is the L/C Issuer that Issued such DIP Letter of Credit) shall, at Agent's election at any time or upon any L/C Issuer's written request delivered to Agent (whether before or after the occurrence of any Default or Event of Default), be reallocated to and assumed by the DIP Revolving Lenders that are not Non-Funding Lenders or Impacted Lenders pro rata in accordance with their Commitment Percentages of the Aggregate DIP Revolving Loan Commitment (calculated as if the Non-Funding Lender's Commitment Percentage was reduced to zero and each other DIP Revolving Lender's (other than any other Non-Funding Lender's or Impacted Lender's) Commitment Percentage had been increased proportionately), provided that no DIP Revolving Lender shall be reallocated any such amounts or be required to fund any amounts that would cause the sum of its outstanding DIP Revolving Loans, outstanding DIP Letter of Credit Obligations to exceed its DIP Revolving Loan Commitment.

(iv)    <u>Voting Rights</u>.    Notwithstanding anything set forth herein to the contrary, including Section 9.1, a Non-Funding Lender shall not have any voting or consent rights under or with respect to any Loan Document or constitute a "Lender", a "DIP Revolving Lender" or a "Prior Revolving Lender" (or be, or have its Loans and Commitments, included in the determination of "Required DIP Revolving Lenders", "Required Prior Revolving Lenders" or "Lenders directly affected" pursuant to Section 9.1) for any voting or consent rights under or with respect to any Loan Document, provided that (A) the Commitment of a Non-Funding Lender may not be increased, extended or reinstated, (B) the principal of a Non-Funding Lender's Loans may not be reduced or forgiven, and (C) the interest rate applicable to Obligations owing to a Non-Funding Lender may not be reduced, in each case, without the consent of such Non-Funding Lender. Moreover, for the purposes of determining Required Prior Revolving Lenders and Required DIP Revolving Lenders, the Loans, Letter of Credit Obligations, and Commitments held by Non-Funding Lenders shall be excluded from the total Loans and Commitments outstanding.

(v)    <u>Borrower Payments to a Non-Funding Lender</u>.    Agent shall be authorized to use all payments received by Agent for the benefit of any Non-Funding Lender pursuant to this Agreement to pay in full the Aggregate Excess Funding Amount to the appropriate Secured Parties.    Agent shall be entitled to hold as cash collateral in a non-interest bearing account up to an amount equal to such Non-Funding Lender's pro rata share, without giving effect to any reallocation pursuant to Section 1.13(e)(ii) or 1.13(e)(iii), of all Letter of Credit Obligations until the Facility Termination Date.    Upon any such unfunded obligations owing by a Non-Funding Lender becoming due and payable, Agent shall be authorized to use such cash collateral to make such payment on behalf of such Non-Funding Lender.    With respect to such Non-Funding Lender's failure to fund Prior LIFO L/C Loans or purchase participations in Prior LIFO Letters of Credit or Prior LIFO Letter of Credit Obligations, any amounts applied by Agent

23

to satisfy such funding shortfalls shall be deemed to constitute a Prior LIFO L/C Loan or amount of the participation required to be funded and, if necessary to effectuate the foregoing, the other Prior Revolving Lenders shall be deemed to have sold, and such Non-Funding Lender shall be deemed to have purchased, Prior LIFO L/C Loans or Prior LIFO Letter of Credit participation interests from the other Prior Revolving Lenders until such time as the aggregate amount of the Prior LIFO L/C Loans and participations in Prior LIFO Letters of Credit and Prior LIFO Letter of Credit Obligations are held by the Prior Revolving Lenders in accordance with their Commitment Percentages of the Aggregate Prior LIFO L/C Loan Commitment.  With respect to such Non-Funding Lender's failure to fund Prior Original L/C Loans or purchase participations in Prior Original Letters of Credit or Prior Original Letter of Credit Obligations, any amounts applied by Agent to satisfy such funding shortfalls shall be deemed to constitute a Prior Original L/C Loan or amount of the participation required to be funded and, if necessary to effectuate the foregoing, the other Prior Revolving Lenders shall be deemed to have sold, and such Non-Funding Lender shall be deemed to have purchased, Prior Original L/C Loans or Prior Original Letter of Credit participation interests from the other Prior Revolving Lenders until such time as the aggregate amount of the Prior Original L/C Loans and participations in Prior Original Letters of Credit and Prior Original Letter of Credit Obligations are held by the Prior Revolving Lenders in accordance with their Commitment Percentages of the Aggregate Prior Original L/C Loan Commitment.  With respect to such Non-Funding Lender's failure to fund DIP Revolving Loans or purchase participations in DIP Letters of Credit or DIP Letter of Credit Obligations, any amounts applied by Agent to satisfy such funding shortfalls shall be deemed to constitute a DIP Revolving Loan or amount of the participation required to be funded and, if necessary to effectuate the foregoing, the other DIP Revolving Lenders shall be deemed to have sold, and such Non-Funding Lender shall be deemed to have purchased, DIP Revolving Loans or DIP Letter of Credit participation interests from the other DIP Revolving Lenders until such time as the aggregate amount of the DIP Revolving Loans and participations in DIP Letters of Credit and DIP Letter of Credit Obligations are held by the DIP Revolving Lenders in accordance with their Commitment Percentages of the Aggregate DIP Revolving Loan Commitment.  Any amounts owing by a Non-Funding Lender to Agent which are not paid when due shall accrue interest at the interest rate applicable during such period to (i) with respect to amounts owing in connection with Prior L/C Loans, Prior Letters of Credit or Prior Letter of Credit Obligations, Prior L/C Loans that are Base Rate Loans, and (ii) with respect to amounts owing in connection with DIP Revolving Loans, DIP Letters of Credit or DIP Letter of Credit Obligations, DIP Revolving Loans that are Base Rate Loans. In the event that Agent is holding cash collateral of a Non-Funding Lender that cures pursuant to clause (v) below or ceases to be a Non-Funding Lender pursuant to the definition of Non-Funding Lender, Agent shall return the unused portion of such cash collateral to such Lender. The "Aggregate Excess Funding Amount" of a Non-Funding Lender shall be the aggregate amount of (A) all unpaid obligations owing by such Lender to Agent, L/C Issuers and other Lenders under the Loan

24

Documents, including such Lender's pro rata share of all DIP Revolving Loans, Prior L/C Loans, DIP Letter of Credit Obligations and Prior Letter of Credit Obligations, as applicable, plus, without duplication, (B) all amounts of such Non-Funding Lender's DIP Letter of Credit Obligations and Prior Letter of Credit Obligations, as applicable.

(vi)     Cure.  A Lender may cure its status as a Non-Funding Lender under clause (a) of the definition of Non-Funding Lender if such Lender fully pays to Agent, on behalf of the applicable Secured Parties, the Aggregate Excess Funding Amount, plus all interest due thereon.  Any such cure shall not relieve any Lender from liability for breaching its contractual obligations hereunder.

(vii)     Fees.  A Lender that is a Non-Funding Lender pursuant to clause (a) of the definition of Non-Funding Lender shall not earn and shall not be entitled to receive, and the Borrower shall not be required to pay, such Lender's portion of the Unused Commitment Fee during the time such Lender is a Non-Funding Lender pursuant to clause (a) thereof.  In the event that any reallocation of Letter of Credit Obligations occurs pursuant to Section 1.13(e)(ii) or 1.13(e)(iii), during the period of time that such reallocation remains in effect, the Letter of Credit Fee payable with respect to such reallocated portion shall be payable to (A)(I) if relating to a Prior Letter of Credit, all Prior Revolving Lenders based on their pro rata share of such reallocation and (II) if relating to a DIP Letter of Credit, all DIP Revolving Lenders based on their pro rata share of such reallocation or (B) to the L/C Issuer for any remaining portion not reallocated to any other DIP Revolving Lenders or Prior Revolving Lenders.  So long as a Lender is a Non-Funding Lender, the Letter of Credit Fee payable with respect to any Letter of Credit Obligation of such Non-Funding Lender that has not been reallocated pursuant to Section 1.13(e)(ii) or 1.13(e)(iii), as applicable, shall be payable to the L/C Issuer.

(f)     Procedures.  Agent is hereby authorized by each Credit Party and each other Secured Party to establish procedures (and to amend such procedures from time to time) to facilitate administration and servicing of the Loans and other matters incidental thereto.  Without limiting the generality of the foregoing, Agent is hereby authorized to establish procedures to make available or deliver, or to accept, notices, documents and similar items on, by posting to or submitting and/or completion, on E-Systems.

1.14     Grant of Lien; Super Priority Nature of Obligations and Lenders' Liens.

(a)     Grant of Lien.  Each Credit Party, as collateral security for the prompt and complete payment and performance when due (whether at stated maturity, by acceleration or otherwise) of the Obligations, hereby mortgages, pledges and hypothecates to the Agent for the benefit of the Secured Parties, and grants to the Agent for the benefit of the Secured Parties a Lien on and security interest in, all of its right, title and interest in, to and under the Collateral of such Credit Party, all as further provided in the DIP Orders.

US-DOCS\112887106.9

(b)    Superpriority Claims.  Each Credit Party hereby covenants, represents and warrants that, upon entry of the Interim Order (and the Final Order, as applicable), the Obligations will have superpriority administrative expense status as expressly set forth in the DIP Orders.

1.15    Guaranty.  To induce the Lenders to make the Loans and the L/C Issuers to Issue Letters of Credit and each other Secured Party to make credit available to or for the benefit of the Borrower, each Guarantor hereby, jointly and severally, absolutely, unconditionally and irrevocably guarantees, as primary obligor and not merely as surety, the full and punctual payment when due, whether at stated maturity or earlier, by reason of acceleration, mandatory prepayment or otherwise in accordance with any Loan Document or the DIP Orders, of all the Obligations of the Borrower and the other Credit Parties whether existing on the date hereof or hereinafter incurred or created (the "**Guaranteed Obligations**").  This guaranty by each Guarantor hereunder constitutes a guaranty of payment and not of collection.

1.16    Contribution.  To the extent that a Guarantor shall be required hereunder to pay any portion of any Guaranteed Obligation exceeding the greater of (a) the amount of the value actually received by such Guarantor and its Subsidiaries from the Loans and other Obligations and (b) the amount such Guarantor would otherwise have paid if such Guarantor had paid the aggregate amount of the Guaranteed Obligations (excluding the amount thereof repaid by such Guarantor that received the benefit of the funds advanced that constituted Guaranteed Obligations) in the same proportion as such Guarantor's net worth on the date enforcement is sought hereunder bears to the aggregate net worth of all Credit Parties on such date, then such Guarantor shall be reimbursed by such other Credit Parties for the amount of such excess, pro rata, based on the respective net worth of such other Credit Parties on such date.

1.17    Authorization; Other Agreement.  The Secured Parties are hereby authorized, without notice to or demand upon any Guarantor and without discharging or otherwise affecting the obligations of any Guarantor hereunder and without incurring any liability hereunder, from time to time, to do each of the following:

(a)    (i) subject to compliance, if applicable, with Section 9.1, modify, amend, supplement or otherwise change, (ii) accelerate or otherwise change the time of payment or (iii) waive or otherwise consent to noncompliance with, any Guaranteed Obligation or any Loan Document;

(b)    apply to the Guaranteed Obligations any sums by whomever paid or however realized to any Guaranteed Obligation in such order as provided in the Loan Documents;

(c)    refund at any time any payment received by any Secured Party in respect of any Guaranteed Obligation;

(d)    sell, exchange, enforce, waive, substitute, liquidate, terminate, release, abandon, fail to perfect, subordinate, accept, substitute, surrender, exchange, affect, impair or otherwise alter or release any Collateral for any Guaranteed Obligation or any other guaranty therefor in any manner, (ii) receive, take and hold additional Collateral to

26

secure any Guaranteed Obligation, (iii) add, release or substitute any one or more other Credit Parties, makers or endorsers of any Guaranteed Obligation or any part thereof and (iv) otherwise deal in any manner with the Borrower, maker or endorser of any Guaranteed Obligation or any part thereof; and

(e)     settle, release, compromise, collect or otherwise liquidate the Guaranteed Obligations.

1.18    <u>Guaranty Absolute and Unconditional</u>.  Each Guarantor hereby waives and agrees not to assert any defense, whether arising in connection with or in respect of any of the following or otherwise, and hereby agrees that its guaranty obligations under this Agreement are irrevocable, absolute and unconditional and shall not be discharged as a result of or otherwise affected by any of the following (which may not be pleaded and evidence of which may not be introduced in any proceeding with respect to this Agreement, in each case except as otherwise agreed in writing by the Agent):

(a)     the invalidity or unenforceability of any obligation of the Borrower or any other Credit Party under any Loan Document or any other agreement or instrument relating thereto (including any amendment, consent or waiver thereto), or any security for, or other guaranty of, any Guaranteed Obligation or any part thereof, or the lack of perfection or continuing perfection or failure of priority of any security for the Guaranteed Obligations or any part thereof;

(b)     the absence of (i) any attempt to collect any Guaranteed Obligation or any part thereof from the Borrower or any Guarantor or other action to enforce the same or (ii) any action to enforce any Loan Document or any Lien thereunder;

(c)     the failure by any Person to take any steps to perfect and maintain any Lien on, or to preserve any rights with respect to, any Collateral;

(d)     any workout, insolvency, bankruptcy proceeding, reorganization, arrangement, liquidation or dissolution by or against the Borrower or any Guarantor or any of the Borrower's or any Guarantor's other Subsidiaries or any procedure, agreement, order, stipulation, election, action or omission thereunder, including any discharge or disallowance of, or bar or stay against collecting, any Guaranteed Obligation (or any interest thereon) in or as a result of any such proceeding;

(e)     any foreclosure, whether or not through judicial sale, and any other sale or other disposition of any Collateral or any election following the occurrence of an Event of Default by any Secured Party to proceed separately against any Collateral in accordance with such Secured Party's rights under any applicable Requirement of Law; or

(f)     any other defense, setoff, counterclaim or any other circumstance that might otherwise constitute a legal or equitable discharge of the Borrower or a Guarantor or any other Subsidiary of a Borrower or any Guarantor, in each case other than the payment in full of the Guaranteed Obligations.

US-DOCS\112887106.9

1.19    Waivers.  Each Credit Party hereby unconditionally and irrevocably waives and agrees not to assert any claim, defense, setoff or counterclaim based on diligence, promptness, presentment, requirements for any demand or notice hereunder including any of the following: (a) any demand for payment or performance and protest and notice of protest; (b) any notice of acceptance; (c) any presentment, demand, protest or further notice or other requirements of any kind with respect to any Guaranteed Obligation (including any accrued but unpaid interest thereon) becoming immediately due and payable; and (d) any other notice in respect of any Guaranteed Obligation or any part thereof, and any defense arising by reason of any disability or other defense of the Credit Parties.  Each Credit Party further unconditionally and irrevocably agrees not to (x) enforce or otherwise exercise any right of subrogation or any right of reimbursement or contribution or similar right against the Borrower or any other Credit Party by reason of any Loan Document or any payment made thereunder or (y) assert any claim, defense, setoff or counterclaim it may have against any other Credit Party or set off any of its obligations to such other Credit Party against obligations of such Credit Party to such Credit Party.  No obligation of any Credit Party hereunder shall be discharged other than by complete performance.

1.20    Reliance.  Each Credit Party hereby assumes responsibility for keeping itself informed of the financial condition of each other Credit Party and any other guarantor, maker or endorser of any Guaranteed Obligation or any part thereof, and of all other circumstances bearing upon the risk of nonpayment of any Guaranteed Obligation or any part thereof that diligent inquiry would reveal, and each Credit Party hereby agrees that no Secured Party shall have any duty to advise any Credit Party of information known to it regarding such condition or any such circumstances.  In the event any Secured Party, in its sole discretion, undertakes at any time or from time to time to provide any such information to any Credit Party, such Secured Party shall be under no obligation to (a) undertake any investigation not a part of its regular business routine, (b) disclose any information that such Secured Party, pursuant to accepted or reasonable commercial finance or banking practices, wishes to maintain confidential or (c) make any future disclosures of such information or any other information to any Credit Party.

## ARTICLE II

## CONDITIONS PRECEDENT

2.1    Conditions of Initial Loans.  The obligation of each Lender to make its initial Loans and of each L/C Issuer to Issue, or cause to be Issued, the initial Letters of Credit hereunder is subject to satisfaction (or waiver) of the following conditions in a manner satisfactory to Agent:

(a)    Loan Documents.  Agent shall have received on or before the Closing Date all of the agreements, documents, instruments and other items set forth on the closing checklist attached hereto as Exhibit 2.1 other than those that are specified therein as permitted to be delivered after the Closing Date, each in form and substance reasonably satisfactory to Agent;

(b)    Availability.  No more than $8,000,000 of DIP Revolving Loans shall be advanced on the Closing Date, and after the funding of the initial Loans and Issuance of

28

the initial DIP Letters of Credit and payment of all costs and expenses in connection therewith, Availability shall be not less than $14,000,000;

(c)    <u>No Litigation</u>.  There shall not exist any order, injunction or decree of any Governmental Authority restraining or prohibiting the funding of the Loans hereunder;

(d)    <u>Debtor-in-Possession</u>.  Each Credit Party shall be a debtor and a debtor-in-possession under Chapter 11 of the Bankruptcy Code;

(e)    <u>Interim Order</u>.  The Bankruptcy Court shall have entered the Interim Order, and such Interim Order shall be in full force and effect and shall not have been stayed, vacated, reversed, amended or otherwise modified without the prior written consent of the Agent and the Required DIP Revolving Lenders in their sole discretion;

(f)    <u>No Other Relief</u>.  No motion, pleading or application seeking relief affecting the provision of the financing contemplated hereunder shall have been filed in the Bankruptcy Court by any Credit Party without the prior written consent of the Agent in its sole discretion;

(g)    <u>Cash Management Order</u>.  The Bankruptcy Court shall have entered a cash management order in form and substance acceptable to the Agent in its sole discretion no later than two (2) days after the Petition Date, and such order shall be in full force and effect and shall not have been stayed, vacated, reversed, amended or otherwise modified without the prior written consent of the Agent in its sole discretion;

(h)    <u>Payment of Pre-Petition Interest and Fees</u>.  The Agent shall have received evidence reasonably satisfactory to the Agent that the Credit Parties have paid in full all pre-petition interest and pre-petition fees that have accrued pursuant to the Pre-Petition Loan Documents but remain unpaid and for which payment thereof is provided for in the Approved Budget;

(i)    <u>Initial Approved Budget</u>.  The Agent and Lenders shall have received the initial 13-week cash flow budget, attached as Exhibit A to the Interim Order, setting forth, on a weekly and a line-item basis, in each case as required by the Interim Order (i) projected cash receipts, (ii) projected disbursements and the amount of outstanding Prior Letters of Credit (including ordinary course operating expenses, bankruptcy-related expenses under the Chapter 11 Cases (including professional fees of the Credit Parties with respect thereto), capital expenditures, asset sales, issuances of any letter of credit, including the fees relating thereto, and estimated fees and expenses of the Agent (including fees and expenses of its legal counsel and financial advisors), estimated fees and expenses of the Pre-Petition Agent and Pre-Petition Lenders (including fees and expenses of their legal counsel and financial advisors), estimated fees and expenses of the members of any statutory committee and any professionals engaged by any such statutory committee) and any other fees and expenses relating to this Agreement or the other Loan Documents), and (iii) the sum of Availability plus unrestricted and available cash on hand (such sum, the "**Aggregate Availability**"), in each case for each week from the first day of the week in which the Petition Date occurs through the last day of the week that is 13

weeks thereafter, to be attached to the Interim Order which shall be in form and substance satisfactory to the Agent and Required DIP Revolving Lenders (the "**Initial Approved Budget**");

(j)      Payment of Fees.  The Agent shall have received evidence reasonably satisfactory to the Agent that the Credit Parties have paid in full all fees owing pursuant to Section 1.11(a) hereof; and

(k)      DIP Order Conditions.  All other conditions to borrowing in the Interim Order shall have been satisfied.

For the purpose of determining satisfaction with the conditions specified in this Section 2.1, each Lender that has signed and delivered this Agreement shall be deemed to have accepted, and to be satisfied with, each document or other matter required under this Section 2.1 unless the Agent shall have received written notice from such Lender prior to the Closing Date specifying its objection thereto.

2.2    Conditions to All Borrowings.  Except as otherwise expressly provided herein, no Lender or L/C Issuer shall be obligated to fund any DIP Revolving Loan or incur any DIP Letter of Credit Obligation, if, as of the date thereof:

(a)      (i) if such date is on or after the Interim Period Outside Date (as defined in the Interim Order), the Bankruptcy Court shall not have entered the Final Order, (ii) if the Interim Order has expired, the Bankruptcy Court shall not have entered the Final Order, (iii) the Interim Order or the Final Order, as the case may be, shall have been vacated, stayed, reversed, modified or amended without the Agent's and Required DIP Revolving Lenders' consent or shall otherwise not be in full force and effect or (iv) the Interim Order or the Final Order, as the case may be, in any respect shall be the subject of a stay pending either appeal or a motion for reconsideration thereof;

(b)      for any DIP Revolving Loan to be made prior to the entry of the Final Order or for any DIP Letter of Credit to be Issued prior to the entry of the Final Order, the sum of the outstanding principal amount of the DIP Revolving Loans plus outstanding DIP Letter of Credit Obligations (after giving effect to the amount of the requested DIP Revolving Loan and the incurrence of the DIP Letter of Credit Obligations) would exceed the amount permitted by the Interim Order;

(c)      for any DIP Letter of Credit to be issued, after giving effect to the requested DIP Letter of Credit, the sum of the outstanding DIP Letter of Credit Obligations would exceed $500,000;

(d)      any representation or warranty by any Credit Party contained herein or in any other Loan Document is untrue or incorrect in any material respect (without duplication of any materiality qualifier contained therein) as of such date, except to the extent that such representation or warranty expressly relates to an earlier date (in which event such representations and warranties were untrue or incorrect in any material respect (without duplication of any materiality qualifier contained therein) as of such earlier date), and Agent or Required DIP Revolving Lenders have determined not to make such

DIP Revolving Loan or incur such DIP Letter of Credit Obligation as a result of the fact that such representation or warranty is untrue or incorrect in any material respect (without duplication of any materiality qualifier contained therein);

(e)     any Default or Event of Default has occurred and is continuing or would result immediately after giving effect to any DIP Revolving Loan (or the incurrence of any DIP Letter of Credit Obligation), and Agent or Required DIP Revolving Lenders shall have determined not to make such DIP Revolving Loan or incur any DIP Letter of Credit Obligation as a result of that Default or Event of Default; and

(f)     after giving effect to any DIP Revolving Loan (or the incurrence of any DIP Letter of Credit Obligations), the aggregate outstanding amount of the DIP Revolving Loans would exceed the Maximum DIP Revolving Loan Balance.

The request by the Borrower and acceptance by the Borrower of the proceeds of any DIP Revolving Loan or the incurrence of any DIP Letter of Credit Obligations shall be deemed to constitute, as of the date thereof, (i) a representation and warranty by the Borrower that the conditions in this Section 2.2 have been satisfied and (ii) a reaffirmation by each Credit Party of the granting and continuance of Agent's Liens, on behalf of itself and the Secured Parties, pursuant to the Collateral Documents.

ARTICLE III

REPRESENTATIONS AND WARRANTIES

The Credit Parties, jointly and severally, represent and warrant to Agent and each Lender that the following are, and after giving effect to the transactions contemplated hereunder will be, true, correct and complete:

3.1     <u>Corporate Existence and Power</u>.  Each Credit Party and each of their respective Subsidiaries:

(a)     is a corporation, limited liability company or limited partnership, as applicable, duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation, organization or formation, as applicable;

(b)     has the power and authority and all governmental licenses, authorizations, Permits, consents and approvals to own its assets, carry on its business and execute, deliver, and perform its obligations under, the Loan Documents to which it is a party;

(c)     is duly qualified as a foreign corporation, limited liability company or limited partnership, as applicable, and licensed and in good standing, under the laws of each jurisdiction where its ownership, lease or operation of Property or the conduct of its business requires such qualification or license; and

(d)     is in compliance with all Requirements of Law;

31

except, in each case referred to in clause (c) or clause (d), to the extent that the failure to do so would not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

3.2     Corporate Authorization; No Contravention.    The execution, delivery and performance by each of the Credit Parties of this Agreement and by each Credit Party and each of their respective Subsidiaries of any other Loan Document to which such Person is a party, have been duly authorized by all necessary action, and do not and will not:

> (a)     contravene the terms of any of that Person's Organization Documents;

> (b)     conflict with or result in any material breach or contravention of, or result in the creation of any Lien under, any document evidencing any material Contractual Obligation to which such Person is a party or any order, injunction, writ or decree of any Governmental Authority to which such Person or its Property is subject; or

> (c)     violate any material Requirement of Law in any material respect.

3.3     Governmental Authorization.    No approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority is necessary or required in connection with the execution, delivery or performance by, or enforcement against, any Credit Party or any Subsidiary of any Credit Party of this Agreement or any other Loan Document except entry by the Bankruptcy Court of the Interim Order (or the Final Order) when applicable.

3.4     Binding Effect.    This Agreement and each other Loan Document to which any Credit Party or any Subsidiary of any Credit Party is a party constitute the legal, valid and binding obligations of each such Person which is a party thereto, enforceable against such Person in accordance with their respective terms, except as enforceability may be limited by applicable bankruptcy, insolvency, or similar laws affecting the enforcement of creditors' rights generally or by equitable principles relating to enforceability.

3.5     Litigation.    Except as specifically disclosed in Schedule 3.5, there are no actions, suits, proceedings, claims or disputes pending, or to the best knowledge of each Credit Party, threatened in writing, at law, in equity, in arbitration or before any Governmental Authority, against any Credit Party, any Subsidiary of any Credit Party or any of their respective Properties which:

> (a)     purport to affect or pertain to this Agreement, any other Loan Document or any of the transactions contemplated hereby or thereby;

> (b)     would reasonably be expected to result in monetary judgment(s) or relief, individually or in the aggregate, in excess of $500,000; or

> (c)     would reasonably be expected to have a Material Adverse Effect.

No injunction, writ, temporary restraining order or any order of any nature has been issued by any court or other Governmental Authority purporting to enjoin or restrain the execution, delivery or performance of this Agreement, any other Loan Document, any Pre-Petition Loan

Document or directing that the transactions provided for herein or therein not be consummated as herein or therein provided. As of the Closing Date, no Credit Party or any Subsidiary of any Credit Party is the subject of an audit or, to each Credit Party's knowledge, any review or investigation by any Governmental Authority (excluding the IRS and other taxing authorities) concerning the material violation of any material Requirement of Law.

3.6    No Default. No Default or Event of Default exists or would result from the incurring of any Obligations by any Credit Party or the grant or perfection of Agent's Liens on the Collateral, except for Defaults and Events of Default occasioned by the filing of the Chapter 11 Cases and Defaults and Events of Default resulting from obligations with respect to which the Bankruptcy Code prohibits the Credit Parties from complying or permits the Credit Parties not to comply. No Credit Party and no Subsidiary of any Credit Party is in default under or with respect to any Contractual Obligation in any respect which, individually or together with all such defaults, would reasonably be expected to have a Material Adverse Effect, except for Defaults and Events of Default resulting from obligations with respect to which the Bankruptcy Code prohibits the Credit Parties from complying or permits the Credit Parties not to comply.

3.7    ERISA Compliance. Schedule 3.7 sets forth, as of the Closing Date, a complete and correct list of, and that separately identifies, (a) all Title IV Plans, (b) all Multiemployer Plans and (c) all material Benefit Plans. Each Benefit Plan, and each trust thereunder, intended to qualify for tax exempt status under Section 401 or 501 of the Code or other Requirements of Law so qualifies. Except for those that would not, in the aggregate, reasonably be expected to have a Material Adverse Effect, (x) each Benefit Plan is in compliance with applicable provisions of ERISA, the Code and other applicable Requirements of Law, (y) there are no existing or pending (or to the knowledge of any Credit Party, threatened in writing) claims (other than routine claims for benefits in the normal course), sanctions, actions, lawsuits or other proceedings or investigations involving any Benefit Plan to which any Credit Party incurs or otherwise has or could have an obligation or any Liability and (z) no ERISA Event is reasonably expected to occur. On the Closing Date, no ERISA Event has occurred in connection with which obligations and liabilities (contingent or otherwise) remain outstanding.

3.8    Use of Proceeds; Margin Regulations. The proceeds of the Loans are intended to be and shall be used solely for the purposes set forth in and permitted by Section 4.10, and are intended to be and shall be used in compliance with Section 5.8. No Credit Party and no Subsidiary of any Credit Party is engaged in the business of purchasing or selling Margin Stock or extending credit for the purpose of purchasing or carrying Margin Stock. Proceeds of the Loans shall not be used for the purpose of purchasing or carrying Margin Stock. As of the Closing Date, except as set forth on Schedule 3.8, no Credit Party and no Subsidiary of any Credit Party owns any Margin Stock.

3.9    Ownership of Property; Liens. As of the Closing Date, the Real Estate listed in Schedule 3.9 constitutes all of the Real Estate owned or leased by each Credit Party and each of their respective Subsidiaries. Each of the Credit Parties and each of their respective Subsidiaries has good record and marketable title in fee simple to, or valid leasehold interests in, all material Real Estate, and good and valid title to all owned personal property and valid leasehold interests in all leased personal property, in each instance, necessary or used in the ordinary conduct of their respective businesses. None of the Property of any Credit Party or any Subsidiary of any

Credit Party is subject to any Liens other than Permitted Liens.  As of the Closing Date, Schedule 3.9 also describes any purchase options, rights of first refusal or other similar contractual rights pertaining to any Real Estate.  All material permits required to have been issued or appropriate to enable the Real Estate to be lawfully occupied and used for all of the purposes for which it is currently occupied and used have been lawfully issued and are in full force and effect.

3.10    Taxes.  All federal and all material state, local and foreign income and franchise and other Tax returns, reports and statements (collectively, the "**Tax Returns**") required to be filed by any Tax Affiliate have been filed with the appropriate Governmental Authorities, all such Tax Returns are true and correct in all material respects, and all Taxes reflected therein and all material Taxes otherwise due and payable have been paid prior to the date on which any Liability may be added thereto for non-payment thereof except for those contested in good faith by appropriate proceedings diligently conducted and for which adequate reserves are maintained on the books of the appropriate Tax Affiliate in accordance with GAAP.  As of the Closing Date, to the knowledge of the Credit Parties and except as set forth on Schedule 3.10, no Tax Return is under audit or examination by any Governmental Authority and no notice of any audit or examination or any assertion of any claim for Taxes has been given or made by any Governmental Authority.  Proper and accurate amounts have been withheld by each Credit Party from their respective employees for all periods in full and complete compliance with the Tax, social security and unemployment withholding provisions of applicable Requirements of Law and such withholdings have been timely paid to the respective Governmental Authorities.  No Tax Affiliate has participated in a "reportable transaction" within the meaning of Treasury Regulation Section 1.6011-4(b) or has been a member of an affiliated, combined or unitary group other than the group of which a Tax Affiliate is the common parent.

3.11    Financial Condition.

(a)    Each of (i) the audited consolidated balance sheet of the Borrower and its Subsidiaries dated December 26, 2018 and the related audited consolidated statements of income or operations and cash flows for the Fiscal Year ended on that date and (ii) the unaudited interim consolidated balance sheet of the Borrower and its Subsidiaries dated November 20, 2019 and the related unaudited consolidated statements of income for the eleven Fiscal Periods then ended:

(x)    were prepared in accordance with GAAP consistently applied throughout the respective periods covered thereby, except as otherwise expressly noted therein, subject to, in the case of the unaudited interim financial statements, normal year-end adjustments and the lack of footnote disclosures; and

(y)    present fairly in all material respects the consolidated financial condition of the Borrower and its Subsidiaries as of the dates thereof and results of operations for the periods covered thereby.

(b)    The pro forma unaudited consolidated balance sheet of the Borrower and its Subsidiaries dated November 20, 2019 delivered on the Closing Date was prepared by the Borrower giving pro forma effect to the funding of the Loans, was based on the

US-DOCS\112887106.9

unaudited consolidated balance sheets of the Borrower and its Subsidiaries dated November 20, 2019, and was prepared in accordance with GAAP, with only such adjustments thereto as would be required in a manner consistent with GAAP.

(c)    Since December 26, 2018 there has been no Material Adverse Effect, other than the filing of the Chapter 11 Cases.

(d)    The Credit Parties and their Subsidiaries have no Indebtedness other than Indebtedness permitted pursuant to Section 5.5 and have no Contingent Obligations other than Contingent Obligations permitted pursuant to Section 5.9.

(e)    All financial performance projections delivered to Agent, including the financial performance projections delivered on or prior to the Closing Date and referenced in Section 3.11(b), represent the Borrower's reasonable estimate of future financial performance and are based on assumptions believed by the Borrower to be fair and reasonable at the time prepared, it being acknowledged and agreed by Agent and Lenders that projections as to future events are not to be viewed as facts and that the actual results during the period or periods covered by such projections may differ materially from the projected results.

3.12    <u>Environmental Matters</u>.  Except as set forth in <u>Schedule 3.12</u> and except where any failures to comply would not reasonably be expected to result in, either individually or in the aggregate, Material Environmental Liabilities to the Credit Parties and their Subsidiaries, (a) the operations of each Credit Party and each Subsidiary of each Credit Party are and have been in compliance with all applicable Environmental Laws, including obtaining, maintaining and complying with all Permits required by any applicable Environmental Law, (b) no Credit Party and no Subsidiary of any Credit Party is party to, and no Credit Party and no Subsidiary of any Credit Party and no Real Estate currently (or to the knowledge of any Credit Party previously) owned, leased, subleased, operated or otherwise occupied by or for any such Person is subject to or the subject of, any Contractual Obligation or any pending (or, to the knowledge of any Credit Party, threatened in writing) order, action, investigation, suit, proceeding, audit, claim, demand, dispute or notice of violation or of potential liability or similar notice relating in any manner to any Environmental Law, (c) no Lien in favor of any Governmental Authority securing, in whole or in part, Environmental Liabilities has attached to any Property of any Credit Party or any Subsidiary of any Credit Party and, to the knowledge of any Credit Party, no facts, circumstances or conditions exist that could reasonably be expected to result in any such Lien attaching to any such Property, (d) no Credit Party and no Subsidiary of any Credit Party has caused or suffered to occur a Release of Hazardous Materials at, to or from any Real Estate, (e) all Real Estate currently (or to the knowledge of any Credit Party previously) owned, leased, subleased, operated or otherwise occupied by or for any such Credit Party and each Subsidiary of each Credit Party is free of contamination by any Hazardous Materials and (f) no Credit Party and no Subsidiary of any Credit Party (i) is or has been engaged in operations in violation of any Environmental Law or (ii) has received any written information request or notice of a violation of any Environmental Law, including receipt of any information request or notice of potential responsibility under the Comprehensive Environmental Response, Compensation and Liability Act or similar Environmental Laws.

US-DOCS\112887106.9

3.13    Regulated Entities.  None of any Credit Party, any Person controlling any Credit Party, or any Subsidiary of any Credit Party, is (a) an "investment company" within the meaning of the Investment Company Act of 1940 or (b) subject to regulation under the Federal Power Act, the Interstate Commerce Act, any state public utilities code, or any other federal or state statute, rule or regulation limiting its ability to incur Indebtedness, pledge its assets or perform its obligations under the Loan Documents.

3.14    [Intentionally Omitted].

3.15    Labor Relations.  There are no strikes, work stoppages, slowdowns or lockouts existing, pending (or, to the knowledge of any Credit Party, threatened in writing) against or involving any Credit Party or any Subsidiary of any Credit Party, except for those that would not, in the aggregate, reasonably be expected to have a Material Adverse Effect.  Except as set forth on Schedule 3.15, as of the Closing Date, (a) there is no collective bargaining or similar agreement with any union, labor organization, works council or similar representative covering any employee of any Credit Party or any Subsidiary of any Credit Party, (b) no petition for certification or election of any such representative is existing or pending with respect to any employee of any Credit Party or any Subsidiary of any Credit Party and (c) no such representative has sought certification or recognition with respect to any employee of any Credit Party or any Subsidiary of any Credit Party.

3.16    Intellectual Property.  Each Credit Party and each Subsidiary of each Credit Party owns, or is licensed to use, all Intellectual Property necessary to conduct its business as currently conducted except for such Intellectual Property the failure of which to own or license would not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.  To the knowledge of each Credit Party, (a) the conduct and operations of the businesses of each Credit Party and each Subsidiary of each Credit Party does not infringe, misappropriate, dilute, violate or otherwise impair any Intellectual Property owned by any other Person and (b) no other Person has contested any right, title or interest of any Credit Party or any Subsidiary of any Credit Party in, or relating to, any Intellectual Property, other than, in each case, as cannot reasonably be expected to affect the Loan Documents and the transactions contemplated therein and would not, in the aggregate, reasonably be expected to have a Material Adverse Effect.

3.17    Brokers' Fees; Transaction Fees.  Except as disclosed on Schedule 3.17 and except for fees payable to Agent and Lenders, none of the Credit Parties or any of their respective Subsidiaries has any obligation to any Person in respect of any finder's, broker's or investment banker's fee in connection with the transactions contemplated hereby.

3.18    Insurance.  Each of the Credit Parties and each of their respective Subsidiaries and their respective Properties are insured with financially sound and reputable insurance companies which are not Affiliates of the Borrower, in such amounts, with such deductibles and covering such risks as are customarily carried by companies engaged in similar businesses of the same size and character as the business of the Credit Parties and, to the extent relevant, owning similar Properties in localities where such Person operates.  A true and complete listing of such insurance, including issuers, coverages and deductibles, has been provided to Agent.

36

3.19    <u>Ventures, Subsidiaries and Affiliates; Outstanding Stock</u>.  Except as set forth in <u>Schedule 3.19</u>, as of the Closing Date, no Credit Party and no Subsidiary of any Credit Party (a) has any Subsidiaries, or (b) is engaged in any joint venture or partnership with any other Person. All issued and outstanding Stock and Stock Equivalents of each of the Credit Parties and each of their respective Subsidiaries are duly authorized and validly issued, fully paid, non-assessable, and free and clear of all Liens other than, with respect to the Stock and Stock Equivalents of the Borrower and Subsidiaries of the Borrower, those in favor of Agent, for the benefit of the Secured Parties, and the Subordinated Lenders.  All such securities were issued in compliance with all applicable state and federal laws concerning the issuance of securities.  All of the issued and outstanding Stock of each Credit Party (other than Holdings), each Subsidiary of each Credit Party and, as of the Closing Date, Holdings is owned by each of the Persons and in the amounts set forth in <u>Schedule 3.19</u>.  Except as set forth in <u>Schedule 3.19</u>, there are no pre-emptive or other outstanding rights to purchase, options, warrants or similar rights or agreements pursuant to which any Credit Party may be required to issue, sell, repurchase or redeem any of its Stock or Stock Equivalents or any Stock or Stock Equivalents of its Subsidiaries.  Set forth in <u>Schedule 3.19</u> is a true and complete organizational chart of Holdings and all of its Subsidiaries, which the Credit Parties shall update upon notice to Agent promptly following the incorporation, organization or formation of any Subsidiary.

3.20    <u>Jurisdiction of Organization; Chief Executive Office</u>.  <u>Schedule 3.20</u> lists each Credit Party's jurisdiction of organization, legal name and organizational identification number, if any, and the location of such Credit Party's chief executive office or sole place of business, in each case as of the date hereof.

3.21    <u>Deposit Accounts and Other Accounts</u>.  <u>Schedule 3.21</u> lists all banks and other financial institutions at which any Credit Party maintains deposit or other accounts as of the Closing Date, and such <u>Schedule 3.21</u> correctly identifies the name, address and any other relevant contact information reasonably requested by Agent with respect to each depository, the name in which the account is held, a description of the purpose of the account, and the complete account number therefor.

3.22    <u>Bonding</u>.  Except as set forth in <u>Schedule 3.22</u>, as of the Closing Date, no Credit Party is a party to or bound by any surety bond agreement, indemnification agreement therefor or bonding requirement with respect to products or services sold by it.

3.23    <u>Status of Holdings</u>.  Holdings has not engaged in any business activities and does not own any Property other than (i) ownership of the Stock and Stock Equivalents of the Borrower, (ii) activities and contractual rights incidental to maintenance of its corporate existence and ownership of the Stock and Stock Equivalents of the Borrower, (iii) performance of its obligations under the Loan Documents and the Subordinated Indebtedness Documents to which it is a party, and (iv) ownership of other de minimis Property and incurrence of other de minimis liabilities.

3.24    <u>Subordinated Debt</u>.  As of the Closing Date, the Borrower has delivered to Agent a complete and correct copy of the Subordinated Indebtedness Documents (including all schedules, exhibits, amendments, supplements, modifications, assignments and all other documents delivered pursuant thereto or in connection therewith).  All Pre-Petition Obligations,

including the L/C Reimbursement Obligations relating to the Prior Letters of Credit, constitute Indebtedness entitled to the benefits of the subordination provisions contained in the Subordination Agreement.

3.25    Full Disclosure.    None of the representations or warranties made by any Credit Party or any of their Subsidiaries in the Loan Documents as of the date such representations and warranties are made or deemed made, and none of the statements contained in each exhibit, report, statement or certificate furnished by or on behalf of any Credit Party or any of their Subsidiaries in connection with the Loan Documents (including the offering and disclosure materials, if any, delivered by or on behalf of any Credit Party to Agent or the Lenders prior to the Closing Date), contains any untrue statement of a material fact or omits any material fact required to be stated therein or necessary to make the statements made therein, in light of the circumstances under which they are made, not misleading as of the time when made or delivered; provided that with respect to projected financial information, each Credit Party represents that such information was prepared in good faith based upon assumptions believed to be reasonable at the time prepared.

3.26    Foreign Assets Control Regulations and Anti-Money Laundering.    Each Credit Party and each Subsidiary of each Credit Party is in compliance in all material respects with all U.S. economic sanctions laws, Executive Orders and implementing regulations as promulgated by the U.S. Treasury Department's Office of Foreign Assets Control ("**OFAC**"), and all applicable anti-money laundering and counter-terrorism financing provisions of the Bank Secrecy Act and all regulations issued pursuant to it.    No Credit Party and no Subsidiary of a Credit Party (i) is a Person designated by the U.S. government on the list of the Specially Designated Nationals and Blocked Persons (the "**SDN List**") with which a U.S. Person cannot deal with or otherwise engage in business transactions, (ii) is a Person who is otherwise the target of U.S. economic sanctions laws such that a U.S. Person cannot deal or otherwise engage in business transactions with such Person or (iii) is controlled by (including by virtue of such Person being a director or owning voting shares or interests), or acts, directly or indirectly, for or on behalf of, any Person on the SDN List or a foreign government that is the target of U.S. economic sanctions prohibitions such that the entry into, or performance under, this Agreement or any other Loan Document would be prohibited under U.S. law.

3.27    Patriot Act.    Each Credit Party and each Subsidiary of each Credit Party is in compliance with (a) the Trading with the Enemy Act, and each of the foreign assets control regulations of the United States Treasury Department and any other enabling legislation or executive order relating thereto, (b) the Patriot Act and (c) other federal or state laws relating to *"know your customer"* and anti-money laundering rules and regulations.    No part of the proceeds of any Loan will be used directly or indirectly for any payments to any government official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977.

3.28    Bankruptcy Matters.

(a)    The Chapter 11 Cases were commenced on the Petition Date in accordance with applicable law and proper notice thereof and the proper notice, to the

extent given or required to be given prior to the date hereof, was given for (x) the motions seeking approval of the Loan Documents and the Interim Order and Final Order, (y) the hearings for the approval of the Interim Order, and (z) the hearings for the approval of the Final Order.

(b)    From and after the entry of the Interim Order, and pursuant to and to the extent permitted in the Interim Order and the Final Order, the Obligations will constitute allowed administrative expenses in the Chapter 11 Cases having priority over all administrative expenses and unsecured claims against the Credit Parties as set forth in the DIP Orders.

(c)    From and after the entry of the Interim Order and pursuant to and to the extent provided in the Interim Order and the Final Order, the Obligations will be secured by a valid and perfected first priority lien on all of the Collateral, subject, as to priority only, to the Carve-Out and the Prepetition Prior Liens, as set forth in the DIP Orders.

(d)    The Interim Order (with respect to the period prior to entry of the Final Order) or the Final Order (with respect to the period on and after entry of the Final Order), as the case may be, is in full force and effect has not been reversed, stayed, modified or amended without the Agent's and Required DIP Revolving Lenders' consent in their sole discretion.

<u>ARTICLE IV</u>

<u>AFFIRMATIVE COVENANTS</u>

Each Credit Party covenants and agrees that until the Facility Termination Date:

4.1    <u>Financial Statements</u>.  Each Credit Party shall maintain, and shall cause each of its Subsidiaries to maintain, a system of accounting established and administered in accordance with sound business practices to permit the preparation of financial statements in conformity with GAAP (provided that monthly and quarterly financial statements shall not be required to have footnote disclosures and are subject to normal year-end adjustments).  The Borrower shall deliver to Agent and each Lender by Electronic Transmission and in detail reasonably satisfactory to Agent and the Required DIP Revolving Lenders:

(a)    [Intentionally Omitted];

(b)    as soon as available, but not later than forty-five (45) days after the end of each Fiscal Quarter of each year, a copy of the unaudited consolidated balance sheets of the Borrower and each of its Subsidiaries, and the related consolidated statements of income as of the end of such Fiscal Quarter and for the portion of the Fiscal Year then ended, all certified on behalf of the Borrower by an appropriate Responsible Officer of the Borrower as being complete and correct and fairly presenting, in all material respects, in accordance with GAAP, the financial position and the results of operations of Holdings and its Subsidiaries, subject to normal year-end adjustments and absence of footnote disclosures; and

(c)     as soon as available, but not later than thirty (30) days after the end of each Fiscal Period of each year, a copy of the internally prepared and unaudited consolidated balance sheets of the Borrower and each of its Subsidiaries, and the related consolidated statements of income and cash flows as of the end of such Fiscal Period and for the portion of the Fiscal Year then ended, all certified on behalf of the Borrower by an appropriate Responsible Officer of the Borrower as being complete and correct and fairly presenting, in all material respects, in accordance with GAAP, the financial position and the results of operations of Holdings and its Subsidiaries, subject to normal year-end adjustments and absence of footnote disclosures.

4.2     <u>Certificates; Other Information</u>.  The Borrower shall furnish to Agent and each Lender by Electronic Transmission:

(a)     together with each delivery of financial statements pursuant to Section 4.1(b), (i) a management discussion and analysis report, in reasonable detail, signed by the chief financial officer of the Borrower, describing the operations and financial condition of the Credit Parties and their Subsidiaries for the Fiscal Period and the portion of the Fiscal Year then ended (or for the Fiscal Year then ended in the case of annual financial statements), and (ii) a report setting forth in comparative form the corresponding figures for the corresponding periods of the previous Fiscal Year and the corresponding figures from the most recent projections for the current Fiscal Year delivered pursuant to Section 4.2(h) and discussing the reasons for any significant variations;

(b)     concurrently with (i) the delivery of the financial statements referred to in Section 4.1(b) above and (ii) the delivery of each Variance Report, a fully and properly completed certificate in the form of <u>Exhibit 4.2(b)</u> (a **"Compliance Certificate"**), certified on behalf of the Borrower by a Responsible Officer of the Borrower;

(c)     promptly upon filing, copies of all financial statements and regular, periodic or special reports which such Person may file with the Securities and Exchange Commission or any successor Governmental Authority;

(d)     as soon as available and in any event within ten (10) days after the end of each calendar month, an Availability Certificate certified on behalf of the Borrower by a Responsible Officer of the Borrower;

(e)     concurrently with the delivery of the financial statements referred to in Section 4.1(b) above, a profit and loss statement at the unit level;

(f)     together with each delivery of financial statements referred to in Section 4.1(b), a reasonably detailed schedule of (i) store openings and closures by any Credit Party during such Fiscal Quarter and (ii) real estate leases entered into by any Credit Party during such Fiscal Quarter;

(g)     concurrently with the delivery of the financial statements referred to in Section 4.1(c) above, a report setting forth same store sales and traffic counts for such Fiscal Period;

(h)    as soon as available and in any event no later than the last day of each Fiscal Year of the Borrower, projections of the Borrower (and its Subsidiaries) consolidated financial performance for the forthcoming three Fiscal Years on a year by year basis, and for the forthcoming Fiscal Year on a Fiscal Period basis (including the assumptions made in the build-up of such projections);

(i)    promptly upon receipt thereof, copies of any reports submitted by the Borrower's certified public accountants in connection with each annual, interim or special audit or review of any type of the financial statements or internal control systems of any Credit Party made by such accountants;

(j)    from time to time, if Agent determines that obtaining appraisals is necessary in order for Agent or any Lender to comply with applicable laws or regulations (including any appraisals required to comply with FIRREA), and at any time if a Default or an Event of Default shall have occurred and be continuing, Agent may, or may require the Borrower to, in either case at the Borrower's expense, obtain appraisals in form and substance and from appraisers reasonably satisfactory to Agent stating the then current fair market value of all or any portion of the personal property of any Credit Party or any Subsidiary of any Credit Party and the fair market value or such other value as determined by Agent (for example, replacement cost for purposes of Flood Insurance) of any Real Estate of any Credit Party or any Subsidiary of any Credit Party; provided, that, notwithstanding any provision herein to the contrary, the Credit Parties shall only be obligated to reimburse Agent for the expenses of such appraisals occurring one (1) time per year so long as an Event of Default has not occurred and is continuing;

(k)    no later than thirty (30) days after the end of each Fiscal Quarter, a certificate of a Responsible Officer of the Borrower setting forth in reasonable detail any Margin Stock owned by each Credit Party and each Subsidiary of each Credit Party as of the last day of such Fiscal Quarter;

(l)    as soon as available, but not later than thirty (30) days after the renewal of any insurance policies, an insurance report setting forth all policies of insurance of any kind with respect to the Property and businesses of the Credit Parties and their Subsidiaries;

(m)    no later than Wednesday of each calendar week (beginning with the calendar week ending on February 7, 2020), cash flow projections, in form and methodology reasonably satisfactory to Agent, showing that the Borrower and the other Credit Parties have liquidity to operate their businesses through and including the date ending thirteen (13) weeks after the applicable date such projections are required to be delivered pursuant to this clause (m);

(n)    concurrently with the delivery of the financial statements referred to in Section 4.1(c) above, a report, in form and methodology reasonably satisfactory to Agent, setting forth monthly financial results on a per Restaurant basis;

(o)    commencing on February 7, 2020, and on every subsequent fourth (4th) Friday thereafter (i.e. every four weeks), a supplement to the then applicable Approved Budget extending the period of such Approved Budget for an additional four weeks (which supplement shall constitute a portion of the Approved Budget if such supplement becomes a Supplemental Approved Budget);

(p)    at the times required by the DIP Orders, a variance report/reconciliation report (the "**Variance Report**"), certified by the Chief Financial Officer of the Borrower, in form acceptable to the Agent, setting forth the applicable information required by the DIP Orders;

(q)    as soon as available, but not later than the date such reports or certificates are required to be delivered pursuant to the terms of the DIP Orders, copies of all other reports and certificates required to be delivered by the Credit Parties pursuant to the terms of the DIP Orders; and

(r)    promptly, such additional business, financial, corporate affairs, perfection certificates and other information as Agent or any DIP Revolving Lender may from time to time reasonably request in writing.

4.3    Notices.  The Borrower shall notify promptly Agent and each Lender of each of the following (and in no event later than three (3) Business Days after a Responsible Officer becomes aware thereof):

(a)    the occurrence or existence of any Default or Event of Default;

(b)    any breach or non-performance of, or any default under, any Contractual Obligation of any Credit Party or any Subsidiary of any Credit Party, or any violation of, or non-compliance with, any Requirement of Law, which would reasonably be expected to result, either individually or in the aggregate, in a Material Adverse Effect, including a description of such breach, non-performance, default, violation or non-compliance and the steps, if any, such Person has taken, is taking or proposes to take in respect thereof;

(c)    any dispute, litigation, investigation, proceeding or suspension which may exist at any time between any Credit Party or any Subsidiary of any Credit Party and any Governmental Authority which would reasonably be expected to result, either individually or in the aggregate, in a Material Adverse Effect;

(d)    the commencement of, or any material development in, any litigation or proceeding affecting any Credit Party or any Subsidiary of any Credit Party or its respective property (i) in which the amount of damages claimed is $500,000 or more, (ii) which would reasonably be expected to have a Material Adverse Effect, or (iii) in which the relief sought is an injunction or other stay of the performance of this Agreement, any other Loan Document, or any Pre-Petition Loan Document;

(e)    (i) the receipt by any Credit Party of any notice of violation of or potential liability or similar notice under Environmental Law, (ii)(A) unpermitted Releases, (B) the existence of any condition that could reasonably be expected to result in violations of or

Liabilities under, any Environmental Law or (C) the commencement of, or any material change to, any action, investigation, suit, proceeding, audit, claim, demand, or dispute alleging a violation of or Liability under any Environmental Law which in the case of clauses (i) and (ii)(A), (B) and (C) above, in the aggregate for all such clauses, would reasonably be expected to result in Material Environmental Liabilities, (iii) the receipt by any Credit Party of notification that any Property of any Credit Party is subject to any Lien in favor of any Governmental Authority securing, in whole or in part, Material Environmental Liabilities and (iv) any proposed acquisition or lease of Real Estate, if such acquisition or lease would have a reasonable likelihood of resulting in Material Environmental Liabilities as a result of Liability under Environmental Laws;

(f)    (i) on or prior to any filing by any ERISA Affiliate of any notice of any reportable event under Section 4043 of ERISA or intent to terminate any Title IV Plan, a copy of such notice, (ii) promptly, and in any event within ten (10) days, after any officer of any ERISA Affiliate knows or has reason to know that a request for a minimum funding waiver under Section 412 of the Code has been filed with respect to any Title IV Plan or Multiemployer Plan, a notice describing such waiver request and any action that any ERISA Affiliate proposes to take with respect thereto, together with a copy of any notice filed with the PBGC or the IRS pertaining thereto, and (iii) promptly, and in any event within ten (10) days after any officer of any ERISA Affiliate knows or has reason to know that an ERISA Event will or has occurred, a notice describing such ERISA Event, and any action that any ERISA Affiliate proposes to take with respect thereto, together with a copy of any notices received from or filed with the PBGC, IRS, Multiemployer Plan or other Benefit Plan pertaining thereto;

(g)    any Material Adverse Effect subsequent to the date of the most recent audited financial statements delivered to Agent and Lenders pursuant to this Agreement;

(h)    any material change in accounting policies or financial reporting practices by any Credit Party or any Subsidiary of any Credit Party;

(i)    any labor controversy resulting in or threatening (in writing) to result in any strike, work stoppage, boycott, shutdown or other labor disruption against or involving any Credit Party or any Subsidiary of any Credit Party if the same would reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect; and

(j)    the creation, establishment or acquisition of any Subsidiary or the issuance by or to any Credit Party of any Stock or Stock Equivalent (other than issuances by Holdings of Stock or Stock Equivalents not requiring a mandatory prepayment hereunder).

Each notice pursuant to this Section shall be in electronic form accompanied by a statement by a Responsible Officer of the Borrower, on behalf of the Borrower, setting forth details of the occurrence referred to therein, and stating what action the Borrower or other Person proposes to take with respect thereto and at what time. Each notice under Section 4.3(a) shall

describe with particularity any and all clauses or provisions of this Agreement or other Loan Document that have been breached or violated.

4.4    <u>Preservation of Corporate Existence, Etc.</u>  Each Credit Party shall, and shall cause each of its Subsidiaries to:

(a)    preserve and maintain in full force and effect its organizational existence and good standing under the laws of its jurisdiction of incorporation, organization or formation, as applicable, except as permitted by Section 5.3;

(b)    preserve and maintain in full force and effect all rights, privileges, qualifications, permits, licenses and franchises necessary in the normal conduct of its business except as permitted by Sections 5.2 and 5.3 and except as would not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect;

(c)    use its commercially reasonable efforts, in the Ordinary Course of Business, to preserve its business organization and preserve the goodwill and business of the customers, suppliers and others having material business relations with it;

(d)    preserve or renew all of its registered Trademarks the non-preservation of which would reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect; and

(e)    (i) conduct its business and affairs without infringement of or interference with any Intellectual Property of any other Person in any respect and (ii) shall comply in all respects with the terms of its IP Licenses except, in the case of clauses (i) and (ii), as would not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

4.5    <u>Maintenance of Property</u>.  Each Credit Party shall maintain, and shall cause each of its Subsidiaries to maintain, and preserve all its Property which is used or useful in its business in good working order and condition, ordinary wear and tear excepted and shall make all necessary repairs thereto and renewals and replacements thereof except where the failure to do so would not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

4.6    <u>Insurance</u>.

(a)    Each Credit Party shall, and shall cause each of its Subsidiaries to, (i) maintain or cause to be maintained in full force and effect all policies of insurance of any kind with respect to the Property and businesses of the Credit Parties and such Subsidiaries with financially sound and reputable insurance companies or associations (in each case that are not Affiliates of the Borrower) of a nature and providing such coverage as is sufficient and as is customarily carried by businesses of the size and character of the business of the Credit Parties and (ii) cause all such insurance relating to any Property or business of any Credit Party to name Agent as additional insured or lenders loss payee as agent for the Lenders, as appropriate.  All policies of insurance on real and personal Property of the Credit Parties will contain an endorsement, in form and substance

44

acceptable to Agent, showing loss payable to Agent (Form CP 1218 or equivalent and naming Agent as lenders loss payee as agent for the Lenders) and extra expense and business interruption endorsements. Such endorsement, or an independent instrument furnished to Agent, will provide that the insurance companies will give Agent at least thirty (30) days' prior written notice before any such policy or policies of insurance shall be canceled and that no act or default of the Credit Parties or any other Person shall affect the right of Agent to recover under such policy or policies of insurance in case of loss or damage. Each Credit Party shall direct all present and future insurers under its "All Risk" policies of property insurance to pay all proceeds payable thereunder directly to Agent. If any insurance proceeds are paid by check, draft or other instrument payable to any Credit Party and Agent jointly, Agent may endorse such Credit Party's name thereon and do such other things as Agent may deem advisable to reduce the same to cash, after the occurrence and during the continuance of an Event of Default. Agent reserves the right at any time, upon review of each Credit Party's risk profile, to require additional forms and limits of insurance to the extent Agent reasonably believes the Credit Parties are not in compliance with this Section 4.6. Notwithstanding the requirement in clause (i) above, Flood Insurance shall not be required for (x) Real Estate not located in a Special Flood Hazard Area, or (y) Real Estate located in a Special Flood Hazard Area in a community that does not participate in the National Flood Insurance Program.

(b)     If the Credit Parties fail to maintain insurance as required by this Agreement (including Flood Insurance), Agent may purchase insurance (including Flood Insurance) at the Credit Parties' expense to protect Agent's and Lenders' interests, including interests in the Credit Parties' and their Subsidiaries' properties but only to the extent the Credit Parties fail to purchase such insurance within ten (10) days of Agent's request. This insurance may, but need not, protect the Credit Parties' and their Subsidiaries' interests. The coverage that Agent purchases may not pay any claim that any Credit Party or any Subsidiary of any Credit Party makes or any claim that is made against such Credit Party or any Subsidiary in connection with said Property. The Borrower may later cancel any insurance purchased by Agent, but only after providing Agent with evidence that there has been obtained insurance as required by this Agreement. If Agent purchases insurance, the Credit Parties will be responsible for the actual costs of that insurance, until the effective date of the cancellation or expiration of the insurance. The costs of the insurance shall be added to the Obligations. The costs of the insurance may be more than the cost of insurance the Borrower may be able to obtain on its own.

4.7     Payment of Obligations. To the extent permitted by the DIP Orders, each Credit Party shall, and shall cause each of its Subsidiaries to, pay or discharge before they become delinquent (a) all material Post-Petition claims, taxes, assessments, charges and levies imposed by any Governmental Authority and (b) all other lawful Post-Petition claims, in each case, that if unpaid would, by the operation of applicable Requirements of Law, become a Lien upon any property of any Credit Party, except, in each case, for those whose amount or validity is being contested in good faith by proper proceedings diligently conducted and for which adequate reserves are maintained on the books of the Credit Parties in accordance with GAAP.

4.8     <u>Compliance with Laws</u>.  Each Credit Party shall, and shall cause each of its Subsidiaries to, comply with all Requirements of Law of any Governmental Authority having jurisdiction over it or its business, except where the failure to comply would not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

4.9     <u>Inspection of Property and Books and Records</u>.  The Borrower shall maintain and shall cause each of its Subsidiaries to maintain proper books of record and account, in which full, true and correct entries in conformity with GAAP consistently applied shall be made of all financial transactions and matters involving the assets and business of such Person.  Within one hundred twenty (120) days of the Closing Date, Holdings shall maintain proper books of record and account, in which full, true and correct entries in conformity with GAAP consistently applied shall be made of all financial transactions and matters involving the assets and business of such Person.  Without duplication of the appraisal rights described in Section 4.2(i), each Credit Party shall, and shall cause each of its Subsidiaries to, with respect to each owned, leased, or controlled property, at any and all times: (a) provide access to such property to Agent and any of its Related Persons, as frequently as Agent determines to be appropriate; and (b) permit Agent and any of its Related Persons to conduct field examinations, audit, inspect, and make extracts and copies from all of such Credit Party's books and records, and evaluate and make physical verifications and appraisals of the Inventory and other Collateral in any manner and through any medium that Agent considers advisable and (c) cause each of its officers, directors, employees attorneys and advisors to fully cooperate with Agent in regards to any inspection, examination, audit or records request made by Agent or any of its Related Persons, in each instance, at the Credit Parties' expense.  Any Lender may accompany Agent or its Related Persons in connection with any inspection at such Lender's expense.

4.10    <u>Use of Proceeds</u>.  The Borrower shall use the proceeds of the Loans and the proceeds of the Collateral solely for (i) working capital (excluding capital expenditures) to the extent set forth in, and in accordance with, the Approved Budget, (ii) maintenance capital expenditures to the extent set forth in, and in accordance with, the Approved Budget, (iii) payment of costs of administration of the Chapter 11 Cases to the extent set forth in, and in accordance with, the Approved Budget, (iv) Permitted Expenses, (v) the unpaid fees, costs, and disbursements of professionals in the Chapter 11 Cases as set forth in the definition of the term "Carve-Out" in the DIP Order, (vi) such Pre-Petition Obligations as the Agent consents to and the Bankruptcy Court approves, in each case in a manner consistent with the terms and conditions contained herein and in the DIP Orders, and to the extent set forth, and in accordance with, the Approved Budget, or as otherwise expressly permitted under this Agreement and (vii) the roll-up of the Pre-Petition Obligations upon entry of the Final Order as contemplated herein and in the DIP Orders.

4.11    [Intentionally Omitted].

4.12    [Intentionally Omitted].

4.13    <u>Further Assurances</u>.

(a)     Each Credit Party shall ensure that all written information, exhibits and reports furnished to Agent or the Lenders do not and will not contain any untrue

statement of a material fact and do not and will not omit to state any material fact or any fact necessary to make the statements contained therein not misleading in light of the circumstances in which made, and will promptly disclose to Agent and the Lenders and correct any defect or error that may be discovered therein or in any Loan Document or in the execution, acknowledgement or recordation thereof; provided, that with respect to projected financial information each Credit Party represents that such information was prepared in good faith based upon assumptions believed to be reasonable at the time prepared.

(b)     Promptly upon request by Agent, the Credit Parties shall (and, subject to the limitations set forth herein and in the Collateral Documents, shall cause each of their Subsidiaries to) take such additional actions and execute such documents as Agent may reasonably require from time to time in order (i) to carry out more effectively the purposes of this Agreement or any other Loan Document, (ii) to subject to the Liens created by any of the Collateral Documents any of the Properties, rights or interests covered by any of the Collateral Documents, (iii) subject to customary "Funds Certain Provisions" with respect to perfection of Liens on assets acquired in any Investment permitted hereunder, to perfect and maintain the validity, effectiveness and priority of any of the Collateral Documents and the Liens intended to be created thereby, and (iv) to better assure, convey, grant, assign, transfer, preserve, protect and confirm to the Secured Parties the rights granted or now or hereafter intended to be granted to the Secured Parties under any Loan Document.

(c)     [Intentionally Omitted].

4.14     <u>Environmental Matters</u>.  Each Credit Party shall, and shall cause each of its Subsidiaries to, comply with, and maintain its Real Estate, whether owned, leased, subleased or otherwise operated, in compliance with, all applicable Environmental Laws (including by implementing any Remedial Action necessary to achieve such compliance) or that is required by orders and directives of any Governmental Authority except where the failure to comply would not reasonably be expected to, individually or in the aggregate, result in a Material Environmental Liability.  Without limiting the foregoing, if an Event of Default is continuing or if Agent at any time has a reasonable basis to believe that there exist violations of Environmental Laws by any Credit Party or any Subsidiary of any Credit Party or that there exist any Environmental Liabilities in each case that are reasonably expected to result in a Material Environmental Liability, then each Credit Party shall, promptly upon receipt of request from Agent, cause the performance of, and allow Agent and its Related Persons access to such Real Estate for the purpose of conducting, such environmental audits and assessments, including subsurface sampling of soil and groundwater to the extent reasonably necessary based on the findings and recommendations of a non-invasive audit or assessment conducted by a reputable consulting firm, and cause the preparation of such reports, in each case as Agent may from time to time reasonably request.  Such audits, assessments and reports, to the extent not conducted by Agent or any of its Related Persons, shall be conducted and prepared by reputable environmental consulting firms reasonably acceptable to Agent and shall be in form and substance reasonably acceptable to Agent.

4.15     <u>[Intentionally Omitted]</u>.

4.16    [Intentionally Omitted].

4.17    Bankruptcy Court Filings.  As soon as practicable in advance of filing with the Bankruptcy Court, the Credit Parties shall provide the Agent with copies of (i) the motion seeking approval of and proposed forms of the Interim Order and the Final Order, which motion shall be in form and substance reasonably satisfactory to the Agent, and which orders shall be in form and substance satisfactory to the Agent and the Required DIP Revolving Lenders in their sole discretion, (ii) the Bid Procedures Motion, which motion shall be in form and substance reasonably satisfactory to the Agent, and the proposed form of the Bid Procedures Order, which order shall be in form and substance satisfactory to Agent in its sole discretion, (iii) all other proposed orders and pleadings related to the financing contemplated hereunder, which orders and pleadings shall be in form and substance satisfactory to the Agent, (iv) any plan of reorganization or liquidation, and/or any disclosure statement related to such plan (which plan or disclosure statement shall comply with the requirements set forth herein), which plan of reorganization or liquidation and any related disclosure statement shall be in form and substance satisfactory to Agent and the Required DIP Revolving Lenders, (v) any motion, and proposed form of order, seeking to extend or otherwise modify the Credit Parties' exclusive periods set forth in section 1121 of the Bankruptcy Code, which motion and proposed order shall be in form and substance satisfactory to Agent, (vi) any motion, other than the Bid Procedures Motion, seeking approval of any sale of any Credit Party's assets, which motion shall be in form and substance acceptable to the Agent and any proposed form of a bidding procedures order and sale order, which orders shall be in form and substance satisfactory to the Agent and the Required DIP Revolving Lenders in their respective sole discretion and (vii) any motion and proposed form of order filed with the Bankruptcy Court relating to the assumption, rejection, modification or amendment of any employment agreement, or the assumption, rejection, modification or amendment of any material contract, each of which motions and orders must be in form and substance satisfactory to the Agent in its sole respective sole discretion.

4.18    Bankruptcy Covenants.  Notwithstanding anything in the Loan Documents to the contrary, the Credit Parties shall comply with all covenants, terms and conditions and otherwise perform all obligations set forth in the DIP Orders.

4.19    Chapter 11 Cases.  In connection with the Chapter 11 Cases, the Credit Parties shall give the proper notice for (v) the motions seeking approval of the Loan Documents and the Interim Order and Final Order, (w) the hearings for the approval of the Interim Order, (x) the hearings for the approval of the Final Order, (y) the motions seeking approval of the sale of all or substantially all of the assets or the Stock of the Credit Parties and (z) the hearings for the approval of the sale of all or substantially all of the assets or the Stock of the Credit Parties.  The Credit Parties shall give, on a timely basis as specified in the Interim Order or the Final Order, as applicable, all notices required to be given to all parties specified in the Interim Order or Final Order, as applicable.

4.20    Sales Process Timeline.  The Credit Parties shall timely comply with the sale process milestones set forth in the DIP Orders and shall incorporate such milestones into a bidding procedures motion and order, each of which shall be in form and substance acceptable to the Agent (the "**Bid Procedures Motion**" and "**Bid Procedures Order**", respectively). Promptly upon receipt by any Credit Party, such Credit Party shall deliver to the Agent copies of

all written indications of interest in the sale (by proposal, letter of intent or otherwise), term sheets, asset purchase agreements and other documents from prospective bidders, other interested parties or their representatives, and such other information and documents as the Agent may from time to time request.

4.21    <u>Other Sale-Related Matters</u>.  The Credit Parties and their investment banker shall at all times leading up to the Qualified Bid Deadline actively market the Credit Parties' assets to a broad range of potentially interested buyers, including any potential buyers identified by the Agent or any DIP Revolving Lender.


ARTICLE V

<u>NEGATIVE COVENANTS</u>

Each Credit Party covenants and agrees that until the Facility Termination Date:

5.1    <u>Limitation on Liens</u>.  No Credit Party shall, and no Credit Party shall suffer or permit any of its Subsidiaries to, directly or indirectly, make, create, incur, assume or suffer to exist any Lien upon or with respect to any part of its Property, whether now owned or hereafter acquired, other than, to the extent permitted by the DIP Orders, the following ("**Permitted Liens**"):

(a)    any Lien existing on the Property of a Credit Party or a Subsidiary of a Credit Party on the Closing Date and set forth in <u>Schedule 5.1</u> securing Indebtedness outstanding on such date and permitted by Section 5.5(c), including replacement Liens on the Property currently subject to such Liens securing Indebtedness permitted by Section 5.5(c);

(b)    any Lien created under any Loan Document or any Pre-Petition Loan Document;

(c)    Liens for Taxes (i) which are not past due or remain payable without penalty, or (ii) the non-payment of which is permitted by Section 4.7;

(d)    carriers', warehousemen's, mechanics', landlords', materialmen's, repairmen's or other similar Liens arising in the Ordinary Course of Business which are not delinquent for more than ninety (90) days or remain payable without penalty or which are being contested in good faith and by appropriate proceedings diligently prosecuted, which proceedings have the effect of preventing the forfeiture or sale of the Property subject thereto and for which adequate reserves in accordance with GAAP are being maintained;

(e)    Liens (other than any Lien imposed by ERISA) consisting of pledges or deposits required in the Ordinary Course of Business in connection with workers' compensation, unemployment insurance and other social security legislation or to secure the performance of tenders, statutory obligations, surety, stay, customs and appeals bonds, bids, leases, governmental contract, trade contracts, performance and return of

49

money bonds and other similar obligations (exclusive of obligations for the payment of borrowed money) or to secure liability to insurance carriers;

(f)    Liens consisting of judgment or judicial attachment liens (other than for payment of Taxes), provided that the enforcement of such Liens is effectively stayed and all such Liens secure claims in the aggregate at any time outstanding for the Credit Parties and their Subsidiaries not exceeding $250,000;

(g)    easements, rights-of-way, zoning and other restrictions, minor defects or other irregularities in title, and other similar encumbrances incurred in the Ordinary Course of Business which, either individually or in the aggregate, are not substantial in amount, and which do not in any case materially detract from the value of the Property subject thereto or interfere in any material respect with the ordinary conduct of the businesses of any Credit Party or any Subsidiary of any Credit Party;

(h)    [Intentionally Omitted];

(i)    [Intentionally Omitted];

(j)    any interest or title of a lessor or sublessor under any lease permitted by this Agreement;

(k)    Liens arising from the filing of precautionary uniform commercial code financing statements with respect to any lease permitted by this Agreement;

(l)    [Intentionally Omitted];

(m)    Liens in favor of collecting banks arising by operation of law under Section 4-210 of the UCC or, with respect to collecting banks located in the State of New York, under Section 4-208 of the UCC;

(n)    Liens (including the right of set-off) in favor of a bank or other depository institution arising as a matter of law encumbering deposits;

(o)    Liens and precautionary UCC financing statements arising out of consignment or similar arrangements for the sale of goods entered into by the Borrower or any Subsidiary of the Borrower in the Ordinary Course of Business;

(p)    Liens in favor of customs and revenue authorities arising as a matter of law which secure payment of customs duties in connection with the importation of goods in the Ordinary Course of Business;

(q)    Liens granted in the Ordinary Course of Business on the unearned portion of insurance premiums securing the financing of insurance premiums to the extent permitted by this Agreement;

(r)    [Intentionally Omitted];

50

(s)    unperfected interests of seller to reclaim goods delivered under Section 2-507 of the UCC;

(t)    [Intentionally Omitted];

(u)    Liens or rights of setoff against credit balances of a Credit Party with any credit card issuer or credit card processor or amounts owing by credit card issuers or credit card processors to a Credit Party in the Ordinary Course of Business to secure the obligations of such Credit Party to such credit card issuer or credit card processor as a result of any fees and chargebacks;

(v)    a landlord's interest in any security deposit provided by any Credit Party or any Subsidiary of any Credit Party under any lease entered into in the Ordinary Course of Business;

(w)    Liens on deposits of cash and Cash Equivalents in order to secure obligations arising under corporate credit cards in an amount not to exceed $150,000 at any time outstanding;

(x)    Liens arising under the Subordinated Indebtedness Documents and any Permitted Subordinated Sponsor Indebtedness;

(y)    [Intentionally Omitted]; and

(z)    Liens not specifically listed above securing obligations not to exceed $50,000 in the aggregate at any time outstanding.

5.2    <u>Disposition of Assets</u>.  No Credit Party shall, and no Credit Party shall suffer or permit any of its Subsidiaries to, directly or indirectly, sell, assign, lease, convey, transfer or otherwise dispose of (whether in one or a series of transactions) any Property (including the Stock of any Subsidiary of any Credit Party, whether in a public or private offering or otherwise, and accounts and notes receivable, with or without recourse), except, to the extent permitted by the DIP Orders:

(a)    dispositions of Inventory, or worn-out or surplus equipment, all in the Ordinary Course of Business;

(b)    [Intentionally Omitted];

(c)    (i) dispositions of cash or Cash Equivalents in the Ordinary Course of Business and (ii) conversions of Cash Equivalents into cash or other Cash Equivalents;

(d)    [Intentionally Omitted];

(e)    the transfer, assignment, cancellation, abandonment or other disposition of Intellectual Property which is, in the reasonable business judgment of a Credit Party, no longer used or useful in the business of any Credit Party;

51

(f)     dispositions from one Credit Party to another Credit Party (other than Holdings);

(g)     [Intentionally Omitted];

(h)     the expiration of any contract, contract right or other agreement in accordance with its term;

(i)     any involuntary condemnation, seizure or taking, by eminent domain or otherwise, or confiscation or requisition of use of property;

(j)     leases entered into in the Ordinary Course of Business;

(k)     [Intentionally Omitted];

(l)     dispositions of any liquor licenses that are redundant or no longer necessary for the business of any Credit Party; and

(m)     any insured casualty event of any owned or leased Real Estate.

5.3     <u>Consolidations and Mergers</u>.  No Credit Party shall, and no Credit Party shall suffer or permit any of its Subsidiaries to, merge, consolidate with or into, or convey, transfer, lease or otherwise dispose of (whether in one transaction or in a series of transactions) all or substantially all of its assets (whether now owned or hereafter acquired) to or in favor of any Person; provided, except upon not less than five (5) Business Days prior written notice to Agent, (a) any Subsidiary of the Borrower may merge with, or dissolve or liquidate into, the Borrower or a Wholly-Owned Subsidiary of the  Borrower which is a Domestic Subsidiary, provided that the Borrower or such Wholly-Owned Subsidiary which is a Domestic Subsidiary and a Credit Party shall be the continuing or surviving entity and all actions reasonably required by Agent, including actions required to maintain perfected Liens on the Stock of the surviving entity and other Collateral in favor of Agent, shall have been completed, and (b) any Foreign Subsidiary may merge with or dissolve or liquidate into another Foreign Subsidiary provided if a Foreign Subsidiary which is not an Excluded Foreign Subsidiary is a constituent entity in such merger, dissolution or liquidation, a Foreign Subsidiary which is not an Excluded Foreign Subsidiary shall be the continuing or surviving entity.

5.4     <u>Loans and Investments</u>.  No Credit Party shall and no Credit Party shall suffer or permit any of its Subsidiaries to (i) purchase or acquire any Stock or Stock Equivalents, or any obligations or other securities of, or any interest in, any Person, including the establishment or creation of a Subsidiary, or (ii) make any Acquisitions, or any other acquisition of all or substantially all of the assets of another Person, or of any business or division of any Person, including by way of merger, consolidation or other combination or (iii) make or purchase any advance, loan, extension of credit or capital contribution to or any other investment in, any Person including the Borrower, any Affiliate of the Borrower or any Subsidiary of the Borrower (the items described in clauses (i), (ii) and (iii) are referred to as "**Investments**"), except for, to the extent permitted by the DIP Orders:

(a)     Investments in cash and Cash Equivalents;

(b)      Investments consisting of (i) capital contributions by Holdings in then existing Credit Parties and (ii) extensions of credit or capital contributions by any Credit Party (other than Holdings) to or in any other then existing Credit Party (other than Holdings);

(c)      loans and advances to employees in the Ordinary Course of Business not to exceed $100,000 in the aggregate at any time outstanding;

(d)      [Intentionally Omitted];

(e)      Investments acquired in connection with the settlement of delinquent Accounts in the Ordinary Course of Business or in connection with the bankruptcy or reorganization of suppliers or customers;

(f)      [Intentionally Omitted];

(g)      Investments existing on the Closing Date and set forth on Schedule 5.4 and any modification of the terms thereof to the extent not resulting in any increase in the amount thereof;

(h)      Investments comprised of Contingent Obligations permitted by Section 5.9;

(i)      [Intentionally Omitted];

(j)      advances made in connection with purchases of goods or services in the Ordinary Course of Business;

(k)      [Intentionally Omitted];

(l)      [Intentionally Omitted]; and

(m)      other Investments in an aggregate amount not to exceed $100,000 at any time outstanding.

5.5      Limitation on Indebtedness.  No Credit Party shall, and no Credit Party shall suffer or permit any of its Subsidiaries to, create, incur, assume, permit to exist, or otherwise become or remain directly or indirectly liable with respect to, any Indebtedness, except, to the extent permitted by the DIP Orders:

(a)      the Obligations;

(b)      Indebtedness consisting of Contingent Obligations permitted pursuant to Section 5.9;

(c)      Indebtedness existing on the Closing Date and set forth in Schedule 5.5, together with any accrued payment-in-kind interest or other capitalized interest under any such Indebtedness;

(d)     [Intentionally Omitted];

(e)     Prior to the Roll-Up Effective Time, Indebtedness under the Pre-Petition Credit Agreement;

(f)     [Intentionally Omitted];

(g)     other unsecured Indebtedness not exceeding in the aggregate at any time outstanding $100,000;

(h)     Indebtedness in respect of netting services, overdraft protections and otherwise in connection with deposit accounts;

(i)     [Intentionally Omitted];

(j)     Indebtedness owed to insurance companies to finance insurance premiums in the Ordinary Course of Business;

(k)     Indebtedness incurred in respect of credit cards, credit card processing services, debit cards, stored value cards, purchase cards (including p-cards), corporate credit cards or other similar cash management services, in each case, incurred in the Ordinary Course of Business;

(l)     Indebtedness in connection with the issuance of gift cards to customers of the Borrower or its Subsidiaries in the Ordinary Course of Business pursuant to the arrangements in place with Costco Wholesale on the Closing Date;

(m)     obligations to advertising co-ops or funds arising in the Ordinary Course of Business;

(n)     [Intentionally Omitted];

(o)     Indebtedness owing by the Credit Parties pursuant to the Management Agreement; and

(p)     obligations incurred in respect of workers' compensation, unemployment insurance or other forms of governmental insurance benefits.

5.6     <u>Transactions with Affiliates</u>.  No Credit Party shall, and no Credit Party shall suffer or permit any of its Subsidiaries to, enter into any transaction with any Affiliate of the Borrower or of any such Subsidiary, except, to the extent permitted by the DIP Orders:

(a)     as expressly permitted by this Agreement (including, without limitation, the transactions and payments (and distributions or dividends to effect the same) contemplated by the Management Agreement permitted pursuant to Sections 5.7 and 5.11); and

(b)      in the Ordinary Course of Business upon fair and reasonable terms no less favorable to such Credit Party or such Subsidiary than would be obtained in a comparable arm's length transaction with a Person not an Affiliate of the Borrower or such Subsidiary.

5.7      <u>Management Fees and Compensation</u>.  No Credit Party shall, and no Credit Party shall permit any of its Subsidiaries to, pay any management, consulting or similar fees to any Affiliate of any Credit Party or to any officer, director or employee of any Credit Party or any Affiliate of any Credit Party or pay or reimburse Sponsor or any of its Affiliates (other than a Credit Party) for any costs, expenses and similar items except the payment of reasonable compensation to employees for actual services rendered to the Credit Parties and their Subsidiaries in the Ordinary Course of Business and as permitted by the DIP Orders.

5.8      <u>Use of Proceeds</u>.  No Credit Party shall, and no Credit Party shall suffer or permit any of its Subsidiaries to, use any portion of the Loan proceeds, directly or indirectly, to purchase or carry Margin Stock or repay or otherwise refinance Indebtedness of any Credit Party or other Person incurred to purchase or carry Margin Stock, or otherwise in any manner which is in contravention of any Requirement of Law, in violation of this Agreement or in violation of the DIP Orders.

5.9      <u>Contingent Obligations</u>.  No Credit Party shall, and no Credit Party shall suffer or permit any of its Subsidiaries to, create, incur, assume or suffer to exist any Contingent Obligations except in respect of the Obligations and except, to the extent permitted by the DIP Orders:

(a)      endorsements for collection or deposit in the Ordinary Course of Business;

(b)      [Intentionally Omitted];

(c)      Contingent Obligations of the Credit Parties and their Subsidiaries existing as of the Closing Date and listed in <u>Schedule 5.9</u>, including extensions and renewals thereof which do not increase the amount of such Contingent Obligations or impose materially more restrictive or adverse terms on the Credit Parties or their Subsidiaries as compared to the terms of the Contingent Obligation being renewed or extended;

(d)      Contingent Obligations arising under indemnity agreements to title insurers to cause such title insurers to issue to Agent title insurance policies;

(e)      [Intentionally Omitted];

(f)      Contingent Obligations arising under Prior Letters of Credit or DIP Letters of Credit;

(g)      [Intentionally Omitted];

(h)      Contingent Obligations incurred in the Ordinary Course of Business with respect to surety and appeals bonds, performance bonds and other similar obligations; and

(i)        other Contingent Obligations not exceeding $100,000 in the aggregate at any time outstanding.

5.10    <u>Compliance with ERISA</u>.  No ERISA Affiliate shall cause or suffer to exist (a) any event that could result in the imposition of a Lien on any asset of a Credit Party or a Subsidiary of a Credit Party with respect to any Title IV Plan or Multiemployer Plan or (b) any other ERISA Event, that would, in the aggregate, have a Material Adverse Effect.  No Credit Party shall cause or suffer to exist any event that could result in the imposition of a Lien with respect to any Benefit Plan.

5.11    <u>Restricted Payments</u>.  No Credit Party shall, and no Credit Party shall suffer or permit any of its Subsidiaries to, (i) declare or make any dividend payment or other distribution of assets, properties, cash, rights, obligations or securities on account of any Stock or Stock Equivalent, (ii) purchase, redeem or otherwise acquire for value any Stock or Stock Equivalent now or hereafter outstanding or (iii) make any payment or prepayment of principal of, premium, if any, interest, fees, redemption, exchange, purchase, retirement, defeasance, sinking fund or similar payment with respect to, Subordinated Indebtedness (the items described in clauses (i), (ii) and (iii) above are referred to as "**Restricted Payments**"); except that any Wholly-Owned Subsidiary of the Borrower may declare and pay dividends to the Borrower or any Wholly-Owned Subsidiary of the Borrower, and except that:

(a)        Holdings may declare and make dividend payments or other distributions payable solely in its Stock or Stock Equivalents; and

(b)        any Subsidiary of the Borrower may declare and pay dividends or distributions to the Borrower.

5.12    <u>Change in Business</u>.  No Credit Party shall, and no Credit Party shall permit any of its Subsidiaries to, engage in any line of business substantially different from those lines of business carried on by it on the Closing Date.  Holdings shall not engage in any business activities or own any Property other than (i) ownership of the Stock and Stock Equivalents of the Borrower, (ii) activities and contractual rights incidental to maintenance of its corporate existence and ownership of the Stock and Stock Equivalents of the Borrower, (iii) performance of its obligations under the Loan Documents and the Subordinated Indebtedness Documents to which it is a party, and (iv) ownership of other de minimis Property and incurrence of other de minimis liabilities.

5.13    <u>Change in Structure</u>.  Except as expressly permitted under Section 5.3, no Credit Party shall, and no Credit Party shall permit any of its Subsidiaries to amend any of its Organization Documents in any material respect or in any respect adverse to Agent or Lenders.

5.14    <u>Changes in Accounting, Name and Jurisdiction of Organization</u>.  No Credit Party shall, and no Credit Party shall suffer or permit any of its Subsidiaries to, (i) make any significant change in accounting treatment or reporting practices, except as required by GAAP, (ii) change the Fiscal Year or method for determining Fiscal Quarters of any Credit Party or of any consolidated Subsidiary of any Credit Party unless Agent has provided its prior written consent (not to be unreasonably withheld or delayed), (iii) change its name as it appears in

official filings in its jurisdiction of organization or (iv) change its jurisdiction of organization, in the case of clauses (iii) and (iv), without at least twenty (20) days' prior written notice to Agent and the acknowledgement of Agent that all actions required by Agent, including those to continue the perfection of its Liens, have been completed.  Anything in this Agreement to the contrary notwithstanding, for purposes of determining compliance with the covenants in this Agreement, any obligation of a Credit Party under a lease (whether existing now or entered into in the future) that is not (or would not be) required to be classified and accounted for as a capital lease on a balance sheet of such Credit Party under GAAP or any other then applicable lease accounting rules as in effect on the Closing Date shall not be treated as a capital lease solely as a result of (x) the adoption of changes in GAAP or any other then applicable lease accounting rules after the Closing Date or (y) changes in the application of GAAP or any other then applicable lease accounting rules after the Closing Date.

5.15    Amendments to Subordinated Indebtedness.  No Credit Party shall, and no Credit Party shall permit any of its Subsidiaries directly or indirectly to, change or amend the terms of any (i) Subordinated Indebtedness Documents except to the extent permitted by the Subordination Agreement, (ii) any Permitted Subordinated Indebtedness Documents Refinancing except to the extent permitted by the applicable subordination agreement executed at the time of the incurrence thereof, (iii) any Permitted Subordinated Sponsor Indebtedness expect to the extent permitted by the applicable subordination agreement executed at the time of the incurrence thereof, or (iv) any other Subordinated Indebtedness not subject to a subordination agreement if the effect of such change or amendment is to: (A) increase the interest rate on such Indebtedness; (B) shorten the dates upon which payments of principal or interest are due on such Indebtedness; (C) add or change in a manner materially adverse to the Credit Parties any event of default or add or make materially more restrictive any covenant with respect to such Indebtedness; (D) change in a manner adverse to the Credit Parties the prepayment provisions of such Indebtedness; (E) change the subordination provisions thereof (or the subordination terms of any guaranty thereof); or (F) change or amend any other term if such change or amendment would materially increase the obligations of the Credit Parties or confer additional material rights on the holder of such Indebtedness in a manner materially adverse to the Credit Parties, Agent or Lenders.

5.16    No Negative Pledges.

(a)    No Credit Party shall, and no Credit Party shall permit any of its Subsidiaries to, directly or indirectly, create or otherwise cause or suffer to exist or become effective any consensual restriction or encumbrance of any kind on the ability of any Credit Party or Subsidiary to pay dividends or make any other distribution on any of such Credit Party's or Subsidiary's Stock or Stock Equivalents or to pay fees, including management fees, or make other payments and distributions to the Borrower or any other Credit Party.  No Credit Party shall, and no Credit Party shall permit any of its Subsidiaries to, directly or indirectly, enter into, assume or become subject to any Contractual Obligation prohibiting or otherwise restricting the existence of any Lien upon any of its assets in favor of Agent, whether now owned or hereafter acquired except in connection with any document or instrument governing Liens permitted pursuant to Sections 5.1(h) and 5.1(i) provided that any such restriction contained therein relates only to the asset or assets subject to such permitted Liens.

57

(b)    No Credit Party shall issue any Stock or Stock Equivalents (i) if such issuance would result in an Event of Default under Section 7.1(k) and (ii) unless such Stock and Stock Equivalents are pledged to Agent, for the benefit of the Secured Parties, as security for the Obligations, on substantially the same terms and conditions as the Stock and Stock Equivalents of the Credit Parties pledged to Agent as of the Closing Date.

5.17    <u>OFAC; Patriot Act</u>.  No Credit Party shall, and no Credit Party shall permit any of its Subsidiaries to fail to comply with the laws, regulations and executive orders referred to in Section 3.26 and Section 3.27.

5.18    <u>Sale-Leasebacks</u>.  No Credit Party shall, and no Credit Party shall permit any of its Subsidiaries to, engage in a sale leaseback, synthetic lease or similar transaction involving any of its assets.

5.19    <u>Hazardous Materials</u>.  No Credit Party shall, and no Credit Party shall permit any of its Subsidiaries to, cause or suffer to exist any Release of any Hazardous Material at, to or from any Real Estate that would violate any Environmental Law, form the basis for any Environmental Liabilities or otherwise adversely affect the value or marketability of any Real Estate (whether or not owned by any Credit Party or any Subsidiary of any Credit Party), other than such violations, Environmental Liabilities and effects that would not, in the aggregate, reasonably be expected to have a Material Adverse Effect.

5.20    <u>[Intentionally Omitted]</u>.

5.21    <u>New Restaurants</u>.  The Credit Parties and their Subsidiaries shall not open or commit to open any new Restaurants.

5.22    <u>KEIP Plan</u>.  No Credit Party shall, and no Credit Party shall permit any of its Subsidiaries to, enter into any key employee incentive or retention plan, or other similar plan or agreement (any such agreement, a "**KEIP**"), unless such KEIP has been approved in writing by the Required DIP Revolving Lenders.

5.23    <u>Chapter 11 Claims</u>.  None of the Credit Parties will, and none will permit any of its Subsidiaries to, incur, create, assume, suffer to exist or permit (other than those existing, and disclosed to the Agent, on the date hereof) any administrative expense, unsecured claim, or other super-priority claim or lien (except for the Carve-Out and Prepetition Prior Liens to the extent such liens had priority over the liens granted under the Pre-Petition Credit Agreement) that are pari passu with or senior to the administrative expenses or the claims of the Secured Parties against the Credit Parties hereunder, or apply to the Bankruptcy Court for authority to do so.

5.24    <u>The DIP Orders</u>.  None of the Credit Parties shall, and none will permit any of its Subsidiaries to, make or permit to be made any change, amendment or modification, or any application or motion for any change, amendment or modification, to the Interim Order or the Final Order, other than as approved by the Agent and the Required DIP Revolving Lenders.

5.25    <u>Critical Vendor and Other Payments</u>.  None of the Credit Parties shall, and none will permit any of its Subsidiaries to, make (i) any pre-petition "critical vendor" payments or

other payments on account of any creditor's pre-petition unsecured claims, (ii) payments on account of claims or expenses arising under section 503(b)(9) of the Bankruptcy Code, (iii) payments in respect of a reclamation program or (iv) payments under any management incentive plan or on account of claims or expenses arising under Section 503(c) of the Bankruptcy Code, except, in each case, in amounts and on terms and conditions that are permitted by the Approved Budget.

## ARTICLE VI

### FINANCIAL  COVENANTS AND BUDGET COMPLIANCE

Each Credit Party covenants and agrees that until the Facility Termination Date:

6.1     Approved Budget Compliance.    Subject to the terms and conditions set forth below and in the DIP Orders, the proceeds of Collateral and the proceeds of DIP Revolving Loans made under this Credit Agreement (and the use of any DIP Letters of Credit) and any other Collateral shall be used in accordance with the Credit Agreement and the DIP Order and the Credit Parties shall at all times be in compliance with the covenants set forth in the DIP Orders.  The Agent and Lenders (i) may assume that the Credit Parties will comply with the Approved Budget to the extent required by this Section 6.1 and shall have no duty to monitor such compliance and (ii) shall not be obligated to pay (directly or indirectly from the Collateral) any unpaid expenses incurred or authorized to be incurred pursuant to the Approved Budget. The line items in the Approved Budget for payment of interest, expenses and other amounts to Agent and Lenders are estimates only, and the Credit Parties remain obligated to pay any and all Obligations in accordance with the terms of the Loan Documents, the Interim Order and the Final Order.   Nothing in the Approved Budget shall constitute an amendment or other modification of this Agreement or any of such restrictions or other lending limits set forth therein.

## ARTICLE VII

### EVENTS OF DEFAULT

7.1     Event of Default.  Any of the following shall constitute an "**Event of Default**":

(a)     Non-Payment.  Any Credit Party fails to pay when and as required to be paid herein, (i) any amount of principal of any Loan, including after maturity of the Loans, (ii) any L/C Reimbursement Obligation, (iii) interest on any Loan or (iv) any fee or any other amount payable hereunder or pursuant to any other Loan Document; or

(b)     Representation or Warranty.  Any representation,  warranty or certification by or on behalf of any Credit Party or any of its Subsidiaries made or deemed made herein, in any other Loan Document, or which is contained in any certificate, document or financial or other statement by any such Person, or their respective Responsible Officers, furnished at any time under this Agreement, or in or under any other Loan Document, shall prove to have been incorrect in any material respect (without duplication

59

of other materiality qualifiers contained therein) on or as of the date made or deemed made; or

(c)    <u>Specific Defaults</u>.  Any Credit Party fails to perform or observe any term, covenant or agreement contained in any of Sections 4.1, 4.2, 4.3(a), 4.6, 4.10, 4.18, 4.19, 4.20, 4.21 or 9.10(d), Article V or Article VI hereof ; or

(d)    <u>Other Defaults</u>.  Any Credit Party or Subsidiary of any Credit Party fails to perform or observe any other term, covenant or agreement contained in this Agreement or any other Loan Document, and such default shall continue unremedied for a period of three (3) days after the earlier to occur of (i) the date upon which a Responsible Officer of any Credit Party becomes aware of such default and (ii) the date upon which written notice thereof is given to the Borrower by Agent or Required DIP Revolving Lenders; or

(e)    <u>Cross-Default</u>.  Except for defaults occasioned by the filing of the Chapter 11 Cases and defaults resulting from obligations with respect to which the Bankruptcy Code prohibits the Credit Parties from complying or permits the Credit Parties not to comply, any Credit Party or any Subsidiary of any Credit Party (i) fails to make any payment in respect of any Post-Petition Indebtedness (other than the Obligations) or Post-Petition Contingent Obligation (other than the Obligations) having an aggregate principal amount (including undrawn committed or available amounts and including amounts owing to all creditors under any combined or syndicated credit arrangement) of more than $500,000 when due (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise) and such failure continues after the applicable grace or notice period, if any, specified in the document relating thereto on the date of such failure; or (ii) fails to perform or observe any other condition or covenant, or any other event shall occur or condition exist, under any agreement or instrument relating to any such Indebtedness or Contingent Obligation (other than Contingent Obligations owing by one Credit Party with respect to the obligations of another Credit Party permitted hereunder or earnouts permitted hereunder), if the effect of such failure, event or condition is to cause, or to permit the holder or holders of such Indebtedness or beneficiary or beneficiaries of such Indebtedness (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause such Indebtedness to be declared to be due and payable prior to its stated maturity (without regard to any subordination terms with respect thereto), or such Contingent Obligation to become payable or cash collateral in respect thereof to be demanded; or

(f)    [Intentionally Omitted]; or

(g)    [Intentionally Omitted]; or

(h)    <u>Monetary Judgments</u>.   One or more Post-Petition judgments, non-interlocutory orders, decrees or arbitration awards shall be entered against any one or more of the Credit Parties or any of their respective Subsidiaries involving in the aggregate a liability of $750,000 or more (excluding amounts covered by insurance to the extent the relevant independent third-party insurer has not denied coverage therefor), and

the same shall remain unsatisfied, unvacated and unstayed pending appeal for a period of thirty (30) days after the entry thereof; or

(i)     Non-Monetary Judgments.    One or more Post-Petition non-monetary judgments, orders or decrees shall be rendered against any one or more of the Credit Parties or any of their respective Subsidiaries which has or would reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect, and there shall be any period of twenty (20) consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect; or

(j)     Collateral.    Any material provision of any Loan Document shall for any reason cease to be valid and binding on or enforceable against any Credit Party or any Subsidiary of any Credit Party party thereto or any Credit Party or any Subsidiary of any Credit Party shall so state in writing or bring an action to limit its obligations or liabilities thereunder; or any Collateral Document shall for any reason (other than pursuant to the terms thereof) cease to create a valid security interest in Collateral with a value in excess of $250,000 purported to be covered thereby or such security interest shall for any reason (other than the failure of Agent to take any action within its control) cease to be a perfected and first priority security interest subject only to Permitted Liens; or

(k)     Ownership.  (i)  Sponsor at any time fails to own beneficially, directly or indirectly, at least fifty and 1/10th of one percent (50.10%) of the issued and outstanding voting Stock of Holdings or, in any event, Stock representing voting control of Holdings; or (ii) Holdings ceases to own one hundred percent (100%) of the issued and outstanding Stock and Stock Equivalents of the Borrower, in each instance in clauses (i) and (ii), free and clear of all Liens, rights, options, warrants or other similar agreements or understandings, other than Liens in favor of Agent, for the benefit of the Secured Parties (a "**Change of Control**"); or

(l)     Invalidity of Subordination Provisions.    The subordination provisions of the Subordination Agreement or any agreement or instrument governing any Subordinated Indebtedness shall for any reason be revoked or invalidated, or otherwise cease to be in full force and effect, or any Person shall contest in any manner the validity or enforceability thereof or deny that it has any further liability or obligation thereunder, or the Obligations, for any reason shall not have the priority contemplated by this Agreement or such other subordination provisions.

(m)     Subordinated Lender Adequate Protection.    The holders of all or any part of the Subordinated Indebtedness shall be granted adequate protection other than as consented to by the Agent and as set forth in the DIP Orders.

(n)     Bankruptcy Defaults.    The occurrence of any of the following in the Chapter 11 Cases:

61

(i)      the payment by the Credit Parties of expenses (A) in excess of the amounts permitted by Section 6.1(a), or (B) otherwise in violation of the terms and condition of Section 6.1(a);

(ii)      obtaining after the Petition Date credit or incurring Indebtedness that is (i) secured by a security interest, mortgage or other lien on all or any portion of Collateral which is equal or senior to any security interest, mortgage or other lien of the Agent, or (ii) entitled to priority administrative status which is equal or senior to that granted to the Agent in the DIP Orders, unless used to indefeasibly repay the Obligations in full in cash;

(iii)      the bringing of a motion, taking of any action or the filing of any plan of reorganization or disclosure statement attendant thereto by the Credit Parties in the Chapter 11 Cases, or the entry of an order (A) to obtain additional financing under Section 364(c) or Section 364(d) of the Bankruptcy Code from any Person other than the Lenders not otherwise permitted by this Credit Agreement, or (B) to authorize any Person to recover from any portions of the Collateral any costs or expenses of preserving or disposing of such Collateral under Section 506(c) of the Bankruptcy Code, or (C) except as provided in the DIP Orders, to use Cash Collateral without the Agent's prior written consent under Section 363(c) of the Bankruptcy Code or (D) except as provided in the DIP Orders, to grant any lien other than Permitted Liens upon or affecting any Collateral;

(iv)      the dismissal of any of the Chapter 11 Cases or the conversion of any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code;

(v)      any failure by the Credit Parties to make adequate protection payments or other payments to the Pre-Petition Agent or Pre-Petition Secured Parties as set forth in the DIP Orders when due;

(vi)      any failure by the Credit Parties to perform, in any respect and subject to any applicable cure periods, any of the terms, provisions, conditions, covenants, or obligations under any DIP Order or a Termination Event under any DIP Order shall occur;

(vii)      the entry of an order which has not been withdrawn, dismissed or reversed (a) appointing an interim or permanent trustee in the Chapter 11 Cases or the appointment of an examiner or other responsible person with expanded powers in the Chapter 11 Cases, (b) granting relief from or modifying the automatic stay of Section 362 of the Bankruptcy Code (x) to allow any creditor to execute upon or enforce a lien on or security interest in any Collateral in excess of $10,000 or (ii) with respect to any lien of or the granting of any lien on any Collateral to any state or local environmental or regulatory agency or authority, (in each case with a value in excess of $25,000), (c) amending, supplementing, staying, reversing, vacating or otherwise modifying any of the Interim Order, the Final Order, this Credit Agreement or any other Loan Document, or Agent's, any

Secured Party's, Pre-Petition Agent's or Pre-Petition Secured Parties' rights, benefits, privileges or remedies under the Interim Order, the Final Order, this Credit Agreement, any other Loan Document or any Pre-Petition Loan Document or (d) approving a sale of any assets of any Credit Party pursuant to section 363 of the Bankruptcy Code or approving bidding procedures therefor other than in each case as required in the DIP Orders;

(viii)    Credit Parties consolidating or combining with any other Person except pursuant to a confirmed plan of reorganization with the prior written consent of the Agent and Required DIP Revolving Lenders;

(ix)    reversal, vacatur, or modification (without the express prior written consent of the Agent and the Required DIP Revolving Lenders, in their sole discretion) of any DIP Order or any provision thereof, or reversal, vacatur, or modification (without the express prior written consent of the Pre-Petition Agent and the Required Lenders (under and as defined in the Pre-Petition Credit Agreement) in their sole discretion) of any provision of any DIP Order directly and adversely affecting the rights of the Pre-Petition Secured Parties;

(x)    the challenge by the Credit Parties (or the support by the Credit Parties of the challenge by any other Person) to the Agent's, any Secured Party's, the Pre-Petition Agent's, or any Pre-Petition Secured Party's claim or the validity, extent, perfection, priority or characterization of any obligations incurred or liens granted under or in connection with the Pre-Petition Credit Agreement;

(xi)    the challenge by the Credit Parties (or the support by the Credit Parties of the challenge by any other Person) to (a) disallow in whole or in part the claim of the Pre-Petition Agent or the Pre-Petition Secured Parties under the Pre-Petition Credit Agreement or the claim of the Agent or any Secured Party in respect of Obligations or to challenge the validity, perfection and enforceability of any of the liens in favor of any of them, or (b) equitably subordinate or re-characterize in whole or in part the claim of the Agent or any Secured Party in respect of the Obligations or the Pre-Petition Agent or any Pre-Petition Secured Party in respect of the Pre-Petition Indebtedness, or in each case the entry of an order by the Bankruptcy Court granting the relief described above;

(xii)    the filing of a lawsuit, adversary proceeding, claim or counterclaim related to the Credit Parties or Collateral or pre-petition collateral against the Agent, any Secured Party, Pre-Petition Agent, or any Pre-Petition Secured Party by the Credit Parties;

(xiii)    the application by the Credit Parties for authority to make any Pre-Petition Payment not contemplated by the Approved Budget without the Agent's prior written consent;

(xiv)    the entry of an order in the Chapter 11 Cases avoiding or requiring disgorgement of any portion of the Pre-Petition Obligations;

US-DOCS\112887106.9

(xv)    the use, remittance or the application of Collateral or proceeds of Collateral in contravention of the terms of the Loan Documents or the DIP Orders;

(xvi)    the entry of an order in the Chapter 11 Cases authorizing procedures for interim compensation of professionals that is not in form and substance customary for the District of Delaware or otherwise not in form and substance acceptable to the Agent;

(xvii)    without the prior written consent of the Agent and the Required DIP Revolving Lenders, the Credit Parties incur, create, assume, suffer to exist or permit any superpriority claim in the Chapter 11 Cases that is pari passu with or senior to the claims of the Secured Parties and Agent, other than the Carve-Out;

(xviii)    the Bankruptcy Court enters an order (a) resulting in the marshaling of any Collateral, or (b) precluding the attachment of liens to Post-Petition property based on the "equities of the case" under Section 552(b) of the Bankruptcy Code;

(xix)    the Credit Parties requesting or seeking authority for or entry of an order that approves or provides authority to take any other action or actions adverse to the Agent or any Secured Party or its rights and remedies under the Loan Documents or its interest in the Collateral;

(xx)    the termination or modification of the Borrower's exclusivity as to the proposal of any plan or reorganization or liquidation; or

(xxi)    the change of venue of any of the Chapter 11 Cases from the Bankruptcy Court to any other court without the prior written consent of the Agent.

7.2    <u>Remedies</u>.  Upon the occurrence and during the continuance of any Event of Default, upon written notice thereof by Agent (which such notice shall be made to the Credit Parties, the official committee(s) of creditors of the Credit Parties and the United States Trustee for the District of Delaware and shall be referred to herein as a "**Termination Declaration**" and the date which is the earliest to occur of any such Termination Declaration (excluding the notice period) being herein referred to as the "**Termination Declaration Date**"), Agent may, and shall at the request of the Required DIP Revolving Lenders, in each case provided such Event(s) of Default are not cured by the Credit Parties pursuant to the terms of this Agreement:

(a)    declare all or any portion of any one or more of the Commitments of each Lender to make Loans or of the L/C Issuer to Issue Letters of Credit to be suspended or terminated, whereupon all or such portion of such Commitments shall forthwith be suspended or terminated;

(b)    declare all or any portion of the unpaid principal amount of all outstanding Loans, all interest accrued and unpaid thereon, and all other amounts owing or payable hereunder or under any other Loan Document to be immediately due and payable;

64

without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by each Credit Party;

(c)     declare a termination, reduction or restriction on the ability of the Credit Parties to use any Cash Collateral; and/or

(d)     subject to the terms of the Interim Order or Final Order, as applicable, exercise on behalf of itself and the Lenders all rights and remedies available to it and the Lenders under the Loan Documents or applicable law; provided, however, Agent shall not credit bid any portion of the Obligations without the consent of the Required DIP Revolving Lenders.

In addition, five (5) Business Days following the Termination Declaration Date (such 5 Business Day period, the "**Remedies Notice Period**"), absent the Credit Parties curing all such existing Events of Default during such Remedies Notice Period, the Agent shall have automatic relief from the automatic stay and may foreclose on all or any portion of the Collateral, collect accounts receivable and apply the proceeds thereof to the Obligations, occupy the Credit Parties' premises to sell or otherwise dispose of the Collateral or otherwise exercise remedies against the Collateral permitted by applicable nonbankruptcy law. During the Remedies Notice Period, the Credit Parties and any statutory committee shall be entitled to an emergency hearing before the Bankruptcy Court for the sole purpose of contesting whether an Event of Default has occurred. Unless during such period the Bankruptcy Court determines that an Event of Default has not occurred and/or is not continuing, the automatic stay, as to the Lenders and the Agent, shall automatically terminate at the end of the Remedies Notice Period, without further notice or order. During the Remedies Notice Period, the Credit Parties may not use the proceeds of Loans hereunder, Cash Collateral, or other Collateral proceeds except to the limited extent permitted by the DIP Orders.

7.3     <u>Rights Not Exclusive</u>. The rights provided for in this Agreement and the other Loan Documents are cumulative and are not exclusive of any other rights, powers, privileges or remedies provided by law or in equity, or under any other instrument, document or agreement now existing or hereafter arising.

7.4     <u>Cash Collateral for Letters of Credit</u>. If an Event of Default has occurred and is continuing, this Agreement (or the DIP Revolving Loan Commitment) shall be terminated for any reason or if otherwise required by the terms hereof, Agent may, and upon request of (i) with respect to Prior Letters of Credit, Required Prior Revolving Lenders or (ii) with respect to DIP Letters of Credit, Required DIP Revolving Lenders, shall, demand (which demand shall be deemed to have been delivered automatically upon any acceleration of the Loans and other obligations hereunder pursuant to Section 7.2), and the Borrower shall thereupon deliver to Agent, to be held for the benefit of the L/C Issuer, Agent and the Lenders entitled thereto, an amount of cash equal to 105% of the amount of Prior Letter of Credit Obligations or DIP Letter of Credit Obligations, as applicable, as additional collateral security for Obligations in respect of any outstanding Prior Letter of Credit or DIP Letter of Credit, as applicable. Agent may at any time apply any or all of such cash and cash collateral to the payment of any or all of the Credit Parties' Obligations in respect of any Letters Prior of Credit or DIP Letter of Credit, as applicable. Pending such application, Agent may (but shall not be obligated to) invest the same

in an interest bearing account in Agent's name, for the benefit of the L/C Issuer, Agent and the Lenders entitled thereto, under which deposits are available for immediate withdrawal, at such bank or financial institution as the L/C Issuer and Agent may, in their discretion, select.

## ARTICLE VIII

## AGENT

8.1     <u>Appointment and Duties</u>.

(a)     <u>Appointment of Agent</u>.  Each Lender and each L/C Issuer hereby appoints Antares (together with any successor Agent pursuant to Section 8.9) as Agent hereunder and authorizes Agent to (i) execute and deliver the Loan Documents and accept delivery thereof on its behalf from any Credit Party, (ii) take such action on its behalf and to exercise all rights, powers and remedies and perform the duties as are expressly delegated to Agent under such Loan Documents and (iii) exercise such powers as are reasonably incidental thereto.  Without limiting the generality of the foregoing, each Lender acknowledges that it has received a copy of the Subordination Agreement, consents to and authorizes Agent's execution and delivery thereof on behalf of such Lender and agrees to be bound by the terms and provisions thereof.

(b)     <u>Duties as Collateral and Disbursing Agent</u>.  Without limiting the generality of clause (a) above, Agent shall have the sole and exclusive right and authority (to the exclusion of the Lenders and L/C Issuers), and is hereby authorized, to (i) act as the disbursing and collecting agent for the Lenders and the L/C Issuers with respect to all payments and collections arising in connection with the Loan Documents (including in any bankruptcy, insolvency or similar proceeding), and each Person making any payment in connection with any Loan Document to any Secured Party is hereby authorized to make such payment to Agent, (ii) file and prove claims and file other documents necessary or desirable to allow the claims of the Secured Parties with respect to any Obligation in any bankruptcy, insolvency or similar proceeding (but not to vote, consent or otherwise act on behalf of such Person), (iii) act as collateral agent for each Secured Party for purposes of the perfection of all Liens created by such agreements and all other purposes stated therein, (iv) manage, supervise and otherwise deal with the Collateral, (v) take such other action as is necessary or desirable to maintain the perfection and priority of the Liens created or purported to be created by the Loan Documents, (vi) except as may be otherwise specified in any Loan Document, exercise all remedies given to Agent and the other Secured Parties with respect to the Credit Parties and/or the Collateral, whether under the Loan Documents, applicable Requirements of Law or otherwise and (vii) execute any amendment, consent or waiver under the Loan Documents on behalf of any Lender that has consented in writing to such amendment, consent or waiver; provided, however, that Agent hereby appoints, authorizes and directs each Lender and L/C Issuer to act as collateral sub-agent for Agent, the Lenders and the L/C Issuers for purposes of the perfection of all Liens with respect to the Collateral, including any deposit account maintained by a Credit Party with, and cash and Cash Equivalents held by, such Lender or L/C Issuer, and may further authorize and direct the Lenders and the L/C Issuers to take further actions as collateral sub-agents for purposes of enforcing such

66

Liens or otherwise to transfer the Collateral subject thereto to Agent, and each Lender and L/C Issuer hereby agrees to take such further actions to the extent, and only to the extent, so authorized and directed.

(c)    <u>Limited Duties</u>.  Under the Loan Documents, Agent (i) is acting solely on behalf of the Secured Parties (except to the limited extent provided in Section 1.4(b) with respect to the Register), with duties that are entirely administrative in nature, notwithstanding the use of the defined term "Agent", the terms "agent", "Agent" and "collateral agent" and similar terms in any Loan Document  to refer to Agent, which terms are used for title purposes only, (ii) is not assuming any obligation under any Loan Document other than as expressly set forth therein or any role as agent, fiduciary or trustee of or for any Lender, L/C Issuer or any other Person and (iii) shall have no implied functions, responsibilities, duties, obligations or other liabilities under any Loan Document, and each Secured Party, by accepting the benefits of the Loan Documents, hereby waives and agrees not to assert any claim against Agent based on the roles, duties and legal relationships expressly disclaimed in clauses (i) through (iii) above.

8.2    <u>Binding Effect</u>.    Each Secured Party, by accepting the benefits of the Loan Documents, agrees that (i) any action taken by Agent or the Required DIP Revolving Lenders (or, if expressly required hereby, a greater proportion of the Lenders) in accordance with the provisions of the Loan Documents, (ii) any action taken by Agent in reliance upon the instructions of Required DIP Revolving Lenders (or, where so required, such greater proportion) and (iii) the exercise by Agent or the Required DIP Revolving Lenders (or, where so required, such greater proportion) of the powers set forth herein or therein, together with such other powers as are reasonably incidental thereto, shall be authorized and binding upon all of the Secured Parties.

8.3    <u>Use of Discretion</u>.

(a)    <u>No Action without Instructions</u>.  Agent shall not be required to exercise any discretion or take, or to omit to take, any action, including with respect to enforcement or collection, except any action it is required to take or omit to take (i) under any Loan Document or (ii) pursuant to instructions from the Required DIP Revolving Lenders (or, where expressly required by the terms of this Agreement, a greater proportion of the Lenders).

(b)    <u>Right Not to Follow Certain Instructions</u>.  Notwithstanding clause (a) above, Agent shall not be required to take, or to omit to take, any action (i) unless, upon demand, Agent receives an indemnification satisfactory to it from the Lenders (or, to the extent applicable and acceptable to Agent, any other Person) against all Liabilities that, by reason of such action or omission, may be imposed on, incurred by or asserted against Agent or any Related Person thereof or (ii) that is, in the opinion of Agent or its counsel, contrary to any Loan Document or applicable Requirement of Law.

(c)    <u>Exclusive Right to Enforce Rights and Remedies</u>.  Notwithstanding anything to the contrary contained herein or in any other Loan Document, the authority to enforce rights and remedies hereunder and under the other Loan Documents against the

Credit Parties or any of them shall be vested exclusively in, and all actions and proceedings at law in connection with such enforcement shall be instituted and maintained exclusively by, Agent in accordance with the Loan Documents for the benefit of all the Lenders and the L/C Issuer; provided that the foregoing shall not prohibit (i) Agent from exercising on its own behalf the rights and remedies that inure to its benefit (solely in its capacity as Agent) hereunder and under the other Loan Documents, (ii) each of the L/C Issuer from exercising the rights and remedies that inure to its benefit (solely in its capacity as L/C Issuer) hereunder and under the other Loan Documents, (iii) any Lender from exercising setoff rights in accordance with Section 9.11 or (iv) any Lender from filing proofs of claim or appearing and filing pleadings on its own behalf during the pendency of a proceeding relative to any Credit Party under any bankruptcy or other debtor relief law; and provided further that if at any time there is no Person acting as Agent hereunder and under the other Loan Documents, then (A) the Required DIP Revolving Lenders shall have the rights otherwise ascribed to Agent pursuant to Section 7.2 and (B) in addition to the matters set forth in clauses (ii), (iii) and (iv) of the preceding proviso and subject to Section 9.11, any Lender may, with the consent of the Required DIP Revolving Lenders, enforce any rights and remedies available to it and as authorized by the Required DIP Revolving Lenders.

8.4   <u>Delegation of Rights and Duties</u>.   Agent may, upon any term or condition it specifies, delegate or exercise any of its rights, powers and remedies under, and delegate or perform any of its duties or any other action with respect to, any Loan Document by or through any trustee, co-agent, employee, attorney-in-fact and any other Person (including any Secured Party).  Any such Person shall benefit from this Article VIII to the extent provided by Agent.

8.5   <u>Reliance and Liability</u>.

(a)   Agent may, without incurring any liability hereunder, (i) treat the payee of any Note as its holder until such Note has been assigned in accordance with Section 9.9, (ii) rely on the Register to the extent set forth in Section 1.6, (iii) consult with any of its Related Persons and, whether or not selected by it, any other advisors, accountants and other experts (including advisors to, and accountants and experts engaged by, any Credit Party) and (iv) rely and act upon any document and information (including those transmitted by Electronic Transmission) and any telephone message or conversation, in each case believed by it to be genuine and transmitted, signed or otherwise authenticated by the appropriate parties.

(b)   None of Agent and its Related Persons shall be liable for any action taken or omitted to be taken by any of them under or in connection with any Loan Document, and each Secured Party, Holdings, the Borrower and each other Credit Party hereby waive and shall not assert (and each of Holdings and the Borrower shall cause each other Credit Party to waive and agree not to assert) any right, claim or cause of action based thereon, except to the extent of liabilities resulting primarily from the gross negligence or willful misconduct of Agent or, as the case may be, such Related Person (each as determined in a final, non-appealable judgment by a court of competent jurisdiction) in connection with the duties expressly set forth herein.  Without limiting the foregoing, Agent:

(i)        shall not be responsible or otherwise incur liability for any action or omission taken in reliance upon the instructions of the Required DIP Revolving Lenders or for the actions or omissions of any of its Related Persons selected with reasonable care (other than employees, officers and directors of Agent, when acting on behalf of Agent);

(ii)        shall not be responsible to any Lender, L/C Issuer or other Person for the due execution, legality, validity, enforceability, effectiveness, genuineness, sufficiency or value of, or the attachment, perfection or priority of any Lien created or purported to be created under or in connection with, any Loan Document;

(iii)        makes no warranty or representation, and shall not be responsible, to any Lender, L/C Issuer or other Person for any statement, document, information, representation or warranty made or furnished by or on behalf of any Credit Party or any Related Person of any Credit Party in connection with any Loan Document or any transaction contemplated therein or any other document or information with respect to any Credit Party, whether or not transmitted or (except for documents expressly required under any Loan Document to be transmitted to the Lenders) omitted to be transmitted by Agent, including as to completeness, accuracy, scope or adequacy thereof, or for the scope, nature or results of any due diligence performed by Agent in connection with the Loan Documents; and

(iv)        shall not have any duty to ascertain or to inquire as to the performance or observance of any provision of any Loan Document, whether any condition set forth in any Loan Document is satisfied or waived, as to the financial condition of any Credit Party or as to the existence or continuation or possible occurrence or continuation of any Default or Event of Default and shall not be deemed to have notice or knowledge of such occurrence or continuation unless it has received a notice from the Borrower, any Lender or L/C Issuer describing such Default or Event of Default clearly labeled "notice of default" (in which case Agent shall promptly give notice of such receipt to all Lenders);

and, for each of the items set forth in clauses (i) through (iv) above, each Lender, L/C Issuer, Holdings and the Borrower hereby waives and agrees not to assert (and each of Holdings and the Borrower shall cause each other Credit Party to waive and agree not to assert) any right, claim or cause of action it might have against Agent based thereon.

8.6    <u>Agent Individually</u>.  Agent and its Affiliates may make loans and other extensions of credit to, acquire Stock and Stock Equivalents of, engage in any kind of business with, any Credit Party or Affiliate thereof as though it were not acting as Agent and may receive separate fees and other payments therefor.  To the extent Agent or any of its Affiliates makes any Loan or otherwise becomes a Lender hereunder, it shall have and may exercise the same rights and powers hereunder and shall be subject to the same obligations and liabilities as any other Lender and the terms "**Lender**", "**Prior Revolving Lender**", "**DIP Revolving Lender**", "**Required Prior Revolving Lender**", "**Required DIP Revolving Lender**" and any similar terms shall,

except where otherwise expressly provided in any Loan Document, include Agent or such Affiliate, as the case may be, in its individual capacity as Lender, Prior Revolving Lender, DIP Revolving Lender or as one of the Required Prior Revolving Lenders or Required DIP Revolving Lenders, respectively.

8.7     Lender Credit Decision.

(a)     Each Lender and each L/C Issuer acknowledges that it shall, independently and without reliance upon Agent, any Lender or L/C Issuer or any of their Related Persons or upon any document (including any offering and disclosure materials in connection with the syndication of the Loans) solely or in part because such document was transmitted by Agent or any of its Related Persons, conduct its own independent investigation of the financial condition and affairs of each Credit Party and make and continue to make its own credit decisions in connection with entering into, and taking or not taking any action under, any Loan Document or with respect to any transaction contemplated in any Loan Document, in each case based on such documents and information as it shall deem appropriate.  Except for documents expressly required by any Loan Document to be transmitted by Agent to the Lenders or L/C Issuers, Agent shall not have any duty or responsibility to provide any Lender or L/C Issuer with any credit or other information concerning the business, prospects, operations, Property, financial and other condition or creditworthiness of any Credit Party or any Affiliate of any Credit Party that may come in to the possession of Agent or any of its Related Persons.

(b)     If any Lender or L/C Issuer has elected to abstain from receiving MNPI concerning the Credit Parties or their Affiliates, such Lender or L/C Issuer acknowledges that, notwithstanding such election, Agent and/or the Credit Parties will, from time to time, make available syndicate-information (which may contain MNPI) as required by the terms of, or in the course of administering the Loans to the credit contact(s) identified for receipt of such information on the Lender's administrative questionnaire who are able to receive and use all syndicate-level information (which may contain MNPI) in accordance with such Lender's compliance policies and contractual obligations and applicable law, including federal and state securities laws; provided, that if such contact is not so identified in such questionnaire, the relevant Lender or L/C Issuer hereby agrees to promptly (and in any event within one (1) Business Day) provide such a contact to Agent and the Credit Parties upon request therefor by Agent or the Credit Parties. Notwithstanding such Lender's or L/C Issuer's election to abstain from receiving MNPI, such Lender or L/C Issuer acknowledges that if such Lender or L/C Issuer chooses to communicate with Agent, it assumes the risk of receiving MNPI concerning the Credit Parties or their Affiliates.

8.8     Expenses; Indemnities; Withholding.

(a)     Each Lender agrees to reimburse Agent and each of its Related Persons (to the extent not reimbursed by any Credit Party) promptly upon demand, severally and ratably, for any costs and expenses (including fees, charges and disbursements of financial, legal and other advisors and Other Taxes paid in the name of, or on behalf of,

any Credit Party) that may be incurred by Agent or any of its Related Persons in connection with the preparation, syndication, execution, delivery, administration, modification, consent, waiver or enforcement of, or the taking of any other action (whether through negotiations, through any work-out, bankruptcy, restructuring or other legal or other proceeding (including preparation for and/or response to any subpoena or request for document production relating thereto) or otherwise) in respect of, or legal advice with respect to, its rights or responsibilities under, any Loan Document.

(b)     Each Lender further agrees to indemnify Agent, each L/C Issuer and each of their respective Related Persons (to the extent not reimbursed by any Credit Party), severally and ratably, from and against Liabilities (including, to the extent not indemnified pursuant to Section 8.8(c), Taxes, interests and penalties imposed for not properly withholding or backup withholding on payments made to or for the account of any Lender) that may be imposed on, incurred by or asserted against Agent, any L/C Issuer or any of their respective Related Persons in any matter relating to or arising out of, in connection with or as a result of any Loan Document, any Related Document, any Letter of Credit or any other act, event or transaction related, contemplated in or attendant to any such document, or, in each case, any action taken or omitted to be taken by Agent, any L/C Issuer or any of their respective Related Persons under or with respect to any of the foregoing; provided, that with respect to any indemnification owed to any L/C Issuer or any of its Related Persons in connection with any Letter of Credit, only DIP Revolving Lenders shall be required to indemnify, such indemnification to be made severally and ratably based on such DIP Revolving Lender's Commitment Percentage of the Aggregate DIP Revolving Loan Commitment (determined as of the time the applicable indemnification is sought by such L/C Issuer or Related Person from the DIP Revolving Lenders); provided, further, however, that no Lender shall be liable to Agent or any of its Related Persons to the extent such liability has resulted primarily from the gross negligence or willful misconduct of Agent or, as the case may be, such Related Person, as determined by a court of competent jurisdiction in a final non-appealable judgment or order.

(c)     To the extent required by any Requirement of Law, Agent may withhold from any payment to any Lender under a Loan Document an amount equal to any applicable withholding Tax (including withholding Taxes imposed under Chapters 3 and 4 of Subtitle A of the Code). If the IRS or any other Governmental Authority asserts a claim that Agent did not properly withhold Tax from amounts paid to or for the account of any Lender (because the appropriate certification form was not delivered, was not properly executed, or fails to establish an exemption from, or reduction of, withholding Tax with respect to a particular type of payment, or because such Lender failed to notify Agent or any other Person of a change in circumstances which rendered the exemption from, or reduction of, withholding Tax ineffective, failed to maintain a Participant Register or for any other reason), or Agent reasonably determines that it was required to withhold Taxes from a prior payment but failed to do so, such Lender shall promptly indemnify Agent fully for all amounts paid, directly or indirectly, by Agent as Tax or otherwise, including penalties and interest, and together with all expenses incurred by Agent, including legal expenses, allocated internal costs and out-of-pocket expenses. Agent may offset against any payment to any Lender under a Loan Document, any

applicable withholding Tax that was required to be withheld from any prior payment to such Lender but which was not so withheld, as well as any other amounts for which Agent is entitled to indemnification from such Lender under this Section 8.8(c).

8.9     Resignation of Agent or L/C Issuer.

(a)     Agent may resign at any time by delivering notice of such resignation to the Lenders and the Borrower, effective on the date set forth in such notice or, if no such date is set forth therein, upon the date such notice shall be effective in accordance with the terms of this Section 8.9.  If Agent delivers any such notice, the Required DIP Revolving Lenders shall have the right to appoint a successor Agent.  If, after 30 days after the date of the retiring Agent's notice of resignation, no successor Agent has been appointed by the Required DIP Revolving Lenders that has accepted such appointment, then the retiring Agent may, on behalf of the Lenders, appoint a successor Agent from among the Lenders.  Each appointment under this clause (a) shall be subject to the prior consent of the Borrower, which may not be unreasonably withheld but shall not be required during the continuance of an Event of Default.

(b)     Effective immediately upon its resignation, (i) the retiring Agent shall be discharged from its duties and obligations under the Loan Documents, (ii) the Lenders shall assume and perform all of the duties of Agent until a successor Agent shall have accepted a valid appointment hereunder, (iii) the retiring Agent and its Related Persons shall no longer have the benefit of any provision of any Loan Document other than with respect to any actions taken or omitted to be taken while such retiring Agent was, or because such Agent had been, validly acting as Agent under the Loan Documents and (iv) subject to its rights under Section 8.3, the retiring Agent shall take such action as may be reasonably necessary to assign to the successor Agent its rights as Agent under the Loan Documents.  Effective immediately upon its acceptance of a valid appointment as Agent, a successor Agent shall succeed to, and become vested with, all the rights, powers, privileges and duties of the retiring Agent under the Loan Documents.

(c)     Any L/C Issuer may resign at any time by delivering notice of such resignation to Agent, effective on the date set forth in such notice or, if no such date is set forth therein, on the date such notice shall be effective.  Upon such resignation, the L/C Issuer shall remain an L/C Issuer and shall retain its rights and obligations in its capacity as such (other than any obligation to Issue Letters of Credit but including the right to receive fees or to have Lenders participate in any L/C Reimbursement Obligation thereof) with respect to Letters of Credit Issued by such L/C Issuer prior to the date of such resignation and shall otherwise be discharged from all other duties and obligations under the Loan Documents.

8.10    Release of Collateral or Guarantors.  Each Lender and L/C Issuer hereby consents to the release and hereby directs Agent to release (or, in the case of clause (b)(ii) below, release or subordinate) the following:

(a)     any Subsidiary of the Borrower from its guaranty of any Obligation if all of the Stock and Stock Equivalents of such Subsidiary owned by any Credit Party are

sold or transferred in a transaction permitted under the Loan Documents (including pursuant to a waiver or consent), to the extent that, after giving effect to such transaction, such Subsidiary would not be required to guaranty any Obligations pursuant to Section 4.13; and

      (b)     any Lien held by Agent for the benefit of the Secured Parties against (i) any Collateral that is sold, transferred, conveyed or otherwise disposed of by a Credit Party in a transaction permitted by the Loan Documents (including pursuant to a valid waiver or consent), to the extent all Liens required to be granted in such Collateral pursuant to Section 4.13 after giving effect to such transaction have been granted and (ii) all of the Collateral and all Credit Parties, upon (A) the occurrence of the Facility Termination Date and (B) to the extent requested by Agent, receipt by Agent and the Secured Parties of liability releases from the Credit Parties each in form and substance acceptable to Agent.

Each Lender and L/C Issuer hereby directs Agent, and Agent hereby agrees, upon receipt of reasonable advance notice from the Borrower, to execute and deliver or file such documents and to perform other actions reasonably necessary to release the guaranties and Liens when and as directed in this Section 8.10.

      8.11   <u>Additional Secured Parties</u>.  The benefit of the provisions of the Loan Documents directly relating to the Collateral or any Lien granted thereunder shall extend to and be available to any Secured Party that is not a Lender or L/C Issuer party hereto as long as, by accepting such benefits, such Secured Party agrees, as among Agent and all other Secured Parties, that such Secured Party is bound by (and, if requested by Agent, shall confirm such agreement in a writing in form and substance acceptable to Agent) this Article VIII, Section 9.3, Section 9.9, Section 9.10, Section 9.11, Section 9.17, Section 9.24 and Section 10.1 (and, solely with respect to L/C Issuers, Section 1.1(c) and Section 1.2, as applicable) and the decisions and actions of Agent and the Required DIP Revolving Lenders (or, where expressly required by the terms of this Agreement, a greater proportion of the Lenders or other parties hereto as required herein) to the same extent a Lender is bound; provided, however, that, notwithstanding the foregoing, (a) such Secured Party shall be bound by Section 8.8 only to the extent of Liabilities, costs and expenses with respect to or otherwise relating to the Collateral held for the benefit of such Secured Party, in which case the obligations of such Secured Party thereunder shall not be limited by any concept of pro rata share or similar concept, (b) each of Agent, the Lenders and the L/C Issuers party hereto shall be entitled to act at its sole discretion, without regard to the interest of such Secured Party, regardless of whether any Obligation to such Secured Party thereafter remains outstanding, is deprived of the benefit of the Collateral, becomes unsecured or is otherwise affected or put in jeopardy thereby, and without any duty or liability to such Secured Party or any such Obligation and (c) except as otherwise set forth herein, such Secured Party shall not have any right to be notified of, consent to, direct, require or be heard with respect to, any action taken or omitted in respect of the Collateral or under any Loan Document.

<u>ARTICLE IX</u>

<u>MISCELLANEOUS</u>

9.1     <u>Amendments and Waivers</u>.

(a)     Subject to the provisions of Section 9.1(f) and 10.5(b) hereof, no amendment or waiver of any provision of this Agreement or any other Loan Document, and no consent with respect to any departure by any Credit Party therefrom, shall be effective unless the same shall be in writing and signed by Agent, the Required DIP Revolving Lenders (or by Agent with the consent of the Required DIP Revolving Lenders), and the Borrower and then such waiver shall be effective only in the specific instance and for the specific purpose for which given; provided, however, that no such waiver, amendment, or consent shall, unless in writing and signed by all the Lenders directly affected thereby (or by Agent with the consent of all the Lenders directly affected thereby), in addition to Agent, the Required DIP Revolving Lenders (or by Agent with the consent of the Required DIP Revolving Lenders) and the Borrower, do any of the following:

(i)     increase or extend the Commitment of any Lender (or reinstate any Commitment terminated pursuant to Section 7.2(a));

(ii)     postpone or delay any date fixed for, or reduce or waive, any scheduled installment of principal or any payment of interest, fees or other amounts (other than principal) due to the Lenders (or any of them) or L/C Issuer hereunder or under any other Loan Document (for the avoidance of doubt, mandatory prepayments pursuant to Section 1.10) may be postponed, delayed, reduced, waived or modified with the consent of Required DIP Revolving Lenders);

(iii)     reduce the principal of, or the rate of interest specified herein (it being agreed that waiver or other modification of the default interest margin shall only require the consent of Required DIP Revolving Lenders) or the amount of interest payable in cash specified herein on any Loan, or of any fees or other amounts payable hereunder or under any other Loan Document, including L/C Reimbursement Obligations;

(iv)     amend or modify Section 1.12(c);

(v)     change the percentage of the Commitments or of the aggregate unpaid principal amount of the Loans which shall be required for the Lenders or any of them to take any action hereunder;

(vi)     amend this Section 9.1 (other than Section 9.1(c)) or, subject to the terms of this Agreement, the definition of Required DIP Revolving Lenders, or any provision providing for consent or other action by all DIP Revolving Lenders; or

(vii)    discharge any Credit Party from its respective payment Obligations under the Loan Documents, or release all or substantially all of the Collateral, except as otherwise may be provided in this Agreement or the other Loan Documents;

it being agreed that all Lenders shall be deemed to be directly affected by an amendment or waiver of the type described in the preceding clauses (v), (vi) and (vii).

(b)    No amendment, waiver or consent shall, unless in writing and signed by Agent or the L/C Issuer, as the case may be, in addition to the Required DIP Revolving Lenders or all Lenders directly affected thereby, as the case may be (or by Agent with the consent of the Required DIP Revolving Lenders or all the Lenders directly affected thereby, as the case may be), affect the rights or duties of Agent or the L/C Issuer, as applicable, under this Agreement or any other Loan Document.

(c)    No amendment or waiver shall, unless signed by Agent and Required Prior Revolving Lenders (or by Agent with the consent of Required Prior Revolving Lenders) in addition to the Required DIP Revolving Lenders (or by Agent with the consent of the Required DIP Revolving Lenders): (i) amend or waive this Section 9.1(c) or the definitions of the terms used in this Section 9.1(c) insofar as the definitions affect the substance of this Section 9.1(c); (ii) change the definition of the term Required Prior Revolving Lenders; or (iii) change the percentage of Prior Revolving Lenders which shall be required for Prior Revolving Lenders to take any action hereunder.

(d)    [Intentionally Omitted].

(e)    Notwithstanding anything to the contrary contained in this Section 9.1, (i) the Borrower may amend Schedules 3.19 and 3.21 upon notice to Agent and (ii) Agent and the Borrower may amend or modify this Agreement and any other Loan Document to (1) cure any ambiguity, omission, defect or inconsistency therein and (2) grant a new Lien for the benefit of the Secured Parties, extend an existing Lien over additional Property for the benefit of the Secured Parties or join additional Persons as Credit Parties.

(f)    [Intentionally Omitted].

9.2    Notices.

(a)    Addresses.  All notices and other communications required or expressly authorized to be made by this Agreement shall be given in writing, unless otherwise expressly specified herein, and (i) addressed to the address set forth on the applicable signature page hereto, (ii) posted to Syndtrak® (to the extent such system is available and set up by or at the direction of Agent prior to posting) in an appropriate location by uploading such notice, demand, request, direction or other communication to www.syndtrak.com or using such other means of posting to Syndtrak® as may be available and reasonably acceptable to Agent prior to such posting, (iii) posted to any other E-System approved by or set up by or at the direction of Agent or (iv) addressed to such other address as shall be notified in writing (A) in the case of the Borrower and Agent, to the other parties hereto and (B) in the case of all other parties, to the Borrower

and Agent.  Transmissions made by electronic mail or E-Fax to Agent shall be effective only (x) for notices where such transmission is specifically authorized by this Agreement, (y) if such transmission is delivered in compliance with procedures of Agent applicable at the time and previously communicated to the Borrower, and (z) if receipt of such transmission is acknowledged by Agent.

(b)     Effectiveness.

(i)     All communications described in clause (a) above and all other notices, demands, requests and other communications made in connection with this Agreement shall be effective and be deemed to have been received (i) if delivered by hand, upon personal delivery, (ii) if delivered by overnight courier service, one (1) Business Day after delivery to such courier service, (iii) if delivered by mail, three (3) Business Days after deposit in the mail, (iv) if delivered by facsimile (other than to post to an E-System pursuant to clause (a)(ii) or (a)(iii) above), upon sender's receipt of confirmation of proper transmission, and (v) if delivered by posting to any E-System, on the later of the Business Day of such posting and the Business Day access to such posting is given to the recipient thereof in accordance with the standard procedures applicable to such E-System; provided, however, that no communications to Agent pursuant to Article I shall be effective until received by Agent.

(ii)     The posting, completion and/or submission by any Credit Party of any communication pursuant to an E-System shall constitute a representation and warranty by the Credit Parties that any representation, warranty, certification or other similar statement required by the Loan Documents to be provided, given or made by a Credit Party in connection with any such communication is true, correct and complete except as expressly noted in such communication or E-System.

(c)     Each Lender shall notify Agent in writing of any changes in the address to which notices to such Lender should be directed, of addresses of its Lending Office, of payment instructions in respect of all payments to be made to it hereunder and of such other administrative information as Agent shall reasonably request.

9.3     Electronic Transmissions.

(a)     Authorization.  Subject to the provisions of Section 9.2(a), each of Agent, Lenders, each Credit Party and each of their Related Persons, is authorized (but not required) to transmit, post or otherwise make or communicate, in its sole discretion, Electronic Transmissions in connection with any Loan Document and the transactions contemplated therein.  Each Credit Party and each Secured Party hereto acknowledges and agrees that the use of Electronic Transmissions is not necessarily secure and that there are risks associated with such use, including risks of interception, disclosure and abuse and each indicates it assumes and accepts such risks by hereby authorizing the transmission of Electronic Transmissions.

(b)    <u>Signatures</u>.  Subject to the provisions of Section 9.2(a), (i)(A) no posting to any E-System shall be denied legal effect merely because it is made electronically, (B) each E-Signature on any such posting shall be deemed sufficient to satisfy any requirement for a "signature" and (C) each such posting shall be deemed sufficient to satisfy any requirement for a "writing", in each case including pursuant to any Loan Document, any applicable provision of any UCC, the federal Uniform Electronic Transactions Act, the Electronic Signatures in Global and National Commerce Act and any substantive or procedural Requirement of Law governing such subject matter, (ii) each such posting that is not readily capable of bearing either a signature or a reproduction of a signature may be signed, and shall be deemed signed, by attaching to, or logically associating with such posting, an E-Signature, upon which Agent, each other Secured Party and each Credit Party may rely and assume the authenticity thereof, (iii) each such posting containing a signature, a reproduction of a signature or an E-Signature shall, for all intents and purposes, have the same effect and weight as a signed paper original and (iv) each party hereto or beneficiary hereto agrees not to contest the validity or enforceability of any posting on any E-System or E-Signature on any such posting under the provisions of any applicable Requirement of Law requiring certain documents to be in writing or signed; provided, however, that nothing herein shall limit such party's or beneficiary's right to contest whether any posting to any E-System or E-Signature has been altered after transmission.

(c)    <u>Separate Agreements</u>.  All uses of an E-System shall be governed by and subject to, in addition to Section 9.2 and this Section 9.3, the separate terms, conditions and privacy policy posted or referenced in such E-System (or such terms, conditions and privacy policy as may be updated from time to time, including on such E-System) and related Contractual Obligations executed by Agent and Credit Parties in connection with the use of such E-System.

(d)    <u>LIMITATION OF LIABILITY</u>.  ALL E-SYSTEMS AND ELECTRONIC TRANSMISSIONS SHALL BE PROVIDED "AS IS" AND "AS AVAILABLE". NONE OF AGENT, ANY LENDER OR ANY OF THEIR RELATED PERSONS WARRANTS THE ACCURACY, ADEQUACY OR COMPLETENESS OF ANY E-SYSTEMS OR ELECTRONIC TRANSMISSION AND DISCLAIMS ALL LIABILITY FOR ERRORS OR OMISSIONS THEREIN.  NO WARRANTY OF ANY KIND IS MADE BY AGENT, ANY LENDER OR ANY OF THEIR RELATED PERSONS IN CONNECTION WITH ANY E-SYSTEMS OR ELECTRONIC COMMUNICATION, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD-PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS.  Each of the Borrower, each other Credit Party executing this Agreement and each Secured Party agrees that Agent has no responsibility for maintaining or providing any equipment, software, services or any testing required in connection with any Electronic Transmission or otherwise required for any E-System.

9.4    <u>No Waiver; Cumulative Remedies</u>.  No failure to exercise and no delay in exercising, on the part of Agent or any Lender, any right, remedy, power or privilege hereunder, shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy,

power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  No course of dealing between any Credit Party, any Affiliate of any Credit Party, Agent or any Lender shall be effective to amend, modify or discharge any provision of this Agreement or any of the other Loan Documents.

9.5     <u>Costs and Expenses</u>.  Any action taken by any Credit Party under or with respect to any Loan Document, even if required under any Loan Document or at the request of Agent or Required DIP Revolving Lenders, shall be at the expense of such Credit Party, and neither Agent nor any other Secured Party shall be required under any Loan Document to reimburse any Credit Party or any Subsidiary of any Credit Party therefor except as expressly provided therein.  In addition, the Borrower agrees to pay or reimburse upon demand (a) Agent for all reasonable and documented out-of-pocket costs and expenses incurred by it or any of its Related Persons (but only to the extent Agent or its Affiliates are required to reimburse such Related Persons), in connection with the investigation, development, preparation, negotiation, syndication, execution, interpretation or administration of, any modification of any term of or termination of, any Loan Document, any commitment or proposal letter therefor, any other document prepared in connection therewith or the consummation and administration of any transaction contemplated therein, in each case including Attorney Costs of Agent, any costs incurred in connection with Chapter 11 Cases, the cost of environmental audits, Collateral audits and appraisals, background checks and similar expenses, to the extent permitted hereunder, (b) Agent for all reasonable and documented costs and expenses incurred by it or any of its Related Persons in connection with internal audit reviews, field examinations and Collateral examinations (which shall be reimbursed, in addition to the reasonable and documented out-of-pocket costs and expenses of such examiners, at the per diem rate per individual charged by Agent for its examiners), (c) each of Agent, its Related Persons, and L/C Issuer for all reasonable and documented costs and expenses incurred in connection with (i) any refinancing or restructuring of the credit arrangements provided hereunder in the nature of a "work-out", (ii) the enforcement or preservation of any right or remedy under any Loan Document, any Obligation, with respect to the Collateral or any other related right or remedy or (iii) the commencement, defense, conduct of, intervention in, or the taking of any other action (including preparation for and/or response to any subpoena or request for document production relating thereto) with respect to, any proceeding (including any bankruptcy or insolvency proceeding) related to any Credit Party, any Subsidiary of any Credit Party, Loan Document or Obligation, including Attorney Costs and (d) fees and disbursements of Attorney Costs of one law firm on behalf of all Lenders (other than Agent) incurred in connection with any of the matters referred to in clause (c) above.

9.6     <u>Indemnity</u>.

(a)     Each Credit Party agrees to indemnify, hold harmless and defend Agent, each Lender, each L/C Issuer and each of their respective Related Persons (each such Person being an "**Indemnitee**") from and against all Liabilities (including brokerage commissions, fees and other compensation) that may be imposed on, incurred by or asserted against any such Indemnitee (whether brought by a Credit Party, an Affiliate of a Credit Party or any other Person) in any matter relating to or arising out of, in connection with or as a result of (i) any Loan Document, Pre-Petition Loan Document, any Obligation (or the repayment thereof), any Letter of Credit, the use or intended use of the proceeds of any Loan or the use of any Letter of Credit or any securities filing of, or with

78

respect to, any Credit Party, (ii) any commitment letter, proposal letter or term sheet with any Person or any Contractual Obligation, arrangement or understanding with any broker, finder or consultant, in each case entered into by or on behalf of any Credit Party or any Affiliate of any of them in connection with any of the foregoing and any Contractual Obligation entered into in connection with any E-Systems or other Electronic Transmissions, (iii) any actual or prospective investigation, litigation or other proceeding, whether or not brought by any such Indemnitee or any of its Related Persons, any holders of securities or creditors (and including attorneys' fees in any case), whether or not any such Indemnitee, Related Person, holder or creditor is a party thereto, and whether or not based on any securities or commercial law or regulation or any other Requirement of Law or theory thereof, including common law, equity, contract, tort or otherwise or (iv) any other act, event or transaction related, contemplated in or attendant to any of the foregoing (collectively, the "**Indemnified Matters**"); provided, however, that no Credit Party shall have any liability under this Section 9.6 to any Indemnitee with respect to any Indemnified Matter, and no Indemnitee shall have any liability with respect to any Indemnified Matter other than (to the extent otherwise liable), to the extent such liability has resulted from the gross negligence or willful misconduct of such Indemnitee, as determined by a court of competent jurisdiction in a final non-appealable judgment or order. Furthermore, the Borrower and each other Credit Party executing this Agreement waives and agrees not to assert against any Indemnitee, and shall cause each other Credit Party to waive and not assert against any Indemnitee, any right of contribution with respect to any Liabilities that may be imposed on, incurred by or asserted against any Related Person. This Section 9.6(a) shall not apply with respect to Taxes other than any Taxes that represent Liabilities arising from any non-Tax claim.

(b)    Without limiting the foregoing, "**Indemnified Matters**" includes all Environmental Liabilities imposed on, incurred by or asserted against any Indemnitee, including those arising from, or otherwise involving, any Property of any Credit Party or any Related Person of any Credit Party or any actual, alleged or prospective damage to Property or natural resources or harm or injury alleged to have resulted from any Release of Hazardous Materials on, upon or into such Property or natural resource or any Property on or contiguous to any Real Estate of any Credit Party or any Related Person of any Credit Party, whether or not, with respect to any such Environmental Liabilities, any Indemnitee is a mortgagee pursuant to any leasehold mortgage, a mortgagee in possession, the successor-in-interest to any Credit Party or any Related Person of any Credit Party or the owner, lessee or operator of any Property of any Related Person through any foreclosure action, in each case except to the extent such Environmental Liabilities (i) are incurred solely following foreclosure by Agent or following Agent or any Lender having become the successor-in-interest to any Credit Party or any Related Person of any Credit Party and (ii) are attributable solely to acts of such Indemnitee.

9.7    <u>Marshaling; Payments Set Aside</u>.  No Secured Party shall be under any obligation to marshal any Property in favor of any Credit Party or any other Person or against or in payment of any Obligation. To the extent that any Secured Party receives a payment from the Borrower, from any other Credit Party, from the proceeds of the Collateral, from the exercise of its rights of setoff, any enforcement action or otherwise, and such payment is subsequently, in whole or in part, invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a

trustee, receiver or any other party, then to the extent of such recovery, the obligation or part thereof originally intended to be satisfied, and all Liens, rights and remedies therefor, shall be revived and continued in full force and effect as if such payment had not occurred.

9.8     <u>Successors and Assigns</u>.  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns; provided that any assignment by any Lender shall be subject to the provisions of Section 9.9, and provided further that the Borrower may not assign or transfer any of its rights or obligations under this Agreement without the prior written consent of Agent and each Lender.

9.9     <u>Assignments and Participations; Binding Effect</u>.

(a)     <u>Binding Effect</u>.  This Agreement shall become effective when it shall have been executed by Holdings, the Borrower, the other Credit Parties signatory hereto and Agent and when Agent shall have been notified by each Lender that such Lender has executed it.  Thereafter, it shall be binding upon and inure to the benefit of, but only to the benefit of, Holdings, the Borrower, the other Credit Parties hereto (in each case except for Article VIII), Agent, each Lender and each L/C Issuer receiving the benefits of the Loan Documents and, to the extent provided in Section 8.11, each other Secured Party and, in each case, their respective successors and permitted assigns.  Except as expressly provided in any Loan Document (including in Section 8.9), none of Holdings, the Borrower, any other Credit Party, any L/C Issuer or Agent shall have the right to assign any rights or obligations hereunder or any interest herein.

(b)     <u>Right to Assign</u>.  Each Lender may sell, transfer, negotiate or assign (a "**Sale**") all or a portion of its rights and obligations hereunder (including all or a portion of its Commitments and its rights and obligations with respect to Loans and Letters of Credit) to:

(i)     any existing Lender (other than a Non-Funding Lender or Impacted Lender);

(ii)     any Affiliate or Approved Fund of any existing Lender (other than a Non-Funding Lender, Impacted Lender or any Subordinated Lender); or

(iii)     any other Person acceptable (which acceptance shall not be unreasonably withheld or delayed) to Agent and, as long as no Event of Default is continuing, the Borrower, and, in the case of any Sale of a DIP Revolving Loan, Letter of Credit or DIP Revolving Loan Commitment, Agent and each L/C Issuer that is a Lender (which acceptances of L/C Issuer and the Borrower shall be deemed to have been given unless an objection is delivered to Agent within five (5) Business Days after notice of a proposed Sale is delivered to the L/C Issuer and the Borrower, as applicable); provided, however, that:

(A)     [Intentionally Omitted];

(B)     for each Loan, the aggregate outstanding principal amount (determined as of the effective date of the applicable Assignment) of the

Loans, Commitments and Letter of Credit Obligations subject to any such Sale shall be in a minimum amount of $1,000,000, unless such Sale is made to an existing Lender or an Affiliate or Approved Fund of any existing Lender, is of the assignor's (together with its Affiliates and Approved Funds) entire interest in such facility or is made with the prior consent of the Borrower (to the extent the Borrower's consent is otherwise required) and Agent;

(C)     interest accrued, other than any interest that is payable-in-kind, prior to and through the date of any such Sale may not be assigned; and

(D)     such Sales by Lenders who are Non-Funding Lenders due to clause (a) of the definition of Non-Funding Lender shall be subject to Agent's prior written consent in all instances, unless in connection with such sale, such Non-Funding Lender cures, or causes the cure of, its Non-Funding Lender status as contemplated in Section 1.13(e)(vi).

Agent's refusal to accept a Sale to a Credit Party, a Subsidiary of a Credit Party, an Affiliate of the Borrower, a Subordinated Lender or a Person that would be a Non-Funding Lender or an Impacted Lender, or the imposition of conditions or limitations (including limitations on voting) upon Sales to such Persons, shall not be deemed to be unreasonable.

(c)     Procedure.  The parties to each Sale made in reliance on clause (b) above (other than those described in clause (e) or (f) below) shall execute and deliver to Agent an Assignment via an electronic settlement system designated by Agent (or, if previously agreed with Agent, via a manual execution and delivery of the Assignment) evidencing such Sale, together with any existing Note subject to such Sale (or any affidavit of loss therefor acceptable to Agent), any Tax forms required to be delivered pursuant to Section 10.1 and payment of an assignment fee in the amount of $3,500 to Agent, unless waived or reduced by Agent; provided that (i) if a Sale by a Lender is made to an Affiliate or an Approved Fund of such assigning Lender, then no assignment fee shall be due in connection with such Sale, and (ii) if a Sale by a Lender is made to an assignee that is not an Affiliate or Approved Fund of such assignor Lender, and concurrently to one or more Affiliates or Approved Funds of such assignee, then only one assignment fee of $3,500 shall be due in connection with such Sale (unless waived or reduced by Agent). Upon receipt of all the foregoing, and conditioned upon such receipt and, if such Assignment is made in accordance with clause (iii) of Section 9.9(b), upon Agent (and the Borrower, if applicable) consenting to such Assignment, from and after the effective date specified in such Assignment, Agent shall record or cause to be recorded in the Register the information contained in such Assignment.

(d)     Effectiveness.  Subject to the recording of an Assignment by Agent in the Register pursuant to Section 1.6(b), (i) the assignee thereunder shall become a party hereto and, to the extent that rights and obligations under the Loan Documents have been assigned to such assignee pursuant to such Assignment, shall have the rights and obligations of a Lender, (ii) any applicable Note shall be transferred to such assignee

through such entry and (iii) the assignor thereunder shall, to the extent that rights and obligations under this Agreement have been assigned by it pursuant to such Assignment, relinquish its rights (except for those surviving the termination of the Commitments and the payment in full of the Obligations) and be released from its obligations under the Loan Documents, other than those relating to events or circumstances occurring prior to such assignment (and, in the case of an Assignment covering all or the remaining portion of an assigning Lender's rights and obligations under the Loan Documents, such Lender shall cease to be a party hereto).

(e)    Grant of Security Interests.  In addition to the other rights provided in this Section 9.9, each Lender may grant a security interest in, or otherwise assign as collateral, any of its rights under this Agreement, whether now owned or hereafter acquired (including rights to payments of principal or interest on the Loans), to (A) any federal reserve bank (pursuant to Regulation A of the Federal Reserve Board), without notice to Agent or (B) any holder of, or trustee for the benefit of the holders of, such Lender's Indebtedness or equity securities, by notice to Agent; provided, however, that no such holder or trustee, whether because of such grant or assignment or any foreclosure thereon (unless such foreclosure is made through an assignment in accordance with clause (b) above), shall be entitled to any rights of such Lender hereunder and no such Lender shall be relieved of any of its obligations hereunder.

(f)    Participants and SPVs.  In addition to the other rights provided in this Section 9.9, each Lender may, (x) with notice to Agent, grant to an SPV the option to make all or any part of any Loan that such Lender would otherwise be required to make hereunder (and the exercise of such option by such SPV and the making of Loans pursuant thereto shall satisfy the obligation of such Lender to make such Loans hereunder) and such SPV may assign to such Lender the right to receive payment with respect to any Obligation and (y) without notice to or consent from Agent or the Borrower, sell participations to one or more Persons other than a Credit Party or an Affiliate of a Credit Party in or to all or a portion of its rights and obligations under the Loan Documents (including all its rights and obligations with respect to the DIP Revolving Loans and Letters of Credit); provided, however, that, whether as a result of any term of any Loan Document or of such grant or participation, (i) no such SPV or participant shall have a commitment, or be deemed to have made an offer to commit, to make Loans hereunder, and, except as provided in the applicable option agreement, none shall be liable for any obligation of such Lender hereunder, (ii) such Lender's rights and obligations, and the rights and obligations of the Credit Parties and the Secured Parties towards such Lender, under any Loan Document shall remain unchanged and each other party hereto shall continue to deal solely with such Lender, which shall remain the holder of the Obligations in the Register, except that (A) each such participant and SPV shall be entitled to the benefit of Article X, but, with respect to Section 10.1, only to the extent such participant or SPV delivers the Tax forms such Lender is required to collect pursuant to Section 10.1(g) and then only to the extent of any amount to which such Lender would be entitled in the absence of any such grant or participation except to the extent such entitlement to receive a greater amount results from any change in, or in the interpretation of, any Requirement of Law that occurs after the date such grant or participation is made and (B) each such SPV may receive other payments that would

82

otherwise be made to such Lender with respect to Loans funded by such SPV to the extent provided in the applicable option agreement and set forth in a notice provided to Agent by such SPV and such Lender, provided, however, that in no case (including pursuant to clause (A) or (B) above) shall an SPV or participant have the right to enforce any of the terms of any Loan Document, and (iii) the consent of such SPV or participant shall not be required (either directly, as a restraint on such Lender's ability to consent hereunder or otherwise) for any amendments, waivers or consents with respect to any Loan Document or to exercise or refrain from exercising any powers or rights such Lender may have under or in respect of the Loan Documents (including the right to enforce or direct enforcement of the Obligations), except for those described in clauses (ii) and (iii) of Section 9.1(a) with respect to amounts, or dates fixed for payment of amounts, to which such participant or SPV would otherwise be entitled and, in the case of participants, except for those described in clause (vii) of Section 9.1(a). No party hereto shall institute (and the Borrower and Holdings shall cause each other Credit Party not to institute) against any SPV grantee of an option pursuant to this clause (f) any bankruptcy, reorganization, insolvency, liquidation or similar proceeding, prior to the date that is one year and one day after the payment in full of all outstanding commercial paper of such SPV; provided, however, that each Lender having designated an SPV as such agrees to indemnify each Indemnitee against any Liability that may be incurred by, or asserted against, such Indemnitee as a result of failing to institute such proceeding (including a failure to be reimbursed by such SPV for any such Liability).  The agreement in the preceding sentence shall survive the termination of the Commitments and the payment in full of the Obligations.  Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each participant and the principal amounts (and stated interest) of each participant's interest in the Loans or other obligations under the Loan Documents (the "**Participant Register**"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any participant or any information relating to a participant's interest in any commitments, loans, letters of credit or its other obligations under any Loan Document) to any Person other than Agent except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations.  The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.  For the avoidance of doubt, Agent shall have no responsibility for maintaining a Participant Register.

(g)    [Intentionally Omitted].

9.10    Non-Public Information; Confidentiality.

(a)    Non-Public Information.  Each of Agent, each Lender and each L/C Issuer acknowledges and agrees that it may receive material non-public information ("**MNPI**") hereunder concerning the Credit Parties and their Affiliates and agrees to use such information in compliance with all relevant policies, procedures and applicable

Requirements of Laws (including United States federal and state securities laws and regulations).

(b)     <u>Confidential Information</u>.  Each of Agent, each Lender and each L/C Issuer agrees to use all reasonable efforts to maintain, in accordance with its customary practices, the confidentiality of information obtained by it pursuant to any Loan Document, except that such information may be disclosed (i) with the Borrower's consent, (ii) to Related Persons of such Lender, L/C Issuer or Agent, as the case may be, or to any Person that any L/C Issuer causes to Issue Letters of Credit hereunder, that are advised of the confidential nature of such information and are instructed to keep such information confidential in accordance with the terms hereof, (iii) to the extent such information presently is or hereafter becomes (A) publicly available other than as a result of a breach of this Section 9.10 or (B) available to such Lender, L/C Issuer or Agent or any of their Related Persons, as the case may be, from a source (other than any Credit Party) not known by them to be subject to disclosure restrictions, (iv) to the extent disclosure is required by applicable Requirements of Law or other legal process or requested or demanded by any Governmental Authority, (v) to the extent necessary or customary for inclusion in league table measurements, (vi) (A) to the National Association of Insurance Commissioners or any similar organization, any examiner or any nationally recognized rating agency or (B) otherwise to the extent consisting of general portfolio information that does not identify Credit Parties, (vii) to current or prospective assignees or SPVs (including the investors or prospective investors therein) and to their respective Related Persons, in each case to the extent such assignees, investors, participants, counterparties or Related Persons agree to be bound by provisions substantially similar to the provisions of this Section 9.10 (and such Person may disclose information to their respective Related Persons in accordance with clause (ii) above), (viii) to any other party hereto, and (ix) in connection with the exercise or enforcement of any right or remedy under any Loan Document, in connection with any litigation or other proceeding to which such Lender, L/C Issuer or Agent or any of their Related Persons is a party or bound, or to the extent necessary to respond to public statements or disclosures by Credit Parties or their Related Persons referring to a Lender, L/C Issuer or Agent or any of their Related Persons.  In the event of any conflict between the terms of this Section 9.10 and those of any other Contractual Obligation entered into with any Credit Party (whether or not a Loan Document), the terms of this Section 9.10 shall govern.

(c)     <u>Tombstones</u>.  Each Credit Party consents to the publication by Agent or any Lender of any press releases, tombstones, advertising or other promotional materials (including via any Electronic Transmission) relating to the financing transactions contemplated by this Agreement using such Credit Party's name, product photographs, logo or trademark.  Agent or such Lender shall provide a draft of any advertising material to the Borrower for review and comment prior to the publication thereof.

(d)     <u>Press Release and Related Matters</u>.  No Credit Party shall, and no Credit Party shall permit any of its Affiliates to, issue any press release or other public disclosure (other than any document filed with any Governmental Authority relating to a public offering of securities of any Credit Party) using the name, logo or otherwise referring to Antares or of any of its Affiliates, the Loan Documents or any transaction

contemplated herein or therein to which Antares or any of its Affiliates is party without the prior written consent of Antares or such Affiliate except to the extent required to do so under applicable Requirements of Law and then, only after consulting with Antares.

(e)     Distribution of Materials to Lenders and L/C Issuers.  The Credit Parties acknowledge and agree that the Loan Documents and all reports, notices, communications and other information or materials provided or delivered by, or on behalf of, the Credit Parties hereunder (collectively, the "**Borrower Materials**") may be disseminated by, or on behalf of, Agent, and made available, to the Lenders and the L/C Issuers by posting such Borrower Materials on an E-System. The Credit Parties authorize Agent to download copies of their logos from its website and post copies thereof on an E-System.

(f)     Material Non-Public Information.  The Credit Parties hereby agree that if either they, any parent company or any Subsidiary of the Credit Parties has publicly traded equity or debt securities in the United States, they shall (and shall cause such parent company or Subsidiary, as the case may be, to) (i) identify in writing, and (ii) to the extent reasonably practicable, clearly and conspicuously mark such Borrower Materials that contain only information that is publicly available or that is not material for purposes of United States federal and state securities laws as "PUBLIC". The Credit Parties agree that by identifying such Borrower Materials as "PUBLIC" or publicly filing such Borrower Materials with the Securities and Exchange Commission, then Agent, the Lenders and the L/C Issuers shall be entitled to treat such Borrower Materials as not containing any MNPI for purposes of United States federal and state securities laws. The Credit Parties further represent, warrant, acknowledge and agree that the following documents and materials shall be deemed to be PUBLIC, whether or not so marked, and do not contain any MNPI: (A) the Loan Documents, including the schedules and exhibits attached thereto, and (B) administrative materials of a customary nature prepared by the Credit Parties or Agent (including, Notices of Borrowing, Notices of Conversion/Continuation, L/C Requests and any similar requests or notices posted on or through an E-System). Before distribution of Borrower Materials, the Credit Parties agree to execute and deliver to Agent a letter authorizing distribution of the evaluation materials to prospective Lenders and their employees willing to receive MNPI, and a separate letter authorizing distribution of evaluation materials that do not contain MNPI and represent that no MNPI is contained therein.

9.11    Set-off; Sharing of Payments.

(a)     Right of Setoff.  Each of Agent, each Lender, each L/C Issuer and each Affiliate (including each branch office thereof) of any of them is hereby authorized, without notice or demand (each of which is hereby waived by each Credit Party), at any time and from time to time during the continuance of any Event of Default and to the fullest extent permitted by applicable Requirements of Law, to set off and apply any and all deposits (whether general or special, time or demand, provisional or final) at any time held and other Indebtedness, claims or other obligations at any time owing by Agent, such Lender, such L/C Issuer or any of their respective Affiliates to or for the credit or the account of the Borrower or any other Credit Party against any Obligation of any

85

Credit Party now or hereafter existing, whether or not any demand was made under any Loan Document with respect to such Obligation and even though such Obligation may be unmatured. No Lender or L/C Issuer shall exercise any such right of setoff without the prior consent of Agent or Required DIP Revolving Lenders. Each of Agent, each Lender and each L/C Issuer agrees promptly to notify the Borrower and Agent after any such setoff and application made by such Lender or its Affiliates; provided, however, that the failure to give such notice shall not affect the validity of such setoff and application. The rights under this Section 9.11 are in addition to any other rights and remedies (including other rights of setoff) that Agent, the Lenders, the L/C Issuer, their Affiliates and the other Secured Parties, may have.

(b)    Sharing of Payments, Etc. If any Lender, directly or through an Affiliate or branch office thereof, obtains any payment of any Obligation of any Credit Party (whether voluntary, involuntary or through the exercise of any right of setoff or the receipt of any Collateral or "proceeds" (as defined under the applicable UCC) of Collateral) other than pursuant to Section 9.9 or Article X and such payment exceeds the amount such Lender would have been entitled to receive if all payments had gone to, and been distributed by, Agent in accordance with the provisions of the Loan Documents, such Lender shall purchase for cash from other Lenders such participations in their Obligations as necessary for such Lender to share such excess payment with such Lenders to ensure such payment is applied as though it had been received by Agent and applied in accordance with this Agreement (or, if such application would then be at the discretion of the Borrower, applied to repay the Obligations in accordance herewith); provided, however, that (i) if such payment is rescinded or otherwise recovered from such Lender or L/C Issuer in whole or in part, such purchase shall be rescinded and the purchase price therefor shall be returned to such Lender or L/C Issuer without interest and (ii) such Lender shall, to the fullest extent permitted by applicable Requirements of Law, be able to exercise all its rights of payment (including the right of setoff) with respect to such participation as fully as if such Lender were the direct creditor of the applicable Credit Party in the amount of such participation. If a Non-Funding Lender receives any such payment as described in the previous sentence, such Lender shall turn over such payments to Agent in an amount that would satisfy the cash collateral requirements set forth in Section 1.13(e).

9.12    Counterparts; Facsimile Signature. This Agreement may be executed in any number of counterparts and by different parties in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement. Signature pages may be detached from multiple separate counterparts and attached to a single counterpart. Delivery of an executed signature page of this Agreement by facsimile transmission or Electronic Transmission shall be as effective as delivery of a manually executed counterpart hereof.

9.13    Severability. The illegality or unenforceability of any provision of this Agreement or any instrument or agreement required hereunder shall not in any way affect or impair the legality or enforceability of the remaining provisions of this Agreement or any instrument or agreement required hereunder.

9.14    Captions.  The captions and headings of this Agreement are for convenience of reference only and shall not affect the interpretation of this Agreement.

9.15    Independence of Provisions.  The parties hereto acknowledge that this Agreement and the other Loan Documents may use several different limitations, tests or measurements to regulate the same or similar matters, and that such limitations, tests and measurements are cumulative and must each be performed, except as expressly stated to the contrary in this Agreement.

9.16    Interpretation.  This Agreement is the result of negotiations among and has been reviewed by counsel to Credit Parties, Agent, each Lender and other parties hereto, and is the product of all parties hereto.  Accordingly, this Agreement and the other Loan Documents shall not be construed against the Lenders or Agent merely because of Agent's or Lenders' involvement in the preparation of such documents and agreements.  Without limiting the generality of the foregoing, each of the parties hereto has had the advice of counsel with respect to Sections 9.18 and 9.19.

9.17    No Third Parties Benefited.  This Agreement is made and entered into for the sole protection and legal benefit of the Borrower, the Lenders, the L/C Issuers party hereto, Agent and, subject to the provisions of Section 8.11, each other Secured Party, and their permitted successors and assigns, and no other Person shall be a direct or indirect legal beneficiary of, or have any direct or indirect cause of action or claim in connection with, this Agreement or any of the other Loan Documents. Neither Agent nor any Lender shall have any obligation to any Person not a party to this Agreement or the other Loan Documents.

9.18    Governing Law and Jurisdiction.

(a)    Governing Law.  To the extent not governed by the provisions of the Bankruptcy Code, the laws of the State of New York shall govern all matters arising out of, in connection with or relating to this Agreement, including its validity, interpretation, construction, performance and enforcement (including any claims sounding in contract or tort law arising out of the subject matter hereof and any determinations with respect to post-judgment interest).

(b)    Submission to Jurisdiction.  Any legal action or proceeding with respect to any Loan Document shall be brought in the Bankruptcy Court or, if the Bankruptcy Court does not have or does not exercise jurisdiction, brought exclusively in the courts of the State of New York located in the City of New York, Borough of Manhattan, or of the United States of America for the Southern District of New York and, by execution and delivery of this Agreement, the Borrower and each other Credit Party executing this Agreement hereby accepts for itself and in respect of its Property, generally and unconditionally, the jurisdiction of the aforesaid courts; provided that nothing in this Agreement shall limit the right of Agent to commence any proceeding in the federal or state courts of any other jurisdiction to the extent Agent determines that such action is necessary or appropriate to exercise its rights or remedies under the Loan Documents. The parties hereto (and, to the extent set forth in any other Loan Document, each other Credit Party) hereby irrevocably waive any objection, including any objection to the

laying of venue or based on the grounds of forum *non conveniens*, that any of them may now or hereafter have to the bringing of any such action or proceeding in such jurisdictions.

(c)    Service of Process.  Each Credit Party hereby irrevocably waives personal service of any and all legal process, summons, notices and other documents and other service of process of any kind and consents to such service in any suit, action or proceeding brought in the United States with respect to or otherwise arising out of or in connection with any Loan Document by any means permitted by applicable Requirements of Law, including by the mailing thereof (by registered or certified mail, postage prepaid) to the address of the Borrower specified herein (and shall be effective when such mailing shall be effective, as provided therein).  Each Credit Party agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

(d)    Non-Exclusive Jurisdiction.  Nothing contained in this Section 9.18 shall affect the right of Agent or any Lender to serve process in any other manner permitted by applicable Requirements of Law or commence legal proceedings or otherwise proceed against any Credit Party in any other jurisdiction.

9.19    Waiver of Jury Trial.    THE PARTIES HERETO, TO THE EXTENT PERMITTED BY LAW, WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, SUIT, OR PROCEEDING ARISING OUT OF, IN CONNECTION WITH OR RELATING TO, THIS AGREEMENT, THE OTHER LOAN DOCUMENTS AND ANY OTHER TRANSACTION CONTEMPLATED HEREBY AND THEREBY.    THIS WAIVER APPLIES TO ANY ACTION, SUIT OR PROCEEDING WHETHER SOUNDING IN TORT, CONTRACT OR OTHERWISE.

9.20    Entire Agreement; Release; Survival.

(a)    THE LOAN DOCUMENTS EMBODY THE ENTIRE AGREEMENT OF THE PARTIES AND SUPERSEDE ALL PRIOR AGREEMENTS AND UNDERSTANDINGS RELATING TO THE SUBJECT MATTER THEREOF AND ANY PRIOR LETTER OF INTEREST, COMMITMENT LETTER, CONFIDENTIALITY AND SIMILAR AGREEMENTS INVOLVING ANY CREDIT PARTY AND ANY LENDER OR ANY L/C ISSUER OR ANY OF THEIR RESPECTIVE AFFILIATES RELATING TO A FINANCING OF SUBSTANTIALLY SIMILAR FORM, PURPOSE OR EFFECT OTHER THAN THE FEE LETTER. IN THE EVENT OF ANY CONFLICT BETWEEN THE TERMS OF THIS AGREEMENT AND ANY OTHER LOAN DOCUMENT, THE TERMS OF THIS AGREEMENT SHALL GOVERN (UNLESS OTHERWISE EXPRESSLY STATED IN SUCH OTHER LOAN DOCUMENTS OR SUCH TERMS OF SUCH OTHER LOAN DOCUMENTS ARE NECESSARY TO COMPLY WITH APPLICABLE REQUIREMENTS OF LAW, IN WHICH CASE SUCH TERMS SHALL GOVERN TO THE EXTENT NECESSARY TO COMPLY THEREWITH).

(b)     Execution of this Agreement by the Credit Parties constitutes a full, complete and irrevocable release of any and all claims which each Credit Party may have at law or in equity in respect of all prior discussions and understandings, oral or written, relating to the subject matter of this Agreement and the other Loan Documents.  In no event shall any Indemnitee be liable on any theory of liability for any special, indirect, consequential or punitive damages (including any loss of profits, business or anticipated savings).  The Borrower and each other Credit Party signatory hereto hereby waives, releases and agrees (and shall cause each other Credit Party to waive, release and agree) not to sue upon any such claim for any special, indirect, consequential or punitive damages, whether or not accrued and whether or not known or suspected to exist in its favor.

(c)     Any indemnification or other protection provided to any Indemnitee pursuant to this Section 9.20, Sections 9.5 (Costs and Expenses), and 9.6 (Indemnity), and Article VIII (Agent) and Article X (Taxes, Yield Protection and Illegality), in each case, shall (x) survive the termination of the Commitments and the payment in full of all other Obligations and (y) inure to the benefit of any Person that at any time held a right thereunder (as an Indemnitee or otherwise) and, thereafter, its successors and permitted assigns.

9.21   <u>Patriot Act</u>.  Each Lender that is subject to the Patriot Act hereby notifies the Credit Parties that pursuant to the requirements of the Patriot Act, it is required to obtain, verify and record information that identifies each Credit Party, which information includes the name and address of each Credit Party and other information that will allow such Lender to identify each Credit Party in accordance with the Patriot Act.

9.22   <u>Replacement of Lender</u>.  Within forty-five days after: (i) receipt by the Borrower of written notice and demand from any Lender (an "**Affected Lender**") for payment of additional costs as provided in Sections 10.1, 10.3 and/or 10.6; or (ii) any failure by any Lender (other than Agent or an Affiliate of Agent) to consent to a requested amendment, waiver or modification to any Loan Document in which Required DIP Revolving Lenders have already consented to such amendment, waiver or modification but the consent of each Lender (or each Lender directly affected thereby, as applicable) is required with respect thereto, the Borrower may, at its option, notify Agent and such Affected Lender (or such non-consenting Lender) of the Borrower's intention to obtain, at the Borrower's expense, a replacement Lender ("**Replacement Lender**") for such Affected Lender (or such non-consenting Lender), which Replacement Lender shall be reasonably satisfactory to Agent.  In the event the Borrower obtains a Replacement Lender within forty-five (45) days following notice of its intention to do so, the Affected Lender (or such non-consenting Lender) shall sell and assign its Loans and Commitments to such Replacement Lender, at par, provided that the Borrower has reimbursed such Affected Lender for its increased costs for which it is entitled to reimbursement under this Agreement through the date of such sale and assignment.  In the event that a replaced Lender does not execute an Assignment pursuant to Section 9.9 within five (5) Business Days after receipt by such replaced Lender of notice of replacement pursuant to this Section 9.22 and presentation to such replaced Lender of an Assignment evidencing an assignment pursuant to this Section 9.22, the Borrower shall be entitled (but not obligated) to execute such an Assignment on behalf of such replaced Lender, and any such Assignment so executed by the

Borrower, the Replacement Lender and Agent, shall be effective for purposes of this Section 9.22 and Section 9.9. Notwithstanding the foregoing, with respect to a Lender that is a Non-Funding Lender or an Impacted Lender, Agent may, but shall not be obligated to, obtain a Replacement Lender and execute an Assignment on behalf of such Non-Funding Lender or Impacted Lender at any time with three (3) Business Days' prior notice to such Lender (unless notice is not practicable under the circumstances) and cause such Lender's Loans and Commitments to be sold and assigned, in whole or in part, at par. Upon any such assignment and payment and compliance with the other provisions of Section 9.9, such replaced Lender shall no longer constitute a "**Lender**" for purposes hereof; provided, any rights of such replaced Lender to indemnification hereunder shall survive.

9.23    Joint and Several. The obligations of the Credit Parties hereunder and under the other Loan Documents are joint and several. Without limiting the generality of the foregoing, reference is hereby made to Section 1.16 hereof, to which the obligations of the Borrower and the other Credit Parties are subject.

9.24    Creditor-Debtor Relationship. The relationship between Agent, each Lender and the L/C Issuer, on the one hand, and the Credit Parties, on the other hand, is solely that of creditor and debtor. No Secured Party has any fiduciary relationship or duty to any Credit Party arising out of or in connection with, and there is no agency, tenancy or joint venture relationship between the Secured Parties and the Credit Parties by virtue of, any Loan Document or any transaction contemplated therein.

9.25    Keepwell. Each Qualified ECP Guarantor hereby jointly and severally absolutely, unconditionally and irrevocably undertakes to provide such funds or other support as may be needed from time to time by each other Credit Party to honor all of its payment obligations under the Guaranty and Security Agreement in respect of Swap Obligations under any Pre-Petition Secured Rate Contract (provided, however, that each Qualified ECP Guarantor shall only be liable under this Section 9.25 for the maximum amount of such liability that can be hereby incurred without rendering its obligations under this Section 9.25, or otherwise under the Guaranty and Security Agreement, voidable under applicable Requirements of Law relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount). The obligations of each Qualified ECP Guarantor under this Section 9.25 shall remain in full force and effect until the guarantees in respect of Swap Obligations under each Pre-Petition Secured Rate Contract have been discharged, or otherwise released or terminated in accordance with the terms of this Agreement. Each Qualified ECP Guarantor intends that this Section 9.25 constitute, and this Section 9.25 shall be deemed to constitute, a "keepwell, support, or other agreement" for the benefit of each other Credit Party for all purposes of Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

9.26    Parties Including Trustees; Bankruptcy Court Proceedings. This Agreement, the other Loan Documents, and all Liens and other rights and privileges created hereby or pursuant hereto or to any other Loan Document shall be binding upon the Credit Parties, the estate of each Credit Party, and any trustee, other estate representative or any successor in interest of each Credit Party in the Chapter 11 Cases or any subsequent case commenced under Chapter 7 of the Bankruptcy Code. This Agreement and the other Loan Documents shall be binding upon, and inure to the benefit of, the successors of the Agent and the Secured Parties and their respective

assigns, transferees and endorsees.  The Liens created by this Agreement and the other Loan Documents shall be and remain valid and perfected in the event of the substantive consolidation or conversion of the Chapter 11 Cases or any other bankruptcy case of the Credit Parties to a case under Chapter 7 of the Bankruptcy Code or in the event of dismissal of the Chapter 11 Cases or the release of any Collateral from the jurisdiction of the Bankruptcy Court for any reason, without the necessity that the Agent file financing statements or otherwise perfect its Liens under applicable law.  The terms and provisions of this Agreement are for the purpose of defining the relative rights and obligations of the Credit Parties, the Agent and Secured Parties with respect to the transactions contemplated hereby and no Person shall be a third party beneficiary of any of the terms and provisions of this Agreement or any of the other Loan Documents.

9.27    Inconsistency.    In the event of any inconsistency between the terms and conditions of this Agreement and of the DIP Orders, the provisions of the DIP Orders shall govern and control.

9.28    Pre-Petition Lender Consent.  Each Pre-Petition Lender signatory hereto hereby irrevocably (x) consents, in their capacity as a Pre-Petition Lender, to the terms of this Agreement and the other Loan Documents and the entry of the Interim Order and the Final Order, (y) authorizes and directs the Agent to, in a manner determined by the Agent, credit bid all or any portion of the Pre-Petition Obligations in connection with any proposed sale of all or any portion of the assets of any or all of the Credit Parties (a "**Credit Bid Transaction**") and (z) in connection with any Credit Bid Transaction, consents to the assignment and delegation to a Qualified Purchaser of such rights and obligations under the Pre-Petition Credit Agreement, the other Pre-Petition Loan Documents, this Agreement and the other Loan Documents, in each case as the Agent determines in order to consummate such Credit Bid Transaction (and each such Pre-Petition Lender shall execute and deliver such documents as the Agent reasonably requests to evidence such assignment and delegation).

9.29    Lender Consent to Credit Bid.  Each Lender hereby irrevocably (x) authorizes and directs the Agent to, in a manner determined by the Agent, credit bid all or any portion of the Obligations in connection with any Credit Bid Transaction and (y) in connection with any Credit Bid Transaction, consents to the assignment and delegation to a Qualified Purchaser of such rights and obligations under this Agreement and the other Loan Documents, in each case as the Agent determines in order to consummate such Credit Bid Transaction (and each such Lender shall execute and deliver such documents as the Agent reasonably requests to evidence such assignment and delegation).

ARTICLE X

TAXES, YIELD PROTECTION AND ILLEGALITY

10.1    Taxes.

(a)    Except as required by a Requirement of Law, each payment by any Credit Party under any Loan Document shall be made free and clear of all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding),

91

assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax, penalties or other Liabilities) with respect thereto (collectively, "**Taxes**").

(b)    If any Taxes shall be required by any Requirement of Law to be deducted from or in respect of any amount payable under any Loan Document to any Secured Party (i) if such Tax is an Indemnified Tax, such amount payable shall be increased as necessary to ensure that, after all required deductions for Indemnified Taxes are made (including deductions applicable to any increases to any amount under this Section 10.1), such Secured Party receives the amount it would have received had no such deductions been made, (ii) the relevant Credit Party shall make such deductions, (iii) the relevant Credit Party shall timely pay the full amount deducted to the relevant Governmental Authority in accordance with applicable Requirements of Law and (iv) within 30 days after such payment is made, the relevant Credit Party shall deliver to Agent an original or certified copy of a receipt evidencing such payment or other evidence of payment reasonably satisfactory to Agent.

(c)    In addition, the Borrower agrees to pay, and authorize Agent to pay in its name, any stamp, documentary, excise or property Tax, charges or similar levies imposed by any applicable Requirement of Law or Governmental Authority and all Liabilities with respect thereto (including by reason of any delay in payment thereof), in each case arising from the execution, delivery or registration of, or otherwise with respect to, any Loan Document or any transaction contemplated therein (collectively, "**Other Taxes**"). Within 30 days after the date of any payment of Other Taxes by any Credit Party, the Borrower shall furnish to Agent, at its address referred to in Section 9.2, the original or a certified copy of a receipt evidencing payment thereof or other evidence of payment reasonably satisfactory to Agent.

(d)    The Credit Parties hereby acknowledge and agree that (i) neither Antares nor any Affiliate of Antares has provided any Tax advice to any Tax Affiliate in connection with the transactions contemplated hereby or any other matters and (ii)  the Credit Parties have received appropriate Tax advice to the extent necessary to confirm that the structure of any transaction contemplated by the Credit Parties in connection with this Agreement complies in all material respects with applicable federal, state and foreign Tax laws.

(e)    The Borrower shall reimburse and indemnify, within 30 days after receipt of demand therefor (with copy to Agent), each Secured Party for all Indemnified Taxes (including any Indemnified Taxes imposed by any jurisdiction on amounts payable under this Section 10.1) paid or payable by such Secured Party and any Liabilities arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally asserted.  A certificate of the Secured Party (or of Agent on behalf of such Secured Party) claiming any compensation under this clause (e), setting forth the amounts to be paid thereunder and delivered to the Borrower with copy to Agent, shall be conclusive, binding and final for all purposes, absent manifest error.  In determining such amount, Agent and such Secured Party may use any reasonable averaging and attribution methods.

(f)     Any Lender claiming any additional amounts payable pursuant to this Section 10.1 shall use its reasonable efforts (consistent with its internal policies and Requirements of Law) to change the jurisdiction of its Lending Office if such a change would reduce any such additional amounts (or any similar amount that may thereafter accrue) and would not, in the sole determination of such Lender, be otherwise disadvantageous to such Lender.

(g)     (i)     Each Non-U.S. Lender Party that, at any of the following times, is entitled to an exemption from United States withholding Tax or, after a change in any Requirement of Law, is subject to such withholding Tax at a reduced rate under an applicable Tax treaty, shall (w) on or prior to the date such Non-U.S. Lender Party becomes a "Non-U.S. Lender Party" hereunder, (x) on or prior to the date on which any such form or certification expires or becomes obsolete, (y) after the occurrence of any event requiring a change in the most recent form or certification previously delivered by it pursuant to this clause (i) and (z) from time to time if requested by the Borrower or Agent (or, in the case of a participant or SPV, the relevant Lender), provide Agent and the Borrower (or, in the case of a participant or SPV, the relevant Lender) with two completed originals of each of the following, as applicable:    (A) Forms W-8ECI (claiming exemption from U.S. withholding Tax because the income is effectively connected with a U.S. trade or business), W-8BEN (claiming exemption from, or a reduction of, U.S. withholding Tax under an income Tax treaty) and/or W-8IMY (together with appropriate forms, certifications and supporting statements) or any successor forms, (B) in the case of a Non-U.S. Lender Party claiming exemption under Sections 871(h) or 881(c) of the Code, Form W-8BEN (claiming exemption from U.S. withholding Tax under the portfolio interest exemption) or any successor form and a certificate in form and substance acceptable to Agent that such Non-U.S. Lender Party is not (1) a "bank" within the meaning of Section 881(c)(3)(A) of the Code, (2) a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code or (3) a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code or (C) any other applicable document prescribed by the IRS certifying as to the entitlement of such Non-U.S. Lender Party to such exemption from United States withholding Tax or reduced rate with respect to all payments to be made to such Non-U.S. Lender Party under the Loan Documents.  Unless the Borrower and Agent have received forms or other documents satisfactory to them indicating that payments under any Loan Document to or for a Non-U.S. Lender Party are not subject to United States withholding Tax or are subject to such Tax at a rate reduced by an applicable Tax treaty, the Credit Parties and Agent shall withhold amounts required to be withheld by applicable Requirements of Law from such payments at the applicable statutory rate.

(ii)     Each U.S. Lender Party shall (A) on or prior to the date such U.S. Lender Party becomes a "U.S. Lender Party" hereunder, (B) on or prior to the date on which any such form or certification expires or becomes obsolete, (C) after the occurrence of any event requiring a change in the most recent form or certification previously delivered by it pursuant to this clause (f) and (D) from time to time if requested by the Borrower or Agent (or, in the case of a participant or SPV, the relevant Lender), provide Agent and the Borrower (or, in the case of a participant or SPV, the relevant Lender) with two completed originals of Form

W-9 (certifying that such U.S. Lender Party is entitled to an exemption from U.S. backup withholding Tax) or any successor form.

(iii)    Each Lender having sold a participation in any of its Obligations or identified an SPV as such to Agent shall collect from such participant or SPV the documents described in this clause (g) and provide them to Agent and the Borrower.

(iv)    If a payment made to a Non-U.S. Lender Party would be subject to United States federal withholding Tax imposed by FATCA if such Non-U.S. Lender Party fails to comply with the applicable reporting requirements of FATCA, such Non-U.S. Lender Party shall deliver to Agent and the Borrower any documentation under any Requirement of Law or reasonably requested by Agent or the Borrower sufficient for Agent or the Borrower to comply with their obligations under FATCA and to determine that such Non-U.S. Lender has complied with its obligations under FATCA or to determine the amount to deduct and withhold from such payment.  Solely for the purposes of this clause (iv), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

(h)    If any Secured Party determines, in its sole discretion exercised in good faith, that it has received a refund of any Indemnified Taxes as to which it has been indemnified pursuant to this Section 10.1 (including by the payment of additional amounts pursuant to Section 10.1(b)), it shall pay to the relevant Credit Party an amount equal to such refund (but only to the extent of indemnity payments made under this Section 10.1 with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such Secured Party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund).  Such Credit Party, upon the request of such Secured Party, shall repay to such Secured Party the amount paid over pursuant to this Section 10.1(h) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such Secured Party is required to repay such refund to such Governmental Authority.  Notwithstanding anything to the contrary in this Section 10.1(h), in no event shall the Secured Party be required to pay any amount to a Credit Party pursuant to this Section 10.1(h) the payment of which would place the Secured Party in a less favorable net after-Tax position than the Secured Party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid.  This Section 10.1(h) shall not be construed to require any Secured Party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the Credit Party or any other Person.

10.2    Illegality.  If after the date hereof any Lender shall determine that the introduction of any Requirement of Law, or any change in any Requirement of Law or in the interpretation or administration thereof, has made it unlawful, or that any central bank or other Governmental Authority has asserted that it is unlawful, for any Lender or its Lending Office to make LIBOR Rate Loans, then, on notice thereof by such Lender to the Borrower through Agent, the

obligation of that Lender to make LIBOR Rate Loans shall be suspended until such Lender shall have notified Agent and the Borrower that the circumstances giving rise to such determination no longer exists.

(a)    Subject to clause (c) below, if any Lender shall determine that it is unlawful to maintain any LIBOR Rate Loan, the Borrower shall prepay in full all LIBOR Rate Loans of such Lender then outstanding, together with interest accrued thereon, either on the last day of the Interest Period thereof if such Lender may lawfully continue to maintain such LIBOR Rate Loans to such day, or immediately, if such Lender may not lawfully continue to maintain such LIBOR Rate Loans, together with any amounts required to be paid in connection therewith pursuant to Section 10.4.

(b)    If the obligation of any Lender to make or maintain LIBOR Rate Loans has been terminated, the Borrower may elect, by giving notice to such Lender through Agent that all Loans which would otherwise be made by any such Lender as LIBOR Rate Loans shall be instead Base Rate Loans.

(c)    Before giving any notice to Agent pursuant to this Section 10.2, the affected Lender shall designate a different Lending Office with respect to its LIBOR Rate Loans if such designation will avoid the need for giving such notice or making such demand and will not, in the judgment of the Lender, be illegal or otherwise disadvantageous to the Lender.

10.3    Increased Costs and Reduction of Return.

(a)    If any Lender or L/C Issuer shall determine that, due to either (i) the introduction of, or any change in, or in the interpretation of, any Requirement of Law or (ii) the compliance with any guideline or request from any central bank or other Governmental Authority (whether or not having the force of law), in the case of either clause (i) or (ii) subsequent to the date hereof, (x) there shall be any increase in the cost to such Lender or L/C Issuer of agreeing to make or making, funding or maintaining any LIBOR Rate Loans or of Issuing or maintaining any Letter of Credit or (y) the Lender or L/C Issuer shall be subject to any Taxes (other than (A) Indemnified Taxes, (B) Taxes described in clauses (b) through (d) of the definition of Excluded Taxes and (C) Connection Income Taxes) on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto, then the Borrower shall be liable for, and shall from time to time, within thirty (30) days of demand therefor by such Lender or L/C Issuer (with a copy of such demand to Agent), pay to Agent for the account of such Lender or L/C Issuer, additional amounts as are sufficient to compensate such Lender or L/C Issuer for such increased costs or such Taxes; provided, that the Borrower shall not be required to compensate any Lender or L/C Issuer pursuant to this Section 10.3(a) for any increased costs incurred more than 180 days prior to the date that such Lender or L/C Issuer notifies the Borrower, in writing of the increased costs and of such Lender's or L/C Issuer's intention to claim compensation thereof; provided, further, that if the circumstance giving rise to such increased costs is retroactive, then the 180-day period referred to above shall be extended to include the period of retroactive effect thereof.

US-DOCS\112887106.9

(b)    If any Lender or L/C Issuer shall have determined that:

(i)    the introduction of any Capital Adequacy Regulation;

(ii)    any change in any Capital Adequacy Regulation;

(iii)    any change in the interpretation or administration of any Capital Adequacy Regulation by any central bank or other Governmental Authority charged with the interpretation or administration thereof; or

(iv)    compliance by such Lender or L/C Issuer (or its Lending Office) or any entity controlling the Lender or L/C Issuer, with any Capital Adequacy Regulation;

affects the amount of capital required or expected to be maintained by such Lender or L/C Issuer or any entity controlling such Lender or L/C Issuer and (taking into consideration such Lender's or such entities' policies with respect to capital adequacy and such Lender's or L/C Issuer's desired return on capital) determines that the amount of such capital is increased as a consequence of its Commitment(s), loans, credits or obligations under this Agreement, then, within thirty (30) days of demand of such Lender or L/C Issuer (with a copy to Agent), the Borrower shall pay to such Lender or L/C Issuer, from time to time as specified by such Lender or L/C Issuer, additional amounts sufficient to compensate such Lender or L/C Issuer (or the entity controlling the Lender or L/C Issuer) for such increase; provided, that the Borrower shall not be required to compensate any Lender or L/C Issuer pursuant to this Section 10.3(b) for any amounts incurred more than 180 days prior to the date that such Lender or L/C Issuer notifies the Borrower, in writing of the amounts and of such Lender's or L/C Issuer's intention to claim compensation thereof; provided, further, that if the event giving rise to such increase is retroactive, then the 180-day period referred to above shall be extended to include the period of retroactive effect thereof.

(c)    Notwithstanding anything herein to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (ii) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case in respect of this clause (ii) pursuant to Basel III (the Third Basel Accord), shall, in each case, be deemed to be a change in a Requirement of Law under Section 10.3(a) above and/or a change in Capital Adequacy Regulation under Section 10.3(b) above, as applicable, regardless of the date enacted, adopted or issued.

10.4    <u>Funding Losses</u>.  The Borrower agrees to reimburse each Lender and to hold each Lender harmless from any loss or expense which such Lender may sustain or incur as a consequence of:

(a)     the failure of the Borrower to make any payment or mandatory prepayment of principal of any LIBOR Rate Loan (including payments made after any acceleration thereof);

(b)     the failure of the Borrower to borrow, continue or convert a Loan after the Borrower has given (or is deemed to have given) a Notice of Borrowing or a Notice of Conversion/Continuation;

(c)     the failure of the Borrower to make any prepayment after the Borrower has given a notice in accordance with Section 1.9;

(d)     the prepayment (including pursuant to Section 1.10) of a LIBOR Rate Loan on a day which is not the last day of the Interest Period with respect thereto; or

(e)     the conversion pursuant to Section 1.8 of any LIBOR Rate Loan to a Base Rate Loan on a day that is not the last day of the applicable Interest Period;

including any such loss or expense arising from the liquidation or reemployment of funds obtained by it to maintain its LIBOR Rate Loans hereunder or from fees payable to terminate the deposits from which such funds were obtained; provided that, with respect to the expenses described in clauses (d) and (e) above, such Lender shall have notified Agent of any such expense within two (2) Business Days of the date on which such expense was incurred.  Solely for purposes of calculating amounts payable by the Borrower to the Lenders under this Section 10.4 and under Section 10.3(a): each LIBOR Rate Loan made by a Lender (and each related reserve, special deposit or similar requirement) shall be conclusively deemed to have been funded at the LIBOR used in determining the interest rate for such LIBOR Rate Loan by a matching deposit or other borrowing in the interbank Eurodollar market for a comparable amount and for a comparable period, whether or not such LIBOR Rate Loan is in fact so funded.

10.5     Inability to Determine Rates.

(a)     If Agent shall have determined in good faith that for any reason adequate and reasonable means do not exist for ascertaining the LIBOR for any requested Interest Period with respect to a proposed LIBOR Rate Loan or that the LIBOR applicable pursuant to Section 1.5(a) for any requested Interest Period with respect to a proposed LIBOR Rate Loan does not adequately and fairly reflect the cost to the Lenders of funding or maintaining such Loan, Agent will forthwith give notice of such determination to the Borrower and each Lender.  Thereafter, the obligation of the Lenders to make or maintain LIBOR Rate Loans hereunder shall be suspended until Agent revokes such notice in writing.  Upon receipt of such notice set forth in the first sentence hereof, the Borrower may revoke any Notice of Borrowing or Notice of Conversion/Continuation then submitted by it.  If the Borrower does not revoke such notice, the Lenders shall make, convert or continue the Loans, as proposed by the Borrower, in the amount specified in the applicable notice submitted by the Borrower, but such Loans shall be made, converted or continued as Base Rate Loans.

(b)    If at any time the Agent determines (which determination shall be conclusive absent manifest error) that either (i) the circumstances set forth in subparagraph (a) of this Section 10.5 have arisen and such circumstances are unlikely to be temporary or (ii) the circumstances set forth in subparagraph (a) of this Section 10.5 have not arisen but the supervisor for the administrator of the LIBOR or a Governmental Authority having jurisdiction over the Agent has made a public statement identifying a specific date after which the LIBOR shall no longer be used for determining interest rates for loans (in the case of either such clause (i) or (ii), an "**Alternative Interest Rate Election Event**"), the Agent and the Borrower shall endeavor to establish an alternate rate of interest to the LIBOR that gives due consideration to the then prevailing market convention for determining a rate of interest for leveraged syndicated loans in the United States at such time, and shall enter into an amendment to this Agreement to reflect such alternate rate of interest and such other related changes to this Agreement as may be applicable. Notwithstanding anything to the contrary in Section 9.1, such amendment shall become effective without any further action or consent of any other party to this Agreement so long as the Agent shall not have received, within five (5) Business Days after the date notice of such alternate rate of interest is provided to the Lenders, a written notice from Required DIP Revolving Lenders stating that they object to such amendment. To the extent an alternate rate of interest is adopted as contemplated hereby, the approved rate shall be applied in a manner consistent with prevailing market convention; provided that, to the extent such prevailing market convention is not administratively feasible for the Agent, such approved rate shall be applied in a manner as otherwise reasonably determined by the Agent and the Borrower. From such time as an Alternative Interest Rate Election Event has occurred and continuing until an alternate rate of interest has been determined in accordance with the terms and conditions of this paragraph, (x) any Notice of Conversion/Continuation that requests the conversion of any Borrowing to, or continuation of any Borrowing as, a LIBOR Rate Loan shall be ineffective, and (y) if any Notice of Borrowing requests a LIBOR Rate Loan, such Borrowing shall be made as a Base Rate Loan. Notwithstanding anything herein to the contrary, if such alternate rate of interest as determined in this subparagraph (b) is determined to be less than one percent (1.0%), such rate shall be deemed to be one percent (1.0%) for the purposes of this Agreement.

10.6    Reserves on LIBOR Rate Loans. The Borrower shall pay to each Lender, as long as such Lender shall be required under regulations of the Federal Reserve Board to maintain reserves with respect to liabilities or assets consisting of or including Eurocurrency funds or deposits (currently known as "Eurocurrency liabilities"), additional costs on the unpaid principal amount of each LIBOR Rate Loan equal to actual costs of such reserves allocated to such Loan by such Lender (as determined by such Lender in good faith, which determination shall be conclusive absent manifest error), payable on each date on which interest is payable on such Loan provided the Borrower shall have received at least fifteen (15) days' prior written notice (with a copy to Agent) of such additional interest from the Lender. If a Lender fails to give notice fifteen (15) days prior to the relevant Interest Payment Date, such additional interest shall be payable fifteen (15) days from receipt of such notice.

10.7    Certificates of Lenders. Any Lender claiming reimbursement or compensation pursuant to this Article X shall deliver to the Borrower (with a copy to Agent) a certificate

setting forth in reasonable detail the amount payable to such Lender hereunder and such certificate shall be conclusive and binding on the Borrower in the absence of manifest error.

ARTICLE XI

DEFINITIONS

11.1    <u>Defined Terms</u>.    The following terms are defined in the Section referenced opposite such terms:

| | |
|---|---|
| **"Affected Lender"** | 9.22 |
| **"Aggregate Availability"** | 2.1(h) |
| **"Aggregate Excess Funding Amount"** | 1.11(e) |
| **"Alternative Interest Rate Event"** | 10.5(b) |
| **"Bid Procedures Motion"** | 4.20 |
| **"Bid Procedures Order"** | 4.20 |
| **"Borrower"** | Preamble |
| **"Borrower Materials"** | 9.10(e) |
| **"Change of Control"** | 7.1(k) |
| **"Closing Fee"** | 1.11(a) |
| **"Compliance Certificate"** | 4.2(b) |
| **"Credit Bid Transaction"** | 9.28 |
| **"DIP L/C Reimbursement Date"** | 1.1(c) |
| **"DIP Letter of Credit Fee"** | 1.1(d) |
| **"DIP Revolving Loan Commitment"** | 1.1(b) |
| **"DIP Revolving Loan"** | 1.1(b) |
| **"Event of Default"** | 7.1 |
| **"Guaranteed Obligations"** | 1.15 |
| **"Indemnified Matters"** | 9.6 |
| **"Indemnitee"** | 9.6 |
| **"Initial Approved Budget"** | 2.1(h) |
| **"Investments"** | 5.4 |
| **"KEIP"** | 5.22 |
| **"L/C Reimbursement Agreement"** | 1.1(c) |
| **"L/C Request"** | 1.1(c) |
| **"L/C Sublimit"** | 1.1(c) |
| **"Lender"** | Preamble |
| **"Letter of Credit Fee"** | 1.9(c) |
| **"Maximum DIP Revolving Loan Balance"** | 1.1(b) |
| **"Maximum Lawful Rate"** | 1.3(d) |
| **"MNPI"** | 9.10(a) |
| **"Notice of Conversion/Continuation"** | 1.6(a) |
| **"OFAC"** | 3.26 |
| **"Other Taxes"** | 10.1(c) |
| **"Participant Register"** | 9.9(f) |
| **"Permitted Liens"** | 5.1 |
| **"Petition Date"** | Recitals |

99

| | |
|---|---|
| **"Pre-Petition Credit Agreement"** | Recitals |
| **"Prior LIFO L/C Loan Commitment"** | 1.2 |
| **"Prior Original L/C Loan Commitment"** | 1.2 |
| **"Prior L/C Request"** | 1.2(b) |
| **"Prior Letters of Credit"** | 1.2 |
| **"Prior Letters of Credit Fee"** | 1.11(c) |
| **"Refinancing Facility**" | 1.9(c) |
| **"Register**" | 1.4(b) |
| **"Remedies Notice Period**" | 7.2 |
| **"Restricted Payments**" | 5.11 |
| **"Replacement Lender**" | 9.22 |
| **"Rollup LIFO Commitment**" | 1.3(b) |
| **"Rollup LIFO Loans**" | 1.3(b) |
| **"Rollup Original Commitments** | 1.3(b) |
| **"Rollup Original Loans"** | 1.3(b) |
| **"Sale**" | 9.9(b) |
| **"SDN List**" | 3.26 |
| **"Settlement Date"** | 1.11(b) |
| **"Taxes**" | 10.1(a) |
| **"Tax Returns**" | 3.10 |
| **"Termination Declaration**" | 7.2 |
| **"Termination Declaration Date**" | 7.2 |
| **"Unused Commitment Fee**" | 1.9(b) |
| **"Variance Report**" | 4.2(p) |

In addition to the terms defined elsewhere in this Agreement, the following terms have the following meanings:

"**Account**" means, as at any date of determination, all "accounts" (as such term is defined in the UCC) of the Borrower and its Subsidiaries, including the unpaid portion of the obligation of a customer of the Borrower or any of its Subsidiaries in respect of Inventory purchased by and shipped to such customer and/or the rendition of services by the Borrower or such Subsidiary, as stated on the respective invoice of the Borrower or such Subsidiary, net of any credits, rebates or offsets owed to such customer.

"**Acquisition**" means any transaction or series of related transactions for the purpose of or resulting, directly or indirectly, in (a) the acquisition of all or substantially all of the assets of a Person, or of any business or division of a Person, (b) the acquisition of in excess of fifty percent (50%) of the Stock and Stock Equivalents of any Person or otherwise causing any Person to become a Subsidiary of the Borrower, or (c) a merger or consolidation or any other combination with another Person.

"**Affiliate**" means, with respect to any Person, each officer, director, general partner or joint-venturer of such Person and any other Person that directly or indirectly controls, is controlled by, or is under common control with, such Person; provided, however, that no Secured Party shall be an Affiliate of any Credit Party or of any Subsidiary of any Credit Party solely by reason of the provisions of the Loan Documents.  For purposes of this definition, "**control**"

means the possession of either (a) the power to vote, or the beneficial ownership of, 10% or more of the voting Stock of such Person (either directly or through the ownership of Stock Equivalents) or (b) the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise.

"**Agent**" means Antares in its capacity as administrative agent for the Lenders hereunder, and any successor administrative agent.

"**Aggregate DIP Revolving Loan Commitment**" means the combined DIP Revolving Loan Commitments of the Lenders, which shall initially be in the amount of $22,000,000, as such amount may be reduced from time to time pursuant to this Agreement.

"**Aggregate Prior LIFO L/C Loan Commitment**" means the combined Prior LIFO L/C Loan Commitments of the Lenders, which shall initially be in the amount of $0.00, as such amount may be reduced from time to time pursuant to this Agreement.

"**Aggregate Prior Original L/C Loan Commitment**" means the combined Prior Original L/C Loan Commitments of the Lenders, which shall initially be in the amount of $0.00, as such amount may be reduced from time to time pursuant to this Agreement.

"**Aggregate Rollup LIFO Commitment**" means the combined Rollup LIFO Commitments of the Lenders.

"**Aggregate Rollup Original Commitment**" means the combined Rollup Original Commitments of the Lenders.

"**Applicable Margin**" means (i) if a Base Rate Loan, eight percent (8.0%) per annum, and (ii) if a LIBOR Rate Loan, nine percent (9.0%) per annum.

"**Approved Budget**" means the aggregate, without duplication, of all items that are set forth in the Initial Approved Budget and any Supplemental Approved Budget.

"**Approved Fund**" means, with respect to any Lender, any Person (other than a natural Person) that (a) (i) is or will be engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the Ordinary Course of Business or (ii) temporarily warehouses loans for any Lender or any Person described in clause (i) above and (b) is advised or managed by (i) such Lender, (ii) any Affiliate of such Lender or (iii) any Person (other than an individual) or any Affiliate of any Person (other than an individual) that administers or manages such Lender.

"**Assignment**" means an assignment agreement entered into by a Lender, as assignor, and any Person, as assignee, pursuant to the terms and provisions of Section 9.9 (with the consent of any party whose consent is required by Section 9.9), accepted by Agent, substantially in the form of Exhibit 11.1(a) or any other form approved by Agent.

"**Attorney Costs**" means and includes all reasonable and documented fees and disbursements of any law firm or other external counsel.

"**Availability**" means, as of any date of determination, the amount by which (a) the Maximum DIP Revolving Loan Balance exceeds (b) the aggregate outstanding principal balance of DIP Revolving Loans; provided, that at all times prior to the entry of the Final Order by the Bankruptcy Court, Availability shall mean the lesser of (a) the amount calculated above and (b) the amount permitted by the Interim Order.

"**Availability Certificate**" means a duly completed certificate of the Borrower on behalf of the Borrower in substantially the form of Exhibit 11.1(b) hereto.

"**Bankruptcy Code**" means the Federal Bankruptcy Reform Act of 1978.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the District of Delaware.

"**Base Rate**" means, for any day, a rate per annum equal to the highest of (a) the rate last quoted by The Wall Street Journal as the "Prime Rate" in the United States or, if The Wall Street Journal ceases to quote such rate, the highest per annum interest rate published by the Federal Reserve Board in Federal Reserve Statistical Release H.15 (519) (Selected Interest Rates) as the "bank prime loan" rate or, if such rate is no longer quoted therein, any similar rate quoted therein (as determined by Agent) or any similar release by the Federal Reserve Board (as determined by Agent), (b) the sum of one half of one percent (0.50%) per annum and the Federal Funds Rate, and (c) the sum of (x) LIBOR calculated for each such day based on an Interest Period of one month determined two (2) Business Days prior to such day (but for the avoidance of doubt, not less than one percent (1.0%) per annum), plus (y) the excess of the Applicable Margin for LIBOR Rate Loans over the Applicable Margin for Base Rate Loans, in each instance, as of such day.  Any change in the Base Rate due to a change in any of the foregoing shall be effective on the effective date of such change in the "bank prime loan" rate, the Federal Funds Rate or LIBOR for an Interest Period of one month.

"**Base Rate Loan**" means a Loan that bears interest based on the Base Rate.

"**Benefit Plan**" means any employee benefit plan as defined in Section 3(3) of ERISA (whether governed by the laws of the United States or otherwise) to which any Credit Party incurs or otherwise has any obligation or liability, contingent or otherwise.

"**Borrowing**" means a borrowing hereunder consisting of Loans made to or for the benefit of the Borrower on the same day by the Lenders pursuant to Article I.

"**Build to Suit Obligations**" means any deemed obligations relating to a lease or other deemed obligation accounted for using "build to suit" accounting in accordance with GAAP.

"**Business Day**" means any day that is not a Saturday, Sunday or a day on which banks are required or authorized to close in New York City and, when determined in connection with notices and determinations in respect of LIBOR or any LIBOR Rate Loan or any funding, conversion, continuation, Interest Period or payment of any LIBOR Rate Loan, that is also a day on which dealings in Dollar deposits are carried on in the London interbank market.

"**Capital Adequacy Regulation**" means any guideline, request or directive of any central bank or other Governmental Authority, or any other law, rule or regulation, whether or not having the force of law, in each case, regarding capital adequacy of any Lender or of any corporation controlling a Lender.

"**Capital Lease**" means, with respect to any Person, any lease that is accounted for as a capital lease on a balance sheet of such Person prepared in accordance with GAAP.

"**Capital Lease Obligations**" means, at any time, with respect to any Capital Lease, any lease entered into as part of any sale leaseback transaction of any Person or any synthetic lease, the amount of all obligations of such Person that is (or that would be, if such synthetic lease or other lease were accounted for as a Capital Lease) capitalized on a balance sheet of such Person prepared in accordance with GAAP.

"**Carve-Out**" shall have the meaning set forth in the DIP Orders.

"**Cash Collateral**" shall have the meaning set forth in the DIP Orders.

"**Cash Equivalents**" means (a) any readily-marketable securities (i) issued by, or directly, unconditionally and fully guarantied or insured by the United States federal government or (ii) issued by any agency of the United States federal government the obligations of which are fully backed by the full faith and credit of the United States federal government, (b) any readily-marketable direct obligations issued by any other agency of the United States federal government, any state of the United States or any political subdivision of any such state or any public instrumentality thereof, in each case having a rating of at least "A-1" from S&P or at least "P-1" from Moody's, (c) any commercial paper rated at least "A-1" by S&P or "P-1" by Moody's and issued by any Person organized under the laws of any state of the United States, (d) any Dollar-denominated time deposit, insured certificate of deposit, overnight bank deposit or bankers' acceptance issued or accepted by (i) any Lender or (ii) any commercial bank that is (A) organized under the laws of the United States, any state thereof or the District of Columbia, (B) "adequately capitalized" (as defined in the regulations of its primary federal banking regulators) and (C) has Tier 1 capital (as defined in such regulations) in excess of $250,000,000 and (e) shares of any United States money market fund that (i) has substantially all of its assets invested continuously in the types of investments referred to in clause (a), (b), (c) or (d) above with maturities as set forth in the proviso below, (ii) has net assets in excess of $500,000,000 and (iii) has obtained from either S&P or Moody's the highest rating obtainable for money market funds in the United States; provided, however, that the maturities of all obligations specified in any of clauses (a), (b), (c) or (d) above shall not exceed 365 days.

"**Chapter 11 Cases**" means the Chapter 11 cases jointly administrated under Holdings, filed on January 27, 2020 by the Credit Parties by filing voluntary petitions with the Bankruptcy Court.

"**Closing Date**" means the date on which all conditions precedent set forth in Section 2.1 are satisfied or waived by the Agent and all Lenders.

"**Code**" means the Internal Revenue Code of 1986.

"**Collateral**" means all Property and interests in Property and proceeds thereof now owned or hereafter acquired by any Credit Party, any of their respective Subsidiaries and any other Person who has granted a Lien to Agent, in or upon which a Lien is granted, purported to be granted, or now or hereafter exists in favor of any Lender or Agent for the benefit of Agent, Lenders and other Secured Parties, whether under this Agreement or under any other documents executed by any such Persons and delivered to Agent.  Without limiting the generality of the foregoing, "Collateral" shall include all rights under section 506(c) of the Bankruptcy Code (solely upon entry of the Final Order), all "property of the estate" (within the meaning of the Bankruptcy Code) of any kind or nature, real or personal, tangible, intangible or mixed, and all rents, products, substitutions, accessions, profits, replacements and cash and non-cash proceeds of all of the foregoing.

"**Collateral Documents**" means, collectively, all security agreements, pledge agreements, patent and trademark security agreements, lease assignments, guaranties and other similar agreements, and all amendments, restatements, modifications or supplements thereof or thereto, by or between any one or more of any Credit Party, any of their respective Subsidiaries or any other Person pledging or granting a lien on Collateral or guarantying the payment and performance of the Obligations, and any Lender or Agent for the benefit of Agent, the Lenders and other Secured Parties now or hereafter delivered to the Lenders or Agent pursuant to or in connection with the transactions contemplated hereby, and all financing statements (or comparable documents now or hereafter filed in accordance with the UCC or comparable law) against any such Person as debtor in favor of any Lender or Agent for the benefit of Agent, the Lenders and the other Secured Parties, as secured party, as any of the foregoing may be amended, restated and/or modified from time to time.

"**Commitment**" means, for each Lender, the sum of its DIP Revolving Loan Commitment, Prior L/C Loan Commitment, Rollup LIFO Commitment and Rollup Original Commitment.

"**Commitment Percentage**" means, as to any Lender, the percentage equivalent of such Lender's DIP Revolving Loan Commitment, Prior LIFO L/C Loan Commitment, Prior Original L/C Loan Commitment, Rollup LIFO Commitment or Rollup Original Commitment divided by the Aggregate DIP Revolving Loan Commitment, Aggregate Prior LIFO L/C Loan Commitment, Aggregate Prior Original L/C Loan Commitment, Aggregate Rollup LIFO Commitment or Aggregate Rollup Original Commitment, as applicable; provided, that following acceleration of the DIP Revolving Loans, such term means, for the calculation of such Lender's Commitment Percentage, as to any Lender, the percentage equivalent of the principal amount of the DIP Revolving Loans held by such Lender, divided by the aggregate principal amount of the DIP Revolving Loans held by all Lenders.

"**Commodity Exchange Act**" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.).

"**Connection Income Taxes**" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profit Taxes.

"**Contingent Obligation**" means, as to any Person, any direct or indirect liability, contingent or otherwise, of that Person:  (a) with respect to any Indebtedness, lease, dividend or other obligation of another Person if the primary purpose or intent of the Person incurring such liability, or the primary effect thereof, is to provide assurance to the obligee of such liability that such liability will be paid or discharged, or that any agreements relating thereto will be complied with, or that the holders of such liability will be protected (in whole or in part) against loss with respect thereto; (b) with respect to any letter of credit issued for the account of that Person or as to which that Person is otherwise liable for reimbursement of drawings; (c) under any Rate Contracts; (d) to make take-or-pay or similar payments if required regardless of nonperformance by any other party or parties to an agreement; or (e) for the obligations of another Person through any agreement to purchase, repurchase or otherwise acquire such obligation or any Property constituting security therefor, to provide funds for the payment or discharge of such obligation or to maintain the solvency, financial condition or any balance sheet item or level of income of another Person.  The amount of any Contingent Obligation shall be equal to the amount of the obligation so guarantied or otherwise supported or, if not a fixed and determined amount, the maximum amount so guarantied or supported.

"**Contractual Obligations**" means, as to any Person, any provision of any security (whether in the nature of Stock, Stock Equivalents or otherwise) issued by such Person or of any agreement, undertaking, contract, indenture, mortgage, deed of trust or other instrument, document or agreement (other than a Loan Document) to which such Person is a party or by which it or any of its Property is bound or to which any of its Property is subject.

"**Conversion Date**" means any date on which the Borrower converts a Base Rate Loan to a LIBOR Rate Loan or a LIBOR Rate Loan to a Base Rate Loan.

"**Copyrights**" means all rights, title and interests (and all related IP Ancillary Rights) arising under any Requirement of Law in or relating to copyrights and all mask work, database and design rights, whether or not registered or published, all registrations and recordations thereof and all applications in connection therewith.

"**Credit Parties**" means Holdings, the Borrower and each other Person (i) which executes a guaranty of the Obligations, (ii) which grants a Lien on all or substantially all of its assets to secure payment of the Obligations and (iii) all of the Stock of which is pledged to Agent for the benefit of the Secured Parties, and excluding, in any event, each Excluded Licensing Subsidiary.

"**Default**" means any event or circumstance that, with the passing of time or the giving of notice or both, would (if not cured or otherwise remedied during such time) become an Event of Default.

"**DIP L/C Reimbursement Obligation**" means, for any DIP Letter of Credit, the obligation of the Borrower to the L/C Issuer thereof or to Agent, as and when matured, to pay all amounts drawn under such DIP Letter of Credit.

"**DIP Letter of Credit**" means documentary or standby letters of credit issued for the account of the Borrower by L/C Issuers, and bankers' acceptances issued by the Borrower, for which Agent and Lenders have incurred DIP Letter of Credit Obligations.

"**DIP Letter of Credit Obligations**" means all outstanding obligations incurred by Agent and Lenders at the request of the Borrower, whether direct or indirect, contingent or otherwise, due or not due, in connection with the Issuance of DIP Letters of Credit by L/C Issuers or the purchase of a participation as set forth in subsection 1.1(c) with respect to any DIP Letter of Credit. The amount of such DIP Letter of Credit Obligations shall equal the maximum amount that may be payable by Agent and Lenders thereupon or pursuant thereto.

"**DIP Orders**" means the Interim Order and the Final Order, as applicable, based on which such order is then in effect.

"**DIP Revolving Lender**" means each Lender with a DIP Revolving Loan Commitment (or if the DIP Revolving Loan Commitments have terminated, who holds DIP Revolving Loans).

"**DIP Revolving Note**" means a promissory note of the Borrower payable to a Lender in substantially the form of Exhibit 11.1(d) hereto, evidencing Indebtedness of the Borrower under the DIP Revolving Loan Commitment of such Lender.

"**DIP Revolving Termination Date**" means the earlier to occur of: (a) July 27, 2020; (b) the effective date of a plan of reorganization in the Chapter 11 Cases, (c) the Termination Declaration Date, (d) the date of the consummation of the sale of all or substantially all of the assets or Stock of the Credit Parties pursuant to Section 363 of the Bankruptcy Code, and (e) the date all Obligations are indefeasibly paid in full in cash and this Credit Agreement and the other Loan Documents are terminated.

"**Disposition**" means (a) the sale, lease, conveyance or other disposition of Property, other than sales or other dispositions expressly permitted under Sections 5.2(a), 5.2(c) and 5.2(d), and (b) the sale or transfer by the Borrower or any Subsidiary of the Borrower of any Stock or Stock Equivalent issued by any Subsidiary of the Borrower and held by such transferor Person.

"**Disqualified Stock**" means any Stock or Stock Equivalent which, by its terms (or by the terms of any security or other Stock into which it is convertible or for which it is exchangeable), or upon the happening of any event or condition, (a) matures or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, or is redeemable at the option of the holder thereof, in whole or in part, on or prior to the date that is ninety-one (91) days following the date referenced in clause (a) of the definition of "DIP Revolving Termination Date" (excluding any provisions requiring redemption upon a "change of control" or similar event; provided that such "change of control" or similar event results in the prior payment in full in cash of the Obligations (other than contingent indemnification obligations to the extent no claim giving rise thereto has been asserted), the termination of all commitments to lend hereunder and the termination of this Agreement), (b) is convertible into or exchangeable for (i) debt securities or (ii) any Stock or Stock Equivalents referred to in (a) above, in each case, at any time on or prior to the date that is ninety-one (91) days following the date referenced in clause (a) of the definition of "DIP Revolving Termination Date", or (c) is entitled to receive scheduled

dividends or distributions in cash prior to the time that the Obligations (other than contingent indemnification obligations to the extent no claim giving rise thereto has been asserted) are paid in full in cash.

"**Dollars**", "**dollars**" and "**$**" each mean lawful money of the United States.

"**Domestic Subsidiary**" means any Subsidiary incorporated, organized or otherwise formed under the laws of the United States, any state thereof or the District of Columbia.

"**Electronic Transmission**" means each document, instruction, authorization, file, information and any other communication transmitted, posted or otherwise made or communicated by e-mail or E-Fax, or otherwise to or from an E-System.

"**Environmental Laws**" means all applicable Requirements of Law and the applicable requirements of Permits imposing liability or standards of conduct for or relating to the regulation and protection of human health, safety, the workplace, the environment and natural resources, and including public notification requirements and environmental transfer of ownership, notification or approval statutes.

"**Environmental Liabilities**" means all Liabilities (including costs of Remedial Actions, natural resource damages and costs and expenses of investigation and feasibility studies, including the reasonable costs of environmental consultants and Attorney's Costs) that are imposed on, incurred by or asserted against any Credit Party as a result of, or related to, any claim, suit, action, investigation, proceeding or demand by any Person, whether based in contract, tort, implied or express warranty, strict liability, criminal or civil statute or common law or otherwise, arising under any Environmental Law and resulting from the ownership, lease, sublease or other operation or occupation of property by any Credit Party or any Subsidiary of any Credit Party, whether on, prior or after the date hereof.

"**ERISA**" means the Employee Retirement Income Security Act of 1974.

"**ERISA Affiliate**" means, collectively, any Credit Party and any Person under common control or treated as a single employer with, any Credit Party, within the meaning of Section 414(b), (c), (m) or (o) of the Code.

"**ERISA Event**" means any of the following:  (a) a reportable event described in Section 4043(b) of ERISA (or, unless the 30-day notice requirement has been duly waived under the applicable regulations, Section 4043(c) of ERISA) with respect to a Title IV Plan; (b) the withdrawal of any ERISA Affiliate from a Title IV Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer, as defined in Section 4001(a)(2) of ERISA; (c) the complete or partial withdrawal of any ERISA Affiliate from any Multiemployer Plan; (d) with respect to any Multiemployer Plan, the filing of a notice of reorganization, insolvency or termination (or treatment of a plan amendment as termination) under Section 4041A of ERISA; (e) the filing of a notice of intent to terminate a Title IV Plan (or treatment of a plan amendment as termination) under Section 4041 of ERISA; (f) the institution of proceedings to terminate a Title IV Plan or Multiemployer Plan by the PBGC; (g) the failure to make any required contribution to any Title IV Plan or Multiemployer Plan when due; (h) the imposition of a Lien under Section 412 or 430(k) of the Code or Section 303 or 4068 of ERISA on any

property (or rights to property, whether real or personal) of any ERISA Affiliate; (i) the failure of a Benefit Plan or any trust thereunder intended to qualify for tax exempt status under Section 401 or 501 of the Code or other Requirements of Law to qualify thereunder; (j) a Title IV plan is in "at risk" status within the meaning of Code Section 430(i); (k) a Multiemployer Plan is in "endangered status" or "critical status" within the meaning of Section 432(b) of the Code; and (l) any other event or condition that might reasonably be expected to constitute grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Title IV Plan or Multiemployer Plan or for the imposition of any material liability upon any ERISA Affiliate under Title IV of ERISA other than for PBGC premiums due but not delinquent.

"**Event of Loss**" means, with respect to any Property, any of the following: (a) any loss, destruction or damage of such Property; or (b) any actual condemnation, seizure or taking, by exercise of the power of eminent domain or otherwise, of such Property, or confiscation of such Property or the requisition of the use of such Property.

"**Excluded Foreign Subsidiary**" means a Foreign Subsidiary which is (a) a controlled foreign corporation (as defined in the Code) that has not guaranteed or pledged any of its assets to secure, or with respect to which there shall not have been pledged  two-thirds or more of the voting Stock and Stock Equivalents to secure, any Indebtedness (other than the Loans) of a Credit Party or (b) a Foreign Subsidiary owned by a Foreign Subsidiary described in clause (a).

"**Excluded Licensing Subsidiary**" means each Subsidiary that (i) owns a liquor license, (ii) with respect to which any Requirement of Law or Contractual Obligation (<u>provided</u> that such Contractual Obligation is entered into in the Ordinary Course of Business and not for the purpose of causing the applicable Person to be an "Excluded Licensing Subsidiary" under this definition) applicable thereto prohibits or restricts (x) such Subsidiary from guarantying the Obligations or granting a Lien on its assets to secure the Obligations or (y) the pledge of such Subsidiary's Stock or Stock Equivalents, and (iii) is designated by the Borrower as an Excluded Licensing Subsidiary in a written notice to Agent.

"**Excluded Rate Contract Obligation**" means, with respect to any Guarantor, any guarantee of any Swap Obligations under a Pre-Petition Secured Rate Contract if, and only to the extent that and for so long as, all or a portion of the guarantee of such Guarantor of, or the grant by such Guarantor of a security interest to secure, such Swap Obligation under a Pre-Petition Secured Rate Contract (or any guarantee thereof) is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Guarantor's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act at the time the guarantee of such Guarantor or the grant of such security interest becomes effective with respect to such Swap Obligation under a Pre-Petition Secured Rate Contract.  If a Swap Obligation under a Pre-Petition Secured Rate Contract arises under a master agreement governing more than one swap, such exclusion shall apply only to the portion of such Swap Obligation under a Pre-Petition Secured Rate Contract that is attributable to swaps for which such guarantee or security interest is or becomes illegal.

"**Excluded Tax**" means with respect to any Secured Party: (a) Taxes measured by net income (including branch profit Taxes) and franchise Taxes imposed in lieu of net income

Taxes, in each case (i) imposed on any Secured Party as a result of being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes; (b) withholding Taxes to the extent that the obligation to withhold amounts existed on the date that such Person became a Secured Party under this Agreement in the capacity under which such Person makes a claim under Section 10.1(b) or designates a new Lending Office, except in each case to the extent such Person is a direct or indirect assignee (other than pursuant to Section 9.22) of any other Secured Party that was entitled, at the time the assignment to such Person became effective, to receive additional amounts under Section 10.1(b); (c) Taxes that are directly attributable to the failure (other than as a result of a change in any Requirement of Law) by any Secured Party to deliver the documentation required to be delivered pursuant to Section 10.1(g); and (d) any United States federal withholding Taxes imposed under FATCA.

"**E-Fax**" means any system used to receive or transmit faxes electronically.

"**E-Signature**" means the process of attaching to or logically associating with an Electronic Transmission an electronic symbol, encryption, digital signature or process (including the name or an abbreviation of the name of the party transmitting the Electronic Transmission) with the intent to sign, authenticate or accept such Electronic Transmission.

"**E-System**" means any electronic system approved by Agent, including Syndtrak®, Intralinks® and ClearPar® and any other Internet or extranet-based site, whether such electronic system is owned, operated or hosted by Agent, any of its Related Persons or any other Person, providing for access to data protected by passcodes or other security system.

"**Facility Termination Date**" means the date on which (A) the DIP Revolving Loan Commitments have terminated, (B) all Loans, all L/C Reimbursement Obligations and all other Obligations under the Loan Documents and all Obligations arising under Pre-Petition Secured Rate Contracts, that Agent has theretofore been notified in writing by the holder of such Obligation are then due and payable have been paid and satisfied in full, and (C) there shall have been deposited cash collateral with respect to all contingent Obligations (or, as an alternative to cash collateral, in the case of any Letter of Credit Obligation, Agent shall have received a back-up letter of credit) in amounts and on terms and conditions and with parties reasonably satisfactory to Agent and each Indemnitee that is, or may be, owed such Obligations (excluding contingent Obligations (other than L/C Reimbursement Obligations) as to which no claim has been asserted).

"**FATCA**" means Sections 1471, 1472, 1473 and 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), current or future United States Treasury Regulations promulgated thereunder and published guidance with respect thereto, any agreements entered into pursuant to Section 1471(b)(1) of the Code and any applicable intergovernmental agreements with respect thereto.

"**Federal Flood Insurance**" means federally backed Flood Insurance available under the National Flood Insurance Program to owners of real property improvements located in Special Flood Hazard Areas in a community participating in the National Flood Insurance Program.

"**Federal Funds Rate**" means, for any period, a fluctuating interest rate per annum equal for each day during such period to the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System arranged by federal funds brokers, as determined by Agent in a commercially reasonable manner.

"**Federal Reserve Board**" means the Board of Governors of the Federal Reserve System, or any entity succeeding to any of its principal functions.

"**FEMA**" means the Federal Emergency Management Agency, a component of the U.S. Department of Homeland Security that administers the National Flood Insurance Program.

"**Final Availability Date**" means the earlier of the DIP Revolving Termination Date and one (1) Business Day prior to the date specified in clause (a) of the definition of DIP Revolving Termination Date.

"**Final Order**" means an order of the Bankruptcy Court with respect to the Credit Parties after a final hearing, in form and substance acceptable to the Agent and the Required DIP Revolving Lenders in their sole discretion, which order is in effect and not stayed, together with all extensions, supplements modifications and amendments thereto, in each case in form and substance acceptable to the Agent and the Required DIP Revolving Lenders, in their sole discretion, which, among other things, provides that the relief requested in the motions seeking approval of the Loan Documents and the Interim Order and Final Order and granted on an interim basis in the Interim Order is granted on a final basis (including any additional relief required by the Bankruptcy Court or agreed to by the Agent) and provides for the roll-up of the Pre-Petition Obligations as contemplated herein, all on a final basis.

"**FIRREA**" means the Financial Institutions Reform, Recovery and Enforcement Act of 1989.

"**Fiscal Period**" means those accounting periods of the Borrower set forth on <u>Schedule 11.1(b)</u>.

"**Fiscal Quarter**" means those quarterly accounting periods of the Borrower set forth on <u>Schedule 11.1(c)</u>.

"**Fiscal Year**" means those yearly accounting periods of the Borrower set forth on <u>Schedule 11.1(d)</u>.

"**Flood Insurance**" means, for any Real Estate located in a Special Flood Hazard Area, Federal Flood Insurance or private insurance reasonably satisfactory to Agent, in either case, that (a) meets the requirements set forth by FEMA in its *Mandatory Purchase of Flood Insurance Guidelines*, (b) shall include a deductible not to exceed $50,000 and (c) shall have a coverage amount equal to the lesser of (i) the "replacement cost value" of the buildings and any personal

property Collateral located on the Real Estate as determined under the National Flood Insurance Program or (ii) the maximum policy limits set under the National Flood Insurance Program.

"**Foreign Subsidiary**" means, with respect to any Person, a Subsidiary of such Person, which Subsidiary is not a Domestic Subsidiary.

"**Franchise Seller Notes**" means the Subordinated Promissory Notes attached as <u>Annex A</u> hereto, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"**GAAP**" means generally accepted accounting principles in the United States, as in effect from time to time, set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants, in the statements and pronouncements of the Financial Accounting Standards Board (or agencies with similar functions and comparable stature and authority within the accounting profession) that are applicable to the circumstances as of the date of determination. Subject to Section 11.3, all references to "GAAP" shall be to GAAP applied consistently with the principles used in the preparation of the financial statements described in Section 3.11(a).

"**Governmental Authority**" means any nation, sovereign or government, any state or other political subdivision thereof, any agency, authority or instrumentality thereof and any entity or authority exercising executive, legislative, taxing, judicial, regulatory or administrative functions of or pertaining to government, including any central bank, stock exchange, regulatory body, arbitrator, public sector entity, supra-national entity (including the European Union and the European Central Bank) and any self-regulatory organization (including the National Association of Insurance Commissioners).

"**Guarantor**" means any Person that has guaranteed any Obligations.

"**Hazardous Material**" means any substance, material or waste that is classified, regulated or otherwise characterized under any Environmental Law as hazardous, toxic, a contaminant or a pollutant or by other words of similar meaning or regulatory effect, including petroleum or any fraction thereof, asbestos, polychlorinated biphenyls and radioactive substances.

"**Impacted Lender**" means any Lender that fails to provide Agent, within three (3) Business Days following Agent's written request, satisfactory assurance that such Lender will not become a Non-Funding Lender, or any Lender that has a Person that directly or indirectly controls such Lender and such Person (a) becomes subject to a voluntary or involuntary case under the Bankruptcy Code or any similar bankruptcy laws, (b) has appointed a custodian, conservator, receiver or similar official for such Person or any substantial part of such Person's assets, or (c) makes a general assignment for the benefit of creditors, is liquidated, or is otherwise adjudicated as, or determined by any Governmental Authority having regulatory authority over such Person or its assets to be, insolvent or bankrupt, and for each of clauses (a) through (c), Agent has determined that such Lender is reasonably likely to become a Non-Funding Lender. For purposes of this definition, control of a Person shall have the same meaning as in the second sentence of the definition of Affiliate.

US-DOCS\112887106.9

"**Indebtedness**" of any Person means, without duplication: (a) all indebtedness for borrowed money; (b) all obligations issued, undertaken or assumed as the deferred purchase price of Property or services, including earnouts (other than trade payables entered into in the Ordinary Course of Business); (c) the face amount of all letters of credit issued for the account of such Person and without duplication, all drafts drawn thereunder and all reimbursement or payment obligations with respect to letters of credit, surety bonds and other similar instruments issued by such Person; (d) all obligations evidenced by notes, bonds, debentures or similar instruments, including obligations so evidenced incurred in connection with the acquisition of Property, assets or businesses; (e) all indebtedness created or arising under any conditional sale or other title retention agreement, or incurred as financing, in either case with respect to Property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such Property); (f) all Capital Lease Obligations; (g) the principal balance outstanding under any synthetic lease, off-balance sheet loan or similar off balance sheet financing product; (h) all obligations of such Person, whether or not contingent, in respect of Disqualified Stock, valued at, in the case of redeemable preferred Stock, the greater of the voluntary liquidation preference and the involuntary liquidation preference of such Stock plus accrued and unpaid dividends; (i) all indebtedness referred to in clauses (a) through (h) above secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien upon or in Property (including accounts and contracts rights) owned by such Person, even though such Person has not assumed or become liable for the payment of such indebtedness; and (j) all Contingent Obligations described in clause (a) of the definition thereof in respect of indebtedness or obligations of others of the kinds referred to in clauses (a) through (i) above.  For the avoidance of doubt, Build to Suit Obligations shall not constitute Indebtedness to the extent (x) at the time any such Build to Suit Obligation constituted a deemed liability of the Credit Parties, a corresponding build to suit asset was required to be reflected on the consolidated balance sheet of the Credit Parties, prepared in accordance with GAAP, and (y) no cash payment in excess of amounts included within the lease agreement giving rise to such Build to Suit Obligation for payment of rents in the Ordinary Course of Business and consistent with past practice is ever required with respect to such Build to Suit Obligations in accordance with GAAP (ASC 840).

"**Indemnified Tax**" means (a) any Tax other than an Excluded Tax and (b) to the extent not otherwise described in clause (a), Other Taxes.

"**Intellectual Property**" means all rights, title and interests in or relating to intellectual property and industrial property arising under any Requirement of Law and all IP Ancillary Rights relating thereto, including all Copyrights, Patents, Software, Trademarks, Internet Domain Names, Trade Secrets and IP Licenses.

"**Interest Payment Date**" means, (a) with respect to any LIBOR Rate Loan, the last day of each Interest Period applicable to such Loan and (b) with respect to Base Rate Loans the first day of each calendar quarter.

"**Interest Period**" means, with respect to any LIBOR Rate Loan, the period commencing on the Business Day such Loan is disbursed or continued or on the Conversion Date on which a Base Rate Loan is converted to the LIBOR Rate Loan and ending on the date one month

thereafter, as selected by the Borrower in its Notice of Borrowing or Notice of Conversion/Continuation; provided that:

(a)    if any Interest Period pertaining to a LIBOR Rate Loan would otherwise end on a day which is not a Business Day, that Interest Period shall be extended to the next succeeding Business Day unless the result of such extension would be to carry such Interest Period into another calendar month, in which event such Interest Period shall end on the immediately preceding Business Day;

(b)    any Interest Period pertaining to a LIBOR Rate Loan that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of the calendar month at the end of such Interest Period; and

(c)    no Interest Period for any Loan or any portion thereof shall extend beyond the DIP Revolving Termination Date.

"**Internet Domain Name**" means all right, title and interest (and all related IP Ancillary Rights) arising under any Requirement of Law in or relating to internet domain names.

"**Interim Order**" means the order of the Bankruptcy Court with respect to the Credit Parties, in substantially the form of <u>Exhibit 11.1(g)</u> hereto, with such extensions, amendments, modifications or supplements acceptable to the Agent and the Required DIP Revolving Lenders in their sole discretion, which order is in effect and not stayed.

"**Inventory**" means all of the "inventory" (as such term is defined in the UCC) of the Borrower and its Subsidiaries, including, but not limited to, all merchandise, raw materials, parts, supplies, work-in-process and finished goods intended for sale, together with all the containers, packing, packaging, shipping and similar materials related thereto, and including such inventory as is temporarily out of the Borrower's or such Subsidiary's custody or possession, including inventory on the premises of others and items in transit.

"**IP Ancillary Rights**" means, with respect to any Intellectual Property, as applicable, all foreign counterparts to, and all divisionals, reversions, continuations, continuations-in-part, reissues, reexaminations, renewals and extensions of, such Intellectual Property and all income, royalties, proceeds and Liabilities at any time due or payable or asserted under or with respect to any of the foregoing or otherwise with respect to such Intellectual Property, including all rights to sue or recover at law or in equity for any past, present or future infringement, misappropriation, dilution, violation or other impairment thereof, and, in each case, all rights to obtain any other IP Ancillary Right.

"**IP License**" means all Contractual Obligations (and all related IP Ancillary Rights), whether written or oral, granting any right, title and interest in or relating to any Intellectual Property.

"**IRS**" means the Internal Revenue Service of the United States and any successor thereto.

"**Issue**" means, with respect to any Letter of Credit, to issue, extend the expiration date of, renew (including by failure to object to any automatic renewal on the last day such objection is permitted), increase the face amount of, or reduce or eliminate any scheduled decrease in the face amount of, such Letter of Credit, or to cause any Person to do any of the foregoing. The terms "**Issued**" and "**Issuance**" have correlative meanings.

"**L/C Issuer**" means any Lender or an Affiliate thereof or a bank or other legally authorized Person, in each case, reasonably acceptable to Agent, in such Person's capacity as an issuer of Letters of Credit hereunder.

"**L/C Reimbursement Obligations**" means, collectively, (a) all DIP L/C Reimbursement Obligations and (b) all Prior L/C Reimbursement Obligations.

"**Lending Office**" means, with respect to any Lender, the office or offices of such Lender specified as its "Lending Office" beneath its name on the applicable signature page hereto, or such other office or offices of such Lender as it may from time to time notify the Borrower and Agent.

"**Letter of Credit**" means documentary or standby letters of credit Issued for the account of the Borrower by L/C Issuers, and bankers' acceptances issued by the Borrower, for which Agent and Lenders have incurred Letter of Credit Obligations.

"**Letter of Credit Fee**" means, (a) with respect to any Prior Letter of Credit or Prior Letter of Credit Obligation, the Prior Letter of Credit Fee and (b) with respect to any DIP Letter of Credit or DIP Letter of Credit Obligation, the DIP Letter of Credit Fee.

"**Letter of Credit Obligations**" means the sum of (a) all Prior Letter of Credit Obligations plus (b) all DIP Letter of Credit Obligations.

"**Liabilities**" means all claims, actions, suits, judgments, damages, losses, liability, obligations, responsibilities, fines, penalties, sanctions, costs, fees, Taxes, commissions, charges, disbursements and expenses, in each case of any kind or nature (including interest accrued thereon or as a result thereto and fees, charges and disbursements of financial, legal and other advisors and consultants), whether joint or several, whether or not indirect, contingent, consequential, actual, punitive, treble or otherwise.

"**LIBOR**" means, for each Interest Period, the higher of (a) 1.0% per annum, and (b) the offered rate per annum for deposits of Dollars for the applicable Interest Period that appears on Reuters Screen LIBOR01 Page as of 11:00 A.M. (London, England time) two (2) Business Days prior to the first day in such Interest Period. If no such offered rate exists, such rate will be the rate of interest per annum, as determined by Agent at which deposits of Dollars in immediately available funds are offered at 11:00 A.M. (London, England time) two (2) Business Days prior to the first day in such Interest Period by major financial institutions reasonably satisfactory to Agent in the London interbank market for such Interest Period for the applicable principal amount on such date of determination.

"**LIBOR Rate Loan**" means a Loan that bears interest based on LIBOR.

"**Lien**" means any mortgage, deed of trust, pledge, hypothecation, assignment, charge, deposit arrangement, encumbrance, easement, lien (statutory or otherwise), security interest or other security arrangement and any other preference, priority or preferential arrangement of any kind or nature whatsoever, including any conditional sale contract or other title retention agreement, the interest of a lessor under a Capital Lease and any synthetic or other financing lease having substantially the same economic effect as any of the foregoing.

"**Loan**" means any loan made or deemed made by any Lender hereunder, including, without limitation, each DIP Revolving Loan, each Prior L/C Loan and, following the Roll-Up Effective Time, the Rollup Loans.

"**Loan Documents**" means this Agreement, the Notes, the Collateral Documents, the DIP Orders and all documents delivered to Agent and/or any Lender in connection with any of the foregoing.

"**Management Agreement**" means that certain Amended and Restated Consulting Agreement dated as of November 14, 2012 between Sun Capital Partners Management V, LLC, a Delaware limited liability company and the Ultimate Parent and guaranteed by each of Holdings, the Borrower and the Borrower's Subsidiaries.

"**Margin Stock**" means "margin stock" as such term is defined in Regulation T, U or X of the Federal Reserve Board.

"**Material Adverse Effect**" means a material adverse change in any of (a) the financial condition, business, performance, operations or Property of the Credit Parties and their Subsidiaries taken as a whole; (b) the ability of any Credit Party, any Subsidiary of any Credit Party or any other Person (other than Agent or Lenders) to perform its obligations under any Loan Document; or (c) the validity or enforceability of any Loan Document or the rights and remedies of Agent, the Lenders and the other Secured Parties under any Loan Document.

"**Material Environmental Liabilities**" means Environmental Liabilities exceeding $1,000,000 in the aggregate.

"**Moody's**" means Moody's Investors Service, Inc.

"**Multiemployer Plan**" means any multiemployer plan, as defined in Section 3(37) or 4001(a)(3) of ERISA, as to which any ERISA Affiliate incurs or otherwise has any obligation or liability, contingent or otherwise.

"**National Flood Insurance Program**" means the program created by the U.S. Congress pursuant to the National Flood Insurance Act of 1968 and the Flood Disaster Protection Act of 1973, as revised by the National Flood Insurance Reform Act of 1994, that mandates the purchase of flood insurance to cover real property improvements located in Special Flood Hazard Areas in participating communities and provides protection to property owners through a federal insurance program.

"**Net Issuance Proceeds**" means, in respect of any issuance of equity or incurrence of Indebtedness, cash proceeds (including cash proceeds as and when received in respect of non-

cash proceeds received or receivable in connection with such issuance), net of underwriting discounts, fees under the Management Agreement and reasonable out-of-pocket costs and expenses paid or incurred in connection therewith in favor of any Person not an Affiliate of the Borrower.

"**Net Proceeds**" means proceeds in cash, checks or other cash equivalent financial instruments (including Cash Equivalents) as and when received by the Person making a Disposition, as well as insurance proceeds and condemnation and similar awards received on account of an Event of Loss, net of: (a) in the event of a Disposition (i) the direct costs relating to such Disposition excluding amounts payable to the Borrower or any Affiliate of the Borrower, (ii) sale, use or other transaction Taxes paid or payable as a result thereof, and (iii) amounts required to be applied to repay principal, interest and prepayment premiums and penalties on Indebtedness secured by a Lien on the asset which is the subject of such Disposition and (b) in the event of an Event of Loss, (i) all money actually applied to repair or reconstruct the damaged Property or Property affected by the condemnation or taking, (ii) all of the costs and expenses reasonably incurred in connection with the collection of such proceeds, award or other payments, and (iii) any amounts retained by or paid to parties having superior rights to such proceeds, awards or other payments.

"**Non-Funding Lender**" means any Lender that has (a) failed to fund any payments required to be made by it under the Loan Documents within two (2) Business Days after any such payment is due (excluding expense and similar reimbursements that are subject to good faith disputes), (b) given written notice (and Agent has not received a revocation in writing), to the Borrower, Agent, any Lender, or the L/C Issuer or has otherwise publicly announced (and Agent has not received notice of a public retraction) that such Lender believes it will fail to fund payments or purchases of participations required to be funded by it under the Loan Documents or one or more other syndicated credit facilities, (c) failed to fund, and not cured, loans, participations, advances, or reimbursement obligations  under one or more other syndicated credit facilities, unless subject to a good faith dispute, or (d) (i) become subject to a voluntary or involuntary case under the Bankruptcy Code or any similar bankruptcy laws, (ii) a custodian, conservator, receiver or similar official appointed for it or any substantial part of such Person's assets, or (iii) made a general assignment for the benefit of creditors, been liquidated, or otherwise been adjudicated as, or determined by any Governmental Authority having regulatory authority over such Person or its assets to be, insolvent or bankrupt, and for this clause (d), Agent has determined that such Lender is reasonably likely to fail to fund any payments required to be made by it under the Loan Documents.

"**Non-U.S. Lender Party**" means each of Agent, each Lender, each L/C Issuer, each SPV and each participant, in each case that is not a United States person as defined in Section 7701(a)(30) of the Code.

"**Note**" means any DIP Revolving Note and "**Notes**" means all such Notes.

"**Notice of Borrowing**" means a notice given by the Borrower to Agent pursuant to Section 1.5, in substantially the form of <u>Exhibit 11.1(c)</u> hereto.

"**Obligations**" means all Loans, and other Indebtedness, advances, debts, liabilities, obligations, covenants and duties owing by any Credit Party to any Lender, Agent, any L/C Issuer or any other Person required to be indemnified, that arises under any Loan Document, whether or not for the payment of money, whether arising by reason of an extension of credit, loan, guaranty, indemnification or in any other manner, whether direct or indirect (including those acquired by assignment), absolute or contingent, due or to become due, now existing or hereafter arising and however acquired; provided, that Obligations of any Guarantor shall not include any Excluded Rate Contract Obligations solely of such Guarantor.

"**Ordinary Course of Business**" means, in respect of any transaction involving any Person, the ordinary course of such Person's business, as conducted by any such Person consistent with past practice and undertaken by such Person in good faith and not for purposes of evading any covenant or restriction in any Loan Document.

"**Organization Documents**" means, (a) for any corporation, the certificate or articles of incorporation, the bylaws, any certificate of determination or instrument relating to the rights of preferred shareholders of such corporation, and any shareholder rights agreement, (b) for any partnership, the partnership agreement and, if applicable, certificate of limited partnership, (c) for any limited liability company, the operating agreement and articles or certificate of formation or (d) any other document setting forth the manner of election or duties of the officers, directors, managers or other similar persons, or the designation, amount or relative rights, limitations and preference of the Stock of a Person.

"**Other Connection Taxes**" means, with respect to any Secured Party, Taxes imposed as a result of a present or former connection between such Secured Party and the jurisdiction imposing such Tax, other than any such connection arising solely from the Secured Party having executed, delivered, become a party to, performed its obligations or received a payment under, received or perfected as a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document.

"**Patents**" means all rights, title and interests (and all related IP Ancillary Rights) arising under any Requirement of Law in or relating to letters patent and applications therefor.

"**Patriot Act**" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, P.L. 107-56.

"**PBGC**" means the United States Pension Benefit Guaranty Corporation or any successor thereto.

"**Permits**" means, with respect to any Person, any permit, approval, authorization, license, registration, certificate, concession, grant, franchise, variance or permission from, and any other Contractual Obligations with, any Governmental Authority, in each case whether or not having the force of law and applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"**Permitted Expenses**" means reasonable legal, accounting, collateral examination, monitoring and appraisal fees, financial advisory fees, fees and expenses of other consultants, and other reasonable out of pocket expenses of the Agent in connection with the Chapter 11

Cases, this Credit Agreement, the Loan Documents, and all documents related thereto, and all costs and expenses of the Agent (including reasonable, documented attorney expenses in accordance herewith) in connection with the enforcement of remedies under the Loan Documents to be reimbursed on a current basis by the Credit Parties from the proceeds of Loans hereunder.  For avoidance of doubt, all fees and expenses in the immediately preceding sentence shall be reimbursed without regard to the amounts set forth in the Approved Budget with respect thereto.

"**Permitted Subordinated Sponsor Indebtedness**" means, collectively, secured Indebtedness owing to the Sponsor or any Affiliate thereof in an aggregate original principal amount not to exceed the amount set forth in Section 5.5(f) at any time outstanding (plus capitalized interest thereon) and which (a) is otherwise on terms reasonably satisfactory to Agent, (b) is subordinated in right of payment to the Obligations, and (c) if secured, the Liens with respect to which are subordinated to Agent's Liens, in the case of clauses (b) and (c) pursuant to a written subordination agreement reasonably satisfactory to Agent in all respects.

"**Permitted Subordinated Indebtedness Documents Refinancing**" means Indebtedness constituting a refinancing (in whole or in part) of the Subordinated Indebtedness as permitted by the Subordination Agreement.

"**Person**" means any individual, partnership, corporation (including a business trust and a public benefit corporation), joint stock company, estate, association, firm, enterprise, trust, limited liability company, unincorporated association, joint venture and any other entity or Governmental Authority.

"**Post-Petition**" means the time period beginning immediately upon the filing of the Chapter 11 Cases and ending upon the closing of the Chapter 11 Cases.

"**Pre-Petition Agent**" means the "Agent" as defined in the Pre-Petition Credit Agreement.

"**Pre-Petition Indebtedness**" means any and all Indebtedness of the Credit Parties incurred prior to the Petition Date and outstanding as of the Petition Date.

"**Pre-Petition Lenders**" means the "Lenders" as defined in the Pre-Petition Credit Agreement.

"**Pre-Petition Loan Documents**" means the "Loan Documents" as defined in the Pre-Petition Credit Agreement.

"**Pre-Petition LIFO Obligations**" means all interest, fees and principal owing with respect to the "LIFO Revolving Loans", "LIFO Revolving Loan Commitments" and "LIFO Letters of Credit", in each as such terms are defined in the Pre-Petition Credit Agreement.

"**Pre-Petition Obligations**" means, collectively, all Pre-Petition LIFO Obligations and all Pre-Petition Other Obligations.

"**Pre-Petition Other Obligations**" means all "Obligations" outstanding under (and as defined in) the Pre-Petition Credit Agreement, in each case other than any Pre-Petition LIFO Obligations.

"**Pre-Petition Payments**" means any payment (by way of adequate protection or otherwise) of principal or interest or otherwise on account of any Pre-Petition Indebtedness or other obligations or claims (including trade payables and payments in respect of reclamation and/or Section 503(b)(9) claims) of the Credit Parties.

"**Prepetition Prior Liens**" shall have the meaning set forth in the DIP Orders.

"**Pre-Petition Secured Parties**" means the "Secured Parties" as defined in the Pre-Petition Credit Agreement.

"**Pre-Petition Secured Rate Contracts**" means any "Secured Rate Contracts" as defined in the Pre-Petition Credit Agreement.

"**Prior L/C Loan**" means, collectively, the Prior LIFO L/C Loans and the Prior Original L/C Loans.

"**Prior L/C Reimbursement Obligation**" means, for any Prior Letter of Credit, the obligation of the Borrower to the L/C Issuer thereof or to Agent, as and when matured, to pay all amounts drawn under such Prior Letter of Credit.

"**Prior LIFO L/C Loan**" means any loan made or deemed made by any Prior Revolving Lender hereunder in connection with any Prior LIFO Letter of Credit.

"**Prior Letter of Credit Obligations**" means, collectively, all Prior LIFO Letter of Credit Obligations and all Prior Original Letter of Credit Obligations.

"**Prior LIFO Letter of Credit**" means any "LIFO Letter of Credit" as defined in the Pre-Petition Credit Agreement.

"**Prior LIFO Letter of Credit Obligations**" means all outstanding obligations incurred by Agent and Lenders at the request of the Borrower, whether direct or indirect, contingent or otherwise, due or not due, in connection with the Issuance of Prior LIFO Letters of Credit by L/C Issuers or the purchase of a participation as set forth in Section 1.2 with respect to any Prior LIFO Letter of Credit.  The amount of such Prior LIFO Letter of Credit Obligations shall equal the maximum amount that may be payable by Agent and Lenders thereupon or pursuant thereto

"**Prior Original L/C Loan**" means any loan made or deemed made by any Prior Revolving Lender hereunder in connection with any Prior Letter of Credit that is not a Prior LIFO Letter of Credit.

"**Prior Original Letter of Credit**" means each Prior Letter of Credit that is not a Prior LIFO Letter of Credit.

"**Prior Original Letter of Credit Obligations**" means all outstanding obligations incurred by Agent and Lenders at the request of the Borrower, whether direct or indirect, contingent or otherwise, due or not due, in connection with the Issuance of Prior Original Letters of Credit by L/C Issuers or the purchase of a participation as set forth in Section 1.2 with respect to any Prior Original Letter of Credit.  The amount of such Prior Original Letter of Credit Obligations shall equal the maximum amount that may be payable by Agent and Lenders thereupon or pursuant thereto.

"**Prior Revolving Lender**" means each "Revolving Lender" as defined in the Pre-Petition Credit Agreement as of the Petition Date.

"**Property**" means any interest in any kind of property or asset, whether real, personal or mixed, and whether tangible or intangible.

"**Qualified Bid Deadline**" shall have the meaning set forth in the DIP Orders.

"**Qualified ECP Guarantor**" means, in respect of any Swap Obligation under a Pre-Petition Secured Rate Contract, each Credit Party that has total assets exceeding $10,000,000 at the time the relevant guarantee or grant of the relevant security interest becomes effective with respect to such Swap Obligation under a Pre-Petition Secured Rate Contract or such other person as constitutes an "eligible contract participant" under the Commodity Exchange Act and can cause another person to qualify as an "eligible contract participant" at such time by entering into a keepwell under Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

"**Qualified Purchaser**" means a Person (i) designated by the Agent as a "Qualified Purchaser" in connection with any Credit Bid Transaction, (ii) whose Stock is owned pro rata by the Lenders (based upon the obligations owing to such Lenders and utilized to consummate such Credit Bid Transaction and the obligations owing to all Lenders and utilized to consummate such Credit Bid Transaction) and (iii) whose actions are controlled by the Required DIP Revolving Lenders.

"**Rate Contracts**" means swap agreements (as such term is defined in Section 101 of the Bankruptcy Code) designed to provide protection against fluctuations in interest or currency exchange rates and any other agreements or arrangements designed to provide such protection.

"**Real Estate**" means any real property owned, leased, subleased or otherwise operated or occupied by any Credit Party or any Subsidiary of any Credit Party.

"**Related Persons**" means, with respect to any Person, each Affiliate of such Person and each director, officer, employee, agent, trustee, representative, attorney, accountant and each insurance, environmental, legal, financial and other advisor (including those retained in connection with the satisfaction or attempted satisfaction of any condition set forth in Article II) and other consultants and agents of or to such Person or any of its Affiliates.

"**Releases**" means any release, spill, emission, leaking, pumping, pouring, emitting, emptying, escape, injection, deposit, disposal, discharge, dispersal, dumping, leaching or migration of Hazardous Material into or through the environment.

"**Remedial Action**" means all actions required to (a) clean up, remove, treat or in any other way address any Hazardous Material in the outdoor environment, (b) prevent or minimize any Release so that a Hazardous Material does not migrate or endanger or threaten to endanger public health or welfare or the indoor or outdoor environment or (c) perform pre remedial studies and investigations and post-remedial monitoring and care with respect to any Hazardous Material.

"**Required DIP Revolving Lenders**" means at any time (a) Lenders then holding more than fifty percent (50%) of the sum of the Aggregate DIP Revolving Loan Commitment then in effect or (b) if the Aggregate DIP Revolving Loan Commitments have terminated, Lenders then holding more than fifty percent (50%) of the sum of the aggregate outstanding amount of DIP Revolving Loans and outstanding DIP Letter of Credit Obligations; provided, that so long as there are two or more DIP Revolving Lenders, Required DIP Revolving Lenders shall include at least two (2) DIP Revolving Lenders that each hold not less than ten percent (10%) of (A) the sum of the Aggregate DIP Revolving Loan Commitment then in effect or (B) if the Aggregate DIP Revolving Loan Commitments have terminated, the sum of the aggregate unpaid principal amount of DIP Revolving Loans then outstanding and outstanding DIP Letter of Credit Obligations (Lenders for purposes of this proviso that are Affiliates or Approved Funds of each other shall constitute a single Lender).

"**Required Prior Revolving Lenders**" means the "Required Revolving Lenders" as defined in the Pre-Petition Credit Agreement.

"**Requirement of Law**" means, with respect to any Person, the common law and any federal, state, local, foreign, multinational or international laws, statutes, codes, treaties, standards, rules and regulations, ordinances, orders, judgments, writs, injunctions, decrees (including administrative or judicial precedents or authorities) and the interpretation or administration thereof by, and other determinations, directives, requirements or requests of, any Governmental Authority, in each case whether or not having the force of law and that are applicable to or binding upon such Person or any of its Property or to which such Person or any of its Property is subject.

"**Reserves**" means reserves established by the Agent to ensure the payment of the Carve-Out and other professional expenses and any other reserves established by the Agent in accordance with the DIP Orders.

"**Responsible Officer**" means the chief executive officer or the president of the Borrower or any other officer having substantially the same authority and responsibility; or, with respect to compliance with financial covenants or delivery of financial information, the chief financial officer or the treasurer of the Borrower or any other officer having substantially the same authority and responsibility.

"**Roll-Up Effective Time**" means the moment in time immediately following of the entry of the Final Order by the Bankruptcy Court approving the roll-up of the Pre-Petition Obligations as contemplated therein and herein.

"**Rollup Loans**" means, collectively, the Rollup LIFO Loans and the Rollup Original Loans.

"**Restaurant**" means a "Bar Louie" restaurant owned and operated by the Credit Parties or by a franchisee, as applicable.

"**S&P**" means Standard & Poor's Rating Services.

"**Secured Party**" means Agent, each Lender, each L/C Issuer, each other Indemnitee and each other holder of any Obligation of a Credit Party.

"**Software**" means (a) all computer programs, including source code and object code versions, (b) all data, databases and compilations of data, whether machine readable or otherwise, and (c) all documentation, training materials and configurations related to any of the foregoing.

"**Special Flood Hazard Area**" means an area that FEMA's current flood maps indicate has at least a one percent (1%) chance of a flood equal to or exceeding the base flood elevation (a 100-year flood) in any given year.

"**Sponsor**" means Sun Capital Partners V, L.P.

"**SPV**" means any special purpose funding vehicle identified as such in a writing by any Lender to Agent.

"**Stock**" means all shares of capital stock (whether denominated as common stock or preferred stock), equity interests, beneficial, partnership or membership interests, joint venture interests, participations or other ownership or profit interests in or equivalents (regardless of how designated) of or in a Person (other than an individual), whether voting or non-voting.

"**Stock Equivalents**" means all securities convertible into or exchangeable for Stock or any other Stock Equivalent and all warrants, options or other rights to purchase, subscribe for or otherwise acquire any Stock or any other Stock Equivalent, whether or not presently convertible, exchangeable or exercisable.

"**Subordinated Indebtedness**" means (i) all obligations owing with respect to the Franchise Seller Notes, (ii) all obligations owing with respect to the Subordinated Credit Agreement and (iii) all other Indebtedness of any Credit Party or any Subsidiary of any Credit Party which is subordinated to the Obligations as to right and time of payment and as to other rights and remedies thereunder and having such other terms as are, in each case, reasonably satisfactory to Agent.

"**Subordinated Indebtedness Documents**" means the Subordinated Credit Agreement and documents related thereto.

"**Subordinated Lender**" means BL Restaurants Group Holding Corp., a Delaware corporation.

"**Subordinated Credit Agreement**" means that certain Subordinated Credit Agreement, dated as of August 30, 2017, by and among the Credit Parties and the Subordinated Lender, as the same may be amended.

"**Subordination Agreement**" means that certain Intercreditor Agreement dated as of August 30, 2017 by and among Agent, the Credit Parties and the Subordinated Lender, as the same may be amended, restated and/or modified from time to time subject to the terms thereof.

"**Subsidiary**" means, with respect to any Person, any corporation, partnership, joint venture, limited liability company, association or other entity, the management of which is, directly or indirectly, controlled by, or of which an aggregate of more than fifty percent (50%) of the voting Stock is, at the time, owned or controlled directly or indirectly by, such Person or one or more Subsidiaries of such Person.

"**Supplemental Approved Budget**" means, in respect of the Initial Approved Budget, supplemental or replacement budgets delivered in accordance with Section 4.2(i) and approved in writing by the Agent and Required DIP Revolving Lenders as provided in the DIP Orders (covering any time period covered by a prior budget or covering additional time periods).

"**Swap Obligation**" means, with respect to any Guarantor, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of section 1a(47) of the Commodity Exchange Act.

"**Tax Affiliate**" means, (a) the Borrower and its Subsidiaries. (b) each other Credit Party and (c) any Affiliate of the Borrower with which the Borrower files or is eligible to file consolidated, combined or unitary Tax returns.

"**Termination Event**" shall have the meaning set forth in the DIP Orders.

"**Test Period**" means the immediately preceding fiscal week period ending on the Tuesday immediately preceding the last day on which a Variance Report is required to be delivered pursuant to Section 4.2(p).

"**Title IV Plan**" means a pension plan subject to Title IV of ERISA, other than a Multiemployer Plan, to which any ERISA Affiliate incurs or otherwise has any obligation or liability, contingent or otherwise.

"**Trade Secrets**" means all right, title and interest (and all related IP Ancillary Rights) arising under any Requirement of Law in or relating to trade secrets.

"**Trademark**" means all rights, title and interests (and all related IP Ancillary Rights) arising under any Requirement of Law in or relating to trademarks, trade names, corporate names, company names, business names, fictitious business names, trade styles, service marks, logos and other source or business identifiers and, in each case, all goodwill associated therewith, all registrations and recordations thereof and all applications in connection therewith.

"**UCC**" means the Uniform Commercial Code of any applicable jurisdiction and, if the applicable jurisdiction shall not have any Uniform Commercial Code, the Uniform Commercial Code as in effect from time to time in the State of New York.

"**Ultimate Parent**" means BL Restaurants Group Holding Corp., a Delaware corporation.

"**United States**" and "**U.S.**" each means the United States of America.

"**U.S. Lender Party**" means each of Agent, each Lender, each L/C Issuer, each SPV and each participant, in each case that is a United States person as defined in Section 7701(a)(30) of the Code.

"**Weighted Average Life to Maturity**" means, when applied to any Indebtedness at any date, the number of years obtained by dividing: (a) the sum of the products obtained by multiplying (i) the amount of each then remaining installment or other required payments of principal, including payment at final maturity, in respect thereof, by (ii) the number of years (calculated to the nearest one-twelfth) that will elapse between such date and the making of such payment by (b) the then outstanding principal amount of such Indebtedness; provided that for purposes of determining the Weighted Average Life to Maturity of any Indebtedness that is being modified, refinanced, refunded, renewed, replaced or extended, the effects of any prepayments made on such Indebtedness prior to the date of the applicable extension shall be disregarded.

"**Wholly-Owned Subsidiary**" of a Person means any Subsidiary of such Person, all of the Stock and Stock Equivalents of which (other than directors' qualifying shares required by law) are owned by such Person, either directly or through one or more Wholly-Owned Subsidiaries of such Person.

11.2    Other Interpretive Provisions.

(a)    Defined Terms.  Unless otherwise specified herein or therein, all terms defined in this Agreement or in any other Loan Document shall have the defined meanings when used in any certificate or other document made or delivered pursuant hereto.  The meanings of defined terms shall be equally applicable to the singular and plural forms of the defined terms.  Terms (including uncapitalized terms) not otherwise defined herein and that are defined in the UCC shall have the meanings therein described.

(b)    The Agreement.  The words "**hereof**", "**herein**", "**hereunder**" and words of similar import when used in this Agreement or any other Loan Document shall refer to this Agreement or such other Loan Document as a whole and not to any particular provision of this Agreement or such other Loan Document; and subsection, section, schedule and exhibit references are to this Agreement or such other Loan Documents unless otherwise specified.

(c)    Certain Common Terms.  The term "**documents**" includes any and all instruments, documents, agreements, certificates, indentures, notices and other writings, however evidenced.  The term "**including**" is not limiting and means "including without limitation."

(d)    Performance; Time.  Whenever any performance obligation hereunder or under any other Loan Document (other than a payment obligation) shall be stated to be due or required to be satisfied on a day other than a Business Day, such performance shall be made or satisfied on the next succeeding Business Day.  For the avoidance of doubt, the initial payments of interest and fees relating to the Obligations (other than amounts due on the Closing Date) shall be due and paid on the first day of the first month or quarter, as applicable, following the entry of the Obligations onto the operations systems of Agent, but in no event later than the first day of the second month or quarter, as applicable, following the Closing Date.  In the computation of periods of time from a specified date to a later specified date, the word "**from**" means "from and including"; the words "**to**" and "**until**" each mean "to but excluding", and the word "**through**" means "to and including."  All references to the time of day shall be a reference to New York time.  If any provision of this Agreement or any other Loan Document refers to any action taken or to be taken by any Person, or which such Person is prohibited from taking, such provision shall be interpreted to encompass any and all means, direct or indirect, of taking, or not taking, such action.

(e)    Contracts.  Unless otherwise expressly provided herein or in any other Loan Document, references to agreements and other contractual instruments, including this Agreement and the other Loan Documents, shall be deemed to include all subsequent amendments, thereto, restatements and substitutions thereof and other modifications and supplements thereto which are in effect from time to time, but only to the extent such amendments and other modifications are not prohibited by the terms of any Loan Document.

(f)    Laws.  References to any statute or regulation may be made by using either the common or public name thereof or a specific cite reference and, except as otherwise provided with respect to FATCA, are to be construed as including all statutory and regulatory provisions related thereto or consolidating, amending, replacing, supplementing or interpreting the statute or regulation.

11.3    Accounting Terms and Principles.  All accounting determinations required to be made pursuant hereto shall, unless expressly otherwise provided herein, be made in accordance with GAAP.  Subject, in each case, to the last sentence of Section 5.14, no change in the accounting principles used in the preparation of any financial statement hereafter adopted by the Borrower shall be given effect for purposes of measuring compliance with any provision of Article V or VI unless the Borrower, Agent and the Required DIP Revolving Lenders agree to modify such provisions to reflect such changes in GAAP and, unless such provisions are modified, all financial statements, Compliance Certificates and similar documents provided hereunder shall be provided together with a reconciliation between the calculations and amounts set forth therein before and after giving effect to such change in GAAP.  Notwithstanding any other provision contained herein, all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios referred to in Article V and Article VI shall be made, without giving effect to any election under  Accounting Standards Codification 825-10 (or any other Financial Accounting Standard having a similar result or effect) to value any Indebtedness or other Liabilities of any Credit Party or any Subsidiary of any Credit Party at "fair value."  For purposes of Section 1.3(c) hereof, a breach of a financial covenant contained in

125

Article VI shall be deemed to have occurred as of any date of determination by Agent or as of the last day of any specified measurement period, regardless of when the financial statements reflecting such breach are delivered to Agent.

11.4    <u>Payments</u>.    Agent may set up standards and procedures to determine or redetermine the equivalent in Dollars of any amount expressed in any currency other than Dollars and otherwise may, but shall not be obligated to, rely on any determination made by any Credit Party or any L/C Issuer.  Any such determination or redetermination by Agent shall be conclusive and binding for all purposes, absent manifest error.  No determination or redetermination by any Secured Party or any Credit Party and no other currency conversion shall change or release any obligation of any Credit Party or of any Secured Party (other than Agent and its Related Persons) under any Loan Document, each of which agrees to pay separately for any shortfall remaining after any conversion and payment of the amount as converted.  Agent may round up or down, and may set up appropriate mechanisms to round up or down, any amount hereunder to nearest higher or lower amounts and may determine reasonable *de minimis* payment thresholds.

**[Signature Pages Follow.]**

US-DOCS\112887106.9

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their duly authorized officers as of the day and year first above written.

BORROWER:

**BL RESTAURANT OPERATIONS, LLC**

By: _Thomas S. Fricke_

Name: _Thomas S. Fricke_

Title: _CEO_

FEIN: 27-1547062

Address for notices:
4550 Beltway Drive
Addison, Texas 75001
Attn: Chief Executive Officer

with copies to:

Klehr Harrison Harvey Branzburg LLP
919 North Market Street, Suite 1000
Wilmington, DE 19801
Attn: Domenic E. Pacitti, Esq.

Address for wire transfers:

4550 Beltway Drive
Addison, Texas 75001
Attn: Chief Executive Officer

[Signature Page to Senior Secured Priming and Superpriority Debtor-in-Possession Credit Agreement]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their duly authorized officers as of the day and year first above written.

**BL RESTAURANTS HOLDING, LLC**

By: _Paul C &_

Name: _THOMAS S. FRICKE_

Title: _CEO_

FEIN: 27-154665

Address for notices:
4550 Beltway Drive
Addison, Texas 75001
Attn: Chief Executive Officer

with copies to:

Klehr Harrison Harvey Branzburg LLP
919 North Market Street, Suite 1000
Wilmington, DE 19801
Attn: Domenic E. Pacitti, Esq.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their duly authorized officers as of the day and year first above written.

**BL RESTAURANT FRANCHISES, LLC**

By: _____

Name: THOMAS S. FRICKE

Title: CEO

FEIN: 27-1546923

Address for notices:
4550 Beltway Drive
Addison, Texas 75001
Attn:  Chief Executive Officer

with copies to:

Klehr Harrison Harvey Branzburg LLP
919 North Market Street, Suite 1000
Wilmington, DE  19801
Attn:  Domenic E. Pacitti, Esq.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their duly authorized officers as of the day and year first above written.

**ANTARES CAPITAL LP**, as Agent

By: _____
Name: Jonathan Balch
Title:  Its Duly Authorized Signatory

Address for Notices:

Jonathan Balch
Antares Capital L.P.
7000 Central Parkway; Suite 450
Atlanta, GA  30328

and

Brad Kimme
Antares Capital, LP
500 W. Monroe St.
Chicago, IL 60661

Address for payments:

Michael Read
Senior Operations Analyst
Antares Capital, LP
500 W. Monroe St.
Chicago, IL 60661

[Signature Page to Senior Secured Priming and Superpriority Debtor-in-Possession Credit Agreement]

**MIDCAP FUNDING XVI TRUST**, as a Lender and a Pre-Petition Lender

By:  Apollo Capital Management, L.P
Its:   Investment Manager

By:  Apollo Capital Management GP, LLC
Its:   General Partner

By: _____
Name: Maurice Amsellem
Title: Authorized Signatory


**MIDCAP FUNDING XXX TRUST**, as a Lender and a Pre-Petition Lender

By:  Apollo Capital Management, L.P
Its:   Investment Manager

By:  Apollo Capital Management GP, LLC
Its:   General Partner

By: _____
Name: Maurice Amsellem
Title: Authorized Signatory


**MIDCAP FINANCIAL TRUST**, as a Lender and a Pre-Petition Lender

By:  Apollo Capital Management, L.P
Its:   Investment Manager

By:  Apollo Capital Management GP, LLC
Its:   General Partner

By: _____
Name: Maurice Amsellem
Title: Authorized Signatory


[Signature Page to Senior Secured Priming and Superpriority Debtor-in-Possession Credit Agreement]

**WOODMONT 2017-2 TRUST**, as a Lender and a Pre-Petition Lender

By: MidCap Financial Services Capital Management LLC, as Collateral Manager

By: _____

Name:

Title:

**WOODMONT 2017-3 LP**, as a Lender and a Pre-Petition Lender

By: MidCap Financial Services Capital Management LLC, as Collateral Manager

By: _____

Name:

Title:

**WOODMONT 2018-4 TRUST**, as a Lender and a Pre-Petition Lender

By: MidCap Financial Services Capital Management LLC, as Collateral Manager

By: _____

Name:

Title:

Annex A

Franchise Seller Notes

[see attached]

**THIS NOTE IS SUBJECT TO THE SUBORDINATION PROVISIONS CONTAINED IN SECTION 3 HEREOF, WHICH SECTION, AMONG OTHER THINGS, CONTAINS PROVISIONS DEFINING THE RELATIVE RIGHTS OF CERTAIN CREDITORS OF BL RESTAURANT OPERATIONS, LLC AND ITS AFFILIATES.**

**THIS NOTE IS SUBJECT TO THE PROVISIONS OF THAT CERTAIN AMENDED AND RESTATED ASSET PURCHASE AGREEMENT, DATED AS OF AUGUST 30, 2017, BY AND AMONG BL RESTAURANT OPERATIONS, LLC, A&Z AUBURN HILLS, LLC, A&Z ROCHESTER, LLC, A&Z DEARBORN, LLC, A&Z NOVI, LLC, A&Z HUNTSVILLE, LLC, A&Z COCONUT CREEK, LLC, A&Z GULCH, LLC, A&Z MURFREESBORO, LLC, MATZ TN MANAGEMENT, LLC, ANTHONY MAROUGI, ZUBIN ANTIA AND ANTHONY MAROUGI, AS SELLER REPRESENTATIVE, WHICH, AMONG OTHER THINGS, CONTAINS CERTAIN RIGHTS OF SET-OFF AGAINST THIS NOTE AND CERTAIN PROVISIONS REGARDING THE POTENTIAL ADJUSTMENT OF THE PRINCIPAL AMOUNT OF THIS NOTE.**

**THIS NOTE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR ANY COMPARABLE STATE SECURITIES LAW. EXCEPT AS EXPRESSLY PROVIDED HEREIN, NEITHER THIS NOTE NOR ANY PORTION HEREOF OR INTEREST HEREIN MAY BE SOLD, ASSIGNED, TRANSFERRED, PLEDGED OR OTHERWISE DISPOSED OF UNLESS THE SAME IS REGISTERED UNDER SAID ACT AND APPLICABLE STATE SECURITIES LAWS OR UNLESS AN EXEMPTION FROM SUCH REGISTRATION IS AVAILABLE AND THE COMPANY HAS RECEIVED EVIDENCE OF SUCH EXEMPTION REASONABLY SATISFACTORY TO THE COMPANY.**

**BL RESTAURANT OPERATIONS, LLC**

**SUBORDINATED PROMISSORY NOTE**

**August 30, 2017**                                                                 **$2,300,000**


    BL Restaurant Operations, LLC, a Delaware limited liability company (the "Company"), hereby promises to pay to A&Z Auburn Hills, LLC, a Michigan limited liability company (the "Holder"), the principal amount of $2,300,000 (subject to adjustment pursuant to **Section 2(a)** hereof), together with interest thereon calculated from the date hereof in accordance with the provisions of this Note. All references in this Note to "$" or "dollars" shall mean U.S. dollars.

    This Subordinated Promissory Note (this "Note") was issued pursuant to that certain Amended and Restated Asset Purchase Agreement, dated as of August 30, 2017 (the "Purchase Agreement"), by and among the Company, the Holder, A&Z Rochester, LLC, A&Z Dearborn, LLC, A&Z Novi, LLC, A&Z Huntsville, LLC, A&Z Coconut Creek, LLC, A&Z Gulch, LLC, A&Z Murfreesboro, LLC and MATZ TN Management, LLC, each Michigan limited liability companies, Anthony Marougi ("Marougi"), Zubin Antia ("Antia" and together with Marougi, the "Principals" and each a "Principal"), and Anthony Marougi, as Seller Representative, and this Note is one of the "Restaurant Seller Notes" referred to in the Purchase Agreement. All provisions of the Purchase Agreement are hereby incorporated herein by reference. Except as defined in **Section 5** hereof or unless otherwise indicated herein, capitalized terms used in this Note have the same meanings set forth in the Purchase Agreement.

1. **Interest**.

(a)    Accrual; Payment.  Interest shall accrue from the date hereof until the Maturity Date at the rate of 9.0% (the "Applicable Interest").  The Applicable Interest shall compound annually, commencing on August 30, 2018 by adding the accrued and unpaid interest to the principal amount of this Note and accruing interest on the increased principal amount thereafter.  Any accrued interest which for any reason has not theretofore been paid shall be paid in full on the Maturity Date.

(b)    Offset.  This Note and all amounts payable hereunder (including principal and interest) to the Holder are subject to a right of offset for which the Company or any Purchaser Indemnitees shall be entitled to be indemnified by the Holder as set forth in the Purchase Agreement, including pursuant to Section 8.08 thereof.

2. **Payment of Principal on Note**.

(a)    Scheduled Payment. The Company shall pay the entire principal amount of this Note on the Maturity Date (subject to any automatic reduction in principal amount pursuant to (i) the provisions hereof or (ii) Section 5.20 of the Purchase Agreement as a result of a BLDG Dearborn Adjustment, as finally determined pursuant to Section 5.20 of the Purchase Agreement, which shall require no further action by the Holder), together with all accrued and unpaid interest thereon; provided that (x) any such repayment is not prohibited by **Section 3** hereof or any Subordination Agreement (as hereinafter defined) and, (y) on the Maturity Date, the outstanding principal amount of this Note will be automatically reduced to be equal to the amount of Unrestricted Cash (after taking into account all accrued interest due and payable hereunder) available at the Company at the time of the repayment in full of the Superior Debt if such amount is less than the then outstanding principal amount of this Note (such unpaid principal amount, the "Excess Principal Amount"), in which event, the Excess Principal Amount shall continue to be payable by the Company to the Holder as general unsecured debt and the Holder agrees that in no event will it pursue any grant of a lien, encumbrance or security interest from the Company or any other Person in respect of such Excess Principal Amount.

(b)    Optional Prepayments.  The Company may, at any time and from time to time without premium or penalty, prepay all or any portion of the outstanding principal amount of, or interest on, this Note; provided that such prepayment is not prohibited by **Section 3** hereof or any Subordination Agreement.  In connection with each prepayment of principal hereunder, the Company shall also pay all then accrued and unpaid interest hereunder, subject to **Section 1(b)** above.

(c)    Mandatory Prepayments Upon a Change of Control.  Subject to any Subordination Agreement and **Section 3** hereof, upon a Change of Control, the Company shall pay the outstanding principal amount of this Note (subject to any automatic reduction in principal amount pursuant to the provisions hereof), together with all then accrued and unpaid interest on the principal amount, subject to **Section 1(b)** above; provided, that, the outstanding principal amount of this Note will be automatically reduced on the consummation of such Change of Control to be equal to the amount of Unrestricted Cash (after taking into account all accrued interest due and payable hereunder) available at the Company at the time of repayment in full of the Superior Debt if such amount is less than the then outstanding principal amount of this Note, in which event, such Excess Principal Amount shall continue to be  payable by the Company to the Holder as general unsecured debt and the Holder agrees that in no event will it pursue any grant of a lien, encumbrance or security interest from the Company or any other Person in respect of such Excess Principal Amount.

(d)     Application of Payments.  Payments under this Note shall be applied (i) first, to the payment of then accrued interest hereunder until all such interest is paid and (ii) second, to the repayment of the principal outstanding hereunder.

3.     **Subordination**.

(a)     This Note is subject to the terms of this **Section 3** and of any subordination or intercreditor agreement (or any similar agreement) made and entered into by the Company, the Holder and the other parties thereto (as the same may be amended, modified or restated from time to time in accordance with its terms, a "Subordination Agreement").  Any Subordination Agreement is hereby incorporated herein in full by reference. The holder of this Note, by accepting this Note, agrees that this Note and the obligations hereunder shall be subordinated in right of payment to the extent and in the manner provided in any Subordination Agreement and agrees to execute any subordination agreement, intercreditor or other agreement customary for a seller subordinated note in the sole judgment of the Company or the holder or proposed holder of Superior Debt as requested by the Company or the holder or prospective holder of any Superior Debt or take any other action reasonably required by the holder or prospective holder of any Superior Debt, including without limitation any action necessary to perfect such holder or prospective holder of any Superior Debt's liens or encumbrances on any assets. Anything in this Note to the contrary notwithstanding, the obligations of the Company on or in respect of this Note (including, without limitation, the principal, interest, fees, charges and other amounts due on this Note) shall be subordinate and junior in right of payment, to the extent and in the manner hereinafter set forth, to all Superior Debt.

(b)     In the event that an Insolvency Event occurs upon any acceleration of Superior Debt, then:

(i)     the holders of Superior Debt shall be entitled to receive payment in full in cash on all Superior Debt before the holder of this Note is entitled to receive any payment on account of principal, interest, fees, charges or other amounts due (or past due) upon or in respect of this Note, and the holders of Superior Debt shall be entitled to receive for application in payment thereof any payment or distribution of any kind or character, whether in cash, property or securities or by set-off or otherwise, which may be payable or deliverable in any such proceedings in respect of this Note; and

(ii)     any payment or distribution of assets of the Company, of any kind or character, whether in cash, property or securities, to which the holder of this Note would be entitled except for the provisions of this **Section 3(b)** shall be paid or delivered by the Company directly to the holders of Superior Debt or their duly appointed agents for application of payment according to the priorities of such Superior Debt and ratably among the holders of any class of Superior Debt, for application in payment thereof until all Superior Debt shall have been paid in full in cash.

(c)     In any proceedings with respect to any Insolvency Event, the holders of Superior Debt are authorized:

(i)     to submit and enforce any claims on this Note either in the name of the holders of Superior Debt or in the name of the holder of this Note as the attorney-in-fact of the holder of this Note in the event such claims have not been submitted by the holder of this Note before 10 days prior to the date when submission of such claims is due;

(ii)     to accept and execute receipts for any payment or distribution made with respect to this Note and to apply such payment or distribution to the payment of the Superior Debt; and

(iii)    to take any action and to execute any instruments necessary to effectuate the foregoing, either in the name of the holders of Superior Debt or in the name of the holder of this Note as the attorney-in-fact of the holder of this Note.

(d)    No payment of principal, interest, fees, charges or other amounts due (or past due) upon or in respect of this Note shall be made if there shall have occurred and be continuing or there would exist as a result of such a payment or distribution any default or event of default under any of the terms of any agreement relating to, or instrument evidencing, any Superior Debt, which (whether with or without notice, lapse of time or both) would permit the holder of such Superior Debt to accelerate all or any portion of such Superior Debt (collectively, the "Blockage Events").  The Company shall notify the holder of this Note in writing of the occurrence of a Blockage Event on or prior to the date on which any payment is due; provided, however, that the failure to so notify the holder of this Note shall not nullify the payment prohibitions contained in the first sentence of this **Section 3(d)**.

(e)    Any amendment or modification of the terms of **Section 3** of this Note shall not be effective against any Person who was a holder of Superior Debt prior to or at the time of such amendment or modification unless such holder of Superior Debt so consents, which consent may be withheld for any reason or no reason at all.

(f)    The holders of Superior Debt may, at any time, in their discretion, renew, amend, extend or otherwise modify the terms and provisions of Superior Debt so held or exercise any of their rights under the Superior Debt including, without limitation, the waiver of defaults thereunder and the amendment of any of the terms or provisions thereof (or any notice evidencing or creating the same), all without notice to or assent from the holder of this Note.  No compromise, alteration, amendment, renewal or other change of, or waiver, consent or other action in respect of, any liability or obligation under or in respect of any terms, covenants or conditions of the Superior Debt (or any instrument evidencing or creating the same), whether or not such compromise, alteration, amendment, renewal, change, waiver, consent or other action is in accordance with the provisions of the Superior Debt (or any instrument evidencing or creating the same), shall in any way alter or affect any of the subordination provisions of this Note.

(g)    If, notwithstanding the provisions of **Section 3** of this Note, any payment or distribution of any character (whether in cash, securities or other property) or any security shall be received by the holder of this Note in contravention of this **Section 3** and before all the Superior Debt shall have been paid in full in cash, such payment, distribution or security shall be held in trust for the benefit of, and shall be promptly paid over or delivered or transferred to, the holders of Superior Debt or their duly appointed agents for application of payment according to the priorities of such Superior Debt and ratably among the holders of any class of Superior Debt.  Any such payments received by the holder of this Note and delivered to the holders of the Superior Debt shall be deemed not to be a payment on this Note for any reason whatsoever and the indebtedness under this Note shall remain as if such erroneous payment had never been paid by the Company or received by the holder of this Note.  In the event of the failure of any holder of this Note to endorse or assign any such payment, distribution or security, each holder of any Superior Debt is hereby irrevocably authorized to endorse or assign the same.

(h)    No present or future holder of Superior Debt shall be prejudiced in its right to enforce the provisions of **Section 3** of this Note by any act or failure to act on the part of the Company.

(i)    At any time that any Superior Debt is outstanding (or any commitment to provide indebtedness or other financial accommodations that, if provided, would constitute Superior Debt remains outstanding), the holder of this Note shall not take or continue any action, or exercise or continue to exercise any rights, remedies or powers under the terms of this Note, or exercise or continue to exercise

any other right or remedy at law or equity that such holder might otherwise possess, to collect any amount due and payable in respect of this Note, including, without limitation, the acceleration of this Note, the filing of any petition in bankruptcy or the taking advantage of any other insolvency law of any jurisdiction (and shall discontinue and cease any such actions including if this Note has already been accelerated, the Holder will, promptly upon becoming aware of the existence of any Superior Debt (or any commitment to provide indebtedness or other financial accommodations that, if provided, would constitute Superior Debt), reverse such acceleration), unless and until the Superior Debt shall have been fully and finally paid (whether in cash or such other form of consideration acceptable to the holders of Superior Debt in their sole discretion) and satisfied and all commitments to provide indebtedness or other financial accommodations that, if provided, would constitute Superior Debt shall have expired or have been terminated.  Notwithstanding the foregoing or any permissible action taken by the holder of this Note, the holder of this Note shall not be entitled to receive any payment in contravention of the other provisions of this **Section 3**, including without limitation **Sections 3(b)**, **3(d)** and **3(g)**, but shall be entitled to file proofs of claim and other similar actions to protect its interests under this Note after the occurrence of an Insolvency Event.

(j)      If any payment or distribution to which any holder of this Note would otherwise have been entitled but for the provisions of this **Section 3** shall have been applied, pursuant to the provisions of this **Section 3**, to the payment of Superior Debt, then and in such case and to such extent, the Holder of this Note, following payment in full in cash of the Superior Debt (or, in the sole discretion of the holders of Superior Debt, such other form of consideration acceptable to them in their sole discretion) and expiration or termination of all commitments to provide indebtedness or other financial accommodations that, if provided, would constitute Superior Debt, shall be entitled to receive any and all further payments or distributions applicable to Superior Debt.  Notwithstanding any provision to the contrary in this Note, in no event shall the holder of this Note be subrogated to the rights of the holders of the Superior Debt.

(k)      The provisions of this **Section 3** are solely for the purpose of defining the relative rights of the holders of Superior Debt, on the one hand, and the holder of this Note on the other, against the Company and its assets, and nothing herein is intended to or shall impair, as between the Company and the holder of this Note, the obligations of the Company which are absolute and unconditional, to pay to the holder the principal and interest on this Note as and when they become due and payable in accordance with their terms, or is intended to or will affect the relative rights of the holder of this Note and creditors of the Company other than the holders of the Superior Debt, nor, except as provided in this **Section 3**, will anything herein or therein prevent the holder of this Note from exercising all remedies otherwise permitted by applicable law upon default under this Note subject to the rights, if any, under this **Section 3** of the holders of Superior Debt in respect of cash, property or securities of the Company received upon the exercise of any such remedy and subject to this **Section 3**.

(l)      The Company and the holder of this Note each acknowledge and agree that each holder of Superior Debt is an express third party beneficiary of this Note.

4.      **Events of Default**.

(a)      <u>Definition</u>.  For purposes of this Note, an Event of Default shall be deemed to have occurred if:

(i)      subject to **Section 3** above, any Subordination Agreement and any Superior Debt, the Company fails to pay the full amount of any principal payment on this Note on the Maturity Date, and such failure to pay is not cured within fifteen (15) days after the occurrence thereof; or

(ii)      an Insolvency Event occurs.

The foregoing shall constitute Events of Default whatever the reason or cause for any such Event of Default and whether it is voluntary or involuntary or is effected by operation of law or pursuant to any judgment, decree or order of any court of competent jurisdiction or any order, rule or regulation of any administrative or governmental body having jurisdiction therein.

(b)    Consequences of Events of Default.

(i)    Subject to **Section 3** above, any Subordination Agreement and any Superior Debt, if an Event of Default as a result of an Insolvency Event has occurred, the aggregate principal amount of this Note (together with all then accrued interest thereon, subject to **Section 1(b)** above, and all other amounts due and payable with respect thereto) shall become immediately due and payable without any action on the part of the Holder, and the Company shall immediately pay to the Holder all amounts then due and payable with respect to this Note.

(ii)    Subject to **Section 3** above, any Subordination Agreement and any Superior Debt, if an Event of Default other than of the type described in **Section 4(a)(i)** has occurred, the Holder may declare the aggregate principal amount of this Note (together with all accrued interest thereon and all other amounts due and payable with respect thereto) to be immediately due and payable and the Company shall immediately thereafter pay to the Holder all amounts due and payable with respect to this Note, together with all reasonable costs of collection, including reasonable attorney fees.

(iii)    Subject to **Section 3** above, any Subordination Agreement and any Superior Debt, following an Event of Default, the Holder shall also have any other rights which the Holder may have pursuant to applicable law.

(iv)    Notwithstanding anything herein, if an Event of Default has occurred and there is no Subordination Agreement or Superior Debt then outstanding, the Holder may not (x) declare the aggregate principal amount of this Note (together with all accrued interest thereon and all other amounts due and payable with respect thereto) to be due and payable or require the Company to pay to the Holder all amounts due and payable with respect to this Note or (y) enforce any other rights which the Holder may have pursuant to applicable law, until the expiration of the applicable Standstill Period. If, during (or after) any applicable Standstill Period, the Event(s) of Default which caused the commencement of the applicable Standstill Period are cured or waived in accordance with the provisions of this Note, such Standstill Period, if still in effect, will terminate, without limiting the commencement of another Standstill Period commencing upon the occurrence of any subsequent Event(s) of Default.

**5.**    **Definitions**.    For purposes of this Note, the following capitalized terms have the following meaning.

"Change of Control" means (i) a sale, or other transfer, in one or more transactions, of all or substantially all of the consolidated assets of the Company or of the Parent and its Subsidiaries taken as a whole, (ii) any merger, amalgamation, consolidation, recapitalization or restructuring of the Company or the Parent with or into any corporation, the merger or amalgamation of another corporation into the Company or the sale of capital stock of the Company if the effect is that immediately following such transaction the stockholders, members or partners, as applicable, of the Parent as of the date hereof (together with their respective Affiliates) cease to own or control, in the aggregate, securities possessing at least 50% of the voting power or equity of the Company, (iii) any dividend, distribution or other payment to the holders of the equity interests in the Company or of the Parent and its Subsidiaries of any cash or assets derived from or relating to the sale, transfer or lease, directly or indirectly, in one or more transactions to a Person or Persons that are not Affiliates of the Company or of the Parent and its Subsidiaries, of 50% or more of the assets of the Company or of the Parent and its Subsidiaries taken as a

whole, or (iv) the initial sale of the equity of the Company or of the Parent and its Subsidiaries to the public pursuant to a registration statement filed with the Securities and Exchange Commission under the Securities Act of 1933, as amended.

"Insolvency Event" means the occurrence of any of the following: (i) the Company makes a general assignment for the benefit of creditors; (ii) an order, judgment or decree is entered adjudicating the Company bankrupt or insolvent; (iii) any order for relief with respect to the Company is entered under any applicable bankruptcy law; (iv) the Company petitions or applies to any tribunal for the appointment of a custodian, trustee, receiver or liquidator of the Company or of any substantial part of the assets of the Company, or commences any proceeding relating to the Company under any bankruptcy, reorganization, arrangement, insolvency, readjustment of debt, dissolution or liquidation law of any jurisdiction; or (v) any such petition or application is filed, or any such proceeding is commenced, against the Company and not dismissed or stayed within 60 days.

"Maturity Date" means August 30, 2022.

"Parent" means Sun BL Restaurants, LP, a Delaware limited partnership.

"Person" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust (including any beneficiary thereof), a joint venture, an unincorporated organization or a governmental entity or any department, agency or political subdivision thereof.

"Standstill Period" means a period of one hundred eighty (180) days commencing with the date on which an applicable Event of Default has occurred.

"Subsidiary" means, with respect to any Person, any corporation, limited liability company, partnership, association or other business entity of which (i) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof, or (ii) if a limited liability company, partnership, association or other business entity, a majority of the partnership or other similar ownership interest thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more Subsidiaries of that Person or a combination thereof. For purposes hereof, a Person or Persons shall be deemed to have a majority ownership interest in a limited liability company, partnership, association or other business entity if such Person or Persons shall be allocated a majority of limited liability company, partnership, association or other business entity gains or losses or shall be or control any managing director or general partner of such limited liability company, partnership, association or other business entity.

"Superior Debt" means all principal of, premium (if any), interest (including, without limitation, interest accruing or that would have accrued but for the filing of a bankruptcy, reorganization or other insolvency proceeding whether or not such interest constitutes an allowable claim in such proceeding) on, and any and all other fees, expense reimbursement obligations, and other amounts due pursuant to the terms of all agreements, documents and instruments providing for, creating, securing or evidencing or otherwise entered into in connection with (i) all "Obligations" under and as defined in that certain Credit Agreement, dated as of March 27, 2014, by and among the Company, as borrower, Antares Capital LP (as successor to General Electric Capital Corporation), as agent, the other affiliates of the Company party thereto as credit parties from time to time and the financial institutions party thereto as lenders from time to time (as the same may be amended, restated, supplemented or otherwise modified from time to time), (ii) all "Obligations" under and as defined in that certain that certain Subordinated Credit Agreement,

dated as of August 30, 2017, by and among the Company, as borrower, BL Restaurants Group Holding Corp., as administrative agent, the other affiliates of the Company party thereto as credit parties from time to time and the lenders party thereto from time to time (as the same may be amended, restated, supplemented or otherwise modified from time to time), (iii) indebtedness for borrowed money of the Company (including, without limitation, guarantees and other contingent obligations with respect to indebtedness for borrowed money of its Subsidiaries or Affiliates) of the type typically held by commercial banks, investment banks, insurance companies and other recognized lending institutions, entities and funds or subsidiaries thereof, whether now outstanding or hereafter created, incurred, assumed or guaranteed which is not by its terms on parity with or subordinated to the Company's obligations under this Note, (iv) obligations evidenced by bonds, debentures, notes or similar instruments, or upon which interest payments are customarily made, of the type typically held by commercial banks, investment banks, insurance companies and other recognized lending institutions, entities and funds or subsidiaries thereof, whether now outstanding or hereafter created, incurred, assumed or guaranteed which is not by its terms on parity with or subordinated to the Company's obligations under this Note, (v) capital leases and similar type of financing, or (vi) any indebtedness for borrowed money of the Company (including, without limitation, guarantees and other contingent obligations with respect to indebtedness for borrowed money of its Subsidiaries or Affiliates) owing to Sun Capital Partners V, L.P. or one or more of its Affiliates, together with renewals, extensions, refundings, refinancings, deferrals, restructurings, amendments and modifications of the items described in (i), (ii), (iii), (iv), (v) and (vi) above.

"Unrestricted Cash" means, as of any date of determination, such cash that does not appear (and is not required to appear) as "restricted" on the consolidated balance sheet of the Company.

**6.     Amendment and Waiver**.  Except with respect to the principal amount of this Note, which may be reduced pursuant to **Section 2(a)** hereof and Section 5.20 of the Purchase Agreement without further action on the part of the Company, the Holder or any other Person, this Note may be amended only with the written consent of the Company and the Holder; provided, however, that the provisions of this **Section 6** and **Section 3** (including any related definitions used in those sections and any other provision of this Note to the extent an amendment, supplement, waiver or other modification of such provision would modify the substance of those sections) may not be amended, modified, waived or terminated without the prior written consent of each holder of Superior Debt then outstanding.

**7.     Assignment and Transfer**.  The Holder shall not sell, assign, transfer, pledge, hypothecate, mortgage, or otherwise encumber this Note; provided, however, that the Holder may assign or transfer all or any portion of this Note upon at least ten days' prior written notice to the Company (a) to either Principal or any corporation, limited liability company or partnership that is, and remains at all times that any amount remains unpaid under his Note, owned and controlled by either Principal, or (b) with the prior written consent of the Company, to a third party acceptable to the Company in its sole discretion.

**8.     Cancellation**.  After all principal and then accrued interest (subject to **Section 1(b)** above) at any time owed on this Note has been paid in full, this Note shall be surrendered to the Company for cancellation and shall not be reissued.

**9.     Payments**.  All payments to be made to the Holder shall be made in U.S. dollars by check or wire transfer.

**10.     Place of Payment**.  Payments of principal and interest shall be delivered to the Holder at such address as is specified by timely prior written notice by the Holder.

11.    <u>**Governing Law**</u>.  All questions concerning the construction, validity, and interpretation of this Note will be governed by and construed in accordance with the domestic laws of the State of Delaware, without giving effect to any choice of law or conflicts of laws provision or rule (whether of the State of Delaware or any other jurisdiction) that would compel the application of the substantive laws of any jurisdiction other than the State of Delaware.

12.    <u>**Waiver of Presentment, Demand and Dishonor**</u>.  The Company hereby waives presentment for payment, protest, demand, notice of protest, notice of nonpayment, and diligence with respect to this Note, and waives and renounces all rights to the benefits of any statute of limitations or any moratorium, appraisement, exemption, or homestead now provided or that hereafter may be provided by any federal or applicable state statute, including but not limited to exemptions provided by or allowed under any applicable bankruptcy laws, both as to itself and as to all of its property, whether real or personal, against the enforcement and collection of the obligations evidenced by this Note and any and all extensions, renewals, and modifications hereof.

13.    <u>**Conflicts**</u>.  In the event of any conflicts between any Subordination Agreement and **Section 3** hereof, the provisions of such Subordination Agreement shall control.

14.    <u>**Business Days**</u>.  If any payment is due, or any time period for giving notice or taking action expires, on a day which is not a Business Day, the payment shall be due and payable on, and the time period shall automatically be extended to, the next day Business Day, and interest shall continue to accrue at the required rate hereunder until any such payment is made.

15.    <u>**Acknowledgement**</u>. The Holder (a) is, by reason of its and its advisors business and financial experience, capable of evaluating the merits and risks of this Note and making an informed investment decision with respect hereto and with respect to the Company's ability to repay the Note, in each case without reliance upon any Affiliate of the Company, and (b) is able to bear the economic and financial risk of the Note.

16.    <u>**Usury Laws**</u>.  It is the intention of the Company and the Holder to conform strictly to all applicable usury laws now or hereafter in force, and any interest payable under this Note shall be subject to reduction to the amount not in excess of the maximum legal amount allowed under the applicable usury laws as now or hereafter construed by the courts having jurisdiction over such matters. The aggregate of all interest (whether designated as interest, service charges, points, or otherwise) contracted for, chargeable, or receivable under this Note shall under no circumstances exceed the maximum legal rate upon the unpaid principal balance of this Note remaining unpaid from time to time.  If such interest does exceed the maximum legal rate, it shall be deemed a mistake and such excess shall be canceled automatically and, if theretofore paid, rebated to the Company or credited on the principal amount of this Note, or if this Note has been repaid, then such excess shall be rebated to the Company.

17.    <u>**Waiver of Jury Trial**</u>.  TO THE EXTENT PERMITTED BY APPLICABLE LAW, EACH OF THE PARTIES TO THIS NOTE HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS NOTE OR THE TRANSACTIONS CONTEMPLATED HEREBY.

18.    <u>**Notices**</u>.  Any notices to Holder under this Note shall be given in accordance with the notice provisions of Section 10.02 of the Purchase Agreement.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

**IN WITNESS WHEREOF**, the Company has executed and delivered this Subordinated Promissory Note on the date first above written.

**BL RESTAURANT OPERATIONS, LLC**

By:

Name:  Tamara Bebb
Title:   Chief Financial Officer

**A&Z AUBURN HILLS, LLC**

By: _____

Name:    Anthony Marougi

Title:    Managing Member

AFFIDAVIT OF OUT-OF-STATE EXECUTION

STATE OF TEXAS          )
                             ) SS:
COUNTY OF DALLAS     )

I hereby certify that on this 29 day of *August*, 2017, before me, an officer duly authorized in the State aforesaid and in the County aforesaid to take acknowledgements, personally appeared _Tamara Bebb____, the _Chief Financial Officer_ of _BL Restaurant Operations, LLC_ to me known to be the person who executed the attached Subordinated Promissory Note dated *August 30*, 2017 in the principal amount of $ *2,300,000.00* in the State and County aforesaid.

NOTARY SEAL



Notary: *Michelle L. Grass*
Print Name: *Michelle L. Grass*_____
Notary Public, State of _*Texas*_____
My Commission Expires:____*7-14-2020*____

MICHELLE L. GRASS
Notary, Public, State of Texas
Comm. Expires 07-14-2020
Notary ID 197304-7

**THIS NOTE IS SUBJECT TO THE SUBORDINATION PROVISIONS CONTAINED IN SECTION 3 HEREOF, WHICH SECTION, AMONG OTHER THINGS, CONTAINS PROVISIONS DEFINING THE RELATIVE RIGHTS OF CERTAIN CREDITORS OF BL RESTAURANT OPERATIONS, LLC AND ITS AFFILIATES.**

**THIS NOTE IS SUBJECT TO THE PROVISIONS OF THAT CERTAIN AMENDED AND RESTATED ASSET PURCHASE AGREEMENT, DATED AS OF AUGUST 30, 2017, BY AND AMONG BL RESTAURANT OPERATIONS, LLC, A&Z AUBURN HILLS, LLC, A&Z ROCHESTER, LLC, A&Z DEARBORN, LLC, A&Z NOVI, LLC, A&Z HUNTSVILLE, LLC, A&Z COCONUT CREEK, LLC, A&Z GULCH, LLC, A&Z MURFREESBORO, LLC, MATZ TN MANAGEMENT, LLC, ANTHONY MAROUGI, ZUBIN ANTIA AND ANTHONY MAROUGI, AS SELLER REPRESENTATIVE, WHICH, AMONG OTHER THINGS, CONTAINS CERTAIN RIGHTS OF SET-OFF AGAINST THIS NOTE AND CERTAIN PROVISIONS REGARDING THE POTENTIAL ADJUSTMENT OF THE PRINCIPAL AMOUNT OF THIS NOTE.**

**THIS NOTE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR ANY COMPARABLE STATE SECURITIES LAW. EXCEPT AS EXPRESSLY PROVIDED HEREIN, NEITHER THIS NOTE NOR ANY PORTION HEREOF OR INTEREST HEREIN MAY BE SOLD, ASSIGNED, TRANSFERRED, PLEDGED OR OTHERWISE DISPOSED OF UNLESS THE SAME IS REGISTERED UNDER SAID ACT AND APPLICABLE STATE SECURITIES LAWS OR UNLESS AN EXEMPTION FROM SUCH REGISTRATION IS AVAILABLE AND THE COMPANY HAS RECEIVED EVIDENCE OF SUCH EXEMPTION REASONABLY SATISFACTORY TO THE COMPANY.**

**BL RESTAURANT OPERATIONS, LLC**

**SUBORDINATED PROMISSORY NOTE**

**August 30, 2017**                                                                                          **$2,300,000**

     BL Restaurant Operations, LLC, a Delaware limited liability company (the "Company"), hereby promises to pay to A&Z Novi, LLC, a Michigan limited liability company (the "Holder"), the principal amount of $2,300,000 (subject to adjustment pursuant to **Section 2(a)** hereof), together with interest thereon calculated from the date hereof in accordance with the provisions of this Note.  All references in this Note to "$" or "dollars" shall mean U.S. dollars.

     This Subordinated Promissory Note (this "Note") was issued pursuant to that certain Amended and Restated Asset Purchase Agreement, dated as of August 30, 2017 (the "Purchase Agreement"), by and among the Company, the Holder, A&Z Auburn Hills, LLC, A&Z Rochester, LLC, A&Z Dearborn, LLC, A&Z Huntsville, LLC, A&Z Coconut Creek, LLC, A&Z Gulch, LLC, A&Z Murfreesboro, LLC and MATZ TN Management, LLC, each Michigan limited liability companies, Anthony Marougi ("Marougi"), Zubin Antia ("Antia" and together with Marougi, the "Principals" and each a "Principal"), and Anthony Marougi, as Seller Representative, and this Note is one of the "Restaurant Seller Notes" referred to in the Purchase Agreement.  All provisions of the Purchase Agreement are hereby incorporated herein by reference.  Except as defined in **Section 5** hereof or unless otherwise indicated herein, capitalized terms used in this Note have the same meanings set forth in the Purchase Agreement.

1.     **Interest**.

(a)     _Accrual; Payment_.  Interest shall accrue from the date hereof until the Maturity Date at the rate of 9.0% (the "_Applicable Interest_").  The Applicable Interest shall compound annually, commencing on August 30, 2018 by adding the accrued and unpaid interest to the principal amount of this Note and accruing interest on the increased principal amount thereafter.  Any accrued interest which for any reason has not theretofore been paid shall be paid in full on the Maturity Date.

(b)     _Offset_.  This Note and all amounts payable hereunder (including principal and interest) to the Holder are subject to a right of offset for which the Company or any Purchaser Indemnitees shall be entitled to be indemnified by the Holder as set forth in the Purchase Agreement, including pursuant to Section 8.08 thereof.

2.     **Payment of Principal on Note**.

(a)     _Scheduled Payment_. The Company shall pay the entire principal amount of this Note on the Maturity Date (subject to any automatic reduction in principal amount pursuant to (i) the provisions hereof or (ii) Section 5.20 of the Purchase Agreement as a result of a BLDG Dearborn Adjustment, as finally determined pursuant to Section 5.20 of the Purchase Agreement, which shall require no further action by the Holder), together with all accrued and unpaid interest thereon; provided that (x) any such repayment is not prohibited by **Section 3** hereof or any Subordination Agreement (as hereinafter defined) and, (y) on the Maturity Date, the outstanding principal amount of this Note will be automatically reduced to be equal to the amount of Unrestricted Cash (after taking into account all accrued interest due and payable hereunder) available at the Company at the time of the repayment in full of the Superior Debt if such amount is less than the then outstanding principal amount of this Note (such unpaid principal amount, the "_Excess Principal Amount_"), in which event, the Excess Principal Amount shall continue to be payable by the Company to the Holder as general unsecured debt and the Holder agrees that in no event will it pursue any grant of a lien, encumbrance or security interest from the Company or any other Person in respect of such Excess Principal Amount.

(b)     _Optional Prepayments_.  The Company may, at any time and from time to time without premium or penalty, prepay all or any portion of the outstanding principal amount of, or interest on, this Note; provided that such prepayment is not prohibited by **Section 3** hereof or any Subordination Agreement.  In connection with each prepayment of principal hereunder, the Company shall also pay all then accrued and unpaid interest hereunder, subject to **Section 1(b)** above.

(c)     _Mandatory Prepayments Upon a Change of Control_.  Subject to any Subordination Agreement and **Section 3** hereof, upon a Change of Control, the Company shall pay the outstanding principal amount of this Note (subject to any automatic reduction in principal amount pursuant to the provisions hereof), together with all then accrued and unpaid interest on the principal amount, subject to **Section 1(b)** above; provided, that, the outstanding principal amount of this Note will be automatically reduced on the consummation of such Change of Control to be equal to the amount of Unrestricted Cash (after taking into account all accrued interest due and payable hereunder) available at the Company at the time of repayment in full of the Superior Debt if such amount is less than the then outstanding principal amount of this Note, in which event, such Excess Principal Amount shall continue to be  payable by the Company to the Holder as general unsecured debt and the Holder agrees that in no event will it pursue any grant of a lien, encumbrance or security interest from the Company or any other Person in respect of such Excess Principal Amount.

(d)     _Application of Payments_.  Payments under this Note shall be applied (i) first, to the payment of then accrued interest hereunder until all such interest is paid and (ii) second, to the repayment of the principal outstanding hereunder.

**3.     Subordination**.

(a)     This Note is subject to the terms of this **Section 3** and of any subordination or intercreditor agreement (or any similar agreement) made and entered into by the Company, the Holder and the other parties thereto (as the same may be amended, modified or restated from time to time in accordance with its terms, a "Subordination Agreement").  Any Subordination Agreement is hereby incorporated herein in full by reference. The holder of this Note, by accepting this Note, agrees that this Note and the obligations hereunder shall be subordinated in right of payment to the extent and in the manner provided in any Subordination Agreement and agrees to execute any subordination agreement, intercreditor or other agreement customary for a seller subordinated note in the sole judgment of the Company or the holder or proposed holder of Superior Debt as requested by the Company or the holder or prospective holder of any Superior Debt or take any other action reasonably required by the holder or prospective holder of any Superior Debt, including without limitation any action necessary to perfect such holder or prospective holder of any Superior Debt's liens or encumbrances on any assets. Anything in this Note to the contrary notwithstanding, the obligations of the Company on or in respect of this Note (including, without limitation, the principal, interest, fees, charges and other amounts due on this Note) shall be subordinate and junior in right of payment, to the extent and in the manner hereinafter set forth, to all Superior Debt.

(b)     In the event that an Insolvency Event occurs upon any acceleration of Superior Debt, then:

(i)     the holders of Superior Debt shall be entitled to receive payment in full in cash on all Superior Debt before the holder of this Note is entitled to receive any payment on account of principal, interest, fees, charges or other amounts due (or past due) upon or in respect of this Note, and the holders of Superior Debt shall be entitled to receive for application in payment thereof any payment or distribution of any kind or character, whether in cash, property or securities or by set-off or otherwise, which may be payable or deliverable in any such proceedings in respect of this Note; and

(ii)     any payment or distribution of assets of the Company, of any kind or character, whether in cash, property or securities, to which the holder of this Note would be entitled except for the provisions of this **Section 3(b)** shall be paid or delivered by the Company directly to the holders of Superior Debt or their duly appointed agents for application of payment according to the priorities of such Superior Debt and ratably among the holders of any class of Superior Debt, for application in payment thereof until all Superior Debt shall have been paid in full in cash.

(c)     In any proceedings with respect to any Insolvency Event, the holders of Superior Debt are authorized:

(i)     to submit and enforce any claims on this Note either in the name of the holders of Superior Debt or in the name of the holder of this Note as the attorney-in-fact of the holder of this Note in the event such claims have not been submitted by the holder of this Note before 10 days prior to the date when submission of such claims is due;

(ii)     to accept and execute receipts for any payment or distribution made with respect to this Note and to apply such payment or distribution to the payment of the Superior Debt; and

(iii)     to take any action and to execute any instruments necessary to effectuate the foregoing, either in the name of the holders of Superior Debt or in the name of the holder of this Note as the attorney-in-fact of the holder of this Note.

(d)     No payment of principal, interest, fees, charges or other amounts due (or past due) upon or in respect of this Note shall be made if there shall have occurred and be continuing or there would exist as a result of such a payment or distribution any default or event of default under any of the terms of any agreement relating to, or instrument evidencing, any Superior Debt, which (whether with or without notice, lapse of time or both) would permit the holder of such Superior Debt to accelerate all or any portion of such Superior Debt (collectively, the "Blockage Events").  The Company shall notify the holder of this Note in writing of the occurrence of a Blockage Event on or prior to the date on which any payment is due; provided, however, that the failure to so notify the holder of this Note shall not nullify the payment prohibitions contained in the first sentence of this **Section 3(d)**.

(e)     Any amendment or modification of the terms of **Section 3** of this Note shall not be effective against any Person who was a holder of Superior Debt prior to or at the time of such amendment or modification unless such holder of Superior Debt so consents, which consent may be withheld for any reason or no reason at all.

(f)     The holders of Superior Debt may, at any time, in their discretion, renew, amend, extend or otherwise modify the terms and provisions of Superior Debt so held or exercise any of their rights under the Superior Debt including, without limitation, the waiver of defaults thereunder and the amendment of any of the terms or provisions thereof (or any notice evidencing or creating the same), all without notice to or assent from the holder of this Note.  No compromise, alteration, amendment, renewal or other change of, or waiver, consent or other action in respect of, any liability or obligation under or in respect of any terms, covenants or conditions of the Superior Debt (or any instrument evidencing or creating the same), whether or not such compromise, alteration, amendment, renewal, change, waiver, consent or other action is in accordance with the provisions of the Superior Debt (or any instrument evidencing or creating the same), shall in any way alter or affect any of the subordination provisions of this Note.

(g)     If, notwithstanding the provisions of **Section 3** of this Note, any payment or distribution of any character (whether in cash, securities or other property) or any security shall be received by the holder of this Note in contravention of this **Section 3** and before all the Superior Debt shall have been paid in full in cash, such payment, distribution or security shall be held in trust for the benefit of, and shall be promptly paid over or delivered or transferred to, the holders of Superior Debt or their duly appointed agents for application of payment according to the priorities of such Superior Debt and ratably among the holders of any class of Superior Debt.  Any such payments received by the holder of this Note and delivered to the holders of the Superior Debt shall be deemed not to be a payment on this Note for any reason whatsoever and the indebtedness under this Note shall remain as if such erroneous payment had never been paid by the Company or received by the holder of this Note.  In the event of the failure of any holder of this Note to endorse or assign any such payment, distribution or security, each holder of any Superior Debt is hereby irrevocably authorized to endorse or assign the same.

(h)     No present or future holder of Superior Debt shall be prejudiced in its right to enforce the provisions of **Section 3** of this Note by any act or failure to act on the part of the Company.

(i)     At any time that any Superior Debt is outstanding (or any commitment to provide indebtedness or other financial accommodations that, if provided, would constitute Superior Debt remains outstanding), the holder of this Note shall not take or continue any action, or exercise or continue to exercise any rights, remedies or powers under the terms of this Note, or exercise or continue to exercise

any other right or remedy at law or equity that such holder might otherwise possess, to collect any amount due and payable in respect of this Note, including, without limitation, the acceleration of this Note, the filing of any petition in bankruptcy or the taking advantage of any other insolvency law of any jurisdiction (and shall discontinue and cease any such actions including if this Note has already been accelerated, the Holder will, promptly upon becoming aware of the existence of any Superior Debt (or any commitment to provide indebtedness or other financial accommodations that, if provided, would constitute Superior Debt), reverse such acceleration), unless and until the Superior Debt shall have been fully and finally paid (whether in cash or such other form of consideration acceptable to the holders of Superior Debt in their sole discretion) and satisfied and all commitments to provide indebtedness or other financial accommodations that, if provided, would constitute Superior Debt shall have expired or have been terminated.  Notwithstanding the foregoing or any permissible action taken by the holder of this Note, the holder of this Note shall not be entitled to receive any payment in contravention of the other provisions of this **Section 3**, including without limitation **Sections 3(b)**, **3(d)** and **3(g)**, but shall be entitled to file proofs of claim and other similar actions to protect its interests under this Note after the occurrence of an Insolvency Event.

(j)  If any payment or distribution to which any holder of this Note would otherwise have been entitled but for the provisions of this **Section 3** shall have been applied, pursuant to the provisions of this **Section 3**, to the payment of Superior Debt, then and in such case and to such extent, the Holder of this Note, following payment in full in cash of the Superior Debt (or, in the sole discretion of the holders of Superior Debt, such other form of consideration acceptable to them in their sole discretion) and expiration or termination of all commitments to provide indebtedness or other financial accommodations that, if provided, would constitute Superior Debt, shall be entitled to receive any and all further payments or distributions applicable to Superior Debt.  Notwithstanding any provision to the contrary in this Note, in no event shall the holder of this Note be subrogated to the rights of the holders of the Superior Debt.

(k)  The provisions of this **Section 3** are solely for the purpose of defining the relative rights of the holders of Superior Debt, on the one hand, and the holder of this Note on the other, against the Company and its assets, and nothing herein is intended to or shall impair, as between the Company and the holder of this Note, the obligations of the Company which are absolute and unconditional, to pay to the holder of this Note the principal and interest on this Note as and when they become due and payable in accordance with their terms, or is intended to or will affect the relative rights of the holder of this Note and creditors of the Company other than the holders of the Superior Debt, nor, except as provided in this **Section 3**, will anything herein or therein prevent the holder of this Note from exercising all remedies otherwise permitted by applicable law upon default under this Note subject to the rights, if any, under this **Section 3** of the holders of Superior Debt in respect of cash, property or securities of the Company received upon the exercise of any such remedy and subject to this **Section 3**.

(l)  The Company and the holder of this Note each acknowledge and agree that each holder of Superior Debt is an express third party beneficiary of this Note.

4.  **Events of Default**.

(a)  <u>Definition</u>.  For purposes of this Note, an Event of Default shall be deemed to have occurred if:

(i)  subject to **Section 3** above, any Subordination Agreement and any Superior Debt, the Company fails to pay the full amount of any principal payment on this Note on the Maturity Date, and such failure to pay is not cured within fifteen (15) days after the occurrence thereof; or

(ii)  an Insolvency Event occurs.

The foregoing shall constitute Events of Default whatever the reason or cause for any such Event of Default and whether it is voluntary or involuntary or is effected by operation of law or pursuant to any judgment, decree or order of any court of competent jurisdiction or any order, rule or regulation of any administrative or governmental body having jurisdiction therein.

(b)     <u>Consequences of Events of Default</u>.

(i)     Subject to **Section 3** above, any Subordination Agreement and any Superior Debt, if an Event of Default as a result of an Insolvency Event has occurred, the aggregate principal amount of this Note (together with all then accrued interest thereon, subject to **Section 1(b)** above, and all other amounts due and payable with respect thereto) shall become immediately due and payable without any action on the part of the Holder, and the Company shall immediately pay to the Holder all amounts then due and payable with respect to this Note.

(ii)     Subject to **Section 3** above, any Subordination Agreement and any Superior Debt, if an Event of Default other than of the type described in **Section 4(a)(i)** has occurred, the Holder may declare the aggregate principal amount of this Note (together with all accrued interest thereon and all other amounts due and payable with respect thereto) to be immediately due and payable and the Company shall immediately thereafter pay to the Holder all amounts due and payable with respect to this Note, together with all reasonable costs of collection, including reasonable attorney fees.

(iii)     Subject to **Section 3** above, any Subordination Agreement and any Superior Debt, following an Event of Default, the Holder shall also have any other rights which the Holder may have pursuant to applicable law.

(iv)     Notwithstanding anything herein, if an Event of Default has occurred and there is no Subordination Agreement or Superior Debt then outstanding, the Holder may not (x) declare the aggregate principal amount of this Note (together with all accrued interest thereon and all other amounts due and payable with respect thereto) to be due and payable or require the Company to pay to the Holder all amounts due and payable with respect to this Note or (y) enforce any other rights which the Holder may have pursuant to applicable law, until the expiration of the applicable Standstill Period. If, during (or after) any applicable Standstill Period, the Event(s) of Default which caused the commencement of the applicable Standstill Period are cured or waived in accordance with the provisions of this Note, such Standstill Period, if still in effect, will terminate, without limiting the commencement of another Standstill Period commencing upon the occurrence of any subsequent Event(s) of Default.

**5.     <u>Definitions</u>**.  For purposes of this Note, the following capitalized terms have the following meaning.

"<u>Change of Control</u>" means (i) a sale, or other transfer, in one or more transactions, of all or substantially all of the consolidated assets of the Company or of the Parent and its Subsidiaries taken as a whole, (ii) any merger, amalgamation, consolidation, recapitalization or restructuring of the Company or the Parent with or into any corporation, the merger or amalgamation of another corporation into the Company or the sale of capital stock of the Company if the effect is that immediately following such transaction the stockholders, members or partners, as applicable, of the Parent as of the date hereof (together with their respective Affiliates) cease to own or control, in the aggregate, securities possessing at least 50% of the voting power or equity of the Company, (iii) any dividend, distribution or other payment to the holders of the equity interests in the Company or of the Parent and its Subsidiaries of any cash or assets derived from or relating to the sale, transfer or lease, directly or indirectly, in one or more transactions to a Person or Persons that are not Affiliates of the Company or of the Parent and its Subsidiaries, of 50% or more of the assets of the Company or of the Parent and its Subsidiaries taken as a

whole, or (iv) the initial sale of the equity of the Company or of the Parent and its Subsidiaries to the public pursuant to a registration statement filed with the Securities and Exchange Commission under the Securities Act of 1933, as amended.

"Insolvency Event" means the occurrence of any of the following: (i) the Company makes a general assignment for the benefit of creditors; (ii) an order, judgment or decree is entered adjudicating the Company bankrupt or insolvent; (iii) any order for relief with respect to the Company is entered under any applicable bankruptcy law; (iv) the Company petitions or applies to any tribunal for the appointment of a custodian, trustee, receiver or liquidator of the Company or of any substantial part of the assets of the Company, or commences any proceeding relating to the Company under any bankruptcy, reorganization, arrangement, insolvency, readjustment of debt, dissolution or liquidation law of any jurisdiction; or (v) any such petition or application is filed, or any such proceeding is commenced, against the Company and not dismissed or stayed within 60 days.

"Maturity Date" means August 30, 2022.

"Parent" means Sun BL Restaurants, LP, a Delaware limited partnership.

"Person" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust (including any beneficiary thereof), a joint venture, an unincorporated organization or a governmental entity or any department, agency or political subdivision thereof.

"Standstill Period" means a period of one hundred eighty (180) days commencing with the date on which an applicable Event of Default has occurred.

"Subsidiary" means, with respect to any Person, any corporation, limited liability company, partnership, association or other business entity of which (i) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof, or (ii) if a limited liability company, partnership, association or other business entity, a majority of the partnership or other similar ownership interest thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more Subsidiaries of that Person or a combination thereof.  For purposes hereof, a Person or Persons shall be deemed to have a majority ownership interest in a limited liability company, partnership, association or other business entity if such Person or Persons shall be allocated a majority of limited liability company, partnership, association or other business entity gains or losses or shall be or control any managing director or general partner of such limited liability company, partnership, association or other business entity.

"Superior Debt" means all principal of, premium (if any), interest (including, without limitation, interest accruing or that would have accrued but for the filing of a bankruptcy, reorganization or other insolvency proceeding whether or not such interest constitutes an allowable claim in such proceeding) on, and any and all other fees, expense reimbursement obligations, and other amounts due pursuant to the terms of all agreements, documents and instruments providing for, creating, securing or evidencing or otherwise entered into in connection with (i) all "Obligations" under and as defined in that certain Credit Agreement, dated as of March 27, 2014, by and among the Company, as borrower, Antares Capital LP (as successor to General Electric Capital Corporation), as agent, the other affiliates of the Company party thereto as credit parties from time to time and the financial institutions party thereto as lenders from time to time (as the same may be amended, restated, supplemented or otherwise modified from time to time), (ii) all "Obligations" under and as defined in that certain that certain Subordinated Credit Agreement,

dated as of August 30, 2017, by and among the Company, as borrower, BL Restaurants Group Holding Corp., as administrative agent, the other affiliates of the Company party thereto as credit parties from time to time and the lenders party thereto from time to time (as the same may be amended, restated, supplemented or otherwise modified from time to time), (iii) indebtedness for borrowed money of the Company (including, without limitation, guarantees and other contingent obligations with respect to indebtedness for borrowed money of its Subsidiaries or Affiliates) of the type typically held by commercial banks, investment banks, insurance companies and other recognized lending institutions, entities and funds or subsidiaries thereof, whether now outstanding or hereafter created, incurred, assumed or guaranteed which is not by its terms on parity with or subordinated to the Company's obligations under this Note, (iv) obligations evidenced by bonds, debentures, notes or similar instruments, or upon which interest payments are customarily made, of the type typically held by commercial banks, investment banks, insurance companies and other recognized lending institutions, entities and funds or subsidiaries thereof, whether now outstanding or hereafter created, incurred, assumed or guaranteed which is not by its terms on parity with or subordinated to the Company's obligations under this Note, (v) capital leases and similar type of financing, or (vi) any indebtedness for borrowed money of the Company (including, without limitation, guarantees and other contingent obligations with respect to indebtedness for borrowed money of its Subsidiaries or Affiliates) owing to Sun Capital Partners V, L.P. or one or more of its Affiliates, together with renewals, extensions, refundings, refinancings, deferrals, restructurings, amendments and modifications of the items described in (i), (ii), (iii), (iv), (v) and (vi) above.

"Unrestricted Cash" means, as of any date of determination, such cash that does not appear (and is not required to appear) as "restricted" on the consolidated balance sheet of the Company.

**6.**     **Amendment and Waiver**.  Except with respect to the principal amount of this Note, which may be reduced pursuant to **Section 2(a)** hereof and Section 5.20 of the Purchase Agreement without further action on the part of the Company, the Holder or any other Person, this Note may be amended only with the written consent of the Company and the Holder; provided, however, that the provisions of this **Section 6** and **Section 3** (including any related definitions used in those sections and any other provision of this Note to the extent an amendment, supplement, waiver or other modification of such provision would modify the substance of those sections) may not be amended, modified, waived or terminated without the prior written consent of each holder of Superior Debt then outstanding.

**7.**     **Assignment and Transfer**.  The Holder shall not sell, assign, transfer, pledge, hypothecate, mortgage, or otherwise encumber this Note; provided, however, that the Holder may assign or transfer all or any portion of this Note upon at least ten days' prior written notice to the Company (a) to either Principal or any corporation, limited liability company or partnership that is, and remains at all times that any amount remains unpaid under his Note, owned and controlled by either Principal, or (b) with the prior written consent of the Company, to a third party acceptable to the Company in its sole discretion.

**8.**     **Cancellation**.  After all principal and then accrued interest (subject to **Section 1(b)** above) at any time owed on this Note has been paid in full, this Note shall be surrendered to the Company for cancellation and shall not be reissued.

**9.**     **Payments**.  All payments to be made to the Holder shall be made in U.S. dollars by check or wire transfer.

**10.**     **Place of Payment**.  Payments of principal and interest shall be delivered to the Holder at such address as is specified by timely prior written notice by the Holder.

**11.    Governing Law**.  All questions concerning the construction, validity, and interpretation of this Note will be governed by and construed in accordance with the domestic laws of the State of Delaware, without giving effect to any choice of law or conflicts of laws provision or rule (whether of the State of Delaware or any other jurisdiction) that would compel the application of the substantive laws of any jurisdiction other than the State of Delaware.

**12.    Waiver of Presentment, Demand and Dishonor**.  The Company hereby waives presentment for payment, protest, demand, notice of protest, notice of nonpayment, and diligence with respect to this Note, and waives and renounces all rights to the benefits of any statute of limitations or any moratorium, appraisement, exemption, or homestead now provided or that hereafter may be provided by any federal or applicable state statute, including but not limited to exemptions provided by or allowed under any applicable bankruptcy laws, both as to itself and as to all of its property, whether real or personal, against the enforcement and collection of the obligations evidenced by this Note and any and all extensions, renewals, and modifications hereof.

**13.    Conflicts**.  In the event of any conflicts between any Subordination Agreement and **Section 3** hereof, the provisions of such Subordination Agreement shall control.

**14.    Business Days**.  If any payment is due, or any time period for giving notice or taking action expires, on a day which is not a Business Day, the payment shall be due and payable on, and the time period shall automatically be extended to, the next day Business Day, and interest shall continue to accrue at the required rate hereunder until any such payment is made.

**15.    Acknowledgement**. The Holder (a) is, by reason of its and its advisors business and financial experience, capable of evaluating the merits and risks of this Note and making an informed investment decision with respect hereto and with respect to the Company's ability to repay the Note, in each case without reliance upon any Affiliate of the Company, and (b) is able to bear the economic and financial risk of the Note.

**16.    Usury Laws**.  It is the intention of the Company and the Holder to conform strictly to all applicable usury laws now or hereafter in force, and any interest payable under this Note shall be subject to reduction to the amount not in excess of the maximum legal amount allowed under the applicable usury laws as now or hereafter construed by the courts having jurisdiction over such matters. The aggregate of all interest (whether designated as interest, service charges, points, or otherwise) contracted for, chargeable, or receivable under this Note shall under no circumstances exceed the maximum legal rate upon the unpaid principal balance of this Note remaining unpaid from time to time.  If such interest does exceed the maximum legal rate, it shall be deemed a mistake and such excess shall be canceled automatically and, if theretofore paid, rebated to the Company or credited on the principal amount of this Note, or if this Note has been repaid, then such excess shall be rebated to the Company.

**17.    Waiver of Jury Trial**.  TO THE EXTENT PERMITTED BY APPLICABLE LAW, EACH OF THE PARTIES TO THIS NOTE HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS NOTE OR THE TRANSACTIONS CONTEMPLATED HEREBY.

**18.    Notices**.  Any notices to Holder under this Note shall be given in accordance with the notice provisions of Section 10.02 of the Purchase Agreement.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the Company has executed and delivered this Subordinated Promissory Note on the date first above written.

BL RESTAURANT OPERATIONS, LLC

By: _____
Name:  Tamara Bebb
Title:    Chief Financial Officer

A&Z NOVI, LLC

By:
Name:   Anthony Marougi
Title:   Managing Member

<u>AFFIDAVIT OF OUT-OF-STATE EXECUTION</u>

STATE OF TEXAS       )
             ) SS:
COUNTY OF DALLAS     )

I hereby certify that on this _29_ day of _August_, 2017, before me, an officer duly authorized in the State aforesaid and in the County aforesaid to take acknowledgements, personally appeared _Tamara Bebb____, the _Chief Financial Officer_ of _BL Restaurant Operations, LLC_ to me known to be the person who executed the attached Subordinated Promissory Note dated _August 30_, 2017 in the principal amount of $_2,300,000.00__ in the State and County aforesaid.

NOTARY SEAL         Notary: _Michelle L. Grass_
              Print Name: _Michelle L. Grass_____
              Notary Public, State of _Texas_____
              My Commission Expires: _7-14-2020____



MICHELLE L. GRASS
Notary, Public, State of Texas
Comm. Expires 07-14-2020
Notary ID 197304-7

EXHIBIT 1.1(c)
TO
CREDIT AGREEMENT

FORM OF LETTER OF CREDIT REQUEST

[NAME OF L/C ISSUER], as L/C Issuer
under the Credit Agreement referred to below

Attention:

_____ __, 20__

   Re:  BL Restaurant Operations, LLC (the "Borrower")

   Reference is made to the Senior Secured Priming and Superpriority Debtor-In-Possession Credit Agreement, dated as of January 27, 2020 (as the same may be amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), by and among the Borrower, the other Credit Parties party thereto, the Lenders and L/C Issuers party thereto and Antares Capital LP, as Agent for the Lenders and L/C Issuers.  Capitalized terms used herein without definition are used as defined in the Credit Agreement.

   The Borrower hereby gives you notice, irrevocably, pursuant to Section 1.1(c) of the Credit Agreement, of its request for your Issuance of a DIP Letter of Credit, in the form attached hereto, for the benefit of [Name of Beneficiary], in the amount of $_____, to be issued on _____, ____ (the "Issue Date") with an expiration date of _____, ____.

   The undersigned hereby certifies that, except as set forth on Schedule A attached hereto, the following statements are true on the date hereof and will be true on the Issue Date, both before and after giving effect to the Issuance of the DIP Letter of Credit requested above and any Loan to be made or any other Letter of Credit to be Issued on or before the Issue Date:

     (i)  the representations and warranties set forth in Article III of the Credit Agreement and elsewhere in the Loan Documents are true and correct in all material respects (without duplication of any materiality qualifier contained therein), except to the extent such representations and warranties expressly relate to an earlier date, in which case such representations and warranties were true and correct in all material respects (without duplication of any materiality qualifier contained therein) as of such date;

     (ii)  no Default or Event of Default has occurred and is continuing;

     (iii)  the aggregate outstanding amount of DIP Revolving Loans does not exceed the Maximum DIP Revolving Loan Balance; and

     (iv)  the aggregate outstanding amount of DIP Letter of Credit Obligations does not exceed $500,00.

[Signature page follows]

BL RESTAURANT OPERATIONS, LLC

By: _____

     Name:

     Title:

[Signature Page to Letter of Credit Request]

EXHIBIT 1.2(b)
to
Credit Agreement

FORM OF NOTICE OF ISSUANCE

[NAME OF L/C ISSUER], as L/C Issuer
under the Credit Agreement referred to below

Attention:

_____ __, 20__

Re:    BL Restaurant Operations, LLC (the "Borrower")

Reference is made to the Senior Secured Priming and Superpriority Debtor-In-Possession Credit Agreement, dated as of January 27, 2020 (as the same may be amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), by and among the Borrower, the other Credit Parties party thereto, the Lenders and L/C Issuers party thereto and Antares Capital LP, as Agent for the Lenders and L/C Issuers. Capitalized terms used herein without definition are used as defined in the Credit Agreement.

The Borrower hereby gives you notice, irrevocably, pursuant to Section 1.2(b) of the Credit Agreement, of its request for your [renewal][extension] of the Prior Letter of Credit more fully described on Schedule A hereto, in the form attached hereto, for the benefit of [Name of Beneficiary], in the amount of $_____, to be [renewed][extended] on _____, ____ (the "Issue Date") with an expiration date of _____, ____.

The undersigned hereby certifies that, except as set forth on Schedule A attached hereto, the following statements are true on the date hereof and will be true on the Issue Date, both before and after giving effect to the [renewal][extension] of the Prior Letter of Credit requested above and any Loan to be made or any other Letter of Credit to be Issued on or before the Issue Date:

(i)    the representations and warranties set forth in Article III of the Credit Agreement and elsewhere in the Loan Documents are true and correct in all material respects (without duplication of any materiality qualifier contained therein), except to the extent such representations and warranties expressly relate to an earlier date, in which case such representations and warranties were true and correct in all material respects (without duplication of any materiality qualifier contained therein) as of such date; and

(ii)    no Default or Event of Default has occurred and is continuing.

[Signature page follows]

BL RESTAURANT OPERATIONS, LLC

By: _____

Name:
Title:

Schedule A

Prior Letter of Credit

| **Issuer** | **Date Issued** | **Face Amount** | **L/C #** |
|---|---|---|---|
|  |  |  |  |

EXHIBIT 1.8
TO
CREDIT AGREEMENT

FORM OF NOTICE OF CONVERSION/CONTINUATION

ANTARES CAPITAL LP,
as Agent under the Credit Agreement referred to below

_____ __, ____

Attention:

      Re:    <u>BL Restaurant Operations, LLC (the "Borrower")</u>

Reference is made to the Senior Secured Priming and Superpriority Debtor-In-Possession Credit Agreement, dated as of January 27, 2020 (as the same may be amended, restated, supplemented or otherwise modified from time to time, the "<u>Credit Agreement</u>"), by and among the Borrower, the other Credit Parties party thereto, the Lenders and L/C Issuers party thereto and Antares Capital LP, as Agent for the Lenders and L/C Issuers. Capitalized terms used herein and not otherwise defined herein are used herein as defined in the Credit Agreement.

The Borrower hereby gives you irrevocable notice, pursuant to <u>Section 1.8</u> of the Credit Agreement of its request for the following:

      (i)    a continuation, on _____, ____, as LIBOR Rate Loans having an Interest Period of ___ months of [Prior LIFO L/C Loans] [Prior Original L/C Loans] [DIP Revolving Loans] [Rollup LIFO Loans] [Rollup Original Loans] in an aggregate outstanding principal amount of $_____ having an Interest Period ending on the proposed date for such continuation;

      (ii)    a conversion, on _____, ____, to LIBOR Rate Loans having an Interest Period of ___ months of [Prior LIFO L/C Loans] [Prior Original L/C Loans] [DIP Revolving Loans] [Rollup LIFO Loans] [Rollup Original Loans] in an aggregate outstanding principal amount of $_____; and

      (iii)    a conversion, on _____, ____, to Base Rate Loans, of [Prior LIFO L/C Loans] [Prior Original L/C Loans] [DIP Revolving Loans] [Rollup LIFO Loans] [Rollup Original Loans] in an aggregate outstanding principal amount of $_____.

In connection herewith, the undersigned hereby certifies that, except as set forth on Schedule A attached hereto, no Default or Event of Default has occurred and is continuing on the date hereof, both before and after giving effect to any Loan to be made or Letter of Credit to be Issued on or before any date for any proposed conversion or continuation set forth above.

[Signature page follows]

1

BL RESTAURANT OPERATIONS, LLC

By: _____
Name:
Title:

Schedule A

EXHIBIT 2.1
TO
CREDIT AGREEMENT

CLOSING CHECKLIST

[See Attached]

US-DOCS\113140651.3

**SENIOR SECURED PRIMING AND SUPERPRIORITY DEBTOR-IN-POSSESSION
CREDIT AGREEMENT**

**Dated as of January 27, 2020**

**by and among**

**BL RESTAURANT OPERATIONS, LLC,**

**as the Borrower, Debtor and Debtor-in-Possession,**

**THE OTHER PERSONS PARTY THERETO THAT ARE
DESIGNATED AS CREDIT PARTIES,**
**as Debtors and Debtors-in-Possession,**

**ANTARES CAPITAL LP**
**as Agent for all Lenders,**

**THE OTHER FINANCIAL INSTITUTIONS PARTY THERETO**

**as Lenders,**

**and**

**ANTARES CAPITAL LP,**
**as Sole Lead Arranger and Bookrunner**

Set forth below is a Closing Checklist, which lists documents and information delivered in connection with that certain Senior Secured Priming and Superpriority Debtor-in-Possession Credit Agreement (the "***Credit Agreement***") listed herein as Document No. 1, the other Loan Documents and the transactions contemplated thereunder.  Each capitalized term used but not defined herein shall have the meaning ascribed to such term in the Credit Agreement and all section references herein are to Sections of the Credit Agreement, unless otherwise indicated.  All documents are dated as of January 27, 2020 unless otherwise indicated.

I.        <u>**PARTIES**</u>

A.      **Agent —** Antares Capital, as Agent

B.      **Antares Capital —** Antares Capital LP, a Delaware limited partnership

C.      **BLRF —** BL Restaurant Franchises, LLC, a Delaware limited liability company

D.      **Borrower —** BL Restaurant Operations, LLC, a Delaware limited liability company

E.      **Guarantors —** Holdings and BLRF (collectively with Borrower, the "Credit Parties")

F.      **Holdings —** BL Restaurants Holding, LLC, a Delaware limited liability company

II.        <u>**COUNSEL TO PARTIES**</u>

A.      **L&W —** Latham & Watkins LLP, counsel to Agent

B.      **MLB —** Morgan, Lewis & Bockius, LLP, counsel to Credit Parties

1

| Action or Document | Responsibility | Executed by | Status |
|---|---|---|---|
| **PRINCIPAL LOAN DOCUMENTS** | | | |
| 1.  Senior Secured Priming and Superpriority Debtor-in-Possession Credit Agreement | L&W US/112887106 | Borrower Guarantors Agent Lenders | |
| 2.  Annexes to Credit Agreement | --- | --- | |
| (i)    Annex A: Franchise Seller Notes | MLB | --- | |
| 3.  Exhibits to Credit Agreement | --- | --- | |
| (i)    Exhibit 1.1(c): Form of L/C Request | L&W US/113140651 | --- | |
| (ii)    Exhibit 1.2(b): Notice of Issuance | L&W US/113140651 | --- | |
| (iii)    Exhibit 1.8: Form of Notice of Conversion/Continuation | L&W US/112961193 | --- | |
| (iv)    Exhibit 2.1: Closing Checklist | L&W US/112961193 | --- | |
| (v)    Exhibit 4.2(b): Form of Compliance Certificate | L&W US/113146706 | --- | |
| (vi)    Exhibit 11.1(a): Form of Assignment | L&W US/113140651 | --- | |
| (vii)    Exhibit 11.1 (b): Form of Availability Certificate | L&W US/113140888 | --- | |
| (viii)    Exhibit 11.1(c): Form of Notice of Borrowing | L&W US/113140651 | --- | |
| (ix)    Exhibit 11.1(d): Form of DIP Revolving Note | L&W | --- | |

2

| Action or Document | Responsibility | Executed by | Status |
|---|---|---|---|
| | US/113140651 | | |
| (x)    Exhibit 11.1(g): Interim Order | L&W US/112467718 | --- | |
| 4.    Schedules to Credit Agreement | --- | --- | |
| (i)    Schedule 1.1(b): DIP Revolving Loan Commitments | MLB US/113354573 | --- | |
| (ii)    Schedule 1.2: Prior Letters of Credit | MLB US/113354573 | --- | |
| (iii)    Schedule 3.5: Litigation | MLB US/113354573 | --- | |
| (iv)    Schedule 3.7: ERISA | MLB US/113354573 | --- | |
| (v)    Schedule 3.8: Margin Stock | MLB US/113354573 | --- | |
| (vi)    Schedule 3.9: Real Estate | MLB US/113354573 | --- | |
| (vii)    Schedule 3.10: Taxes | MLB US/113354573 | --- | |
| (viii)    Schedule 3.12: Environmental | MLB US/113354573 | --- | |
| (ix)    Schedule 3.15: Labor Relations | MLB US/113354573 | --- | |
| (x)    Schedule 3.17: Brokers' and Transaction Fees | MLB US/113354573 | --- | |
| (xi)    Schedule 3.19: Ventures, Subsidiaries and Affiliates; Outstanding Stock | MLB US/113354573 | --- | |
| (xii)    Schedule 3.20: Jurisdiction of Organization; Chief Executive Office | MLB US/113354573 | --- | |

3

| Action or Document | Responsibility | Executed by | Status |
|---|---|---|---|
| (xiii)    Schedule 3.21: Deposit Accounts and Other Accounts | MLB US/113354573 | --- | |
| (xiv)    Schedule 3.22: Bonding | MLB US/113354573 | --- | |
| (xv)    Schedule 5.1: Liens | MLB US/113354573 | --- | |
| (xvi)    Schedule 5.4: Investments | MLB US/113354573 | --- | |
| (xvii)    Schedule 5.5: Indebtedness | MLB US/113354573 | --- | |
| (xviii)   Schedule 5.9: Contingent Obligations | MLB US/113354573 | --- | |
| (xix)    Schedule 11.1(b): Fiscal Periods | MLB US/113354573 | --- | |
| (xx)    Schedule 11.1(c): Fiscal Quarters | MLB US/113354573 | --- | |
| (xxi)    Schedule 11.1(d): Fiscal Years | MLB US/113354573 | --- | |
| 5.   Notice of Borrowing | MLB | Borrower | |
| **BANKRUPTCY DOCUMENTS** | | | |
| 6.   Interim Order | L&W US/112467718 | --- | |
| 7.   All First Day Orders | MLB/Credit Parties | --- | |
| 8.   Initial Approved Budget | MLB/Credit Parties | --- | |
| **CORPORATE AND ORGANIZATIONAL DOCUMENTS** | | | |
| 9.   Certificates from secretary or assistant secretary of each of the following certifying to (a) articles/certificate of formation, as applicable, and all amendments thereto, certified | MLB/Credit Parties | --- | |

4

| Action or Document | Responsibility | Executed by | Status |
|---|---|---|---|
| by the secretary of the state of incorporation, (b) bylaws/operating agreement, as applicable, and all amendments thereto, (c) resolutions, (d) certificates of good standing/qualifications to do business in the state of formation for each entity and jurisdictions in which such entity is qualified to do business and (e) the incumbency and signatures of the officers or representatives executing the Credit Agreement and the other Loan Documents | | | |
| (i)    Holdings | MLB/Credit Parties | Holdings | |
| (ii)    Borrower | MLB/Credit Parties | Borrower | |
| (iii)    BLRF | MLB/Credit Parties | BLRF | |
| 10. Officer's certificate certifying that (1) since December 31, 2018 there has been no Material Adverse Effect, other than the filing of the Chapter 11 Cases, (2) no litigation, inquiry, injunction or restraining order is pending, entered or threatened that, in the reasonable opinion of the Agent, could reasonably be expected to have a material adverse effect on (i) the transactions contemplated by the Credit Agreement, (ii) the ability of Holdings, the Borrower or any of its Subsidiaries to perform their obligations under the Loan Documents or Pre-Petition Loan Documents, (iii) the rights and remedies of the Agent and the Lenders under the Loan Documents or Pre-Petition Loan Documents, or (iv) the perfection or priority of any security interests granted to the Agent under the Loan Documents, (3) that each of the representations and warranties of the Credit Parties and their Subsidiaries contained in the Credit Agreement, the other Loan Documents or in any document or instrument delivered pursuant to or in connection with the Credit Agreement are true and correct in all material respects and that no Default or Event of Default has occurred | MLB/Credit Parties US/113128628 | Borrower | |

5

| Action or Document | Responsibility | Executed by | Status |
|---|---|---|---|
| and is continuing or would result from the initial borrowings or issuance of letters of credit on the Closing Date and (4) each condition set forth in Article II of the Credit Agreement has been satisfied | | | |
| **UCC DOCUMENTATION** | | | |
| 11. UCC-1 financing statements naming Agent as Secured Party and each Credit Party as Debtor filed in jurisdictions listed on **Exhibit B** hereto | L&W | --- | |

6

**EXHIBIT A**

**SECRETARY'S CERTIFICATES**

| ENTITY | SECRETARY'S CERTIFICATE | CHARTER | OPERATING AGREEMENT / BYLAWS | RESOLUTIONS | GOOD STANDING CERTIFICATE | INCUMBENCY |
|--------|--------|--------|--------|--------|--------|--------|
| Holdings | X | X | X | X | X | X |
| Borrower | X | X | X | X | X | X |
| BLRF | X | X | X | X | X | X |

7

**EXHIBIT B**

**FILING OFFICES**

| CREDIT PARTY | FILLING OFFICE |
|---|---|
| Holdings | DE SOS |
| Borrower | DE SOS |
| BLRF | DE SOS |

8

**EXHIBIT 4.2(b)**

FORM OF
COMPLIANCE CERTIFICATE
BL RESTAURANT OPERATIONS, LLC

Date: _____, 202_

        This Compliance Certificate (this "Certificate") is given by BL Restaurant Operations, LLC, a Delaware limited liability company (the "Borrower"), pursuant to Section 4.2(b) of that certain Senior Secured Priming and Superpriority Debtor-in-Possession Credit Agreement dated as of January 27, 2020, among the Borrower, the other Credit Parties party thereto, Antares Capital LP, as administrative agent (in such capacity, "Agent"), and the Lenders party thereto (as such agreement may be amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement"). Capitalized terms used herein without definition shall have the meanings set forth in the Credit Agreement.

        The officer executing this Certificate is a Responsible Officer of the Borrower and as such is duly authorized to execute and deliver this Certificate on behalf of the Borrower. By executing this Certificate, such officer hereby certifies to Agent, the Lenders and the L/C Issuers, on behalf of the Borrower and not in an individual capacity, that:

        (a)     the financial statements delivered with this Certificate in accordance with Section 4.1(b) of the Credit Agreement are correct and complete and fairly present, in all material respects, in accordance with GAAP the financial position and the results of operations of the Borrower and its Subsidiaries as of the dates of and for the periods covered by such financial statements (subject, in the case of interim financial statements, to normal year-end adjustments and the absence of footnote disclosure);

        (b)     <u>Exhibit A</u> attached hereto is a correct calculation of each of the financial covenants contained in the DIP Orders;

        (c)     as of _____ ___, 202_, no Credit Party or any Subsidiary of any Credit Party owns any Margin Stock **[, except as specified on <u>Exhibit B</u> attached hereto]**;

        (d)     to the best of such officer's knowledge, no Default or Event of Default exists **[except as specified on <u>Exhibit B</u> attached hereto]**; and

        (e)     since the Closing Date and except as disclosed in prior Certificates delivered to Agent, no Credit Party and no Subsidiary of any Credit Party has:

                (i)     changed its legal name, identity, jurisdiction of incorporation, organization or formation or organizational structure or formed or acquired any Subsidiary except as follows: _____;

                (ii)    acquired all or substantially all of the assets of, or merged or consolidated with or into, any Person, except as follows:_____; or

                (iii)   changed its address or otherwise relocated, acquired fee simple title to any real property or entered into any real property leases, except as follows: _____ _____.

IN WITNESS WHEREOF, the Borrower has caused this Certificate to be executed by one of its Responsible Officers this _____ day of _____, 202_.

BL RESTAURANT OPERATIONS, LLC

Name: _____

Title: _____

Note:   Unless otherwise specified, all financial covenants are calculated for the Borrower and its Subsidiaries on a consolidated basis in accordance with GAAP.  All calculations are without duplication.

2

EXHIBIT A
TO COMPLIANCE CERTIFICATE
Covenants

**Covenant 2(e)(i)(I) Total Receipts**

A.  Cumulative cash receipts for applicable test period          $_____

B.  Budgeted "Total Receipts" set forth in Approved Budget for
applicable test period                                           $_____

C.  Required Percentage                                          90%

D.  Required Receipts (B x C)                                    $_____

E.  Is A greater than D                                          Yes/No

**In Compliance**                                               **Yes/No**

## Covenant 2(e)(i)(II) Cash Disbursements

A. Cumulative cash disbursements for applicable test period   $_____

B. KEIP/KERP expenses for applicable test period   $_____

C. Marketing expenses for applicable test period   $_____

D. G&A Expenses for applicable test period   $_____

E. Rent and Facilities Expense for applicable test period   $_____

F. Maintenance & Remodel Capex for applicable test period   $_____

G. Debtor Professionals expenses for applicable test period   $_____

H. Committee Professionals expenses for applicable test period   $_____

I.   Line Item Expenditures for applicable test period (sum of B through H above)   $_____

J. Food, beverage and alcohol costs for applicable test period   $_____

K. Cumulative cash disbursements less Line Item Expenditures and food, beverage and alcohol costs for applicable test period (A minus I minus J above)   $_____

L.   Budgeted "cumulative cash disbursements" less budgeted Line Item Expenditures and budgeted food, beverage and alcohol costs set forth in Approved Budget for applicable test period   $_____

M. Maximum Percentage   110%

N. Maximum cash disbursements (L x M)   $_____

O. Is K greater than N?   Yes/No

**In Compliance**   **Yes/No**

### Covenant 2(e)(ii)(I) KEIP/KERP Line Item Cash Disbursements

A.  Cash disbursements with respect to the line-item identified as KEIP/KERP (the "KEIP/KERP Line Item") for applicable test period

$_____

B. Budgeted cash disbursements with respect to the KEIP/KERP Line Item set forth in Approved Budget for applicable test period

$_____

C.  Is A less than or equal to B

Yes/No

**In Compliance**

**Yes/No**

3

EXHIBIT A
TO COMPLIANCE CERTIFICATE
Covenants

**Covenant 2(e)(ii)(II) Other Line Item Expenditures**

A.  Cash disbursements with respect to Line Item Expenditures other than the KEIP/KERP Line Item for applicable test period (Item I of Covenant 2(e)(i)(II) above minus Item B of Covenant 2(e)(i)(II) above)    $_____

B.  Budgeted cash disbursements with respect to Line Item Expenditures other than the KEIP/KERP Line Item set forth in Approved Budget for applicable test period    $_____

C.  Maximum Percentage    105%

D.  Maximum other Line Item Expenditures (B x C)    $_____

E.  Is A greater than D?    Yes/No

**In Compliance**    **Yes/No**

EXHIBIT A
TO COMPLIANCE CERTIFICATE
Covenants

**Covenant 2(e)(iii)(I) Cumulative Cash Disbursements for Line Item Expenditures**

A. KEIP/KERP expenses for applicable test period                                  $_____

B. Marketing expenses for applicable test period                                     $_____

C. G&A Expenses for applicable test period                                              $_____

D. Rent and Facilities Expense for applicable test period                        $_____

E. Maintenance & Remodel Capex for applicable test period                  $_____

F. Debtor Professionals expenses for applicable test period                    $_____

G. Committee Professionals expenses for applicable test period             $_____

H. Cumulative cash disbursements with respect to all Line Item Expenditures for applicable test period (sum of A through G above)     $_____

I. Budgeted KEIP/KERP expenses set forth in Approved Budget for applicable test period     $_____

J. Budgeted Marketing expenses set forth in Approved Budget for applicable test period     $_____

K. Budgeted G&A Expenses set forth in Approved Budget for applicable test period     $_____

L. Budgeted Rent and Facilities Expense set forth in Approved Budget for applicable test period     $_____

M. Budgeted Maintenance & Remodel Capex set forth in Approved Budget for applicable test period     $_____

N. Budgeted Debtor Professionals expenses set forth in Approved Budget for applicable test period     $_____

O. Budgeted Committee Professionals expenses set forth in Approved Budget for applicable test period     $_____

P. Cumulative budgeted cash disbursements with respect to all Line Item Expenditures set forth in Approved Budget for applicable test period (sum of I through O above)     $_____

Q. Permitted maximum cash disbursements with respect to all Line Item Expenditures for applicable test period (P plus $300,000)     $_____

R. Is H greater than Q                                                                               Yes/No

**In Compliance**                                                                                      **Yes/No**

EXHIBIT A
TO COMPLIANCE CERTIFICATE
Covenants

**Covenant 2(e)(iii)(II) Cumulative Net Cash Flow**

A.  Cumulative net cash flow for applicable test period                    $_____

B.  Budgeted cumulative net cash flow set forth in Approved Budget
for applicable test period                                                 $_____

C.  Permitted minimum cumulative net cash flow for applicable test
period (B minus $150,000)                                                  $_____

D.  Is A less than C                                                       Yes/No

**In Compliance**                                                         **Yes/No**

EXHIBIT A
TO COMPLIANCE CERTIFICATE
Covenants

**Covenant 2(e)(iv) Excess Net Cash Flow**

A.   Cumulative net cash flow from operations for applicable test period                    $_____

B.   Budgeted cumulative net cash flow from operations set forth in Approved Budget for applicable test period                    $_____

C.   Excess cumulative net cash flow from operations for applicable test period (A minus B)                    $_____

D.   Reserve against DIP availability (compare C to chart below)                    $_____

| Amount of Excess NCF | Amount of Reserve |
|---|---|
| Over $1,000,000 but less than or equal to $2,000,000 | $500,000 |
| Over $2,000,000 but less than or equal to $3,000,000 | $1,000,000 |
| Over $3,000,000 but less than or equal to $4,000,000 | $1,500,000 |
| Over $4,000,000 | $2,000,000 |

EXHIBIT B
TO COMPLIANCE CERTIFICATE
Margin Stock and Defaults

[_____]

EXHIBIT 11.1(a)
TO
CREDIT AGREEMENT

FORM OF ASSIGNMENT

This **ASSIGNMENT** (this "Assignment"), dated as of the Effective Date, is entered into between _____ (the "Assignor") and _____ (the "Assignee").

The parties hereto hereby agree as follows:

| | |
|---|---|
| Borrower: | BL Restaurant Operations, LLC, a Delaware limited liability company (the "<u>Borrower</u>") |
| Agent: | Antares Capital LP, as Agent for the Lenders and L/C Issuers (in such capacity and together with its successors and permitted assigns, the "<u>Agent</u>") |
| Credit Agreement: | Senior Secured Priming and Superpriority Debtor-In-Possession Credit Agreement, dated as of January 27, 2020, among the Borrower, the other Credit Parties party thereto, the Lenders and L/C Issuers party thereto and the Agent (as the same may be amended, restated, supplemented or otherwise modified from time to time, the "<u>Credit Agreement</u>"; capitalized terms used herein without definition are used as defined in the Credit Agreement) |
| [Trade Date: | _____, ____]¹ |
| Effective Date: | _____, ____² |

---

¹ Insert for informational purposes only if needed to determine other arrangements between the assignor and the assignee.

² To be filled out by Agent upon entry in the Register.

1

| Loan/ Commitment Assigned[3] | Aggregate amount of Commitments or principal amount of Loans for all Lenders[5] | Aggregate amount of Commitments[4] or principal amount of Loans Assigned[5] | Percentage Assigned[6] |
|---|---|---|---|
| | $_____ | $_____ | ___.____% |
| | $_____ | $_____ | ___.____% |
| | $_____ | $_____ | ___.____% |

[THE REMAINDER OF THIS PAGE WAS INTENTIONALLY LEFT BLANK]

---

[3]     Fill in the appropriate defined term for the type of Loan and/or Commitment under the Credit Agreement that are being assigned under this Assignment.  (e.g., "DIP Revolving Loan Commitment", "Prior LIFO L/C Loans", "Rollup LIFO Loans", etc.)

[4]     In the case of the DIP Revolving Loan Commitment, including DIP Revolving Loans and interests, participations and obligations to participate in  DIP Letter of Credit Obligations.

[5]     Amount to be adjusted by the counterparties to take into account any payments or prepayments made between the Trade Date and the Effective Date.  The aggregate amounts are inserted for informational purposes only to help in calculating the percentages assigned which, themselves, are for informational purposes only.

[6]     Set forth, to at least 9 decimals, the Assigned Interest as a percentage of the aggregate Commitment or Loans in the Facility.  This percentage is set forth for informational purposes only and is not intended to be binding.  The assignments are based on the amounts assigned, not on the percentages listed in this column.

2

Section 1.    Assignment.    Assignor hereby sells and assigns to Assignee, and Assignee hereby purchases and assumes from Assignor, Assignor's rights and obligations in its capacity as Lender under the Credit Agreement (including Liabilities owing to or by Assignor thereunder) and the other Loan Documents, in each case to the extent related to the amounts identified above (the "Assigned Interest").

Section 2.    Representations, Warranties and Covenants of Assignors.    Assignor (a) represents and warrants to Assignee and Agent that (i) it has full power and authority, and has taken all actions necessary for it, to execute and deliver this Assignment and to consummate the transactions contemplated hereby, (ii) it is the legal and beneficial owner of its Assigned Interest and such Assigned Interest is free and clear of any Lien and other adverse claims and (iii) by executing, signing and delivering this Assignment via ClearPar® or any other electronic settlement system designated by Agent, the Person executing, signing and delivering this Assignment on behalf of the Assignor is an authorized signatory for the Assignor and is authorized to execute, sign and deliver this Assignment, (b) makes no other representation or warranty and assumes no responsibility, including with respect to the aggregate amount of the Loans and Commitments, the percentage of the Loans and Commitments represented by the amounts assigned, any statements, representations and warranties made in or in connection with any Loan Document or any other document or information furnished pursuant thereto, the execution, legality, validity, enforceability or genuineness of any Loan Document or any document or information provided in connection therewith and the existence, nature or value of any Collateral, (c) assumes no responsibility (and makes no representation or warranty) with respect to the financial condition of any Credit Party or the performance or nonperformance by any Credit Party of any obligation under any Loan Document or any document provided in connection therewith and (d) attaches any Notes held by it evidencing any part of the Assigned Interest of such Assignor (or, if applicable, an affidavit of loss or similar affidavit therefor) and requests that Agent exchange such Notes for new Notes in accordance with Section 1.4 of the Credit Agreement.

Section 3.    Representations, Warranties and Covenants of Assignees.    Assignee (a) represents and warrants to Assignor and Agent that (i) it has full power and authority, and has taken all actions necessary for Assignee, to execute and deliver this Assignment and to consummate the transactions contemplated hereby, (ii) it is **[not]** an Affiliate or an Approved Fund of _____, a Lender, (iii) it is sophisticated with respect to decisions to acquire assets of the type represented by the Assigned Interest assigned to it hereunder and either Assignee or the Person exercising discretion in making the decision for such assignment is experienced in acquiring assets of such type, (iv) by executing, signing and delivering this Assignment via ClearPar® or any other electronic settlement system designated by Agent, the Person executing, signing and delivering this Assignment on behalf of the Assignee is an authorized signer for the Assignee and is authorized to execute, sign and deliver this Assignment, (b) appoints and authorizes Agent to take such action as administrative agent on its behalf and to exercise such powers under the Loan Documents as are delegated to Agent by the terms thereof, together with such powers as are reasonably incidental thereto, (c) shall perform in accordance with their terms all obligations that, by the terms of the Loan Documents, are required to be performed by it as a Lender, (d) confirms it has received such documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment and shall continue to make its own credit decisions in taking or not taking any action under any Loan

3

Document independently and without reliance upon Agent, any L/C Issuer, any Lender or any other Indemnitee and based on such documents and information as it shall deem appropriate at the time, (e) acknowledges and agrees that, as a Lender, it may receive material non-public information and confidential information concerning the Credit Parties and their Affiliates and their Stock and agrees to use such information in accordance with Section 9.10 of the Credit Agreement, (f) specifies as its applicable Lending Offices (and addresses for notices) the offices at the addresses set forth beneath its name on the signature pages hereof, (g) shall pay to Agent an assignment fee in the amount of $3,500 to the extent such fee is required to be paid under Section 9.9 of the Credit Agreement and (h) to the extent required pursuant to Section 10.1(g)(i) of the Credit Agreement, attaches two completed originals of Forms W-8ECI, W-8BEN, W-8IMY or W-9 and, if applicable, a portfolio interest exemption certificate.

Section 4.    Determination of Effective Date; Register.  Following the due execution and delivery of this Assignment by Assignor, Assignee and, to the extent required by Section 9.9 of the Credit Agreement, the Borrower and/or each L/C Issuer that is a Lender, this Assignment (including its attachments) will be delivered to Agent for its acceptance and recording in the Register.  The effective date of this Assignment (the "Effective Date") shall be the later of (i) the acceptance of this Assignment by Agent and (ii) the recording of this Assignment in the Register.  Agent shall insert the Effective Date when known in the space provided therefor at the beginning of this Assignment.

Section 5.    Effect.  As of the Effective Date, (a) Assignee shall be a party to the Credit Agreement and, to the extent provided in this Assignment, have the rights and obligations of a Lender under the Credit Agreement and (b) Assignor shall, to the extent provided in this Assignment, relinquish its rights (except those surviving the termination of the Commitments and payment in full of the Obligations) and be released from its obligations under the Loan Documents other than those obligations relating to events and circumstances occurring prior to the Effective Date.

Section 6.    Distribution of Payments.  On and after the Effective Date, Agent shall make all payments under the Loan Documents in respect of the Assigned Interest (a) in the case of amounts accrued to but excluding the Effective Date, to Assignor and (b) otherwise, to Assignee.

Section 7.    Miscellaneous.  (a) The parties hereto, to the extent permitted by law, waive all right to trial by jury in any action, suit, or proceeding arising out of, in connection with or relating to, this Assignment and any other transaction contemplated hereby.  This waiver applies to any action, suit or proceeding whether sounding in tort, contract or otherwise.

(b)    On and after the Effective Date, this Assignment shall be binding upon, and inure to the benefit of, the Assignor, Assignee, Agent and their Related Persons and their successors and assigns.

(c)    The laws of the State of New York shall govern all matters arising out of, in connection with or relating to this Assignment, including its validity, interpretation, construction, performance and enforcement (including any claims sounding in contract or tort law arising out of the subject matter hereof and any determinations with respect to post-judgment interest).

4

(d)     This Assignment may be executed in any number of counterparts and by different parties in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.

(e)     Signature pages may be detached from multiple separate counterparts and attached to a single counterpart.  Delivery of an executed signature page of this Assignment by facsimile transmission or Electronic Transmission shall be as effective as delivery of a manually executed counterpart of this Assignment.

[Signature pages follow]

5

IN WITNESS WHEREOF, the parties hereto have caused this Assignment to be executed by their respective officers thereunto duly authorized, as of the date first above written.

[NAME OF ASSIGNOR],
as Assignor

By: _____
Name:
Title:

[NAME OF ASSIGNEE],
as Assignee

By: _____
Name:
Title:

<u>Lending Office for Eurodollar Rate Loans</u>:

[Insert Address (including contact name, fax number and e-mail address)]

<u>Lending Office (and address for notices)</u>
<u>for any other purpose</u>:

[Insert Address (including contact name, fax number and e-mail address)]

[Signature Page to Assignment]

ACCEPTED and AGREED
this __ day of _____ _____:

ANTARES CAPITAL LP,
as Agent

By:_____
    Name:
    Title:

[BL RESTAURANT OPERATIONS, LLC][7]

By:_____
    Name:
    Title:

[NAME OF L/C ISSUER] [7]

By:_____
    Name:
    Title:

---

[7]    Include only if required pursuant to Section 9.9 of the Credit Agreement.

[Signature Page to Assignment]

EXHIBIT 11.1(b)
TO
CREDIT AGREEMENT

FORM OF AVAILABILITY CERTIFICATE

**BL Restaurant Operations, LLC**

_____, 202__[1]

This Availability Certificate (this "Certificate") is given by BL Restaurant Operations, LLC, (the "Borrower"), pursuant to Section 4.2(d) of that certain Senior Secured Priming and Superpriority Debtor-in-Possession Credit Agreement, dated as of January 27, 2020 among the Borrower, the other Credit Parties party thereto, Antares Capital LP, as administrative agent (in such capacity, "Agent"), and as a Lender, and the additional Lenders party thereto (as such agreement may be amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement"). Capitalized terms used herein without definition shall have the meanings set forth in the Credit Agreement.

The officer executing this Certificate is a Responsible Officer of the Borrower and as such is duly authorized to execute and deliver this Certificate on behalf of the Borrower. By executing this Certificate, such officer hereby certifies to Agent, the Lenders and the L/C Issuer(s), on behalf of the Borrower, that:

(a) Attached as <u>Annex A</u> is a true and correct calculation of the Maximum DIP Revolving Loan Balance and Availability under the Credit Agreement as of the above date (the "Calculation Date");

(b) Based on such calculation, Availability as of the Calculation Date is:

$_____

IN WITNESS WHEREOF, the Borrower has caused this Certificate to be executed by one of its Responsible Officers this _____ day of _____, 202__.

_____

Name: _____
Title: _____

---

[1] Borrower Note:  Calculation Date is last day of each calendar month.

ANNEX A
TO
AVAILABILITY CERTIFICATE

**I.    Calculation of Maximum DIP Revolving Loan Balance**

A.    Aggregate DIP Revolving Loan Commitment                          _____

B.    [reserved][2] [Lesser of A above and $8,000,000][3]              _____

C.        Aggregate amount of DIP Letter of Credit Obligations          _____

D.        Reserves                                                      _____

E.        Maximum DIP Revolving Loan Balance (Result of [A][4] [B][5] minus C minus    _____
          D above)

**II.    Calculation of Availability**

*[if calculated prior to the entry of the Final Order by the Bankruptcy Court:]*

[A.    Maximum DIP Revolving Loan Balance (from I.E above)             _____

B.    Outstanding principal balance of DIP Revolving Loans            _____

C.    Result of A minus B above                                       _____

D.    The amount permitted by the Interim Order                       _____

E.    Availability (lesser of C and D above)                          _____

*[if calculated after the entry of the Final Order by the Bankruptcy Court:]*

A.    Maximum DIP Revolving Loan Balance (from I.E above)             _____

B.    Outstanding principal balance of DIP Revolving Loans            _____

C.    Availability (result of A minus B above                         _____

---

[2] Include if calculated at any time after the effectiveness of the Final Order.

[3] Include if calculated at any time prior to the effectiveness of the Final Order.

[4] Include if calculated at any time after the effectiveness of the Final Order.

[5] Include if calculated at any time prior to the effectiveness of the Final Order.

EXHIBIT 11.1(c)
TO
CREDIT AGREEMENT

FORM OF NOTICE OF BORROWING

ANTARES CAPITAL LP,
as Agent under the Credit Agreement referred to below

_____ __, ___

Attention:

      Re:      <u>BL Restaurant Operations, LLC (the "Borrower")</u>

Reference is made to the Senior Secured Priming and Superpriority Debtor-In-Possession Credit Agreement, dated as of January 27, 2020 (as the same may be amended, restated, supplemented or otherwise modified from time to time, the "<u>Credit Agreement</u>"), by and among the Borrower, the other Credit Parties party thereto, the Lenders and L/C Issuers party thereto and Antares Capital LP, as Agent for such Lenders and L/C Issuers. Capitalized terms used herein without definition are used as defined in the Credit Agreement.

The Borrower hereby gives you irrevocable notice, pursuant to <u>Section 1.7</u> of the Credit Agreement, of its request of a Borrowing (the "<u>Proposed Borrowing</u>") under the Credit Agreement and, in connection therewith, sets forth the following information:

      A.    The date of the Proposed Borrowing is _____, ____ (the "<u>Funding Date</u>").

      B.    The aggregate principal amount of requested DIP Revolving Loans is $_____, of which $_____ consists of Base Rate Loans and $_____ consists of LIBOR Rate Loans having an initial Interest Period of _____ months.

The undersigned hereby certifies that, except as set forth on <u>Schedule A</u> attached hereto, the following statements are true on the date hereof and will be true on the Funding Date, both before and after giving effect to the Proposed Borrowing and any other Loan to be made or Letter of Credit to be Issued on or before the Funding Date:

      (i)    the representations and warranties set forth in <u>Article III</u> of the Credit Agreement and elsewhere in the Loan Documents are true and correct in all material respects (without duplication of any materiality qualifier contained therein), except to the extent such representations and warranties expressly relate to an earlier date, in which case such representations and warranties were true and correct in all material respects (without duplication of any materiality qualifier contained therein) as of such date;

(ii)      no Default or Event of Default has occurred and is continuing;

(iii)     the aggregate outstanding amount of DIP Revolving Loans does not exceed the Maximum DIP Revolving Loan Balance;

(iv)     [the Bankruptcy Court has entered the Final Order;][7]

(v)      the sum of (i) the principal amount of the DIP Revolving Loan being requested, plus (ii) the cash that the Credit Parties have on hand as reflected on the books and records of the Credit Parties, plus (iii) the cash receipts that the Credit Parties reasonably expect to receive during the next five (5) Business Day period, does not exceed the sum of (i) the cash disbursements that the Credit Parties reasonably expect to make during the next five (5) Business Day period plus (ii) $500,000;

(vi)     the DIP Orders have not been vacated, stayed, reversed, modified or amended without the Agent's and Required DIP Revolving Lenders' consent and are in full force and effect; and

(vii)    the DIP Orders are not subject of a stay pending either appeal or a motion for reconsideration thereof.

[Signature page follows]

---

[7] Include if (i) the Funding Date is on or after the Interim Period Outside Date (as defined in the Interim Order) or (ii) if the Interim Order has expired.

BL RESTAURANT OPERATIONS, LLC

By: _____
Name:
Title:

US-DOCS\113140651.3

EXHIBIT 11.1(d)
TO
CREDIT AGREEMENT

FORM OF DIP REVOLVING NOTE

Lender:  [NAME OF LENDER]                                      New York, New York
Principal Amount:  $_____                                    _____, 20__

    FOR VALUE RECEIVED, the undersigned, BL Restaurant Operations, LLC, a Delaware limited liability company (the "Borrower"), hereby promises to pay to the Lender set forth above (the "Lender") the Principal Amount set forth above, or, if less, the aggregate unpaid principal amount of all DIP Revolving Loans (as defined in the Credit Agreement referred to below) of the Lender to the Borrower, payable at such times and in such amounts as are specified in the Credit Agreement.

    The Borrower promises to pay interest on the unpaid principal amount of the DIP Revolving Loans from the date made until such principal amount is paid in full, payable at such times and at such interest rates as are specified in the Credit Agreement.  Demand, diligence, presentment, protest and notice of non-payment and protest are hereby waived by the Borrower.

    Both principal and interest are payable in Dollars to Antares Capital LP, as Agent, at the address set forth in the Credit Agreement, in immediately available funds.

    This Note is one of the Notes referred to in, and is entitled to the benefits of, the Senior Secured Priming and Superpriority Debtor-In-Possession Credit Agreement, dated as of January 27, 2020 (as the same may be amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), by and among the Borrower, the other Credit Parties party thereto, the Lenders and the L/C Issuers party thereto and Antares Capital LP, as Agent for the Lenders and L/C Issuers.  Capitalized terms used herein without definition are used as defined in the Credit Agreement.

    The Credit Agreement, among other things, (a) provides for the making of DIP Revolving Loans by the Lender to the Borrower in an aggregate amount not to exceed at any time outstanding the Principal Amount set forth above, the indebtedness of the Borrower resulting from such DIP Revolving Loans being evidenced by this Note, and (b) contains provisions for acceleration of the maturity of the unpaid principal amount of this Note upon the happening of certain stated events and also for prepayments on account of the principal hereof prior to the maturity hereof upon the terms and conditions specified therein.

    This Note is a Loan Document, is entitled to the benefits of the Loan Documents and is subject to certain provisions of the Credit Agreement, including Sections 9.18(b) (Submission to Jurisdiction), 9.19 (Waiver of Jury Trial) and 11.2 (Other Interpretive Provisions) thereof.

This Note is a registered obligation, transferable only upon notation in the Register, and no assignment hereof shall be effective until recorded therein.

The laws of the State of New York shall govern all matters arising out of, in connection with or relating to this Note, including its validity, interpretation, construction, performance and enforcement (including any claims sounding in contract or tort law arising out of the subject matter hereof and any determinations with respect to post-judgment interest).

[Signature page follows]

2

IN WITNESS WHEREOF, the Borrower has caused this Note to be executed and delivered by its duly authorized officer as of the day and year and at the place set forth above.

BL RESTAURANT OPERATIONS, LLC


By: _____
Name:
Title:

Exhibit 11.1(g)

Interim Order

[see attached]

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| BL RESTAURANTS HOLDING, LLC, *et al.*, [1] | ) Case No. 20-(_____) (___) |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) |
| | ) **Related to Docket No. _____** |

### INTERIM ORDER (I) AUTHORIZING DEBTORS TO OBTAIN POSTPETITION FINANCING PURSUANT TO SECTION 364 OF THE BANKRUPTCY CODE, (II) AUTHORIZING THE USE OF CASH COLLATERAL PURSUANT TO SECTION 363 OF THE BANKRUPTCY CODE, (III) GRANTING ADEQUATE PROTECTION TO THE PREPETITION SECURED PARTIES PURSUANT TO SECTIONS 361, 362, 363 AND 364 OF THE BANKRUPTCY CODE, (IV) GRANTING LIENS AND SUPERPRIORITY CLAIMS, (V) MODIFYING AUTOMATIC STAY, AND (VI) SCHEDULING A FINAL HEARING

Upon the motion (the "DIP Motion") of the above-captioned debtors and debtors-in-possession (collectively, the "Debtors") in the above-referenced chapter 11 cases (the "Cases") seeking entry of an interim order (this "Interim Order") pursuant to sections 105, 361, 362, 363(b), 363(c)(2), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 507 and 552 of title 11 of the United States Code (as amended, the "Bankruptcy Code"), Rules 2002, 4001, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), that, among other things:

(i)     authorizes the Debtors designated as "Borrower" and "Guarantors" under, and as defined in, the DIP Credit Agreement (as defined below) (collectively, the "DIP Borrowers") to

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each of the Debtors' respective federal tax identification numbers, are as follows: BL Restaurants Holding, LLC (6665); BL Restaurant Operations, LLC (7062); BL Restaurant Franchises, LLC (6923); and BL Hunt Valley, LLC (9513). The Debtors' headquarters and mailing address is: 4550 Beltway Drive, Addison, TX 75001.

obtain senior secured priming and superpriority postpetition financing, which if approved on a final basis, would consist of (i) a letter of credit facility composed of all existing prepetition Letters of Credit (as defined in the Prepetition First Lien Secured Credit Agreement (as defined below), collectively, the "Prepetition Letters of Credit"), including any renewals thereof (the "LC Facility"), (ii) a revolving credit facility (the "Revolver Facility," and advances thereunder, "Revolver Facility Advances") for up to $22,000,000 in principal, which would include a sublimit of $1,000,000 for Letters of Credit issued from and after the Petition Date (collectively, the "Postpetition Letters of Credit"), and (iii) upon entry of a Final Order (as defined below), the Prepetition First Lien Roll-Up (as defined below) (collectively with the LC Facility and Revolver Facility, the "DIP Facility") pursuant to the terms of (x) this Interim Order, (y) that certain Senior Secured Priming and Superpriority Debtor-in-Possession Credit Agreement, dated as of [the Petition Date] (as the same may be amended, restated, supplemented, or otherwise modified from time to time in accordance with its terms and the terms of the Interim Order, the "DIP Credit Agreement," attached hereto as **Exhibit B**),[2] by and among the DIP Borrowers, Antares Capital LP ("Antares"), as administrative agent for all Lenders (as defined in the DIP Credit Agreement) (in such capacity, the "DIP Agent"), the other financial institutions party to the DIP Credit Agreement as Lenders under the DIP Credit Agreement (the "DIP Lenders" and, together with the DIP Agent and any other party to which DIP Obligations (as defined below) are owed, the "DIP Secured Parties"), and (z) any and all other Loan Documents (as defined in the DIP Credit Agreement, and together with the DIP Credit Agreement, collectively, the "DIP Loan Documents");

---

[2]  Capitalized terms used but not defined herein have the meanings given to them in the DIP Credit Agreement.

(ii)     grants to the DIP Agent, for the benefit of itself and the other DIP Secured Parties, (x) Liens on all of the DIP Collateral (as defined below) pursuant to sections 364(c)(2), (c)(3) and (d) of the Bankruptcy Code, which Liens shall be senior to the Primed Liens (as defined below) and shall be junior solely to any valid, enforceable, and non-avoidable Liens that are (A) in existence on the Petition Date, (B) either perfected as of the Petition Date or perfected subsequent to the Petition Date solely to the extent permitted by section 546(b) of the Bankruptcy Code, and (C) senior in priority to the Prepetition First Liens (as defined below) and Prepetition Second Liens (as defined below) after giving effect to any intercreditor or subordination agreement (all such liens, collectively, the "Prepetition Prior Liens") and (y) pursuant to section 364(c)(1) of the Bankruptcy Code, superpriority administrative expense claims having recourse to all prepetition and postpetition property of the Debtors' estates, now owned or hereafter acquired, including, upon entry of the Final Order, any Debtors' rights under section 506(c) of the Bankruptcy Code and the proceeds thereof;

(iii)    authorizes the Debtors to use "cash collateral," as such term is defined in section 363 of the Bankruptcy Code (the "Cash Collateral"), including, without limitation, Cash Collateral in which the Prepetition Secured Parties (as defined below) and/or the DIP Secured Parties have a Lien or other interest, in each case whether existing on the Petition Date, arising pursuant to this Interim Order or otherwise, and provides the respective Prepetition Secured Parties (as defined below) the Prepetition Secured Parties' Adequate Protection (as defined below) as set forth herein;

(iv)     modifies the automatic stay imposed by section 362 of the Bankruptcy Code solely to the extent necessary to implement and effectuate the terms and provisions of the DIP Loan Documents and this Interim Order;

(v)        authorizes the DIP Borrowers during the Interim Period (as defined below) to:  (A) borrow an aggregate outstanding principal amount not to exceed $8,000,000 composed of advances under the Revolver Facility and the face amount of Postpetition Letters of Credit, and (B) permit to remain outstanding, and fund draws under, the full amount of the LC Facility;

(vi)       schedules a final hearing on the DIP Motion to be held on or prior to the Interim Period Outside Date (the "Final Hearing") to consider entry of a final order which grants all of the relief requested in the DIP Motion on a final basis and which final order shall be in form and substance (including with respect to any subsequent modifications to the form or substance made in response to objections of other creditors or the Court) acceptable to the DIP Agent (the "Final Order"); and

(vii)      waives any applicable stay (including under Bankruptcy Rule 6004) and provides for immediate effectiveness of this Interim Order.

Having considered the DIP Motion, the DIP Credit Agreement, the *Declaration of Howard Meitiner in Support of First Day Motions and Applications* (the "First Day Declaration"), the *Declaration of Howard Meitiner in Support of the DIP Motion* (the "DIP Declaration") and the evidence submitted or proffered at the hearing on this Interim Order (the "Interim Hearing"); and notice of the DIP Motion and the Interim Hearing having been adequate under the circumstances; an Interim Hearing having been held and concluded on January 28, 2020; and it appearing that approval of the interim relief requested in the DIP Motion is necessary to avoid immediate and irreparable harm to the Debtors pending the Final Hearing and otherwise is fair and reasonable and in the best interests of the Debtors, their creditors, their estates and all parties in interest, and is essential for the continued operation of the Debtors' business; and after due deliberation and consideration, and for good and sufficient cause appearing therefor:

**THE COURT MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**

A.        **Petition Date**.  On January 27, 2020 (the "Petition Date"), each of the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of Delaware (this "Court").  The Debtors have continued in the management and operation of their businesses and properties as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No statutory committee of unsecured creditors (if such committee is appointed, the "Committee"), trustee, or examiner has been appointed in the Cases.

B.        **Jurisdiction and Venue**.  This Court has core jurisdiction over the Cases, the DIP Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334.  Venue for the Cases and proceedings on the DIP Motion is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief sought herein are sections 105, 361, 362, 363, 364, 507 and 552 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004, and 9014 and the Local Rules.

C.        **Notice**.  The Interim Hearing was held pursuant to the authorization of Bankruptcy Rule 4001.  Notice of the Interim Hearing and the emergency relief requested in the DIP Motion has been provided by the Debtors, whether by facsimile, electronic mail, overnight courier or hand delivery, to certain parties in interest, including: (i) the Office of the United States Trustee for the District of Delaware (the "United States Trustee"), (ii) those entities or individuals included on the Debtors' list of 20 largest unsecured creditors on a consolidated basis, (iii) the Prepetition First Lien Secured Agent (as defined below), (iv) counsel to the Prepetition First Lien Secured Agent, (v) the DIP Agent, (vi) counsel to the DIP Agent, (vii) the Prepetition Second Lien Secured Agent (as defined below), and (viii) counsel to the Prepetition Second Lien Secured

Agent.  Under the circumstances, such notice of the DIP Motion, the relief requested therein and the Interim Hearing complies with Bankruptcy Rule 4001(b), (c) and (d) and the Local Rules, and no other notice need be provided for entry of this Interim Order.

**D.**  **Debtors' Stipulations Regarding the Prepetition First Lien Secured Credit Facility**.  Without prejudice to the rights of the Committee and other parties in interest solely to the extent set forth in Paragraph 7 below, the Debtors admit, stipulate, acknowledge, and agree (Paragraphs D and E hereof shall be referred to herein collectively as the "Debtors' Stipulations") as follows:

(i)  Prepetition First Lien Secured Credit Facility.  Pursuant to that certain Credit Agreement, dated as of March 27, 2014 (as amended, restated or otherwise modified from time to time prior to the Petition Date, the "Prepetition First Lien Secured Credit Agreement" and, collectively with any other agreements executed or delivered in connection therewith, and all other "Loan Documents" as defined therein, each as may be amended, restated, supplemented, or otherwise modified from time to time, the "Prepetition First Lien Loan Documents"), among (a) BL Restaurant Operations, LLC, as Borrower (as defined in the Prepetition First Lien Secured Credit Agreement, (b) the other Persons party thereto as Credit Parties (as defined in the Prepetition First Lien Secured Credit Agreement) (together with the Borrower, the "Prepetition Credit Parties"), (c) the financial institutions party thereto as "Lenders" (collectively, the "Prepetition First Lien Secured Lenders"), and (d) Antares, as agent (in such capacity, the "Prepetition First Lien Secured Agent" and, together with the Prepetition First Lien Secured Lenders and any other party to which Prepetition First Lien Obligations (as defined below) are owed, the "Prepetition First Lien Secured Parties"), the Prepetition First Lien Secured Parties agreed to extend certain loans and make other financial accommodations to, and issue letters of credit for the account of,

6

the Borrower.  Pursuant to a Guaranty and Security Agreement, dated as of March 27, 2014 (as amended, restated or otherwise modified from time to time prior to the Petition Date, the "Guaranty"), the Credit Parties (as defined in the Prepetition First Lien Secured Credit Agreement) unconditionally guaranteed the Borrower's obligations under the Prepetition First Lien Loan Documents.  All liabilities and other obligations of the Debtors arising under the Prepetition First Lien Loan Documents and applicable law and all other "Obligations" (as defined in the Prepetition First Lien Secured Credit Agreement) shall collectively be referred to herein as the "Prepetition First Lien Obligations."

      (ii)    Prepetition First Liens and Prepetition Collateral.  Pursuant to the Collateral Documents (as defined in the Prepetition First Lien Secured Credit Agreement) (as such documents were amended, restated, supplemented, or otherwise modified from time to time prior to the Petition Date, the "Prepetition First Lien Collateral Documents"), by and among each of the Prepetition Credit Parties and the Prepetition First Lien Secured Agent, each Prepetition Credit Party granted to the Prepetition First Lien Secured Agent, for the benefit of itself and the other Prepetition First Lien Secured Parties, to secure the Prepetition First Lien Obligations, a first priority security interest in and continuing lien (the "Prepetition First Liens") on substantially all of such Prepetition Credit Party's assets and properties (including Cash Collateral) and all proceeds, products, accessions, and profits thereof, in each case whether then owned or existing or thereafter acquired or arising.  All "Collateral," as defined in the Prepetition First Lien Secured Credit Agreement, granted or pledged by the Prepetition Credit Parties pursuant to any Prepetition First Lien Collateral Document or any other Prepetition First Lien Loan Document shall collectively be referred to herein as the "Prepetition First Lien Collateral."  As of the Petition Date, (I) the Prepetition First Liens (a) are valid, binding, enforceable, and perfected liens, (b) were

granted to, or for the benefit of, the Prepetition First Lien Secured Parties for fair consideration and reasonably equivalent value, (c) are not subject to avoidance, recharacterization, or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law (except for the priming contemplated herein), and (d) are subject and subordinate only to (A) the DIP Liens (as defined below), (B) the Carve-Out (as defined below), and (C) the Prepetition Prior Liens (as defined below), and (II) (x) the Prepetition First Lien Obligations constitute legal, valid, and binding obligations of the applicable Debtors, enforceable in accordance with the terms of the applicable Prepetition First Lien Loan Documents (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code), (y) no setoffs, recoupments, offsets, defenses, or counterclaims to any of the Prepetition First Lien Obligations exist, and (z) no portion of the Prepetition First Lien Obligations or any transfers made to any or all of the Prepetition First Lien Secured Parties are subject to avoidance, recharacterization, recovery, subordination, attack, recoupment, offset, counterclaim, defense, or "claim" (as defined in the Bankruptcy Code) of any kind pursuant to the Bankruptcy Code or applicable non-bankruptcy law.

(iii)    <u>Amounts Owed under Prepetition First Lien Loan Documents</u>.  As of the Petition Date, the Debtors owed the Prepetition First Lien Secured Parties, pursuant to the Prepetition First Lien Loan Documents, without defense, counterclaim, or offset of any kind, in respect of loans made and letters of credit issued by the Prepetition First Lien Secured Parties:  (a) an aggregate principal amount of not less than $48,030,501.82 with respect to Term Loans (as defined in the Prepetition First Lien Secured Credit Agreement), an aggregate principal amount of not less than $14,409,875.00 with respect to Revolving Loans (as defined in the Prepetition First

Lien Secured Credit Agreement),[3] and an aggregate face amount of zero dollars ($0.00) with respect to Prepetition Letters of Credit, *plus* (b)(I) all obligations under any Secured Rate Contract, and (II) any other Obligations (each as defined in the Prepetition First Lien Secured Credit Agreement), *plus* (c) all accrued and hereafter accruing and unpaid interest thereon and any additional fees, expenses (including any reasonable attorneys', accountants', appraisers', and financial advisors' fees and expenses that are chargeable or reimbursable under the Prepetition First Lien Loan Documents), and other amounts now or hereafter due under the Prepetition First Lien Loan Documents and applicable law.

(iv)    <u>Release of Claims</u>.  Subject to the reservation of rights set forth in Paragraph 7 below, each Debtor and its estate shall be deemed to have forever waived, discharged, and released each of the Prepetition First Lien Secured Parties and their respective affiliates, assigns or successors and the respective members, managers, equity security holders, affiliates, agents, attorneys, financial advisors, consultants, officers, directors, employees and other representatives of the foregoing (all of the foregoing, collectively, the "<u>Prepetition First Lien Secured Party Releasees</u>") from any and all "claims" (as defined in the Bankruptcy Code), counterclaims, causes of action (including, without limitation, causes of action in the nature of "lender liability"), defenses, setoff, recoupment, other offset rights and other rights of disgorgement or recovery against any and all of the Prepetition First Lien Secured Party Releasees, whether arising at law or in equity, relating to and/or otherwise in connection with the Prepetition First Lien Loan Documents, the Prepetition First Lien Obligations, the Prepetition First Liens, or the debtor-creditor relationship between any of the Prepetition First Lien Secured Parties, on the one hand,

---

[3]  The Revolving Loans are composed of not less than $11,409,875.00 in Original Revolving Loans and $3,000,000.00 in LIFO Revolving Loans (each as defined in the Prepetition First Lien Secured Credit Agreement).

and any of the Prepetition Credit Parties and/or their affiliates, on the other hand, including, without limitation, (I) any recharacterization, subordination, avoidance, disallowance or other claim arising under or pursuant to section 105 or chapter 5 of the Bankruptcy Code or under any other similar provisions of applicable non-bankruptcy law and (II) any right, basis, or action to challenge or object to the amount, validity, or enforceability of the Prepetition First Lien Obligations or any transfers made on account of the Prepetition First Lien Obligations, or the validity, enforceability, priority, or non-avoidability of the Prepetition First Liens.

(v)     Intercreditor Agreement.  The Prepetition First Lien Secured Agent, the Prepetition Credit Parties, and the Prepetition Second Lien Secured Agent (as defined below) are parties to that certain Intercreditor Agreement, dated as of August 30, 2017 (as amended, restated, supplemented, or otherwise modified in accordance with its terms, the "Intercreditor Agreement"), which sets forth subordination and other provisions governing the relative priorities and rights of the Prepetition First Lien Obligations and the Prepetition First Liens, on the one hand, and the Prepetition Second Lien Obligations and the Prepetition Second Liens (each term as defined below), on the other hand.  The Debtors admit, stipulate, and agree that the Intercreditor Agreement was entered into in good faith and is fair and reasonable to the parties thereto and enforceable in accordance with the terms thereof.

E.     **Debtors' Stipulations Regarding the Prepetition Second Lien Secured Credit Facility**.  Without prejudice to the rights of the Committee and other parties in interest to the extent set forth in Paragraph 7 below, the Debtors further admit, stipulate, acknowledge, and agree as follows:

(i)     Prepetition Second Lien Secured Credit Facility.  Pursuant to that certain Subordinated Credit Agreement, dated as of August 30, 2017 (as amended, restated or otherwise

modified from time to time prior to the Petition Date, the "Prepetition Second Lien Secured Credit Agreement," collectively with any other agreements executed or delivered in connection therewith, each as may be amended, restated, supplemented, or otherwise modified from time to time, the "Prepetition Second Lien Loan Documents" and, together with the Prepetition First Lien Loan Documents, collectively the "Prepetition Secured Loan Documents"), among (a) the Persons designated as "Borrower" on the signature pages thereto (the "Prepetition Second Lien Borrowers"), (b) the other Credit Parties (as defined in the Prepetition Second Lien Secured Credit Agreement) party thereto, (c) the financial institutions party thereto as "Lenders" (as defined in the Prepetition Second Lien Secured Credit Agreement) (collectively, the "Prepetition Second Lien Secured Lenders"), and (d) BL Restaurants Group Holding Corp., as agent (in such capacity, the "Prepetition Second Lien Secured Agent" and, together with the Prepetition Second Lien Secured Lenders and any other party to which Prepetition Second Lien Obligations (as defined below) are owed, the "Prepetition Second Lien Secured Parties" and, together with the Prepetition First Lien Secured Parties, the "Prepetition Secured Parties"), the Prepetition Second Lien Secured Parties agreed to extend certain loans and other financial accommodations to the Prepetition Second Lien Borrowers.  All liabilities and other obligations of the Debtors arising under the Prepetition Second Lien Loan Documents and applicable law and all other "Obligations" (as defined in the Prepetition Second Lien Loan Documents) shall collectively be referred to herein as the "Prepetition Second Lien Obligations" and, together with the Prepetition First Lien Obligations, the "Prepetition Secured Obligations."

(ii)    Prepetition Second Liens and Prepetition Collateral.  The Prepetition Second Lien Obligations are secured by Liens granted to the Prepetition Second Lien Secured Agent, for the benefit of the Prepetition Second Lien Secured Parties (the "Prepetition Second

Liens" and, together with the Prepetition First Liens, the "Prepetition Liens"), on substantially all of the Debtors' assets and properties (including Cash Collateral) as set forth in the Prepetition Second Lien Loan Documents, whether then owned or existing or thereafter acquired or arising. All "Collateral," as defined in the Prepetition Second Lien Secured Credit Agreement, granted or pledged by the Debtors pursuant to any Prepetition Second Lien Loan Documents shall collectively be referred to herein as the "Prepetition Second Lien Collateral" and, together with the Prepetition First Lien Collateral, the "Prepetition Collateral."   As of the Petition Date, (I) the Prepetition Second Liens (a) are valid, binding, enforceable, and perfected liens, (b) were granted to, or for the benefit of, the Prepetition Second Lien Secured Parties for fair consideration and reasonably equivalent value, (c) are not subject to avoidance, recharacterization, or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law (except for the priming contemplated herein and as otherwise permitted under the Intercreditor Agreement), and (d) are subject and subordinate only to (A) the DIP Liens (as defined below), (B) the Carve-Out (as defined below), (C) the First Lien Adequate Protection Replacement Liens (as defined below), (D) the Prepetition First Liens, and (E) the Prepetition Prior Liens, and (II) (x) the Prepetition Second Lien Obligations constitute legal, valid, and binding obligations of the applicable Debtors, enforceable in accordance with the terms of the applicable Prepetition Second Lien Loan Documents (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code), (y) no setoffs, recoupments, offsets, defenses, or counterclaims to any of the Prepetition Second Lien Obligations exist, and (z) no portion of the Prepetition Second Lien Obligations or any transfers made to any or all of the Prepetition Second Lien Secured Parties are subject to avoidance, recharacterization, recovery, subordination, attack, recoupment, offset, counterclaim, defense, or "claim" (as defined in the Bankruptcy Code) of any kind pursuant to the Bankruptcy Code or

applicable non-bankruptcy law, except for the priming contemplated herein and as otherwise permitted by the Intercreditor Agreement.

(iii)    <u>Amounts Owed under Prepetition Second Lien Loan Documents</u>. As of the Petition Date, the Debtors owed the Prepetition Second Lien Secured Parties, pursuant to the Prepetition Second Lien Loan Documents, without defense, counterclaim, or offset of any kind, an aggregate principal amount of not less than $24.9 million, *plus* all prepetition accrued or, subject to section 506(b) of the Bankruptcy Code, postpetition accruing and unpaid interest thereon and any additional reasonable fees and expenses (including any reasonable attorneys', accountants', appraisers', and financial advisors' fees and expenses that are chargeable or reimbursable under the Prepetition Second Lien Loan Documents), and other amounts now or hereafter due under the Prepetition Second Lien Loan Documents and applicable law.

(iv)    <u>Release of Claims</u>.    Subject to the Intercreditor Agreement and the reservation of rights set forth in Paragraph 7 below, each Debtor and its estate shall be deemed to have forever waived, discharged, and released each of the Prepetition Second Lien Secured Parties and their respective affiliates, members, managers, equity security holders, agents, attorneys, financial advisors, consultants, officers, directors, and employees (all of the foregoing, collectively, the "<u>Prepetition Second Lien Secured Party Releasees</u>") of any and all "claims" (as defined in the Bankruptcy Code), counterclaims, causes of action (including causes of action in the nature of "lender liability"), defenses, setoff, recoupment, and/or other offset rights against any and all of the Prepetition Second Lien Secured Party Releasees, whether arising at law or in equity, relating to and/or otherwise in connection with the Prepetition Second Lien Loan Documents, Prepetition Second Lien Obligations and the Prepetition Second Liens, or the debtor creditor relationship between any of the Prepetition Second Lien Secured Parties, on the one hand, and any

13

of the Prepetition Second Lien Borrowers and/or their affiliates, on the other hand, including, without limitation, (I) any recharacterization, subordination, avoidance, or other claim arising under or pursuant to section 105 or chapter 5 of the Bankruptcy Code or under any other similar provisions of applicable non-bankruptcy law and (II) any right, basis, or action to challenge or object to the amount, validity, or enforceability of the Prepetition Second Lien Obligations or any transfers made on account of the Prepetition Second Lien Obligations, or the validity, enforceability, priority, or non-avoidability of the Prepetition Second Liens.

F.    **Findings Regarding the DIP Facility**.

(i)    Need for Postpetition Financing.  The Debtors have an immediate need to obtain the DIP Facility and use Cash Collateral to, among other things, permit the orderly continuation of the operation of their businesses, to maintain business relationships with vendors, suppliers, and customers, to make payroll, to make capital expenditures, to satisfy other working capital and operational needs, to complete the Debtors' marketing and sale process, and to otherwise preserve and maximize the value of the Debtors' estates.  The Debtors' access to sufficient working capital and liquidity through the use of Cash Collateral and borrowing under the DIP Facility is vital to a successful sale and/or to otherwise preserve the enterprise value of the Debtors' estates.  Immediate and irreparable harm will be caused to the Debtors and their estates if immediate financing is not obtained and permission to use Cash Collateral is not granted, in each case in accordance with the terms of this Interim Order and the DIP Loan Documents.

(ii)    No Credit Available on More Favorable Terms.  As set forth in the DIP Motion, the First Day Declaration and the DIP Declaration, the Debtors have determined, at the time hereof, that no acceptable financing on more favorable terms is available.  The Debtors are unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense.  The Debtors are also unable to obtain secured credit on terms acceptable

14

to the Debtors allowable only under sections 364(c)(1), 364(c)(2), or 364(c)(3) of the Bankruptcy Code. The Debtors are unable to obtain secured credit under section 364(d)(1) of the Bankruptcy Code without (a) granting to the DIP Secured Parties the rights, remedies, privileges, benefits, and protections provided herein and in the DIP Loan Documents, including, without limitation, the DIP Liens and the DIP Superpriority Claims (each as defined below), (b) allowing the DIP Secured Parties to provide (or to permit to remain outstanding, as applicable) the loans, letters of credit, and other financial accommodations under the DIP Facility on the terms set forth herein and in the DIP Loan Documents (all of the foregoing described in clauses (a) and (b) above, including, without limitation, the DIP Liens and the DIP Superpriority Claims, collectively, the "DIP Protections"), and (c) providing the respective Prepetition Secured Parties the adequate protection more fully described in Paragraphs 4 and 5 below.

G.     **Adequate Protection for Prepetition Secured Parties**. Based on the record at the Interim Hearing, the Prepetition First Lien Secured Parties and the Prepetition Second Lien Secured Parties have negotiated in good faith regarding the Debtors' use of the Prepetition Collateral (including the Cash Collateral) to fund the administration of the Debtors' estates and continued operation of their businesses. The Prepetition First Lien Secured Agent (on behalf of the Prepetition First Lien Secured Parties)[4] and the Prepetition Second Lien Secured Agent (on behalf of the Prepetition Second Lien Secured Parties)[5] have each agreed to permit the Debtors to use the Prepetition Collateral, including the Cash Collateral, during the Interim Period (as defined below), subject to the terms and conditions set forth herein, including the protections afforded a

---

[4]  Prepetition First Lien Secured Parties holding 100% of the Prepetition First Lien Obligations have expressly consented to the entry of this Interim Order and the relief provided herein.

[5]  Prepetition Second Lien Secured Parties holding 100% of the Prepetition Second Lien Obligations have expressly consented to the entry of this Interim Order and the relief provided herein.

party acting in "good faith" under section 364(e) of the Bankruptcy Code. In addition, the DIP Facility contemplated hereby provides for a priming of the Prepetition Liens pursuant to section 364(d) of the Bankruptcy Code. The Prepetition Secured Parties are entitled to adequate protection as set forth herein, including, with respect to the Prepetition First Lien Secured Parties, the Prepetition First Lien Roll-Up (as defined below) upon entry of a Final Order, pursuant to sections 361, 362, 363, and 364 of the Bankruptcy Code. Based on the DIP Motion and the record presented to the Court at the Interim Hearing, the terms of the proposed adequate protection arrangements, use of the Cash Collateral, and the DIP Facility contemplated hereby are fair and reasonable, reflect the Debtors' prudent exercise of business judgment, and constitute reasonably equivalent value and fair consideration for the consent of the Prepetition First Lien Secured Parties and the Prepetition Second Lien Secured Parties.

H.    **Section 552**. In light of the subordination of their Liens and superpriority administrative expense claims to (i) the Carve-Out (as defined below) in the case of the DIP Secured Parties, (ii) the Carve-Out, the DIP Superpriority Claims (as defined below) and the DIP Liens in the case of the Prepetition First Lien Secured Parties, and (iii) the Carve-Out, the DIP Superpriority Claims, the DIP Liens, First Lien Adequate Protection Superpriority Claims, the First Lien Adequate Protection Replacement Liens, and the Prepetition First Liens in the case of the Prepetition Second Lien Secured Parties, each of the DIP Secured Parties and the respective Prepetition Secured Parties is entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and, subject to the entry of the Final Order, the "equities of the case" exception shall not apply.

PHIL1 8615410v.7

I.        **Business Judgment and Good Faith Pursuant to Section 364(e)**.

(i)        Based on the record at the Interim Hearing, the DIP Agent and the other DIP Secured Parties are willing to provide the DIP Facility to the Debtors, and the Prepetition First Lien Secured Parties and the Prepetition Second Lien Secured Parties are willing to consent to the Debtors' use of Cash Collateral, in each case during the Interim Period in accordance with, and pursuant to, this Interim Order and the DIP Loan Documents, as applicable.

(ii)        Based on the record at the Interim Hearing, the terms and conditions of the DIP Facility as set forth in the DIP Loan Documents and this Interim Order, and the fees, expenses, and other charges paid and to be paid thereunder or otherwise in connection therewith, are fair, reasonable, and the best available under the circumstances, and the Debtors' agreement to the terms and conditions of the DIP Loan Documents and to the payment of such fees reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties. Such terms and conditions are supported by reasonably equivalent value and fair consideration.

(iii)        Based on the record at the Interim Hearing, the DIP Facility and the DIP Loan Documents were negotiated in good faith and at arm's length among the Debtors and the DIP Secured Parties with the assistance and counsel of their respective advisors, and all of the DIP Obligations shall be deemed to have been extended by the DIP Secured Parties and their affiliates for valid business purposes and uses and in good faith, as that term is used in section 364(e) of the Bankruptcy Code, and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code or this Interim Order, and the DIP Liens, the DIP Superpriority Claims and the other DIP Protections shall be entitled to the full protection of section 364(e) of the Bankruptcy Code and this Interim Order in the event this Interim Order or any other order or any provision hereof or thereof is vacated, reversed, amended, or modified, on appeal or otherwise.

**J.**      **Relief Essential; Best Interest**.  For the reasons stated above, the Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2), 4001(c)(2), and the Local Rules.  Absent granting the relief set forth in this Interim Order, the Debtors' estates and their ability to successfully sell their assets or otherwise preserve the enterprise value of the Debtors' estates will be immediately and irreparably harmed.  Consummation of the DIP Facility and authorization of the use of Cash Collateral in accordance with this Interim Order and the DIP Loan Documents is therefore in the best interests of the Debtors' estates and consistent with their fiduciary duties.

**NOW, THEREFORE**, on the DIP Motion and the record before this Court with respect to the DIP Motion, and with the consent of the Debtors, the Prepetition First Lien Secured Agent (on behalf of the Prepetition First Lien Secured Parties), the Prepetition Second Lien Secured Agent (on behalf of the Prepetition Second Lien Secured Parties) and the DIP Agent (on behalf of the DIP Secured Parties) to the form and entry of this Interim Order, and good and sufficient cause appearing therefor,

**IT IS ORDERED that**:

1.      **Motion Granted**.  The DIP Motion is hereby granted in accordance with the terms and conditions set forth in this Interim Order.  Any objections to the DIP Motion with respect to the entry of this Interim Order that have not been withdrawn, waived, or settled are hereby denied and overruled.

2.      **DIP Loan Documents and DIP Protections**.

(a)      Approval of DIP Loan Documents.  The Debtors are expressly and immediately authorized to establish the DIP Facility, to execute, deliver, and perform under the DIP Loan Documents and this Interim Order, to incur the DIP Obligations (as defined below)

(including, subject to the entry of the Final Order, conversion of all Prepetition First Lien Obligations into DIP Obligations pursuant to the Prepetition First Lien Roll-Up (as defined below)) in accordance with, and subject to, the terms of this Interim Order and the DIP Loan Documents, and to execute, deliver, and perform under all other instruments, certificates, agreements, and documents which may be required or necessary for the performance by the Debtors under the DIP Loan Documents and the creation and perfection of the DIP Liens described in, and provided for, by this Interim Order and the DIP Loan Documents. The Debtors are hereby authorized to do and perform all acts and pay the principal, interest, fees, expenses, and other amounts described in the DIP Loan Documents as such become due pursuant to the DIP Loan Documents and this Interim Order, including, without limitation, all closing fees, arranger fees, commitment fees, and reasonable attorneys', financial advisors', and accountants' fees, and disbursements arising under the DIP Loan Documents and this Interim Order, which amounts shall not be subject to further approval of this Court, shall be non-refundable and shall not otherwise be subject to a Challenge (as defined below) pursuant to Paragraph 7 hereof or otherwise. Upon their execution and delivery, the DIP Loan Documents shall represent valid and binding obligations of the applicable Debtors enforceable against such Debtors in accordance with their terms. Each officer of a Debtor is authorized to execute and deliver each of the DIP Loan Documents, such execution and delivery to be conclusive evidence of such officer's respective authority to act in the name of and on behalf of the Debtors.

(b)     DIP Obligations.  For purposes of this Interim Order, the term "DIP Obligations" shall mean all amounts and other obligations and liabilities owing by the Debtors under the DIP Loan Documents (including, without limitation, all "Obligations" as defined in the DIP Credit Agreement and, subject to entry of the Final Order, obligations and liabilities owing

by the Debtors on account of the Prepetition First Lien Roll-Up (as defined below)) and shall include, without limitation, the principal of, interest on, fees, costs, expenses, and other charges owing in respect of, such amounts (including, without limitation, any reasonable attorneys', accountants', financial advisors', and other fees, costs, and expenses that are chargeable or reimbursable under the DIP Loan Documents and/or this Interim Order), and any obligations in respect of indemnity claims, whether contingent or otherwise.  In addition, notwithstanding anything to the contrary herein or in any Prepetition First Lien Loan Document or DIP Loan Document, from and after the entry of this Interim Order, the DIP Obligations (and the definition of "DIP Obligations" used in this Interim Order) shall include (i) subject to entry of a Final Order, the aggregate amount of all draws made on Prepetition Letters of Credit that are funded by the Prepetition First Lien Secured Parties from and after the Petition Date in accordance with the Prepetition First Lien Loan Documents and (ii) the aggregate amount of all draws made on Postpetition Letters of Credit that are funded by the DIP Secured Parties from and after the Petition Date in accordance with the DIP Loan Documents.

(c)    Authorization to Incur DIP Obligations.  To enable the Debtors to continue to operate their business, during the period from the entry of this Interim Order through and including the earliest to occur of (i) the entry of the Final Order, (ii) February 28, 2020, and (iii) the Termination Declaration Date (as defined below), in each case unless extended by up to fourteen calendar days by written agreement of the Debtors and the DIP Agent without further order of this Court (such earliest date, as may be extended pursuant to this Paragraph 2(c), the "Interim Period Outside Date" and, the period from the entry of this Interim Order through and including Interim Period Outside Date, the "Interim Period"), and subject to the terms and conditions of this Interim Order and the DIP Loan Documents, including, without limitation, the

20

Budget Covenants as defined and contained in Paragraph 2(e) below, the DIP Borrowers are hereby authorized to (x) borrow under the Revolver Facility and issue Postpetition Letters of Credit in an aggregate outstanding principal amount comprising Revolver Facility Advances and Postpetition Letters of Credit not to exceed $8,000,000, and (y) permit to remain outstanding, and fund draws under, the full amount of the LC Facility (following the entry of the Final Order, the DIP Borrowers' authority to incur further DIP Obligations, if any, will be governed by the terms of such Final Order). Any amounts repaid under the Revolver Facility may be reborrowed, subject to the terms of the DIP Loan Documents and this Interim Order. All DIP Obligations are unconditionally guaranteed, on a joint and several basis, by the "Guarantors" (as defined in the DIP Credit Agreement) as further provided in the DIP Loan Documents. Upon entry of a Final Order: (i) the Debtors shall, subject to the terms of the DIP Loan Documents and such Final Order, be entitled to borrow all amounts under the DIP Facility and use Cash Collateral to fund the Debtors' working capital and other general corporate needs and pay such other amounts required or allowed to be paid pursuant to the DIP Loan Documents, the Approved Budget (as defined below), the Final Order, and any other orders of this Court, and (ii) all then outstanding Prepetition First Lien Obligations shall be automatically converted to DIP Obligations.

(d)    Budget. Attached hereto as **Exhibit A** is a 13-week cash flow budget (the "Initial Approved Budget") which reflects on a line-item basis the Debtors' (i) weekly projected cash receipts, (ii) weekly projected disbursements (including ordinary course operating expenses, bankruptcy-related expenses under the Cases (including the fees and expenses of the Debtors' Professionals (as defined below)), capital expenditures, asset sales, issuances of any Postpetition Letter of Credit, including the fees relating thereto, and budgeted fees and expenses of the DIP Agent and DIP Lenders, the Prepetition First Lien Secured Parties, and any other fees and expenses

21

relating to the DIP Facility), (iii) the sum of weekly unused Revolver Facility availability under the DIP Facility plus unrestricted cash on hand (collectively, "Aggregate Liquidity"), and (iv) the weekly outstanding principal balance of the Obligations under the DIP Facility and aggregate face amount of all Postpetition Letters of Credit under the DIP Facility.  Commencing on February 7, 2020 and continuing every Friday thereafter (i.e., every week), the Debtors shall prepare and deliver to the DIP Agent, DIP Lenders, Prepetition First Lien Secured Agent, and Prepetition Second Lien Secured Agent an updated "rolling" 13-week cash flow budget, which, once approved in writing by the DIP Agent and DIP Lenders constituting "Required DIP Revolving Lenders" under, and as defined in, the DIP Credit Agreement (the "Requisite DIP Lenders"), each in their respective sole discretion, shall supplement and replace the Initial Approved Budget or Supplemental Approved Budget, as applicable, then in effect (each such updated budget that has been approved in writing by the DIP Agent and Requisite DIP Lenders, a "Supplemental Approved Budget") without further notice, motion, or Court order; provided, however, that unless and until the DIP Agent and Requisite DIP Lenders have approved such updated budget, the Debtors shall remain subject to and be governed by the terms of the Initial Approved Budget or Supplemental Approved Budget, as applicable, then in effect, and none of the DIP Secured Parties and Prepetition Secured Parties shall, as applicable, have any obligation to fund to such updated "rolling budget" or permit the use of Cash Collateral with respect thereto, as applicable.  Commencing on February 5, 2020 and continuing every Wednesday thereafter (i.e., every week), the Debtors shall provide to the DIP Agent, DIP Lenders, and Prepetition First Lien Secured Agent (x) a variance report/reconciliation report certified by the Chief Financial Officer of the Debtors, in form acceptable to the DIP Agent, setting forth (A) the actual cash receipts, expenditures, disbursements, and outstanding Revolver Facility balance of the Debtors for such immediately

preceding fiscal week (including any "stub week" that includes the Petition Date) cumulatively and on a line-item basis, and the Aggregate Liquidity as of the end of such week, and (B) the variance in dollar amounts of the actual expenditures, disbursements, and outstanding Revolver Facility balance for each week and cumulatively from those budgeted amounts for the corresponding week and cumulatively as reflected in the Approved Budget, and (y) a certificate signed by the Chief Financial Officer of the Debtors, in form acceptable to the DIP Agent, certifying whether the Debtors are in full compliance with the Budget Covenants for the applicable testing period.  The Initial Approved Budget and any Supplemental Approved Budget, whichever is then in effect, shall constitute the "Approved Budget."  Notwithstanding anything to the contrary in this Interim Order, the reasonable professional fees, costs and expenses of the DIP Agent and other DIP Secured Parties (including, without limitation, counsel and other advisors therefor) and the Prepetition First Lien Secured Parties (including, without limitation, counsel and other advisors therefor), respectively, shall be due, payable and paid in accordance with the terms of this Interim Order notwithstanding any budgeted amounts for such fees, costs and expenses set forth in the Approved Budget.

(e)    Budget Covenants.  The Debtors shall only incur DIP Obligations and expend Cash Collateral and other DIP Collateral proceeds in accordance with the specific purposes, and at the specific time periods, set forth in the Approved Budget, subject to the following permitted variances:  (i) as of the close of business of the last Business Day of each fiscal week (beginning with the first full fiscal week following the Petition Date), for the shorter of (A) the number of weeks that have elapsed since the Petition Date and (B) the preceding six fiscal week-period, (I) cumulative cash receipts shall exceed 90.0% of the cumulative cash receipts set forth for such period in the Approved Budget, (II) cumulative cash disbursements (exclusive

of food, beverage and alcohol costs, and the line-items in the Approved Budget identified as KEIP/KERP (the "KEIP/KERP Line Item"), Marketing, G&A Expenses, Rent and Facilities Expense, Maintenance & Remodel Capex, Debtor Financial Advisor, Debtor Legal Counsel, Debtor IB, UCC Financial Advisor, and UCC Legal Counsel (all such line-item expenditures, including the KEIP/KERP Line Item, the "Line Item Expenditures")) shall not exceed 110.0% of the cumulative cash disbursements (exclusive of food, beverage and alcohol costs and Line Item Expenditures) set forth for such period in the Approved Budget; (ii) as of the close of business of the last Business Day of each fiscal week (beginning with the first full fiscal week following the Petition Date), for the shorter of (A) the number of weeks that have elapsed since the Petition Date and (B) the preceding four fiscal week-period, (I) cash disbursements with respect to the KEIP/KERP Line Item shall not exceed 100.0% of the cash disbursements for the KEIP/KERP Line Item set forth for such period in the Approved Budget, and (II) for each Line Item Expenditure other than the KEIP/KERP Line Item, cash disbursements with respect to such Line Item Expenditure shall not exceed 105.0% of the cash disbursements for such Line Item Expenditure set forth for such period in the Approved Budget; (iii) as of the close of business of the last Business Day of each fiscal week (beginning with the first full fiscal week following the Petition Date), for the number of weeks that have elapsed since the Petition Date, (I) cumulative cash disbursements with respect to all Line Item Expenditures minus the cumulative cash disbursements for all Line Item Expenditures set forth in Approved Budgets shall not exceed $300,000, and (II) cumulative net cash flow shall not be less than the cumulative net cash flow set forth in Approved Budgets minus $150,000; and (iv) as of the close of business of the last Business Day of the fourth fiscal week following the Petition Date and each four fiscal week period thereafter, for each such four week period, if actual cumulative net cash flow from operations for such period exceeds the

24

cumulative net cash flow from operations as set forth in Approved Budgets (such amounts, the "Excess NCFO")  in the amounts set forth in the chart below, not on account of timing of disbursements, then a reserve against borrowing under the DIP Facility in the corresponding amount set forth in the chart below shall be established by the Agent; provided, however, such reserve may be reduced and made available for borrowing by the Debtors upon approval of the Requisite DIP Lenders:

| Amount of Excess NCFO | Amount of Reserve |
|---|---|
| Over $1,000,000 but less than or equal to $2,000,000 | $500,000 |
| Over $2,000,000 but less than or equal to $3,000,000 | $1,000,000 |
| Over $3,000,000 but less than or equal to $4,000,000 | $1,500,000 |
| Over $4,000,000 | $2,000,000 |

The foregoing budget-related covenants are collectively referred to herein as the "Budget Covenants."

(f)      Termination Events.  The occurrence of any of the following events, unless waived in writing by the DIP Agent, Requisite DIP Lenders, the Prepetition First Lien Secured Agent and Prepetition First Lien Secured Lenders constituting "Required Lenders" under the Prepetition First Lien Secured Credit Agreement ("Requisite Prepetition First Lien Lenders"), in their respective sole discretion, shall constitute a termination event under this Interim Order and the DIP Loan Documents (each, a "Termination Event"):

(i)      the occurrence of any Event of Default (as defined in the DIP Credit Agreement);

(ii)      the failure of the Debtors to timely comply with any of the following sale process milestones (collectively, the "Sale Process Deadlines") or the failure of the Debtors to incorporate such milestones into a sale procedures motion which shall be in form and substance reasonably acceptable to the DIP Agent (the "Sale Procedures Motion") and a sale procedures order which shall be in form and substance acceptable to the DIP Agent and Requisite DIP Lenders ("Sale Procedures Order"):

(A)    on or prior to January 28, 2020, the Debtors shall file the Sale Procedures Motion and proposed form of Sale Procedures Order and a motion to approve the sale of substantially all of the Debtors' assets to a stalking horse purchaser subject to higher and better offers and which shall be in form and substance reasonably acceptable to the DIP Agent (the "<u>Sale Motion</u>");

(B)    the hearing on the Sale Procedures Motion shall be completed on or prior to February 26, 2020;

(C)    the Sale Procedures Order shall have been entered by this Court on or prior to February 28, 2020;

(D)    on or prior to March 18, 2020, all qualified bids (pursuant to which potential bidders shall have unconditionally waived or satisfied all financing and diligence outs) shall be due (which bid deadline shall not be extended without the consent of the DIP Agent and Requisite DIP Lenders) (the "<u>Qualified Bid Deadline</u>");

(E)    the auction shall, if necessary, be commenced on or prior to March 20, 2020;

(F)    the hearing on the Sale Motion to approve the sale to the winning bidder shall have concluded on or prior to March 27, 2020 (the proceeds of such sale shall be used to repay in cash all DIP Obligations and Prepetition First Lien Obligations on the closing thereof or such sale shall otherwise be on terms, and pursuant to definitive documentation, acceptable to the DIP Agent, Requisite DIP Lenders, Prepetition First Lien Secured Agent and Requisite Prepetition First Lien Lenders) (such sale, an "<u>Acceptable Sale</u>");

(G)    an order approving an Acceptable Sale shall have been entered by this Court on or prior to March 31, 2020; and

(H)    on or prior to April 22, 2020, such Acceptable Sale shall have been consummated pursuant to definitive documentation acceptable in form and substance to the DIP Agent and Requisite DIP Lenders.

(g)    <u>Interest, Fees, Costs and Expenses</u>.  The DIP Obligations shall bear interest at the rates, and be due and payable (and paid), as set forth in, and in accordance with the terms and conditions of, this Interim Order and the DIP Loan Documents, in each case without further notice, motion, or application to, order of, or hearing before, this Court.  The Debtors shall pay on demand all fees, costs, expenses (including reasonable out-of-pocket legal and other professional fees and expenses of the DIP Agent and DIP Lenders) and other charges in accordance with the terms of the DIP Loan Documents.  Notwithstanding any provision herein to the contrary, all fees

26

described in the DIP Credit Agreement are fully earned, all paid portions of such fees are finally allowed and non-refundable, all unpaid portions of such fees shall be immediately payable by the Debtors upon entry of this Interim Order, and the payment of such fees, costs, and expenses shall not be subject to Challenge pursuant to Paragraph 7 hereof or otherwise.

(h)     <u>Use of DIP Facility Proceeds and Proceeds of DIP Collateral</u>.  The DIP Borrowers shall use the proceeds of all DIP Collateral (as defined below) and Revolver Facility Advances (including Postpetition Letter of Credit issuances) solely in accordance with this Interim Order and the applicable provisions of the DIP Loan Documents.  Without limiting the foregoing, the Debtors shall not be permitted to make any payments on account of any prepetition debt or obligation prior to the effective date of a chapter 11 plan or plans with respect to any of the Debtors, except with respect to (i) the Prepetition Secured Obligations as set forth in this Interim Order and a Final Order; (ii) as provided in the orders granting the relief requested in the various motions filed by the Debtors on the Petition Date, which orders shall be in form and substance acceptable to the DIP Agent; (iii) as provided in other motions, orders, and requests for relief, each in form and substance acceptable to the DIP Agent prior to such motion, order, or request for such relief being filed; or (iv) as otherwise provided in the DIP Credit Agreement.

(i)     <u>Conditions Precedent</u>.  The DIP Secured Parties and Prepetition First Lien Secured Parties each have no obligation to extend credit under the DIP Facility or permit use of any DIP Collateral proceeds, including Cash Collateral, as applicable, during the Interim Period unless and until all conditions precedent to the extension of credit and/or use of DIP Collateral or proceeds thereof under the DIP Loan Documents and this Interim Order have been satisfied in full or waived by the requisite DIP Secured Parties and the Prepetition First Lien Secured Parties in accordance with the DIP Loan Documents and this Interim Order.

27

(j)      <u>DIP Liens</u>.  As security for the DIP Obligations, the following security interests and liens are hereby granted to the DIP Agent, for its own benefit and the ratable benefit of the DIP Secured Parties, on all property of the Debtors, now existing or hereinafter acquired, including, without limitation, all cash and cash equivalents (whether maintained with the DIP Agent or otherwise), and any investment in such cash or cash equivalents, money, inventory, goods, accounts receivable, contract rights, other rights to payment, intercompany loans and other investments, investment property, contracts, contract rights, properties, plants, equipment, machinery, general intangibles, payment intangibles, accounts, deposit accounts, documents, instruments, chattel paper, securities (whether or not marketable), franchise rights, documents of title, letters of credit, letter of credit rights, supporting obligations, leases and other interests in leaseholds (<u>provided</u>, <u>however</u>, that to the extent that any lease prohibits the granting of a lien thereon, or otherwise prohibits hypothecation of the leasehold interest, then in such event the DIP Agent shall be granted only a lien on the proceeds of sale or other disposition of such leasehold interests), real property, fixtures, patents, copyrights, trademarks, trade names, other intellectual property, intellectual property licenses, capital stock of subsidiaries, tax and other refunds, insurance proceeds, commercial tort claims, (subject to entry of the Final Order) rights under section 506(c) of the Bankruptcy Code, all other Collateral (as defined in the DIP Loan Documents), and all other "property of the estate" (as defined in section 541 of the Bankruptcy Code) of any kind or nature, real or personal, tangible, intangible, or mixed, now existing or hereafter acquired or created, and all rents, products, substitutions, accessions, profits, replacements, and cash and non-cash proceeds of all of the foregoing, excluding claims and causes of action under sections 502(d), 544, 545, 547, 548, 549, 550, and 553 of the Bankruptcy Code and any other avoidance or similar action under the Bankruptcy Code or similar state law

("Avoidance Actions"), but, subject to entry of the Final Order, including any proceeds or property recovered, unencumbered or otherwise, from Avoidance Actions, whether by judgment, settlement or otherwise (all of the foregoing collateral collectively referred to as the "DIP Collateral" and, all such Liens granted to the DIP Agent for the benefit of the DIP Secured Parties pursuant to this Interim Order and the DIP Loan Documents, the "DIP Liens"):

> (i)      pursuant to section 364(c)(2) of the Bankruptcy Code, a first priority Lien on all unencumbered DIP Collateral;

> (ii)     pursuant to section 364(c)(3) of the Bankruptcy Code, a junior Lien on all DIP Collateral that is subject solely to the Prepetition Prior Liens; and

> (iii)    pursuant to section 364(d)(1) of the Bankruptcy Code, a first priority, senior priming lien on all DIP Collateral (including, without limitation, Cash Collateral) that is senior to the Adequate Protection Replacement Liens (as defined below) and senior and priming to (x) the Prepetition Liens and (y) any Liens that are junior to the Prepetition Liens and the Adequate Protection Replacement Liens, after giving effect to any intercreditor or subordination agreements (the liens referenced in clauses (x) and (y), collectively, the "Primed Liens"); provided, however, that the liens described in this clause (iii) shall be junior solely to the Carve-Out and the Prepetition Prior Liens.

(k)      DIP Lien Priority.  Notwithstanding anything to the contrary contained in this Interim Order or the DIP Loan Documents, for the avoidance of doubt, the DIP Liens granted to the DIP Agent for the ratable benefit of the DIP Secured Parties shall in each and every case be first priority senior liens that (i) are subject only to the Prepetition Prior Liens, and to the extent provided in the provisions of this Interim Order and the DIP Loan Documents, shall also be subject to the Carve-Out, and (ii) except as provided in sub-clause (i) of this subsection (k), are senior to all prepetition and postpetition liens of any other person or entity (including, without limitation, the Primed Liens and the Adequate Protection Replacement Liens).  The DIP Liens and the DIP Superpriority Claims (as defined below) (A) subject to entry of the Final Order, shall not be subject to sections 506(c), 510, 549, 550, or 551 of the Bankruptcy Code or the "equities of the case" exception of section 552 of the Bankruptcy Code, (B) shall not be subordinate to, or *pari passu*

with, (x) any lien that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or (y) any intercompany or affiliate liens or claims of the Debtors, and (C) shall be valid and enforceable against any trustee or any other estate representative appointed or elected in the Cases, upon the conversion of any of the Cases to a case under chapter 7 of the Bankruptcy Code or in any other proceedings related to any of the foregoing (each, a "Successor Case"), and/or upon the dismissal of any of the Cases to the maximum extent permitted by law.

(l)    Enforceable Obligations.  The DIP Loan Documents shall constitute and evidence the valid and binding DIP Obligations of the Debtors, which DIP Obligations shall be enforceable against the Debtors, their estates and any successors thereto (including, without limitation, any trustee or other estate representative in any Successor Case), and their creditors, in accordance with their terms.  No obligation, payment, transfer, or grant of security under the DIP Credit Agreement, the other DIP Loan Documents, or this Interim Order shall be stayed, restrained, voidable, avoidable, or recoverable under the Bankruptcy Code or under any applicable law (including, without limitation, under sections 502(d), 544, 547, 548, or 549 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or similar statute or common law), or subject to any avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaim, cross-claim, defense, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity.

(m)    Superpriority Administrative Claim Status.  In addition to the DIP Liens granted herein, effective immediately upon entry of this Interim Order, all of the DIP Obligations shall constitute allowed superpriority administrative expense claims pursuant to section 364(c)(1)

of the Bankruptcy Code, which shall have priority, subject only to the payment of the Carve-Out, over all administrative expense claims, adequate protection and other diminution claims (including the Adequate Protection Superpriority Claims (as defined below)), unsecured claims, and all other claims against the Debtors, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses or other claims of the kinds specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546, 726, 1113, and 1114 or any other provision of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment (the "DIP Superpriority Claims").  The DIP Superpriority Claims shall, for purposes of section 1129(a)(9)(A) of the Bankruptcy Code, be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, shall be against each Debtor on a joint and several basis, and shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof.  Other than as provided in the DIP Credit Agreement and this Interim Order with respect to the Carve-Out, no costs or expenses of administration, including, without limitation, professional fees allowed and payable under sections 328, 330, and 331 of the Bankruptcy Code, or otherwise, that have been or may be incurred in these proceedings, or in any Successor Cases, and no priority claims are, or will be, senior to, prior to, or on a parity with the DIP Superpriority Claims or the DIP Obligations, or with any other claims of the DIP Secured Parties arising hereunder.

3.     **Authorization to Use Cash Collateral and Proceeds of the DIP Facility**.  Subject to, and solely in accordance with, the terms and conditions of this Interim Order and the DIP Loan Documents, including without limitation, the Budget Covenants set forth in Paragraph 2(e) hereof

and Paragraph 16 hereof, (a) the Debtors are authorized to use proceeds of credit extended under

the DIP Facility, and (b) the Debtors are authorized to use Cash Collateral.

4. **Adequate Protection for Prepetition First Lien Secured Parties**.    In

consideration for the use of the Prepetition Collateral (including Cash Collateral) and the priming

of the Prepetition First Liens, the Prepetition First Lien Secured Parties shall receive the following

adequate protection (collectively referred to as the "Prepetition First Lien Secured Parties'

Adequate Protection"):

(a) <u>Prepetition First Lien Roll-Up</u>.  Subject to and only upon entry of a Final

Order, all Prepetition First Lien Obligations, including on account of Prepetition Letters of Credit,

shall immediately, automatically, and irrevocably be deemed to have been converted into DIP

Obligations and incurred under the DIP Facility (the "Prepetition First Lien Roll-Up").

(b) <u>First Lien Adequate Protection Replacement Liens</u>.  To the extent there is a

diminution in value of the interests of the Prepetition First Lien Secured Parties in the Prepetition

Collateral (including Cash Collateral) from and after the Petition Date resulting from the use, sale,

or lease by the Debtors of the applicable Prepetition Collateral (including Cash Collateral), the

granting of the DIP Superpriority Claims, the granting of the DIP Liens, the subordination of the

Prepetition First Liens thereto and to the Carve-Out, the imposition or enforcement of the

automatic stay of section 362(a) of the Bankruptcy Code or otherwise (the "Diminution in Value

of the Prepetition First Lien Collateral"), the Prepetition First Lien Secured Agent, for the benefit

of all the Prepetition First Lien Secured Parties, is hereby granted, subject to the terms and

conditions set forth below, pursuant to sections 361, 363(e), and 364 of the Bankruptcy Code,

Liens upon all of the DIP Collateral (such adequate protection replacement liens, the "First Lien

Adequate Protection Replacement Liens"), which First Lien Adequate Protection Replacement

PHIL1 8615410v.7

Liens on such DIP Collateral shall be subject and subordinate only to the DIP Liens, the Prepetition

Prior Liens, and the Carve-Out and shall be senior in priority to the Prepetition First Liens, the

Second Lien Adequate Protection Replacement Liens (as defined below), and the Prepetition

Second Liens.  The First Lien Adequate Protection Replacement Liens and the First Lien Adequate

Protection Superpriority Claims (as defined below) (A) shall not be subject to sections 510, 549,

550, or 551 of the Bankruptcy Code or, subject to entry of the Final Order, section 506(c) of the

Bankruptcy Code or the "equities of the case" exception of section 552 of the Bankruptcy Code,

(B) shall be senior in priority and right of payment to (x) any lien that is avoided and preserved for

the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or (y) any

intercompany or affiliate liens or claims of the Debtors, and (C) shall be valid and enforceable

against any trustee or any other estate representative appointed in the Cases or any Successor

Cases, and/or upon the dismissal of any of the Cases.

(c)    First Lien Adequate Protection Superpriority Claims.  To the extent of

Diminution in Value of the Prepetition First Lien Collateral, the Prepetition First Lien Secured

Parties are hereby further granted allowed superpriority administrative expense claims (such

adequate protection superpriority claims, the "First Lien Adequate Protection Superpriority

Claims"), pursuant to section 507(b) of the Bankruptcy Code, with priority over all administrative

expense claims and unsecured claims against the Debtors or their estates, now existing or hereafter

arising, of any kind or nature whatsoever, including, without limitation, administrative expenses

of the kind specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b),

506(c), 507(a), 507(b), 546(c), 546(d), 726 (to the extent permitted by law), 1113, and 1114 and

any other provision of the Bankruptcy Code, junior only to the DIP Superpriority Claims and the

Carve-Out to the extent provided herein and in the DIP Loan Documents, and payable from and

having recourse to all of the DIP Collateral; _provided_, _however_, that the Prepetition First Lien Secured Parties shall not receive or retain any payments, property, or other amounts in respect of the First Lien Adequate Protection Superpriority Claims unless and until all DIP Obligations have been Paid in Full (as defined below).  Subject to the relative priorities set forth above, the Adequate Protection Superpriority Claims against each Debtor shall be against each Debtor on a joint and several basis.  For purposes of this Interim Order, the terms "_Pay in Full_," "_Paid in Full_," and "_Payment in Full_" shall mean, with respect to any referenced DIP Obligations, Prepetition First Lien Obligations and/or Prepetition Second Lien Obligations, (i) the indefeasible payment in full in cash of such obligations, (ii) the termination of all credit commitments under the DIP Loan Documents, Prepetition First Lien Loan Documents and/or Prepetition Second Lien Loan Documents, as applicable, and (iii) the absence of any contingent indemnification claim arising from any pending or potential Challenge.

(d)    _Further Adequate Protection_.  As further adequate protection, the Debtors (A) have committed, as set forth in this Interim Order, to timely comply with the Sale Process Deadlines and (B) shall simultaneously provide copies of any reports sent to the DIP Secured Parties or the Prepetition Second Lien Secured Parties as may be required under this Interim Order or the DIP Credit Agreement to the Prepetition First Lien Secured Parties.

(e)    _Interest and Professional Fees_.  As further adequate protection, and without limiting any rights of the Prepetition First Lien Secured Parties under section 506(b) of the Bankruptcy Code which are hereby preserved, and in consideration, and as a requirement, for obtaining the consent of the Prepetition First Lien Secured Parties to the entry of this Interim Order and the Debtors' consensual use of Cash Collateral as provided herein, the Debtors shall (i) pay or reimburse currently the Prepetition First Lien Secured Parties for any and all of their accrued and

past-due fees, costs, expenses, and charges to the extent, and at the times, payable under the Prepetition First Lien Loan Documents, (ii) on the last day of each calendar month commencing after the Petition Date, pay to the Prepetition First Lien Secured Agent for prompt distribution to the applicable Prepetition First Lien Secured Parties any and all of the interest accruing on the Prepetition First Lien Obligations under the Prepetition First Lien Secured Credit Agreement at the default rate provided for in the Prepetition First Lien Secured Credit Agreement (which, for the avoidance of doubt, shall be paid (i) in cash with respect to the LIFO Revolving Loans and (ii) in kind with respect to all other Prepetition First Lien Obligations) (and in the case of the first month after the Petition Date, all accrued and unpaid prepetition interest shall also be due and payable hereunder (which, for the avoidance of doubt, shall be paid (i) in cash with respect to the LIFO Revolving Loans and (ii) in kind with respect to all other Prepetition First Lien Obligations)), and (iii) pay currently all reasonable out-of-pocket fees, costs, and expenses of the Prepetition First Lien Secured Parties (including without limitation reasonable attorneys' fees and costs and reasonable consulting, accounting, appraisal, investment banking and similar professional fees and charges) in accordance with the Prepetition First Lien Secured Loan Documents, in the case of each of sub-clauses (i), (ii), and (iii) above, all whether accrued prepetition or postpetition and whether or not budgeted in the Approved Budget, and without further notice (except as provided in Paragraph 20(b) below with respect to postpetition professional fees, costs, and expenses), motion, or application to, order of, or hearing before, this Court.

(f)    Consent to Priming and Adequate Protection. The Prepetition First Lien Secured Agent, on behalf of the Prepetition First Lien Secured Parties, consents to the Prepetition First Lien Secured Parties' Adequate Protection and the priming provided for herein; provided, however, that such consent of the Prepetition First Lien Secured Agent to the priming of the

Prepetition First Liens, the use of Cash Collateral, and the sufficiency of the Prepetition First Lien

Secured Parties' Adequate Protection provided for herein is expressly conditioned upon the entry

of this Interim Order, and such consent shall not be deemed to extend to any other Cash Collateral

usage or other replacement financing or debtor-in-possession financing other than the DIP Facility

provided under the DIP Loan Documents; and provided, further, that such consent shall be of no

force and effect in the event this Interim Order is not entered or is entered and subsequently

reversed, modified, stayed, or amended (unless such reversal, modification, stay, or amendment is

acceptable to the Prepetition First Lien Secured Agent) or the DIP Loan Documents and DIP

Facility as set forth herein are not approved.

(g)     Right to Credit Bid.  Without limiting any the rights of any DIP Secured

Parties or Prepetition First Lien Secured Parties under applicable law, each of the DIP Agent (on

behalf of the DIP Secured Parties) and the Prepetition First Lien Secured Agent (on behalf of the

Prepetition First Lien Secured Parties) or their respective assignees, designees, or successors, shall

automatically be deemed a "qualified bidder" with respect to any disposition of DIP Collateral,

and subject to a Final Order, shall have the right (unless this Court for cause orders otherwise after

notice and a hearing upon request of any party in interest prior to the Qualified Bid Deadline) to

"credit bid" up to the full amount of the DIP Obligations and the Prepetition First Lien Obligations

with the consent of Requisite DIP Lenders and Requisite Prepetition First Lien Lenders,

respectively (including the DIP Superpriority Claims and the First Lien Adequate Protection

Superpriority Claims, as applicable, to the extent such claims have any value), during any

disposition of all or any portion of the DIP Collateral or Prepetition Collateral, as applicable (in

all cases excluding sales in the Debtors' ordinary course of business in accordance with this Interim

Order and the DIP Loan Documents), or any deposit in connection with such sale, including,

without limitation, sales occurring pursuant to section 363 of the Bankruptcy Code or included as part of any reorganization plan subject to confirmation under section 1129(b)(2)(A)(iii) of the Bankruptcy Code.  The DIP Agent and the Prepetition First Lien Secured Agent have the absolute right to assign, transfer, sell, or otherwise dispose of their rights to credit bid, except as prohibited by the DIP Loan Documents or Prepetition First Lien Secured Loan Documents, as applicable.

(h)    Section 507(b) Reservation.  Under the circumstances and given that the above-described adequate protection is consistent with the Bankruptcy Code, including section 506(b) thereof, the Court finds that the adequate protection provided herein is reasonable and sufficient to protect the interests of the Prepetition First Lien Secured Parties.  Nothing herein shall impair or modify the application of section 507(b) of the Bankruptcy Code in the event that the adequate protection provided herein to the Prepetition First Lien Secured Parties is insufficient to compensate for any Diminution in Value of the Prepetition First Lien Collateral of the interests of the Prepetition First Lien Secured Parties in the Prepetition First Lien Collateral during the Cases or any Successor Cases; provided, however, any such additional section 507(b) claims shall be subject to the same relative priority as such party's Adequate Protection Superpriority Claims, as provided in this Interim Order, and the terms of the Intercreditor Agreement.

5.    **Adequate Protection for Prepetition Second Lien Secured Parties**.  In consideration for the use of the Prepetition Collateral (including Cash Collateral) and the priming of the Prepetition Second Liens, the Prepetition Second Lien Secured Parties shall receive the following adequate protection (collectively referred to as the "Prepetition Second Lien Secured Parties' Adequate Protection" and, together with the Prepetition First Lien Secured Parties' Adequate Protection, the "Prepetition Secured Parties' Adequate Protection"):

(a)        <u>Second Lien Adequate Protection Replacement Liens</u>.  To the extent there is a diminution in value of the interests of the Prepetition Second Lien Secured Parties in the Prepetition Second Lien Collateral (including Cash Collateral) from and after the Petition Date resulting from the use, sale, or lease by the Debtors of the Prepetition Second Lien Collateral (including Cash Collateral), the granting of the DIP Superpriority Claims and the First Lien Adequate Protection Superpriority Claims, the granting of the priming DIP Liens and the granting of the First Lien Adequate Protection Replacement Liens, the subordination of the Prepetition Second Liens thereto and to the Carve-Out, and the imposition or enforcement of the automatic stay of section 362(a) of the Bankruptcy Code or otherwise ("<u>Diminution in Value of the Prepetition Second Lien Collateral</u>" and, collectively with the Diminution in Value of the Prepetition First Lien Collateral, "<u>Diminution in Value</u>"), the Prepetition Second Lien Secured Agent, for the benefit of all the Prepetition Second Lien Secured Parties, is hereby granted, subject to the terms and conditions set forth below, pursuant to sections 361, 363(e), and 364 of the Bankruptcy Code, Liens upon all of the DIP Collateral (such adequate protection replacement liens, the "Second Lien Adequate Protection Replacement Liens" and, together with the First Lien Adequate Protection Replacement Liens, the "<u>Adequate Protection Replacement Liens</u>"), which Second Lien Adequate Protection Replacement Liens on such DIP Collateral shall be subject and subordinate only to the DIP Liens, the Prepetition Prior Liens, the Carve-Out, the First Lien Adequate Protection Replacement Liens, and the Prepetition First Liens and shall be senior in priority to the Prepetition Second Liens.  The Second Lien Adequate Protection Replacement Liens and the Second Lien Adequate Protection Superpriority Claims (as defined below) (A) shall not be subject to sections 510, 549, 550, or 551 of the Bankruptcy Code or, subject to entry of the Final Order, section 506(c) of the Bankruptcy Code or the "equities of the case" exception of

section 552 of the Bankruptcy Code, (B) shall be senior in priority and right of payment to (x) any lien that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or (y) any intercompany or affiliate liens or claims of the Debtors, and (C) shall be valid and enforceable against any trustee or any other estate representative appointed in the Cases or any Successor Cases, and/or upon the dismissal of any of the Cases.

(b)    <u>Second Lien Adequate Protection Superpriority Claims</u>.  To the extent of Diminution in Value of the Prepetition Second Lien Collateral, the Prepetition Second Lien Secured Parties are hereby further granted allowed superpriority administrative expense claims (such adequate protection superpriority claims, the "Second Lien Adequate Protection Superpriority Claims" and, together with the First Lien Adequate Protection Superpriority Claims, the "<u>Adequate Protection Superpriority Claims</u>"), pursuant to section 507(b) of the Bankruptcy Code, with priority over all administrative expense claims and unsecured claims against the Debtors or their estates, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kind specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726 (to the extent permitted by law), 1113, and 1114 and any other provision of the Bankruptcy Code, junior only to the DIP Superpriority Claim, the Carve-Out, the First Lien Adequate Protection Superpriority Claims, and the Prepetition First Lien Obligations as provided herein, and payable from and having recourse to all of the DIP Collateral; <u>provided</u>, <u>however</u>, that the Prepetition Second Lien Secured Parties shall not, without the prior written consent of the DIP Agent and Prepetition First Lien Secured Agent, receive or retain any payments, property, or other amounts in respect of the Second Lien Adequate Protection Superpriority Claims unless and until (y) all DIP Obligations have been Paid in Full, and (z) the Prepetition First Lien Obligations have been

Paid in Full.  Subject to the relative priorities set forth above, the Second Lien Adequate Protection Superpriority Claims against each Debtor shall be against each Debtor on a joint and several basis.

(c)    <u>Further Adequate Protection</u>.  As further adequate protection, the Debtors (A) have committed, as set forth in this Interim Order, to timely comply with the Sale Process Deadlines and (B) shall simultaneously provide copies to the Prepetition Second Lien Secured Agent of any reports sent to the DIP Secured Parties or the Prepetition First Lien Secured Parties as may be required under this Interim Order or the DIP Credit Agreement.

(d)    <u>Consent to Priming and Adequate Protection</u>.  During the Interim Period, the Prepetition Second Lien Secured Agent and the other Prepetition Second Lien Secured Parties consent to the Prepetition Second Lien Secured Parties' Adequate Protection and the priming provided for herein; <u>provided</u>, <u>however</u>, that such consent of the Prepetition Second Lien Secured Parties to the priming of their Prepetition Second Liens, the use of Cash Collateral, and the sufficiency of the Prepetition Second Lien Secured Parties' Adequate Protection provided for herein is expressly conditioned upon the entry of this Interim Order, and such consent shall not be deemed to extend to any other replacement financing or debtor-in-possession financing other than the DIP Facility provided under the DIP Loan Documents; and <u>provided</u>, <u>further</u>, that such consent shall be of no force and effect in the event this Interim Order is not entered or is entered and subsequently reversed, modified, stayed, or amended (unless such reversal, modification, stay, or amendment is acceptable to the Prepetition Second Lien Secured Agent) or the DIP Loan Documents and DIP Facility as set forth herein are not approved; and <u>provided</u>, <u>further</u>, that in the event of the occurrence of a Termination Event, nothing herein shall alter the burden of proof set forth in the applicable provisions of the Bankruptcy Code at any hearing concerning the continued use of Prepetition Collateral (including Cash Collateral) by the Debtors.  The Prepetition Second

40

Lien Secured Agent and the other Prepetition Second Lien Secured Parties also consent to the entry of a Final Order (and to the use of Prepetition Collateral, including Cash Collateral, and to the priming and adequate protection in favor of the Prepetition Second Lien Secured Parties provided for therein) consistent with this Interim Order; provided, however, that (i) such consent of the Prepetition Second Lien Secured Parties to the priming of their Prepetition Second Liens, the use of Cash Collateral, and the sufficiency of the Prepetition Second Lien Secured Parties' adequate protection provided for in such Final Order is expressly conditioned upon the entry of such Final Order; and (ii) any change between this Interim Order and any Final Order that is adverse to any DIP Secured Parties and/or Prepetition First Lien Secured Parties shall not constitute an inconsistency between this Interim Order and the Final Order solely for purposes of the Prepetition Second Lien Secured Parties' consent to entry of such Final Order).

(e)     Right to Credit Bid.  Without limiting any rights of any DIP Secured Parties or Prepetition First Lien Secured Parties under applicable law, the Prepetition Second Lien Secured Agent (on behalf of the Prepetition Second Lien Secured Parties) or its assignee, designee, or successor, shall automatically be deemed a "qualified bidder" with respect to any disposition of Prepetition Collateral and/or DIP Collateral, and subject to a Final Order, shall have the right (unless this Court for cause orders otherwise after notice and a hearing upon request of any party in interest prior to the Qualified Bid Deadline) to "credit bid" up to the amount of the Prepetition Second Lien Obligations with the consent of Prepetition Second Lien Secured Lenders constituting "Required Lenders" under the Prepetition Second Lien Secured Credit Agreement ("Requisite Prepetition Second Lien Lenders") (including its Second Lien Adequate Protection Superpriority Claim to the extent such Second Lien Adequate Protection Superpriority Claim has any value) during any disposition of all or any portion of the Prepetition Collateral and DIP Collateral (in the

41

case of the DIP Collateral, only to the extent of the value of the Second Lien Adequate Protection Superpriority Claim resulting from a postpetition Diminution in Value of the Prepetition Second Lien Collateral as provided herein) (in all cases excluding sales in the Debtors' ordinary course of business in accordance with this Interim Order and the DIP Loan Documents), or any deposit in connection with such sale, including, without limitation, sales occurring pursuant to section 363 of the Bankruptcy Code or included as part of any reorganization plan subject to confirmation under section 1129(b)(2)(A)(iii) of the Bankruptcy Code; provided, that any such "credit bid" provides for Payment in Full of all DIP Obligations and Prepetition First Lien Obligations at the closing of such transaction unless otherwise agreed by the DIP Agent (with the consent of the Requisite DIP Lenders) and the Prepetition First Lien Secured Agent (with the consent of the Requisite Prepetition First Lien Lenders), in their sole and absolute discretion.  The Prepetition Second Lien Secured Agent has the absolute right to assign, transfer, sell, or otherwise dispose of its right to credit bid at the direction of the Prepetition Second Lien Secured Parties.

(f)    Section 507(b) Reservation.  Under the circumstances and given that the above-described adequate protection is consistent with the Bankruptcy Code, including section 506(b) thereof, the Court finds that the adequate protection provided herein is reasonable and sufficient to protect the interests of the Prepetition Second Lien Secured Parties.  Nothing herein shall impair or modify the application of section 507(b) of the Bankruptcy Code in the event that the adequate protection provided herein to the Prepetition Second Lien Secured Parties is insufficient to compensate for any Diminution in Value of the Prepetition Second Lien Collateral of the interests of the Prepetition Second Lien Secured Parties in the Prepetition Second Lien Collateral during the Cases or any Successor Cases; provided, however, any such additional section 507(b) claims shall be subject to the same relative priority as such party's Adequate

Protection Superpriority Claims, as provided in this Interim Order, and the terms of the Intercreditor Agreement.

6. **Automatic Postpetition Lien Perfection**.  This Interim Order shall be sufficient and conclusive evidence of the validity, enforceability, perfection, priority and non-avoidability of the DIP Liens and the Adequate Protection Replacement Liens without the necessity of (a) filing or recording any financing statement, deed of trust, mortgage, control agreement, or other instrument or document which may otherwise be required under the law of any jurisdiction or (b) taking any other action to validate or perfect the DIP Liens and the Adequate Protection Replacement Liens or to entitle the DIP Liens and the Adequate Protection Replacement Liens to the priorities granted herein.  Notwithstanding the foregoing, each of the DIP Agent and the Prepetition Secured Parties (in the latter case, solely with respect to the Adequate Protection Replacement Liens) may, each in their sole discretion, enter into and file, as applicable, financing statements, mortgages, security agreements, notices of liens, and other similar documents, and is hereby granted relief from the automatic stay of section 362 of the Bankruptcy Code in order to do so, and all such financing statements, mortgages, security agreements, notices, and other agreements or documents shall be deemed to have been filed or recorded at the time and on the Petition Date.  The applicable Debtors shall execute and deliver to the DIP Agent, the Prepetition First Lien Secured Agent, and/or the Prepetition Second Lien Secured Agent, as applicable, all such financing statements, mortgages, notices, and other documents as such parties may reasonably request to evidence and confirm the contemplated priority of, the DIP Liens and the Adequate Protection Replacement Liens, as applicable, granted pursuant hereto.  Without limiting the foregoing, each of the DIP Agent, the Prepetition First Lien Secured Agent, and the Prepetition Second Lien Secured Agent, each in its discretion, may file a photocopy of this Interim Order as a

financing statement with any recording officer designated to file financing statements or with any registry of deeds or similar office in any jurisdiction in which any Debtor has real or personal property, and in such event, the subject filing or recording officer shall be authorized to file or record such copy of this Interim Order.  Subject to the entry of the Final Order, any provision of any lease, loan document, easement, use agreement, proffer, covenant, license, contract, organizational document, or other instrument or agreement that requires the payment of any fees or obligations to any governmental entity or non-governmental entity in order for the Debtors to pledge, grant, mortgage, sell, assign, or otherwise transfer any fee or leasehold interest or the proceeds thereof or other DIP Collateral shall have no force or effect with respect to the Liens on such leasehold interests or other applicable DIP Collateral or the proceeds of any assignment and/or sale thereof by any Debtor, in favor of the DIP Secured Parties in accordance with the terms of the DIP Loan Documents and this Interim Order or in favor of the Prepetition Secured Parties in accordance with this Interim Order, as applicable.  To the extent that the Prepetition First Lien Secured Agent is the secured party under any security agreement, mortgage, leasehold mortgage, landlord waiver, financing statement, or account control agreements, listed as loss payee under any of the Debtors' insurance policies, or is the secured party under any of the Prepetition Secured Loan Documents, the DIP Agent shall also be deemed to be the secured party under such account control agreements, loss payee under the Debtors' insurance policies, and the secured party under each such Prepetition Secured Loan Document, shall have all rights and powers attendant to that position (including, without limitation, rights of enforcement), and shall act in that capacity and distribute any proceeds recovered or received first, for the benefit of the DIP Secured Parties in accordance with the DIP Loan Documents, second, subsequent to Payment in Full of all DIP Obligations, for the benefit of the Prepetition First Lien Secured Parties, and third, subsequent to

Payment in Full of all Prepetition First Lien Obligations, for the benefit of the Prepetition Second Lien Secured Parties.  The Prepetition First Lien Secured Agent shall serve as agent for the DIP Agent for purposes of perfecting its respective liens on all DIP Collateral that is of a type such that perfection of a lien therein may be accomplished only by possession or control by a secured party.

7.   **Reservation of Certain Third Party Rights and Bar of Challenges and Claims**. The Debtors' Stipulations shall be binding upon the Debtors and their estates in all circumstances upon entry of this Interim Order.  The Debtors' Stipulations shall be binding upon all other parties in interest, including the Committee, unless such Committee or any other party in interest (including any Chapter 11 trustee) other than the Debtors *first*, commences, by the earliest of (x) if a Committee is appointed, sixty (60) calendar days from the formation of the Committee, (y) if no Committee is formed, with respect to all parties in interest with standing other than the Debtors, seventy-five (75) calendar days following the date of entry of the Interim Order, or (z) the Qualified Bid Deadline (such time period established by the earliest of clauses (x), (y) and (z), as the same may be extended in accordance with this Paragraph 7, shall be referred to as the "Challenge Period," and the date that is the next calendar day after the termination of the Challenge Period in the event that either (i) no Challenge is raised during the Challenge Period or (ii) with respect only to those parties who commence a Challenge during the Challenge Period, such Challenge is fully and finally adjudicated, shall be referred to as the "Challenge Period Termination Date"), (A) a contested matter, adversary proceeding, or other action or "claim" (as defined in the Bankruptcy Code) challenging or otherwise objecting to the admissions, stipulations, findings, or releases included in the Debtors' Stipulations, or (B) a contested matter, adversary proceeding, or other action against any or all of the Prepetition Secured Parties in connection with or related to the Prepetition Secured Obligations (including, without limitation,

45

Prepetition First Lien Obligations converted into DIP Obligations pursuant to the Prepetition First Lien Roll-Up), or the actions or inactions of any of the Prepetition Secured Parties arising out of or related to the Prepetition Secured Obligations or otherwise, including, without limitation, any claim against any or all of the Prepetition Secured Parties in the nature of a "lender liability" cause of action, setoff, counterclaim, or defense to the Prepetition Secured Obligations (including, but not limited to, those under sections 506, 544, 547, 548, 549, 550, and/or 552 of the Bankruptcy Code or by way of suit against any of the Prepetition Secured Parties) (clauses (A) and (B) collectively, the "Challenges" and, each individually, a "Challenge"), and *second*, obtains a final, non-appealable order in favor of such party in interest sustaining any such Challenge in any such contested matter, adversary proceeding, or other action to which such Challenge is subject.  If a Chapter 7 trustee or a Chapter 11 trustee is appointed during the Challenge Period, the Challenge Period Termination Date with respect to such trustee only, shall be the later of (i) the last day of the Challenge Period and (ii) the date that is twenty (20) days after the date on which such trustee is appointed.   Except as otherwise expressly provided herein, upon the Challenge Period Termination Date and for all purposes in these Cases and any Successor Cases, (i) all payments made to or for the benefit of the Prepetition Secured Parties pursuant to, or otherwise authorized by, this Interim Order or otherwise (whether made prior to, on, or after the Petition Date) shall be indefeasible and not be subject to counterclaim, set-off, subordination, recharacterization, defense, or avoidance, (ii) any and all such Challenges by any party in interest shall be deemed to be forever released, waived, and barred; (iii) the Prepetition First Lien Obligations shall be deemed to be a fully allowed secured claim within the meaning of section 506 of the Bankruptcy Code (which claim and liens shall have been deemed satisfied in full by the repayment of the Prepetition First Lien Obligations as provided herein), (iv) the Prepetition Second Lien Obligations shall be deemed

46

to be a fully allowed secured claim (subject to the provisions set forth in this Interim Order), (v) the Debtors' Stipulations, including the release provisions therein, shall be binding on all parties in interest, including any Committee.  Notwithstanding the foregoing, to the extent any Challenge is asserted in accordance with this Interim Order, the Debtors' Stipulations and the other provisions in clauses (i) through (v) in the immediately preceding sentence shall nonetheless remain binding and preclusive on any Committee and on any other party in interest from and after the Challenge Period Termination Date, except to the extent that such Debtors' Stipulations or the other provisions in clauses (i) through (v) of the immediately preceding sentence were successfully challenged in such adversary proceeding, contested matter, or other action.  The Challenge Period may be extended only with the written consent of the Prepetition First Lien Secured Agent (with the consent of Requisite Prepetition First Lien Lenders) with respect to any Challenge against the Prepetition First Lien Secured Parties or the Prepetition Second Lien Secured Agent (with the consent of the Requisite Prepetition Second Lien Lenders) with respect to any Challenge against the Prepetition Secured Lien Secured Parties, in each case in their sole discretion.  Notwithstanding any provision to the contrary herein, nothing in this Interim Order shall be construed to grant standing on any party in interest, including any Committee, to bring any Challenge on behalf of the Debtors' estates.  The failure of any party in interest, including any Committee, to obtain an order of this Court granting standing to bring any Challenge on behalf of the Debtors' estates prior to the expiration or termination of the Challenge Period shall not be a defense to failing to commence a Challenge prior to the Challenge Period Termination Date.  In the event of a successful Challenge, the estate shall be entitled to appropriate relief, if any, under the Bankruptcy Code and applicable law.

8.    **Carve-Out**. Subject to the terms and conditions contained in this Paragraph 8, each of the DIP Liens, the DIP Superpriority Claims, the Prepetition Liens, the Adequate Protection Replacement Liens, and the Adequate Protection Superpriority Claims shall be subject and subordinate to payment of the Carve-Out (as defined below):

(a)    Carve-Out. For purposes of this Interim Order, "Carve-Out" means (a) all unpaid fees required to be paid in these Cases to the clerk of the Court and to The United States Trustee under 28 U.S.C. § 1930(a)(6); (b) subject to the terms and conditions of this Interim Order and the Approved Budget, the unpaid fees, costs, and disbursements of professionals retained by the Debtors in these Cases and the Debtors' ordinary course professionals (collectively, the "Debtors' Professionals") that are incurred prior to the delivery by the DIP Agent of a Carve-Out Trigger Notice (as defined below) and that are allowed pursuant to an order of the Court under sections 327, 328, 330, or 363 of the Bankruptcy Code and remain unpaid after application of any retainers being held by such professionals; (c) subject to the terms and conditions of this Interim Order and the Approved Budget, the reasonable unpaid fees, costs, and disbursements of professionals retained by the Committee in these Cases (collectively, the "Committee's Professionals") and all reasonable unpaid out-of-pocket expenses of the members of any Committee ("Committee Members") that are incurred prior to the delivery of a Carve-Out Trigger Notice and that are allowed by the Court under sections 328, 330, or 1103 of the Bankruptcy Code, in an aggregate amount (for both Committee Members and the Committee's Professionals) not to exceed the aggregate amount set forth in the line-item in Approved Budgets identified as Committee Professionals for all periods prior to delivery of such Carve-Out Trigger Notice; (d) the reasonable unpaid fees, costs, and disbursements of the Debtors' Professionals that are incurred after the delivery of a Carve-Out Trigger Notice, that are allowed by the Court under sections 327,

328, 330 or 363 of the Bankruptcy Code, in an aggregate amount not to exceed $200,000 (inclusive of any unused prepetition retainers held by such professionals) (the "Debtors' Professionals Carve-Out Cap"); (e) the reasonable fees, costs, and disbursements of the Committee Professionals and the reasonable expenses of Committee Members that are incurred at any time after the delivery of a Carve-Out Trigger Notice, that are allowed by the Court under sections 328 or 1103 of the Bankruptcy Code, in an aggregate amount (for both Committee Members and the Committee's Professionals) not to exceed $50,000 (the "Committee Carve-Out Cap"); and (f) solely for the benefit of Configure Partners, LLC, an amount equal to any M&A Transaction Fee (as defined, and solely to the extent provided, in the Configure Partners, LLC engagement letter dated as of September 20, 2019 (without giving effect to any subsequent amendments or modifications)) allowed by the Court and payable to Configure Partners, LLC as a result of the closing of any Acceptable Sale consented to by the DIP Agent, Prepetition Agent, and Required Lenders (the "Configure Carve-Out Cap" and, together with the Debtors' Professionals Carve-Out Cap and the Committee Carve-Out Cap, the "Post-Default Carve-Out Cap") (clauses (a), (b), (c), (d), (e), and (f) collectively, the "Carve-Out").   The term "Carve-Out Trigger Notice" shall mean a written notice delivered by the DIP Agent to the Debtors' counsel, the United States Trustee, the Prepetition Second Lien Secured Agent, and lead counsel to any Committee appointed in these Cases, which notice may be delivered at any time following the occurrence and during the continuation of any Termination Event.   After the delivery of a Carve-Out Trigger Notice, upon the later of five (5) Business Days following (i) the liquidation or sale of any DIP Collateral and (ii) any order of the Court allowing for payment of unpaid fees, costs and disbursements of the Debtors' Professionals, the Committees' Professionals or the Committee Members that are incurred after the delivery of a Carve-Out Trigger Notice, all such allowed amounts shall be paid

49

from the net proceeds of such DIP Collateral to the applicable Debtors' Professional, Committee Professional or Committee Member, provided, however, that in no circumstance shall the aggregate amounts paid on account of such fees, costs and disbursements incurred after the  delivery of a Carve-Out Trigger Notice exceed, as applicable, the Debtors' Professionals Carve-Out Cap or the Committee Carve-Out Cap.  The DIP Agent shall be entitled to establish and maintain reserves against borrowing availability under the Revolver Facility on account of the Carve-Out and fees and expenses of the Lender Professionals (as defined below) in accordance with the terms of the DIP Credit Agreement.  No amounts set forth in this subparagraph (a) with respect to the Post-Default Carve-Out Cap may be modified without the prior written consent of the DIP Agent and the Prepetition First Lien Secured Agent.  Further, prior to the delivery of a Carve-Out Trigger Notice, the Debtors are authorized to fund, on a weekly basis, a trust account held by the Debtors' counsel (the "Trust Account") up to the amounts set forth in the Approved Budget for the sole purpose of paying the fees and expenses of the Debtors' Professionals and the Committee's Professionals (collectively, the "Case Professionals").  To the extent that the Trust Account is actually funded, the Carve Out shall be reduced by such funded amount dollar-for-dollar.  Any amounts in the Trust Account after the payment of all allowed professional fees of Case Professionals shall be returned to the Debtors and shall be DIP Collateral.

(b)    No Direct Obligation to Pay Professional Fees; No Waiver of Right to Object to Fees.  Subject to their obligations under Paragraph 8(a) hereof, nothing in this Interim Order or otherwise shall be construed (i) to obligate the Prepetition First Lien Secured Agent, the Prepetition Second Lien Secured Agent or any other Prepetition Secured Parties in any way to pay compensation to, or to reimburse expenses of, any of the Debtors' Professionals or Committee's Professionals, or to guarantee that the Debtors have sufficient funds to pay such compensation or

reimbursement or (ii) to increase the Carve-Out if actual allowed fees and expenses of any of the Debtors' Professionals or Committee's Professionals are higher in fact than the Carve-Out Cap. The respective Prepetition Secured Parties' liens and claims shall be subject to the Carve-Out as set forth in this Interim Order. Nothing herein shall be construed as consent to the allowance of any professional fees or expenses of any of the Debtors, any Committee, any other official or unofficial committee in these Cases, or of any other person or entity, or shall affect the right of any DIP Secured Party or any Prepetition Secured Party to object to the allowance and payment of such fees and expenses.

(c)     <u>Payment of Allowed Professional Fees Prior to the Termination Declaration Date</u>. Prior to the occurrence of the Termination Declaration Date, the Debtors shall be permitted to pay, subject to this Interim Order, allowed fees of the Debtors' Professionals and the Committee's Professionals, subject to the Bankruptcy Code, the Bankruptcy Rules, the Local Rules and any interim compensation procedures order entered by this Court.

9.     **<u>Waiver of 506(c) Claims</u>**. Subject to the entry of the Final Order, as a further condition of the DIP Facility and any obligation of the DIP Secured Parties to make credit extensions pursuant to the DIP Loan Documents and as a condition to the respective Prepetition Secured Parties consenting to the priming set forth herein and to the use of Cash Collateral (and all such parties' consent to the payment of the Carve-Out to the extent provided herein), no costs or expenses of administration of the Cases or any Successor Cases shall be charged against or recovered from or against any or all of the Prepetition Secured Parties, the Prepetition Collateral, and the Cash Collateral pursuant to section 506(c) of the Bankruptcy Code or otherwise, without the prior written consent of the Prepetition First Lien Secured Agent or the Prepetition Second Lien Secured Agent, as the case may be, and no such consent shall be implied from any other

action, inaction, or acquiescence of any or all of the Prepetition First Lien Secured Parties and the Prepetition Second Lien Secured Parties.

10.     **After-Acquired Property**.  Except as otherwise provided in this Interim Order, pursuant to section 552(a) of the Bankruptcy Code, all property acquired by the Debtors on or after the Petition Date is not, and shall not be, subject to any Lien of any person or entity resulting from any security agreement entered into by the Debtors prior to the Petition Date, except to the extent that such property constitutes proceeds of property of the Debtors that is subject to a valid, enforceable, perfected, and unavoidable Lien as of the Petition Date and not subject to subordination under the Bankruptcy Code or other provisions or principles of applicable law.

11.     **Protection of DIP Secured Parties' Rights**.

(a)     Unless the requisite DIP Secured Parties under the DIP Loan Documents shall have provided their prior written consent or all DIP Obligations have been Paid in Full, there shall not be entered in these proceedings, or in any Successor Cases, any order which authorizes any of the following: (i) the obtaining of credit or the incurring of indebtedness that is secured by a security, mortgage, or collateral interest or other Lien on all or any portion of the DIP Collateral and/or that is entitled to administrative priority status, in each case which is superior to or *pari passu* with the DIP Liens, the DIP Superpriority Claims, and the other DIP Protections granted pursuant to this Interim Order to the DIP Secured Parties; or (ii) the use of Cash Collateral for any purpose other than to Pay in Full the DIP Obligations or as otherwise permitted in the DIP Loan Documents and this Interim Order.

(b)     The Debtors (and/or their legal and financial advisors in the case of clauses (ii) through (iv) below) will (i) maintain books, records, and accounts to the extent and as required by the DIP Loan Documents, (ii) reasonably cooperate, consult with, and provide to the DIP

Secured Parties and the Prepetition Secured Parties all such information and documents as required or allowed under the DIP Loan Documents or the provisions of this Interim Order or the Prepetition Secured Loan Documents, (iii) permit representatives of each of the DIP Agent, the Prepetition First Lien Secured Agent and the Prepetition Second Lien Secured Agent such rights to visit and inspect any of the Debtors' respective properties, to examine and make abstracts or copies from any of their respective books and records, to conduct a collateral audit and analysis of their respective inventory and accounts, to tour the Debtors' business premises and other properties, and to discuss, and provide advice with respect to, their respective affairs, finances, properties, business operations, and accounts with their respective officers, employees, and independent public accountants as and to the extent provided in the DIP Loan Documents and the Prepetition Secured Loan Documents, and (iv) permit the DIP Agent, the Prepetition First Lien Secured Agent, and the Prepetition Second Lien Secured Agent and their respective representatives to consult with the Debtors' management and advisors on matters concerning the general status of the Debtors' businesses, financial condition, and operations.   Notwithstanding anything to the contrary contained herein, nothing in this Interim Order shall require the Debtors to waive any right to attorney-client, work product, or similar privilege, and nothing in this Interim Order shall require the Debtors to provide the DIP Agent, the Prepetition First Lien Secured Agent, the Prepetition Second Lien Secured Agent, or their respective financial advisors with any information subject to attorney-client privilege or consisting of attorney work product.

      12.    **Proceeds of Subsequent Financing**.   Without limiting the provisions and protections of Paragraph 11 above, if at any time prior to the Payment in Full of all the DIP Obligations (including subsequent to the confirmation of any Chapter 11 plan or plans with respect to any of the Debtors), the Debtors' estates, any trustee, any examiner with enlarged powers, or

PHIL1 8615410v.7

any responsible officer subsequently appointed shall obtain credit or incur debt pursuant to sections 364(b), 364(c), 364(d), or any other provision of the Bankruptcy Code in violation of the DIP Loan Documents, then all of the cash proceeds derived from such credit or debt and all Cash Collateral shall immediately be turned over to the DIP Agent until Payment in Full of the DIP Obligations.

13.     **Cash Collection**.  From and after the date of the entry of this Interim Order, all collections and proceeds of any DIP Collateral or Prepetition Collateral or services provided by any Debtor and all Cash Collateral which shall at any time come into the possession, custody, or control of any Debtor, or to which any Debtor is now or shall become entitled at any time, shall be promptly deposited in the same bank accounts into which the collections and proceeds of the Prepetition Collateral were deposited under the Prepetition Secured Loan Documents (or in such other accounts as are designated by the DIP Agent from time to time) (collectively, the "Cash Collection Accounts"), which accounts shall be subject to the sole dominion and control of the DIP Agent and the Prepetition First Lien Secured Agent (and the funds in such accounts may be used by the Debtors to the extent provided in this Interim Order and the DIP Loan Documents). Upon the direction of the DIP Agent or, following Payment in Full of the DIP Obligations, the Prepetition First Lien Secured Agent, at any time after the occurrence of a Termination Event, all proceeds in the Cash Collection Accounts shall be remitted to the DIP Agent for application to the DIP Obligations until Payment in Full and then to the Prepetition First Lien Secured Agent for application to the Prepetition First Lien Obligations until Payment in Full, and the DIP Agent and the Prepetition First Lien Secured Agent shall be entitled to take all action that is necessary or appropriate to effectuate the foregoing.  Unless otherwise agreed to in writing by the DIP Agent and the Prepetition First Lien Secured Agent, the Debtors shall maintain no accounts except those identified in the Court's order approving the Debtors' continued operation of their cash

management system (the "Cash Management Order").  The Debtors and the financial institutions where the Debtors' Cash Collection Accounts are maintained (including those accounts identified in any Cash Management Order) are authorized and directed to remit, without offset or deduction, funds in such Cash Collection Accounts upon receipt of any direction to that effect from the DIP Agent or, following Payment in Full of the DIP Obligations, the Prepetition First Lien Secured Agent.  The Debtors are authorized to incur obligations and liabilities for treasury, depositary or cash management services, including overnight overdraft services, controlled disbursement, automated clearinghouse transactions, return items, overdrafts and interstate depository network services provided on a postpetition basis by any financial institution at which any Cash Collection Account is maintained; provided, however, that (i) any Lien securing any such obligations shall be junior to the DIP Liens on the funds in the Cash Collection Accounts at such financial institution, and (ii) except to the extent otherwise required by this Court, nothing herein shall require any DIP Secured Party or Prepetition First Lien Secured Party to incur any overdrafts or provide any such services or functions to the Debtors.

14.    **Disposition of DIP Collateral**.  Unless the DIP Obligations and the Prepetition First Lien Obligations are Paid in Full upon the closing of a sale or similar transaction, the Debtors shall not sell, transfer, lease, encumber, or otherwise dispose of any portion of the DIP Collateral (or enter into any binding agreement to do so) outside the ordinary course of business without the prior written consent of the requisite DIP Secured Parties under the DIP Loan Documents and the Prepetition First Lien Secured Agent (and no such consent shall be implied from any other action, inaction, or acquiescence by any DIP Secured Party or Prepetition First Lien Secured Party or any order of this Court), except as permitted in the DIP Loan Documents and/or the Prepetition First Lien Loan Documents, as applicable, and this Interim Order.

15. **Rights and Remedies Upon Termination Event**. Any automatic stay otherwise applicable to the DIP Secured Parties and the Prepetition First Lien Secured Parties is hereby modified, without requiring prior notice to or authorization of this Court, to the extent necessary to permit the DIP Secured Parties and/or the Prepetition First Lien Secured Parties, as applicable, to exercise the following rights and remedies upon the occurrence and during the continuance of any Termination Event (as set forth in section 2(f) of this Interim Order):

(a)    At any time after written notice of any Termination Event by the DIP Agent or Prepetition First Lien Secured Agent, as applicable, to the Debtors, the Committee, the Prepetition Second Lien Secured Agent, and the United States Trustee (such notice shall be referred to herein as a "Termination Declaration," and the earliest date on which a Termination Declaration is provided shall be referred to herein as the "Termination Declaration Date"), and provided such Termination Event is not cured by the Debtors during such notice period, the DIP Secured Parties and/or Prepetition First Lien Secured Parties, as applicable, shall have the right to: (i) terminate any or all of the DIP Obligations; (ii) declare the principal amount then outstanding of, and the accrued interest on, any or all of the DIP Obligations and all other amounts payable by the Debtors under the DIP Loan Documents to be forthwith due and payable, whereupon such amounts shall be immediately due and payable without presentment, demand, protest, or other formalities of any kind, all of which are hereby expressly waived by the Debtors; (iii) terminate the DIP Facility and any DIP Loan Document as to any future liability or obligation of the DIP Secured Parties, but without affecting any of the DIP Obligations or the DIP Liens securing the DIP Obligations; (iv) declare a termination, reduction, or restriction on the ability of the Debtors to use any proceeds of the DIP Facility, DIP Collateral and/or Prepetition Collateral, including Cash Collateral (except as permitted in Paragraph 15(b) below); (v) reduce any claim to judgment;

PHIL1 8615410v.7

(vi) take any other action permitted by law; and/or (vii) take any action permitted to be taken by the DIP Loan Documents during the continuance of any Termination Event.

(b)     Five (5) Business Days following a Termination Declaration Date (provided that the Debtors have not cured the existing Termination Events during such period), the DIP Secured Parties, and, upon Payment in Full of the DIP Obligations, the Prepetition First Lien Secured Parties, shall have further relief from the automatic stay to the extent necessary to foreclose on all or any portion of the DIP Collateral or Prepetition Collateral, as applicable, collect accounts receivable, and apply the proceeds thereof to the DIP Obligations and/or Prepetition First Lien Obligations, as applicable, occupy the Debtors' premises to sell or otherwise dispose of the DIP Collateral or Prepetition Collateral, as applicable, or otherwise exercise remedies against the DIP Collateral or Prepetition Collateral, as applicable, permitted by applicable nonbankruptcy law. During the five (5) Business Day period after a Termination Declaration Date, the Debtors, the DIP Agent, the Prepetition First Lien Secured Agent, the Prepetition Second Lien Secured Agent, and any Committee shall be entitled to an emergency hearing before the Court for the sole purpose of contesting whether a Termination Event has occurred and section 105 of the Bankruptcy Code may not be invoked by the Debtors, the Committee, or any other party in interest in an effort to restrict or preclude any DIP Secured Party from exercising any rights or remedies set forth in this Interim Order or the DIP Loan Documents.  Unless during such period the Court determines that a Termination Event has not occurred and/or is not continuing, the automatic stay, as to the DIP Secured Parties (and, upon Payment in Full of the DIP Obligations, as to the Prepetition First Lien Secured Parties), shall automatically terminate at the end of such five (5) Business Day period, without further notice or order.  During such five (5) Business Day period, which period shall run concurrently with any other notice or cure period provided for in this Interim Order or the DIP

57

Loan Documents, the Debtors shall not be permitted to use Cash Collateral or any amounts under the DIP Facility except to pay payroll and other expenses critical to avoid immediate and irreparable harm to the Debtors' business and assets (and in no event in violation of the Budget Covenants).  For the avoidance of doubt, (i) the Prepetition First Lien Secured Parties shall also have the benefit of the automatic stay relief and other provisions set forth in this Paragraph 15 upon the Payment in Full of the DIP Obligations with respect to any Termination Event, and (ii) the Prepetition Second Lien Secured Parties shall also have the benefit of the automatic stay relief and other provisions set forth in this Paragraph 15 upon the Payment in Full of the DIP Obligations and the Prepetition First Lien Obligations.

(c)    All proceeds realized in connection with the exercise of the rights and remedies of the DIP Secured Parties or the Prepetition Secured Parties, as applicable, shall be turned over to the DIP Agent for application to the other DIP Obligations under, and in accordance with, the provisions of the DIP Loan Documents until Payment in Full of the DIP Obligations; provided, that in the event of the liquidation of the Debtors' estates after the occurrence and during the continuance of a Termination Event, the Carve-Out shall be funded into a segregated account exclusively (i) first, from proceeds of any unencumbered assets of the Debtors, and (ii) then from Cash Collateral received by the DIP Agent subsequent to the date of termination of the DIP Obligations and prior to the distribution of any such Cash Collateral to any other parties in interest.

(d)    Subject to entry of the Final Order, and notwithstanding anything contained herein to the contrary, and without limiting any other rights or remedies of the DIP Agent or the other DIP Secured Parties contained in this Interim Order or the DIP Loan Documents, or otherwise available at law or in equity, and subject to the terms of the DIP Loan Documents, upon five (5) Business Days' written notice to the Debtors and any landlord, lienholder, licensor, or

other third party owner of any leased or licensed premises or intellectual property that a Termination Event has occurred and is continuing, the DIP Agent (i) may, unless otherwise provided in any separate agreement by and between the applicable landlord or licensor and the DIP Agent (the terms of which shall be reasonably acceptable to the parties thereto), enter upon any leased or licensed premises of the Debtors for the purpose of exercising any remedy with respect to Collateral located thereon and (ii) shall be entitled to all of the Debtors' rights and privileges as lessee or licensee under the applicable license and to use any and all trademarks, trade names, copyrights, licenses, patents, or any other similar assets of the Debtors, which are owned by or subject to a Lien of any third party and which are used by Debtors in their businesses, in either the case of subparagraph (i) or (ii) of this Paragraph 15(e) without interference from lienholders or licensors thereunder, subject to such lienholders' or licensors' rights under applicable law; provided, however, that the DIP Agent, on behalf of the DIP Secured Parties, shall pay only rent and additional rent, fees, royalties, or other obligations of the Debtors that first arise after the written notice referenced above from the DIP Agent and that accrue during the period of such occupancy or use by such DIP Agent calculated on a *per diem* basis. Nothing herein shall require the Debtors, the DIP Agent, or the other DIP Secured Parties to assume any lease or license under section 365(a) of the Bankruptcy Code as a precondition to the rights afforded to the DIP Agent and the other DIP Secured Parties in this Paragraph 15(e).

(e)     The automatic stay imposed under section 362(a) of the Bankruptcy Code is hereby modified pursuant to the terms of this Interim Order and the DIP Loan Documents as necessary to (i) permit the Debtors to grant the Adequate Protection Replacement Liens and the DIP Liens and to incur all liabilities and obligations to the Prepetition Secured Parties and the DIP Secured Parties under the DIP Loan Documents, the DIP Facility, and this Interim Order, (ii)

authorize the DIP Secured Parties and the Prepetition Secured Parties to retain and apply payments hereunder, and (iii) otherwise to the extent necessary to implement and effectuate the provisions of this Interim Order.

16.    **Restriction on Use of Proceeds**.  Notwithstanding anything herein to the contrary (including, without limitation, in Paragraph 8 hereof), no loans and/or proceeds from the DIP Facility, DIP Collateral, Cash Collateral (including any prepetition retainer held by any professionals for the below-referenced parties), Prepetition Collateral, or any portion of the Carve-Out may be used by (a) any Debtor, any Committee or trustee or other estate representative appointed in the Cases or any Successor Cases, or any other person, party, or entity to (or to pay any professional fees and disbursements incurred in connection therewith) investigate or prosecute any Challenge or any other litigation in connection with the value of the Prepetition Collateral or the DIP Collateral; and (b) any of the Debtors, any Committee, and any trustee or other estate representative appointed in the Cases or any Successor Cases, or any other person, party, or entity to (or to pay any professional fees and disbursements incurred in connection therewith): (i) request authorization to obtain postpetition loans or other financial accommodations pursuant to Bankruptcy Code section 364(c) or (d), or otherwise, other than from the DIP Secured Parties; (ii) investigate (except as set forth below), assert, join, commence, support, or prosecute any action for any claim, counter-claim, action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination, or similar relief against, or adverse to the interests of, in any capacity, any or all of the DIP Secured Parties, the Prepetition Secured Parties, and their respective officers, directors, employees, agents, attorneys, affiliates, assigns, or successors, with respect to any transaction, occurrence, omission, action, or other matter (including formal discovery proceedings in anticipation thereof), including, without limitation, (A) any

Challenges and any Avoidance Actions or other actions arising under chapter 5 of the Bankruptcy Code; (B) any action with respect to the validity, enforceability, priority, and extent of the DIP Obligations and/or the respective Prepetition Secured Obligations, or the validity, extent, and priority of the DIP Liens, the Prepetition Liens, or the Adequate Protection Replacement Liens; (C) any action seeking to invalidate, set aside, avoid, or subordinate, in whole or in part, the DIP Liens, the other DIP Protections, the Prepetition Liens, the Adequate Protection Replacement Liens, or the other Prepetition First Lien Secured Parties' Adequate Protection or Prepetition Second Lien Secured Parties' Adequate Protection; (D) except to contest in good faith the occurrence or continuance of any Termination Event as permitted in Paragraph 15, any action seeking, or having the effect of, preventing, hindering, or otherwise delaying any or all of the DIP Secured Parties' (and, after the Payment in Full of the DIP Obligations, the Prepetition First Lien Secured Parties', and, after the Payment in Full of the Prepetition First Lien Obligations, the Prepetition Second Lien Secured Parties') assertion, enforcement, or realization on the Cash Collateral or the DIP Collateral in accordance with the DIP Loan Documents or the Prepetition Secured Loan Documents, as applicable, or this Interim Order; and/or (E) any action seeking to modify any of the rights, remedies, priorities, privileges, protections, and benefits granted to any or all of the DIP Secured Parties and the Prepetition First Lien Secured Parties hereunder or under the DIP Loan Documents or the Prepetition Secured Loan Documents, as applicable; provided, however, up to $50,000 in the aggregate of the Carve-Out, any DIP Collateral, any Prepetition Collateral, any Cash Collateral or proceeds of the DIP Facility may be used by the Committee (to the extent such committee is appointed) to investigate (but not prosecute) the extent, validity, and priority of the Prepetition Secured Obligations, the Prepetition Liens, or any other claims against the Prepetition Secured Parties so long as such investigation occurs within the Challenge Period;

(iii) pay any fees or similar amounts to any person (other than the Prepetition Secured Parties) who has proposed or may propose to purchase interests in any of the Debtors without the prior written consent of the DIP Agent; or (iv) use or seek to use Cash Collateral or sell or otherwise dispose of DIP Collateral, unless otherwise permitted hereby, without the consent of the DIP Secured Parties or the Prepetition Secured Parties, as applicable.

17.     **Proofs of Claim**.  Upon entry of the Final Order, the Prepetition First Lien Secured Parties and the Prepetition Second Lien Secured Parties will not be required to file proofs of claim in any of the Cases or Successor Cases for any claim allowed herein.  The Debtors' Stipulations shall be deemed to constitute a timely filed proof of claim for the Prepetition First Lien Secured Parties and the Prepetition Second Lien Secured Parties.  Notwithstanding any order entered by the Court in relation to the establishment of a bar date in any of the Cases or Successor Cases to the contrary, the Prepetition First Lien Secured Agent for the benefit of itself and the other Prepetition First Lien Secured Parties, and the Prepetition Second Lien Secured Agent for the benefit of itself and the Prepetition Second Lien Secured Lenders, are hereby authorized and entitled, in their sole discretion, but not required, to file (and amend and/or supplement, as they see fit) a proof of claim and/or aggregate proofs of claim in each of the Cases or Successor Cases for any claim allowed herein.

18.     **Preservation of Rights Granted Under the Interim Order**.

(a)     No Non-Consensual Modification or Extension of Interim Order.  The Debtors irrevocably waive any right to seek any amendment, modification, or extension of this Interim Order without the prior written consent of the DIP Agent, Requisite DIP Lenders, the Prepetition First Lien Secured Agent, and the Prepetition Second Lien Secured Agent (solely to the extent the interests of the Prepetition Second Lien Secured Parties are adversely affected by

such amendment, modification or extension) and no such consent shall be implied by any other action, inaction, or acquiescence of the DIP Secured Parties or any of the Prepetition Secured Parties.  In the event any or all of the provisions of this Interim Order are hereafter modified, amended, or vacated by a subsequent order of this Court or any other court, such modification, amendment, or vacatur shall not affect the validity, perfection, priority, allowability, enforceability, or non-avoidability of any advances, payments, or use of cash whether previously or hereunder, or lien, claim, or priority authorized or created hereby.  Based on the findings set forth in this Interim Order and in accordance with section 364(e) of the Bankruptcy Code, which is applicable to the DIP Facility contemplated by this Interim Order, in the event any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated, or stayed by a subsequent order of this Court or any other court, the DIP Secured Parties and the Prepetition Secured Parties shall be entitled to the protections provided in section 364(e) of the Bankruptcy Code, and no such reversal, modification, vacatur, or stay shall affect (i) the validity, priority, or enforceability of any DIP Protections and the Prepetition Secured Parties' Adequate Protection granted or incurred prior to the actual receipt of written notice by the DIP Agent, the Prepetition First Lien Secured Agent, or the Prepetition Second Lien Secured Agent, as the case may be, of the effective date of such reversal, modification, vacatur, or stay or (ii) the validity or enforceability of any lien or priority authorized or created hereby or pursuant to the DIP Loan Documents with respect to any DIP Obligations and the Prepetition Secured Parties' Adequate Protection. Notwithstanding any such reversal, modification, vacatur, or stay, any use of Cash Collateral or any DIP Obligations or Prepetition Secured Parties' Adequate Protection incurred or granted by the Debtors prior to the actual receipt of written notice by the DIP Agent, the Prepetition First Lien Secured Agent, or the Prepetition Second Lien Secured Agent, as applicable, of the effective date

of such reversal, modification, vacatur, or stay shall be governed in all respects by the original provisions of this Interim Order, and the DIP Secured Parties and the Prepetition Secured Parties shall be entitled to all of the DIP Protections and Prepetition Secured Parties' Adequate Protection, as the case may be, and all other rights, remedies, liens, priorities, privileges, protections, and benefits granted in section 364(e) of the Bankruptcy Code, this Interim Order, and pursuant to the DIP Loan Documents with respect to all uses of Cash Collateral and all DIP Obligations and Prepetition Secured Parties' Adequate Protection.

(b)     <u>Dismissal</u>.  If any order dismissing any of the Cases under section 1112 of the Bankruptcy Code or otherwise is at any time entered, such order shall provide (in accordance with sections 105 and 349 of the Bankruptcy Code), to the fullest extent permitted by law, that (i) the DIP Protections and the Prepetition Secured Parties' Adequate Protection shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order until all DIP Obligations have been Paid in Full, the Prepetition First Lien Obligations have been Paid in Full, and the Prepetition Second Lien Obligations have been Paid in Full in cash or otherwise satisfied in full (and that all DIP Protections and the Prepetition Secured Parties' Adequate Protection shall, notwithstanding such dismissal, remain binding on all parties in interest), and (ii) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing such DIP Protections and the Prepetition Secured Parties' Adequate Protection.

(c)     <u>Survival of Interim Order</u>.  The provisions of this Interim Order and the DIP Loan Documents, any actions taken pursuant hereto or thereto, and all of the DIP Protections, the Prepetition Secured Parties' Adequate Protection, and all other rights, remedies, liens, priorities, privileges, protections, and benefits granted to any or all of the DIP Secured Parties and the Prepetition Secured Parties shall survive, and shall not be modified, impaired, or discharged by,

64

the entry of any order confirming any plan of reorganization in any Case, converting any Case to a case under chapter 7, dismissing any of the Cases, withdrawing of the reference of any of the Cases or any Successor Cases or providing for abstention from handling or retaining of jurisdiction of any of the Cases in this Court, or terminating the joint administration of these Cases or by any other act or omission.  The terms and provisions of this Interim Order, including all of the DIP Protections, the Prepetition Secured Parties' Adequate Protection, and all other rights, remedies, liens, priorities, privileges, protections, and benefits granted to any or all of the DIP Secured Parties and the Prepetition Secured Parties, shall continue in full force and effect notwithstanding the entry of any such order, and such DIP Protections and Prepetition Secured Parties' Adequate Protection shall continue in these proceedings and in any Successor Cases, and shall maintain their respective priorities as provided by this Interim Order.  Subject to the provisions of this Interim Order and the DIP Loan Documents that permit the treatment of the DIP Obligations under the DIP Facility pursuant to a Chapter 11 plan with respect to any of the Debtors, the DIP Obligations shall not be discharged by the entry of an order confirming a Chapter 11 plan, the Debtors having waived such discharge pursuant to section 1141(d)(4) of the Bankruptcy Code.

19.    **Insurance Policies**.  Upon entry of this Interim Order, the DIP Secured Parties and the Prepetition Secured Parties shall be, and shall be deemed to be, without any further action or notice, named as additional insureds and loss payees on each insurance policy maintained by the Debtors which in any way relates to the Collateral, subject in all respects to the Intercreditor Agreement and the relative priorities set forth therein and in this Interim Order.

20.    **Other Rights and Obligations**.

(a)    Expenses.  As and to the extent provided in the DIP Loan Documents, and to the extent set forth in the Approved Budget, the applicable Debtors will pay all reasonable

expenses incurred by the DIP Agent and DIP Lenders (including, without limitation, the reasonable fees and disbursements of all counsel for the DIP Agent and DIP Lenders and any internal or third-party appraisers, consultants, and auditors advising the DIP Agent).

(b)     Notice of Professional Fees.  Professionals for the DIP Secured Parties and the Prepetition First Lien Secured Parties (collectively, the "Lender Professionals") shall not be required to comply with the United States Trustee fee rules or guidelines or submit invoices to the Court, United States Trustee, any Committee or any other party-in-interest absent further court order.  Copies of summary invoices submitted to the Debtors by such Lender Professionals shall be forwarded by the Debtors to the United States Trustee and counsel for any Committee.  The summary invoices shall be sufficiently detailed to enable a determination as to the reasonableness of such fees and expenses; provided, however, that such summary invoices may be redacted to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, and the provision of such summary invoices shall not constitute any waiver of the attorney-client privilege or of any benefits of the attorney work product doctrine.  If the Debtors, United States Trustee, or counsel for any Committee object to the reasonableness of the fees and expenses of any of the Lender Professionals and cannot resolve such objection, the Debtors, United States Trustee, or the Committee, as the case may be, shall file with the Court and serve on such Lender Professionals an objection (the "Fee Objection") limited to the issue of the reasonableness of such fees and expenses within ten (10) days of receipt of such invoices.  Any hearing on an objection to payment of any fees, costs, and expenses set forth in a professional fee invoice shall be limited to the reasonableness or necessity of the particular items or categories of the fees, costs, and expenses that are the subject of such objection.  The Debtors shall timely pay in accordance with the terms

and conditions of this Interim Order the undisputed fees, costs, and expenses reflected on any invoice to which a Fee Objection has been timely filed. The Debtors shall indemnify the DIP Agent and the DIP Lenders (and other applicable parties) to the extent set forth in the DIP Loan Documents, including, without limitation, as provided in Section 9.6 of the DIP Credit Agreement. All such unpaid fees, costs, expenses, charges, and indemnities of the DIP Agent that have not been disallowed by this Court on the basis of an objection filed by the United States Trustee or the Committee (or any subsequent trustee of the Debtors' estates) in accordance with the terms hereof shall constitute DIP Obligations and shall be secured by the DIP Collateral as specified in this Interim Order. Any and all fees, commissions, costs, and expenses paid prior to the Petition Date by any Debtor to the DIP Agent or the DIP Lenders in connection with or with respect to the DIP Facility, the DIP Credit Agreement, or the other DIP Loan Documents are hereby approved in full and non-refundable.

(c)     Binding Effect. Subject to Paragraph 7 above, the provisions of this Interim Order, including all findings herein, and the DIP Loan Documents shall be binding upon all parties in interest in these Cases, including, without limitation, the DIP Secured Parties, the Prepetition Secured Parties, any Committee, and the Debtors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary or responsible person appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors), whether in any of the Cases, in any Successor Cases, or upon dismissal of any such Case or Successor Case; provided, however, that the DIP Secured Parties and the Prepetition Secured Parties shall have no obligation to permit

PHIL1 8615410v.7

the use of Cash Collateral or to extend any financing to any chapter 7 or chapter 11 trustee or other responsible person appointed for the estates of the Debtors in any Case or Successor Case.

(d)     No Waiver.  Neither the failure of the Prepetition Secured Parties to seek relief or otherwise exercise their rights and remedies under this Interim Order, the Prepetition Secured Loan Documents, or otherwise (or any delay in seeking or exercising same), nor the failure of the DIP Secured Parties to seek relief or otherwise exercise their respective rights and remedies under this Interim Order, the DIP Loan Documents, or otherwise (or any delay in seeking or exercising same), shall constitute a waiver of any of such parties' rights hereunder, thereunder, or otherwise.  Nothing contained in this Interim Order (including, without limitation, the authorization of the use of any Cash Collateral) shall impair or modify any rights, claims, or defenses available in law or equity to any Prepetition Secured Party or any DIP Secured Party, including, without limitation, rights of a party to a swap agreement, securities contract, commodity contract, forward contract, or repurchase agreement with a Debtor to assert rights of setoff or other rights with respect thereto as permitted by law (or the right of a Debtor to contest such assertion). Except as prohibited by this Interim Order, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise impair, the ability of the Prepetition Secured Parties or the DIP Secured Parties under the Bankruptcy Code or under non-bankruptcy law to (i) request conversion of the Cases to cases under chapter 7, dismissal of the Cases, or the appointment of a trustee in the Cases, (ii) propose, subject to the provisions of section 1121 of the Bankruptcy Code, any Chapter 11 plan or plans with respect to any of the Debtors, or (iii) except as expressly provided herein, exercise any of the rights, claims, or privileges (whether legal, equitable, or otherwise) of the DIP Secured Parties or the Prepetition Secured Parties, respectively.  Except to the extent otherwise expressly provided in this Interim Order, neither the

68

commencement of the Cases nor the entry of this Interim Order shall limit or otherwise modify the rights and remedies of the Prepetition Secured Parties with respect to non-Debtor entities or their respective assets, whether such rights and remedies arise under the Prepetition Secured Loan Documents, applicable law, or equity. Nothing in this Interim Order or in any DIP Loan Document shall in any way modify the terms of the Intercreditor Agreement or the rights, and obligations of the parties thereunder. The Intercreditor Agreement shall continue to apply to the Prepetition First Lien Obligations converted to DIP Obligations pursuant to the terms hereof.

(e)  <u>No Third Party Rights</u>. Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder, or any direct, indirect, or incidental beneficiary. In determining to make any loan (whether under the DIP Credit Agreement or otherwise) or to permit the use of Cash Collateral or in exercising any rights or remedies as and when permitted pursuant to this Interim Order or the DIP Loan Documents, the DIP Secured Parties and the Prepetition Secured Parties shall not (i) be deemed to be in control of the operations of the Debtors or (ii) owe any fiduciary duty to the Debtors, their respective creditors, shareholders, or estates.

(f)  <u>No Marshaling</u>. Neither the DIP Secured Parties nor the Prepetition Secured Parties shall be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral or the Prepetition Collateral, as applicable.

(g)  <u>Amendments</u>. The Debtors are authorized and empowered, without further notice and hearing or approval of this Court, to amend, modify, supplement, or waive any provision of the DIP Loan Documents in accordance with the provisions thereof, in each case unless such amendment, modification, supplement, or waiver (i) increases the interest rate (other than as a result of the imposition of the default rate), (ii) increases the aggregate commitments of all of the

69

DIP Lenders in respect of the DIP Facility, (iii) changes the stated maturity of the DIP Obligations more than 30 days beyond July 27, 2020, or (iv) adds or amends (in any respect unfavorable to the Debtors) any Termination Event. No waiver, modification, or amendment of any of the provisions hereof shall be effective unless set forth in writing, signed by or on behalf of all the Debtors and the DIP Agent (after having obtained the approval of Requisite DIP Lenders) and, except as provided herein, approved by this Court. Notwithstanding the foregoing, no waiver, modification or amendment of any of the provisions of this Interim Order or the DIP Loan Documents that would directly and adversely affect the rights or interests of the Prepetition First Lien Secured Parties or the Prepetition Second Lien Secured Parties, as applicable, shall be effective unless also consented to in writing by the adversely affected Prepetition First Lien Secured Agent (on behalf of and after obtaining the approval of the applicable Prepetition First Lien Secured Parties as required under the Prepetition First Lien Secured Credit Agreement) and/or the Prepetition Second Lien Secured Agent (on behalf of the Prepetition Second Lien Secured Parties), as applicable; provided, however, that in no event shall any modification of the respective Sale Process Deadlines by ten (10) business days or less constitute an adverse effect on the Prepetition Second Lien Secured Parties giving rise to a consent right of the Prepetition Second Lien Secured Parties under this subparagraph (g).

(h)     Inconsistency. In the event of any inconsistency between the terms and conditions of the DIP Loan Documents and of this Interim Order, the provisions of this Interim Order shall govern and control. Notwithstanding anything to the contrary contained in any other orders of this Court, any payment made or to be made under such orders, any authorization contained in such orders, or any claim for which payment is authorized under such orders shall be

70

subject to the requirements imposed on the Debtors under this Interim Order, the Budget, and the DIP Loan Documents.

(i)     _Enforceability_.  This Interim Order shall constitute findings of fact and conclusions of law pursuant to the Bankruptcy Rule 7052 and shall take effect and be fully enforceable _nunc pro tunc_ to the Petition Date immediately upon execution hereof. Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062 or 9024 or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry, and there shall be no stay of execution or effectiveness of this Interim Order.

(j)     _Reservation of Rights_.  Nothing in this Interim Order shall be deemed to constitute the consent of the DIP Secured Parties, the Prepetition First Lien Secured Parties, or the Prepetition Second Lien Secured Parties, and each of the foregoing expressly reserve the right to object, to entry of any Order of the Court that provides for the sale of all or substantially all of the assets of the Debtors to any party unless, in connection and concurrently with any such event, the proceeds of such sale are or will be sufficient to Pay in Full the DIP Obligations, the Prepetition First Lien Obligations, the Prepetition First Lien Secured Parties' Adequate Protection, the Prepetition Second Lien Obligations and the Prepetition Second Lien Secured Parties' Adequate Protection, and all of the foregoing are Paid in Full on the closing date of such sale.

(k)     _Headings_.  Paragraph headings used herein are for convenience only and are not to affect the construction of, or to be taken into consideration in, interpreting this Interim Order.

21. **Final Hearing**

(a)    <u>Final Hearing Date and Time</u>.  The Final Hearing to consider entry of the Final Order and final approval of the DIP Facility is scheduled for _____, 2020 at _____ (prevailing Eastern Time) at the United States Bankruptcy Court for the District of Delaware.  The proposed Final Order shall be substantially the same as the Interim Order except that those provisions in the Interim Order that are subject to the entry of the Final Order shall be included in the Final Order without such qualification.  If no objections to the relief sought in the Final Hearing are filed and served in accordance with this Interim Order, no Final Hearing may be held, and a separate Final Order may be presented by the Debtors and entered by this Court.

(b)    <u>Final Hearing Notice</u>.  Within three (3) business days of the entry of this Interim Order, the Debtors shall serve, by United States mail, first-class postage prepaid, (such service constituting adequate notice of the Final Hearing) (i) notice of the entry of this Interim Order and of the Final Hearing (the "<u>Final Hearing Notice</u>") and (ii) a copy of this Interim Order, on the parties having been given notice of the Interim Hearing and to any other party that has filed a request for notices with this Court and to any Committee after the same has been appointed, or Committee counsel, if the same shall have been appointed.  The Final Hearing Notice shall state that any party in interest objecting to the entry of the proposed Final Order shall file written objections with the Clerk of the Court no later than _____, 2020 at _____ (prevailing Eastern time) (the "<u>Objection Deadline</u>"), which objections shall be served so that the same are received on or before such date by:  (a) counsel for the Debtors,  Klehr Harrison Harvey Branzburg LLP, 919 North Market Street, Suite 1000, Wilmington, Delaware 19801, Attn: Domenic E. Pacitti (dpacitti@klehr.com) and Michael W. Yurkewicz (myurkewicz@klehr.com); (b) counsel for the DIP Agent and the Prepetition First Lien Secured Agent, Latham & Watkins

72

LLP, 330 N. Wabash Avenue, Suite 2800, Chicago, IL 60611, Attn: James Ktsanes (james.ktsanes@lw.com) and Jeramy D. Webb (jeramy.webb@lw.com); and Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, DE 19801, Attn: Michael R. Nestor (mnestor@ycst.com) and Andrew L. Magaziner (amagaziner@ycst.com); (c) counsel to the Prepetition Second Lien Secured Agent, Morgan, Lewis & Bockius LLP, 1701 Market Street, Philadelphia, PA 19103, Attn: Barbara J. Shander (barbara.shander@morganlewis.com); (d) Office of the United States Trustee, 844 King Street, Suite 2207, Lock Box 35, Wilmington, Delaware 19801, Attn: David Buchbinder (david.l. buchbinder@usdoj.gov); and (e) counsel to any Committee, and such objections shall be filed with the Clerk of the United States Bankruptcy Court for the District of Delaware, in each case to allow actual receipt of the foregoing no later than the Objection Deadline.

22.    **Retention of Jurisdiction**.  The Court has and will retain jurisdiction to enforce this Interim Order according to its terms.

PHIL1 8615410v.7

## Exhibit A

**Initial Approved Budget**

(see attached)

**<u>Exhibit B</u>**

**DIP Credit Agreement**

(see attached)

`

Schedule 1.1(b)

DIP Revolving Loan Commitments

| | |
|---|---|
| Antares Holdings LP | $12,774,666.70 |
| MidCap Financial Trust | $9,225,333.30 |
| **Total:** | **$22,000,000.00** |

Schedule 1.2

Prior Letters of Credit

None

Prior LIFO L/C Loan Commitments

None

Prior Original L/C Loan Commitments

None

## **Exhibit B**

## **Form of Asset Purchase Agreement**

See attached.

*Execution version*

**ASSET PURCHASE AGREEMENT**

**by and among**

**BL RESTAURANTS HOLDING, LLC,**

**BL RESTAURANT OPERATIONS, LLC,**

**BL RESTAURANT FRANCHISES, LLC,**

**BL HUNT VALLEY, LLC**

**and**

**BLH ACQUISITION CO., LLC**

**January 26, 2020**

# TABLE OF CONTENTS

**Page**

Article I

       DEFINITIONS.................................................................................................2

Article II

       PURCHASE AND SALE .................................................................12

**Section 2.1**   **Purchase and Sale of Purchased Assets** ...................................12
**Section 2.2**   **Excluded Assets**................................................................15
**Section 2.3**   **Assumption of Assumed Liabilities**...................................16
**Section 2.4**   **Excluded Liabilities**.........................................................18
**Section 2.5**   **Consideration**...................................................................18
**Section 2.6**   **Assumption and Assignment of Contracts.** ........................18
**Section 2.7**   **Schedule Updates.**.............................................................19
**Section 2.8**   **Closing.**............................................................................20
**Section 2.9**   **Deliveries at Closing.** .......................................................20
**Section 2.10**  **Allocation**.........................................................................22
**Section 2.11**  **Excluded Locations**..........................................................22

Article III

       SELLERS' REPRESENTATIONS AND WARRANTIES ...............................22

**Section 3.1**   **Organization of Sellers; Good Standing.** ...........................22
**Section 3.2**   **Authorization of Transaction**...........................................23
**Section 3.3**   **Noncontravention; Consents and Approvals**.....................23
**Section 3.4**   **Compliance with Laws** .....................................................24
**Section 3.5**   **Title to Purchased Assets**.................................................24
**Section 3.6**   **Contracts**.........................................................................24
**Section 3.7**   **Intellectual Property**.......................................................25
**Section 3.8**   **Litigation**........................................................................25
**Section 3.9**   **Employees and Employment Matters**.................................25
**Section 3.10**  **Employee Benefit Plans.**...................................................27
**Section 3.11**  **Real Property.** .................................................................28
**Section 3.12**  **Tangible Personal Property**.............................................29
**Section 3.13**  **Permits.**...........................................................................29
**Section 3.14**  **Purchased Inventory**........................................................29
**Section 3.15**  **Environmental Matters**...................................................30
**Section 3.16**  **Financial Statements**.......................................................30
**Section 3.17**  **Brokers' Fees**..................................................................31
**Section 3.18**  **No Other Agreements to Purchase**...................................31
**Section 3.19**  **Taxes**..............................................................................31
**Section 3.20**  **No Other Representations or Warranties**..........................32

i

Article IV

      BUYER'S REPRESENTATIONS AND WARRANTIES ...................................33

      Section 4.1    **Organization of Buyer** ........................................................33
      Section 4.2    **Authorization of Transaction** .............................................33
      Section 4.3    **Noncontravention** ..............................................................34
      Section 4.4    **Litigation** .........................................................................34
      Section 4.5    **Adequate Assurances Regarding Executory Contracts** .....34
      Section 4.6    **Brokers' Fees** ....................................................................34
      Section 4.7    **No Outside Reliance** ..........................................................34

Article V

      PRE-CLOSING COVENANTS ...................................................................35

      Section 5.1    **Notices and Consents**.........................................................35
      Section 5.2    **Bankruptcy Actions**..........................................................36
      Section 5.3    **Conduct of Business**..........................................................38
      Section 5.4    **Notice of Developments**......................................................40
      Section 5.5    **Antitrust Notification**.......................................................40
      Section 5.6    **Access**..............................................................................41
      Section 5.7    **Press Releases and Public Announcements** .......................42
      Section 5.8    **Bulk Transfer Laws** ..........................................................42
      Section 5.9    **Release of Claims** .............................................................42
      Section 5.10   **Additional DIP Indebtedness**.............................................42

Article VI

      OTHER COVENANTS ...............................................................................43

      Section 6.1    **Cooperation** .....................................................................43
      Section 6.2    **Further Assurances** ..........................................................43
      Section 6.3    **Availability of Business Records** ........................................43
      Section 6.4    **Employee Matters**.............................................................44
      Section 6.5    **Transfer Taxes** .................................................................45
      Section 6.6    **Wage Reporting** ...............................................................45
      Section 6.7    **Insurance Policies** ............................................................45
      Section 6.8    **Collection of Accounts Receivable**......................................45
      Section 6.9    **Liquor License Approvals** .................................................46
      Section 6.10   **Data Privacy Protection** ....................................................46
      Section 6.11   **Alternate Transactions** .....................................................46
      Section 6.12   **Covenant Not to Sue**.........................................................46

Article VII

      CONDITIONS TO CLOSING ......................................................................47

      Section 7.1    **Conditions to Buyer's Obligations**......................................47
      Section 7.2    **Conditions to Sellers' Obligations** .....................................48
      Section 7.3    **No Frustration of Closing Conditions**................................49

**Section 7.4**    **Waiver of Conditions** ...............................................................................49

Article VIII

        TERMINATION ..................................................................................49

**Section 8.1**    **Termination of Agreement** ....................................................................49
**Section 8.2**    **Procedure upon Termination** ...............................................................51
**Section 8.3**    **Breakup Fee and Expense Reimbursement** ..........................................51
**Section 8.4**    **Effect of Termination** ...........................................................................52

Article IX

        MISCELLANEOUS ...........................................................................52

**Section 9.1**     **Remedies** ..............................................................................................52
**Section 9.2**     **Expenses** ...............................................................................................52
**Section 9.3**     **Entire Agreement** .................................................................................52
**Section 9.4**     **Incorporation of Schedules, Exhibits and Disclosure Schedule** ..........53
**Section 9.5**     **Amendments and Waivers** .....................................................................53
**Section 9.6**     **Succession and Assignment** ..................................................................53
**Section 9.7**     **Notices** ..................................................................................................53
**Section 9.8**     **Governing Law; Jurisdiction** ...............................................................54
**Section 9.9**     **Consent to Service of Process** ..............................................................55
**Section 9.10**    **WAIVERS OF JURY TRIAL** ...............................................................55
**Section 9.11**    **Severability** ...........................................................................................55
**Section 9.12**    **No Third Party Beneficiaries** ...............................................................55
**Section 9.13**    **No Survival of Representations, Warranties and Agreements** ..............55
**Section 9.14**    **Non-Recourse** .......................................................................................56
**Section 9.15**    **Construction** .........................................................................................56
**Section 9.16**    **Computation of Time** ............................................................................56
**Section 9.17**    **Mutual Drafting** ...................................................................................56
**Section 9.18**    **Disclosure Schedule** .............................................................................56
**Section 9.19**    **No Waiver or Release** ...........................................................................57
**Section 9.20**    **Headings; Table of Contents** ...............................................................57
**Section 9.21**    **Counterparts; Facsimile and Email Signatures** ...................................57
**Section 9.22**    **Time of Essence** ...................................................................................57


Exhibit A        -        Form of Bill of Sale
Exhibit B        -        Form of Assignment and Assumption Agreement

Schedule 1.1(a)                    Continuing Restaurants
Schedule 1.1(b)        -        Excluded Restaurants
Schedule 2.6(a)        -        Assumed Contract List
Schedule 3.3(b)        -        Consents and Approvals
Schedule 3.6          -        Contracts
Schedule 3.7          -        Intellectual Property
Schedule 3.8          -        Litigation

Schedule 3.10          -          Employee Benefit Plans
Schedule 3.11(b)       -          Real Property
Schedule 3.13(a)       -          Permits
Schedule 3.13(b)       -          Liquor Licenses
Schedule 5.4           -          Conduct of Business

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "Agreement") is entered into as of January 26, 2020, by and among BL Restaurants Holding, LLC, a Delaware limited liability company ("BL Holding"), BL Restaurant Operations, LLC, a Delaware limited liability company ("BL Operations"), BL Restaurant Franchises, LLC, a Delaware limited liability company ("BL Franchises"), BL Hunt Valley, LLC, a Maryland limited liability company ("BL Hunt" and together with BL Holding, BL Operations and BL Franchises, "Sellers" or the "Debtors"), and BLH Acquisition Co., LLC, a Delaware limited liability company (together with its permitted successors, designees and assigns, "Buyer"). Sellers and Buyer are referred to collectively herein as the "Parties." Capitalized terms used but not otherwise defined herein shall have the meanings assigned to them in Article I.

WHEREAS, Sellers presently conduct the business of operating and franchising casual dining restaurants under the trade name "Bar Louie" in several states (collectively, the "Business");

WHEREAS, on the date hereof, Sellers intend to file voluntary petitions for relief (the "Chapter 11 Cases") pursuant to Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code");

WHEREAS, the Parties entered into a debtor-in-possession credit facility, pursuant to which certain lenders agreed to provide a secured super-priority debtor-in-possession loan facility to the Debtors pursuant to the DIP Order (as defined below) and the DIP Loan Documents (as defined below) (such credit facility, the "DIP Facility");

WHEREAS, Sellers desire to sell, transfer and assign to Buyer, and Buyer desires to acquire and assume from Sellers, pursuant to Sections 363 and 365 of the Bankruptcy Code, the Purchased Assets and the Assumed Liabilities upon the terms and subject to the conditions set forth herein;

WHEREAS, Sellers intend to seek entry of Sale Procedures Order by the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") upon the terms and subject to the conditions set forth herein and in the Sale Procedures Order;

WHEREAS, Sellers intend to seek the entry of the Sale Order by the Bankruptcy Court approving this Agreement and authorizing Sellers to consummate the Contemplated Transactions upon the terms and subject to the conditions set forth herein and in the Sale Order;

WHEREAS, the board of managers or other applicable governing body of each Seller has determined that it is advisable and in the best interests of such Seller's estate and the beneficiaries of such estate to consummate the Contemplated Transactions provided for herein pursuant to the Sale Procedures Order and the Sale Order and has approved this Agreement, subject to higher and better offers as contemplated by the Sale Procedures Order; and

WHEREAS, the Contemplated Transactions are subject to the approval of the Bankruptcy Court, subject to higher and better offers as contemplated by the Sale Procedures Order, and will be consummated only pursuant to the Sale Order to be entered by the Bankruptcy Court.

NOW, THEREFORE, in consideration of the mutual promises herein made, and in consideration of the representations, warranties and covenants herein contained, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by the Parties, the Parties agree as follows:

## ARTICLE I
## DEFINITIONS

"401(k) Plan" means the BL Restaurant Operations 401(k) Plan.

"503(b)(9) Claim" means an Administrative Claim against any Seller under Section 503(b)(9) of the Bankruptcy Code.

"Accounts Receivable" means (a) all accounts, accounts receivable, contractual rights to payment, notes, notes receivable, negotiable instruments, chattel paper, and vendor and supplier rebates of Sellers in connection with the Business as conducted by the Sellers and (b) any security interest, claim, remedy or other right related to any of the foregoing.

"Additional Excluded Restaurants" has the meaning set forth in Section 2.7(a) hereto.

"Administrative Claim" means an allowed Claim arising under Sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code.

"Affiliate" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by Contract or otherwise.

"Agreement" has the meaning set forth in the preamble.

"Alternate Transaction" means a transaction or series of related transactions pursuant to which Sellers, pursuant to the Sale Procedures Order, (a) accept a Qualified Bid, other than that of Buyer, as the highest and best offer, or (b) sell, transfer, lease or otherwise dispose of, directly or indirectly, including through an asset sale, stock sale, merger, reorganization or other similar transaction (by Sellers or otherwise), including pursuant to a Plan or refinancing, all or substantially all of the Purchased Assets (or agrees to do any of the foregoing) in a transaction or series of transactions to a Person or Persons other than Buyer, but does not mean the sale of assets to customers conducted in the Ordinary Course of Business; provided, that with respect to any series of related transactions described herein, the first such transaction in such series constitutes an "Alternate Transaction" for purposes of Section 8.1 and Section 8.3.

"Assignment and Assumption Agreement" means a duly executed assignment and assumption agreement, substantially in the form attached as Exhibit B hereto.

"Assumed Contract List" means Schedule 2.6(a) hereto.

"Assumed Contracts" means those Leases and Contracts that have been assumed by Sellers and assigned to Buyer pursuant to Section 2.6 and Section 365 of the Bankruptcy Code, which, for the avoidance of doubt shall not include any Non-Real Property Contract or Lease that is excluded and rejected pursuant to Section 2.6.

"Assumed Liabilities" has the meaning set forth in Section 2.3.

"Assumed Permits" means all Permits relating to the Business that are transferable in accordance with their terms and under applicable Law, but excluding all Permits to the extent related exclusively to any Excluded Asset (including any Lease that is not an Assumed Contract).

"Assumed Plans" has the meaning set forth in Section 2.1(t).

"Auction" means the auction for the sale and assignment of the Purchased Assets as specified in the Sale Procedures Order.

"Bankruptcy Code" has the meaning set forth in the recitals.

"Bankruptcy Court" has the meaning set forth in the recitals.

"Bill of Sale" means a duly executed bill of sale, substantially in the form attached as Exhibit A hereto.

"BL Franchises" has the meaning set forth in the preamble.

"BL Holding" has the meaning set forth in the preamble.

"BL Hunt" has the meaning set forth in the preamble.

"BL Operations" has the meaning set forth in the preamble.

"Breakup Fee" means a breakup fee equal to three percent (3%) of the amount of the Credit Bid.

"Business" has the meaning set forth in the recitals.

"Business Day" means any day other than a Saturday, a Sunday or a day on which banks located in New York, New York shall be authorized or required by Law to close.

"Buyer" has the meaning set forth in the preamble.

"Buyer Released Parties" has the meaning set forth in Section 5.9.

"Chapter 11 Cases" has the meaning set forth in the recitals.

"Claim" means a "claim" as defined in section 101(5) of the Bankruptcy Code, whether arising before or after the Petition Date.

"Closing" means the closing of the transactions contemplated by this Agreement, which shall be deemed to have occurred at 12:01 p.m. (prevailing Eastern Time) on the Closing Date.

"Closing Date" means the second (2nd) Business Day after the date on which all conditions to the obligations of Sellers and Buyer to consummate the Contemplated Transactions set forth in Article VII (other than conditions with respect to actions Sellers and/or Buyer will take at the Closing itself, but subject to the satisfaction or waiver of those conditions) have been satisfied or waived by the Party entitled to waive that condition, or at such other time or on such other date as shall be mutually agreed upon by Sellers and Buyer prior thereto.

"COBRA" means Part 6 of Subtitle B of Title I of ERISA, Section 4980B of the IRC, and any similar state Law.

"Committee" means the official committee of unsecured creditors appointed in the Chapter 11 Cases.

"Consent" means any approval, consent, ratification, permission, clearance, designation, qualification, waiver or authorization, or an order of the Bankruptcy Court that deems or renders any of the foregoing unnecessary.

"Contemplated Transactions" means the sale by Sellers to Buyer, and the purchase by Buyer from Sellers, of the Purchased Assets and the assumption by Buyer of the Assumed Liabilities.

"Continuing Restaurant" means any of Sellers' restaurant locations with respect to which the associated Leases have been designated by Buyer as Assumed Contracts and are listed on Schedule 1.1(a), as such restaurant locations may be changed in accordance with Section 2.6(a) and Section 2.7.

"Contract" means any written or oral agreement, contract, lease, sublease, indenture, mortgage, instrument, guaranty, loan or credit agreement, note, bond, customer order, purchase order, sales order, sales agent agreement, supply agreement, development agreement, joint venture agreement, promotion agreement, license agreement, contribution agreement, partnership agreement or other arrangement, understanding, permission or commitment that, in each case, is legally-binding.

"Credit Bid" means a bid by the Buyer pursuant to section 363(k) of the Bankruptcy Code equal to $82,500,000.

"Credit Card Receivables" means all accounts receivable and other amounts owed to any Seller (whether current or non-current) in connection with any customer purchases from any Continuing Restaurants operated by Sellers that are made with credit cards or any other related amounts owing (including deposits or holdbacks to secure chargebacks, offsets or otherwise) from credit card processors to Sellers.

"Cure Amount Cap" has the meaning set forth in Section 2.3(a).

"Cure Amounts" has the meaning set forth in Section 2.6(b).

"Current Employees" means all individuals employed by Sellers as of the day before the Closing Date, whether active or not (including those on short-term disability, leave of absence, paid or unpaid, or long-term disability).

"Dataroom" has the meaning set forth in Section 4.7.

"DIP Budget" shall have the same meaning as the term "Approved Budget" as defined in the DIP Order.

"DIP Indebtedness" means all "DIP Obligations" as defined in the DIP Order.

"DIP Lenders" shall have the same meaning given such term in the DIP Order.

"DIP Loan Agreement" shall have the same meaning as the term "DIP Credit Agreement" as defined in the DIP Order.

"DIP Loan Documents" shall have the meaning given such term in the DIP Order, and for the avoidance of doubt shall include all guarantees, all other security agreements, pledge agreements, notes, guarantees, mortgages, certificates, Uniform Commercial Code financing statements and all other related agreements, instruments and other documents, in each case relating to the DIP Indebtedness, and executed and/or delivered in connection therewith by the Sellers.

"DIP Order" means as of any date of determination (i) the *Interim Order (I) Authorizing Debtors to Obtain Postpetition Financing Pursuant to Section 364 of the Bankruptcy Code, (II) Authorizing the Use of Cash Collateral Pursuant to Section 363 of the Bankruptcy Code, (III) Granting Adequate Protection to the Prepetition Secured Parties Pursuant to Sections 361, 362, 363 and 364 of the Bankruptcy Code, (IV) Granting Liens and Superpriority Claims, (V) Modifying Automatic Stay, and (VI) Scheduling a Final Hearing* that is anticipated to be entered by the Bankruptcy Court on or about January 30, 2020 (the "Interim Order") or (ii) the Final Order (as defined in the Interim Order), whichever such Order is then in effect.

"DIP Secured Parties" shall have the same meaning given such term in the DIP Order.

"Decree" means any judgment, decree, ruling, decision, opinion, injunction, assessment, attachment, undertaking, award, charge, writ, executive order, judicial order, administrative order or any other order of any Governmental Entity.

"Disclosure Schedule" has the meaning set forth in Article III.

"Employee Benefit Plan" means (a) any "employee benefit plan" (as such term is defined in Section 3(3) of ERISA), (b) employment, consulting, severance, termination protection, change in control, transaction bonus, retention or similar plan, program, policy, agreement or arrangement and (c) any other benefit or compensation plan, program, agreement or arrangement of any kind, providing for compensation, bonuses, profit-sharing, or other forms of incentive or deferred compensation, vacation benefits, insurance, medical, dental, vision, prescription or fringe benefits, life insurance, disability or sick leave benefits or post-employment or retirement benefits, in each case, maintained or contributed to by any Seller or in which any Seller participates or participated and that provides benefits to any Current Employee or Former Employee.

DB1/ 109641500.6

PHIL1 8628846v.6

"Employee Roster" has the meaning set forth in Section 3.9(f).

"Environmental Laws" all applicable Laws concerning pollution or protection of the environment, human health and safety, and natural resources.

"ERISA" means the United States Employee Retirement Income Security Act of 1974.

"Excluded Assets" has the meaning set forth in Section 2.2.

"Excluded Bank Account" means one or more bank accounts of Sellers that will be established by Sellers prior to the Closing Date exclusively to administer the Wind Down Cash.

"Excluded Claims" means all rights (including rights of set-off and rights of recoupment), refunds, claims, counterclaims, demands, causes of action and rights to collect damages of Sellers against third parties to the extent related exclusively to any Excluded Asset or Excluded Liability.

"Excluded Employee" has the meaning set forth in Section 6.4(b).

"Excluded Liabilities" has the meaning set forth in Section 2.4.

"Excluded Restaurants" means the restaurant locations set forth on Schedule 1.1(b), as such restaurant locations may be changed in accordance with Section 2.6(a) and Section 2.7.

"Expense Reimbursement" means an expense reimbursement of actual, necessary and documented out of pocket expenses associated with this Agreement in an aggregate amount not to exceed one percent (1%) of the amount of the Credit Bid.

"Express Representations" has the meaning set forth in Section 4.7.

"Former Employees" means all individuals who have been employed by the Sellers (or any of their predecessors) who are not Current Employees.

"GAAP" means United States generally accepted accounting principles as in effect from time to time.

"Governmental Entity" means any United States federal, state or local or non-United States governmental or regulatory authority, agency, commission, court, body or other governmental entity.

"Hazardous Substance" means any toxic or hazardous material, substance or waste as to which Liability or standards of conduct may be imposed under any Environmental Laws.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the regulations promulgated thereunder.

"Information Presentation" has the meaning set forth in Section 4.7.

"Insurance Policy" means each primary, excess and umbrella insurance policy, bond and other forms of insurance owned or held by or on behalf, or providing insurance coverage to the

Business, Sellers and their operations, properties and assets, including, without limitation, all stop-loss insurance policies with respect to Sellers' self-insured medical and/or dental insurance programs.

"Intellectual Property" means any and all rights, title and interest in or relating to intellectual property of any type, which may exist or be created under the Laws of any jurisdiction throughout the world, including: (a) patents and patent applications, together with all reissues, continuations, continuations-in-part, divisionals, extensions and reexaminations in connection therewith; (b) trademarks, service marks, trade dress, logos, slogans, trade names, service names, brand names, Internet domain names and all other source or business identifiers and general intangibles of a like nature, along with all applications, registrations and renewals in connection therewith, and all goodwill associated with any of the foregoing; (c) rights associated with works of authorship, including exclusive exploitation rights, mask work rights, copyrights, database and design rights, whether or not registered or published, all registrations and recordations thereof and applications in connection therewith, along with all extensions and renewals thereof; (d) trade secrets; and (e) all other intellectual property rights related to the Business.

"Intellectual Property Assignments" has the meaning set forth in Section 2.9(a).

"Inventory" means all of Sellers' now or hereafter (prior to the Closing) acquired inventory and goods, wherever located, including, without limitation, consumable food, alcoholic beverages, and other beverages and raw materials and work-in-process therefor and all of Sellers' tangible property used in the preparation of, serving, and cleaning up from, food and drinks, including napkins, silverware, plates and dining ware, cups, glassware, mugs, cooking and cleaning utensils, packaging materials, paper products, ingredients, miscellaneous consumables, materials, supplies, inventories and other related items or that are otherwise included in the Purchased Assets and are permitted to be sold and transferred under applicable Law.

"IRC" means the United States Internal Revenue Code of 1986, as amended.

"Law" means any federal, state, provincial, local, municipal, foreign or international, multinational or other law, statute, legislation, constitution, principle of common law, resolution, ordinance, code, edict, decree, proclamation, treaty, convention, rule, regulation, ruling, directive, pronouncement, determination, decision, opinion or requirement issued, enacted, adopted, promulgated, implemented or otherwise put into effect by or under the authority of any Governmental Entity, or court of competent jurisdiction, or other legal requirement or rule of law, including applicable building, zoning, subdivision, health and safety and other land use Laws.

"Leased Real Property" means all (i) leasehold or sub-leasehold estates and other rights to use or occupy any land, buildings, structures, improvements, fixtures or other interest in real property which is used in or otherwise related to the Business, including the right to all security deposits and other amounts and instruments deposited by or on behalf of Sellers thereunder, and (ii) any buildings, structures, improvements and fixtures located on any Leased Real Property which are owned by Seller, regardless of whether title to such buildings, structures, improvements or fixtures are subject to reversion to the landlord or other third party upon the expiration or termination of the Lease for such Leased Real Property ("Leasehold Improvements").

"Leasehold Improvements" has the meaning set forth in the definition of "Leased Real Property".

"Leases" means all leases, subleases, licenses, concessions and other Contracts, including all amendments, extensions, renewals, guaranties and other agreements with respect thereto, in each case pursuant to which any Seller holds any Leased Real Property.

"Liability" means, as to any Person, any debt, Claim, liability (including any liability that results from, relates to or arises out of tort or any other product liability claim), duty, responsibility, obligation, commitment, assessment, cost, expense, loss, expenditure, charge, fee, penalty, fine, contribution, or premium of any kind or nature whatsoever, whether known or unknown, asserted or unasserted, absolute or contingent, direct or indirect, accrued or unaccrued, liquidated or unliquidated, or due or to become due, and regardless of when sustained, incurred, or asserted or when the relevant events occurred or circumstances existed.

"Lien" means any lien (as defined in Section 101(37) of the Bankruptcy Code), encumbrance, right, demand, charge, mortgage, deed of trust, option, pledge, security interest or similar interests, title defects, hypothecations, easements, rights of way, encroachments, judgments, conditional sale or other title retention agreements and other similar impositions, imperfections or defects of title or restrictions on transfer or use (whether known or unknown, secured or unsecured or in the nature of setoff or recoupment, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or nonmaterial, disputed or undisputed, whether arising prior to or subsequent to the commencement of the Chapter 11 Cases, and whether imposed by agreement, understanding, Law, equity, or otherwise, including claims otherwise arising under doctrines of successor liability).

"Liquor Licenses" means all liquor licenses (including, without limitation, beer and wine licenses) held or used by each Seller, including the Seller in whose name such license is issued, date of issuance and renewal date.

"Liquor License Approvals" means the necessary consents and approvals pertaining to the transfer and/or issuance of any of the Liquor Licenses (except those relating exclusively to Excluded Restaurants) to Buyer.

"Litigation" means any action, cause of action, suit, claim, investigation, mediation, audit, grievance, demand, hearing or proceeding, whether civil, criminal, administrative or arbitral, whether at law or in equity and whether before any Governmental Entity or arbitrator.

"Management Agreement" has the meaning set forth in Section 2.9(a)(vii).

"Material Adverse Effect" means any change, event, effect, development, condition, circumstance or occurrence (when taken together with all other changes, events, effects, developments, conditions, circumstances or occurrences), that (a) is, or could reasonably be expected to become, individually or in the aggregate, materially adverse to the condition (financial or otherwise), value or results of operations of the Purchased Assets (taken as a whole); provided, however, that no change, event, effect, development, condition, circumstance or occurrence related

to any of the following shall be deemed to constitute, and none of the following shall be taken into account in determining whether there has been a Material Adverse Effect: (i) the filing of a voluntary petition under Chapter 11 of the Bankruptcy Code or the effect, directly or indirectly, of such filing; (ii) acts of war, armed hostilities, sabotage or terrorism, or any escalation or worsening of any such acts of war, armed hostilities, sabotage or terrorism threatened or underway as of the date of this Agreements, except to the extent that such change has a materially disproportionate adverse effect on the Business relative to the adverse effect that such changes have on other companies in the industry in which the Business operates; (iii) changes in conditions in the U.S. or global economy or capital or financial markets generally, including changes in interest or exchange rates, except to the extent that such change has a materially disproportionate adverse effect on Business relative to the adverse effect that such changes have on other companies in the industry in which the Business operates; (iv) resulting from any act of God or other force majeure event (including natural disasters); or (v) changes in Law or in GAAP or interpretations thereof; or (b) would reasonably be expected to prevent, materially delay or materially impair to the ability of any Seller to consummate the transactions contemplated by this Agreement or the Related Agreements on the terms set forth herein and therein.

"Non-Real Property Contracts" means the Contracts to which any Seller is a party other than the Leases.

"Offeree" has the meaning set forth in Section 6.4(a).

"Ordinary Course of Business" means the ordinary and usual course of business of Sellers taken as a whole consistent with past custom and practice and taking into account the commencement of the Chapter 11 Cases.

"Outside Date" means May 13, 2020.

"PACA/PASA Claims" means any valid claims against the Sellers under the Perishable Agricultural Commodities Act of 1930 or any similar state statutes of similar effect or the Packers and Stockyards Act of 1921, as amended, 7 U.S.C. § 181, *et seq*.

"Parties" has the meaning set forth in the preamble.

"Permit" means any and all franchise, approval, permit (including environmental, construction and operation permits), license, order, registration, certificate, variance, Consent, exemption or similar right issued, granted, given or otherwise obtained or required to be obtained, from or by any Governmental Entity, under the authority thereof or pursuant to any applicable Law.

"Permitted Liens" means (a) Liens for Taxes which are (i) being contested in good faith by appropriate proceedings or (ii) not due and payable as of the Closing Date and which shall be prorated or released at Closing, and, in each case of clauses (i) and (ii), for which adequate reserves have been made on the Financial Statements in accordance with GAAP and which shall be prorated or otherwise released at Closing; (b) mechanics liens and similar liens for labor, materials or supplies provided with respect to real property incurred in the Ordinary Course of Business which are being contested in good faith by appropriate proceedings for which adequate reserves have been made on the Financial Statements in accordance with GAAP and which shall be prorated or

otherwise released at Closing; (c) with respect to real property, zoning, building codes and other land use Laws regulating the use or occupancy of such real property or the activities conducted thereon which are imposed by any Governmental Entity having jurisdiction over such real property which are not violated by the current use or occupancy of such real property or the operation of the Business, except where any such violation would not, individually or in the aggregate, materially impair the use, operation or transfer of the affected property or the conduct of the Business thereon as it is currently being conducted; (d) easements, covenants, conditions, restrictions and other similar matters affecting title to real property and other encroachments and title and survey defects that do not or would not materially impair value or the use or occupancy of such real property or materially interfere with the operation of the Business at such real property; (e) with respect to Leasehold Improvements, any reversion or similar rights to the landlord or other third party upon expiration or termination of the applicable Lease; and (f) any Liens associated with or arising in connection with any Assumed Liabilities.

"<u>Person</u>" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization or any other entity, including any Governmental Entity or any group or syndicate of any of the foregoing.

"<u>Personal Property Leases</u>" means all leases of personal property relating to personal property used by Sellers or to which any Seller is a party or by which the properties or assets of any Seller are bound, in each case relating to the Business.

"<u>Petition Date</u>" means the date of the filing of the Chapter 11 Cases.

"<u>PII</u>" means "personally identifiable information" within the meaning of section 101(41A) of the Bankruptcy Code.

"<u>Plan</u>" means a plan of reorganization or liquidation proposed by the Sellers and/or the Committee.

"<u>Priority Claim</u>" means a Claim entitled to priority pursuant to section 507(a) of the Bankruptcy Code.

"<u>Professional Services</u>" means any legal services, accounting services, financial advisory services, investment banking services or any other professional services provided by the Sellers' advisers obtained pursuant to any order of the Bankruptcy Court.

"<u>Purchase Price</u>" has the meaning set forth in <u>Section 2.5</u>.

"<u>Purchased Assets</u>" has the meaning set forth in <u>Section 2.1</u>.

"<u>Purchased Avoidance Actions</u>" means all causes of action, lawsuits, claims, rights of recovery and other similar rights of any Seller, including avoidance claims or causes of action under Chapter 5 of the Bankruptcy Code relating to the Business and the Purchased Assets.

"<u>Purchased Inventory</u>" means Inventory that is part of the Purchased Assets as set forth in <u>Section 2.1</u>.

"Qualified Bid" means competing bids qualified for the Auction in accordance with the Sale Procedures Order.

"Records" means the books, records, information, ledgers, files, invoices, documents, work papers, correspondence, lists (including customer lists, supplier lists and mailing lists), plans (whether written, electronic or in any other medium), drawings, designs, specifications, creative materials, advertising and promotional materials, marketing plans, studies, reports, data and similar materials related to the Business.

"Registered" means issued by, registered with, renewed by or the subject of a pending application before any Governmental Entity or domain name registrar.

"Related Agreements" means the Bill of Sale, the Assignment and Assumption Agreement and the Intellectual Property Assignments and any other instruments of transfer and conveyance as may be required under applicable Law to convey valid title of the Purchased Assets to Buyer.

"Representative" means a Person's officers, directors, managers, employees, advisors, representatives (including its legal counsel and its accountants) and agents.

"Restaurant Petty Cash" means any petty cash of Sellers on the premise of any Continuing Restaurant or Excluded Restaurant.

"Sale Hearing" means the hearing conducted in the Bankruptcy Court to seek approval of the Sale Motion and the Contemplated Transactions.

"Sale Motion" means a motion filed by the Sellers with the Bankruptcy Court in connection with the Chapter 11 Cases requesting the entry of the Sale Procedures Order and the Sale Order.

"Sale Order" means an order of the Bankruptcy Court entered in the Chapter 11 Cases consistent with the terms of this Agreement approving the Sale Motion and sale to Buyer in form and substance satisfactory to Buyer.

"Sale Order Deadline" means March 31, 2020, unless extended by the Seller.

"Sale Procedures Order" means an order of the Bankruptcy Court approving the sale procedures relief requested in the Sale Motion in the form attached hereto.

"Seller" or "Sellers" has the meaning set forth in the preamble.

"Sellers' Knowledge" (or words of similar import) means the actual knowledge, after due inquiry, of Tom Fricke, Jonathan Ehrhart, Leigh Bailey and Stephanie Davidson.

"Subsidiary" means, with respect to any Person, any corporation, limited liability company, partnership, association or other business entity of which (a) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof (or other persons performing similar functions with respect to such corporation) is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination

thereof, or (b) if a limited liability company, partnership, association or other business entity (other than a corporation), a majority of partnership or other similar ownership interest thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more Subsidiaries of that Person or a combination thereof and for this purpose, a Person or Persons owns a majority ownership interest in such a business entity (other than a corporation) if such Person or Persons shall be allocated a majority of such business entity's gains or losses or shall be or control any managing director, managing member, or general partner of such business entity (other than a corporation). The term "Subsidiary" shall include all Subsidiaries of such Subsidiary.

"Tax" or "Taxes" means any United States federal, state or local or non-United States income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental (including taxes under Section 59A of the IRC), customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, real property, personal property, ad valorem, escheat, sales, use, liquor, cigarette, transfer, value added, alternative or add-on minimum, estimated or other tax of any kind whatsoever (however denominated), whether computed on a separate or consolidated, unitary or combined basis or in any other manner, including any interest, penalty or addition thereto, whether or not disputed.

"Tax Return" means any return, declaration, report, claim for refund or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Termination Event" has the meaning set forth in Section 8.1.

"Transfer Tax" means any stamp, documentary, registration, transfer, added-value or similar Tax imposed under any applicable Law in connection with the transactions contemplated by this Agreement.

"Transferred Employees" means all Offerees who accept offers prior to the Closing pursuant to Section 6.4(a).

"Transferring Party" has the meaning set forth in Section 5.1(c).

"Wind Down Cash" means an aggregate amount of cash equal to $750,000.

## ARTICLE II
## PURCHASE AND SALE

**Section 2.1    Purchase and Sale of Purchased Assets**. Pursuant to sections 105, 363 and 365 of the Bankruptcy Code, on the terms and subject to the conditions set forth in this Agreement (including, without limitation, Section 4.7 below), at the Closing, Buyer shall purchase, acquire and accept from Sellers, and Sellers shall sell, transfer, assign, convey and deliver to Buyer, all of the Seller's right, title and interest in, to and under the Purchased Assets, free and clear of all Liens (other than Permitted Liens and any Liens included in the Assumed Liabilities), for the consideration specified in Section 2.5. "Purchased Assets" shall mean all of the, direct or indirect, right, title and interest of Sellers in, to and under the tangible and intangible assets (including goodwill), properties, rights, going concern value, claims and Contracts used, useful, or held for

use in, or related to, the Business (but excluding Excluded Assets) wherever situated and of whatever kind and nature, real or personal, as of the Closing, including:

      (a)    except for the Wind Down Cash, all cash, cash equivalents, bank deposits and similar cash items of Sellers, including Restaurant Petty Cash;

      (b)    all bank accounts of Sellers, except for the Excluded Bank Account;

      (c)    all Accounts Receivable of Sellers as of the Closing;

      (d)    all Credit Card Receivables;

      (e)    all Inventory of Sellers as of the Closing, including all rights of Sellers to receive such Inventory, supplies and materials which are on order as of the Closing, but excluding alcoholic beverage Inventory in jurisdictions where the Law does not permit Buyer to take title to such Inventory until it obtains the requisite Liquor License Approvals from the pertinent Governmental Entity; provided, however, Sellers shall promptly transfer, assign, convey and deliver to Buyer such alcoholic beverage Inventories in each instance upon issuance of the relevant Liquor License Approval from the relevant Governmental Entity; provided, further, Sellers' obligations to transfer, assign, convey and deliver such alcoholic beverage Inventories shall only continue until the Chapter 11 Cases are closed or dismissed;

      (f)    without duplication of the above, all deposits (including, without limitation, deposits in transit, customer deposits and security deposits for rent, electricity, telephone, utilities or otherwise) and other prepaid charges and expenses of Sellers;

      (g)    all Assumed Contracts that have been assumed by and assigned to Buyer pursuant to Section 2.6;

      (h)    all Intellectual Property owned by Sellers;

      (i)    all open purchase orders with suppliers to the extent related to the Continuing Restaurants;

      (j)    all items of machinery, equipment, supplies, furniture, fixtures, leasehold improvements (to the extent of Sellers' rights to any Leasehold Improvements under the Leases that are Assumed Contracts) owned by Sellers as of the Closing and related to the Continuing Restaurants;

      (k)    all Records, including Records related to Taxes paid or payable by any Seller related to the Business (provided that Sellers are entitled to retain copies of all Records and Buyer will make all such Records available to Sellers upon request and at no charge), but excluding (i) personnel files for Current Employees and Former Employees of Sellers who are not hired by Buyer as of the Closing Date and (ii) any materials exclusively related to any Excluded Assets;

(l) all goodwill associated with the Business or the Purchased Assets, including all goodwill associated with the Intellectual Property owned by Sellers and all rights under any confidentiality agreements executed by any third party for the benefit of any of Sellers to the extent relating to the Purchased Assets and/or the Assumed Liabilities (or any portion thereof);

(m) all rights of Sellers under non-disclosure or confidentiality, noncompete, or nonsolicitation agreements with Current or Former Employees, directors, consultants, independent contractors and agents of any of Sellers to the extent relating to the Purchased Assets and/or the Assumed Liabilities (or any portion thereof);

(n) all of the Assumed Permits or all of the rights and benefits accruing under any Permits that are (i) related to the Continuing Restaurants, or (ii) to the extent related to the Excluded Restaurants, listed on Schedule 7.1, in each case of clauses (i) and (ii), including all Liquor Licenses to the extent transferrable and held by Sellers, other than alcohol permits (including Liquor Licenses) in jurisdictions where the Law does not permit Buyer to take title to such Permits until it obtains the requisite approvals from the pertinent Governmental Entity in which case Sellers shall transfer, assign convey and deliver to Buyer such permits in each instance upon issuance of the requisite approvals from the relevant Governmental Entity;

(o) the amount of, and all rights to any, insurance proceeds received by any of Sellers after the date hereof in respect of (i) the loss, destruction or condemnation of any Purchased Assets, occurring prior to, on or after the Closing or (ii) any Assumed Liabilities;

(p) all other rights, demands, claims, credits, allowances, rebates or other refunds (excluding any vendor or supplier rebates) and rights in respect of promotional allowances or rights of setoff and rights of recoupment of every kind and nature (whether or not known or unknown or contingent or non-contingent), other than against Sellers, arising out of or relating to the Continuing Restaurants as of the Closing, including all deposits (including customer deposits and security deposits (whether maintained in escrow or otherwise) for rent, electricity, telephone or otherwise), advances and prepayments;

(q) except for the Excluded Claims, all causes of action, lawsuits, judgments, claims, refunds, rights of recovery, rights of set-off, counterclaims, defenses, demands, warranty claims, rights to indemnification, contribution, advancement of expenses or reimbursement, or similar rights of any Seller (at any time or in any manner arising or existing, whether choate or inchoate, known or unknown, now existing or hereafter acquired, contingent or noncontingent), including, without limitation, the Purchased Avoidance Actions;

(r) all rights under or pursuant to all warranties, representations and guarantees made by suppliers, manufacturers, contractors and any other Person to the extent relating to equipment purchased, products sold, or services provided, to Sellers or to the extent affecting any Purchased Assets and/or Assumed Liabilities;

(s)    all of the Sellers' telephone numbers, fax numbers, e-mail addresses, websites, URLs and internet domain names related to the Continuing Restaurants;

(t)    all rights of Seller under the Employee Benefit Plans listed on Schedule 2.1(t) (the "Assumed Plans"), including all assets held with respect to the Assumed Plans and any insurance contracts, administrative services agreements or funding arrangements;

(u)    all rights arising from any refunds due from federal, state and/or local Governmental Entities with respect to Taxes paid by Sellers; and

(v)    all other assets that are related to or used in connection with the Purchased Assets or the Business (but excluding all of the Excluded Assets).

**Section 2.2    Excluded Assets**. Notwithstanding Section 2.1, Buyer expressly understands and agrees that Buyer is not purchasing or acquiring, and the Sellers are not selling or assigning, any of the following assets, properties and rights of Sellers (the "Excluded Assets"):

(a)    the Wind Down Cash;

(b)    the Excluded Bank Account;

(c)    all alcoholic beverage Inventory of Sellers in jurisdictions where the Law does not permit Buyer to take title to such Inventory until it obtains the requisite Liquor License Approvals from the pertinent Governmental Entity; provided, however, Sellers shall transfer, assign, convey and deliver to Buyer such alcoholic beverage Inventory in each instance upon issuance of the relevant Liquor License Approval from the relevant Governmental Entity;

(d)    all of Sellers' certificates of formation and other organizational documents, qualifications to conduct business as a foreign entity, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, minute books, stock transfer books, unit certificates and other documents relating to the organization, maintenance and existence of any Seller as a limited liability company or other entity;

(e)    all equity securities of any Seller or securities convertible into, exchangeable, or exercisable for any such equity securities and all net operating losses of any Seller;

(f)    all Leases (and related Leased Real Property, if any) and Contracts, in each case, other than the Assumed Contracts;

(g)    the Excluded Claims;

(h)    any loans or notes payable to any Seller or any of its Affiliates from any employee of any Seller or any of its Affiliates (other than Ordinary Course of Business employee advances and other than loans or notes from any Transferred Employees);

(i)     any (1) Records containing confidential personal private information including confidential personnel and medical Records pertaining to any Current Employees or Former Employees to the extent the disclosure of such information is prohibited by applicable Law, (2) other Records that Sellers are required by Law to retain and (3) any Records or other documents relating to the Chapter 11 Cases that are protected by the attorney-client privilege; provided that Buyer shall have the right to make copies of any portions of such retained Records (other than the Records referenced in subsection (3)) to the extent that such portions relate to the Business or any Purchased Asset;

(j)     all liquor licenses associated with any Excluded Restaurants not included on Schedule 7.1 pursuant to Section 2.1(n), or which the Sellers presently hold in safe keeping;

(k)     all Permits other than the Assumed Permits;

(l)     all directors' and officers' liability insurance policies, including any tail insurance policies, including the rights of the directors and officers thereunder for coverage (i.e., advancement of expenses and liability coverage with respect to claims made against such officers and directors); provided that for the avoidance of doubt, any proceeds or right to proceeds under such policies payable or paid to the Company (other than for purposes of paying, reimbursing or advancing the expenses and liability coverage to or on behalf of any director or officer covered under such policy and payable to a third party with respect to claims made against such director or officer) including for damages and reimbursement for losses or otherwise, shall be payable to Buyer as a Purchased Asset from and after the Closing;

(m)     all Employee Benefit Plans which are not Assumed Plans; and

(n)     the rights of Sellers under this Agreement and the Related Agreements and all non-cash consideration payable or deliverable to Sellers under this Agreement.

**Section 2.3     Assumption of Assumed Liabilities**. On the terms and subject to the conditions of this Agreement and the Sale Order, at the Closing (or, with respect to Assumed Liabilities under Assumed Contracts or Assumed Permits that are assumed by Buyer after the Closing, such later date of assumption as provided in Sections 2.6 and Section 2.7), Buyer shall assume from Sellers (and from and after the Closing pay, perform, discharge, or otherwise satisfy in accordance with their respective terms), and Sellers shall irrevocably convey, transfer, and assign to Buyer, the following Liabilities, without duplication and only to the extent not paid prior to the Closing and no other Liabilities (collectively, the "Assumed Liabilities"):

(a)     all Cure Amounts under any and all Assumed Contracts; provided, however, that the Buyer shall not be obligated to assume or pay any Cure Amounts with respect to the Assumed Contracts set forth on Schedule 2.3(a) as of the date of this Agreement in excess of $2,007,621 in the aggregate (the "Cure Amount Cap");

(b)     Liabilities under the Assumed Contracts, Assumed Permits and Assumed Plans from and after the Closing Date as well as any Liabilities to the extent arising exclusively out of the Purchased Assets, in each case, from and after the Closing Date;

(c)     to the extent not already paid, all current Liabilities, trade payables and accrued expenses of Sellers (including, for the avoidance of doubt, (i) invoiced accounts payable, (ii) accrued but uninvoiced accounts payable and (iii) any open purchase orders), to the extent arising exclusively out of the Continuing Restaurants and incurred in the Ordinary Course of Business and related to the period following the Petition Date, other than those owing for Professional Services for retained professionals in the Chapter 11 Cases;

(d)     all accrued payroll, accrued and unused vacation, and accrued payroll Taxes, in each case, as of the Closing Date (and not paid by Sellers prior thereto) to the extent related exclusively to a Transferred Employee incurred in the Ordinary Course of Business and arising and related to the period following the Petition Date;

(e)     Liabilities under any Assumed Plan;

(f)     any Liabilities under COBRA for M&A Qualified Beneficiaries (within the meaning of COBRA) with respect to the Purchased Assets;

(g)     allowed PACA/PASA Claims;

(h)     allowed 503(b)(9) Claims;

(i)     all gift card obligations of Sellers as of the Closing Date (including any escheatment claims);

(j)     Liabilities expressly assumed by Buyer under the Agreement;

(k)     sponsorship of, and obligations under, the 401(k) Plan and the Health and Welfare Plans, provided that Sellers pay all Liabilities and obligations described in this item as and when due through the Closing Date consistent with Sellers' past practices;

(l)     Priority Claims incurred prior to the Closing Date only to the extent allowed by order of the Bankruptcy Court or agreed to (in writing) by Buyer;

(m)     claims for stub-rent pursuant to section 503(b) of the Bankruptcy Code (it being understood that Buyer shall pay such amounts no later than the later of (a) 10 days following Closing and (b) the last day of the month in which the Closing occurs);

(n)     Liabilities for CAM, CAM reconciliation and Percentage Rent, solely to the extent incurred for the period from and after the Petition Date through the Closing Date in the Ordinary Course of Business; and

(o)     all Transfer Taxes in accordance with Section 6.5.

Notwithstanding the foregoing, Assumed Liabilities shall not include any post-petition Liabilities of the Sellers that were incurred in violation of the DIP Order or the DIP Loan Documents.

**Section 2.4** **Excluded Liabilities**. Notwithstanding anything herein to the contrary, the Parties expressly acknowledge and agree that Buyer shall not assume, be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any Liabilities of Sellers, whether existing on the Closing Date or arising thereafter, other than the Assumed Liabilities (all such Liabilities that Buyer is not assuming being referred to collectively as the "Excluded Liabilities").

### Section 2.5    Consideration.

(a)    In aggregate consideration for the sale and transfer of the Purchased Assets (the "Purchase Price") shall be composed of the following:

       i.    the Credit Bid; and

       ii.    the assumption by Buyer of the Assumed Liabilities.

(b)    The Purchase Price shall be satisfied at the Closing as to:

       i.    the Credit Bid, by causing the DIP Lenders to (A) acknowledge satisfaction of the portion of the DIP Indebtedness covered by the Credit Bid and (B) to the extent the Credit Bid covers all DIP Indebtedness, release all guarantees of the DIP Indebtedness and security interests and liens securing the DIP Indebtedness (collectively, (i)(A) and (i)(B) above, the "Credit Bid And Release"); and

       ii.    the amount of the Assumed Liabilities described in Section 2.3, by assuming such Assumed Liabilities through one or more Assignment and Assumption Agreements.

### Section 2.6    Assumption and Assignment of Contracts.

(a)    The Assumed Contract List sets forth a list of all Contracts and Leases to which a Seller is a party and which Buyer has designated to be included as an Assumed Contract, together with estimated Cure Amounts for each Assumed Contract.

(b)    In connection with the assumption and assignment to Buyer of any Assumed Contract pursuant to this Section 2.6, (i) the cure amounts, if any, necessary to cure all defaults, if any, and to pay all actual pecuniary losses, if any, that have resulted from such defaults under the Assumed Contracts (such amounts, the "Cure Amounts"), in each case as of the Petition Date and to the extent required by Section 365(b) of the Bankruptcy Code and any order of the Bankruptcy Court, shall be paid by Buyer at the Closing (provided that Buyer shall not be obligated to assume or pay any Cure Amounts with respect to the Assumed Contracts set forth on Schedule 2.3(a) as of the date of this Agreement in an aggregate amount that is in excess of the Cure Amount Cap), and neither the Cure Amounts paid by Buyer nor any other expense or obligation set forth in this Section 2.6(b) shall reduce, directly or indirectly, any consideration payable to Sellers hereunder and (ii) Buyer shall provide sufficient adequate assurance of future performance as of the Sale Hearing necessary to satisfy the conditions contained in Sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to Assumed Contracts.

(c)     Sellers shall use their respective commercially reasonable efforts to obtain an order of the Bankruptcy Court to assign the Assumed Contracts to Buyer on the terms set forth in this Section 2.6. In the event Sellers are unable to assign any such Assumed Contract to Buyer pursuant to an order of the Bankruptcy Court, then the Parties shall use their commercially reasonable efforts to obtain, and to cooperate in obtaining, all Consents from Governmental Entities and third parties necessary to assume and assign such Assumed Contracts to Buyer, including, in the case of Buyer, paying any applicable Cure Amounts.

(d)     Notwithstanding the foregoing, but subject to Section 5.1, a Contract shall not be an Assumed Contract hereunder and shall not be assigned to, or assumed by, Buyer to the extent that such Contract (i) is rejected by a Seller or terminated by a Seller in accordance with the terms hereof or by the other party thereto, or terminates or expires by its terms, on or prior to the Closing and is not continued or otherwise extended upon assumption, or (ii) was not listed on Schedule 2.3(a) and not provided by Buyer to Sellers at least fourteen (14) calendar days prior to the Auction and requires a Consent of any Governmental Entity or other third party (except as permitted by the Bankruptcy Code) in order to permit the sale or transfer to Buyer of Sellers' rights under such Contract, and no such Consent has been obtained prior to the Closing. In addition, a Permit (including any Liquor License) shall not be assigned to, or assumed by, Buyer to the extent that such Permit requires a Consent of any Governmental Entity or other third party (other than, and in addition to, that of the Bankruptcy Court) in order to permit the sale or transfer to Buyer of Sellers' rights under such Permit, and no such Consent has been obtained prior to the Closing.

**Section 2.7     Schedule Updates**.

(a)     Notwithstanding anything to the contrary in this Agreement, and without any increase or decrease in the Purchase Price (other than any resulting increase or decrease in Cure Amounts), the Buyer may, in its sole discretion, revise, amend or modify this Agreement and any schedule setting forth the Purchased Assets and the Excluded Assets prior to the Closing to (i) include in the definition of Purchased Assets (pursuant to the applicable schedule) and to exclude from the definition of Excluded Assets, any Contract or other asset of the Sellers not previously included in the Purchased Assets and require (A) the Sellers to file a notice of assumption and assignment with the Bankruptcy Court and (B) the Sellers to provide any necessary notice to the parties to any such Contract and (ii) to exclude from the definition of Purchased Assets (pursuant to the applicable schedule) and to include in the definition of Excluded Assets, any Assumed Contract, Assumed Plan or other asset of the Sellers previously included in the Purchased Assets and not otherwise included in the definition of Excluded Assets; provided that no such change of a schedule, the definition of the Purchased Assets or the definition of the Excluded Assets shall reduce the amount of the Purchase Price below the amount of the Credit Bid; provided further that, Buyer agrees to reimburse Sellers for any Liabilities or losses reasonably incurred in connection with any such removal of a Purchased Asset occurring during the period from and after the Auction through the Closing Date; and provided, further, notwithstanding anything herein to the contrary, to the extent that Buyer elects to remove more than eight (8) restaurant locations that are included on Schedule 1.1(a) on the date of this Agreement

and include such additional restaurant locations on <u>Schedule 1.1(b)</u> prior to the Auction (such restaurant locations that exceed eight locations previously selected by Buyer in its sole discretion as of the date hereof, referred to herein as the "<u>Additional Excluded Restaurants</u>"), (i) Buyer shall thereafter be responsible, in addition to any other costs for which the Buyer is liable under this <u>Section 2.7</u>, for all losses and Liabilities applicable to the period after the Petition Date with respect to such Additional Excluded Restaurants, including, without limitation, costs of closing the restaurants at such locations, including de-imaging costs, and Liabilities for employee claims for accrued vacation, accrued payroll, accrued and unused vacation and accrued expenses and Liabilities which may arise under the Workers Adjustment and Retraining Notification Act of 1988, in each case to the extent constituting an Administrative Claim or a claim for which non-payment results in personal liability to directors and officers, and (ii) each Seller covenants and agrees that it will wind down and close such restaurants as soon as commercially reasonable and will take all commercially reasonable measures to avoid or mitigate any losses and Liabilities.

(b)     If any Contract is added to (or removed from) the Purchased Assets as permitted by this <u>Section 2.7</u>, the Sellers shall promptly take such steps as are reasonably necessary, including, if applicable, payment or adequate assurance of payment of all Cure Amounts (which shall be funded by the DIP Loan Agreement and the DIP Loan Documents prior to the Closing Date) (provided that Buyer shall be obligated to assume or pay all Cure Amounts with respect to any Contract added fewer than fourteen (14) calendar days prior to the Auction, and such Cure Amounts shall not be included in the Cure Amount Cap) and prompt delivery of notice to the non-debtor counterparty, to cause such Contracts to be assumed by the Sellers, and assigned to the Buyer, on the Closing Date (other than as excluded under the Sale Order and this Agreement).

(c)     If any Contract is removed from the Purchased Assets as permitted by this <u>Section 2.7</u>, all Liabilities to third parties arising under such Contract shall be Excluded Liabilities. Without limiting any of the Buyer's rights pursuant to this <u>Section 2.7</u>, in the event that the Sale Order does not approve the assignment or transfer of one or more of the Assumed Contracts to the Buyer as Purchased Assets, the Buyer may, in its sole discretion and at any time prior to the Closing Date, exclude any or all of the Assumed Contracts from the Purchased Assets but may not reduce the amount of the Purchase Price.

**Section 2.8    <u>Closing</u>**. The Closing shall take place remotely by electronic exchange of counterpart signature pages commencing at 10:00 a.m. Eastern time on the Closing Date.

**Section 2.9    <u>Deliveries at Closing</u>**.

(a)     At the Closing, Sellers shall deliver to Buyer the following documents and other items, duly executed by Sellers, as applicable:

i.      all Bills of Sale reasonably requested by Buyer;

ii.     all Assignment and Assumption Agreements reasonably requested by Buyer;

iii.    instruments of assignment in form and substance to be agreed to by the Parties in their reasonable discretion for each registered trademark and domain name, respectively, transferred or assigned hereby and for each pending application therefor, and general assignments of all other Intellectual Property of the Sellers, in each case as reasonably requested by Buyer (collectively, the "Intellectual Property Assignments");

iv.    a non-foreign affidavit from the regarded owner of the Sellers for U.S. federal income Tax purposes, dated as of the Closing Date, sworn under penalty of perjury and in form and substance required under Treasury Regulations issued pursuant to Section 1445 of the IRC stating that such owner is not a "foreign person" as defined in Section 1445 of the IRC;

v.    the officer's certificates required to be delivered pursuant to Section 7.1(k);

vi.    a management agreement in form and substance reasonably satisfactory to Buyer (the "Management Agreement"), duly executed by Sellers;

vii.    such other bills of sale, special warranty deeds, completed transfer tax returns, title affidavits, assignments of leases, endorsements, assignments and other good and sufficient instruments of conveyance and transfer, in form reasonably satisfactory to the Buyer (in each case signed and acknowledged as appropriate), as the Buyer may reasonably request to vest in the Buyer all the right, title and interest of the Sellers in, to or under any or all the Purchased Assets; provided that all of the reasonable and documented out-of-pocket post-Closing costs incurred by the Sellers in preparing and delivering the foregoing shall be borne by the Buyer and paid promptly after demand therefor and receipt of supporting invoices; and

viii.    all other previously undelivered certificates, agreement and other documents required to be delivered by this Agreement by the Sellers at or prior to the Closing in connection with the transactions contemplated by this Agreement.

(b)    At the Closing, Buyer shall deliver to Sellers the following documents and other items, duly executed by Buyer, as applicable:

i.    any and all Assignment and Assumption Agreements to which the Buyer is party;

ii.    the Purchase Price, in the form of the Credit Bid And Release, in form reasonably satisfactory to the Sellers (including documentation reasonably acceptable to the Sellers evidencing satisfaction of the DIP Indebtedness);

iii.    the officer's certificates required to be delivered pursuant to Section 7.2(f);

iv.    the Management Agreement, duly executed by Buyer; and

v.    all other previously undelivered certificates, agreements and other documents required by this Agreement to be delivered by the Buyer at or prior to the Closing in connection with the Contemplated Transactions.

Section 2.10    **Allocation**. Within ninety (90) calendar days after the Closing Date, Buyer shall in good faith prepare an allocation of the Purchase Price (and all capitalized costs and other amounts treated as purchase price for U.S. federal income Tax purposes) among the Purchased Assets in accordance with Section 1060 of the IRC and the Treasury Regulations thereunder (and any similar provision of United States state or local or non-United States Law, as appropriate). Sellers shall have thirty (30) calendar days following receipt of Buyer's proposed allocation to review and comment on such proposed allocation and Buyer shall consider such comments in good faith. Thereafter, Buyer shall provide Sellers with Buyer's final allocation schedule, and Buyer and Sellers shall report, act and file Tax Returns (including Internal Revenue Service Form 8594) in all respects and for all purposes consistent with such allocation. Neither Buyer nor Sellers shall take any position (whether in audits, Tax Returns or otherwise) which is inconsistent with such allocation; provided that nothing contained herein shall prevent Buyer or Sellers from settling any proposed deficiency or adjustment by any Governmental Entity based upon or arising out of such allocation, and neither Buyer nor Sellers shall be required to litigate before any court any proposed deficiency or adjustment by any Governmental Entity challenging the allocation.

Section 2.11    **Excluded Locations**.  Any of Sellers' restaurant locations with respect to which the associated Leases have not been designated by Buyer as Assumed Contracts in accordance with Section 2.6(a) shall be deemed to have been classified as Excluded Restaurants.

# ARTICLE III
## SELLERS' REPRESENTATIONS AND WARRANTIES

Sellers hereby represent and warrant to Buyer as of the date hereof and as of the Closing Date that, except as set forth in the disclosure schedule accompanying this Agreement (the "Disclosure Schedule"), the statements contained in this Article III are true and correct.

Section 3.1    **Organization of Sellers; Good Standing**.

(a)    Each Seller is duly organized, validly existing and in good standing under the Laws of its state of formation and has all necessary power and authority to own, lease and operate its properties and to conduct its business in the manner in which its Business is currently being conducted. Each Seller has all requisite corporate or similar power and authority to own, lease and operate its assets and to carry on the Business as currently conducted.

(b)    Except as a result of the commencement of the Chapter 11 Cases, each Seller is duly authorized to do business and is in good standing as a foreign corporation in each jurisdiction where the ownership or operation of the Purchased Assets or the conduct of the Business requires such qualification, except for failures to be so authorized or be in such good standing, as would not, individually or in the aggregate, have a Material Adverse Effect.

(c)     None of the Sellers has any Subsidiaries (other than other Sellers, if applicable).

**Section 3.2    Authorization of Transaction**. Subject to the Sale Order having been entered and still being in effect and not subject to any stay pending appeal at the time of Closing:

(a)     each Seller has all requisite limited liability company power and authority to execute and deliver this Agreement and all Related Agreements to which it is a party and to perform its obligations hereunder and thereunder; the execution, delivery and performance of this Agreement and all Related Agreements to which a Seller is a party have been duly authorized by such Seller and no other company action on the part of any Seller is necessary to authorize this Agreement or the Related Agreements to which it is party or to consummate the Contemplated Transactions; and

(b)     this Agreement has been duly and validly executed and delivered by each Seller, and, upon their execution and delivery in accordance with the terms of this Agreement, each of the Related Agreements to which any Seller is a party will have been duly and validly executed and delivered by each such Seller, as applicable. Assuming that this Agreement constitutes a valid and legally binding obligation of Buyer, this Agreement constitutes the valid and legally-binding obligations of Sellers, enforceable against Sellers in accordance with its terms and conditions, subject to applicable bankruptcy, insolvency, moratorium or other similar Laws relating to creditors' rights and general principles of equity. Assuming, to the extent that it is a party thereto, that each Related Agreement constitutes a valid and legally binding obligation of Buyer, each Related Agreement to which any Seller is a party, when executed and delivered, constituted or will constitute the valid and legally-binding obligations of such Seller, as applicable, enforceable against Sellers, as applicable, in accordance with their respective terms and conditions, subject to applicable bankruptcy, insolvency, moratorium or other similar Laws relating to creditors' rights and general principles of equity.

**Section 3.3    Noncontravention; Consents and Approvals**.

(a)     Neither the execution and delivery of this Agreement, nor the consummation of the Contemplated Transactions (including the Related Agreements), subject to the Sale Order having been entered and still being in effect and not subject to any stay pending appeal at the time of Closing and the requirements of the HSR Act are complied with, (i) will conflict with or result in a breach of the certificate of formation, operating agreement or other organizational documents of any Seller, (ii) will violate any Law to which any Seller is, or its respective assets or properties are, subject, (iii) subject to the entry of the Sale Order, will conflict with any Assumed Contract or Assumed Permit, or (iv) subject to and assuming entry of the Sale Order, will conflict with, or result in any violation of or constitute a breach or default under, any order of any Governmental Entity applicable to the Sellers or any of the Purchased Assets, and, in the case of clauses (ii), (iii) and (iv) for such conflicts, breaches, violations, defaults, accelerations, rights or failures to give notice, would not, individually or in the aggregate, have a Material Adverse Effect.

(b)     Except as set forth in <u>Schedule 3.3(b) of the Disclosure Schedule</u>, subject to the Sale Order having been entered and still being in effect (and not subject to any stay pending appeal at the time of Closing) and the requirements of the HSR Act are complied with, no Consent, notice or filing is required to be obtained by any Seller from, or to be given by any Seller to, or made by any Seller with, any Governmental Entity in connection with the execution, delivery and performance by any Seller of this Agreement or any Related Agreement. After giving effect to the Sale Order and any applicable order of the Bankruptcy Court authorizing the assignment and assumption of any Contract that is an Assumed Contract hereunder, no Consent, notice or filing is required to be obtained by any Seller from, or to be given by any Seller to, or made by any Seller with, any Person that is not a Governmental Entity in connection with the execution, delivery and performance by any Seller of this Agreement or any Related Agreement, except where the failure to give notice, file or obtain such authorization, consent or approval would not, individually or in the aggregate, have a Material Adverse Effect.

**Section 3.4     Compliance with Laws**. Sellers are in compliance with all Laws applicable to the Business or the Purchased Assets in all material respects. Sellers have not received any written notice of violation of any Law with respect to any Seller, the Business or the Purchased Assets and there is no reasonable basis for the issuance of any such notice or the taking of any action for such violation.

**Section 3.5     Title to Purchased Assets**. Sellers, as of immediately prior to the Closing, have good and valid title to, or, in the case of leased assets, have good and valid leasehold interests in (subject to the effect on enforceability of (a) any applicable Law relating to bankruptcy, reorganization, insolvency, moratorium, fraudulent conveyance or preferential transfers, or similar Laws relating to or affecting creditors' rights generally and (b) general principles of equity (regardless of whether enforceability is considered in a proceeding in equity or at law)), the Purchased Assets, free and clear of all Liens (except for Permitted Liens), subject to entry of the Sale Order. At the Closing or such time as title is conveyed under <u>Section 2.6</u>, Sellers will convey, subject to the Sale Order having been entered and still being in effect and not subject to any stay pending appeal at the time of Closing, good and valid title to, or valid leasehold interests in, all of the Purchased Assets, free and clear of all Liens (except for Permitted Liens), to the fullest extent permissible under section 363(f) of the Bankruptcy Code and subject to the rights of licensees under section 365(n) of the Bankruptcy Code.  The Purchased Assets constitute substantially all of the properties, assets and rights used by the Sellers to conduct and operate the Business in all material respects as currently conducted and operated by the Sellers, except with respect to the Excluded Restaurants. All of the Purchased Assets are in good order and repair (ordinary wear and tear excepted) for assets of comparable age and past use and are capable of being used in the Ordinary Course of Business to operate the Business substantially as currently conducted and operated by the Sellers.  No Person other than Sellers are engaged in the operation of, or hold rights, title and interest in (except for Permitted Liens), the Purchased Assets.

**Section 3.6     Contracts**. <u>Schedule 3.6 of the Disclosure Schedule</u> sets forth an accurate list, as of the date hereof, of all material Contracts, including any and all amendments, modifications, supplements, exhibits and restatements thereto and thereof, to which a Seller is a party with respect to the Business as of the date hereof (and Sellers have made available, or within five (5) days of the date hereof shall make available, to Buyer true and complete copies of all such

Contracts).  Except as set forth in Schedule 3.6 of the Disclosure Schedule, no Seller has assigned, delegated or otherwise transferred to any third party any of its rights or obligations with respect to any such Contract.  The Assumed Contracts include all Contracts material to the ownership and/or operation of the Business, except with respect to the Excluded Restaurants.  Sellers have not, and, to Sellers' Knowledge, no other party to any Assumed Contract has, commenced any action against any of the parties to any Assumed Contract or given or received any written notice of any default or violation under any Assumed Contract that has not been withdrawn or dismissed except to the extent such default or violation will be cured as a result of the payment of the applicable Cure Amounts, assuming entry of the Sale Order. To Sellers' Knowledge, each Assumed Contract is, or will be upon the Closing, valid, binding and in full force and effect in accordance with its terms.

### Section 3.7    Intellectual Property.

(a)    Schedule 3.7 of the Disclosure Schedule sets forth a true and complete list of (i) all Registered Intellectual Property that is owned by any Seller, (ii) all material Contracts pursuant to which any Seller obtains the right to use any Intellectual Property, and (iii) all material Contracts pursuant to which any Seller grants to any other Person the right to use any Intellectual Property. Sellers own all Registered Intellectual Property free and clear of all Liens (except for Permitted Liens and subject to entry of the Sale Order), and all such Registered Intellectual Property is valid, subsisting and, enforceable, and is not subject to any outstanding Decree adversely affecting Sellers' use thereof or rights thereto.

(b)    To Sellers' Knowledge and except as set forth on Schedule 3.7 of the Disclosure Schedule, none of the use of the Intellectual Property included in the Purchased Assets, the conduct of the Business as currently conducted (except with respect solely to the Excluded Restaurants), nor any of the products sold or services provided by Sellers or any of their Affiliates in connection therewith (except with respect solely to the Excluded Restaurants), infringes upon or otherwise violates the Intellectual Property of any other Person. To Sellers' Knowledge, no third party is infringing any Intellectual Property owned by any Seller and included in the Purchased Assets, except as would not reasonably be expected to have a Material Adverse Effect.

### Section 3.8    Litigation. Other than the Chapter 11 Cases, Schedule 3.8 of the Disclosure Schedule sets forth all unresolved Litigation brought by or against any Seller, and to Sellers' Knowledge, there is no other Litigation threatened in writing against any Seller which is reasonably likely to adversely affect the ability of any Seller to enter into this Agreement or to consummate the Contemplated Transactions.

### Section 3.9    Employees and Employment Matters.

(a)    No Seller is a party to or bound by any collective bargaining agreement covering the Current Employees (as determined as of the date of this Agreement), nor is any Seller aware of any ongoing strike, walkout, work stoppage, or other material collective dispute affecting any Seller with respect to the Business. To Sellers' Knowledge, there is no organizational effort being made or threatened by or on behalf of any labor union with respect to the Current Employees (as determined as of the date of this

Agreement). Within five (5) days of the date hereof, Sellers shall make available to Buyer a list of all Current Employees.

(b)    There are no grievances or unfair labor practice complaints pending against Seller or any of its Subsidiaries before the National Labor Relations Board or any other Governmental Entity with respect to any employees of Sellers.

(c)    Sellers are in compliance in all material respects with all applicable Laws relating to employment or labor, including those related to hiring, background checks, wages, pay equity, hours, collective bargaining and labor relations, classification of independent contractors and employees, equal opportunity, document retention, notice, plant closing and mass layoff, health and safety, employment eligibility verification, immigration, child labor, discrimination, harassment, retaliation, accommodations, disability rights or benefits, affirmative action, workers' compensation, unemployment insurance, employment and reemployment rights of members of the uniformed services, secondment, employee leave issues and the payment of social security and other Taxes, and are not liable for any arrears of wages, other compensation or benefits (other than such Liabilities that have been incurred in the ordinary course of business of the Seller), or any Taxes or penalties for failure to comply with any of the foregoing.

(d)    No individual who has performed services for Sellers with respect to the Business has been improperly excluded from participation in any Employee Benefit Plan, and none of the Sellers has any direct or indirect liability, whether absolute or contingent, with respect to any misclassification of any Person as an independent contractor or on any other non-employee basis for such Seller rather than as an employee, with respect to any individual employed, engaged, or leased by the Seller from another employer, or with respect to any misclassification of any employee as exempt versus non-exempt under the Fair Labor Standards Act.

(e)    Except as set forth on Schedule 3.9(e) of the Disclosure Schedule, there is no material employment or labor-related claim pending against any Seller brought by or on behalf of any employee or any Governmental Entity and no such claim is threatened. Except as disclosed to Buyer confidentially, in the last five (5) years, there have been no allegations of sexual or other unlawful harassment or discrimination made on more than one occasion against (i) any officer of any Seller or (ii) any managerial employee of a Seller.

(f)    All employees of Sellers are authorized to work in the United States. Sellers have provided Buyer as of a date no earlier than five business days before the date of this Agreement a complete and correct list of all employees who are reasonably expected to be Current Employees by: name; title or position; status (part-time, full-time, exempt, non-exempt, etc.); whether paid on a salaried, hourly or other basis; current base salary or wage rate; current target bonus; start date; service reference date (if different from the start date); work location; vacation entitlement formula; and an indication of whether or not such employee is on leave of absence (the "Employee Roster").

DB1/ 109641500.6

PHIL1 8628846v.6

**Section 3.10**    **Employee Benefit Plans**.

(a)    Schedule 3.10 of the Disclosure Schedule lists each Employee Benefit Plan that Sellers maintain or to which Sellers contribute. Sellers have made available to Buyer a copy of, to the extent applicable, (i) each Employee Benefit Plan and, with respect to any unwritten Employee Benefit Plan, a written summary thereof and, (ii) with respect to each Assumed Plan, (A) each trust, insurance, annuity or other funding Contract related thereto, (B) the most recent financial statements and actuarial or other valuation reports prepared with respect thereto, (C) the three (3) most recent annual reports on Form 5500 required to be filed with the United States Internal Revenue Service with respect thereto, (D) the most recent summary plan description and any material modification with respect thereto, (E) the most recent determination or opinion letter received from the United States Internal Revenue Service with respect to each Assumed Plan intended to qualify under Section 401 of the Code, and (F) all non-routine, written communications relating thereto.

(b)    With respect to each Employee Benefit Plan:

i.    such Employee Benefit Plan, if intended to meet the requirements of a "qualified plan" under Section 401(a) of the IRC, has received a favorable determination letter from the United States Internal Revenue Service or may rely on a favorable opinion letter issued by the United States Internal Revenue Service or is comprised of a master or prototype plan that has received a favorable opinion letter issued by the United States Internal Revenue Service and there are no facts or circumstances that could reasonably be expected to result in the loss of such qualified status, including to Sellers' Knowledge any event that could be corrected under the Employee Plans Compliance Resolution System;

ii.    No Employee Benefit Plan is subject to Title IV of ERISA;

iii.    No Tax penalties or additional Taxes have been imposed or would be reasonably expected to be imposed on any Current Employee, and no acceleration of Taxes has occurred or would be reasonably expected to occur with respect to any Current Employee, in each case as a result of a failure to comply with Section 409A of the Code with respect to any Employee Benefit Plan that is a "nonqualified deferred compensation plan" within the meaning of Section 409A of the IRC.  No Current Employee is entitled to receive any gross-up or additional payment in connection with the Tax required by Section 409A or Section 4999 of the IRC;

iv.    Except pursuant to the Employee Benefit Plans or other agreements or arrangements listed on Schedule 3.10(b) of the Disclosure Schedule, none of the execution and delivery of this Agreement or the consummation of the transactions contemplated hereby (alone or in conjunction with any other event, including any termination of employment on or following the Closing) will (i) entitle any Current Employee to any compensation or benefit, (ii) accelerate the time of payment or vesting, or trigger any payment or funding, of any compensation or benefits for any Current Employee or trigger any other material obligation under any Assumed Plan,

(iii) result in any breach or violation of or default under or limit Sellers' right (or Buyer's right with respect to an Assumed Plan) to amend, modify or terminate any Employee Benefit Plan or (iv) result in the payment of any "excess parachute payment" (as defined in Section 280G(b)(1) of the Code); and

v.    Each Employee Benefit Plan (and any related trust or other funding vehicle) has been maintained, operated and administered in compliance with applicable Laws and with the terms of such Employee Benefit Plan. There are no pending or threatened material investigations by any Governmental Entity with respect to or termination proceedings or other material claims, suits or proceedings (except routine claims for benefits payable in the ordinary course) against or involving any Employee Benefit Plan.

**Section 3.11    Real Property.**

(a)    Sellers do not own any real property.

(b)    Schedule 3.11(b) of the Disclosure Schedule sets forth the address of each Leased Real Property related to the Continuing Restaurants, and a true and complete list of all Leases that are Assumed Contracts (including the date and name of the parties to such Lease document). Sellers have made available to Buyer a true and complete copy of all Leases that are Assumed Contracts (including all amendments, extensions, renewals, guaranties and other agreements with respect thereto) for such Leased Real Property, as amended through the date hereof. Except as set forth in Schedule 3.11(b) of the Disclosure Schedule, with respect to each of the Leases that are Assumed Contracts: (i) to Sellers' Knowledge and subject to the effect on enforceability of (A) any applicable Law relating to bankruptcy, reorganization, insolvency, moratorium, fraudulent conveyance or preferential transfers, or similar Laws relating to or affecting creditors' rights generally and (B) general principles of equity (regardless of whether enforceability is considered in a proceeding in equity or at law), such Lease is legal, valid, binding, enforceable and in full force and effect in accordance with its terms; (ii) Sellers' possession and quiet enjoyment of the Leased Real Property under such Lease has not been disturbed, and to Sellers' Knowledge, there are no disputes with respect to Sellers' obligations under such Lease that will not be satisfied by the Sale Order; (iii) to Sellers' Knowledge, no other party to a Lease is in breach or default under such Lease, and no event has occurred or circumstance exists which, with the delivery of notice, the passage of time or both, would constitute such a breach or default; (iv) no security deposit or portion thereof deposited with respect such Lease has been applied in respect of a breach or default under such Lease which has not been redeposited in full; (v) the other party to such Lease is not an affiliate of, and otherwise does not have any economic interest in, Sellers; (vi) the Sellers have not subleased, licensed or otherwise granted any Person the right to use or occupy such Leased Real Property or any portion thereof; and (vii) there are no liens or encumbrances (other than Permitted Liens) on the estate or interest created by such Lease.

(c)    Schedule 3.11(c) of the Disclosure Schedule sets forth a description of all material Leasehold Improvements for each Leased Real Property related to the Continuing Restaurants.

(d)    The Leased Real Property identified in <u>Schedule 3.11(b) of the Disclosure Schedule</u> and the Leasehold Improvements comprise all of the real property used in or otherwise related to the operation by Sellers of, the Business, with respect to the Continuing Restaurants.

(e)    Sellers have received no notice of any condemnation, expropriation or other proceeding in eminent domain pending or, to Sellers' Knowledge, which is threatened, affecting any real property underlying the Leased Real Property related to the Continuing Restaurants or any portion thereof or interest therein.

**Section 3.12    <u>Tangible Personal Property</u>** . <u>Schedule 3.12 of the Disclosure Schedule</u> sets forth all material Personal Property Leases related to the Continuing Restaurants, and, to Sellers' Knowledge, each such material Personal Property Lease is valid and enforceable.

**Section 3.13    <u>Permits</u>**.

(a)    <u>Schedule 3.13(a) of the Disclosure Schedule</u> contains a list of all material Permits related to the Continuing Restaurants that Sellers hold as of the date hereof in connection with the operations of the Business. As of the date hereof, there is no Litigation pending or, to Sellers' Knowledge, threatened in writing that seeks the revocation, cancellation, suspension, failure to renew or adverse modification of any material Assumed Permits, except where a failure of this representation and warranty to be so true and correct would not be material to the ownership and operation of the Business. All required filings with respect to the Assumed Permits have been made and all required applications for renewal thereof have been filed, except where a failure of this representation and warranty to be so true and correct would not be material to the ownership and operation of the Business.

(b)    <u>Schedule 3.13(b) of the Disclosure Schedule</u> sets forth a complete and correct list as of the date of this Agreement of Liquor Licenses related to the Continuing Restaurants. Each of the Sellers is in compliance in all material respects with all applicable state, municipal and other governmental laws, regulations and rules with respect to the sale of liquor and all alcoholic beverages and has the right to sell liquor at retail for consumption within each of the restaurant locations of such Seller where the Leases constitute Assumed Contracts, subject to and in accordance with all applicable provisions of the Liquor Licenses. To Sellers' Knowledge, except as set forth in <u>Schedule 3.13(b) of the Disclosure Schedule</u>, since December 31, 2017, (i) there has been no material Litigation brought or threatened in writing to be brought by or before a Governmental Entity in respect of any such Liquor License related to a Continuing Restaurant or the activities of such Seller in connection with any such Liquor License (or in connection with any other liquor licenses previously held or used by such Seller), (ii) no such Liquor License related to a Continuing Restaurant is subject to any due but unpaid Tax obligation owed to a Governmental Entity, the outstanding nature of which would preclude transfer of such Liquor License from any of the Sellers to Buyer, and (iii) no such Liquor License related to a Continuing Restaurant has been threatened by a Governmental Entity to be revoked, limited or not renewed.

**Section 3.14    <u>Purchased Inventory</u>**.

(a)     No Inventory that is Purchased Inventory is materially damaged in any significant way, except for any such damage which would not be material to the Purchased Inventory taken as a whole;

(b)     To Sellers' Knowledge, none of the Purchased Inventory has been part of a current or past product recall, except for any such recall which would not be material to the Purchased Inventory taken as a whole;

(c)     To Sellers' Knowledge, the Purchased Inventory is in material compliance with United States federal and applicable state guidelines for such products as of the date hereof, except for any such noncompliance which would not be material to the Purchased Inventory taken as a whole; and

(d)     To Sellers' Knowledge, the Purchased Inventory is in working condition or in a condition fit for sale and consumption in accordance with all applicable Laws, as the case may be, except for such failure to be in such condition which would not have a Material Adverse Effect on the Purchased Inventory taken as a whole.

**Section 3.15    Environmental Matters**.    Except as set forth in Schedule 3.15 of the Disclosure Schedule:

(a)     Each Seller is, and has been during the prior two (2) years, in compliance in all material respects with all applicable Environmental Laws, which compliance has included obtaining and maintaining all permits, licenses and authorizations required under applicable Environmental Laws;

(b)     No Seller has received during the prior two (2) years written notice from any Governmental Entity or third party regarding any actual or alleged violation of or Liability under Environmental Laws;

(c)     To Sellers' Knowledge, no Hazardous Substance has been released at any current or former Leased Real Property, or other real property, by Sellers in violation of any Environmental Law;

(d)     Sellers have made available to Buyer copies of all material environmental audits, assessments and reports in its possession relating to Sellers, any actual or potential Liabilities under Environmental Laws and the Leased Real Property; and

(e)     This Section 3.15 contains the sole and exclusive representations and warranties of Sellers with respect to any environmental, health or safety matters, including any arising under any Environmental Law or with respect to any Hazardous Substance.

**Section 3.16    Financial Statements**. Sellers have delivered to Buyer true and correct copies of (i) the audited consolidated balance sheets of Sellers as of December 26, 2018 and December 27, 2017 and the related audited consolidated statements of income and of cash flows of Sellers for the years then ended, and (ii) the unaudited consolidated balance sheet of the Sellers as of December 25, 2019, and the related consolidated statement of income and cash flows of Sellers for the twelve (12) months then ended (such audited and unaudited statements, including

the related notes and schedules thereto, are referred to herein as the "<u>Financial Statements</u>").  Each of the Financial Statements has been prepared in accordance with GAAP consistently applied and presents fairly in all material respects the consolidated financial position, results of operations and cash flows of Sellers as of the dates and for the periods indicated therein, subject to normal year-end adjustments and the absence of complete notes in the case of the unaudited statements.  Other than with respect to Excluded Liabilities as to which the Sellers do not provide any representations and warranties, no Seller has any material Liabilities that would be required by GAAP to be reflected on a consolidated balance sheet (or the notes thereto) of the Sellers, except for liabilities and obligations (a) reflected, accrued or reserved against in the Sellers' consolidated balance sheet as of December 25, 2019 (or the notes thereto) included in the Financial Statements, (b) incurred in the Ordinary Course of Business since of December 25, 2019, (c) which have been discharged or paid in full prior to the date of this Agreement, (d) incurred pursuant to the transactions contemplated by this Agreement, or (e) obligations under Assumed Contracts (other than liabilities or obligations related to or arising out of breaches of such Assumed Contracts to the extent arising prior to the Closing Date).  Since December 25, 2019, to Sellers' Knowledge, no Seller has received any written complaint, allegation, assertion or Claim regarding the accounting or auditing practices, procedures, methodologies or methods of Sellers or their respective internal accounting controls.

**Section 3.17**  <u>Brokers' Fees</u>  Except for amounts due to Configure Partners, LLC (which amounts are to be paid by the Seller), no Seller has entered into any Contract to pay any fees or commissions to any broker, finder or agent with respect to the transactions contemplated by this Agreement for which Buyer could become liable or obligated to pay.

**Section 3.18**  <u>No Other Agreements to Purchase</u>  Sellers have not entered into any agreement with any other Person (written or oral) which grants such third party the right or option purchase or acquire from Sellers any Purchased Asset, other than purchase orders for Inventory accepted by Sellers in the Ordinary Course of Business.

**Section 3.19**  <u>Taxes</u>.

(a)    Each Seller has duly and timely filed all income and other material Tax Returns that it was required to file, and all such filed Tax Returns were true, correct and complete in all material respects. All material Taxes owed by the Sellers and all material Taxes owed with respect to the Purchased Assets (in each case, whether or not shown on any Tax Return) have been paid. In the last three (3) years, no claim has been made in writing by a Governmental Entity in a jurisdiction where the Sellers do not file Tax Returns that the Sellers or the Business is or may be subject to taxation by that jurisdiction.

(b)    There is no audit, dispute, claim or controversy concerning any Tax Liability or Tax Return of Sellers or with respect to the Business in progress or pending by any taxing authority.  No Seller has waived any statute of limitations in respect of Taxes or agreed to any extension of time with respect to a Tax assessment or deficiency that could result in a Lien on the Purchased Assets or the imposition of any liability for Taxes on Buyer, its direct or indirect equityholders, or their Affiliates.

(c)     No Seller has received written notice of any Liens for Taxes on any of the Purchased Assets, other than Permitted Liens.

(d)     No Seller is party to any Tax sharing, Tax allocation or Tax indemnity agreement, except for (i) any such agreement solely between the Sellers or (ii) customary gross-up or indemnification provisions in commercial agreements entered into in the ordinary course of business, the primary subject matter of which is not related to Taxes, in each case that would be binding on the Buyer.

(e)     No Seller has participated in any "reportable transaction" within the meaning of Treasury Regulation section 1.6011-4(b).

(f)     Each Seller has collected or withheld all material Taxes required to have been collected or withheld (including from payments made to employees, independent contractors, creditors, stockholders and other Persons) and such collected and withheld Taxes have been or will be duly paid to the proper Governmental Entity, and each of the Seller has complied in all material respects with all Laws relating to withholding, including any reporting and record keeping requirements.

(g)     Each Seller has collected all material amounts of sales and use Taxes required to be collected, and has remitted, or will remit on a timely basis, such amounts to the appropriate Governmental Entity, or has been furnished properly completed exemption certificates and has, in all material respects, maintained all such records and supporting documents in the manner required by all applicable sales and use Tax statutes and regulations.

(h)     Each Seller and each of its Affiliates (if any) which has filed a voluntary petition for relief pursuant to the Bankruptcy Code in connection with the Chapter 11 Cases is classified as an entity disregarded from its owner or a partnership for U.S. federal income Tax purposes, and has been so classified since the date of its formation.  No Seller nor any such Affiliate has filed any election or taken any other action to be classified as an association taxable as a corporation for U.S. federal income Tax purposes.

**Section 3.20  No Other Representations or Warranties**. EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES CONTAINED IN THIS ARTICLE III (AS QUALIFIED, AMENDED, SUPPLEMENTED AND MODIFIED BY THE DISCLOSURE SCHEDULE), NEITHER A SELLER NOR ANY OTHER PERSON MAKES (AND BUYER IS NOT RELYING UPON) ANY OTHER EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY WITH RESPECT TO SELLERS, THE BUSINESS, THE PURCHASED ASSETS (INCLUDING THE VALUE, CONDITION OR USE OF ANY PURCHASED ASSET), THE ASSUMED LIABILITIES OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT, AND SELLERS DISCLAIM ANY OTHER REPRESENTATIONS OR WARRANTIES, WHETHER MADE BY SELLERS, ANY AFFILIATE OF SELLERS OR ANY OF THEIR RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES, AGENTS OR REPRESENTATIVES. EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES CONTAINED IN THIS ARTICLE III (AS QUALIFIED, AMENDED, SUPPLEMENTED AND MODIFIED BY THE DISCLOSURE SCHEDULE), EACH SELLER EXPRESSLY

DISCLAIMS AND NEGATES ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AT COMMON LAW, BY STATUTE OR OTHERWISE, RELATING TO THE CONDITION OF THE PURCHASED ASSETS (INCLUDING ANY IMPLIED OR EXPRESSED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, OR OF THE PROBABLE SUCCESS OR PROFITABILITY OF THE OWNERSHIP, USE OR OPERATION OF THE BUSINESS OR THE PURCHASED ASSETS BY BUYER AFTER THE CLOSING). THE DISCLOSURE OF ANY MATTER OR ITEM IN THE DISCLOSURE SCHEDULE SHALL NOT BE DEEMED TO CONSTITUTE AN ACKNOWLEDGMENT THAT ANY SUCH MATTER IS REQUIRED TO BE DISCLOSED OR IS MATERIAL OR THAT SUCH MATTER WOULD RESULT IN A MATERIAL ADVERSE EFFECT.

BUYER HAS PERFORMED AN INDEPENDENT INVESTIGATION, ANALYSIS, AND EVALUATION OF THE PURCHASED ASSETS.

THE PROVISIONS OF THIS <u>SECTION 3.20</u> SHALL SURVIVE THE CLOSING OR EARLIER TERMINATION OF THIS AGREEMENT AND SHALL BE INCORPORATED INTO THE CLOSING DOCUMENTS TO BE DELIVERED AT CLOSING.

## ARTICLE IV
## BUYER'S REPRESENTATIONS AND WARRANTIES

Buyer represents and warrants to Sellers as follows as of the date hereof and as of the Closing Date:

**Section 4.1    <u>Organization of Buyer</u>**. Buyer is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of Delaware and has all requisite limited liability company power and authority to own, lease and operate its assets and to carry on its business as now being conducted.

**Section 4.2    <u>Authorization of Transaction</u>**.

(a)    Buyer has full limited liability company power and authority to execute and deliver this Agreement and all Related Agreements to which it is a party and to perform its obligations hereunder and thereunder.

(b)    The execution, delivery and performance of this Agreement and all other Related Agreements to which Buyer is a party have been duly authorized by Buyer, and no other limited liability company action on the part of Buyer is necessary to authorize this Agreement or the Related Agreements to which it is a party or to consummate the Contemplated Transactions.

(c)    This Agreement has been duly and validly executed and delivered by Buyer, and, upon their execution and delivery in accordance with the terms of this Agreement, each of the Related Agreements to which Buyer is a party will have been duly and validly executed and delivered by Buyer. To the extent this Agreement constitutes a valid and legally-binding obligation of Sellers, this Agreement constitutes a valid and legally-binding obligation of Buyer, enforceable against Buyer in accordance with its terms and

conditions, subject to applicable bankruptcy, insolvency, moratorium or other similar Laws relating to creditors' rights and general principles of equity. To the extent each Related Agreement constitutes a valid and legally-binding obligation of each Seller party thereto, each Related Agreement to which Buyer is a party, when executed and delivered, constituted or will constitute the valid and legally-binding obligations of Buyer, enforceable against Buyer in accordance with their respective terms and conditions, subject to applicable bankruptcy, insolvency, moratorium or other similar Laws relating to creditors' rights and general principles of equity.

Section 4.3    **Noncontravention**. Neither the execution and delivery of this Agreement, nor the consummation of the Contemplated Transactions (including the assignments and assumptions referred to in Section 2.6) will (i) conflict with or result in a breach of the certificate of formation, operating agreement, or other organizational documents, of Buyer, (ii) subject to any consents required to be obtained from any Governmental Entity, including the requirements of the HSR Act, violate any Law to which Buyer is, or its assets or properties are subject, or (iii) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify or cancel any Contract to which Buyer is a party or by which it is bound, except, in the case of either clause (ii) or (iii), for such conflicts, breaches, defaults, accelerations or rights as would not, individually or in the aggregate, reasonably be expected to prevent, materially delay or materially impair to the ability of Buyer to consummate the transactions contemplated by this Agreement or by the Related Agreements. Buyer is not required to give any notice to, make any filing with, or obtain any authorization, consent or approval of any Governmental Entity in order for the Parties to consummate the transactions contemplated by this Agreement or any of the Related Agreement, except where the failure to give notice, file or obtain such authorization, consent or approval would not, individually or in the aggregate, reasonably be expected to prevent, materially delay or materially impair to the ability of Buyer to consummate the transactions contemplated by this Agreement or by the Related Agreements.

Section 4.4    **Litigation**.    There are no Litigation pending or, to Buyer's knowledge, threatened against or affecting Buyer that will adversely affect Buyer's performance under this Agreement or the consummation of the transactions contemplated by this Agreement.

Section 4.5    **Adequate Assurances Regarding Executory Contracts**. Buyer will be capable of satisfying as of the Sale Hearing the conditions contained in Sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Assumed Contracts.

Section 4.6    **Brokers' Fees** . Neither Buyer nor any of its Affiliates has entered into any Contract to pay any fees or commissions to any broker, finder or agent with respect to the transactions contemplated by this Agreement for which any Seller could become liable or obligated to pay.

Section 4.7    **No Outside Reliance**. Notwithstanding anything contained in this Article IV or any other provision of this Agreement to the contrary, Buyer acknowledges and agrees that the representations and warranties made by the Sellers to Buyer in Article III (as qualified by the Schedules and in accordance with the express terms and conditions (including limitations and exclusions) of this Agreement) (the "Express Representations") are the sole and exclusive

representations, warranties, and statements of any kind made by Sellers to Buyer in connection with the transactions contemplated by this Agreement.  Buyer acknowledges and agrees that all other representations, warranties and statements of any kind or nature expressed or implied, whether in written, electronic or oral form, including (a) the completeness or accuracy of, or any omission to state or to disclose, any information (other than solely to the extent expressly set forth in the Express Representations) including in the Confidential Information Memorandum prepared by Configure Partners, LLC (the "Information Presentation"), that certain datasite administered by Firmex (the "Dataroom"), any projections, meetings, calls or correspondence with management of Sellers and their Representatives, or any other Person on behalf of Sellers or any of their respective Affiliates or Representatives and (b) any other statement relating to the historical, current or future business, financial condition, results of operations, assets, Liabilities, properties, contracts, and prospects of Sellers, or the quality, quantity or condition of Sellers assets, are, in each case, specifically disclaimed by Sellers and that Buyer has not relied on any such representations, warranties or statements. Buyer will accept the Purchased Assets and assume the Assumed Liabilities at the Closing "AS IS," "WHERE IS" and "WITH ALL FAULTS."

### ARTICLE V
### PRE-CLOSING COVENANTS

The Parties agree as follows with respect to the period between the execution of this Agreement and the Closing (except as otherwise expressly stated to apply to a different period):

**Section 5.1**    **Notices and Consents**.

(a)    To the extent required by the Bankruptcy Code or the Bankruptcy Court, Sellers shall give any notices to third parties, and each Seller shall use its commercially reasonable efforts to obtain any third party Consents or sublicenses; provided, however, that neither Seller nor Buyer shall be required to incur any Liabilities or provide any financial accommodation, in order to obtain any such third party Consent with respect to the transfer or assignment of any Purchased Asset.

(b)    Sellers and Buyer shall cooperate with one another (a) in promptly determining whether any filings are required to be or should be made or consents, approvals, permits or authorizations are required to be or should be obtained under any applicable Law in connection with this Agreement and the Contemplated Transactions and (b) in promptly making any such filings, furnishing information required in connection therewith and seeking to obtain timely any such consents, permits, authorizations, approvals or waivers; provided, however, that Sellers' obligations hereunder shall only continue until the Chapter 11 Cases are closed or dismissed.

(c)    To the extent permitted by applicable Law and the terms of the Purchased Assets, in the event any third party Consent has not been obtained by the Closing, at the Buyer's request, the Party contemplated to be transferring such Purchased Asset under this Agreement (the "Transferring Party") shall hold in trust for the Buyer, as applicable, the relevant Purchased Asset until the earlier of such time as (i) the third party Consent is obtained, (ii) the Chapter 11 Cases are closed or dismissed or (iii) Buyer elects not to assume such Purchased Asset.  During such time period, Buyer shall comply with all

applicable covenants and obligations under the Purchased Assets, including the payment of any costs or expenses in connection therewith.  Buyer shall be entitled to receive all of the benefits of the Transferring Party under the Purchased Asset. Buyer shall satisfy all Liabilities with respect to such Purchased Assets until the earlier of such time as (i) the third party Consent is obtained, (ii) the Chapter 11 Cases are closed or dismissed or (iii) Buyer elects not to assume such Purchased Asset, and shall indemnify and hold Sellers harmless with respect to any such reasonable out-of-pocket expenses arising in the Ordinary Course of Business pursuant to a budget to be reasonably agreed to by the Parties in good faith arising or otherwise relating to such period; provided that, each Seller covenants and agrees that in the event of clause (iii), it will wind down such Purchased Asset as soon as commercially reasonable and shall take all commercially reasonable measures to avoid or mitigate any losses, expenses and Liabilities.

(d)    Subject to the terms and conditions set forth in this Agreement and applicable Law, Buyer and Sellers shall (A) promptly notify the other Party of any communication to that Party from any Governmental Entity in respect of any filing, investigation or inquiry concerning this Agreement or the Contemplated Transactions, (B) if practicable, permit the other Party the opportunity to review in advance all the information relating to Sellers and their respective Subsidiaries or Buyer and its Affiliates, as the case may be, that appears in any filing made with, or written materials submitted to, any third party and/or any Governmental Entity in connection with the Agreement and the transactions contemplated by this Agreement and consider in good faith the other Party's reasonable comments, (C) not participate in any substantive meeting or discussion with any Governmental Entity in respect of any filing, investigation, or inquiry concerning this Agreement and the transactions contemplated by this Agreement unless it consults with the other Party in advance, and, to the extent permitted by such Governmental Entity, gives the other Party the opportunity to attend, and (D) furnish the other Party with copies of all correspondences, filings, and written communications between them and their Subsidiaries and Representatives, on the one hand, and any Governmental Entity or its respective staff, on the other hand, with respect to this Agreement and the transactions contemplated by this Agreement, provided, however, that any materials or information provided pursuant to any provision of this Section 5.1(d) may be redacted before being provided to the other Party (i) to remove references concerning the valuation of Buyer, Sellers, or any of their Subsidiaries, (ii) financing arrangements, (iii) as necessary to comply with contractual arrangements, and (iv) as necessary to address reasonable privilege or confidentiality issues. Sellers and Buyer may, as each deems advisable and necessary, reasonably designate any commercially or competitively sensitive material provided to the other under this Section 5.1(d) as "outside counsel only." Such materials and the information contained therein shall be given only to the outside legal counsel and any retained consultants or experts of the recipient and shall not be disclosed by such outside counsel to employees, officers or directors of the recipient, unless express written permission is obtained in advance from the source of the materials (Sellers or Buyer, as the case may be). Each of Sellers and Buyer shall promptly notify the other Party if such Party becomes aware that any third party has any objection to the Agreement on antitrust or anti-competitive grounds.

**Section 5.2    Bankruptcy Actions**.

(a)    Sellers shall have commenced the Chapter 11 Cases no later than January 31, 2020.

(b)    The Sellers shall have filed the Sale Motion, which motion shall seek the Bankruptcy Court's: (i) entry of the Sale Procedures Order, (ii) entry of the Sale Order by no later than the Sale Order Deadline that provides the parties, inter alia, consummate the Closing as soon as practicable after the entry of the Sale Order and no later than three (3) days following the entry of the Sale Order, subject to the satisfaction of all conditions to the obligations of Sellers and Buyer as set forth in Article VII (other than conditions with respect to actions Sellers and/or Buyer will take at the Closing itself, but subject to the satisfaction or waiver of those conditions).

(c)    Sellers will provide Buyer with a reasonable opportunity to review and comment upon all motions, applications, and supporting papers relating to the transactions contemplated by this Agreement prepared by Sellers or any Affiliates (including forms of orders and notices to interested parties) prior to the filing thereof in the Chapter 11 Cases. All motions, applications, and supporting papers prepared by Sellers and relating to the transactions contemplated by this Agreement to be filed on behalf of Sellers after the date hereof must be approved in form and substance by Buyer.

(d)    Each of Buyer and Sellers shall continue to act in good faith and without any improper conduct, including collusion or fraud of any kind.

(e)    Each of Buyer and Sellers will promptly take such actions as are reasonably requested by the other party to assist in obtaining entry of the Sale Order and the Sale Procedures Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes, among others, of providing necessary assurances of performance by Sellers of their obligations under this Agreement and the Related Agreements and demonstrating that Buyer is a good faith buyer under Section 363(m) of the Bankruptcy Code.

(f)    Pursuant to the terms of the proposed Sale Procedures Order, Sellers will, among other things, solicit bids from other prospective purchasers for the sale of all or substantially all of the Purchased Assets on terms and conditions substantially the same in all respects to this Agreement (or more favorable terms to Sellers) and in accordance with the procedures set forth in the proposed Sale Procedures Order, and Sellers shall adhere to those procedures. The Sellers and Buyer agree, and the Sale Procedures Order shall reflect the fact that, the provisions of this Agreement are reasonable, were a material inducement to the Buyer to enter into this Agreement and are designed to achieve the highest or best offer for the Purchased Assets.

(g)    Sellers shall use commercially reasonable efforts to provide appropriate notice of the hearings on the Sale Motion to all Persons entitled to notice, including, but not limited to, all Persons that have asserted Liens in the Purchased Assets, all parties to the Assumed Contracts and all Taxing authorities in jurisdictions applicable to Sellers and as otherwise required by the Bankruptcy Code and bankruptcy rules.

(h)    Sellers shall serve a cure notice by first class mail on all non-debtor counterparties to all Non-Real Property Contracts and Leases as required by the Sale Procedures Order and provide a copy of the same to Buyer.

**Section 5.3    <u>Conduct of Business</u>**. Until the earlier of the termination of this Agreement and the Closing, subject to the terms and conditions of the DIP Loan Documents and the DIP Budget, and except as expressly contemplated by this Agreement or as set forth on <u>Schedule 5.3</u>, or required under the Bankruptcy Code or other applicable Law and except with the prior written consent of Buyer (which consent shall not be unreasonably withheld, conditioned, or delayed):

      i.    Sellers shall not permit or suffer to exist any event of default under the DIP Loan and shall comply with the DIP Order in all material respects;

      ii.    Sellers shall use commercially reasonable efforts to conduct the Business and operate and maintain, preserve and protect all of the Purchased Assets in the condition in which they exist on the date hereof, except for ordinary wear and tear and except for replacements, modifications or maintenance in the Ordinary Course of Business;

      iii.    Sellers shall use commercially reasonable efforts not to take, or agree to or commit to assist any other Person in taking, any action (i) that would reasonably be expected to result in a failure of any of the conditions to the Closing or (ii) that would reasonably be expected to impair the ability of Sellers or Buyer to consummate the Closing in accordance with the terms hereof or to materially delay such consummation;

      iv.    Except as permitted by this Agreement, no Seller shall, directly or indirectly, sell or otherwise transfer or dispose, or offer, agree or commit (in writing or otherwise) to sell or otherwise transfer or dispose of any of the Purchased Assets other than in the Ordinary Course of Business or except to the extent permitted by the DIP Loan Documents;

      v.    No Seller shall, directly or indirectly, permit, offer, agree or commit to permit, any of the Purchased Assets to become subject, directly or indirectly, to any Lien or Claim except for Permitted Liens or except to the extent permitted by the DIP Loan Documents;

      vi.    No Seller shall assume, reject or assign any (i) Contract that may become an Assumed Contract other than through the assumption and assignment of the Assumed Contracts, as contemplated by this Agreement, to Buyer (or to a third party in connection with an Alternate Transaction), or (ii) Lease;

      vii.    No Seller shall enter into new Contracts or amend or modify Contracts, and no Seller shall amend, modify, extend, renew or terminate any Lease, nor enter into any new lease, in each case other than in the Ordinary Course of Business;

viii.    No Seller shall remove or permit to be removed from any building, facility, or real property any Purchased Asset or any Purchased Inventory (other than the sale of Inventory in the Ordinary Course of Business or any Purchased Assets from an Excluded Restaurant);

ix.    No Seller shall return Inventory with an aggregate value of more than $5,000 to any single vendor unless defective;

x.    No Seller shall (i) enter into any commitment for any expenditures in excess of $50,000 for any individual commitment and $125,000 for all commitments in the aggregate, or (ii) enter into any commitment with respect to remodeling, except as required by the terms of any Lease for Leased Real Property;

xi.    Sellers shall make all post-petition payments related to Assumed Contracts (other than Cure Amounts) that become or became due or payable pursuant to the terms thereof to the extent provided in the DIP Budget;

xii.    Sellers shall comply in all material respects with all material Laws applicable to them or having jurisdiction over the Business or any Purchased Asset;

xiii.    No Seller shall, directly or indirectly, cancel, forgive or compromise any material debt or claim or waive or release any material right of any Seller, in each case that constitutes an Purchased Asset;

xiv.    Sellers shall maintain in full force and effect each Assumed Permit and Liquor License held by any Seller as of the date hereof or otherwise obtained by any Seller prior to the Closing, and shall comply with the terms of each such Permit and Liquor License and no Seller shall permit any such Permit or Liquor License to terminate, expire or lapse other than in the Ordinary Course of Business;

xv.    Sellers shall (v) conduct the Business in the Ordinary Course of Business, (w) use commercially reasonable efforts to preserve the existing business organization and keep management of the Business intact, (x) use commercially reasonable efforts to keep available the services of the Current Employees, to the extent reasonably feasible, and (y) use commercially reasonable efforts to maintain the existing relations with customers, carriers, suppliers, creditors, business partners, Current Employees and others having business dealings with the Business, to the extent reasonably feasible;

xvi.    No Seller shall file any Tax election or take any other action which, in each case, could cause such Seller to be classified as an association taxable as a corporation for U.S. federal income Tax purposes; and

xvii.    Other than as required by applicable Law, no Seller shall (i) grant any loan to or pay any bonus to any employee, (ii) hire or promote or terminate the employment (other than for cause) of any employee with an annual base salary in excess of $100,000, (iii) grant or increase any severance, change in control, retention, termination or similar compensation or benefits to (or amend any existing

severance, change in control, retention, termination or similar compensation, benefits or arrangement with) any Current Employee, (iv) recognize any union or other collective employee representative, (v) increase the compensation, bonus or other benefits payable to any employee, (vi) pay to any employee any benefit or amount not required under any Employee Benefit Plan as in effect on the date of this Agreement, (vii) amend any Assumed Plan, or (viii) take any action to accelerate the vesting of, or payment of, any compensation or benefit under any Assumed Plan.

Nothing contained in this Agreement is intended to give Buyer or its Affiliates, directly or indirectly, the right to control or direct the business of Sellers prior to the Closing.

**Section 5.4** **Notice of Developments**. From the date hereof until the Closing Date, each of the Sellers (with respect to itself), as the case may be, shall promptly disclose to Buyer, on the one hand, and Buyer shall promptly disclose to Sellers, on the other hand, in writing (in the form of an updated Disclosure Schedule, if applicable) after attaining knowledge (as applicable to each of Sellers and Buyer) of any real or alleged failure of any of Sellers or Buyer to comply with or satisfy any of their respective covenants, conditions or agreements to be complied with or satisfied by it under this Agreement in any material respect; provided, however, that the delivery of any notice pursuant to this Section 5.4 shall not limit or otherwise affect the remedies available to the party receiving such notice under this Agreement if such party objects to the disclosures contained in such notice within five (5) days of receipt of such notice.

**Section 5.5** **Antitrust Notification**.

(a) Sellers and Buyer will, as promptly as practicable and no later than ten (10) Business Days following the date hereof, file with the United States Federal Trade Commission and the United States Department of Justice, the notification form required pursuant to the HSR Act for the transactions contemplated by this Agreement, which form will specifically request early termination of the waiting period prescribed by the HSR Act. Each of Sellers and Buyer will (and shall cause their respective Affiliates to) furnish to each other's counsel such necessary information and reasonable assistance as the other may request in connection with its preparation of any filing or submission that is necessary under the HSR Act and will provide any supplemental information requested by any Governmental Entity as promptly as practicable. Buyer will use all reasonable best efforts to comply as promptly as practicable with any requests made for any additional information in connection with such filings. Buyer will be responsible for all filing fees payable in connection with such filings.

(b) Subject to the immediately following sentence, Sellers and Buyer will use their reasonable best efforts to promptly obtain any clearance required under the HSR Act for the consummation of this Agreement and the transactions contemplated hereby and will keep each other apprised of the status of any communications with, and any inquiries or requests for additional information from, any Governmental Entity and will comply promptly with any such inquiry or request.

(c) Notwithstanding anything to the contrary set forth in this Agreement, in no event shall Buyer or any of its Affiliates be required to (A) proffer to, or agree to, sell, divest,

lease, license, transfer, dispose of or otherwise encumber or hold separate and agree to sell, divest, lease, license, transfer, dispose of or otherwise encumber before or after the Closing, any of the Purchased Assets or any material assets, licenses, operations, rights, product lines, businesses or interest therein of Buyer or any of its Affiliates (or to consent to any sale, divestiture, lease, license, transfer, disposition or other encumbrance by Sellers of any of the Purchased Assets or to any agreement by any Seller to take any of the foregoing actions) or to agree to any material change (including without limitation, through a licensing arrangement) or restriction on, or other impairment of Buyer's ability to own or operate any of the Purchased Assets, (B) take any other action under this <u>Section 5.5</u> if the U.S. Department of Justice or the U.S. Federal Trade Commission has sought a preliminary injunction, restraining order or other Litigation proceeding to enjoin consummation of the transactions contemplated by this Agreement, or (C) make any material payments, other than filing fees required by Law, or provide any other material consideration in connection with any waiver or consent reasonably necessary, proper or advisable to consummate and make effective the transactions contemplated hereby (or to consent to any material payment, other than filing fees required by Law, or provide any other material consideration in connection with such waivers or consents). Sellers will have the right to review (subject to appropriate redactions for confidentiality and attorney-client privilege concerns) and comment on the content of any presentations, white papers or other written materials to be submitted to any Governmental Entity in advance of any such submission and Buyer shall take into account any such comments in good faith.

(d)    The Parties commit to instruct their respective counsel to cooperate with each other and use reasonable best efforts to facilitate and expedite the identification and resolution of any issues arising under the HSR Act at the earliest practicable dates. Such reasonable best efforts and cooperation include counsel's undertaking (i) to keep each other appropriately informed of communications from and to personnel of the reviewing Governmental Entities and (ii) to confer with each other regarding appropriate contacts with and response to personnel of such Governmental Entities and the content of any such contacts or presentations. Neither Sellers nor Buyer will participate in any meeting or discussion with any Governmental Entity with respect of any such filings, applications, investigation or other inquiry without giving the other party prior notice of the meeting or discussion and, to the extent permitted by the relevant Governmental Entity, the opportunity to attend and participate in such meeting or discussion (which, at the request of either Sellers or Buyer, will be limited to outside antitrust counsel only).

**Section 5.6    <u>Access</u>**. Upon reasonable advance written request by Buyer, Sellers shall permit Buyer and its Representatives to have reasonable access to, and make reasonable investigation of, during normal business hours, subject to the terms of Leases and in a manner so as not to interfere unreasonably with the normal business operations of Sellers, to all of the books and records, premises, properties, personnel, Records, Contracts, businesses, assets, accountants, auditors, counsel and operations of the Sellers related to the Business; <u>provided</u>, <u>however</u>, that, for avoidance of doubt, the foregoing shall not require any Party to waive, or take any action with the effect of waiving, its attorney-client privilege or any confidentiality obligation to which it is bound with respect thereto or take any action in violation of applicable Law. Sellers shall cause their respective officers, employees, consultants, agents, accountants, attorneys and other representatives to cooperate with Buyer and Buyer's Representatives in connection with such investigation and examination, and Buyer and its Representatives shall cooperate with Sellers and

their respective Representatives and shall use their reasonable efforts to minimize any disruption to the Business.

Section 5.7 **Press Releases and Public Announcements**. After notice to and consultation with Buyer, Sellers shall be entitled to disclose, only to the extent required by applicable Law or by order of the Bankruptcy Court, this Agreement and all information provided by Buyer in connection herewith to the Bankruptcy Court, the United States Trustee, the Committee, parties in interest in the Chapter 11 Cases. Other than statements made in the Bankruptcy Court (or in pleadings filed therein), no Party shall issue (prior to, on or after the Closing) any press release or make any public statement or public communication without the prior written consent of the other Parties, which shall not be unreasonably withheld or delayed; provided, however, (i) Sellers, without the prior consent of Buyer, may (A) make any such public announcement in connection with the Auction after having provided Buyer at least one (1) Business Day to review and comment on such release or announcement (which comments shall be reasonably considered by the Seller) and (B) communicate with its and its Affiliates' investors and potential investors relating to the transactions contemplated by this Agreement.

Section 5.8 **Bulk Transfer Laws**. Buyer acknowledges that Sellers will not comply with the provisions of any bulk transfer Laws of any jurisdiction in connection with the transactions contemplated by this Agreement, and hereby waives all claims related to the non-compliance therewith. The Parties intend that pursuant to section 363(f) of the Bankruptcy Code, the transfer of the Purchased Assets shall be free and clear of any Liens on the Purchased Assets (other than Permitted Liens), including any Liens arising out of the bulk transfer Laws, and the Parties shall take such steps as may be necessary or appropriate to so provide in the Sale Order.

Section 5.9 **Release of Claims**. Notwithstanding anything contained herein to the contrary (including any restriction contained in Section 5.3) prior to the Closing, the Sellers shall deliver to Buyer and the DIP Secured Parties, a full, irrevocable and unconditional release of any and all claims, actions, refunds, causes of action, choses in action, actions, suits or proceedings, rights of recovery, rights of setoff, rights of recoupment, rights of indemnity or contribution and other similar rights (known and unknown, matured and unmatured, accrued or contingent, regardless of whether such rights are currently exercisable) against Buyer, the DIP Secured Parties and their respective current and former officers, directors, stockholders, employees, agents, representatives, attorneys, investors, parents, predecessors, subsidiaries, successors, assigns, and affiliates, each of the foregoing in their capacity as such (individually and collectively, the "Buyer Released Parties"), from all actions, causes of action, damages, claims, and demands whatsoever, in law or in equity, known or unknown, contingent or liquidated, whether direct claims or for indemnification or contribution, that the Sellers ever had, now has, or may have against the Buyer Released Parties in connection with any event, conduct or circumstance occurring prior to the Closing.

Section 5.10 **Additional DIP Indebtedness**. To the extent of availability under the DIP Facility and as directed in writing by Buyer, the Sellers shall borrow additional amounts under the DIP Facility on or prior to the Closing Date which amount shall be utilized solely to pay any Assumed Liabilities incurred prior to the Closing designated in writing by Buyer.

**ARTICLE VI**
**OTHER COVENANTS**

The Parties agree as follows with respect to the period from and after the Closing:

**Section 6.1    Cooperation**. Each of the Parties shall cooperate with each other, and shall use their commercially reasonable efforts to cause their respective Representatives to cooperate with each other, to provide an orderly transition of the Purchased Assets and Assumed Liabilities from Sellers to Buyer and to minimize the disruption to the Business resulting from the Contemplated Transactions.

**Section 6.2    Further Assurances**. In case at any time from and after the Closing any further action is necessary or reasonably required to carry out the purposes of this Agreement, subject to the terms and conditions of this Agreement and the terms and conditions of the Sale Order, at any Party's request and sole cost and expense, each Party shall take such further action (including the execution and delivery to any other Party of such other reasonable instruments of sale, transfer, conveyance, assignment, assumption and confirmation and providing materials and information) as another Party may reasonably request as shall be necessary to transfer, convey and assign to Buyer all of the Purchased Assets, to confirm Buyer's assumption of the Assumed Liabilities and to confirm Sellers' retention of the Excluded Assets and Excluded Liabilities. Without limiting the generality of this Section 6.2, to the extent that either Buyer or Sellers discovers any additional assets or properties which the parties mutually agree should have been transferred or assigned to Buyer as Purchased Assets but were not so transferred or assigned, Buyer and Sellers shall cooperate and execute and deliver any instruments of transfer or assignment necessary to transfer and assign such asset or property to Buyer.

**Section 6.3    Availability of Business Records**. From and after the Closing, Buyer shall promptly provide to Sellers and their respective Representatives (after reasonable notice and during normal business hours and without charge to Sellers) access to all Records included in the Purchased Assets for periods prior to the Closing and reasonable access to Transferred Employees to the extent such access is necessary in order for Sellers (as applicable) to comply with applicable Law or any contract to which it is a party, for liquidation, winding up, Tax reporting or other proper purposes and so long as such access is subject to an obligation of confidentiality, and shall preserve such Records until the latest of (i) six (6) years after the Closing Date, (ii) the required retention period for all government contact information, records or documents, (iii) the conclusion of all bankruptcy proceedings relating to the Chapter 11 Cases or (iv) in the case of Records related to Taxes, the expiration of the statute of limitation applicable to such Taxes. Such access shall include access to any information in electronic form to the extent reasonably available. Buyer acknowledges that Sellers have the right to retain originals or copies of all of Records included in the Purchased Assets for periods prior to the Closing. Prior to destroying any Records included in the Purchased Assets for periods prior to the Closing, Buyer shall notify Sellers thirty (30) days in advance of any such proposed destruction of its intent to destroy such Records, and Buyer shall permit Sellers to retain such Records, at Sellers' cost and expense. With respect to any Litigation and claims that are Excluded Liabilities, Buyer shall render all reasonable assistance that Sellers may request in defending or prosecuting such Litigation or claim and shall make available to Sellers such personnel as are most knowledgeable about the matter in question, all without charge.

**Section 6.4    Employee Matters.**

(a)    Within twenty (20) Business Days prior to Closing Sellers will update the Employee Roster.  At least 15 Business Days prior to the Closing, Buyer will identify the employees (or corresponding positions) on the Employee Roster to whom Buyer intends make an offer of employment.  Prior to Closing, Buyer shall offer employment to the employees listed on such schedule (an "Offeree") to the extent such employee is an employee of a Seller and remains employed by such Seller immediately prior to the Closing on employment terms as Buyer may determine in its sole discretion.

(b)    Each Offeree of Sellers who is not a Transferred Employee shall be referred to herein as an "Excluded Employee."

(c)    Following the date of this Agreement:

i.    Sellers will allow Buyer or any of its Representatives reasonable access upon reasonable advance notice to meet with and interview the individuals listed on the Employee Roster during normal business hours;

ii.    Sellers shall not, nor shall any Seller authorize or direct or give express permission to any Affiliate, officer, director or employee of any Seller or any Affiliate, to (A) interfere with Buyer's or its Representatives' rights under Section 6.4(a) to make offers of employment to any Offeree, or (B) solicit or encourage any Offeree not to accept, or to reject, any such offer of employment;

iii.    Sellers shall provide reasonable cooperation and information to Buyer or the relevant Representative as reasonably requested by Buyer or such Representative with respect to its determination of terms and conditions of employment for any Offeree;

iv.    Buyer and the Sellers will, or will cause their respective Representatives or Affiliates to, take such actions as are reasonably necessary to cause the sponsorship of the Assumed Plans to transfer to Buyer and to facilitate Buyer's assumption of the Liabilities associated with such Assumed Plans, in each case effective as of the Closing;

v.    Sellers shall process the payroll for and pay, or cause to be paid, the base wages, base salary and benefits that are due and payable on or prior to the Closing Date with respect to all employees of Sellers. Sellers shall withhold and remit all applicable payroll taxes as required by Law on or prior to the Closing Date with respect to all employees of Sellers as of such date; and

vi.    Buyer agrees to provide payroll reporting services to Sellers with respect to reporting to the applicable governmental authorities for periods on or prior to Closing for all Excluded Employees; provided that for the sake of clarity Buyer does not assume any liability for paying any Excluded Employees any accrued wages, paid time off or other accrued compensation obligations except as otherwise specifically provided under an Assumed Plan.

(d)     Nothing in this <u>Section 6.4</u> shall be construed as requiring, and neither Sellers nor any of their Affiliates shall take any affirmative action that would have the effect of requiring Buyer to continue any specific employee benefit plan or to continue the employment of any specific person. Nothing in this Agreement is intended to establish, create or amend, nor shall anything in this Agreement be construed as establishing, creating or amending, any employee benefit plan, practice or program of Buyer, any of its Affiliates or any of Sellers' Employee Benefit Plans, nor shall anything in this Agreement create or be construed as creating any contract of employment or as conferring upon any Current Employee, Transferred Employee or upon any other person, other than the parties to this Agreement in accordance with its terms, any rights to enforce any provisions of this Agreement under ERISA or otherwise.

**Section 6.5     <u>Transfer Taxes</u>**. To the extent not exempt under section 1146 of the Bankruptcy Code, Buyer shall pay all Transfer Taxes. Sellers and Buyer shall cooperate to prepare and timely file any Tax Returns required to be filed in connection with Transfer Taxes described in the immediately preceding sentence.

**Section 6.6     <u>Wage Reporting</u>**. Buyer and Sellers agree to utilize, or cause their respective Affiliates to utilize, the alternate procedure set forth in Internal Revenue Service Revenue Procedure 2004-53 with respect to wage reporting.

**Section 6.7     <u>Insurance Policies</u>**.  Other than as provided in <u>Section 2.2(l)</u> above, upon Closing, the Sellers shall cause the assignment of all rights of the Sellers in and to all insurance coverage provided in relation to Sellers and the Purchased Assets that is maintained by any Seller or its Affiliates (whether such policies are maintained with third party insurers or with such Seller or its Affiliates) to the Buyer as soon as reasonably practicable (and in no event within forty-five (45) days following the Closing).

**Section 6.8     <u>Collection of Accounts Receivable</u>**.

(a)     As of the Closing Date, each Seller hereby (i) authorizes Buyer to open any and all mail addressed to any Seller relating to the Business or the Purchased Assets and delivered to the offices of the Business or otherwise to Buyer if received on or after the Closing Date and (ii) appoints Buyer or its attorney-in-fact to endorse, cash and deposit any monies, checks or negotiable instruments received by Buyer after the Closing Date with respect to Accounts Receivable that are Purchased Assets or accounts receivable relating to work performed by Buyer after the Closing, as the case may be, made payable or endorsed to any Seller or Sellers' order, for Buyer's own account.

(b)     As of the Closing Date, each Seller agrees that any monies, checks or negotiable instruments received by any Seller after the Closing Date with respect to Accounts Receivable that are Purchased Assets or accounts receivable relating to work performed by Buyer after the Closing, as the case may be, shall be held in trust by such Seller for Buyer's benefit and account, and promptly upon receipt by a Seller of any such payment (but in any event within five (5) Business Days of such receipt), such Seller shall pay over to Buyer or its designee the amount of such payments. In addition, Buyer agrees that, after the Closing, it shall hold and shall promptly transfer and deliver to Sellers, from

time to time as and when received by Buyer or its Affiliates, any cash, checks with appropriate endorsements, or other property that Buyer or its Affiliates may receive on or after the Closing which properly belongs to Sellers hereunder, including any Excluded Assets.

(c)     As of the Closing Date, Buyer shall have the sole authority to bill and collect Accounts Receivable that are Purchased Assets and accounts receivable relating to work performed by Buyer after the Closing.

**Section 6.9      Liquor License Approvals**. Sellers shall reasonably cooperate with Buyer in connection with Buyer's filings with any Governmental Entity or third party with respect to any of the Liquor Licenses and obtaining Liquor License Approvals, including, if requested by Buyer, at Buyer's sole cost and expense, initiating and/or participating in such Litigation reasonably requested by Buyer to obtain such Liquor License Approvals.

**Section 6.10     Data Privacy Protection**. Buyer acknowledges that the Purchased Assets include PII, along with associated personal information about the Sellers' customers. In connection with the same, Buyer agrees to: (i) employ appropriate security controls and procedures (technical, operational and managerial) to protect PII and personal information, (ii) abide by all applicable Laws and regulations with respect to PII and (iii) take such further actions with respect to PII as may be agreed between the Parties. Buyer agrees that it shall, absent a customer's express consent received after adequate notice: (a) abide by the Sellers' privacy policies and privacy-related covenants made in Sellers' terms of service that were in effect as of the Petition Date, (b) respect prior requests of customers to opt out of receipt of marketing messages (to the extent Sellers make Buyer aware of such requests; provided that Buyer shall seek to obtain such information from Sellers), and (c) use personal information only for the purposes of continuing Business operations and continuing to provide similar goods and services to customers, including marketing the products and services related to Purchased Assets. Buyer shall require express consent of a customer for any additional use of PII or personal information or before making material changes to the privacy policies that weaken a customer's consumer protection. Furthermore, to the extent PII includes any social security numbers, Buyer shall limit such use to tax reporting purposes, and shall purge such information from its databases when such information is no longer required for that purpose.

**Section 6.11     Alternate Transactions**.   Notwithstanding any provision herein to the contrary, nothing in this Agreement shall restrict Sellers' right to pursue one or more Alternate Transactions, including but not limited to marketing the Sellers' assets or providing due diligence materials.

**Section 6.12     Covenant Not to Sue**.   Buyer hereby covenants and agrees that it shall not bring suit or otherwise assert any claims against Sellers' current or former officers and directors which constitute Purchased Assets before any court, arbitrator, mediator or administrative agency anywhere in the world, except in the case of fraud, gross negligence or willful misconduct on the part of such current or former officers and directors. Buyer further covenants and agrees that it shall not assign the Purchased Avoidance Actions or claims against Sellers' current or former officers and directors to any third party.  This <u>Section 6.12</u> shall in no way limit any of the rights and remedies of the Agent, the Lenders, the Pre-Petition Agent or the Pre-Petition Lenders under

the terms of the DIP Loan Documents or the Pre-Petition Credit Agreement (as such terms are defined in the DIP Loan Agreement).

## ARTICLE VII
## CONDITIONS TO CLOSING

**Section 7.1     Conditions to Buyer's Obligations**.

Subject to Section 7.3, Buyer's obligation to consummate the Contemplated Transactions in connection with the Closing is subject to satisfaction or written waiver of the following conditions (any or all of which may be waived in writing by the Sellers and the Buyer in whole or in part to the extent permitted by applicable Law):

(a)     as of the date hereof and as of the Closing (in each case, except for any representation or warranty that is expressly made as of a specified date, in which case as of such specified date), (i) each representation or warranty contained in Section 3.1, Section 3.2 or Section 3.3 shall be true and correct in all respects other than *de minimis* exceptions, and (ii) each other representation or warranty set forth in Article III shall be true and correct in all respects, except where the failure of such representations and warranties referred to in this clause (ii) to be true and correct, individually or in the aggregate with other such failures, has not had, and would not reasonably be expected to have, a Material Adverse Effect; provided, however, that for purposes of determining the accuracy of representations and warranties referred to in clause (ii) for purposes of this condition, all qualifications as to "materiality" and "Material Adverse Effect" contained in such representations and warranties shall be disregarded;

(b)     Sellers shall have performed and complied with their covenants and agreements hereunder to the extent required to be performed prior to the Closing in all material respects, and Sellers shall have caused the documents and instruments required by Section 2.9(a) to be delivered to Buyer (or tendered subject only to Closing);

(c)     the applicable waiting period under the HSR Act will have expired or been terminated;

(d)     no Governmental Entity of competent jurisdiction shall have enacted, issued, promulgated, enforced or entered any Decree that is in effect and that has the effect of making the Closing illegal or otherwise prohibiting the consummation of the Closing;

(e)     the amount of Cure Amounts paid with respect to the Assumed Contracts set forth on Schedule 2.3(a) as of the date of this Agreement does not, in the aggregate, exceed the Cure Amount Cap;

(f)     Buyer shall have received all of the Consents from third parties (including any Governmental Entities) and Permits (including Liquor Licenses) listed on Schedule 7.1 (as the same may be revised, amended or modified by the Buyer in its sole discretion up until the Auction);

(g)     the Sale Order shall have been entered by the Bankruptcy Court and shall not be subject to a stay pending appeal;

(h)     no Default or Event of Default shall have occurred and be continuing under the DIP Loan Agreement;

(i)     The DIP Order and DIP Loan Documents shall have been approved and shall not have been terminated;

(j)     from the date of this Agreement until the Closing Date, there shall not have occurred and be continuing any Material Adverse Effect; and

(k)     Sellers shall have delivered a certificate from an authorized officer of Sellers to the effect that each of the conditions specified in Section 7.1(a), Section 7.1(b) and Section 7.1(j) has been satisfied.

**Section 7.2     Conditions to Sellers' Obligations.** Subject to Section 7.3, Sellers' obligation to consummate the Contemplated Transactions in connection with the Closing are subject to satisfaction or written waiver of the following conditions (any or all of which may be waived in writing by the Sellers and the Buyer in whole or in part to the extent permitted by applicable Law):

(a)     as of the date hereof and as of the Closing (in each case, except for any representation or warranty that is expressly made as of a specified date, in which case as of such specified date), (i) each representation or warranty contained in Section 4.1, Section 4.2 or Section 4.3 shall be true and correct in all respects other than *de minimis* exceptions, and (ii) each other representation or warranty set forth in Article IV shall be true and correct in all material respects, except where the failure of such representations and warranties referred to in this clause (ii) to be true and correct, individually or in the aggregate with other such failures, would not reasonably be expected to materially prevent, restrict or delay the consummation of the Contemplated Transactions or by any Related Agreement; provided, however, that for purposes of determining the accuracy of representations and warranties referred to in clause (ii) for purposes of this condition, all qualifications as to "materiality" and "Material Adverse Effect" contained in such representations and warranties shall be disregarded;

(b)     Buyer shall have performed and complied with its covenants and agreements hereunder to the extent required to be performed prior to the Closing in all material respects, and Buyer shall have caused the documents, instruments and payments required by Section 2.9(b) to be delivered to Sellers (or tendered subject only to Closing);

(c)     the applicable waiting period under the HSR Act will have expired or been terminated;

(d)     no Governmental Entity of competent jurisdiction shall have enacted, issued, promulgated, enforced or entered any Decree that is in effect and that has the effect of making the Closing illegal or otherwise prohibiting the consummation of the Closing;

(e)      the Sale Order shall have been entered by the Bankruptcy Court and shall not be subject to a stay pending appeal; and

(f)      Buyer shall have delivered a certificate from an authorized officer of Buyer to the effect that each of the conditions specified in Section 7.2(a) and Section 7.2(b) has been satisfied.

**Section 7.3      No Frustration of Closing Conditions**. Neither Buyer nor Sellers may rely on the failure of any condition to its obligation to consummate the Contemplated Transactions set forth in Section 7.1 or Section 7.2, as the case may be, to be satisfied if such failure was caused by such Party's failure to use its commercially reasonable efforts with respect to those matters contemplated by the applicable Sections of this Agreement to satisfy the conditions to the consummation of the Contemplated Transactions or other breach of a representation, warranty or covenant hereunder.

**Section 7.4      Waiver of Conditions**.  Upon the occurrence of the Closing, any condition set forth in this Article VII that was not satisfied as of the Closing will be deemed to have been waived for all purposes by the Party having the benefit of such condition as of and after the Closing.

## ARTICLE VIII
## TERMINATION

**Section 8.1      Termination of Agreement**. This Agreement may be terminated in accordance with this Article VIII and the Contemplated Transactions abandoned at any time prior to the Closing (each a "Termination Event"):

(a)      by the mutual written consent of Buyer, on the one hand, and Sellers, on the other hand;

(b)      by written notice of either Buyer or Sellers, if there shall be any Law that makes consummation of the transactions contemplated hereby illegal or otherwise prohibited, or upon the issuance by any Governmental Entity of an Decree restraining, enjoining, or otherwise prohibiting the consummation of the transactions contemplated by this Agreement or declaring unlawful the transactions contemplated by this Agreement, and such Decree having become final, binding and non-appealable; provided that no termination may be made by a Party under this Section 8.1(b) if the issuance of such Decree was caused by the breach or action or inaction of such Party;

(c)      by written notice of either Buyer or Sellers, if the Closing shall not have occurred on or before the Outside Date;

(d)      by written notice of either Buyer or Sellers, if any of the Chapter 11 Cases is dismissed or converted to a case under Chapter 7 of the Bankruptcy Code, or if a trustee or examiner with expanded powers to operate or manage the financial affairs or reorganization of the Sellers is appointed in the Chapter 11 Cases;

(e)     by Buyer, if (i) the Sale Procedures Order shall not have been entered by the Bankruptcy Court on or before February 28, 2020, (ii) the Auction has not concluded by midnight March 22, 2020, (iii) the Sale Order shall not have been entered by the Bankruptcy Court on or before March 31, 2020, (iv) at any time after entry of the Sale Procedures Order, such Sale Procedures Order (including, without limitation, the provisions therein relating to the bid protections) is reversed, stayed, vacated or otherwise modified by the Bankruptcy Court, or (v) at any time after entry of the Sale Order, such Sale Order is reversed, stayed, vacated or otherwise modified;

(f)     by Buyer by giving written notice to Sellers at any time prior to Closing (i) in the event Sellers have breached any representation, warranty, covenant or agreement contained in this Agreement and as a result of such breach the conditions set forth in Sections 7.1(a) and 7.1(b) hereof, as the case may be, would not then be satisfied at the time of such breach, Buyer has notified Sellers of the breach, and the breach has continued without cure for the earlier of ten (10) days following the proposed Closing Date so long as all other conditions of Buyer have been satisfied or for a period of thirty (30) days after the notice of the breach, unless such failure shall be due to the failure of Buyer to perform or comply with any of the covenants hereof to be performed or complied with by it prior to the Closing, and such condition is not waived by Buyer;

(g)     by Sellers by giving written notice to Buyer at any time prior to Closing (i) in the event Buyer has breached any representation, warranty, covenant or agreement contained in this Agreement and as a result of such breach the conditions set forth in Sections 7.2(a) and 7.2(b) hereof, as the case may be, would not then be satisfied at the time of such breach, Sellers have notified Buyer of the breach, and the breach has continued without cure for the earlier of ten (10) days following the proposed Closing Date so long as all other conditions of Buyer have been satisfied or for a period of thirty (30) days after the notice of the breach, unless such failure shall be due to the failure of Sellers to perform or comply with any of the covenants hereof to be performed or complied with by them prior to the Closing, and such condition is not waived by Sellers;

(h)     by written notice from Sellers to Buyer, if all of the conditions set forth in Section 7.1 have been satisfied (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions at the Closing) or waived and Buyer fails to complete the Closing at the time required by Section 2.8;

(i)     by written notice from Buyer to Sellers upon the occurrence of any Event of Default (as defined in the DIP Order or any DIP Loan Documents);

(j)     by Buyer if any secured creditor of any Seller obtains relief from the stay to foreclose on a material portion of the Purchased Assets;

(k)     by Buyer if any Affiliates of the Sellers that, directly or indirectly through one or more intermediaries, controls Sellers, files for relief pursuant to the Bankruptcy Code; or

(l)    automatically and without any action or notice by Sellers to Buyer, or Buyer to Sellers, immediately upon:

i.    approval by the Bankruptcy Court of an Alternate Transaction, unless Buyer has agreed to be a "back-up bidder" under the Sale Order; or

ii.    the consummation of an Alternate Transaction.

Notwithstanding anything to the contrary contained herein, (i) in no event may Buyer terminate this Agreement under Section 8.1(f) on account of Buyer's failure to satisfy the conditions contained in Sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code with respect to any proposed Assumed Contract, and (ii) a Party shall not be permitted to terminate this Agreement pursuant to this Article VIII if the applicable Termination Event was caused by the breach of such Party or such Party's gross negligence, willful misconduct, or bad faith.

**Section 8.2    Procedure upon Termination**. In the event of termination and abandonment by Buyer, on the one hand, or Sellers, on the other hand, or both, pursuant to Section 8.1, written notice thereof shall forthwith be given to the other Party or Parties, and this Agreement shall terminate and the Contemplated Transactions shall be abandoned, without further action by Buyer or Sellers.

**Section 8.3    Breakup Fee and Expense Reimbursement.**

(a)    Upon the closing of an Alternate Transaction, Sellers shall immediately pay to Buyer the Breakup Fee and the Expense Reimbursement.

(b)    Sellers' obligation to pay the Breakup Fee and Expense Reimbursement pursuant to this Section 8.3 shall be subject to Bankruptcy Court approval and shall survive termination of this Agreement and shall constitute an administrative expense of Sellers under section 503(b) of the Bankruptcy Code.

(c)    The Sellers acknowledge and agree that (A) the payment of the Breakup Fee and Expense Reimbursement is an integral part of the transactions contemplated by this Agreement, (B) in the absence of the Sellers' obligations to make this payment, the Buyer would not have entered into this Agreement, (C) time is of the essence with respect to the payment of the Breakup Fee and Expense Reimbursement and (D) the Breakup Fee and Expense Reimbursement shall constitute part of the DIP Indebtedness and shall be secured by the DIP Lien (as defined in the DIP Order) on the Collateral (as defined in the DIP Order) and be entitled to the other DIP Protections (as defined in the DIP Order).  If the Sellers fail to take any action necessary to cause the delivery of the Breakup Fee and Expense Reimbursement under circumstances where the Buyer is entitled to the Breakup Fee and Expense Reimbursement and, in order to obtain such Breakup Fee or Expense Reimbursement the Buyer commences a suit which results in a judgment in favor of the Buyer, the Sellers shall pay to the Buyer, in addition to the Breakup Fee and Expense Reimbursement, an amount in cash equal to the costs and expenses (including reasonable attorney's fees) incurred by the Buyer in connection with such suit.

(d)    The Parties further acknowledge that the damages resulting from termination of this Agreement under circumstances where Buyer is entitled to the Breakup Fee are uncertain and incapable of accurate calculation and that the delivery of the Breakup Fee to the Buyer is not a penalty but rather shall constitute liquidated damages in a reasonable amount that will compensate the Buyer in the circumstances where the Buyer is entitled to the Breakup Fee for the efforts and resources expended and opportunities foregone while negotiating this Agreement and in reliance on this Agreement and on the expectation of the consummation of the Contemplated Transactions, and that, without these agreements, the Buyer would not enter into this Agreement.

**Section 8.4**    **Effect of Termination**.

(a)    In the event that this Agreement is validly terminated pursuant to a right of termination as provided herein, then each of the Parties shall be relieved of its duties and obligations arising under this Agreement effective as of the date of such termination and such termination shall be without Liability to Buyer or the Sellers; provided, however, that Section 8.1, Section 8.2, Section 8.3 this Section 8.4, Article IX and the Sale Procedures Order (if entered) shall survive any such termination and shall be enforceable hereunder. In no event shall any termination of this Agreement relieve any Party hereto of any Liability for any breach of this Agreement by such Party.

## ARTICLE IX
## MISCELLANEOUS

**Section 9.1**    **Remedies**.  The Parties recognize that if a Party breaches or refuses to perform any of their covenants set forth in this Agreement, monetary damages alone would not be adequate to compensate the non-breaching Party for their injuries. The nom-breaching Party shall therefore be entitled, in addition to any other remedies that may be available, to obtain specific performance of, or to enjoin the violation of, the terms of such covenants. If any Litigation is brought by the non-breaching Party to enforce such covenants, the breaching Party shall waive the defense that there is an adequate remedy at Law. The Parties agree to waive any requirement for the security or posting of any bond in connection with any Litigation seeking specific performance of, or to enjoin the violation of, such covenants. The Parties agree that the only permitted objection that they may raise in response to any action for specific performance of such covenants is that it contests the existence of a breach or threatened breach of such covenants.

**Section 9.2**    **Expenses**. Except as otherwise provided in this Agreement, the DIP Order, the DIP Loan Documents or a Related Agreement, Sellers and Buyer shall bear their own expenses, including attorneys' fees, incurred in connection with the negotiation and execution of this Agreement, the Related Agreements and each other agreement, document and instrument contemplated by this Agreement and the consummation of the Contemplated Transactions.

**Section 9.3**    **Entire Agreement**. This Agreement (including the schedules and exhibits hereto and other documents specifically referred to herein) and the Related Agreements constitute the entire agreement among the Parties and supersede any prior understandings, agreements or representations (whether written or oral) by or among the Parties, written or oral, with respect to the subject matter hereof.

**Section 9.4    Incorporation of Schedules, Exhibits and Disclosure Schedule**. The schedules, appendices and exhibits to this Agreement, the documents and other information made available in the Disclosure Schedule are incorporated herein by reference and made a part hereof.

**Section 9.5    Amendments and Waivers**. No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by each Party except as expressly provided herein. No waiver of any breach of this Agreement shall be construed as an implied amendment or agreement to amend or modify any provision of this Agreement. No waiver by any Party of any default, misrepresentation or breach of warranty or covenant hereunder, whether intentional or not, shall be valid unless the same shall be in writing and signed by the Party making such waiver, nor shall such waiver be deemed to extend to any prior or subsequent default, misrepresentation or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent default, misrepresentation or breach of warranty or covenant. No conditions, course of dealing or performance, understanding or agreement purporting to modify, vary, explain or supplement the terms or conditions of this Agreement shall be binding unless this Agreement is amended or modified in writing pursuant to the first sentence of this Section 9.5 except as expressly provided herein. Except where a specific period for action or inaction is provided herein, no delay on the part of any Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

**Section 9.6    Succession and Assignment**. This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns. None of the Parties may assign either this Agreement or any of its rights, interests or obligations hereunder without the prior written approval of all Parties; provided, however, that Buyer shall be permitted to assign any of its rights hereunder to one or more of its Affiliates, as designated by Buyer in writing to Sellers; provided, however, Buyer shall remain liable for all of its obligations under this Agreement after any such assignment; provided, further, that Sellers shall be permitted to assign any of their rights hereunder pursuant to a confirmed chapter 11 plan or pursuant to an order of the Bankruptcy Court.

**Section 9.7    Notices**. All notices, requests, demands, claims and other communications hereunder shall be in writing except as expressly provided herein. Any notice, request, demand, claim or other communication hereunder shall be deemed duly given (i) when delivered personally to the recipient; (ii) one (1) Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid); (iii) when sent by email (with written confirmation of transmission); or (iv) three (3) Business Days after being mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid, and addressed to the intended recipient as set forth below:

If to any Sellers, then to:

BL Restaurants Holding, LLC
4550 Beltway Drive
Addison, TX 75001
Attention: Howard Meitiner, CRO
Email: hmeitiner@carlmarks.com

with a copy to:

> Klehr Harrison Harvey Branzburg LLP
> 919 North Market Street, Suite 1000
> Wilmington, DE 19801
> Attention: Domenic E. Pacitti, Esquire
> Email: dpacitti@klehr.com

If to Buyer, then to:

> Antares Capital L.P.
> 7000 Central Parkway, Suite 450
> Atlanta, GA 30328
> Attention: Jonathan E. Balch, Managing Director
> Email: jonathan.balch@antares.com

> and

> Antares Capital L.P.
> 500 W. Monroe St.
> Chicago, IL 60661
> Attention: Bradley Kimme
> Email: Bradley.kimme@antares.com

with copies (which shall not constitute notice) to:

> Latham & Watkins LLP
> 330 N. Wabash Avenue
> Chicago, IL 60611
> Attention: James Ktsanes, Esquire; Zachary Judd, Esquire
> Email:  james.ktsanes@lw.com
>            zachary.judd@lw.com

Any Party may change the mailing address or email address to which notices, requests, demands, claims and other communications hereunder are to be delivered by giving the other Party notice in the manner set forth in this Section 9.7.

**Section 9.8    Governing Law; Jurisdiction.** This Agreement shall in all aspects be governed by and construed in accordance with the internal Laws of the State of Delaware without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Delaware, and the obligations, rights and remedies of the Parties shall be determined in accordance with such Laws. The Parties agree that any Litigation one Party commences against any other Party pursuant to this Agreement shall be brought exclusively in the Bankruptcy Court and each of the Parties hereby irrevocably consents to the jurisdiction of the Bankruptcy Court (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by Law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in the

DB1/ 109641500.6

PHIL1 8628846v.6

Bankruptcy Court or that any such suit, action or proceeding which is brought in the Bankruptcy Court has been brought in an inconvenient forum; provided that if the Bankruptcy Court is unwilling or unable to hear any such Litigation, then the courts of the State of Delaware, sitting in New Castle County, Delaware, and the federal courts of the United States of America sitting in New Castle County, Delaware, shall have exclusive jurisdiction over such Litigation.

Section 9.9    **Consent to Service of Process**. Each of the Parties hereby consents to process being served by any Party, respectively, in any suit, action or proceeding by delivery of a copy thereof in accordance with the provisions of Section 9.7.

Section 9.10   **WAIVERS OF JURY TRIAL**. EACH OF THE PARTIES IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR THE CONTEMPLATED TRANSACTIONS OR THEREBY.

Section 9.11   **Severability**. The provisions of this Agreement shall be deemed severable, and the invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provisions of this Agreement so long as the economic or legal substance of the transactions contemplated hereby is not affected in a manner adverse to any Party. If any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (a) the Parties shall negotiate in good faith to find a suitable and equitable provision that shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision, and (b) the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability, nor shall such invalidity or unenforceability in any one jurisdiction affect the validity or enforceability of such provision, or the application thereof, in any other jurisdiction.

Section 9.12   **No Third Party Beneficiaries**. This Agreement shall not confer any rights or remedies upon any Person other than the Parties and their respective successors and permitted assigns.

Section 9.13   **No Survival of Representations, Warranties and Agreements**. Each of the representations and warranties and the covenants and agreements (to the extent such covenant or agreement contemplates or requires performance by such party prior to the Closing) of the Parties set forth in this Agreement or in any other document contemplated hereby, or in any certificate delivered hereunder or thereunder, will terminate effective immediately as of the Closing such that no claim for breach of any such representation, warranty, covenant or agreement, detrimental reliance or other right or remedy (whether in contract, in tort or at law or in equity) may be brought with respect thereto after the Closing. Each covenant and agreement that explicitly contemplates performance after the Closing, will, in each case and to such extent, expressly survive the Closing in accordance with its terms, and if no term is specified, then for six (6) years following the Closing Date, and nothing in this Section 9.13 will be deemed to limit any rights or remedies of any Person for breach of any such surviving covenant or agreement. Buyer and Sellers acknowledge and agree, on their own behalf and, with respect to Buyer that the agreements contained in this Section 9.13 (a) require performance after the Closing to the maximum extent

permitted by applicable Law and will survive the Closing for six (6) years; and (b) are an integral part of the transactions contemplated hereby and that, without the agreements set forth in this <u>Section 9.13</u>, none of the Parties would enter into this Agreement.

**Section 9.14    Non-Recourse**. This Agreement may only be enforced against, and any Litigation based upon, arising out of or related to this Agreement may only be brought against, the Persons that are expressly named as parties to this Agreement. Except to the extent named as a party to this Agreement, and then only to the extent of the specific obligations of such parties set forth in this Agreement, no past, present or future shareholder, member, partner, manager, director, officer, employee, Affiliate, agent or representative of any party to this Agreement will have any Liability (whether in contract, tort, equity or otherwise) for any of the representations, warranties, covenants, agreements or other obligations or Liabilities of any of the parties to this Agreement or for any Litigation based upon, arising out of or related to this Agreement.

**Section 9.15    Construction**. The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms. Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of names and pronouns shall include the plural and vice versa. The word "including" and "include" and other words of similar import shall be deemed to be followed by the phrase "without limitation." The words "herein," "hereto" and "hereby," and other words of similar import refer to this Agreement as a whole and not to any particular Article, Section or other subdivision of this Agreement. Unless expressly stated in connection therewith or the context otherwise requires, the phrase "relating to the Business" and other words of similar import shall be deemed to mean "relating to the operation of the Business as conducted as of the date hereof." Except as otherwise provided herein, references to Articles, Sections, clauses, subclauses, subparagraphs, Schedules, Exhibits, Appendices and the Disclosure Schedule herein are references to Articles, Sections, clauses, subclauses, subparagraphs, Schedules, Appendices, Exhibits and the Disclosure Schedule of this Agreement. Any reference herein to any Law (or any provision thereof) shall include such Law (or any provision thereof) and any rule or regulation promulgated thereunder, in each case, including any successor thereto, and as it may be amended, modified or supplemented from time to time. Any reference herein to "dollars" or "$" means United States dollars.

**Section 9.16    Computation of Time**. In computing any period of time prescribed by or allowed with respect to any provision of this Agreement that relates to Sellers or the Chapter 11 Cases, the provisions of rule 9006(a) of the Federal Rules of Bankruptcy Procedure shall apply.

**Section 9.17    Mutual Drafting**. Each of the Parties has participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

**Section 9.18    Disclosure Schedule**. The Disclosure Schedule has been arranged for purposes of convenience in separately numbered sections corresponding to the sections of this Agreement; <u>however</u>, each section of the Disclosure Schedule will be deemed to incorporate by reference all information disclosed in any other section of the Schedules, and any disclosure in the

Disclosure Schedule will be deemed a disclosure against any representation or warranty set forth in this Agreement if the purpose for disclosure in such other section of the Schedules or again any other representation or warranty is reasonably apparent on its face. Capitalized terms used in the Disclosure Schedule and not otherwise defined therein have the meanings given to them in this Agreement. The specification of any dollar amount or the inclusion of any item in the representations and warranties contained in this Agreement, the Disclosure Schedule or the attached exhibits is not intended to imply that the amounts, or higher or lower amounts, or the items so included, or other items, are or are not required to be disclosed (including whether such amounts or items are required to be disclosed as material or threatened) or are within or outside of the Ordinary Course of Business or consistent with past practice, and no party will use the fact of the setting of the amounts or the fact of the inclusion of any item in this Agreement, the Disclosure Schedule or exhibits in any dispute or controversy between the Parties as to whether any obligation, item or matter not set forth or included in this Agreement, the Disclosure Schedule or exhibits is or is not required to be disclosed (including whether the amount or items are required to be disclosed as material or threatened) or are within or outside of the Ordinary Course of Business. In addition, matters reflected in the Disclosure Schedule are not necessarily limited to matters required by this Agreement to be reflected in the Disclosure Schedule. Such additional matters are set forth for informational purposes only and do not necessarily include other matters of a similar nature. No information set forth in the Disclosure Schedule will be deemed to broaden in any way the scope of the parties' representations and warranties. Any description of any agreement, document, instrument, plan, arrangement or other item set forth on any Disclosure Schedule is a summary only and is qualified in its entirety by the terms of such agreement, document, instrument, plan or arrangement which terms will be deemed disclosed for all purposes of this Agreement. The information contained in this Agreement, in the Disclosure Schedule and exhibits hereto is disclosed solely for purposes of this Agreement, and no information contained herein or therein will be deemed to be an admission by any Party to any third party of any matter whatsoever, including any violation of Law or breach of contract.

**Section 9.19    No Waiver or Release**. Notwithstanding anything herein to the contrary, all terms, conditions, covenants, representations and warranties contained in the DIP Order and the DIP Loan Documents, and all rights, powers and remedies of the DIP Secured Parties and all of the obligations of the Sellers thereunder (including, without limitation, the obligation to reimburse the DIP Secured Parties for fees and expenses incurred in connection with preparation and negotiation of this Agreement to the extent set forth therein), are reserved and are not amended, modified, limited or otherwise affected by the terms and conditions of this Agreement.

**Section 9.20    Headings; Table of Contents**. The section headings and the table of contents contained in this Agreement and the Disclosure Schedule are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

**Section 9.21    Counterparts; Facsimile and Email Signatures**. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument. This Agreement or any counterpart may be executed and delivered by facsimile or email with scan attachment copies, each of which shall be deemed an original.

**Section 9.22    Time of Essence**. Time is of the essence of this Agreement.

[END OF PAGE]
[SIGNATURE PAGES FOLLOW]

**SIGNATURE PAGE TO**
**ASSET PURCHASE AGREEMENT**

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the date first above written.

**SELLERS:**

**BL RESTAURANTS HOLDING, LLC**
**BL RESTAURANT OPERATIONS, LLC**
**BL RESTAURANT FRANCHISES, LLC**
**BL HUNT VALLEY, LLC**

By_____
Name: Thomas Fricke
Title: Chief Executive Officer

**SIGNATURE PAGE TO**
**ASSET PURCHASE AGREEMENT**

**BUYER:**

BLH ACQUISITION CO., LLC

By _____
   Name: Jonathan Balch
   Title:   Vice President