## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| BL RESTAURANTS HOLDING, LLC, *et al.*,[1] | ) Case No. 20-10156 (___) |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) |

## DECLARATION OF HOWARD MEITINER IN SUPPORT
## OF DEBTORS' FIRST DAY MOTIONS AND APPLICATIONS

Howard Meitiner declares as follows:

1.      I am the Chief Restructuring Officer of BL Restaurants Holding, LLC; BL Restaurant Operations, LLC; BL Restaurant Franchises, LLC; and BL Hunt Valley, LLC, the debtors and debtors-in-possession in the above-captioned chapter 11 cases (each a "Debtor", and collectively, the "Debtors" or the "Company").  On the date hereof (the "Petition Date"), each of the Debtors commenced a voluntary case under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code").  I am familiar with the day-to-day operations, businesses, and financial affairs of the Debtors.

2.      I submit this declaration (the "First Day Declaration") to provide the Court and other parties in interest with an overview of the Debtors' businesses and to describe the circumstances compelling the commencement of these chapter 11 cases.  I also submit this First Day Declaration in support of the first day motions[2] and applications filed by the Debtors

---

[1]     The Debtors in these Chapter 11 Cases, along with the last four digits of each of the Debtors' respective federal tax identification numbers, are as follows: BL Restaurants Holding, LLC (6665); BL Restaurant Operations, LLC (7062); BL Restaurant Franchises, LLC (6923); and BL Hunt Valley, LLC (9513).  The Debtors' headquarters and mailing address is: 4550 Beltway Drive, Addison, TX 75001.

[2]     All references to agreements, pleadings, or other documentation or summaries thereof in this First Day Declaration are qualified in their entirety by the terms set forth in the relevant agreements, pleadings, or other documents.

contemporaneously herewith, or as soon as reasonably practicable hereafter, by which the Debtors seek relief enabling the Debtors to continue as going concerns, operate effectively, minimize certain of the potential adverse effects of the commencement of their chapter 11 cases, and preserve and maximize the value of the Debtors' estates.  I submit this First Day Declaration based on my own personal knowledge, except as expressly provided, and as my testimony, if called to testify.

## BACKGROUND

### A.    The Company's Businesses

3.    The Company was founded in 1991 in Chicago, Illinois around an original concept of locally themed bars catering to the specific demographics within each neighborhood location. The Company grew to 31 locations from 1991 to 2010, at which time it was acquired by its current owners.  From 2010 through and as of the end of 2019, the Company had grown to 110 owned locations and 24 franchised locations through it franchising program, operating in 26 states and the District of Columbia.  The Company's gastrobars are located in a variety of locations, including lifestyle centers, traditional shopping malls, event locations, central business districts and other stand-alone specialty sites.  Each gastrobar operates under the "Bar Louie" brand name and offers a wide range of beer, liquor and curated food offerings.

4.    Currently, the Company is focused on key initiatives designed to drive traffic, increase sales, and enhance the customer experience, including its Louie Nation Loyalty Program, construction of private dining rooms where feasible, construction of covered patios to limit the impact of weather on outdoor seating areas, implementation of store-level party planning sales managers, and  corporate gift card partnerships. The Company also consistently reviews pricing, menu items, and specials to enhance and provide value and variety for its customers.

5.      The Company's revenue for the twelve months ended December 31, 2019, was $252 million, down 3.7% from the prior year.

6.      The Debtors employ approximately 4,141 full-time and part-time hourly employees, approximately 370 full time restaurant salaried employees, and 55 salaried employees at the corporate headquarters in Addison, Texas.  None of the Debtors' employees are covered by a collective bargaining agreement.

**B.      Corporate and Capital Structure of the Company**

7.      BL Restaurants Holding, LLC owns 100% of the interests in BL Restaurant Operations, LLC , which itself owns 100 % of the interests in BL Restaurant Franchises, LLC and 100 % of the voting interests BL Hunt Valley, LLC.  A Corporate Organizational Chart is attached hereto as Exhibit A.

8.      As of the Petition Date, the Debtors' capital structure consists of outstanding funded-debt obligations in the aggregate principal amount of approximately $87 million, and unsecured trade of $8 million, and other potential unsecured debt of approximately $6  million, exclusive of potential lease termination claims.

**I.      *Prepetition First Lien Secured Credit Facility.***

9.      The Prepetition First Lien Secured Lenders (as defined below) extended certain loans and made other financial accommodations to, and issued letters of credit for the account of, certain of the Debtors (the "Prepetition First Lien Facility"), pursuant to that to that certain Credit Agreement, dated as of March 27, 2014 (as amended, restated or otherwise modified from time to time prior to the Petition Date, the "Prepetition First Lien Secured Credit Agreement" and, collectively with any other agreements executed or delivered in connection therewith, and all other "Loan Documents" as defined therein, each as may be amended, restated, supplemented, or otherwise modified from time to time, the "Prepetition First Lien Loan Documents"), among

(a) BL Restaurant Operations, LLC, as Borrower (as defined in the Prepetition First Lien Secured Credit Agreement, (b) the other Persons party thereto as Credit Parties (as defined in the Prepetition First Lien Secured Credit Agreement) (together with the Borrower, the "Prepetition Credit Parties"), (c) the financial institutions party thereto as "Lenders" (collectively, the "Prepetition First Lien Secured Lenders"), and (d) Antares, as agent (in such capacity, the "Prepetition First Lien Secured Agent" and, together with the Prepetition First Lien Secured Lenders and any other party to which Prepetition First Lien Obligations (as defined below) are owed, the "Prepetition First Lien Secured Parties").

10.    Pursuant to a Guaranty and Security Agreement, dated as of March 27, 2014 (as amended, restated or otherwise modified from time to time prior to the Petition Date, the "Guaranty"), the Credit Parties (as defined in the Prepetition First Lien Secured Credit Agreement) unconditionally guaranteed the Borrower's obligations under the Prepetition First Lien Loan Documents.

11.    As of the Petition Date, the Debtors owed the Prepetition First Lien Secured Parties, pursuant to the Prepetition First Lien Loan Documents, without defense, counterclaim, or offset of any kind, in respect of loans made and letters of credit issued by the Prepetition First Lien Secured Parties:  (a) an aggregate principal amount of not less than $48,030,501.82 with respect to Term Loans (as defined in the Prepetition First Lien Secured Credit Agreement), an aggregate principal amount of not less than $14,409,875.00 with respect to Revolving Loans (as defined in the Prepetition First Lien Secured Credit Agreement),[3] and an aggregate face amount of zero dollars ($0.00) with respect to Prepetition Letters of Credit, and (b)(I) all obligations under any Secured Rate Contract, and (II) any other Obligations (each as defined in the Prepetition First Lien Secured

---

[3]  The Revolving Loans are composed of not less than $11,409,875.00 in Original Revolving Loans and $3 million in LIFO Revolving Loans (each as defined in the Prepetition First Lien Secured Credit Agreement).

Credit Agreement), *plus* (c) all accrued and hereafter accruing and unpaid interest thereon and any additional fees, expenses (including any reasonable attorneys', accountants', appraisers', and financial advisors' fees and expenses that are chargeable or reimbursable under the Prepetition First Lien Loan Documents), and other amounts now or hereafter due under the Prepetition First Lien Loan Documents and applicable law (collectively, the "Prepetition First Lien Obligations").

12.     Prior to the Petition Date and pursuant to the Collateral Documents (as defined in the Prepetition First Lien Secured Credit Agreement) (as such documents were amended, restated, supplemented, or otherwise modified from time to time prior to the Petition Date, the "Prepetition First Lien Collateral Documents"), by and among each of the Prepetition Credit Parties and the Prepetition First Lien Secured Agent, each Prepetition Credit Party granted to the Prepetition First Lien Secured Agent, for the benefit of itself and the other Prepetition First Lien Secured Parties, to secure the Prepetition First Lien Obligations, a first priority security interest in and continuing lien (the "Prepetition First Liens") on substantially all of such Prepetition Credit Party's assets and properties (including Cash Collateral) and all proceeds, products, accessions, and profits thereof, in each case whether then owned or existing or thereafter acquired or arising.  (All "Collateral," as defined in the Prepetition First Lien Secured Credit Agreement, granted or pledged by the Prepetition Credit Parties pursuant to any Prepetition First Lien Collateral Document or any other Prepetition First Lien Loan Document shall collectively be referred to herein as the "Prepetition First Lien Collateral").

13.     Additionally, the Prepetition Credit Parties have entered into deposit account control agreements in favor of the Prepetition First Lien Secured Agent with respect to their bank accounts.  Thus, substantially all of the Debtors' cash is subject to a perfected security interest in favor of the Prepetition First Lien Secured Agent.

## II.    *Prepetition Intercreditor Agreement.*

14.    The Prepetition First Lien Secured Agent, the Prepetition Credit Parties, and the Prepetition Second Lien Secured Agent (as defined below) are parties to that certain Intercreditor Agreement, dated as of August 30, 2017 (as amended, restated, supplemented, or otherwise modified in accordance with its terms, the "Intercreditor Agreement"), which sets forth subordination and other provisions governing the relative priorities and rights of the Prepetition First Lien Obligations and the Prepetition First Liens, on the one hand, and the Prepetition Second Lien Obligations and the Prepetition Second Liens (each term as defined below), on the other hand. The Debtors admit, stipulate, and agree that the Intercreditor Agreement was entered into in good faith and is fair and reasonable to the parties thereto and enforceable in accordance with the terms thereof.

## III.    *Prepetition Second Lien Secured Credit Facility*

15.    The Prepetition Second Lien Secured Lenders (as defined below) extended certain loans and made other financial accommodations to, and issued letters of credit for the account of, certain of the Debtors (the "Prepetition Second Lien Facility"), pursuant to that certain Subordinated Credit Agreement, dated as of August 30, 2017 (as amended, restated or otherwise modified from time to time prior to the Petition Date, the "Prepetition Second Lien Secured Credit Agreement," collectively with any other agreements executed or delivered in connection therewith, each as may be amended, restated, supplemented, or otherwise modified from time to time, the "Prepetition Second Lien Loan Documents" and, together with the Prepetition First Lien Loan Documents, collectively the "Prepetition Secured Loan Documents"), among (a) the Persons designated as "Borrower" on the signature pages thereto (the "Prepetition Second Lien Borrowers"), (b) the other Credit Parties (as defined in the Prepetition Second Lien Secured Credit Agreement) party thereto, (c) the financial institutions party thereto as "Lenders" (as defined in

the Prepetition Second Lien Secured Credit Agreement) (collectively, the "Prepetition Second Lien Secured Lenders"), and (d) BL Restaurants Group Holding Corp., as agent (in such capacity, the "Prepetition Second Lien Secured Agent" and, together with the Prepetition Second Lien Secured Lenders and any other party to which Prepetition Second Lien Obligations (as defined below) are owed, the "Prepetition Second Lien Secured Parties" and, together with the Prepetition First Lien Secured Parties, the "Prepetition Secured Parties").

16.     As of the Petition Date, the Debtors owed the Prepetition Second Lien Secured Parties, pursuant to the Prepetition Second Lien Loan Documents, without defense, counterclaim, or offset of any kind, an aggregate principal amount of not less than $23.6 million, *plus* all prepetition accrued, accruing and unpaid interest thereon and any additional reasonable fees and expenses (including any reasonable attorneys', accountants', appraisers', and financial advisors' fees and expenses that are chargeable or reimbursable under the Prepetition Second Lien Loan Documents), and other amounts now or hereafter due under the Prepetition Second Lien Loan Documents and applicable law (collectively, the "Prepetition Second Lien Obligations" and, together with the Prepetition First Lien Obligations, the "Prepetition Secured Obligations").

17.     The Prepetition Second Lien Obligations are secured by Liens granted to the Prepetition Second Lien Secured Agent, for the benefit of the Prepetition Second Lien Secured Parties (the "Prepetition Second Liens" and, together with the Prepetition First Liens, the "Prepetition Liens"), on substantially all of the Debtors' assets and properties (including Cash Collateral) as set forth in the Prepetition Second Lien Loan Documents, whether then owned or existing or thereafter acquired or arising.  All "Collateral," as defined in the Prepetition Second Lien Secured Credit Agreement, granted or pledged by the Debtors pursuant to any Prepetition Second Lien Loan Documents shall collectively be referred to herein as the "Prepetition Second

Lien Collateral" and, together with the Prepetition First Lien Collateral, the "Prepetition Collateral").

## C.    Events Leading to the Commencement of the Chapter 11 Cases

18.    Over the past several years, the opening of new locations was the primary driver for sales and profit growth for the Company.  This growth was partially funded through new debt, but also utilized cash flow from operations, which ultimately over time restricted liquidity otherwise needed for store refreshes and equipment maintenance and modernization, resulting in inconsistent delivery of the brand promise across the system.  This inconsistent brand experience, coupled with increased competition and the general decline in customer traffic visiting traditional shopping locations and malls, resulted in less traffic at the Company's locations proximate to shopping locations and malls and contributed to sales falling short of forecast. These customer declines were also driven by major changes in consumer behavior, including the general national trend away from casual dining.  The combination of these factors had a particularly major impact on a significant segment of the Company's footprint.

19.    In 2018, a new CEO was hired, and a new management team was assembled. This new team implemented a turnaround strategy including the following initiatives: (a) improving the guest experience through better customer service and store maintenance; (b) improving the quality of the food offerings to better compliment a world class beverage program; and (c) redefining the brand essence and developing a new advertising campaign to communicate to the guest base.  The Company has been focused on new corporate sales initiatives to improve same store sales, ("SSS"), and has implemented key initiatives designed to drive traffic, increase sales, and enhance the customer experience as outlined above. (*See* ¶4 above).

20.     These initiatives have positively impacted the Company's performance in 72 of the 110 corporate locations.  However, despite successful execution of these programs, 38 of the locations have seen their sales and profits decline at an accelerating pace.  These declines forced a reduction of expenses and other investments, with the inevitable impact being felt throughout the whole system.  Despite the success of these initiatives, the Company's lack available liquidity has resulted in delays to the broader roll out of these initiatives to other locations and curtailed the ability to implement further marketing related activities compared to others in the industry, resulting in a SSS decline in 2019 of 4.2%.

21.     The 38 locations that represented a major, ongoing challenge to the Company generated a loss of $4.0 million loss in 2019.  Further, the surrounding environment at these locations has seen significant declines in customer traffic and coupled with increasing rental and other store level costs, could no longer absorb the continuing decline in sales at these locations.  These 38 locations saw SSS decline of 10.9% in 2019, whereas the rest of the system only experienced a 1.4% SSS decline. The bulk of the decline occurred in the 4th quarter 2019, when financial conditions and a lack of liquidity forced management to significantly reduce marketing spend

22.     To assist the management team, Carl Marks Advisors were engaged in September 2019 to provide general advice, a strategic review of the business, cash management oversight and potential restructuring solutions to address the Company's challenges preventing its realization of future profitability and growth.  The Company also  engaged Configure Partners, LLC ("Configure") on September 20, 2019 as their proposed investment banker to assist in the evaluation of strategic alternatives, including the sale of the Company, refinancing, or other

alternatives.   The Company also engaged Howard Meitiner of Carl Marks to serve as Chief Restructuring Officer effective January 23, 2020.

23.     The Prepetition First Lien Secured Parties supported the Company's restructuring and sales efforts by making available an incremental $3 million in revolving credit in October 2019.  However, the Company lacked sufficient liquidity to continue to fund projected cash needs due to lower than expected cash flow from operations, continuing operating losses at certain locations and the concomitant inability to access additional financing.

24.     After its engagement, Configure prepared a marketing teaser and confidential information memorandum that it used to market the sale of the Debtors' assets.  As of the Petition Date, Configure contacted approximately 101 potential strategic buyers and 153 financial buyers, out of which 73 executed confidentiality agreements and received the confidential information memorandum and access to key documents in an online data room.  The Debtors received initial indications interest from 7 potential buyer and engaged in additional diligence discussions including management presentations in Dallas.  Out of the 7 potential buyers, three parties submitted letters of Intent in December 2019.  Meanwhile, the Debtors continued to suffer a drain on cash flow from its underperforming stores.  Consequently, it became apparent, that the Debtors liquidity position would require that the sale process continue in a chapter 11 process.  Rather than commence these chapter 11 cases with no stalking horse, in December 2019, concurrently with the sale process, the Debtors and its advisors had commenced discussions with the Prepetition First Lien Secured Lenders and the Prepetition First Lien Secured Agent to serve as a "stalking horse" via a credit bid and ultimately executed an asset purchase agreement with BLH Acquisition Co., LLC to serve as the stalking horse in its sale process.

25.     Also immediately preceding the filing of these chapter 11 cases, and after unsuccessful attempts to reduce store level costs and drive sales, the Company closed the 38 unprofitable locations referenced above. (*See* ¶¶20 and 21 above). Considering all the events previously detailed, increasing store level costs, the need to exit 38 closed locations, and limited liquidity to pursue strategic alternatives outside of the bankruptcy process, the Company decided to seek protection under chapter 11 of the Bankruptcy Code, pursue the sale of their assets as a going concern, and commenced these chapter 11 cases.

**D.      Goals of the Chapter 11 Cases**

26.     The Company commenced these chapter 11 cases to preserve value for its stakeholders, including its employees and creditors.   Additionally, the Debtors have negotiated a debtor-in-possession financing facility that will allow the Debtors to continue to operate in the normal course, pay landlords and vendors, and have sufficient liquidity to pay the administrative costs, both operational and statutory, required in these chapter 11 cases.

27.     Contemporaneously with the filing of these chapter 11 cases, the Debtors filed their sale procedures motion and sale motion with the Court to approve the asset purchase agreement with BLH Acquisition Co., LLC to serve as the stalking horse purchaser, establish a formal sale timeline, which will include an auction process, with a goal of exposing the existing asset purchase agreement to higher and better offers.

28.     After the Petition Date, the Debtors and Configure will continue discussions with interested parties and market the Debtors' assets with a goal of entering into an asset purchase agreement with a stalking horse buyer.

29.     The Debtors believe that a marketing and sale process through these chapter 11 cases is in the best interests of the Company's creditors and will maximize the value of these estates

**Evidentiary Support for First Day Motions**

30.     Contemporaneously, the Debtors have filed a number of first day pleadings seeking relief that the Debtors believe is necessary to enable them to efficiently administer their estates with minimal disruption and loss of value during these chapter 11 cases. The Debtors request that the relief sought in each of the first day motions be granted as critical elements in ensuring the maximization of value of the Debtors' estates. I believe that the relief requested in the first day motions is necessary to allow the Debtors to operate with minimal disruption during the pendency of these chapter 11 cases.  I have reviewed each of the first day motions discussed below, and the facts set forth in each first day motion are true and correct to the best of my knowledge and belief with appropriate reliance on corporate officers and advisors.  A description of the relief requested in and the facts supporting each of the first day motions is set forth in Exhibit B attached hereto and incorporated herein by reference.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true correct.

Dated:  January 27, 2020

*/s/ Howard Meitiner*

Name:  Howard Meitiner
Title:    Chief Restructuring Officer

## EXHIBIT A

## Organizational Chart



# EXHIBIT B

## Evidentiary Support for First Day Motions[4]

---

[4]    Capitalized terms not defined hereafter shall have the same meanings ascribed to such terms in the respective First Day Motions.

**Evidentiary Support for First Day Motions**[1]

I.    **Debtors' Motion for Entry of an Order (I) Directing Joint Administration of Their Related Chapter 11 Cases and (II) Granting Related Relief (the "Joint Administration Motion").**

1.    Pursuant to the Joint Administration Motion, the Debtors request entry of an order directing the joint administration of their related chapter 11 cases and granting any related relief. Given the integrated nature of the Debtors' operations, joint administration of these chapter 11 cases will provide significant administrative convenience and cost savings to the Debtors without harming the substantive rights of any party in interest.

2.    Many of the motions, hearings, and orders in these chapter 11 cases will affect each Debtor entity.  For example, virtually all of the relief sought by the Debtors in the First Day Motions is sought on behalf of all of the Debtors.  The entry of an order directing joint administration of these chapter 11 cases will reduce fees and costs by avoiding duplicative filings and objections.   Joint administration of these chapter 11 cases, for procedural purposes only, under a single docket, will also ease the administrative burdens on the Court by allowing the Debtors' cases to be administered as a single joint proceeding, instead of multiple independent chapter 11 cases.  Accordingly, I respectfully submit that the Joint Administration Motion should be approved.

---

[1]    Capitalized terms not defined hereafter shall have the same meanings ascribed to such terms in the respective First Day Motion.

II.    **Debtors' Motion For Entry of an Order (I) Authorizing the Debtors to File A Consolidated List of Creditors in Lieu of Submitting A Separate Mailing Matrix for Each Debtor, and (II) Granting Related Relief (the "<u>Creditor Matrix Motion</u>").**

3.    Pursuant to the Creditor Matrix Motion, the Debtors seek entry of an order authorizing the Debtors to maintain a consolidated list of creditors in lieu of submitting a separate mailing matrix for each Debtor and granting related relief.

4.    Although I understand that a list of creditors is usually filed on a debtor-by-debtor basis, in a complex chapter 11 bankruptcy case involving more than one debtor, the debtors may file a consolidated creditor matrix "in the interest of justice." Requiring the Debtors to segregate and convert their computerized records to a Debtor-specific creditor matrix format would be an unnecessarily burdensome task and result in duplicate mailings. Accordingly, I respectfully submit that the Court should approve the Creditor Matrix Motion.

III.    **Application of the Debtors For Entry of Order Appointing Epiq Corporate Restructuring, LLC as Claims and Noticing Agent Effective as of Petition Date (the "<u>Claims and Noticing Agent Retention Application</u>").**

5.    Pursuant to the Claims and Noticing Agent Retention Application, the Debtors seek entry of an order appointing Epiq Corporate Restructuring, LLC ("<u>Epiq</u>") as claims and noticing agent for the Debtors and their chapter 11 cases, effective *nunc pro tunc* to the Petition Date, including assuming full responsibility for the distribution of notices and the maintenance, processing, and docketing of proofs of claim filed in the Debtors' chapter 11 cases and granting related relief.

6.    Based on my discussions with the Debtors' advisors, I believe that the Debtors' selection of Epiq to act as the Claims and Noticing Agent is appropriate under the circumstances and in the best interest of the estates. Moreover, it is my understanding that based on all

engagement proposals obtained and reviewed that Epiq's rates are competitive and comparable to the rates charged by their competitors for similar services.

7.       The Debtors anticipate that there will be thousands of parties and entities to be noticed in these chapter 11 cases.  In light of the number of parties in interest and the complexity of the Debtors' businesses, the Debtors submit that the appointment of a claims and noticing agent will provide the most effective and efficient means of, and relieve the Debtors and/or the Clerk's office of the administrative burden of, noticing and processing proofs of claim and is in the best interests of both the Debtors' estates and their creditors.  Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the Claims and Noticing Agent Retention Application.

**IV.     Debtors' Motion for Entry of an Interim and Final Order (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, a n d (C) Maintain Existing Business Forms,  and (II) Granting Related Relief  (the "<u>Cash Management Motion</u>").**

8.       Pursuant to the Cash Management Motion, the Debtors seek entry of interim and final orders authorizing the Debtors to (i) continue to operate their Cash Management System; (ii) honor certain prepetition obligations related thereto; and (iii) maintain existing Business Forms in the ordinary course of business and granting any related relief.

9.       The Debtors' Cash Management System is similar to the centralized cash management systems used by other comparably sized companies to manage cash flow.   The Debtors use their Cash Management System in the ordinary course to transfer and distribute funds and to facilitate cash monitoring, forecasting, and reporting.   The Debtors maintain daily oversight over the Cash Management System and implement cash management controls  for entering, processing, and releasing funds.   Additionally, the Debtors' corporate accounting

and cash forecasting personnel regularly reconcile the Debtors' books and records to ensure that all transfers are accounted for properly.

10.    Because of the disruption that would result if the Debtors were forced to close their existing bank accounts, I believe that it is critical that the existing Cash Management System remain in place.  I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11.    Accordingly, on behalf of the Debtors, I respectfully submit that the Cash Management Motion should be approved.

**V.    Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing, But Not Directing, the Debtors to (A) Pay Prepetition Employee Wages, Salaries, Other Compensation, and Reimbursable Employee Expenses and (B) Continue Employee Benefits Programs, and (II) Granting Related Relief (the "Wages Motion").**

11.    Pursuant to the Wages Motion, the Debtors seek entry of interim and final orders authorizing, but not directing, the Debtors to (i) pay prepetition wages, salaries, other compensation, payroll services, federal and state withholding taxes and other amounts withheld plus reimbursable employee expenses, and (ii) continue employee benefits programs in the ordinary course, including payment of certain prepetition obligations related thereto. The Debtors seek authority to make the following payments related to prepetition amounts owed on account of the Employee Compensation and Benefits:

| Employee Obligation | Interim Amount | Final Amount |
| --- | --- | --- |
| Employee Compensation, Gross Wages and Tips | $3,050,000 | $3,410,000 |
| Withholding Obligations | $485,000 | $585,000 |
| Payroll Processing Fees | $20,000 | $30,000 |
| Reimbursable Expenses | $100,000 | $150,000 |
| Employee Benefits Programs | $250,000 | $500,000 |

| Employee Obligation | Interim Amount | Final Amount |
|---|---|---|
| Total | $3,755,000 | $4,325,000 |

12.     The Debtors employ approximately 4100 full-time and part-time hourly employees, approximately 370 full time restaurant salaried employees, and 55 salaried employees at the corporate headquarters in Addison, Texas (collectively, the "Employees").  The Employees perform a variety of functions critical to the preservation of value and the administration of the Debtors' estates.  In many instances, the Employees include personnel who are intimately familiar with the Debtors' businesses, processes, and systems, and who cannot be easily replaced.

13.     The majority of Employees rely on t he Employee Compensation and Benefits to pay their daily living expenses.  Thus, Employees will face significant financial consequences if the Debtors are not permitted to continue the Employee Compensation and Benefits in the ordinary course of business.  The Debtors seek to minimize the personal hardship the Employees would suffer if employee obligations are not paid when due or as expected.  Consequently, I believe the relief requested is necessary and appropriate.

14.     The Debtors are seeking authority to pay and honor certain prepetition claims relating to the Employee Compensation and Benefits, including, among other things, wages, salaries, and other compensation, payroll services, federal and state withholding taxes and other amounts withheld, reimbursable expenses, health insurance, life insurance, workers' compensation benefits, short- and long-term  disability coverage, auxiliary benefits, retirement plans, paid time off, severance, and other benefits that the Debtors have historically directly or indirectly provided to the Employees in the ordinary course of business and as further described in the Wages Motion.

15.     I believe the Employees provide the Debtors with services necessary to conduct the Debtors' businesses, and absent the payment of the Employee Compensation Benefits owed to the Employees, the Debtors will likely experience Employee turnover and instability at this critical time.  I believe that without these payments, the Employees may become demoralized and unproductive because of the potentially significant financial strain and other hardships the Employees may face.  Employees may then elect to seek alternative employment opportunities.  I believe enterprise value may be materially impaired to the detriment of all stakeholders in such a scenario.  I, therefore, believe that payment of the prepetition obligations with respect to the Employee Compensation and Benefits is a necessary and critical element of the Debtors' efforts to preserve value and will give the Debtors the greatest likelihood of retention of their Employees as the Debtors seek to operate their business in these chapter 11 cases.

16.     Therefore, I believe that the relief requested in the Wages Motion inures to the benefit of all parties in interest.  Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the Wages Motion.

**VI.    Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing the Debtors to Maintain and Administer Their Existing Customer Programs and Honor Certain Prepetition Obligations Related Thereto and (II) Granting Related Relief (the "<u>Customer Programs Motion</u>").**

17.     The Debtors have historically provided gift cards, coupons, discounts, and other accommodations to their customers to attract and maintain positive customer relationships.  The Customer Programs promote customer satisfaction and inure to the goodwill of the Debtors' businesses and the value of their brand.  Accordingly, maintaining the goodwill of their customers is critical to the Debtors' ongoing operations in these chapter 11 cases, and is necessary to maximize value for the benefit of all of the Debtors' stakeholders.

18.     Importantly, I understand that the Debtors estimate that substantially all of their prepetition obligations under the Customer Programs, including those for pre-paid gift cards, rewards, discounts, or other similar obligations owing to their customers *do not* entail the expenditure of cash.

19.     The Debtors seek authorization in their sole discretion to honor all gift cards purchased by or issued to customers prior to the Petition Date and maintain the Gift Cards Program postpetition.  The Debtors also seek to continue their Rewards Program whereby participating customers earn points for each meal, beverage and/or gift card purchased from the Debtors. Neither the Gift Card nor the Rewards Program require a cash outlay by the Debtors.

20.     I believe that continuing to administer the Customer Programs without interruption during the pendency of the chapter 11 cases will help preserve the Debtors' valuable customer relationships and goodwill, which will inure to the benefit of all of the Debtors' creditors and benefit their estates.  In contrast, if the Debtors are unable to continue the Customer Programs postpetition or honor their existing obligations thereunder, the Debtors risk alienating certain customers (who might then decide to patron the Debtors' competitors) and might suffer corresponding losses in customer loyalty and goodwill that will harm their prospects for maximizing the value of their estates.  The Debtors' Customer Programs are essential marketing strategies for attracting new customers.

21.     I believe that the failure to honor the Customer Programs could place the Debtors at a competitive disadvantage in the marketplace, amplifying the negative effect of customer uncertainty that may arise from the chapter 11 filings.  Such uncertainty could erode the Debtors' hard-earned reputation, which, in turn, could adversely impact the prospects for a successful sale process in these chapter 11 cases.

22.     I believe that the relief requested herein will benefit the Debtors' estates and the sale process, both in terms of profitability and the engendering of goodwill, especially at this critical time following the filing of the chapter 11 cases.  Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the Customer Programs Motion.

**VII.    Debtors' Motion for Entry of Interim and Final Orders (I)  Authorizing Debtors to Pay Certain Prepetition Claims of Trade Claimants, PACA/PASA Claimants, and Other Venders; and (II) Approving the Procedures Related Thereto; and (III) Granting Related Relief (the "<u>Comprehensive Vendor Motion</u>").**

23.     Pursuant to the Comprehensive Vendor Motion, the Debtors seek entry of interim and final orders:  (i) authorizing the Debtors to pay, in their sole discretion, prepetition claims held by (a) Critical Vendors; (b) Logistics Claimants; (c) PACA/PASA Claimants' and (d) section 503(b)(9) Claimants in an aggregate amount not to exceed $2.0 million, pursuant to the Interim Order and, inclusive of amounts paid pursuant to the Interim Order, an aggregate amount not to exceed $5.0 million, pursuant to the Final Order, in each case absent further order of the Court; and (ii) granting related relief.

24.     The Debtors interact with numerous different vendors and the Debtors have undergone a stringent analysis, in consultation with their advisors, to determine which vendors fall into these categories of Claimants and the extent to which each vendor is critical to the ongoing operations of the Debtors' businesses.  A number of these vendors possess claims that are entitled to certain priorities under Bankruptcy Code section 503(b)(9) or under PACA or PASA (as defined in the Comprehensive Vendor Motion).  A number of these creditors may be entitled to possessory liens or a statutory trust for goods in transit to the Debtors.  Additionally, a number of these vendors may be vendors that are essential to the Debtors' operations and cannot be replaced.  The Debtors have long-standing, familiar relationships with a number of their top vendors that have specific delivery schedules, quality and portion sizing, and special products with exacting specifications

that have been developed over a long period of time. Replacing these vendors would be extremely time consuming and could cause significant operational disruptions at a time the Debtors can least afford to experience them. Furthermore, due to the nature of the Debtors' restaurant business that requires frequent deliveries and quick turnover of goods sold, a very significant number of the creditors affected by this Comprehensive Vendor Motion will fall into more than one of the categories described in the Motion.

25.    The Debtors proposed to undertake a reconciliation of such claims, and in their discretion and in accordance with their business judgement, determine which of these claims should be currently satisfied and whether or not the payment of such claims should be contingent on the extension of favorable business terms.

26.    Recognizing that payment of prepetition claims of certain vendors is extraordinary relief, the Debtors, with the assistance of myself and the Debtors' advisors, reviewed their books and records, consulted operations management and purchasing personnel, reviewed contracts and supply agreements, and analyzed applicable laws, regulations, and historical practices to identify the limited number of vendors that are critical to the continued and uninterrupted operation of the Debtors' businesses—the loss of which could materially harm their businesses, shrink their market share, reduce their enterprise value, and impair going-concern viability.

27.    The Debtors submit that the requested relief will allow the Debtors to continue to operate and preserve the value of their estates by paying certain prepetition claims of certain vendors that are critical to the Debtors' business enterprise. Accordingly, the Debtors seek authority, but not direction, to pay prepetition claims of certain Critical Vendors, Logistics Claimants, PACA/PASA Claimants and Section 503(b)(9) Claimants, on a case-by-case basis, a total of

approximately $5 million in the aggregate, with an amount up to $2 million due and payable on an interim basis and up to an additional $3 million due and payable on a final basis.

28.      Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the Comprehensive Vendor Motion.

**VIII.  Debtors' Motion for Entry of Interim and Final Orders (I) Prohibiting Utility Providers From Altering, Refusing, or Discontinuing Utility Services, (II) Determining Adequate Assurance of Payment for Future Utility Services, (III) Establishing Procedures for Determining Adequate Assurance of Payment, and (VI) Granting Related Relief (the "Utilities Motion").**

29.      In connection with the operation of their businesses and management of their properties, the Debtors obtain water, sewer service, electricity, waste disposal, natural gas, and other similar services either directly from utility companies or their brokers or indirectly from landlords that pay for and pass through the costs associated therewith to the Debtors in accordance with the applicable nonresidential real property lease.  The relief requested herein applies to all Utility Providers.

30.      The Debtors pay approximately $785,000 per month on average over the prior twelve-month period for utilities.  Accordingly, with the closure of certain locations, the Debtors estimate that their cost for Utility Services during the next 30 days will be approximately $550,000. The Debtors propose depositing $392,500 into a segregated account as additional assurance of payment, which is an amount sufficient to cover one-half of the Debtors' average monthly cost based on the historical average payment.

31.      Additionally, the Debtors seek approval of their proposed Adequate Assurance Procedures.  These procedures allow Utility Providers to request adequate assurance for unpaid Utility Services and additional adequate assurance when they believe the proposed amount is not sufficient.  This ensures that all key stakeholder groups obtain notice of such request before it is honored.

32.     Any disruption in the Debtors' businesses would adversely impact customer relationships and result in a significant decline in the Debtors' revenues and profits.  This, in turn, jeopardizes the value of the Debtors' estates and impacts creditor recoveries.  Therefore, it is critical that Utility Services continue uninterrupted during these chapter 11 cases.  Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the Utilities Motion.

IX.    **Debtors' Motion for Entry of an Interim and Final Order (I) Authorizing, But Not Directing the Payment of Certain Prepetition Taxes and Fees and (II) Granting Related Relief (the "Taxes Motion").**

33.     The Debtors request entry of interim and final orders authorizing, but not directing, the Debtors, in their sole discretion, to negotiate, remit and pay certain accrued and outstanding prepetition obligations accrued in the ordinary course of business on account of the Taxes and Fees in an aggregate amount not to exceed $2,090,000 on an interim basis  and  $2,300,000 on  a final basis, absent further order of the Court; and to continue negotiating and paying the Taxes and Fees accrued in the ordinary course of business on a postpetition basis.

34.     The Debtors collect, incur, and pay sales and use taxes, franchise taxes and various other governmental taxes, fees, and assessments.  The Debtors remit the Taxes and Fees to various federal, state, and local governments, including taxing authorities.  Taxes and Fees are remitted and paid by the Debtors through checks and electronic transfers that are processed through their banks and other financial institutions.  The Debtors estimate that approximately $2,300,000 in Taxes and Fees relating to the prepetition period are or will become due and owing to the Governmental Authorities after the Petition Date in the ordinary course.[2]  The Debtors further estimate that approximately $2,090,000 in Taxes and Fees relating to the prepetition period are or will become due and owing to the Governmental Authorities within 30 days after the Petition Date.

---

[2]     This estimate does not include any potential prepetition tax liability that may later come due as the result of an audit.

35.     The Debtors must continue to pay the Taxes and Fees to avoid potential costly distractions during these chapter 11 cases.   Specifically, the Debtors' failure to pay the Taxes and Fees could adversely affect the Debtors' estate because the Governmental Authorities could file liens or seek to lift the automatic stay.

36.     I believe that the relief requested in the Taxes Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.   Accordingly, on behalf of the Debtors, I respectfully submit that the Taxes Motion should be approved.

**X.     Debtors' Motion for Entry of an Interim and Final Order (I) Authorizing, But Not Directing, the Debtors to (A) Pay Their Obligations Under Insurance Policies Entered into Prepetition, (B) Continue to Pay Brokerage Fees, (C) Renew, Supplement, Modify, or Purchase Insurance Coverage, and (D) Honor the Terms of the Financing Agreements and Pay Premiums Thereunder, and (II) Granting Related Relief (the "Insurance Motion").**

37.     The Debtors request authority authorizing but not directing them to pay obligations under insurance policies entered into prepetition and to renew, supplement, modify, or purchase insurance coverage in the ordinary course and honor the terms of certain financing agreements.   In addition, the Debtors request that the Court schedule a final hearing within approximately 30 days of the commencement of these chapter 11 cases to consider approval of this motion on a final basis.

38.     The Debtors maintain approximately fourteen (14) insurance policies administered by multiple third-party insurance carriers.   The Insurance Policies provide coverage for, among other things, the Debtors' directors and officers liability, crime, flood, food contamination, casualty, international, and network/cyber liability. The Debtors' Insurance Policies are essential to the preservation of the value of the Debtors' business, properties, and assets.   I understand

that, in many cases, insurance coverage such as that provided by the Insurance Policies is required by diverse regulations, laws, and contracts.

39.     For the twelve months preceding the Petition Date, the Debtors paid approximately $2,692,000 in the aggregate on account of premiums under the existing Insurance Policies. The Debtors generally pay premiums with respect to the Insurance Policies, as a combination of down payment and monthly payment, to the Debtors' insurance brokers.

40.     Most of the Insurance Policies are financed through premium Financing Agreements with Imperial PFS. Pursuant to the Financing Agreements, the Debtors are required to make monthly premium payments for the various policies. As of the Petition Date, there is approximately $615,000 outstanding on account of the Financing Agreements and an additional $150,000 due on account of other insurance obligations, some or all of which will come due during the pendency of these chapter 11 cases. The Debtors further estimate that approximately $214,000 of such amounts will come due within the first 30 days of these cases. The Debtors seek the authority to honor any prepetition amounts outstanding on account of the Insurance Policies, including under the terms of the Financing Agreements, and pay premiums thereunder.

41.     Failure to make the payments required by the Debtors' Insurance Policies, including the Financing Agreements, could have a significant negative impact on the Debtors' operations. Continuation of the Insurance Policies is essential to the preservation of the value of the Debtors' properties and assets. Moreover, in many cases, coverage provided by the Insurance Policies is required by the regulations, laws, and contracts governing the Debtors' commercial activities, including the requirements of the Office of the United States Trustee for the District of Delaware.

42.     I believe that the relief requested in the Insurance Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the Insurance Motion should be approved.

**XI.     Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing Pursuant to Section 364 of the Bankruptcy Code, (II) Authorizing the Use of Cash Collateral Pursuant to Section 363 of the Bankruptcy Code, (III) Granting Adequate Protection to the Prepetition Secured Parties Pursuant to Sections 361, 362, 363 and 364 of the Bankruptcy Code, (IV) Granting Liens and Superpriority Claims, (V) Modifying the Automatic Stay, and (VI) Scheduling a Final Hearing (the "<u>DIP Motion</u>").**

43.     The Debtors have an immediate need for access to incremental liquidity in the form of postpetition financing as well as access to Cash Collateral.  The Debtors cannot maintain the value of their estates during the pendency of these chapter 11 cases without access to cash.  The Debtors will use cash to, among other things, continue operating their businesses and satisfy other working capital needs during these chapter 11 cases.  The Debtors believe that all or substantially all of their available cash constitutes the cash collateral, as that term is used by section 363(c) of the Bankruptcy Code, of the Prepetition Secured Parties.  The Debtors will therefore be unable to proceed with operating their businesses without the ability to use Cash Collateral and will suffer immediate and irreparable harm to the detriment of all creditors and other parties in interest.  In short, the Debtors' ability to finance their business operations, and the availability of sufficient working capital and liquidity to the Debtors through the use of Cash Collateral, is vital to the preservation and maintenance of the value of the Debtors' estates and the successful prosecution of these chapter 11 cases.

44.     Further support for the DIP Motion can be found in the First Day Declaration and the *Declarations of Vineet ("Vin") Batra in Support of the DIP Motion* filed contemporaneously herewith.  The DIP Motion seeks authority for the Debtors to obtain a DIP Facility with a DIP

Revolving Loan up to $22,000,000 in new money, including $8,000,000 during the interim period and additional $14,000,000 upon entry of the Final Order (the "DIP Facility" and the loans made thereunder, the "DIP Loans") on the terms and conditions set forth in the DIP Orders and the Senior Secured Priming and Super-Priority Debtor-in-Possession Credit Agreement (the "DIP Agreement") to be executed among the Borrowers, Antares Capital LP, as agent (in such capacity, the "DIP Agent"), and for and on behalf of the lenders party thereto from time to time (collectively, the "DIP Lenders").

45.     Without access to postpetition financing, I believe the Debtors would lack sufficient funds to meet their working capital needs and operate their business during these chapter 11 cases, including payment of employees and vendors, resulting in significant impairment of the value of the Debtors' estates to the detriment of all stakeholders.

46.     In light of the Debtors' liquidity position, I have assisted the Debtors in an evaluation of the Debtors' financing needs and funding alternatives and have worked closely with the Debtors, their management, and their advisors to evaluate the Debtors' cash requirements for their businesses.  As part of their evaluation of the Debtors' financing needs, I worked with the Debtors in developing a cash flow forecast, which took into account anticipated cash receipts and disbursements during the projected period and considered a number of factors, including the effect of the chapter 11 filing on the operations of the business, likely fees and interest expenses associated with any debtor-in-possession financing facility, professional fees, and required operational payments.  Given the Debtors' circumstances and for the reasons set forth below, I believe that the terms of the DIP Facility, as set forth in the DIP Agreements, are fair, reasonable, and adequate.

47.    Based on the foregoing, it is my belief that the DIP Facility and consensual use of Cash Collateral represents the best option available to address the Debtors' immediate liquidity needs and is a critical component of the Debtors' chapter 11 strategy.  It is also my belief that the terms and conditions of the DIP Facility are reasonable and appropriate under the circumstances and were the product of extensive good-faith, arm's-length negotiations with the DIP Lenders.  Specifically, the Debtors determined that the roll-up contemplated by the DIP Facility is necessary to obtain access to the liquidity necessary to preserve the value of their business, and that the milestones and covenants contained in the DIP Credit Agreement were negotiated and required by the DIP Lender as a condition to the DIP Facility.  Under the circumstances of these chapter 11 cases, these provisions are reasonable and appropriate.

48.    Finally, the Debtors' businesses are cash intensive, with significant recurring costs required to satisfy obligations to vendors and employees.  As such, and due to their current limited liquidity, the Debtors require immediate access to the DIP Facility and the use of Cash Collateral to operate their businesses, preserve value, and to avoid irreparable harm pending the Final Hearing.  Absent funds available from the DIP Facility and access to Cash Collateral at this critical early stage, the Debtors could face a value-destructive interruption to their businesses—which, in turn, would hinder the Debtors' ability to maximize the value of their estates—and be forced to curtail their operations significantly and to the detriment of the Debtors, their estates, and their creditors.

49.    The Debtors seek further authorization to use the proceeds of the DIP Facility as expressly provided in the DIP Documents and consistent with the Budget to pay costs, fees, and expenses of the DIP Agent and DIP Lenders and related attorneys' fees; to provide working capital for other general corporate purposes of the Debtors; and to pay administration costs, fees and

expenses of these Cases and claims or amounts approved by the Bankruptcy Court.  As set forth in the DIP Motion, the Debtors also seek authorization to execute and deliver the DIP Agreement and related documents and to perform such other and further acts as may be necessary or appropriate in connection therewith.

50.    In exchange for the DIP Loans, the DIP Obligations will receive joint and several superpriority allowed administrative expense claim status in the chapter 11 cases; and the DIP Secured Parties will receive postpetition security interests in and liens on the DIP Collateral first priority lien on all assets of the Debtors, including all property of their respective estates in the Cases, whether real or personal, tangible or intangible, now owned or hereafter acquired and all proceeds, profits, rents, accessions and substitutes thereof, that is not subject to (i) valid, perfected and non-avoidable liens in existence as of the Petition Date or (ii) valid and non-avoidable liens in existence as of the Petition Date that are perfected thereafter to the extent permitted by section 546(b) of the Bankruptcy Code; a first priority, senior priming lien on and security interest in all of the Debtors' assets subject to certain excluded assets and carve outs.

51.    The DIP Motion seeks further authority, subject to entry of the Final Order, to grant liens to the DIP Secured Parties on the proceeds of the Debtors' claims and chapter 5 causes of action.  The DIP Motion, if granted, provides authority for the Debtors to use, among other things, in accordance with the Budget, any cash collateral in which the Prepetition Secured Parties may have an interest and the granting of adequate protection to the Prepetition Secured Parties with respect to any diminution in value of their interests in the Prepetition Collateral arising from, inter alia, the Debtors' use of the Prepetition Collateral (including Cash Collateral), or the imposition of the automatic stay under section 362 of the Bankruptcy Code.

52.    The Debtors, therefore, request immediate authority to obtain postpetition financing and use Cash Collateral on an interim basis, as set forth in this Motion and in the Interim Order, to prevent immediate and irreparable harm to their estates pending the Final Hearing.