## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| BL RESTAURANTS HOLDING, LLC, *et al.*,[1] | ) Case No. 20-10156 (___) |
|  | ) |
| Debtors. | ) (Joint Administration Requested) |
|  | ) |

### DEBTORS' MOTION SEEKING ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTORS TO OBTAIN POSTPETITION FINANCING PURSUANT TO SECTION 364 OF THE BANKRUPTCY CODE, (II) AUTHORIZING THE USE OF CASH COLLATERAL PURSUANT TO SECTION 363 OF THE BANKRUPTCY CODE, (III) GRANTING ADEQUATE PROTECTION TO THE PREPETITION SECURED PARTIES PURSUANT TO SECTIONS 361, 362, 363 AND 364 OF THE BANKRUPTCY CODE, (IV) GRANTING LIENS AND SUPERPRIORITY CLAIMS, (V) MODIFYING AUTOMATIC STAY, AND (VI) SCHEDULING A FINAL HEARING

The above-captioned debtors and debtors in possession (collectively, the "Debtors")[2] respectfully submit this motion (the "DIP Motion")[3] for the relief set forth herein.  In support of hereof, the Debtors rely upon the First Day Declaration and the *Declaration of Vineet Batra in Support of the DIP Motion* (the "Batra Declaration"), filed contemporaneously herewith.  In further support of this DIP Motion, the Debtors respectfully state as follows:

---

[1]   The Debtors in these Chapter 11 Cases, along with the last four digits of each of the Debtors' respective federal tax identification numbers, are as follows: BL Restaurants Holding, LLC (6665); BL Restaurant Operations, LLC (7062); BL Restaurant Franchises, LLC (6923); and BL Hunt Valley, LLC (9513).  The Debtors' headquarters and mailing address is: 4550 Beltway Drive, Addison, TX 75001.

[2]   A detailed description of the Debtors and their businesses, and the facts and circumstances supporting this motion and the Debtors' chapter 11 cases, are set forth in greater detail in the *Declaration of Howard Meitiner in Support of Debtors' First Day Motions and Applications* (the "First Day Declaration"), filed contemporaneously with the Debtors' voluntary petitions for relief filed under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), on January 27, 2020 (the "Petition Date").

[3]   Capitalized terms used but not defined herein shall have the meanings given to them in the Interim Order or the DIP Credit Agreement, as applicable, both of which are defined below.

## RELIEF REQUESTED

1.      The Debtors seek entry of an interim order, substantially in the form attached hereto as **Exhibit A** (the "Interim Order"), and a final order (the "Final Order"[4] and, together with the Interim Order, the "DIP Orders"):

   (a)      authorizing the Debtors designated as "Borrower" and "Guarantors" under, and as defined in, the DIP Credit Agreement (as defined below) (collectively, the "DIP Borrowers") to obtain senior secured priming and superpriority postpetition financing, which if approved on a final basis, would consist of (i) a letter of credit facility composed of all existing prepetition Letters of Credit (as defined in the Prepetition First Lien Secured Credit Agreement (as defined below), collectively, the "Prepetition Letters of Credit"), including any renewals thereof (the "LC Facility"), (ii) a revolving credit facility (the "Revolver Facility," and advances thereunder, "Revolver Facility Advances") for up to $22,000,000 in principal, which would include a sublimit of $1,000,000 for Letters of Credit issued from and after the Petition Date (collectively, the "Postpetition Letters of Credit"), and (iii) upon entry of a Final Order (as defined below), the Prepetition First Lien Roll-Up (as defined below) (collectively with the LC Facility and Revolver Facility, the "DIP Facility") pursuant to the terms of (x) this Interim Order, (y) that certain Senior Secured Priming and Superpriority Debtor-in-Possession Credit Agreement, dated as of the Petition Date (as the same may be amended, restated, supplemented, or otherwise modified from time to time in accordance with its terms and the terms of the Interim Order, the "DIP Credit Agreement," attached as Exhibit B to the Interim Order), by and among the DIP Borrowers, Antares Capital LP ("Antares"), as administrative agent for all Lenders (as defined in the DIP Credit Agreement) (in such capacity, the "DIP Agent"), the financial institutions party to the DIP Credit Agreement as Lenders under the DIP Credit Agreement (the "DIP Lenders" and, together with the DIP Agent and any other party to which DIP Obligations (as defined below) are owed, the "DIP Secured Parties"), and (z) any and all other Loan Documents (as defined in the DIP Credit Agreement, and together with the DIP Credit Agreement, collectively, the "DIP Loan Documents");

   (b)      grants to the DIP Agent, for the benefit of itself and the other DIP Secured Parties, (x) Liens on all of the DIP Collateral (as defined below) pursuant to sections 364(c)(2), (c)(3) and (d) of the Bankruptcy Code, which Liens shall be senior to the Primed Liens (as defined below) and shall be junior solely to any valid, enforceable, and non-avoidable Liens that are (A) in existence on the Petition Date, (B) either perfected as of the Petition Date or perfected subsequent to the Petition Date solely to the extent permitted by section 546(b) of the Bankruptcy Code, and (C) senior in priority to the Prepetition First Liens (as defined below) and Prepetition Second

---

4      The Debtors will file a proposed Final Order prior to the Final Hearing.

2

Liens (as defined below) after giving effect to any intercreditor or subordination agreement (all such liens, collectively, the "Prepetition Prior Liens") and (y) pursuant to section 364(c)(1) of the Bankruptcy Code, superpriority administrative expense claims having recourse to all prepetition and postpetition property of the Debtors' estates, now owned or hereafter acquired, including, upon entry of the Final Order, any Debtors' rights under section 506(c) of the Bankruptcy Code and the proceeds thereof;

(c)     authorizing the Debtors to use "cash collateral," as such term is defined in section 363 of the Bankruptcy Code (the "Cash Collateral"), including, without limitation, Cash Collateral in which the Prepetition Secured Parties (as defined below) and/or the DIP Secured Parties have a Lien or other interest, in each case whether existing on the Petition Date, arising pursuant to this Interim Order or otherwise, and provides the respective Prepetition Secured Parties (as defined below) the Prepetition Secured Parties' Adequate Protection (as defined below) as set forth herein;

(d)     modifying the automatic stay imposed by section 362 of the Bankruptcy Code solely to the extent necessary to implement and effectuate the terms and provisions of the DIP Loan Documents and the DIP Orders;

(e)     authorizing the DIP Borrowers during the Interim Period (as defined below) to: (A) borrow an aggregate outstanding principal amount not to exceed $8,000,000 composed of advances under the Revolver Facility and the face amount of Postpetition Letters of Credit, and (B) permit to remain outstanding, and fund draws under, the full amount of the LC Facility;

(f)     scheduling a final hearing on the DIP Motion to be held on or prior to the Interim Period Outside Date (the "Final Hearing") to consider entry of a Final Order which grants all of the relief requested in the DIP Motion on a final basis and which Final Order shall be in form and substance (including with respect to any subsequent modifications to the form or substance made in response to objections of other creditors or the Court) acceptable to the DIP Agent; and

(g)     waiving any applicable stay (including under Bankruptcy Rule 6004) and provides for immediate effectiveness of the Interim Order and Final Order.

## PRELIMINARY STATEMENT[5]

2.     Immediate access to incremental liquidity in the form of postpetition financing (as well as access to Cash Collateral) is vital to preserving the value of the Debtors' estates and to

---

[5]     Capitalized terms used but not defined herein have the meanings ascribed to them in the DIP Credit Agreement, or the Interim Order, as applicable.

maximizing the likelihood of a successful sale process.  The Debtors will suffer immediate and irreparable harm absent access to additional liquidity.

3.      As described in the First Day Declaration, the Debtors commenced these chapter 11 cases to conduct a prompt sale of all or substantially all of their assets with the goal of maximizing value for all stakeholders.  Consummation of a sale transaction as soon as possible is in the best interests of the Debtors' estates.  The Debtors' ability to use Cash Collateral and access additional liquidity through the available DIP Facility is necessary to support the sale process contemplated.

4.      In an effort to support their ongoing business, the Debtors commenced negotiations with the Prepetition First Lien Secured Lenders (defined below) in September 2019.  While the Debtors did obtain a brief incremental additional amount of $3,000,000 of funding from the Prepetition First Lien Secured Lenders in October 2019, and had several conversations with the Prepetition First Lien Secured Lenders regarding further out-of-court funding, it became clear that the needed incremental financing would only be available in connection with the filing of these chapter 11 cases and the pursuit of the contemplated sale process by the Debtors.

5.      In addition, the Debtors, with the assistance of their advisors, solicited proposals for alternative debtor-in-possession financing from a variety of third-party potential lenders, including at least six financial institutions.  No actionable proposal or indication of interest in a debtor-in-possession financing facility was provided to the Debtors.

6.      As explained in the First Day Declaration, after significant back and forth with the Prepetition Secured Parties, the DIP Lenders agreed to provide $22,000,000 of new money postpetition financing, including $8,000,000 during the interim period and additional $14,000,000 upon entry of the Final Order.

4

7.      As discussed below, in the Batra Declaration and in the First Day Declaration, the provisions of the DIP Credit Agreement and the Interim Order were negotiated at arm's-length and in good faith, and the proposed DIP Facility provides the best terms presently available to the Debtors.  The Debtors firmly believe that incurrence of the DIP Facility will allow the Debtors to continue normal business operations while in chapter 11, including by paying their employees, vendors, landlords, and satisfying other working capital and operational requirements and is in the exercise of the Debtors' sound business judgment.  Satisfaction of these key obligations is necessary to preserve and maintain the value of the Debtors' estates while the Debtors pursues a sale of substantially all of their assets.  Accordingly, the Debtors have an immediate need to obtain postpetition or "DIP" financing and to use its Cash Collateral and, therefore, the Debtors respectfully request that the Court approve the entry of the Interim Order and the Final Order.

## JURISDICTION AND VENUE

8.      The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012.  The Debtors confirm their consent, pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), to the entry of a final order by the Court in connection with this motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

9.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

5

10.     The statutory bases for the relief requested herein are sections 105, 361, 362, 363, 364, 503, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, and 9014, and Local Rules 2002-1(b) and 4001-2.

## BACKGROUND

## I.     The Debtors' Prepetition Capital Structure.

11.     As of the Petition Date, the Debtors' capital structure consists of outstanding funded-debt obligations in the aggregate principal amount of approximately $87 million, and unsecured trade of $8 million, and other potential unsecured debt of approximately $6 million, exclusive of potential lease termination claims.

## A.     Prepetition First Lien Secured Credit Facility.

12.     The Prepetition First Lien Secured Lenders (as defined below) extended certain loans and made other financial accommodations to, and issued letters of credit for the account of, certain of the Debtors (the "Prepetition First Lien Facility"), pursuant to that to that certain Credit Agreement, dated as of March 27, 2014 (as amended, restated or otherwise modified from time to time prior to the Petition Date, the "Prepetition First Lien Secured Credit Agreement" and, collectively with any other agreements executed or delivered in connection therewith, and all other "Loan Documents" as defined therein, each as may be amended, restated, supplemented, or otherwise modified from time to time, the "Prepetition First Lien Loan Documents"), among (a) BL Restaurant Operations, LLC, as Borrower (as defined in the Prepetition First Lien Secured Credit Agreement, (b) the other Persons party thereto as Credit Parties (as defined in the Prepetition First Lien Secured Credit Agreement) (together with the Borrower, the "Prepetition Credit Parties"), (c) the financial institutions party thereto as "Lenders" (collectively, the "Prepetition First Lien Secured Lenders"), and (d) Antares, as agent (in such capacity, the "Prepetition First

6

Lien Secured Agent" and, together with the Prepetition First Lien Secured Lenders and any other party to which Prepetition First Lien Obligations (as defined below) are owed, the "Prepetition First Lien Secured Parties").

13.     Pursuant to a Guaranty and Security Agreement, dated as of March 27, 2014 (as amended, restated or otherwise modified from time to time prior to the Petition Date, the "Guaranty"), the Credit Parties (as defined in the Prepetition First Lien Secured Credit Agreement) unconditionally guaranteed the Borrower's obligations under the Prepetition First Lien Loan Documents.

14.     As of the Petition Date, the Debtors owed the Prepetition First Lien Secured Parties, pursuant to the Prepetition First Lien Loan Documents, without defense, counterclaim, or offset of any kind, in respect of loans made and letters of credit issued by the Prepetition First Lien Secured Parties:  (a) an aggregate principal amount of not less than $48,030,501.82 with respect to Term Loans (as defined in the Prepetition First Lien Secured Credit Agreement), an aggregate principal amount of not less than $14,409,875.00 with respect to Revolving Loans (as defined in the Prepetition First Lien Secured Credit Agreement),[6] and aggregate face amount of zero dollars ($0.00) with respect to Prepetition Letters of Credit, *plus* (b)(I) all obligations under any Secured Rate Contract, and (II) any other Obligations (each as defined in the Prepetition First Lien Secured Credit Agreement), *plus* (c) all accrued and hereafter accruing and unpaid interest thereon and any additional fees, expenses (including any reasonable attorneys', accountants', appraisers', and financial advisors' fees and expenses that are chargeable or reimbursable under the Prepetition

---

[6]  The Revolving Loans are composed of $11,409,875.00 in Original Revolving Loans and $3,000,000 in LIFO Revolving Loans (each as defined in the Prepetition First Lien Secured Credit Agreement).

First Lien Loan Documents), and other amounts now or hereafter due under the Prepetition First Lien Loan Documents and applicable law (collectively, the "Prepetition First Lien Obligations").

15.     Prior to the Petition Date and pursuant to the Collateral Documents (as defined in the Prepetition First Lien Secured Credit Agreement) (as such documents were amended, restated, supplemented, or otherwise modified from time to time prior to the Petition Date, the "Prepetition First Lien Collateral Documents"), by and among each of the Prepetition Credit Parties and the Prepetition First Lien Secured Agent, each Prepetition Credit Party granted to the Prepetition First Lien Secured Agent, for the benefit of itself and the other Prepetition First Lien Secured Parties, to secure the Prepetition First Lien Obligations, a first priority security interest in and continuing lien (the "Prepetition First Liens") on substantially all of such Prepetition Credit Party's assets and properties (including Cash Collateral) and all proceeds, products, accessions, and profits thereof, in each case whether then owned or existing or thereafter acquired or arising.  (All "Collateral," as defined in the Prepetition First Lien Secured Credit Agreement, granted or pledged by the Prepetition Credit Parties pursuant to any Prepetition First Lien Collateral Document or any other Prepetition First Lien Loan Document shall collectively be referred to herein as the "Prepetition First Lien Collateral").

16.     Additionally, the Prepetition Credit Parties have entered into deposit account control agreements in favor of the Prepetition First Lien Secured Agent with respect to their bank accounts.  Thus, substantially all of the Debtors' cash is subject to a perfected security interest in favor of the Prepetition First Lien Secured Agent.

**B.     Prepetition Intercreditor Agreement.**

17.     The Prepetition First Lien Secured Agent, the Prepetition Credit Parties, and the Prepetition Second Lien Secured Agent (as defined below) are parties to that certain Intercreditor

Agreement, dated as of August 30, 2017 (as amended, restated, supplemented, or otherwise modified in accordance with its terms, the "Intercreditor Agreement"), which sets forth subordination and other provisions governing the relative priorities and rights of the Prepetition First Lien Obligations and the Prepetition First Liens, on the one hand, and the Prepetition Second Lien Obligations and the Prepetition Second Liens (each term as defined below), on the other hand. The Debtors admit, stipulate, and agree that the Intercreditor Agreement was entered into in good faith and is fair and reasonable to the parties thereto and enforceable in accordance with the terms thereof.

C.    **Prepetition Second Lien Secured Credit Facility**

18.    The Prepetition Second Lien Secured Lenders (as defined below) extended certain loans and made other financial accommodations to, and issued letters of credit for the account of, certain of the Debtors (the "Prepetition Second Lien Facility"), pursuant to that certain Subordinated Credit Agreement, dated as of August 30, 2017 (as amended, restated or otherwise modified from time to time prior to the Petition Date, the "Prepetition Second Lien Secured Credit Agreement," collectively with any other agreements executed or delivered in connection therewith, each as may be amended, restated, supplemented, or otherwise modified from time to time, the "Prepetition Second Lien Loan Documents" and, together with the Prepetition First Lien Loan Documents, collectively the "Prepetition Secured Loan Documents"), among (a) the Persons designated as "Borrower" on the signature pages thereto (the "Prepetition Second Lien Borrowers"), (b) the other Credit Parties (as defined in the Prepetition Second Lien Secured Credit Agreement) party thereto, (c) the financial institutions party thereto as "Lenders" (as defined in the Prepetition Second Lien Secured Credit Agreement) (collectively, the "Prepetition Second Lien Secured Lenders"), and (d) BL Restaurants Group Holding Corp., as agent (in such capacity,

9

the "Prepetition Second Lien Secured Agent" and, together with the Prepetition Second Lien Secured Lenders and any other party to which Prepetition Second Lien Obligations (as defined below) are owed, the "Prepetition Second Lien Secured Parties" and, together with the Prepetition First Lien Secured Parties, the "Prepetition Secured Parties").

19.    As of the Petition Date, the Debtors owed the Prepetition Second Lien Secured Parties, pursuant to the Prepetition Second Lien Loan Documents, without defense, counterclaim, or offset of any kind, an aggregate principal amount of not less than $24.9 million, *plus* all prepetition accrued or, subject to section 506(b) of the Bankruptcy Code, postpetition accruing and unpaid interest thereon and any additional reasonable fees and expenses (including any reasonable attorneys', accountants', appraisers', and financial advisors' fees and expenses that are chargeable or reimbursable under the Prepetition Second Lien Loan Documents), and other amounts now or hereafter due under the Prepetition Second Lien Loan Documents and applicable law (collectively, the "Prepetition Second Lien Obligations" and, together with the Prepetition First Lien Obligations, the "Prepetition Secured Obligations").

20.    The Prepetition Second Lien Obligations are secured by Liens granted to the Prepetition Second Lien Secured Agent, for the benefit of the Prepetition Second Lien Secured Parties (the "Prepetition Second Liens" and, together with the Prepetition First Liens, the "Prepetition Liens"), on substantially all of the Debtors' assets and properties (including Cash Collateral) as set forth in the Prepetition Second Lien Loan Documents, whether then owned or existing or thereafter acquired or arising.  All "Collateral," as defined in the Prepetition Second Lien Secured Credit Agreement, granted or pledged by the Debtors pursuant to any Prepetition Second Lien Loan Documents shall collectively be referred to herein as the "Prepetition Second

Lien Collateral" and, together with the Prepetition First Lien Collateral, the "Prepetition Collateral").

## II.     Alternative Sources of Financing Are Not Readily Available.

21.     The Debtors do not have alternative sources of financing readily available.  The Prepetition Secured Parties assert that substantially all of the Debtors' assets are encumbered, which, along with the Debtors' existing capital structure, restricts the availability of, and options for, postpetition financing.  *See*  Batra Declaration ¶ 7.  The Prepetition First Lien Secured Agent also made it clear that it would not consent to "priming" debtor-in-possession financing provided by a third party.  *See* Batra Declaration ¶ 9.  Additionally, the Debtors', through its professionals, reached to at least six parties for a variety of financing solutions—yielded no actionable results.  Accordingly, the Debtors do not believe third-party debtor-in-possession financing would be reasonably obtainable.

22.     While negotiating the DIP Facility with the Debtors' existing Prepetition First Lien Secured Agent, the Debtors, with the assistance of its advisors, began soliciting indications of interest from at least six alternative third-party sources of asset based financing (including specialty lenders, distressed-oriented investors with experience in retail, and those that routinely provide debtor-in-possession financing), to gauge their interest in providing postpetition financing to the Debtors.  *See*  Batra Declaration ¶ 9. No party provided a proposal for alternative financing, with several parties explaining that their financing proposal would require priming of the Prepetition Secured Parties—likely resulting in expensive and distracting litigation at the critical start of these chapter 11 cases.  *See id.*

23.     Additionally, with any third-party proposal, the Debtors would incur the execution risk associated with a new lender transaction, including material timing and due diligence

constraints, necessarily involving the payment of additional professional fees.  In contrast, the proposed DIP Facility offered by the DIP Lenders allow the Debtors to avoid the need to engage in a costly and time-consuming priming fight at the outset of these chapter 11 cases.

## MATERIAL TERMS OF THE DIP FACILITY

24.    Bankruptcy Rule 4001(c)(1)(B) and Local Rule 4001-2 (a)(ii) require that a motion for authority to obtain credit list or summarize, and set out the location within the relevant documents, all material provisions of the proposed credit agreement and form of order, including interest rate, maturity, events of default, liens, borrowing limits and borrowing conditions. The principal terms of the DIP Facility are as follows[7]:

| Bankruptcy Rule | Summary of Material Terms |
| --- | --- |
| **Borrowers**<br>Bankruptcy Rule 4001(c)(1)(B) | BL Restaurant Operations, LLC<br><br>*See* DIP Credit Agreement Preamble. |
| **Guarantors**<br>Bankruptcy Rule 4001(c)(1)(B) | BL Restaurants Holding, LLC and BL Restaurant Franchises, LLC<br><br>*See* DIP Credit Agreement Preamble. |
| **DIP Agent**<br>Bankruptcy Rule 4001(c)(1)(B) | Antares Capital LP<br><br>*See* DIP Credit Agreement Preamble. |
| **DIP Lenders**<br>Bankruptcy Rule 4001(c)(1)(B) | The financial institutions from time to time a party to the DIP Credit Agreement.<br><br>*See* DIP Credit Agreement Preamble. |
| **Term**<br>Bankruptcy Rule 4001(b)(l)(B)(iii), 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(ii) | The earlier to occur of:   (a) July 27, 2020; (b) the effective date of a plan of reorganization in the Cases, (c) the Termination Declaration Date, (d) the date of the consummation of the sale of all or substantially all of the assets or Stock of the Credit Parties pursuant to section 363 of the Bankruptcy Code, and (e) the date all Obligations are indefeasibly paid in full in cash under the DIP Credit Agreement and the other Loan Documents are terminated.<br><br>*See* DIP Credit Agreement definition of "DIP Revolving Termination Date." |

---

[7]    The summaries contained in this motion are qualified in their entirety by the provisions of the documents referenced, including the DIP Loan Documents and the Interim Order.  To the extent anything in this motion is inconsistent with such documents, the terms of the applicable documents shall control.  Capitalized terms used in this summary chart but not otherwise defined have the meanings ascribed to them in the DIP Loan Documents or the Interim Order, as applicable.

12

| Bankruptcy Rule | Summary of Material Terms |
|---|---|
| **Commitment**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(ii) | The DIP Facility provides the Debtors with: (a) DIP Revolving Loan up to $8,000,000 on an interim basis and an aggregate of $22,000,000 on a final basis; (b) Letters of Credit Sublimit of $1,000,000; (c) Roll-Up Commitments for Pre-Petition LIFO Obligations and Pre-Petition Other Obligations, solely upon a Final Order.<br><br>*See* DIP Credit Agreement, definition of "Commitments" and § 1.3 |
| **Conditions of Borrowing**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(ii) | The closing of the DIP Facility and extensions of credit thereunder are subject to satisfaction of usual and customary conditions precedent, including entry of the Interim Order.<br><br>*See* DIP Credit Agreement §§ 2.2. |
| **Interest Rates**<br>Bankruptcy Rule 4001(c)(1)(B)<br>Local Rule 4001-2(a)(ii) | Rates and Payment of Interest.<br><br>Either Prime Rate *plus* 8.0% or LIBOR *plus* 9% per annum payable monthly in arrears on all Obligations under the DIP Credit Agreement, including the Rollup Loans.<br><br>During any Event of Default, the applicable rate *plus* 2.0%.<br><br>*See* DIP Credit Agreement §§ 1.5 and definitions of "LIBOR", "Base Rate" and "Applicable Margin". |
| **Use of DIP Financing Facility and Cash Collateral**<br>Bankruptcy Rule 4001(b)(l)(B)(ii)<br><br>Local Rule 4001-2(a)(ii) | For (i) working capital (excluding capital expenditures) to the extent set forth in, and in accordance with, the Approved Budget, (ii) maintenance capital expenditures to the extent set forth in, and in accordance with, the Approved Budget, (iii) payment of costs of administration of the chapter 11 cases to the extent set forth in, and in accordance with, the Approved Budget, (iv) Permitted Expenses, (v) the unpaid fees, costs, and disbursements of professionals in the chapter 11 cases as set forth in the definition of the term "Carve-Out" in the DIP Order, (vi) such Pre-Petition Obligations as the Agent consents to and the Bankruptcy Court approves, in each case in a manner consistent with the terms and conditions contained herein and in the DIP Orders, and to the extent set forth, and in accordance with, the Approved Budget, or as otherwise expressly permitted under this Agreement and (vii) the roll-up of the Pre-Petition Obligations upon entry of the Final Order as contemplated herein and in the DIP Orders.<br><br>*See* DIP Credit Agreement § 4.10. |
| **Adequate Protection**<br>Bankruptcy Rules 4001(b)(l)(B)(iv), 4001(c)(1)(B)(ii) | Adequate Protection Liens. Pursuant to sections 361, 363(e) and 364(d) of the Bankruptcy Code, as adequate protection of the interests of the Prepetition Secured Parties in the Prepetition Collateral against any Diminution in Value of such interests in the Prepetition Collateral, the Debtors seek authority to grant to the Prepetition Secured Parties, additional and replacement, continuing, valid, binding, enforceable and automatically perfected postpetition security interests in and liens on the DIP Collateral.<br><br>Adequate Protection Superpriority Claims. As further adequate protection of the interests of the Prepetition Secured Parties in the Prepetition Collateral against any Diminution in Value of such interests in the Prepetition Collateral since the Petition Date, the Debtors seek authority to allow the Court to grant to the Prepetition Secured Parties, to the extent provided by section 507(b) of the Bankruptcy Code, an allowed superpriority administrative expense claim in each of the Cases and any Successor Cases; *provided,* that such superpriority expense claim shall be subject to the Carve Out, the Prepetition Prior Liens and the DIP Liens. |

13

| Bankruptcy Rule | Summary of Material Terms |
|---|---|
| | **Adequate Protection Interest, Fees and Expenses.** Debtors shall (i) pay or reimburse currently the Prepetition First Lien Secured Parties for any and all of their accrued and past-due fees, costs, expenses, and charges to the extent, and at the times, payable under the Prepetition First Lien Loan Documents, (ii) on the last day of each calendar month commencing after the Petition Date, pay to the Prepetition First Lien Secured Agent for prompt distribution to the applicable Prepetition First Lien Secured Parties any and all of the interest accruing on the Prepetition First Lien Obligations under the Prepetition First Lien Secured Credit Agreement (i) in cash with respect to the LIFO Revolving Loans and (ii) in kind with respect to all other Prepetition First Lien Obligations) (and in the case of the first month after the Petition Date, all accrued and unpaid prepetition interest shall also be due and payable (which, for the avoidance of doubt, shall be paid (i) in cash with respect to the LIFO Revolving Loans and (ii) in kind with respect to all other Prepetition First Lien Obligations)) at the default rate provided for in the Prepetition First Lien Secured Credit Agreement, and (iii) pay currently all reasonable out-of-pocket fees, costs, and expenses of the Prepetition First Lien Secured Parties (including without limitation reasonable attorneys' fees and costs and reasonable consulting, accounting, appraisal, investment banking and similar professional fees and charges) in accordance with the Prepetition First Lien Secured Loan Documents, in the case of each of sub-clauses (i), (ii), and (iii) above, all whether accrued prepetition or postpetition and whether or not budgeted in the Approved Budget, and without further notice (except as provided in Paragraph 20(b) below with respect to postpetition professional fees, costs, and expenses), motion, or application to, order of, or hearing before, the Court. <br><br> **Credit Bid.** The DIP Agent (on behalf of the DIP Secured Parties) and the Prepetition First Lien Secured Agent (on behalf of the Prepetition First Lien Secured Parties) or their respective assignees, designees, or successors, shall automatically be deemed a "qualified bidder" with respect to any disposition of DIP Collateral, and subject to a Final Order, shall have the right (unless this Court for cause orders otherwise after notice and a hearing upon request of any party in interest prior to the Qualified Bid Deadline) to "credit bid" up to the full amount of the DIP Obligations and the Prepetition First Lien Obligations with the consent of Requisite DIP Lenders and Requisite Prepetition First Lien Lenders, respectively (including the DIP Superiority Claims and the First Lien Adequate Protection Superiority Claims, as applicable, to the extent such claims have any value), during any disposition of all or any portion of the DIP Collateral or Prepetition Collateral, as applicable (in all cases excluding sales in the Debtors' ordinary course of business in accordance with this Interim Order and the DIP Loan Documents), or any deposit in connection with such sale, including, without limitation, sales occurring pursuant to section 363 of the Bankruptcy Code or included as part of any reorganization plan subject to confirmation under section 1129(b)(2)(A)(iii) of the Bankruptcy Code. <br><br> The Prepetition Second Lien Secured Agent (on behalf of the Prepetition Second Lien Secured Parties) or its assignee, designee, or successor, shall automatically be deemed a "qualified bidder" with respect to any disposition of Prepetition Collateral and/or DIP Collateral, and subject to a Final Order, shall have the right (unless this Court for cause orders otherwise after notice and a hearing upon request of any party in interest prior to the Qualified Bid Deadline) to "credit bid" up to the amount of the Prepetition Second Lien Obligations with the consent of Prepetition Second Lien Secured Lenders constituting "Required Lenders" under the Prepetition Second Lien Secured Credit Agreement ("Requisite Prepetition Second Lien Lenders") (including its Second Lien Adequate Protection Superiority Claim to the extent such Second Lien Adequate Protection Superiority Claim has any value) during any disposition of all or any portion of the Prepetition Collateral and DIP Collateral (in the case of the DIP Collateral, |

14

| Bankruptcy Rule | Summary of Material Terms |
|---|---|
| | only to the extent of the value of the Second Lien Adequate Protection Superpriority Claim resulting from a postpetition Diminution in Value of the Prepetition Second Lien Collateral as provided herein) (in all cases excluding sales in the Debtors' ordinary course of business in accordance with this Interim Order and the DIP Loan Documents), or any deposit in connection with such sale, including, without limitation, sales occurring pursuant to section 363 of the Bankruptcy Code or included as part of any reorganization plan subject to confirmation under section 1129(b)(2)(A)(iii) of the Bankruptcy Code; provided, that any such "credit bid" provides for Payment in Full of all DIP Obligations and Prepetition First Lien Obligations at the closing of such transaction unless otherwise agreed by the DIP Agent (with the consent of the Requisite DIP Lenders) and the Prepetition First Lien Secured Agent (with the consent of the Requisite Prepetition First Lien Lenders), in their sole and absolute discretion.<br><br>*See* Interim Order ¶¶ 4 and 5. |
| **Repayment Features** <br> Local Rule 4001-2(a)(i)(E) | Payment due upon "DIP Revolving Termination Date" with permitted prepayments and mandatory prepayments upon various events.<br>*See* DIP Credit Agreement §1.10 and definition of "DIP Revolving Termination Date". |
| **Fees** <br> Bankruptcy Rule 4001(c)(1)(B) <br><br> Local Rule 4001-2(a)(ii) | Arranger Fee of $50,000<br><br>Closing Fee of 3.0% of the DIP Revolving Loan Commitment ($22,000,000)<br><br>Unused Commitment Fee of 1%<br><br>*See* DIP Credit Agreement § 1.1. |
| **Budget** <br> Bankruptcy Rule 4001 (c)(1)(B) <br> Local Rule 4001-2(a)(ii) | <u>Budget</u>.  Attached as <u>Exhibit A</u> to the Interim Order. |
| **Budget Covenant (Variances)** <br><br> Bankruptcy Rule 4001(c)(l)(B) <br><br> Local Rule 4001-2(a)(ii) | The Debtors shall only incur DIP Obligations and expend Cash Collateral and other DIP Collateral proceeds in accordance with the specific purposes, and at the specific time periods, set forth in the Approved Budget, subject to the following permitted variances: (i) as of the close of business of the last Business Day of each fiscal week (beginning with the first full fiscal week following the Petition Date), for the shorter of (A) the number of weeks that have elapsed since the Petition Date and (B) the preceding six fiscal week-period, (I) cumulative cash receipts shall exceed 90.0% of the cumulative cash receipts set forth for such period in the Approved Budget, (II) cumulative cash disbursements (exclusive of food, beverage and alcohol costs, and the line-items in the Approved Budget identified as KEIP/KERP (the "KEIP/KERP Line Item"), Marketing, G&A Expenses, Rent and Facilities Expense, Maintenance and Remodel Capex, Debtor Professionals, and Committee Professionals (all such line-item expenditures, including the KEIP/KERP Line Item, the "Line Item Expenditures")) shall not exceed 110.0% of the cumulative cash disbursements (exclusive of food, beverage and alcohol costs and Line Item Expenditures) set forth for such period in the Approved Budget; (ii) as of the close of business of the last Business Day of each fiscal week (beginning with the first full fiscal week following the Petition Date), for the shorter of (A) the number of weeks that have elapsed since the Petition Date and (B) the preceding four fiscal week-period, (I) cash disbursements with respect to the KEIP/KERP Line Item shall not exceed 100.0% of the cash disbursements for the KEIP/KERP Line Item set forth for such period in the |

| Bankruptcy Rule | Summary of Material Terms |
|---|---|
| | Approved Budget, and (II) for each Line Item Expenditure other than the KEIP/KERP Line Item, cash disbursements with respect to such Line Item Expenditure shall not exceed 105.0% of the cash disbursements for such Line Item Expenditure set forth for such period in the Approved Budget; (iii) as of the close of business of the last Business Day of each fiscal week (beginning with the first full fiscal week following the Petition Date), for the number of weeks that have elapsed since the Petition Date, (I) cumulative cash disbursements with respect to all Line Item Expenditures minus the cumulative cash disbursements for all Line Item Expenditures set forth in Approved Budgets shall not exceed $300,000, and (II) cumulative net cash flow shall not be less than the cumulative net cash flow set forth in Approved Budgets minus $150,000.<br><br>*See* Interim Order ¶¶ 2(e) |
| **Events of Default**<br>Bankruptcy Rule 4001(c)(l)(B)<br><br>Local Rule 4001-2(a)(ii) | Usual and customary for financings of this type, including non-payment of obligations, defaults under covenants, breaches of representations and warranties, defaults related to the budget, cross-defaults to other indebtedness, attachment defaults, judgment defaults, invalidity of loan documents, change of control, failure to comply with ERISA rules and regulations, invalidity of collateral documents, change of control, invalidity of postpetition loan documents, failure to achieve any of the Required Milestones the occurrence of any number of adverse actions or consequences in any of the chapter 11 cases.<br><br>*See* DIP Credit Agreement § 7.1. |
| **Costs and Expenses:**<br>Bankruptcy Rule 4001(c)(1)(B)(ix) | Debtors shall (i) pay or reimburse currently the Prepetition First Lien Secured Parties for any and all of their accrued and past-due fees, costs, expenses, and charges to the extent, and at the times, payable under the Prepetition First Lien Loan Documents, (ii) on the last day of each calendar month commencing after the Petition Date, pay to the Prepetition First Lien Secured Agent for prompt distribution to the applicable Prepetition First Lien Secured Parties any and all of the interest accruing on the Prepetition First Lien Obligations under the Prepetition First Lien Secured Credit Agreement (which, for the avoidance of doubt, shall be paid (i) in cash with respect to the LIFO Revolving Loans and (ii) in kind with respect to all other Prepetition First Lien Obligations) (and in the case of the first month after the Petition Date, all accrued and unpaid prepetition interest shall also be due and payable (which, for the avoidance of doubt, shall be paid (i) in cash with respect to the LIFO Revolving Loans and (ii) in kind with respect to all other Prepetition First Lien Obligations)) at the default rate provided for in the Prepetition First Lien Secured Credit Agreement, and (iii) pay currently all reasonable out-of-pocket fees, costs, and expenses of the Prepetition First Lien Secured Parties (including without limitation reasonable attorneys' fees and costs and reasonable consulting, accounting, appraisal, investment banking and similar professional fees and charges) in accordance with the Prepetition First Lien Secured Loan Documents, in the case of each of sub-clauses (i), (ii), and (iii) above, all whether accrued prepetition or postpetition and whether or not budgeted in the Approved Budget, and with ten (10) days' notice to the Debtors, U.S. Trustee and Committee to file an objection.<br><br>*See* Interim Order ¶¶ 4(e) and 20(b). |
| **Milestones:**<br>Bankruptcy Rule 4001(c)(1)(B) | Achieve each of the following Required Milestones:<br><br>(a)      on or prior to January 28, 2020, the Debtors shall file the Sale Procedures Motion and proposed form of Sale Procedures Order and a motion to approve the sale of |

16

| Bankruptcy Rule | Summary of Material Terms |
|---|---|
| | substantially all of the Debtors' assets to a stalking horse purchaser subject to higher and better offers and which shall be in form and substance reasonably acceptable to the DIP Agent (the "<u>Sale Motion</u>"); |
| | (b)   the hearing on the Sale Procedures Motion shall be completed on or prior to February 26, 2020; |
| | (c)   the Sale Procedures Order shall have been entered by this Court on or prior to February 28, 2020; |
| | (d)   on or prior to March 18, 2020, all qualified bids (pursuant to which potential bidders shall have unconditionally waived or satisfied all financing and diligence outs) shall be due (which bid deadline shall not be extended without the consent of the DIP Agent and Requisite DIP Lenders) (the "<u>Qualified Bid Deadline</u>"); |
| | (e)   the auction shall, if necessary, be commenced on or prior to March 20, 2020; |
| | (f)   the hearing on the Sale Motion to approve the sale to the winning bidder shall have concluded on or prior to March 27, 2020 (the proceeds of such sale shall be used to repay in cash all DIP Obligations and Prepetition First Lien Obligations on the closing thereof   or   such   sale   shall   otherwise   be   on   terms,   and   pursuant   to   definitive documentation, acceptable to the DIP Agent, Requisite DIP Lenders, Prepetition First Lien Secured Agent and Requisite Prepetition First Lien Lenders) (such sale, an "<u>Acceptable Sale</u>"); |
| | (g)   an order approving an Acceptable Sale shall have been entered by this Court on or prior to March 31, 2020; and |
| | (h)   on or prior to April 22, 2020, such Acceptable Sale shall have been consummated pursuant to definitive documentation acceptable in form and substance to the DIP Agent and Requisite DIP Lenders. |
| | *See* Interim Order ¶ 2(f). |

## **HIGHLIGHTED PROVISIONS PURSUANT TO LOCAL RULE 4001-2**

25.    The DIP Facility includes certain provisions the Debtors are required to highlight pursuant to Local Rule 4001-2(a)(i) as set forth in the chart below.  As discussed in detail herein, the Debtors believe these provisions are reasonable in light of the facts and circumstances of these chapter 11 cases and should be approved.

26.    **Cross Collateralization**:  Pursuant to Local Rule 4001-2(a)(i)(A)a movant must identify any provisions that grants cross-collateralization protections.  The DIP Facility does <u>not</u> contain any cross-collateralization provisions.

17

27.     **Validity, Perfection and Amount of Prepetition Obligations:** Pursuant to Local Rule 4001-2(a)(i)(B), a movant must identify any provisions that contain findings of fact that bind the estate or other parties in interest with respect to the validity, perfection or amount of the secured creditor's prepetition lien or the waiver of claims against the secured creditor.  The Debtors have agreed and stipulated that the Prepetition First Lien Secured Facility and Prepetition Second Lien Secured Facility is a valid and binding agreement, and the Liens related thereto constitute valid, binding, enforceable and perfected Liens.  Additionally, the Debtors have waived, discharged and released any right they may have to challenge any of the indebtedness pursuant to the Prepetition First Lien Secured Facility and Prepetition Second Lien Secured Facility or the security for those obligations.  *See* Interim Order at ¶ D (i)-(v) and ¶ E (i)-(iv).

28.     **Committee Challenge Period**: Local Rule 4001-2(a)(i)(B) also requires disclosure of the challenge period with respect to the Debtors' Stipulations.  Here, all non-debtor parties in interest (including any trustee or Committee appointed in the Cases) who have been granted the requisite standing shall have until the earliest of (i) the 60 days from the formation of a Committee, (ii) if no Committee is formed, the 75 days after entry of the Interim Order, or (iii) the Qualified Bid Deadline to investigate the validity, perfection, and enforceability of the Liens of the Prepetition Secured Parties and the claims of the Prepetition Secured Parties and to assert any claims or causes of action against the Prepetition Secured Parties. *See* Interim Order at ¶ 7.

29.     **Waiver of Section 506(c) of the Bankruptcy Code**: Local Rule 4001-2(a)(i)(C) requires disclosure of provisions that constitute a waiver, *without notice*, of whatever rights the estate may have under section 506(c) of the Bankruptcy Code.  The Interim Order provides that the waiver of any rights under section 506(c) of the Bankruptcy Code is subject to entry of the Final Order.  Because this waiver only will be effective upon entry of the Final Order and to the

18

extent such order so provides, the Debtor respectfully submits that parties in interest will have an opportunity to be heard and, as such, the waiver will not be "without notice," but the Debtor discloses the provision out of an abundance of caution. *See* Interim Order at ¶ 9.

30.     **Liens on Avoidance Actions**: Local Rule 4001-2(a)(i)(D) requires disclosure of provisions that provide for immediate liens on actions under sections 544, 545, 547, 548 and 549 of the Bankruptcy Code. Here, solely upon entry of the Final Order will DIP Liens be granted on such actions. *See* Interim Order at ¶ 2(j).

31.     **Roll-Up Provisions**: Pursuant to Local Rule 4001-2(a)(i)(E)), a movant must identify any roll-up provisions. Solely upon entry of the Final Order and closing of the DIP Facility, the total outstanding amount of the Prepetition Facility shall be replaced and refinanced by the DIP Obligations. *See* Interim Order at ¶ 4(a). The Debtor believes that such relief is often provided, and appropriate, upon entry of the Final Order.

32.     **Carve-Out**: Local Rule 4001-2(a)(i)(F) requires disclosure of *disparate* treatment between the professionals retained by the Debtor and the professionals retained by the unsecured creditors' committee, if any, with respect to a professional fee carve out. Budgeted professional fees comprise the primary component of the Carve-Out. The Budget provides different amounts for Committee professionals and Debtor professionals. The Debtors submit the proposed amounts are common in cases of similar size before the Court, accurately accounts for the increased administrative tasks required of Debtors' professionals and are reasonable and appropriate under the circumstances. *See* Interim Order at ¶ 8.

33.     **Nonconsensual Priming**: Pursuant to Local Rule 4001-2(a)(i)(G), a movant must identify any provisions that seek to prime any secured lien without the consent of that lienor. The

Debtors do not anticipate that the Interim Order or the Final Order provide for any nonconsensual priming.

34.     **Waiver of Section 552(b)(1)**: Pursuant to Local Rule 4001-2(a)(i)(H), a movant must identify any provisions that seek to affect the Court's power to consider the equities of the case under 11 U.S.C. § 552(b)(1).  Solely upon entry of the Final Order, the DIP Agent, the DIP Lenders and the Prepetition Secured Parties shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the DIP Agent, the DIP Lenders and the Prepetition Secured Parties with respect to proceeds, product, offspring or profits of any of the Prepetition Collateral or DIP Collateral.  *See* Interim Order at ¶ 27.  The Debtor believes that such relief is often provided, and appropriate, upon entry of the Final Order.

35.     The DIP Lender would not have agreed to provide the DIP Facility and consented to the use of Cash Collateral, and the Prepetition Secured Parties would not have consented to having their prepetition liens primed, without the inclusion of the aforementioned provisions, each of which was heavily negotiated among the various parties.  Moreover, as discussed below, these provisions are justified under the circumstances.  Finally, the Debtors determined in its sound business judgment, that agreeing to such provisions was appropriate under the circumstances of these chapter 11 cases to afford the Debtors immediate and much needed liquidity to fund, on the most competitive terms available, its ongoing operations and the sale process in these chapter 11 cases.

**BASIS FOR RELIEF**

I.     **The Debtors Should Be Authorized to Obtain Postpetition Financing Through the DIP Loan Documents.**

    A.     **Entry into the DIP Loan Documents Is an Exercise of the Debtors' Sound Business Judgment.**

36.     The Court should authorize the Debtors, as an exercise of their sound business judgment, to enter into the DIP Loan Documents, obtain access to the DIP Facility, and continue using Cash Collateral.  Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or superpriority financing under certain circumstances discussed in detail below.  Courts grant a debtor-in-possession considerable deference in acting in accordance with its business judgment in obtaining postpetition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code.  *See, e.g.*, *In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving a postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment"); *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

37.     Specifically, to determine whether the business judgment standard is met, a court need only "examine whether a reasonable businessperson would make a similar decision under similar circumstances."  *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also*

*In re Curlew Valley Assocs.*, 14 B.R. 506, 513–14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code").

38.    Furthermore, in considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender.  *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Elingsen McLean Oil Co., Inc.)*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard bargains" to acquire funds for its reorganization).   The Court may also appropriately take into consideration non-economic benefits to the Debtors offered by a proposed postpetition facility.  For example, in *In re ION Media Networks. Inc.*, the bankruptcy court for the Southern District of New York held that:

> Although all parties, including the Debtors and the Committee, are naturally motivated to obtain financing on the best possible terms, a business decision to obtain credit from a particular lender is almost never based purely on economic terms.  *Relevant features of the financing must be evaluated, including non-economic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization.*  This is particularly true in a bankruptcy setting where cooperation and establishing alliances with creditor groups can be a vital part of building support for a restructuring that ultimately may lead to a confirmable reorganization plan.  That which helps foster consensus may be preferable to a notionally better transaction that carries the risk of promoting unwanted conflict.

No. 09-13125, 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009) (emphasis added).

39.    The Debtors' determination to move forward with the DIP Facility is an exercise of their sound business judgment following an arm's-length process and careful evaluation.

22

Specifically, the Debtors and their advisors determined that postpetition financing will create certainty with respect to cash flows necessary for the administration of these chapter 11 cases through a sale process. The Debtors negotiated the DIP Credit Agreement and other DIP Loan Documents with the DIP Agent in good faith, at arm's length, and with the assistance of their respective advisors. The Debtors conducted intensive negotiations with their Prepetition Secured Parties that resulted in the proposed DIP Facility, which provides reasonable milestones for the Debtors to conduct an appropriate sale process. Given the Debtors' capital structure and current circumstances, the Debtors believe that they have obtained the best financing available. Accordingly, the Court should authorize the Debtors' entry into the DIP Loan Documents, as it is a reasonable exercise of the Debtors' business judgment.

**B.      The Debtors Should Be Authorized to Grant Liens and Superpriority Claims.**

40.      The Debtors propose to obtain financing under the DIP Facility by providing security interests and liens as set forth in the DIP Loan Documents pursuant to section 364(c) of the Bankruptcy Code. Specifically, the Debtors propose to provide to the DIP Secured Parties postpetition security interests in and liens on the DIP Collateral (as defined in the Interim Order) that are valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination immediately upon entry of the Interim Order:

(a)      The DIP Liens securing the DIP Obligations will be senior priming liens on the Prepetition Collateral, senior in priority to all Prepetition Liens thereon and any Adequate Protection Liens thereon, except that the DIP Liens will be junior to:

i.      the Carve Out; and

ii.      Prepetition Prior Liens, which is defined as: "any valid, enforceable, and non-avoidable Liens that are (A) in existence on the Petition Date, (B) either perfected as of the Petition Date or perfected subsequent to the Petition Date solely to the extent permitted by

23

section 546(b) of the Bankruptcy Code, and (C) senior in priority to the Prepetition First Liens (as defined below) and Prepetition Second Liens (as defined below) after giving effect to any intercreditor or subordination agreement." *See* Interim Order at p. 3.

41.     The statutory requirement for obtaining postpetition credit under section 364(c) is a finding, made after notice and hearing, that a debtor is "unable to obtain unsecured credit allowable under Section 503(b)(1) of [the Bankruptcy Code]." 11 U.S.C. § 364(c). *See In re Crouse Grp., Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured credit under section 364(c) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained). Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code. Specifically, courts look to whether:

(a)     the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code, *i.e.*, by allowing a lender only an administrative claim;

(b)     the credit transaction is necessary to preserve the assets of the estate; and

(c)     the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and proposed lenders.

*See In re Los Angeles Dodgers LLC*, 457 B.R. 308 (Bankr. D. Del. 2011); *In re Ames Dep't Stores*, 115 B.R. 34, 37–40 (Bankr. S.D.N.Y. 1990); *see also In re St. Mary Hosp.*, 86 B.R. 393, 401-02 (Bankr. E.D. Pa. 1988); *Crouse Grp.*, 71 B.R. at 549.

42.     As described above and as set forth in the Batra Declaration, third-party lenders were unwilling to provide postpetition financing on an unsecured basis or otherwise junior to the Prepetition Secured Parties. *See* Batra Declaration ¶ 9. Therefore, the Debtors, in consultation with their advisors, concluded that any workable financing in connection with a chapter 11 filing would likely require the support of, or be provided by, the Debtors' existing lenders. *See* Batra Declaration ¶¶ 11 and 14. Absent the DIP Facility, which will provide certainty that the Debtors

24

will have sufficient liquidity to administer these chapter 11 cases and to continue operating in the ordinary course, the value of the Debtors' estates would be significantly impaired to the detriment of all stakeholders.  Given the Debtors' circumstances, the Debtors believe that the terms of the DIP Facility, as set forth in the DIP Agreements, are fair, reasonable, and adequate, all as more fully set forth below.  For all these reasons, the Debtors submit that they have met the standard for obtaining postpetition financing.

43.    In the event that a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, section 364(c) provides that a court "may authorize the obtaining of credit or the incurring of debt (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Bankruptcy Code]; (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or (3) secured by a junior lien on property of the estate that is subject to a lien." As described above, the Debtors are unable to obtain unsecured credit.  Therefore, approving superpriority claims in favor of the DIP Secured Parties is reasonable and appropriate.

44.    Further, section 364(d) provides that a debtor may obtain credit secured by a senior or equal lien on property of the estate already subject to a lien, after notice and a hearing, where the debtor is "unable to obtain such credit otherwise" and "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted." 11 U.S.C. § 364(d)(1).  The Debtors may incur "priming" liens under the DIP Facility if either (a) the Prepetition Secured Parties have consented or (b) Prepetition Lenders' interests in collateral are adequately protected.  *See, e.g.*, *Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 122 (N.D. Ga. 1989) ("[B]y tacitly consenting to the superpriority

25

lien, those [undersecured] creditors relieved the debtor of having to demonstrate that they were adequately protected.").

45.    Here the Prepetition Secured Parties have consented to the DIP Facility so long as they are provided the adequate protection described in the Interim Order.  The Debtors submit that its provision of adequate protection as described herein is fair and reasonable and satisfies the requirements of section 364(d)(1)(B) of the Bankruptcy Code.

### B.    No Comparable Alternative to the DIP Facility Is Reasonably Available.

46.    A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by sections 364(c) of the Bankruptcy Code. *In re Snowshoe Co., Inc.*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see also In re Plabell Rubber Prods., Inc.*, 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992).  Moreover, in circumstances where only a few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing."  *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986) (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met); *In re Ames Dep't Stores*, 115 B.R. at 37–39 (debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b)).

47.    As noted above, the Debtors do not believe that alternative sources of financing are reasonably available given the realities imposed by the Debtors' existing capital structure and the

Debtors' unsuccessful solicitation of alternative financing proposals. Substantially all of the Debtors' existing assets are encumbered. *See* First Day Declaration ¶¶ 12 and 17; Batra Declaration ¶ 7. Moreover, the Debtors have searched for actionable alternative proposals—in this regard, the market has spoken. There are no other options. Thus, the Debtors have determined that the DIP Facility provides the best opportunity available to the Debtors under the circumstances to fund these chapter 11 cases. *See* First Day Declaration Exhibit B, ¶ 47; Batra Declaration ¶¶ 11 and 14. Therefore, in addition to evidence to be introduced at the hearing on the Interim Order if necessary, the Debtors submit that the requirement of section 364 of the Bankruptcy Code that alternative credit on more favorable terms be unavailable to the Debtors is satisfied.

## II.     The Debtors Should Be Authorized to Use Cash Collateral.

48.     Section 363 of the Bankruptcy Code generally governs the use of estate property. Section 363(c)(2)(A) permits a debtor in possession to use cash collateral with the consent of the secured party. Here, the Prepetition Secured Parties consent to the Debtors' use of the Cash Collateral (as well as the Prepetition Collateral), subject to the terms and limitations set forth in the Interim Order.

49.     Section 363(e) provides for adequate protection of interests in property when a debtor uses cash collateral. Further, section 362(d)(1) of the Bankruptcy Code provides for adequate protection of interests in property due to the imposition of the automatic stay. *See In re Cont'l Airlines*, 91 F.3d 553, 556 (3d Cir. 1996) (*en banc*). While section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as granting replacement liens and administrative claims, courts decide what constitutes sufficient adequate protection on a case-by-case basis. *In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994); *In re Satcon Tech. Corp.*, No. 12-12869 (KG), 2012 WL 6091160, at *6 (Bankr. D. Del. Dec. 7, 2012); *In re*

27

*N.J. Affordable Homes Corp.*, No. 05-60442 (DHS), 2006 WL 2128624, at *14 (Bankr. D.N.J.

June 29, 2006); *In re Columbia Gas Sys., Inc.*, Nos. 91-803, 91-804, 1992 WL 79323, at *2 (Bankr.

D. Del. Feb. 18, 1992); *see also In re Dynaco Corp.*, 162 B.R. 389, 394 (Bankr. D.N.H. 1993)

(citing 2 Collier on Bankruptcy ¶ 361.01[1] at 361–66 (15th ed. 1993) (explaining that adequate

protection can take many forms and "must be determined based upon equitable considerations

arising from the particular facts of each proceeding").

50.   As described more fully below, and as set forth in the Interim Order, the Debtors

propose to provide the Prepetition Secured Parties with a variety of adequate protection to protect

against the postpetition diminution in value of the Cash Collateral (as well as the Prepetition

Collateral) resulting from the use of the Cash Collateral by the Debtors and the imposition of the

automatic stay (collectively, the "Adequate Protection Obligations"):

(a)   For the Benefit of the Prepetition First Lien Secured Parties (*See* Interim Order at ¶ 4), the following:

(i)   subject to and only upon entry of a Final Order, all Prepetition First Lien Obligations, including on account of Prepetition Letters of Credit, shall immediately, automatically, and irrevocably be deemed to have been converted into DIP Obligations and incurred under the DIP Facility (the "Prepetition First Lien Roll-Up");

(ii)   valid and perfected replacement security interests in and liens on the DIP Collateral to the extent of Diminution in Value of the Prepetition First Lien Collateral ("Prepetition First Lien Adequate Protection Replacement Liens");

(iii)   to the extent of Diminution in Value of the Prepetition First Lien Collateral, allowed superpriority administrative expense claims (such adequate protection superpriority claims, the "First Lien Adequate Protection Superpriority Claims");

(iv)   payment of the Prepetition First Lien Secured Parties' reasonable professional fees and expenses;

(v)   interest accruing on the Prepetition First Lien Obligations under the Prepetition First Lien Secured Credit Agreement (which, for the avoidance

of doubt, shall be paid (x) in cash with respect to the LIFO Revolving Loans and (y) in kind with respect to all other Prepetition First Lien Obligations; and

(vi)     each of the DIP Agent (on behalf of the DIP Secured Parties) and the Prepetition First Lien Secured Agent (on behalf of the Prepetition First Lien Secured Parties) shall automatically be deemed a "qualified bidder" with respect to any disposition of DIP Collateral, and subject to a Final Order, shall have the right (unless this Court for cause orders otherwise after notice and a hearing upon request of any party in interest prior to the Qualified Bid Deadline) to "credit bid" up to the full amount of the DIP Obligations and the Prepetition First Lien Obligations.

(b)     For the Benefit of the Prepetition Second Lien Secured Parties (*See* Interim Order at ¶ 5), the following:

(i)     valid and perfected replacement security interests in and liens on the DIP Collateral to the extent of Diminution in Value of the Prepetition Second Lien Collateral ("<u>Prepetition Second Lien Adequate Protection Replacement Liens</u>");

(ii)     to the extent of Diminution in Value of the Prepetition Second Lien Collateral, allowed superpriority administrative expense claims (such adequate protection superpriority claims, the "<u>First Lien Adequate Protection Superpriority Claims</u>");

(iii)     the Prepetition Second Lien Secured Agent (on behalf of the Prepetition Second Lien Secured Parties) shall automatically be deemed a "qualified bidder" with respect to any disposition of DIP Collateral, and subject to a Final Order, shall have the right (unless this Court for cause orders otherwise after notice and a hearing upon request of any party in interest prior to the Qualified Bid Deadline) to "credit bid" up to the amount of the Prepetition Second Lien Obligations (including its Second Lien Adequate Protection Superpriority Claim to the extent such Second Lien Adequate Protection Superpriority Claim has any value) during any disposition of all or any portion of the Prepetition Collateral and DIP Collateral; provided, that any such "credit bid" provides for Payment in Full of all DIP Obligations and Prepetition First Lien Obligations at the closing of such transaction unless otherwise agreed by the DIP Agent (with the consent of the Requisite DIP Lenders) and the Prepetition First Lien Secured Agent (with the consent of the Requisite Prepetition First Lien Lenders), in their sole and absolute discretion.

51.     Therefore, the Debtors submit that the proposed Adequate Protection Obligations are sufficient to protect the Prepetition Secured Parties from any diminution in value to the Cash

Collateral and Prepetition Collateral.  In light of the foregoing, the Debtors further submit that the proposed Adequate Protection Obligations to be provided for the benefit of the Prepetition Secured Parties are appropriate.  Thus, the Debtors' provision of the Adequate Protection Obligations is not only necessary to protect against any diminution in value but is fair and appropriate under the circumstances of these chapter 11 cases to ensure the Debtors are able to continue using the Cash Collateral, subject to the terms and limitations set forth in the Interim Order, for the benefit of all parties in interest and their estates.

**III.    The Repayment Feature "Roll-Up" in the DIP Facility Is Appropriate.**

52.     Section 363(b) of the Bankruptcy Code permits a debtor to use, sell, or lease property, other than in the ordinary course of business, with court approval. It is well settled in the Third Circuit that such transactions should be approved when they are supported by a sound business purpose.  *See In re Abbots Dairies, Inc.*, 788 F.2d 143 (3d Cir. 1986) (holding that in the Third Circuit, a debtor's use of assets outside the ordinary course of business under Section 363(b) of the Bankruptcy Code should be approved if the debtor can demonstrate a sound business justification for the proposed transaction).   The business judgment rule shields a debtor's management from judicial second-guessing.  *In re Johns-Manville Corp.*, 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986) ("[T]he [Bankruptcy] Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions.").

53.     Repayment of prepetition debt (often referred to as a "roll-up") is a common feature in debtor in possession financing arrangements.  Courts in this jurisdiction have approved similar DIP features, including on the first day of the case, although to be clear, <u>the roll up component of this DIP Facility is conditioned upon and effective only upon entry of the Final Order</u>. *See, e.g., In re In re Remington Outdoor Company, Inc.*, No. 18-10684 (BLS) (Bankr. D. Del. Mar. 28,

30

2018) (authorizing approximately $338 million DIP that included roll-up of approximately $160 million pursuant to interim order); *In re Bon-Ton Stores, Inc.*, No. 18-10248 (MFW) (Bankr. D. Del. Feb. 6, 2018) (authorizing full roll-up of all outstanding prepetition revolving obligations pursuant to interim order); *In re Real Industry, Inc.*, No. 17-12464 (KJC) (Bankr. D. Del. Nov. 20, 2017) (authorizing approximately $365 million DIP that included a creeping roll-up pursuant to interim order and a full roll-up pursuant to final order of approximately $266 million prepetition debt); *In re Charming Charlie, LLC*, No. 17-12906 (CSS) (Bankr. D. Del. Dec. 12, 2017) (authorizing approximately $90 million DIP that included roll-up of approximately $22 million prepetition debt pursuant to interim order); *In re Radioshack Corp.*, No. 15-10197 (BLS) (Bankr. D. Del. Feb. 5, 2015) (authorizing approximately $285 million DIP that included roll-up of approximately $250 million prepetition debt pursuant to interim order); *In re MACH Gen, LLC*, No. 14-10461 (MFW) (Bankr. D. Del. Mar. 5, 2014) (authorizing approximately $200 million DIP that included roll-up of approximately $144 million prepetition debt pursuant to interim order); *In re Furniture Brands Int'l, Inc.*, No. 13-12329 (CSS) (Bankr. D. Del. Sept. 11, 2013) (authorizing approximately $140 million DIP that included roll-up of approximately $91 million prepetition debt pursuant to interim order); *In re Appleseed's Intermediate Holdings LLC*, No. 11-10160 (KG) (Bankr. D. Del. Jan. 20, 2011) (authorizing approximately $140 million DIP that included roll-up of approximately $48.6 million prepetition debt pursuant to interim order); *In re Dayton Superior Corp.*, No. 09-11351 (BLS) (Bankr. D. Del. Apr. 21, 2009) (authorizing approximately $165 million DIP that included roll-up of approximately $110 million prepetition debt pursuant to interim order).

54.     As set forth above, the DIP Credit Agreement and the Interim Order provide that: subject to and only upon entry of a Final Order, all Prepetition First Lien Obligations, including

on account of Prepetition Letters of Credit, shall immediately, automatically, and irrevocably be deemed to have been converted into DIP Obligations and incurred under the DIP Facility (the "Prepetition First Lien Roll-Up").

55.    The Prepetition First Lien Roll-Up is a sound exercise of the Debtors' business judgment, is a material component of the structure of the DIP Facility and was required by the DIP Lenders as a condition to their commitment to provide postpetition financing. *See* First Day Declaration at Exhibit B, ¶ 47. The Debtors were unable to obtain DIP financing on better (or any) terms. Without continued access to $22 million in incremental liquidity under the DIP Facility, the Debtors would lack sufficient liquidity to operate their business. Maintaining the going-concern value of the Debtors until consummation of the proposed sale is of immense benefit to the Debtors' estates and stakeholders.

56.    Ultimately, the DIP Facility provide the Debtors with the best path forward for a peaceful, going-concern transition into chapter 11 and the continuation of its sale process. The Prepetition Lenders are unlikely to continue to lend postpetition without some assurance regarding their prepetition claims. Absent the Prepetition Secured Parties' support, the first month of the chapter 11 cases would likely devolve into a costly priming fight. *See* First Day Declaration at Exhibit B, ¶¶ 47 and 48; Batra Declaration at ¶ 9.

57.    Given these circumstances, the Prepetition First Lien Roll-Up, as set forth in the DIP Credit Agreement and the DIP Orders, is reasonable, appropriate, and a sound exercise of the Debtors' business judgment.

**IV.    The Debtors Should Be Authorized to Pay the Fees Required by the DIP Agent and the DIP Lenders Under the DIP Loan Documents.**

58.    Under the DIP Agreement, the Debtors have agreed, subject to Court approval, to pay certain fees to the DIP Agent and the DIP Lenders. In particular, the Debtors have agreed to

32

pay certain fees to the DIP Agent and DIP Lenders (in accordance with the terms of the DIP Loan Documents) consisting of the following:

<blockquote>

(a)      An Arranger fee of $50,000;

(b)      A Closing Fee of 3.0% of the DIP Revolving Loan Commitment ($22,000,000); and

(c)      Unused Commitment Fee of 1%.

</blockquote>

59.      Under the circumstances of these cases, these fees and costs are reasonable, customary, and appropriate.  Accordingly, the Court should authorize the Debtors to pay the fees provided under the DIP Agreement in connection with entering into those agreements.  *See* First Day Declaration Exhibit B, ¶ 47; Batra Declaration ¶¶ 11 and 15.

**V.      The DIP Lenders Should Be Deemed Good-Faith Lenders Under Section 364(e).**

60.      Section 364(e) of the Bankruptcy Code protects a good-faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal.  Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

61.      As explained herein, in the Batra Declaration and the First Day Declaration, the DIP Loan Documents are the result of:  (a) the Debtors' reasonable and informed determination that the DIP Secured Parties offered the most favorable terms on which to obtain vital postpetition financing, and (b) arms'-length, good-faith negotiations between the Debtors and the DIP Secured

Parties.  The Debtors submit that the terms and conditions of the DIP Loan Documents are reasonable and appropriate under the circumstances, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code.  Further, no consideration is being provided to any party to the DIP Loan Documents other than as described herein. Accordingly, the Court should find that the DIP Secured Parties are "good faith" lenders within the meaning of section 364(e) of the Bankruptcy Code and are entitled to all of the protections afforded by that section.

## VI.   The Automatic Stay Should Be Modified on a Limited Basis.

62.    The proposed Interim Order provides that the automatic stay provisions of section 362 of the Bankruptcy Code will be modified to allow the DIP Agent to file any financing statements, security agreements, notices of liens, and other similar instruments and documents in order to validate and perfect the liens and security interests granted to them under the Interim Order.   The proposed Interim Order further provides that the automatic stay is modified as necessary to permit the Debtors to grant the DIP Liens to the DIP Secured Parties and to incur all liabilities and obligations set forth in the Interim Order.   Finally, the proposed Interim Order provides that, following the occurrence of an Event of Default, the automatic stay shall be modified to the extent necessary to permit the DIP Agent to exercise all rights and remedies in accordance with the DIP Loan Documents, or applicable law.

63.    Stay modifications of this kind are ordinary and standard features of debtor-in-possession financing arrangements, and, in the Debtors' business judgment, are reasonable and fair under the circumstances of these chapter 11 cases.  *See, e.g.*, *In re Magnum Hunter Res. Corp.*, No. 15-12533 (KG) (Bankr. D. Del. Dec. 15, 2015) (terminating automatic stay after event of default); *In re Peak Broad., LLC*, No. 12-10183 (PJW) (Bankr. D. Del. Feb. 2, 2012) (terminating

34

automatic stay after occurrence of termination event); *In re TMP Directional Mktg., LLC*, No. 11-13835 (MFW) (Bankr. D. Del. Jan. 17, 2012) (modifying automatic stay as necessary to effectuate the terms of the order); *In re Broadway 401 LLC*, No. 10-10070 (KJC) (Bankr. D. Del. Feb. 16, 2010) (same); *In re Haights Cross Commc'ns, Inc.*, No. 10-10062 (BLS) (Bankr. D. Del. Feb. 8, 2010) (same).

## VII.   Failure to Obtain Immediate Interim Access to the DIP Facility and Cash Collateral Would Cause Immediate and Irreparable Harm.

64.     Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code or to use cash collateral pursuant to section 363 of the Bankruptcy Code may not be commenced earlier than 14 days after the service of such motion.  Upon request, however, the Court may conduct a preliminary, expedited hearing on the motion and authorize the obtaining of credit and use of cash collateral to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.

65.     For the reasons noted above, the Debtors have an immediate postpetition need to use Cash Collateral and access additional liquidity under the DIP Facility.  The Debtors cannot maintain the value of their estates during the pendency of these chapter 11 cases without access to this liquidity.  The Debtors will use cash to, among other things, fund the administration of these chapter 11 cases and the operation of their business.  The Debtors believe that substantially all of their available cash constitutes the Prepetition Secured Parties' Cash Collateral.  The Debtors will therefore be unable to operate their business or otherwise fund these chapter 11 cases without access to the Cash Collateral and will suffer immediate and irreparable harm to the detriment of all creditors and other parties in interest.  In short, the Debtors' ability to administer these chapter 11 cases through the use of Cash Collateral and access to additional financing is vital to preserve and maximize the value of the Debtors' estates.

66.     The Debtors request that the Court hold and conduct a hearing to consider entry of the Interim Order authorizing the Debtors, from and after entry of the Interim Order until the Final Hearing, to receive immediate authorization to use Cash Collateral and initial funding under the DIP Facility.  This relief will enable the Debtors to preserve and maximize value and, therefore, avoid immediate and irreparable harm and prejudice to their estates and all parties in interest, pending the Final Hearing.

## REQUEST FOR FINAL HEARING

67.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for the Final Hearing that is as soon as practicable, and in no event more than 30 days after the Petition Date, and fix the time and date prior to the Final Hearing for parties to file objections to this motion.

## WAIVER OF BANKRUPTCY RULE 6004(A) AND 6004(H)

68.     To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

## NOTICE

69.     The Debtors will provide notice of this motion to:  (a) the Office of the U.S. Trustee for the District of Delaware; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) counsel to the DIP Agent; (d) counsel to the Prepetition First Lien Secured Agent; (e) counsel to Prepetition Second Lien Secured Agent; (f) the United States Attorney's Office for the District of Delaware; (g) the Internal Revenue Service; (h) the United States Securities and Exchange Commission; (i) the state attorneys general for all states in which

36

the Debtors conduct business; (j) all known parties that have asserted a lien on the Debtors' assets; and (k) any party that requests service pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## **NO PRIOR REQUEST**

70.    No prior request for the relief sought in this motion has been made to this or any other court.

WHEREFORE, the Debtors respectfully request that the Court enter the DIP Orders, granting relief requested herein and such other relief as the Court deems appropriate under the circumstances.

| | |
|---|---|
| Dated: January 27, 2020<br>Wilmington, Delaware | _/s/ Domenic E. Pacitti_<br>Domenic E. Pacitti (DE Bar No. 3989)<br>Michael W. Yurkewicz (DE Bar No. 4165)<br>Sally E. Veghte (DE Bar No. 4762)<br>**KLEHR HARRISON HARVEY BRANZBURG LLP**<br>919 North Market Street, Suite 1000<br>Wilmington, Delaware 19801<br>Telephone:    (302) 426-1189<br>Facsimile:    (302) 426-9193<br>Email:  dpacitti@klehr.com<br>          myurkewicz@klehr.com<br>          sveghte@klehr.com<br><br>*Proposed Counsel to the Debtors* |