**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| BL RESTAURANTS HOLDING, LLC, *et al.*,[1] | ) | Case No. 20-10156 (___) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**DEBTORS' MOTION FOR ENTRY OF AN ORDER (A) APPROVING
PROCEDURES IN CONNECTION WITH SALE OF DEBTORS' ASSETS; (B)
APPROVING BREAK-UP FEE AND EXPENSE REIMBURSEMENT; (C)
SCHEDULING AUCTION AND HEARING TO CONSIDER APPROVAL OF
SALE; (D) APPROVING PROCEDURES RELATED TO ASSUMPTION AND
ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED
LEASES; (E) APPROVING FORM AND MANNER OF NOTICES THEREOF;
AND (F) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors")[2], hereby submit this motion (the "Sale Procedures Motion") requesting entry of an order pursuant to sections 105, 363, 365, 503 and 507 of the United States Bankruptcy Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"), Rules 2002, 6003, 6004, 6006, 9008 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), substantially in the form attached hereto as Exhibit A (the "Sale Procedures Order"), (a) authorizing and approving procedures for (i) submitting bids for the sale

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each of the Debtors' respective federal tax identification numbers, are as follows: BL Restaurants Holding, LLC (6665); BL Restaurant Operations, LLC (7062); BL Restaurant Franchises, LLC (6923); and BL Hunt Valley, LLC (9513). The Debtors' headquarters and mailing address is: 4550 Beltway Drive, Addison, TX 75001.

[2] A detailed description of the Debtors and their businesses, and the facts and circumstances supporting this motion and the Debtors' chapter 11 cases, are set forth in greater detail in the *Declaration of Howard Meitiner in Support of Debtors' First Day Motions and Applications* (the "First Day Declaration"), filed contemporaneously with the Debtors' voluntary petitions for relief filed under chapter of the Bankruptcy Code, on January 27, 2020 (the "Petition Date").

or sales (the "Sale") of the Debtors' assets (the "Purchased Assets") and (ii) conducting an auction for the Assets (the "Auction"); (b) approving break-up fee and expense reimbursement; (c) authorizing and approving procedures for the assumption and assignment of certain executory contracts in connection with the sale of the Purchased Assets; (d) scheduling (i) a deadline to submit bids for the Assets, (ii) the date and time of the Auction, and (iii) the date and time of the hearing to consider the approval of the proposed sale of the Assets (the "Sale Hearing"); (e) authorizing the form and manner of notices with respect to the Sale; and (d) granting related relief.   In  support of this Motion, the Debtors incorporate and rely upon the statements contained in the First Day Declaration filed contemporaneously with this Sale Procedures Motion, and further respectfully state as follows:

## JURISDICTION AND VENUE

1.      The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012.   Consideration of this Motion is a core proceeding pursuant to 28 U.S.C. § 157(b).   The Debtors confirm their consent, pursuant to Bankruptcy Rule 7008 and Local Rule 9013-1(f), to the entry of a final order by the Court in connection with this motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

2.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory predicates for the relief requested herein are sections 105(a), 363, 365, 503 and 507 of the Bankruptcy Code, along with Bankruptcy Rules 2002, 6003, 6004, 6006, 9008 and 9014, and Local Rule 6004-1.

2

## BACKGROUND

4.      January 27, 2020 (the "Petition Date"), the Debtors each filed a voluntary petition in this Court for relief under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases").  The Debtors continue to manage and operate their businesses as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

5.      No official committee of general unsecured creditors (the "Committee") has been appointed in these cases by the Office of the United States Trustee to date.

6.      Additional information regarding the circumstances leading to the commencement of these Chapter 11 Cases and information regarding the Debtors' businesses and capital structure is set forth in detail in the First Day Declaration filed contemporaneously with this Sale Procedures Motion and incorporated herein by reference.

7.      Also filed contemporaneously herewith is the *Debtors' Motion for an Order (A) Approving Asset Purchase Agreement and Authorizing the Sale of Debtors' Assets Free and Clear of All Liens, Claims, Interests, and Encumbrances, (B) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (C) Granting Related Relief* (the "Sale Motion"), which is incorporated herein by reference.

## A.      The Proposed Sale

8.      As described in the First Day Declaration and the Sale Motion, the Debtors, in the exercise of their reasonable business judgment, have determined that the most effective way to maximize the value of the Debtors' estates for the benefit of their constituents was to seek bankruptcy protection and to sell their businesses and assets through a Sale pursuant to section 363 of the Bankruptcy Code. The sale is supported by the lenders under the Debtors' debtor-in-

possession financing facility (the "<u>DIP Lenders</u>")[3], who do not object to the use of their cash collateral and are lending the Debtors additional amounts under the DIP Facility[4] to continue operating post-Petition Date in the ordinary course of business and to continue and effectuate the contemplated sale process.  Also, in order to satisfy the requirements of the DIP Facility and maintain the support of the DIP Lenders, customers and vendors, and maintain the Debtors' employee base, it is in the best interests of the Debtors and their estates to move expeditiously with a sale process, as discussed herein.  The Debtors' ability to use Cash Collateral and access additional liquidity through the available debtor-in-possession financing will only support the sale process contemplated by this Sale Procedures Motion and thereby necessitates the completion of a Sale of all of the Purchased Assets as expeditiously as possible.

**B.      Marketing of the Debtors Assets and the Selection of the Stalking Horse Purchaser**

9.      On September 20, 2019, the Debtors engaged Configure Partners, LLC ("<u>Configure</u>") as their proposed investment banker to locate investors and to market their assets for sale, to assist in the evaluation of strategic alternatives, including the sale of the Company or its assets.

10.      Configure prepared marketing materials intended for distribution to prospective buyers of the Debtors' assets including a teaser, confidential investment memorandum and the aggregation of key company documents located in an online data room for further diligence.  In addition, Configure worked with the Debtors and the Prepetition First Lien Secured Lenders and the Prepetition First Lien Secured Agent to develop a list of suitable potential buyers to be contacted on a discreet and confidential basis, after approval by the Debtors.

---

[3]      The DIP Lenders are composed of the Debtors' lenders under their prepetition first lien financing facility.

[4]      Capitalized terms not otherwise defined herein shall have the meaning ascribed to such term as set forth in the First Day Declaration or Sale Motion , as applicable.

4

11.     As of the Petition Date, Configure contacted approximately 101 potential strategic buyers and 153 financial buyers, out of which 73 executed confidentiality agreements and received the confidential information memorandum and access to key documents in an online data room.  The Debtors received initial indications interest from 7 potential buyer and engaged in additional diligence discussions including management presentations in Dallas.  Out of the 7 potential buyers, three parties submitted letters of Intent in December 2019.  Meanwhile, the Debtors continued to suffer a drain on cash flow from its underperforming stores.  Consequently, it became apparent, that the Debtors liquidity position would require that the sale process continue in a chapter 11 process.

12.     Rather than commence these chapter 11 cases with no stalking horse, in December 2019, concurrently with the sale process, the Debtors and its advisors had commenced discussions with the Prepetition First Lien Secured Lenders and the Prepetition First Lien Secured Agent to serve as a "stalking horse" via a credit bid.  The Debtors were able to conclude these negotiations and on January 26, 2020 entered into an Asset Purchase Agreement date January 26, 2020 the "Stalking Horse Agreement") by and among  BL Restaurants Holding, LLC,  BL Restaurant Operations, LLC, BL Restaurant Franchises, LLC, and BL Hunt Valley, LLC as sellers and BLH Acquisition Co., LLC as buyer ("BLH AcqCo" or the "Stalking Horse Purchaser").

13.     Configure continues to market the Debtors' assets postpetition. The Debtors expect that Configure's marketing process may result in competing bids being submitted by the proposed Bid Deadline. The Debtors believe that, based on consultations with Configure, the marketing period, which will have spanned approximately eighteen (18) weeks prepetition and seven (7) weeks during these Chapter 11 Cases, is a reasonable and sufficient period to solicit bids on the Debtors' assets given the current market. The Debtors believe that the marketing efforts will be

sufficient to ensure the highest or otherwise best offer, particularly in light of the Debtors' limited financing options and ongoing cash needs. Further, the Debtors believe that a delayed process likely would lead to the deterioration of the operating performance of their businesses and the value of their assets.

14.     The Debtors also believe that, based on consultations with Configure, the proposed Sale Procedures will solicit the highest or otherwise best offer for the Debtors' assets under the circumstances of these Chapter 11 Cases.

## <u>SUMMARY OF RELIEF REQUESTED</u>

15.     The Debtors seek, pursuant to sections 105, 363, 365, 503 and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 6003, 6004, 6006, 9008 and 9014 and Local Rule 6004-1, the Court's approval of the institution of certain sale, bidding, auction and notice procedures for the solicitation and consideration of competing offers for the Purchased Assets (collectively, the "<u>Sale Procedures</u>," attached as <u>Annex 1</u> to the Sale Procedures Order).

More specifically, through this Motion, the Debtors request that the Court enter an order at a hearing (the "<u>Sale Procedures Hearing</u>"), in substantially the form attached hereto as <u>Exhibit A</u> (the "<u>Sale Procedures Order</u>"), which, among other things:

        (a)     schedules the Sale Hearing on or about **March 27, 2020**, subject to the Court's calendar (or as soon as the Court is available) to consider approval of the sale of the Purchased Assets to the Prevailing Bidder (if any) (and subject to extension);

        (b)     authorizes and approves (i) the Debtors' proposed procedures for the submission and consideration of bids for the Purchased Assets (the "<u>Sale Procedures</u>"), as set forth in <u>Annex 1</u> attached to the proposed Sale Procedures Order and incorporated herein in its entirety by reference; and (ii) the form and manner of notice of these matters, including (A) notice of the Sale Hearing in the form attached as <u>Annex 2</u> to the proposed Sale Procedures Order (the "<u>Sale Notice</u>") to be served on parties in interest, and (B) a one-time publication version of the Sale Notice (modified as necessary or appropriate for publication);

        (c)     approves the Break-Up Fee (defined herein)  and Expense Reimbursement (defined herein)  to the Stalking Horse Purchaser; and

(d)    authorizes and approves (i) the Debtors' proposed procedures for (A) the assumption and assignment of certain executory contracts and unexpired leases to the Prevailing Bidder in connection with any proposed Purchased Assets acquisition transaction, and (B) curing defaults under these executory contracts and unexpired leases; and (ii) notice of the assumption and assignment of such executory contracts and unexpired leases and the proposed amounts necessary to cure defaults related thereto (the "Cure Costs") in the form attached as Annex 3 to the proposed Sale Procedures Order (the "Assignment Notice").

## **Proposed Notice, Bidding and Other Procedures**

**A.    Notice Procedures**

16.    The Debtors request approval of the following notice procedures in connection with

the Auction and Sale:

(a)    Date, Time and Place of the Sale Hearing.  The Debtors propose that the Sale Hearing be held before the United States Bankruptcy Court for the District of Delaware, on or about **March 27, 2020** subject to the Court's calendar, or such other date and time that the Court may direct.  The Sale Hearing may be adjourned, from time to time, without further notice to creditors or parties in interest other than by announcement of the adjournment in open Court or on the Court's docket.

(b)    Sale Notice.  Within two (2) business days after entry of the Sale Procedures Order (the "Mailing Deadline"), the Debtors will serve the Sale Notice by first-class mail, postage prepaid upon: (i) counsel to the DIP Agent; (ii) counsel to the Prepetition First Lien Secured Agent counsel to any official committees appointed in these Chapter 11 Cases; (iii) counsel to the Prepetition Second Lien Agent; (iv) any party that expressed in writing to the Debtors or Configure an interest in acquiring the Purchased Assets or that Configure or the Debtors previously contacted or identified as potentially having an interest in acquiring the Purchased Assets; (v) non-Debtor counterparties to all Potential Designated Contracts (as defined below); (vi) all parties who are known to assert liens upon the Purchased Assets; (vii) the Internal Revenue Service and applicable state and local taxing authorities; (viii) the U.S. Trustee; and (ix) all entities that have requested notice in these Chapter 11 Cases under Bankruptcy Rule 2002 (collectively, the "Notice Parties").

(c)    Deadline for Objection to Relief Sought in the Motion.  The Debtors propose that, to be timely and otherwise eligible for consideration by the Court, objections to the approval of the sale of Purchased Assets to one or more Prevailing Bidder – other than an objection to the proposed assumption and assignment of the Potential Designated Contracts or to any proposed Cure Costs including, but not limited to, the sale of the Purchased Assets free and clear of Claims pursuant to section 363(f) of the Bankruptcy Code for all parties in interest must: (i) be in writing; (ii) clearly specify the grounds for the objection; (iii) conform to the Bankruptcy Rules and the Local Rules; and (iv) be filed with the Court and served so as to be received by the following parties (collectively, the "Objection Notice Parties") by no later than **4:00 p.m. (ET) on March 24, 2020** (the "Sale Objection Deadline"): (a) the Debtors, 4550 Beltway Drive, Addison, TX 75001, Attn: Howard Meitiner, CRO; (b)  counsel to the Debtors, Klehr Harrison Harvey Branzburg LLP, 919 North Market Street, Suite 1000, Wilmington, Delaware 19801, Attn:

7

Domenic E. Pacitti (dpacitti@klehr.com) and Michael W. Yurkewicz (myurkewicz@klehr.com); (c) counsel to the DIP Agent and the Pre-Petition Agent, Latham & Watkins LLP, 330 N. Wabash Ave, Chicago, IL 60611, Attn: James Ktsanes (James.Ktsanes@lw.com) and Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, DE 19801, Attn: Michael R. Nestor (mnestor@ycst.com) and Andrew L. Magaziner (amagaziner@ycst.com); (d) counsel to any Committee; and (e) Office of The United States Trustee, 844 King Street, Suite 2207, Lock Box 35, Wilmington, Delaware 19801, Attn: David Buchbinder (David.L.Buchbinder@usdoj.gov).

(d)    <u>Information Provided to Interested Parties</u>.  The Sale Notice provides that any party that wishes to obtain a copy of this Motion and the Sale Procedures Order, including all exhibits thereto, may make such a request by sending a written request to counsel to the Debtors, Klehr Harrison Harvey Branzburg LLP, 919 North Market Street, Suite 1000, Wilmington, Delaware 19801, Attn: Domenic E. Pacitti and Michael W. Yurkewicz.  All parties that have expressed, or may express, an interest in purchasing the Purchased Assets or who the Debtors believe may have an interest in purchasing the Purchased Assets, may obtain access to certain due diligence materials, subject to satisfying the conditions required to become a Qualified Bidder set forth in the Sale Procedures.

**B.    Proposed Sale Procedures**

17.    The Debtors believe the proposed Sale Procedures will maximize the realizable value of the Purchased Assets for the benefit of the Debtors' estates, creditors and other interested parties.  The Sale Procedures contemplate an auction process pursuant to which bids for the Purchased Assets will be subject to higher or otherwise better offers.  The Sale Procedures primarily benefit the Debtors by creating a bidding process that ensures, among other things: (a) structure and logistical certainty; (b) the Debtors' ability to compare the relative values of competing offers, if any; (c) that potential purchasers have the financial wherewithal to timely consummate a purchase of the Purchased Assets; and (d) meaningful bidding increments.

18.    The Sale Procedures are set forth in detail in <u>Annex 1</u> to the Sale Procedures Order. The Sale Procedures describe, among other things, the requirements for prospective purchasers to participate in the bidding process, the availability and conduct of due diligence by prospective bidders, the deadline and requirements for submitting a bid, the method and criteria for bids to become "qualified," the manner in which qualified bids will be negotiated, clarified and improved,

8

and the criteria for selecting one or more Prevailing Bidders, including if necessary, through a public auction.

19.     As described below and more fully in the Sale Procedures, only Qualified Bidders who timely submit Qualified Bids will be eligible to participate in the Auction. Specifically, consistent with Local Rule 6004-1(c), set forth below is a summary of such Sale Procedures, which summary is qualified in its entirety by the Sale Procedures[5]:

## Participation Requirements and Due Diligence

(a)     In order to participate in the bidding process, the Auction, or otherwise be considered for any purpose hereunder, a person interested in purchasing the Assets (a "Potential Bidder") must first deliver the following materials to the Debtors and their counsel:

(i)     An executed confidentiality agreement in form and substance satisfactory to the Debtors and their counsel (the "Confidentiality Agreement"). Without limiting the foregoing sentence, the Confidentiality Agreement will provide that all non-public information about the Debtors received by a Potential Bidder, or if the bidder is qualified, a Qualified Bidder (as defined below), will be kept strictly confidential and used only in connection with analyzing a transaction for the Assets.

(ii)     Written evidence that enables the Debtors and their advisors to determine, in consultation with counsel for the Committee and the Agents, whether a Potential Bidder has the financial and other ability to close the contemplated sale transaction and provide adequate assurance of future performance under all contracts to be assumed and assigned in connection therewith.

(iii)     The advisors to the Debtors shall provide the Sale Procedures, together with a copy of the form Stalking Horse Agreement to each Potential Bidder, provided, however, any Bid for all or substantially all of the Assets shall include a form of Asset Purchase Agreement marked against the Stalking Horse Agreement (the "Alternative Agreement") and shall be subject to the conditions and terms set forth in (e) below. All Potential Bidders, whether deemed Qualified Bidders (as defined below) or not, consent to the jurisdiction of the Bankruptcy Court to determine matters concerning the sale, their Bid and otherwise with respect to the process and waive any right to any other venue.

(b)     Any Potential Bidder wishing to conduct due diligence concerning a prospective acquisition transaction of the Assets shall be granted access to all relevant information regarding the Assets and the related business of each of the Debtors reasonably necessary to enable a

---

[5]     This summary is provided in accordance with Local Rule 6004-1(c)(i) and is qualified in its entirety by reference to the provisions of the Sale Procedures. Each capitalized term used and not otherwise defined herein shall have the meaning assigned thereto in the Sale Procedures. To the extent there exists any inconsistency between this summary and the provisions of the Sale Procedures, the provisions of the Sale Procedures shall control.

Potential Bidder to evaluate the Assets and the prospective transaction. The Debtors shall make such access available to Potential Bidders during normal business hours as soon as reasonably practicable following execution of the Confidentiality Agreement. Potential Bidders interested in conducting due diligence should contact Configure Partners LLC, 368 9th Avenue, New York, NY 10001, Attn: Vin Batra (vbatra@configurepartners.com). Notwithstanding the foregoing, the Debtors and their advisors shall not provide confidential or proprietary information to any person if the Debtors, and their respective advisors, believe that such disclosure would be detrimental to the interests of the Debtors' estates. All due diligence must be completed before the Bid Deadline (as defined below). No condition(s) allowing or regarding further due diligence will be accepted or authorized after the Bid Deadline. Potential Bidders are required to exercise their own discretion before relying on any information regarding the Assets provided by the Debtors. Neither the Debtors nor their representatives are responsible for, and will bear no liability with respect to, any information obtained by Potential Bidders pursuant hereto.

(c)    The Debtors and their advisors shall: (i) receive and evaluate any Bids from Potential Bidders; (ii) request information from Potential Bidders, engage in discussions with Potential Bidders, and take such other actions to determine whether any Bid constitutes or could lead to a Qualified Bid (as defined below); and (iii) take any other actions contemplated under the Sale Procedures.

**<u>Submission of Bids</u>**

(d)    Any Potential Bidder interested in purchasing the Assets must submit a Bid prior to **4:00 p.m. prevailing Eastern time on March 18, 2020** (the "<u>Bid Deadline</u>"). The Debtors may, in consultation with counsel for the Committee and with the consent of the Agents, extend the Bid Deadline and shall promptly notify all Potential Bidders of any such extension. In order for such Bid to be considered, however, it must be a "<u>Qualified Bid</u>." The Debtors and their advisors will determine if a Bid is a Qualified Bid based on the requirements herein. A Potential Bidder will be deemed to be a "<u>Qualified Bidder</u>" if the Debtors and their advisors, in consultation with the Committee and the Agents, determine that such Potential Bidder submitted either a Qualified Aggregate Bid or a Qualified Partial Bid. BLH AcqCo, or its designee, shall be deemed a Qualified Bidder for all purposes under the Sale Procedures, and the Bid submitted by BLH AcqCo pursuant to the Stalking Horse Agreement shall be deemed to be a Qualified Bid for all purposes under the Sale Procedures.

(e)    A Bid will be considered a "<u>Qualified Aggregate Bid</u>" only if the Bid is for the sale of all or substantially all of the Assets and fulfills the following requirements prior to the Bid Deadline (capitalized terms used in this section are defined later in the Sale Procedures):

    (i)    Provides that the Qualified Bidder's Bid shall remain open and irrevocable until the earliest of (X) thirty (30) days following the date of entry of a Sale Order; (Y) the date of the closing of the sale of the Assets pursuant to the Sale Order; or (Z) such date as the Debtors affirm in writing that they do not intend to pursue a sale transaction based on such Qualified Bidder's Bid (the "<u>Bid Expiration Date</u>");

    (ii)    Provides that the Qualified Bidder is obligated to perform as a Back-Up Bidder (as defined below) in the event such Qualified Bidder is not the Prevailing Bidder;

10

provided, however, notwithstanding the foregoing or anything in the Sale Procedures or this Order to the contrary, any Qualified Bid submitted by BLH AcqCo shall not be required to serve as a Back-Up Bid, and BLH AcqCo shall not be required to serve as a Back-Up Bidder, in each case absent the express written consent of BLH AcqCo;

(iii)    Is made by a person or entity that demonstrates evidence of fully committed and firm financing for each component of debt or equity in support of such Bid and other ability to consummate the proposed transaction, in each case acceptable to the Debtors;

(iv)    Provides written evidence that the Qualified Bidder has obtained authorization and approval from its board of directors (or comparable governing body) with respect to the submission of its Bid and the execution of the Alternative Agreement, or a representation that no such authorization or approval is required;

(v)    Provides that the purchase price will be paid in cash, cash equivalents, assumption of debt, or such other consideration acceptable to the Debtors;

(vi)    Provides by wire transfer of immediately available funds to the Debtors or an escrow agent selected by the Debtors before the Bid Deadline of an earnest money deposit equal to the greater of (X) 10% of the dollar amount of the purchase price of such Bid; or (Y) 10% of the value otherwise ascribed to such Bid (the "Deposit"), provided, however, that the Stalking Horse Purchaser shall not be required to submit a Deposit in connection with the submission of the Stalking Horse Agreement or the exercise of its credit bid rights;

(vii)    Provides evidence satisfactory to the Debtors that the Qualified Bidder is reasonably likely to obtain prompt regulatory approval and any other consents, licenses, or permits, if any is required, to purchase the Assets;

(viii)    Is submitted in a writing in the form of the Alternative Agreement with any proposed changes to the Stalking Horse Agreement set forth in an electronic form both clean and marked to reflect such changes signed by the Qualified Bidder, that:

(1)    Identifies the Qualified Bidder and any members of its investor group, if applicable;

(2)    Is not subject to conditions, representations or terms that the Debtors determine to be unacceptable;

(3)    Specifies the consideration allotted to each Asset, or class of Assets, as applicable, such Qualified Bidder proposes to purchase pursuant to the Alternative Agreement;

(4)    Is not conditioned upon the Bankruptcy Court's approval of any Bid protections, including any break-up fee, termination fee, expense reimbursement, working fee or similar type of payment;

11

(5)    Does not contain any financing or due diligence contingencies to closing of the proposed transaction;

(6)    Does not contain any condition to closing of the transaction relating to the receipt of any third-party approvals that is not otherwise set forth in the Stalking Horse Agreement (excluding required Bankruptcy Court approval);

(7)    Expressly acknowledges and represents that the Qualified Bidder: (A) has had an opportunity to conduct any and all due diligence regarding the Assets and the proposed transaction prior to making its Bid, (B) has relied solely upon its own independent review, investigation and/or inspection of any documents and the Assets in making its Bid or that of any of its legal, financial or other advisors, and (C) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the business of the Debtors or the Assets or the proposed transaction, or the completeness or accuracy of any information provided in connection therewith, except as expressly stated in the representations and warranties contained in the Stalking Horse Agreement or Alternative Agreement (as applicable) ultimately accepted and executed by the Debtors;

(8)    Identifies each and every executory contract and unexpired lease that the Qualified Bidder desires the Debtors to assume and assign to the Qualified Bidder at the closing and provides evidence of such Qualified Bidder's ability to provide adequate assurance of future performance of such contracts or leases (as required by section 365(f)(2)(B) of the Bankruptcy Code) along with the Bid;

(ix)    Fully discloses the identity of each entity participating in connection with such Bid, and the complete terms of any such participation; and

(x)    Contains other information reasonably requested by the Debtors.

(f)    A "Qualified Partial Bid" for less than substantially all of the Assets will be considered for the Auction, and Qualified Bidders submitting Qualified Partial Bids shall be allowed to participate in the Auction only if the Qualified Partial Bid, or the Qualified Partial Bid when combined with other additional Qualified Partial Bids, if accepted and executed, would yield individual asset sales amounting to a Qualified Aggregate Bid or would otherwise exceed the value of or be considered a better offer than any Qualified Aggregate Bid after considering, among other things, the Bid Assessment Criteria (as defined below).  Bids that offer to purchase only a portion of the Debtors' business may, at the discretion of the Debtors after consultation with the Committee and the Agents, not be considered Qualified Partial Bids.  The Debtors in their discretion, after consultation with the Committee and the Agents, shall determine which Qualified Partial Bids to include in determining whether they amount to a Qualified Aggregate Bid and shall assemble and present such Bids in a way that allows for the ready comparison of the Qualified Aggregate Bids against all other Qualified Bids.  To constitute a Qualified Partial Bid, a Bid must fulfill the following requirements prior to the Bid Deadline:

(i)    Fulfills each of the requirements set forth in paragraphs (e)(i) through and including (e)(x) above; and

12

(ii)    Conspicuously states that the Qualified Bidder offers to purchase a portion of the Assets, which assets shall be described in detail.

(g)    A Qualified Bidder that desires to make a Bid must deliver written electronic copies of its Bid prior to the Bid Deadline to the following representatives of the Debtors: Klehr Harrison Harvey Branzburg LLP, 919 North Market Street, Suite 1000, Wilmington, Delaware 19801, Attn: Domenic E. Pacitti (dpacitti@klehr.com) and Michael W. Yurkewicz (myurkewicz@klehr.com). On the date the Debtors receive each such Bid, the Debtors shall deliver a copy of each such Bid to counsel to the DIP Agent, the Pre-Petition Agent, and any Committee.

(h)    Persons who collectively are referred to as a "Qualified Bidder" need not be affiliated persons and need not act in concert with one another and the Debtors may aggregate separate bids from unaffiliated persons to create one "Qualified Bid" from a "Qualified Bidder"; provided, however, all bidders shall remain subject to the provisions of section 363(n) of the Bankruptcy Code regarding collusive bidding.

(i)    After the Bid Deadline, the Debtors shall determine which Qualified Aggregate Bid or group of Qualified Partial Bids represents the then-highest or otherwise best bid (the "Initial Highest Bid"). Prior to or at the start of the Auction, each Qualified Bidder that timely submitted a Qualified Bid or a Qualified Partial Bid will be advised of such Initial Highest Bid and the Debtors may, at its discretion: (a) distribute copies of other Qualified Aggregate Bids or Qualified Partial Bids to other Qualified Bidders prior to or during the Auction; or (b) proceed with the open or sealed bidding process set forth in the Sale Procedures Order to the extent authorized therein.

**Due Diligence From Potential Bidders or Qualified Bidders**

(j)    Each Potential Bidder shall comply with all reasonable requests for additional information by the Debtors or their advisors regarding such Potential Bidder's financial wherewithal to consummate and perform obligations in connection with the acquisition transaction of the Assets. Failure by a Potential Bidder to comply with requests for additional information may be a basis for the Debtors to determine that a Potential Bidder is not a Qualified Bidder. Similarly, each Qualified Bidder shall comply with all reasonable requests for additional information by the Debtors or their advisors regarding such Qualified Bidder's financial wherewithal to consummate and perform obligations in connection with the acquisition transaction of the Assets as the Auction progresses. Failure by a Qualified Bidder to comply with requests for additional information may be a basis for the Debtors to determine that the Qualified Bidder may no longer participate in the Auction.

**"_As Is, Where Is_"**

(k)    Any sale of the Assets shall be on an "as is, where is" basis and without representations or warranties of any kind, nature or description by the Debtors, their agents or estates or any other party, except to the extent set forth in the Stalking Horse Agreement or Alternative Agreement between the Debtors and the Prevailing Bidder. Except as otherwise provided in the Stalking Horse Agreement or Alternative Agreement between the Debtors and the Prevailing Bidder, all of the Debtors' rights, title and interests in and to the Assets shall be sold free and clear of all liens, claims, interests, and encumbrances (collectively, the "Claims") pursuant

13

to section 363(f) of the Bankruptcy Code, such Claims to attach to the net proceeds of the sale of the Assets, with the same validity and priority as existed immediately prior to such sale.

## The Auction

(l)     If more than one Qualified Bid has been submitted for the Assets in accordance with the Sale Procedures, the Debtors will conduct the Auction on **March 20, 2020, at 10:00 a.m., prevailing Eastern time**, with respect to such Qualified Bids in order to determine the highest and best Bid (the "Prevailing Bid") to submit for approval by the Bankruptcy Court at the Sale Hearing (as defined below).  The Auction shall be organized and conducted by the Debtors at the Philadelphia offices of their counsel, Klehr Harrison Harvey Branzburg LLP, 1835 Market Street, Suite 1400, Philadelphia, Pennsylvania 19103 or such other location as may be announced prior to the Auction to all Qualified Bidders, the DIP Agent, the Pre-Petition Agent, the U.S. Trustee and any Committee.

(m)     The only persons or entities who will be permitted to bid at the Auction are the authorized representatives of each Qualified Bidder (the "Auction Participants").  While only the Auction Participants may make Qualified Bids at the Auction, the Auction may be attended and viewed also by the Debtors, the Debtors' advisors, the DIP Agent, the Pre-Petition Agent, and their advisors, any duly appointed Committee, the U.S. Trustee, and their respective counsel, financial advisors, and/or other authorized representatives.  To the extent not designated as a Qualified Bidder, all creditors of the Debtors' estates shall be permitted to attend; provided, however, that in order to attend the Auction, such creditors must advise the Debtors in writing no later than 48 hours prior to the Auction, provided, further, however, that the Debtors may seek relief from the Bankruptcy Court in the event that they object to any such creditor's attendance.[6]

(n)     The Debtors are authorized to conduct the Auction in accordance with such reasonable procedures and requirements as may be established at the discretion of the Debtors, in consultation with counsel for any Committee and the Agents, which rules may include the determination of the amount of time between Qualified Bids, whether to adjourn the Auction at any time and from time to time, the conducting of multiple rounds of open bidding with notice only to the parties entitled to attend the Auction, to ability to request "best and final" bids at the Auction, the ability to request bidding by sealed bids, and to declare that the Auction has ended when no further Bids are timely made or otherwise.

(o)     The Qualified Bid that is deemed the Initial Highest Bid, determined as set forth above, shall be the first Qualified Bid to begin the Auction.  The next Qualified Bid at the Auction shall be an amount equal to or greater than the Initial Highest Bid *plus* the Minimum Bid Increment (as defined below).  Thereafter, the Auction will continue in the manner determined by the Debtors above; provided, however, (i) additional Bids must be Qualified Bids (except that subsequent Qualified Bids made at the Auction, although received from a Qualified Bidder that made a Qualified Bid prior to the Bid Deadline, need not be received by the Bid Deadline) and (ii) additional Qualified Bids must be made in increments greater than the prior Qualified Bid *plus* [$500,000.00] or such other increment as determined by the Debtors, in consultation with the

---

[6] **Note to Draft**: Debtors' counsel to consider whether to exclude landlords and other creditors.

Committee and the Agents, and announced at the start of or during the Auction (the "Minimum Bid Increment").

(p)     In the case of a Qualified Bid based upon Qualified Partial Bids, such Qualified Bid may be altered or re-submitted in the sole discretion of the Qualified Bidders, provided, that such Bid remains a Qualified Partial Bid in accordance with the requirements set forth in paragraph (f) above. A Qualified Partial Bid will be considered for any given round of the Auction only if such Bid individually or in combination with other Qualified Partial Bids yields a Qualified Aggregate Bid (individually, a "Qualified Partial Overbid" and collectively, a "Qualified Aggregate Overbid"), provided that the Qualified Aggregate Overbid must, considered as a whole, meet all the requirements of paragraph (e) above. The Debtors shall, in consultation with the Committee and the Agents, determine which Qualified Partial Overbids to include in the Qualified Aggregate Overbid, and shall, in each round of the Auction, as necessary, assemble and present such Bids in a way that allows for the ready comparison of the Qualified Aggregate Overbid as against all other Qualified Bids received in that round of the Auction.

(q)     The Debtors, in consultation with any Committee and the Agents, shall determine, in their discretion and subject to final determination by the Bankruptcy Court, whether a Qualified Bid by a Qualified Bidder at the Auction matches or is higher and better than the prior Qualified Bid.

(r)     At the conclusion of the Auction: (i) the Debtors shall, in consultation with any Committee and the Agents, select (X) the Prevailing Bid(s) and (Y) the second highest or best offer for the Assets (the "Back-Up Bid"); (ii) the Debtors shall notify the Prevailing Bidder that such person's offer has been determined by the Debtors to be the Prevailing Bid and will be contingent only on Bankruptcy Court approval, and shall notify the person that made the Back-Up Bid (the "Back-Up Bidder") that such person's offer has been determined by the Debtors to be a Back-Up Bid and will be contingent only on the failure of the Prevailing Bid to close as set forth below and Bankruptcy Court approval; and (iii) the Debtors shall file a notice with the Bankruptcy Court announcing the Prevailing Bidder or Prevailing Bidders. Notwithstanding the foregoing sentence or anything in the Sale Procedures or the Sale Procedures Order to the contrary, any Qualified Bid submitted by BLH AcqCo shall not be required to serve as a Back-Up Bid, and BLH AcqCo shall not be required to serve as a Back-Up Bidder, in each case absent the express written consent of BLH AcqCo. Immediately following the conclusion of the Auction, the Prevailing Bidder or Prevailing Bidders shall complete and sign all agreements and documents as necessary to bind the Prevailing Bidder or Bidders to all the terms and conditions contemplated by the Prevailing Bid.

(s)     In making the determination of which Qualified Bid(s) constitutes the Prevailing Bid(s), the Debtors may, in consultation with any Committee and the Agents, take into account any factors the Debtors reasonably deem relevant to the value of the Qualified Bid(s) to the Debtors' estates, including, but not limited to: (a) the number, type, and nature of any changes in the Alternative Agreement requested by the Qualified Bidder, including the type and amount of the Assets sought and the liabilities of the Debtors to be assumed in the Bid; (b) the amount and nature of the total consideration, including the extent of assumed liabilities; (c) the likelihood of the Qualified Bidder's ability to close a transaction, the conditions thereto, and the timing thereof, including whether the Bidder has or can obtain all necessary consents, licenses, permits, or other

15

regulatory approvals to operate the Assets sought in the Bid; (d) any excluded assets, executory contracts, or unexpired leases; (e) any purchase price adjustments; (f) the net economic effect of any changes to the value to be received by the Debtors' estates from the transaction contemplated by the Bid; (g) whether the Bid is a bulk bid or a partial bid for only some of the Assets; and (h) the tax consequences of such Qualified Bid (collectively, the "Bid Assessment Criteria").[7]

(t)     The Deposit of the Prevailing Bidder or the Back-Up Bidder, as the case may be, shall be applied by the Debtors against the purchase price to be paid by the Prevailing Bidder or the Back-Up Bidder, as applicable, at the closing of the relevant transaction approved by the Bankruptcy Court. The Prevailing Bidder's Deposit shall be held by the Debtors and forfeited to the Debtors if the Prevailing Bidder breaches its obligations to close under the Stalking Horse Agreement or Alternative Agreement (as applicable) in accordance with the Prevailing Bid and such forfeited Deposit shall constitute collateral of the DIP Agent and Pre-Petition Agent, and be subject to the debtor-in-possession financing orders ("DIP Orders").

(u)     The Debtors shall not be deemed to have finally accepted any Qualified Bid unless and until such Qualified Bid and the Debtors' acceptance thereof have been authorized by order of the Bankruptcy Court following the conclusion of the Sale Hearing.

**Timeline**

(v)     Set forth below for convenience is a chart reflecting the various proposed deadlines and dates requested by the Debtors set forth herein and the Sale Procedures Order:

| Cure/Assignment Objection Deadline | March 18, 2020 at 4:00 p.m. prevailing Eastern time |
|---|---|
| Bid Deadline | March 18, 2020 at 4:00 p.m. prevailing Eastern time |
| SH Adequate Assurance Objection Deadline | March 18, 2020 at 4:00 p.m. prevailing Eastern time |
| Auction | March 20, 2020 at 10:00 a.m. prevailing Eastern time |
| Sale Objection Deadline | March 24, 2020 at 4:00 p.m. prevailing Eastern time |
| Non-SH Adequate Assurance Objection Deadline | March 24, 2020 at 4:00 p.m. prevailing Eastern time |
| Sale Hearing | March 27, 2020 at [•] [•]. m. prevailing Eastern time |

**Back-Up Bidder**

(w)     If for any reason the Prevailing Bidder fails to consummate the acquisition of the Assets in accordance with the Prevailing Bid, the Debtors are authorized to proceed with the sale of the applicable Assets to the Back-Up Bidder in accordance with the Back-Up Bid without further order of the Bankruptcy Court so long as the Sale to the Back-Up Bidder is approved at the Sale Hearing, or upon further hearing and order of the Bankruptcy Court; provided, however, solely with respect to any assumption and assignment of the Potential Designated Contracts to the Back-Up Bidder, a hearing shall be held on no less than five (5) business days' notice, with

---

[7]     The Bid Assessment Criteria listed herein are not mandatory, not exhaustive, and are provided for illustrative purposes only. The Debtors, in their discretion in the exercise of their business judgment and in consultation with any Committee and the Agents, may consider any criteria that the Debtors consider reasonably relevant to the value of any Qualified Bid.

objections due at least one (1) day prior to such hearing, unless otherwise ordered by the Court. For the avoidance of doubt, the scope of such hearing shall be limited to issues relating to the identity of the Back-Up Bidder such as adequate assurance of future performance, and the assumption and assignment of any Potential Designated Contracts to the Back-Up Bidder.  If for any reason the Back-Up Bidder fails to consummate the acquisition of the Assets in accordance with the Back-Up Bid, the Back-Up Bidder's Deposit shall be forfeited to the Debtors and such forfeited Deposit shall constitute collateral of the DIP Agent and Pre-Petition Agent, and be subject to the debtor-in-possession financing orders.

## Deposit

(x)     No later than the Bid Expiration Date, the Debtors shall return to each Qualified Bidder(s), other than the Prevailing Bidder and the Back-Up Bidder, their respective Deposit(s). No later than the seventh (7th) business day after the closing of the sale of the Assets to the Prevailing Bidder, the Debtors shall return the Back-Up Bidder's Deposit to the Back-Up Bidder.

## Modifications

(y)     The Debtors, in consultation with any Committee and the Agents, may (a) extend the deadlines set forth in the Sale Procedures Order or the Sale Procedures, (b) waive any requirement for a Bid to be a Qualified Bid or to be the Prevailing Bid, including, but not limited to, designating one or more Qualified Partial Bids for less than substantially all the Assets as the Prevailing Bid or Prevailing Bids, and/or (c) adopt, implement, and/or waive such other, additional or existing procedures or requirements that in their discretion serves to further an orderly Auction and bid process, including, but not limited to, the imposition of a requirement that all Qualified Bidders submit sealed Qualified Bids during the Auction, all without further notice except to those parties that would be entitled to attend the Auction or participate in the Auction, as appropriate; in each case (a)-(c), without limiting the rights of the Agents under the DIP Orders.

(z)     The Debtors, in consultation with any Committee and the Agents, may, in their discretion, (a) determine which Qualified Bid, if any, is the Prevailing Bid, and (b) reject at any time before entry of the Sale Order approving the Prevailing Bid, any Bid that, in the discretion of the Debtors, in consultation with the Committee and the Agents, is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code or the Sale Procedures, or (iii) contrary to the best interests of the Debtors' estates and their creditors.  At or before the conclusion of the Auction, the Debtors, in consultation with any Committee and the Agents, may impose such other terms and conditions upon Qualified Bidders as the Debtors determine to be in the best interests of the Debtors' estates in this case.

## Right to Credit Bid

(aa)     Antares, in its capacity as DIP Agent and Pre-Petition Agent, or a designee or subagent thereof shall be entitled to credit bid, subject to any limits in the Stalking Horse Agreement, all or a portion of the outstanding obligations under the DIP Credit Agreement and Prepetition First Lien Secured Credit Agreement (each as defined in the DIP Orders) in accordance with section 363(k) of the Bankruptcy Code and as directed by the DIP Lenders and the Prepetition First Lien Secured Lenders (each as defined in the DIP Orders), as applicable, pursuant to the DIP

Credit Agreement and the Prepetition First Lien Secured Credit Agreement.  BLH AcqCo shall be deemed to be a Qualified Bidder for all purposes hereunder.

20.     Unless otherwise determined by the Debtors, after consultation with the DIP Agent, counsel for the Prepetition First Lien Secured Lenders and the Prepetition First Lien Secured Agent, and any official committee appointed in these Chapter 11 Cases, the Debtors will consider proposals for the acquisition of all of the Purchased Assets in a single sale to a single Qualified Bidder or in multiple sales to multiple Qualified Bidders.

21.     The Debtors reserve the right to modify the Sale Procedures as necessary, including, without limitation, any deadlines thereunder, if such modification is determined by the Debtors, in consultation with the DIP Agent, the Pre-Petition Lenders, the Required Lenders and any official committee appointed in these Chapter 11 Cases, as they deem appropriate to maximize value for the Debtors' estates and creditors.

22.     The Debtors will present the results of the Auction to the Court at the Sale Hearing, at which time certain findings will be sought from the Court regarding the Auction, including, among other things, that: (a) the Auction was conducted and the Prevailing Bidder (or Bidders) was properly selected in accordance with the Sale Procedures; (b) the Auction was fair in substance and procedure; and (c) consummation of the Purchased Asset sale by the Prevailing Bidder will provide the highest or otherwise best value for the Purchased Assets and is in the best interests of the Debtors, their estates and creditors.

23.     The Debtors believe that the Sale Procedures are fair and reasonable and are not likely to dissuade any serious potential purchaser from bidding for the Purchased Assets.

**C.     The Break-Up Fee and Expense Reimbursement**

24.     The Stalking Horse Purchaser has requested bid protections consisting of a break-up fee in the amount equal to 3% of the Credit Bid component of the Purchase Price (the "Break-

18

Up Fee") and the Expense Reimbursement of actual, reasonable and documented out-of-pocket costs and expenses in connection with the Sale in an amount not to exceed 1% of the Credit Bid component of the Purchase Price (the "Expense Reimbursement"), each payable to the Stalking Horse Purchaser  upon the terms and conditions set forth in Section 8.3 of the Stalking Horse Agreement to partially defray the substantial out-of-pocket costs the Stalking Horse Purchaser has and is expected to incur in this process. The Break-Up Fee is warranted here in consideration of the Stalking Horse Purchaser's substantial expenditure of time, energy and resources, and the benefits to the Debtors' estate of securing a "stalking horse" or guaranteed minimum bid and setting a floor price at the Auction. Pursuant to Section 8.3, if the Stalking Horse Agreement is terminated as a result of the Debtors closing an Alternative Transaction, the Termination Fee shall be paid upon the closing of such Alternative Transaction.

25.    Accordingly, the Debtors, in the exercise of their sound business judgment, request approval of the Break-Up Fee and Expense Reimbursement.  The Break-Up Fee and Expense Reimbursement, if any is approved, will be an administrative expense claim against the Debtors' estates under section 503(b) of the Bankruptcy Code; provided, however, in the event that the Break-Up Fee and Expense Reimbursement shall be paid upon the closing of such Alternative Transaction.

**D.**    **Proposed Procedures for the Assumption  and Assignment of Executory Contracts and Unexpired Leases**

26.    In accordance with Bankruptcy Rule 6006(c), the Debtors must also provide notice of: (a) the potential assumption and assignment of executory contracts and unexpired leases and rights thereunder; (b) the proposed maximum Cure Costs that the Prevailing Bidder may pay to cure all defaults, if any, under executory contracts and unexpired leases and rights thereunder that the Debtors propose to assume and assign; and (c) the deadline to file objections to such

assumption and assignment, maximum Cure Costs, the existence of any defaults, and/or adequate assurance of the future performance.

27.     The Debtors propose the following procedures (the "Contract Procedures") to govern the assumption and assignment of the Potential Designated Contracts in connection with the sale of the Purchased Assets:[8]

(a)     By the Mailing Deadline, which is two (2) business days after entry of the Sale Procedures Order, the Debtors shall file with this Court and shall serve an Assignment Notice by overnight delivery service on each non-debtor counterparty to an executory contract or unexpired lease with any of the Debtors (each a "Non-Debtor Counterparty") that may be assumed and assigned to the Prevailing Bidder (the "Potential Designated Contracts"). The Debtors shall attach to the Assignment Notice a list identifying the Non-Debtor Counterparties to the Potential Designated Contracts and the proposed corresponding Cure Costs under the Potential Designated Contracts as of the Petition Date.

(b)     At any time prior to the closing of any sale transaction for the Purchased Assets, the Prevailing Bidder may direct the Debtors to serve a notice excluding any of the Potential Designated Contracts on (i) the Non-Debtor Counterparty to such Potential Designated Contracts and (ii) all Objection Notice Parties other than the Debtors, indicating, by reasonably specific information, which Potential Designated Contracts have been excluded, and stating that the Prevailing Bidder has excluded such Potential Designated Contracts. Upon consummation of the sale with the Prevailing Bidder and service of such notice, the executory contracts and/or unexpired leases referenced in such notice (x) shall no longer be considered Potential Designated Contracts; (y) shall not be deemed to be, or to have been, assumed or assigned; and (z) shall remain subject to assumption, rejection or assignment by the Debtors.

(c)     For each Potential Designated Contract, on the Assignment Notice, the Debtors shall indicate the proposed Cure Costs relating to such Potential Designated Contract. The Assignment Notice also may identify any additional terms or conditions of assumption and assignment.

(d)     Objections, if any, to the proposed Cure Costs, or to the proposed assumption and assignment of the Potential Designated Contracts, excluding objections related to adequate assurance of future performance or objections relating to whether applicable law excuses the Non-Debtor Counterparty from accepting performance by, or rendering performance to, the Prevailing Bidder for purposes of section 365(c)(1) of the Bankruptcy Code, must be in writing and filed with this Court and served on the Objection Notice Parties so as to be received no later than thirty (30) days after the Mailing Deadline (the "Cure/Assignment Objection Deadline"). The Non-Debtor Counterparties shall have until the Sale Hearing to submit an objection to the Debtors' ability to assign the Potential Designated Contract to the Prevailing Bidder without the Non-Debtor

---

[8]     If requested by the Prevailing Bidder, these Contract Procedures may be modified if necessary, by further order of this Court after expedited notice and a hearing.

Counterparty's consent or to the adequate assurance of future performance to be provided (the "Adequate Assurance Objection Deadline," and together with the Cure/Assignment Objection Deadline, the "Contract Objection Deadlines").

(e)      Where a Non-Debtor Counterparty to a Potential Designated Contract files an objection meeting the requirements of subparagraph (d), objecting to the assumption by the Debtors and assignment to the Prevailing Bidder of such Potential Designated Contract (the "Disputed Designation") and/or asserting a cure amount higher than the proposed Cure Costs listed on the Assignment Notice (the "Disputed Cure Costs"), the Debtors and the Non-Debtor Counterparty shall meet and confer in good faith to attempt to resolve any such objection without Court intervention.  If the Debtors and the Non-Debtor Counterparty determine that the objection cannot be resolved without judicial intervention, then the determination of the assumption and assignment of the Disputed Designation and/or the amount to be paid under section 365 of the Bankruptcy Code with respect to the Disputed Cure Costs will be determined by the Court at the Sale Hearing, unless the Debtors, the Prevailing Bidder and the Non-Debtor Counterparty to the Potential Designated Contract in dispute agree otherwise or the Court orders otherwise.  If the Court determines at the Sale Hearing that the Potential Designated Contract will not be assumed and assigned, then such executory contract or unexpired lease shall no longer be considered a Potential Designated Contract.  If any objection related to a Disputed Designation or Disputed Cure Costs is continued beyond the Sale Hearing, the Prevailing Bidder shall escrow the portion of the Cure Costs that is disputed pending such resolution.

(f)      Any Non-Debtor Counterparty to a Potential Designated Contract who fails to timely file an objection to the proposed Cure Costs or the proposed assumption and assignment of a Potential Designated Contract by the Contract Objection Deadlines, as applicable, is deemed to have consented to such Cure Costs and the assumption and assignment of such Potential Designated Contract by the Debtor and to the Prevailing Bidder, and such party shall be forever barred from objecting to the Cure Costs and from asserting any additional cure or other amounts against the Debtors, their estates or the Prevailing Bidder.

(g)      If the Non-Debtor Counterparty to a Potential Designated Contract fails to timely object to the assumption and assignment of a Potential Designated Contract or the proposed Cure Cost relating thereto by the Contract Objection Deadlines, as applicable, or upon the resolution of any timely objection by agreement of the parties or order of the Court approving an assumption and assignment, such Potential Designated Contract shall be deemed to be assumed by the Debtors and assigned to the Prevailing Bidder and the proposed Cure Cost related to such Potential Designated Contract shall be established and approved in all respects, subject to the conditions set forth in subparagraph (h) below.

(h)      The Debtors' decision to assume and assign the Potential Designated Contract is subject to Court approval and consummation of a Purchased Asset sale transaction with a Prevailing Bidder. Accordingly, subject to the satisfaction of conditions in subparagraph (g) above, the Debtors shall be deemed to have assumed and assigned each of the Potential Designated Contracts as of the date of and effective only upon the closing date of a Purchased Asset sale transaction with a Prevailing Bidder, and absent such closing, each of the Potential Designated Contracts shall neither be deemed assumed nor assigned and shall in all respects be subject to subsequent assumption or rejection by the Debtors under the Bankruptcy Code.  Also, assumption

21

and assignment of the Potential Designated Contracts is subject to the Prevailing Bidder's right set forth in subparagraph (b) above (and inclusion of any document on the list of Potential Designated Contracts shall not constitute or be deemed to be a determination or admission by the Debtors or the Prevailing Bidder that such document is, in fact, an executory contract or unexpired lease within the meaning of the Bankruptcy Code, all rights with respect thereto being expressly reserved).  The Prevailing Bidder shall have no rights in and to a particular Potential Designated Contract until such time as the particular Potential Designated Contract is assumed and assigned in accordance with the procedures set forth herein.

(i)    Except as may otherwise be agreed to in an APA with a Prevailing Bidder or by the parties to a Potential Designated Contract, the defaults under the Potential Designated Contract that must be cured in accordance with section 365(b) of the Bankruptcy Code shall be cured as follows: without any reduction of or credit against the amount of the Prevailing Bid, the Purchaser shall pay all Cure Costs relating to an assumed executory contract or unexpired lease within ten days after the later of (i) the closing date specified in the APA entered into with a Prevailing Bidder or (ii) the date on which such executory contract or unexpired lease is deemed assumed and assigned, in accordance with subparagraph (h) of these Contract Procedures.

## Basis For Relief

A.    **Approval of the Sale Procedures Is Appropriate and in the Best Interests of the Debtors' Estates and Their Creditors**

*(1)    The Sale Procedures Are Appropriate under the Circumstances*

28.    Maximization of proceeds received by the estate is one of the dominant goals of any proposed sale of estate property.  In the hope of maximizing the value received by the estate, courts typically establish procedures that are intended to enhance competitive bidding by, among other things, setting forth the rules that will govern the auction process.  *See, e.g., In re Fin. News Network, Inc.*, 126 B.R. 152, 156 (Bankr. S.D.N.Y. 1991) ("court-imposed rules for the disposition of assets . . . [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estates"); *In re Edwards*, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998) (bid procedures should allow for "an open and fair public sale designed to maximize value for the estate").

29.    Although the Debtors commenced efforts to market the Purchased Assets for sale prior to the Petition Date, a stalking horse bid has not yet been finalized.  Notwithstanding that,

the Debtors believe that the Sale Procedures will help the Debtors receive the maximum value for the Purchased Assets by establishing a competitive bidding process in which potentially interested parties can step forward and bid, knowing, among other things, the quality of the title they will receive if they are the Prevailing Bidder.  The Debtors believe that the Sale Procedures will encourage active bidding from seriously interested parties who possess the financial and operational capacity to purchase and/or operate the Purchased Assets.  Furthermore, the proposed Sale Procedures will allow the Debtors to conduct an auction in a controlled, fair and competitive fashion that will serve to dispel any doubt as to the best and highest offer reasonably available for the Purchased Assets.  Therefore, the Debtors believe the Sale Procedures will confirm that they are receiving the greatest possible consideration for the Purchased Assets.

30.     Procedures to dispose of assets, similar to the proposed Sale Procedures, have been approved in other large, complex chapter 11 cases in this District.  *See e.g. In re Things Remembered Inc.*, No. 19-10234 (KG) (Bankr. D. Del. Feb. 21, 2019);  *In re Argos Therapeutics Inc.*, No. 18-12714 (KJC) (Bankr. D. Del. Dec. 20, 2018); *In re Bertucci's Holdings Inc.*, No. 18-10894 (MFW) (Bankr. D. Del. May 7, 2018); *GAL Liquidating Corp.*, No. 17-12100 (LSS) (Bankr. D. Del. Nov. 15, 2017); *Emerald Oil, Inc.*, No. 16-10704 (KG) (Bankr. D. Del. July 28, 2016); *In re Quicksilver Res., Inc.*, No. 15-10585 (LSS) (Bankr. D. Del. Oct. 6, 2015).  In sum, the Debtors believe that the proposed Sale Procedures provide an appropriate framework for expeditiously establishing that the Debtors are receiving the best and highest offer for the Purchased Assets. Accordingly, the proposed Sale Procedures are reasonable, appropriate and within the Debtors' sound business judgment under the circumstances.

(2)    *The Overbid Protections Are Appropriate Under the Circumstances*

31.    The Minimum Bid Increment is appropriate under the circumstances and will enable the Debtors to simultaneously maximize the value for the Purchased Assets while limiting the chilling effect in the marketing process.  This provision also is consistent with the overbid increments previously approved by courts in this District.  *See e.g. In re Things Remembered Inc.*, No. 19-10234 (KG) (Bankr. D. Del. Feb. 21, 2019);  *In re Argos Therapeutics Inc.*, No. 18-12714 (KJC) (Bankr. D. Del. Dec. 20, 2018); *In re Bertucci's Holdings Inc.*, No. 18-10894 (MFW) (Bankr. D. Del. May 7, 2018); *GAL Liquidating Corp.*, No. 17-12100 (LSS) (Bankr. D. Del. Nov. 15, 2017); *Emerald Oil, Inc.*, No. 16-10704 (KG) (Bankr. D. Del. July 28, 2016); *In re Quicksilver Res., Inc.*, No. 15-10585 (LSS) (Bankr. D. Del. Oct. 6, 2015).

(3)    *The Break-Up Fee and Expense Reimbursement, if Approved by the Court,  Is an Actual and Necessary Cost of Preserving the Debtors' Estate*

32.    Debtors submit that approval of the Break-Up Fee and Expense Reimbursement are justified by the facts and circumstances of these Chapter' 11 Cases, whether considered under the business judgment rule or as an administrative expense of the estates.  Break-up fees and expense reimbursements are a vital means by which a debtor-in-possession can manage value maximization risk by setting a value floor for the assets to be sold, which is a key benefit to the Debtors and their estates and weighs heavily in favor of approving the procedures for later offering the Break-Up Fee and Expense Reimbursement.  Moreover, without the ability to later offer the Break-Up Fee and Expense Reimbursement upon shortened notice, the sale and reorganization process might be substantially hampered.  Such fees encourage the investment of time, effort and money necessary to consummate a sale of the Purchased Assets, despite the possibility that the Stalking Horse Purchaser may not ultimately effectuate the Transaction.   A break-up fee and expense reimbursement are important tools to be used to encourage bidding.

24

33.     Moreover, Break-Up Fee and Expense Reimbursement are material inducements for, and condition of, the Stalking Horse Purchaser's entry into the Stalking Horse Agreement. The Stalking Horse Purchaser has put forth considerable time and resources to negotiate the Stalking Horse Agreement, which will serve as a floor price at the Auction and, regardless of whether other Qualified Bids are received, will benefit the Debtors' estates. The Debtors believe that the Break-Up Fee and Expense Reimbursement are fair and reasonable in view of (a) the analysis and negotiation undertaken by the Stalking Horse Purchaser in connection with the transaction and (b) the fact that, if the Break-Up Fee and Expense Reimbursement are triggered, the Stalking Horse Purchaser's efforts will have influenced the chances that the Debtors will receive the highest or otherwise best offer for the Purchased Assets to the benefit of all of the Debtors' stakeholders.

34.     Thus, the Debtors submit that the Break-Up Fee and Expense Reimbursement are: (a) an actual and necessary cost of preserving the Debtors' estates within the meaning of sections 503(b) and 507(a) of the Bankruptcy Code; (b) commensurate to the real and substantial benefit conferred on the Debtors' estates by the Stalking Horse Purchaser, and (c) reasonable and appropriate in light of, among other things (i) the size and nature of the Purchased Asset sale contemplated and comparable transactions, (ii) the substantial efforts that will need to be expended by the Stalking Horse Purchaser, (iii) the benefits the Stalking Horse Purchaser will have provided to the Debtors' estate, their creditors and other parties in interest, notwithstanding that the Stalking Horse Agreement may be terminated by the Debtors if any higher or otherwise better transaction is identified and consummated at the conclusion of the Auction, and (d) necessary to induce the Stalking Horse Purchaser to serve as a "stalking horse" bidder and to continue to pursue the Purchased Asset sale transaction.

35.    The determination of whether a break-up fee should be allowed is made based on standards established by the Third Circuit in *Calpine Corp. v. O'Brien Env't Energy, Inc. (In re O'Brien Env't Energy. Inc.),* 181 F.3d 527 (3d Cir. 1999).  *O'Brien* held that while bidding incentives are measured against a business judgment standard in non-bankruptcy transactions, the administrative expense provisions in section 503(b) of the Bankruptcy Code govern in the bankruptcy context.  *Id.*  To be approved, bidding incentives, such as break-up fees, must provide benefit to a debtor's estate.  *Id.* at 533; *see also In re Reliant Energy Channelview LP*, 594 F.3d 200, 206 (3d Cir. 2010) ("the allowability of break-up fees, like that of other administrative expenses, depends on the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate").

36.    *O'Brien* identified at least two instances in which bidding incentives may provide benefit to the estate.  First, benefit may be found if "assurance of a breakup fee promote[s] more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would [be] limited." *Id.* at 537.  Second, where the availability of bidding incentives induces a bidder to research the value of the debtor and submit a bid that serves as a minimum or floor bid on which other bidders can rely, "the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth." *Id.*

37.    The Debtors submit that the Break-Up Fee and Expense Reimbursement are consistent with the *O'Brien* standard and should be approved as fair and reasonable.  First, the Debtors and their professionals are negotiated with any and all bidders willing to serve as the Stalking Horse Purchaser, which dispenses of any notion of self-dealing or non-arm's-length negotiations under the circumstances.  Second, the Debtors believe, based on their reasoned

26

business judgment, that designating a Stalking Horse Purchaser to serve as a "stalking horse" enhances their ability to maximize value without chilling bidding. The presence of a Stalking Horse Purchaser, first and foremost, signifies the existence of a contractually-committed bidder at a floor price believed to be fair and reasonable. In addition, such an incentive provides the Debtors with the upside opportunity of potentially receiving a higher or otherwise better offer which, absent such a bid floor, might not otherwise be realized. Third, the Debtors believe, based on their reasoned business judgment, that the amount of the Break-Up Fee and Expense Reimbursement is reasonable and appropriate relative to the commitments made and resources expended by the Stalking Horse Purchaser. Further, if the Break-Up Fee and Expense Reimbursement were to be paid, it will be because the Debtors have received a higher or otherwise superior offer. Additionally, the proposed Break-Up Fee and Expense Reimbursement is well within the range of such fees approved by this and other courts, as noted above.

> (4)    *The Proposed Sale Notice and Assignment Notice and*
> *Proposed Dates for the Sale Objection Deadlines, the Contract Objection*
> *Deadlines and the Sale Hearing Are Appropriate*

38.    Under Bankruptcy Rules 2002(a) and (c), the Debtors are required to notify their creditors of any proposed sale of their assets, including a disclosure of the time and place of the Sale Hearing, the terms and conditions of the sale and the deadline for filing any objections related thereto. The Debtors submit that the Sale Notice fully complies with Bankruptcy Rules 2002(a) and (l) and includes adequate information to (a) enable interested parties to bid on the Purchased Assets pursuant to the Sale Procedures and by the Bid Deadline, and (b) inform such parties of the Sale Hearing and the relevant Sale Objection Deadline related thereto.

39.     The Debtors submit that the proposed Sale Objection Deadline is reasonable and appropriate under the circumstances.  Parties in interest are provided adequate notice in accordance with the Bankruptcy Rules and the Local Rules.

40.     The Debtors submit that the notice to be provided via the Assignment Notice is reasonably calculated to provide all counterparties to the Potential Designated Contracts with proper notice of the potential assumption and assignment of their executory contracts or unexpired leases, any Cure Costs relating thereto and the Contract Procedures, including, but not limited to, the Contract Objection Deadlines. As such, the proposed Assignment Notice is appropriate and sufficient under the circumstances.

41.     The Debtors submit that the notice to be provided through the Sale Notice and the method of service proposed herein fully complies with the requirements set forth in Bankruptcy Rule 2002 and constitutes good and adequate notice of the Sale Procedures and the subsequent proceedings related thereto, including the proposed dates for (a) the Bid Deadline; (b) the Sale Objection Deadline; (c) the Contract Objection Deadlines; and (d) the Sale Hearing.  Therefore, the Debtors respectfully request this Court to approve the proposed notice procedures.

**REQUEST FOR RELIEF UNDER BANKRUPTCY RULES 6004(H) AND 6006(D)**

42.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  Similarly, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise."  The Debtors request that the Sale Procedures Order be effective immediately by providing that the fourteen (14) day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

43.     The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented.  See Advisory Committee Notes to Fed. R. Banks. P. 6004(h) and 6006(d).  Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the fourteen-day stay period, Collier on Bankruptcy suggests that the fourteen (14) day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure."  10 Collier on Bankruptcy ¶ 6064.09 (L. King, 15th rev. ed. 1988).  Furthermore, Collier's provides that if an objection is filed and overruled, and the objecting party informs the Court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal.  *Id.*

## NOTICE

44.     Notice will provide notice of this motion to:  (a) the Office of the U.S. Trustee for the District of Delaware; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) counsel to the DIP Agent; (d) counsel to the Prepetition First Lien Secured Agent; (e) counsel to Prepetition Second Lien Secured Agent; (f) the United States Attorney's Office for the District of Delaware; (g) the Internal Revenue Service; (h) the United States Securities and Exchange Commission; (i) the state attorneys general for all states in which the Debtors conduct business; (j) all known parties that have asserted a lien on the Debtors' assets; and (k) any party that requests service pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

WHEREFORE, the Debtors respectfully request that the Court enter the Sale Procedures Order in substantially the form attached hereto as <u>Exhibit A</u>, (a) approving bidding procedures in connection with the sale of substantially all of their assets; (b) scheduling a hearing to consider the sale of assets; (c) approving the form and manner of notice thereof; and (d) grant such other and further relief to the Debtors as the Court may deem proper.

Dated: January 27, 2020
Wilmington, Delaware

/s/ Domenic E. Pacitti
Domenic E. Pacitti (DE Bar No. 3989)
Michael W. Yurkewicz (DE Bar No. 4165)
Sally E. Veghte (DE Bar No. 4762)
**KLEHR HARRISON HARVEY
BRANZBURG LLP**
919 North Market Street, Suite 1000
Wilmington, Delaware 19801
Telephone:    (302) 426-1189
Facsimile:    (302) 426-9193
Email:  dpacitti@klehr.com
          myurkewicz@klehr.com
          sveghte@klehr.com

*Proposed Counsel to the Debtors*