**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>BL RESTAURANTS HOLDING, LLC, *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 20-10156 (MFW)<br><br>(Jointly Administered)<br><br>Re: Docket No. 17<br><br>Hearing Date: February 27, 2020 at 2:00 p.m.<br>Objection Deadline: February 21, 2020 at 5:00 p.m.[2] |

**OBJECTION OF THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS TO DEBTORS' MOTION FOR ENTRY
OF AN ORDER (I) APPROVING PROCEDURES IN CONNECTION WITH THE
SALE OF THE DEBTORS' ASSETS; (II) APPROVING BID PROTECTIONS;
AND (III) APPROVING THE FORM OF STALKING HORSE AGREEMENT**

The Official Committee of Unsecured Creditors (the "Committee") of BL Restaurants Holding, LLC, *et al.*, the above-captioned debtors and debtors-in-possession (collectively, the "Debtors"), by and through its proposed undersigned counsel, hereby files this objection (the "Objection") to *Debtors' Motion for Entry of an Order (A) Approving Procedures in Connection With Sale of Debtors' Assets; (B) Scheduling Auction and Hearing to Consider Approval of Sale; (C) Approving Procedures Related to Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; (D) Approving Form and Manner of Notice Thereof; and (E) Granting Related Relief* (the "Motion").[3] In support of this Objection, the Committee respectfully states as follows:

---

[1] The Debtors in these cases are: BL Restaurants Holding, LLC; BL Restaurant Operations, LLC; BL Restaurant Franchises, LLC; and BL Hunt Valley, LLC.

[2] Extended as to the Committee with the consent of the Debtors.

[3] Docket No. 17. Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

**PRELIMINARY STATEMENT**

1.  Given the lack of value for unsecured creditors under the current credit bid, the Committee supports the pursuit of a fair and reasonable sale process designed to foster competitive bidding. The relief requested in the Motion, however, fails to achieve this goal in contravention of the clear mandate of the Bankruptcy Code. Instead, the sale procedures, bid protections and Stalking Horse Agreement will ultimately serve to chill bidding and deprive unsecured creditors of unencumbered value through a credit bid by Antares and the other senior creditors that provides no cash to the estates.

2.  The relief requested is inappropriate in three ways. First, the procedures themselves are not designed to foster robust bidding and does not require Antares to comply with the Bankruptcy Code. The sale timeline is unnecessarily truncated, with bids due less than 3 weeks following the hearing on this Motion, which will inherently chill interest in participating in the process. The procedures also remarkably include Antares as a consultation party in critical issues relating to the bidding process. The procedures also fail to mandate any deadline for Antares to provide adequate assurance of future performance as required under section 365.

3.  Second, the proposed bid protections are inappropriate in the context of these cases and will only serve to further chill bidding. Antares seeks approval of a $2.5 million break-up fee and $825,000 expense reimbursement in connection with a credit bid that is not supported by recent precedent. Antares does not need to be induced to participate in this process and had no learning curve with respect to the Debtors' operations. Antares has been involved with the business for at least six years and is submitting a credit bid to protect its existing interests. The bid protection will only deter bidding and deprive other creditors of value to the extent of competitive bidding.

4. Third, the Stalking Horse Agreement inappropriately seeks to deprive unsecured creditors of the value of unencumbered assets through an inappropriate credit bid. Notwithstanding extreme vagueness in identifying the assets sought to be acquired, it is clear that Antares intends to provide no cash consideration for various categories of unencumbered assets, including: (i) liquor licenses, remarkably whether or not they relate to go-forward locations, in states that do not authorize liens on liquor licenses; (ii) avoidance actions that are not subject to Antares' prepetition liens; (iii) other potential causes of action, including commercial tort claims, that have nothing to do with the go-forward operations; and (iv) the proceeds of D&O insurance policies for historic conduct unrelated to continuing operations. These unencumbered assets may serve as the only sources of recoveries for unsecured creditors absent competitive bidding. Rather than acknowledge and preserve such value, the Stalking Horse Agreement seeks to eradicate it.

5. Absent modification, the Court should not allow the Debtors to proceed down a path solely designed to benefit Antares, at the expense of the Debtors' estates and unsecured creditors. If the Debtors and Antares want to enjoy the benefits of chapter 11, they must conduct a fair sale process.

## BACKGROUND

### I. General Case Background

6. On January 27, 2020 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with this Court. Since the Petition Date, the Debtors have remained in possession of their assets and have continued to operate and manage their businesses as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3

7. On February 5, 2020, the Office of the United States Trustee for Region 3 appointed a five-member Committee consisting of: (i) A&Z Novi, LLC; (ii) Bradley Alverson; (iii) Brookfield Property REIT, Inc.; (iv) Edward Don & Company; and (v) NCR Corporation.[4] The Committee selected Kelley Drye & Warren LLP as its lead counsel and Womble Bond Dickinson (US) LLP as Delaware counsel. The Committee also selected Province, Inc. to serve as its financial advisor.

## II.  Prepetition Debt Structure

8. In 2010, Sun Capital acquired the Debtors from Restaurant America for an undisclosed price. Between 2010 and 2019, Sun Capital significantly expanded the company's footprint, growing from 31 to 135 locations.[5] Although the addition of new locations added to the company's revenue, which grew from $216 million in 2016 to $262 million in 2018, increased costs let to liquidity constraints, making it difficult for the Debtors to reinvest in the business, including refreshes to existing locations and advertising.[6] For the year ending 2016, the Debtors operated at a $6.6 million operating loss, which increased to an $11 million loss for 2018.

9. The Debtors are party to a Credit Agreement, dated March 27, 2014 (as amended, the "Senior Credit Agreement"), with Antares Capital LP, as agent and lender ("Antares") and the other lenders thereto (together with Antares, the "Senior Creditors"), which initially provided the Debtors with a $32 million credit facility.[7] Following a series of amendments and incremental advances to fund the Debtors' expansion, the Debtors were purportedly indebted

---

[4] Docket No. 143.

[5] *See Declaration of Howard Meitiner in Support of Debtors' First Day Motions and Applications* (the "Meitiner Declaration"), ¶ 3. Docket No. 4.

[6] *Id.* ¶ 18.

[7] *Id.* ¶ 9.

to the Senior Creditors in the amount of $62.4 million as of the Petition Date.[8] The obligations under the Senior Credit Agreement are secured by certain of the Debtors' assets.

10. The Debtors are also party to a Subordinated Credit Agreement, dated as of August 30, 2017 (as amended, the "Subordinated Credit Agreement") with Sun Capital. This facility replaced a prior subordinated facility dating back to 2011, that was provided by a different Sun Capital affiliate, BL Finance LLC. Following a series of amendments, the obligations under the Subordinated Credit Agreement increased to nearly $25 million, with $23.6 million outstanding as of the Petition Date.[9]

### III. The Debtors' Restructuring Efforts

11. In 2018, the Debtors hired a new CEO and management team to implement a turnaround strategy, including improvements to the guest experience, food quality and investments in advertising, as well as initiatives to increase same store sales.[10] Although these initiatives reportedly benefited approximately two-thirds of the Debtors' locations, 38 locations continued to suffer, generating a 10.9% SSS decline and $4 million loss in 2019.[11]

12. In light of these continuing losses and underperformance, in September 2019, the Debtors retained Carl Marx Advisors and Configure Partners to explore strategic alternatives, including a sale process.[12] In October 2019, Antares agreed to provide $3 million of incremental financing to fund the process.[13]

---

[8]     *Id.* ¶ 11.

[9]     *Id.* ¶ 15.

[10]    *Id.* ¶ 19.

[11]    *Id.* ¶ 20.

[12]    *Id.* ¶ 22.

[13]    *Id.* ¶ 23.

## IV. The Sale Procedures And Stalking Horse Agreement

13. Although the prepetition sale process resulted in numerous indications of interest and receipt of three letters of intent in December 2019, the Debtors were unable to reach agreement with any prospective purchaser.[14] Instead, the Debtors pivoted and, on January 26, 2020, only one day prior to the Petition Date, entered into a stalking horse agreement with Antares (the "Stalking Horse Agreement"). Pursuant to the Stalking Horse Agreement, Antares proposed to purchase certain of the Debtors' assets for an $82.5 million credit bid, plus the assumption of certain liabilities (the "Stalking Horse Bid").[15]

14. Notably, the Stalking Horse Bid does not include any cash consideration notwithstanding the fact that Antares seeks to acquire assets that are not subject to its liens. Pursuant to section 2.1(n) of the Stalking Horse Agreement, Antares seek to acquire all liquor licenses of the Debtors related to continuing restaurants as well as those related to excluded restaurants listed on a yet to be provided Schedule 7.1.[16] The Motion provides no explanation as to why Antares needs any liquor licenses with respect to excluded restaurants or the consideration being provided for liquor licenses that are not subject to its lien under applicable state law.

15. Pursuant to section 2.1(q) of the Stalking Horse Agreement, Antares seeks to acquire all causes of action of any seller other than "Excluded Claims."[17] Excluded Claims are vaguely defined as claims and causes of action to the extent related exclusively to any Excluded Asset or Excluded Liability.[18] Based on discussions with the Debtors, the Committee has no

---

[14] *Id.* ¶ 24.

[15] Stalking Horse Agreement, § 2.5.

[16] *Id.* § 2.1(n).

[17] *Id.* § 2.1(q).

[18] *Id.* at Article I.

transparency into the breadth of claims Antares intends to acquire under section 2.1(q) of the Stalking Horse Agreement or the consideration being provided to acquire such claims.

16. Similarly, while Section 2.2(l) of the Stalking Horse Agreement purportedly excludes the Debtors' directors' and officers' liability insurance policies from the list of acquired assets, it explicitly provides that any proceeds of such policies shall be payable to Antares.[19] The Motion is again silent as to the consideration being provided in exchange for the right of Antares to receive such proceeds.

17. The Debtors propose to subject the Stalking Horse Bid to higher and better offers through an expedited sale process, including a: (i) March 18 bid deadline; (ii) March 20 auction; (iii) March 27 sale hearing; and (iv) April 22 sale closing deadline. If approved, the process will afford parties less than three weeks from the bid procedures hearing to submit bids.[20]

18. Notably, the proposed procedures fail to include the deadline for Antares or alternative bidders to provide adequate assurance information as required by section 365(b)(1)(c) and (f)(2) of the Bankruptcy Code. The proposed bid procedures also unexplainably allow Antares to serve as a consultation party with respect to numerous critical decisions in the bidding process, including the procedures for conducting the auction, bid increments, modifications to the bid deadlines and selection of the winning bidder.

19. In addition, the Motion seeks approval of a $2,475,000 Break-Up Fee and an $825,000 Expense Reimbursement, amounting to 4% of the credit bid price (collectively, the "Bid Protections").[21] Together with the $500,000 initial overbid, a competing bid will need to be

---

[19] *Id*. § 2.2(l).

[20] Motion, ¶ 19(v).

[21] *Id.*

a minimum of $86.3 million to compete at the auction and potentially provide the estates any incremental value.[22]

## OBJECTION

20. The goal of a section 363 sale is to maximize proceeds for a debtor's estate and creditors.[23] To effectuate this goal, bankruptcy courts are provided discretion and latitude in conducting a sale. Courts have consistently held that bid procedures must be crafted to facilitate an open and fair public sale designed to maximize value for all creditors.[24]

21. Section 363 was not designed to allow a debtor to circumvent the Bankruptcy Code's protections for unsecured creditors. "A principal goal of the reorganization provisions of the Bankruptcy Code is to benefit the creditors of the Chapter 11 debtor by preserving going-concern value and thereby enhancing the amounts recovered by all creditors."[25] A sale that benefits only secured lenders to the exclusion of unsecured creditors runs contrary to the good-faith requirements inherent in the chapter 11 process and should not be countenanced.[26]

---

[22] The Committee notes that this minimum overbid amount does not account for the significant increase in Configure's M&A Transaction Fee resulting from an alternative bid, which will increase from $700,000 to more than $2.4 million in the event of any non-credit bid transaction.

[23] *In re Dura Auto. Sys.*, 2007 Bankr. LEXIS 2764, at *253-54 (Bankr. D. Del. Aug. 15, 2007) (internal quotations omitted) (debtor "had a fiduciary duty to protect and maximize the estate's assets") (*citing In re Mushroom Transp. Co., Inc*., 382 F.3d 325, 339 (3rd Cir. 2004); *Official Comm. of Unsecured Creditors of Cybergenics Corp., v. Chinery*, 330 F.3d 548, 573 (3rd Cir. 2003) (same); *Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)*, 107 F.3d 558, 564-65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code is to enhance the value of the estate at hand").

[24] *In re Wintz Co*., 219 F.3d 807, 812 (8th Cir. 2000) ("[B]ankruptcy courts have wide discretion in structuring sales of estate assets") (*citing Food Barn Stores*, 107 F.3d at 565); *Edwards*, 228 B.R. at 561 ("[B]ankruptcy courts are necessarily given discretion and latitude in conducting [a] sale").

[25] *In re Timbers of Inwood Forest Assoc., Ltd*., 808 F.2d 363, 373 (5th Cir. 1987), aff'd, 484 U.S. 365 (1988).

[26] *See In re Gulf Coast Oil Corp*., 404 B.R. 407, 428 (Bankr. S.D. Tex. 2009) (denying 363 sale that would transfer the debtors' assets to its secured creditor that it otherwise could not achieve through foreclosure).

22.     Where a debtor seeks to sell substantially all assets through a sale process under section 363, the sale requires closer scrutiny because such a sale deprives creditors of the safeguards afforded by the confirmation process.[27]  In such expedited sales, the debtor bears a heightened burden beyond mere sound business judgment.[28]

23.     The Committee is supportive of a reasonable and fair sale process that will maintain the Debtors' operations, preserve jobs, maintain relationships with existing vendors, suppliers and landlords, and is ultimately designed to maximize value for all stakeholders.  The proposed sale process, however, and the substantial benefits afforded Antares at the expenses of all other stakeholders, is not designed to achieve these goals and will only serve to chill bidding and deprive unsecured creditors of value.

I.  **The Bid Procedures Should Be Rationalized To Foster
    An Open and Competitive Process**

24.     Notwithstanding the Debtors' prepetition marketing efforts, the sale process would clearly benefit from a brief extension of the milestones mandated by Antares in the DIP. As currently proposed, bids will be due by March 18, less than three weeks following the hearing on the Motion, notwithstanding the fact that a sale closing milestone is not until the end of April.

---

[27] *In re Summit Global Logistics, Inc.*, 2008 Bankr. LEXIS 896, *27-28 (Bankr. D. N.J. Mar. 26, 2008) (*quoting In re Medical Software Solutions*, 286 B.R. 431, 445 (Bankr. D. Utah 2002) ("[W]hen a pre-confirmation [section] 363(b) sale is of all, or substantially all, of the Debtor's property, and is proposed during the beginning stages of the case, the sale transaction should be closely scrutinized …")); *In re Exaeris, Inc.*, 380 B.R 741, 744 (Bankr. D. Del. 2008) (the sale of substantially all of a debtor's assets outside of plan confirmation "requires careful bankruptcy court scrutiny").

[28] *See In re CGE Shattuck, LLC*, 254 B.R. 5, 12 (Bankr. D. N.H. 2000) (internal citations omitted) ("a debtor may not use the provisions of § 363 to deny creditors the protections they would receive under Chapter 11 if the transaction were part of a plan of reorganization" and that "[t]he closer a proposed transaction gets to the heart of the reorganization process, the greater scrutiny the Court must give to that matter."); *In re Channel One Communications, Inc.*, 117 B.R. 493, 496 (Bankr. E.D. Mo. 1990) ("[I]n the absence of the protection and finality offered by a disclosure statement and plan, such a transaction pursuant to Section 363(b) requires specific authorization by the Court. The sale must be closely scrutinized, and the proponent bears a heightened burden of proving the elements necessary for authorization") (*citing In re Industrial Valley Refrigeration & Air Conditioning Supplies, Inc.,* 11 B.R. 15, 17 (Bankr. E.D. Pa. 1987)).

25. While the Committee does not doubt Configure's efforts to market the assets prior to the Petition Date, the fact is that new parties are now involved in the process and are actively conducting diligence and assessing potential bids. Such parties must have a fullsome opportunity to analyze the Debtors' assets and the benefits that a bankruptcy sale, with all of the protections afforded under section 363, will provide. In particular, a number of financial enhancements will be realized in connection with the bankruptcy cases, including potential rent and operational savings achieved through the closure of 38 stores.

26. Given the significant benefits that would result from a robust auction, the Committee proposes the following modification of the sale timeline:

| Event/Deadline | Proposed Timeline | Committee's Timeline |
| --- | --- | --- |
| Stalking Horse Deadline to Serve Adequate Assurance Information | N/A | March 2 |
| Deadline to Serve Cure/Assignment Notice | March 2 | March 2 |
| Bid Deadline | March 18 | April 3 |
| Non-Stalking Horse Deadline to Serve Adequate Assurance Information | N/A | April 6 |
| Auction | March 20 | April 7 |
| Cure/Assignment/Stalking Horse Adequate Assurance Objection Deadline | March 18 | April 9 |
| Sale Objection Deadline | March 24 | April 9 |
| Non-Stalking Horse Adequate Assurance Objection Deadline | March 24 | April 14 |
| Sale Hearing | March 27 | April 16 |
| Sale Closing | April 22 | April 30 |

27. The Committee's proposed timeline will provide interested parties two additional weeks to submit bids, while keeping the outside closing date in April, which should minimize the incremental cost associated with a modest extension. This timeline will also allow the Committee to conduct a full 60-day investigation of Antares' prepetition liens and claims, as

mandated by this Court's local rules. As set forth in the Committee's objection to the Debtors' proposed DIP facility, although the DIP order contemplates a 60-day challenge period, such period is rendered meaningless by virtue of the current proposed sale timeline, which proposes an auction more than two weeks prior to the Committee's April 6 challenge deadline. The Committee must have the opportunity to conduct a thorough investigation in light of the proposed credit bid and the absence of any proposed value for unsecured creditors under the Stalking Horse Bid.

28. The Committee's proposed sale timeline also cures a core defect in the existing procedures with respect to adequate assurance information. The Sale Procedures do not include any deadline for either Antares or third-party bidders to provide adequate assurance information. Section 365 mandates that landlords and contract counterparties be provided sufficient time to review such information in advance of any objection deadline. Similarly, the Committee is keenly interested in the proposed capitalization of the go-forward business to assess the long-term viability of any acquisition entity. Given that the Stalking Horse Agreement was executed in January, Antares should have no issue providing adequate assurance information by Mach 2. The proposed April 6 deadline for other bidders will provide the Debtors three days from receipt of bids to distribute such information and a week after the auction for parties to object.

29. Lastly, the proposed inclusion of Antares as a consultation party in the sale process is inappropriate. Antares is the stalking horse bidder and, therefore, should have no say in the bid process. Antares should not be a consultation party unless and until it gives notice to the Debtors that it no longer intend to participate in the sale process as a bidder.[29]

---

[29] *See Nuo Therapeutics,* Case No. 16-10192 (MFW) (Bankr. D. Del. February 22, 2016); Hr'g Tr. at 248:4-248:10 ("With respect to the other [bid] process issues, I agree if Deerfield is going to be a bidder, it shouldn't have consultation rights with the Debtors. It has no fiduciary duty to this estate and, therefore, any comments it has on other bids, really, should not be a factor here. I think, in contrast, the Creditors Committee and the Ad Hoc Committee should have consultation rights."). An excerpt of the transcript is attached hereto as <u>Exhibit A</u>.

## II. The Bid Protections Will Chill Bidding And Should Be Denied

30. The purpose of bid procedures is to facilitate the fair sale of a debtor's assets through a process that will maximize value for the benefit of all creditors.[30] The Debtors have an affirmative obligation to develop a bid process that will maximize value.[31] Courts have routinely held that procedures that will have a chilling effect on the bidding process should not be approved.[32] The Debtors, however, have failed to demonstrate that: (i) the Bid Protections are "actually necessary to preserve the value of the Debtors' estates" under section 503(b) of the Bankruptcy Code; and (ii) even if such protections are necessary to preserve the value of these estates, that the protections do "not give an advantage to a favored purchaser over other bidders by increasing the cost of the acquisition."[33]

31. Where a party is willing to bid on the debtor's assets without the possibility of a break-up fee, a fee is not needed to induce a party to bid.[34] Here, there is no evidence that either the Break-Up Fee or the Expense Reimbursement are fundamental aspects of the Stalking Horse Bid, without which Antares would not have submitted a bid for the Debtors' assets. Instead,

---

[30] *Food Barn Stores*, 107 F.3d at 564-65; *In re E-Z Convenience Stores, Inc.*, 289 B.R. 45, 55 (Bankr. M.D. N.C. 2003) (denying sale because the auction procedures were patently unfair and inequitable); *In re Edwards*, 228 B.R. at 561 (purpose of bid procedures is to facilitate an open and fair public sale designed to maximize value for the estate); *In re Reading Broad., Inc.*, 386 B.R. 562, 575 (Bankr. E.D. Pa. 2008) (the purpose of bankruptcy sales is to obtain the highest and best price for the estate and its creditors).

[31] *In re Mataldyne Corp.*, 409 B.R. 661, 667-68 (Bankr. S.D.N.Y. 2009).

[32] *In re President Casinos, Inc.*, 314 B.R. at 786 (declining to approve procedures that chilled bidding); *In re Jon J. Peterson, Inc.*, 411 B.R. 131, 137 (Bankr. W.D.N.Y. 2009) (unless the bid process remains fair and equitable, competitors will refrain from participating which is necessary to assure the highest possible value); *In re America West Airlines, Inc.*, 166 B.R. 908, 912-13 (Bankr. D. Ariz. 1994) (denying bid procedure that did not induce competitive bidding).

[33] *In re O'Brien Env'l Energy, Inc.,* 181 F.3d 527, 535 (3d Cir. 1999).

[34] *See In re Reliant Energy Channelview LP,* 594 F.3d 200, 207 (3d Cir. 2010) (finding that the purchasers agreement to enter into the bid process without the entitlement to receive a break-up fee subject to court approval means that the bidder "did make its bid without the assurance of a break-up fee, and this fact destroys [the debtor's] argument that the fee was needed to induce it to bid.").

Antares agreed to serve as the stalking horse to protect the value of its investment, undermining the need for such protections.

32.     The need for the Bid Protections is further undermined by Antares' involvement with the Debtors since 2014. Antares did not need to be induced into the process and does not have a learning curve. It has been well versed in the Debtors' operations for 6 years. There is, therefore, no reason for a $2.5 million Break-Up Fee or an $825,000 Expense Reimbursement in connection with this credit bid, other than to chill the bidding process and extract value from other stakeholders.[35]

33.     The requested Bid Protections are also not supported by recent precedent. While the Debtors and Antares will undoubtedly point to boilerplate case law authorizing break-up fees in the 2-3% range, such case law fails to account for the facts of this case. Based upon the Committee's review of comparable cases where the stalking horse purchaser was also the prepetition lenders, 60% did not include any break-up fee, 40% did not include an expense reimbursement, and 30% did not include either a break-up fee or an expense reimbursement.[36] Even in cases where some measure of bid protections were authorized, such protections were significantly less than sought here, with a 1.8% mean and 1.0% median for both the break-up fee and expense reimbursement.[37]

---

[35] *See In re Nuo Therapeutics, Inc., et al.*, Case No. 16-10192 (MFW) (Bankr. D. Del. February 22, 2016); Hr'g Tr. at 247:21-248:3 ("With respect to expense reimbursement, I agree with the U.S. Trustee, there is no reason to give any to Deerfield. It is not an incentive to them to bid. They already are insisting on bidding anyway. And since they were the pre-bankruptcy lender, I am not sure what due diligence they need to do. They know these assets. And, certainly, they're not sharing their due diligence with other bidders. So I think it does chill the bidding."). An excerpt of the transcript is attached hereto as Exhibit A.

[36] *See Declaration of Sanjuro Kietlinski in Support of Objection of The Official Committee of Unsecured Creditors to Debtors' Motion for Entry of an Order (I) Approving Procedures in Connection with the Sale of the Debtors' Assets; (II) Approving Bid Protection; and (III) Approving the Form of Stalking Horse Agreement*, which is attached hereto as Exhibit B.

[37] *See id.*

34. The Committee submits that to the extent any break-up fee is warranted, a smaller percentage is appropriate given the size of the bid. While a higher percentage may be warranted in smaller sale cases, the $82.5 million credit-bid mandates a smaller percentage to balance the interests of Antares with other stakeholders.

## III. The Stalking Horse Agreement Must Be Modified Prior to Approval

35. The Stalking Horse Agreement suffers from a significant lack of clarity regarding the acquired assets, which the Committee believes is intended to obscure the fact that Antares is seeking, through a pure credit bid, to acquire significant assets that have no relation to the go-forward business and are not subject to its prepetition liens.

36. Three provisions in particular are troubling and, at a minimum, require clarification prior to approval of the Stalking Horse Agreement. First, section 2.1(n) would require the transfer to the buyer of all liquor licenses related to continuing locations. However, as set forth at length in the Committee's DIP objection, a number of these liquor licenses relate to locations in states that do not permit a debtor to grant liens in liquor licenses, including New Jersey and Ohio.[38] The Stalking Horse Bid, however, provides no cash value to acquire such licenses.

37. The Bankruptcy Code is clear regarding the extent of a credit bid. Section 363(k) provides the holder of an allowed claim the right to credit bid on property that secures such claim.[39] Section 363(k) does not allow a secured creditor to credit bid for unencumbered assets.

---

[38] *See e.g.*, *In Re Circle 10 Restaurant LLC*, 519 B.R. 95, 137 (Bankr. D. N.J. 2014) (holding that under New Jersey law, a private creditor cannot obtain a security interest in any right associated with a liquor license, including the proceeds of its sale); *Banc of America Strategic Solutions, Inc. v. Cooker Rest. Corp.*, No. 05AP-1126, 2006 Ohio App. LEXIS 4507, *7 (Ohio Ct. App. Sept. 5, 2006) ("These [permits] are considered personal licenses and not property which can be mortgaged or seized under execution or court order for the satisfaction of debts...the [liquor permit holders'] liquor permits cannot be treated as property subject to a creditor's security interest.) (internal citation omitted).

[39] *See* 11 U.S.C. § 363(k).

38. Section 2.1(n) of the Stalking Horse Agreement is further problematic in its attempt to acquire liquor licenses that relate to excluded restaurants. Antares had yet to provide Schedule 7.1 identifying such liquor licenses and provide no explanation as to why it seeks to acquire liquor licenses with respect to excluded restaurants, other than to inhibit the ability of unsecured creditors to monetize such assets.

39. Second, section 2.1(q) of the Stalking Horse Agreement would provide for the sale of seemingly all potential Debtor causes of action, including avoidance actions and potential claims against the Debtors' insiders. Antares, however, does not have the right to credit bid for such claims. As of the Petition Date, Antares did not have a lien in the Debtors' avoidance actions[40] or previously unidentified commercial tort claims.[41] Such litigation claims and avoidance actions are intended to benefit the Debtors' unsecured creditors, not Antares.[42] They similarly should not be sold as part of credit bid that provides no new value to the estates.

40. As drafted, neither the Committee nor any other party can identify what litigation claims and causes of action are intended to be included as acquired assets. There is no schedule of such claims and the Excluded Claims definition is intentionally vague and only applies to causes of action that relate <u>exclusively</u> to any Excluded Asset or Excluded Liability.[43] Far from

---

[40] *See PAH Litig. Trust v. Water St. Healthcare Partners L.P. (In re Physiotherapy Holdings, Inc.)*, Case No. 13-12965, 2016 Bankr. LEXIS 2810, *53-54 (Bankr. D. Del. June 20, 2016) ("Post-petition avoidance actions can only be brought by the trustee after the petition is filed").

[41] The financing statements filed by Antares do not list any commercial tort claims, and therefore, do not provide the specificity required to perfect its prepetition lien in any such claims. *See* U.C.C. § 9-108(e) (stating that a description only by type of collateral is an insufficient description of a commercial tort claim).

[42] *See Buncher Co. v. Official Comm. of Unsecured Creditors of GenFarm Ltd. Partnership IV*, 229 F.3d 245, 250 (3d Cir. 2000) ("when recovery is sought under section 544(b) of the Bankruptcy Code, any recovery is for the benefit of all unsecured creditors"); *Mellon Bank, N.A. v. Glick (In re Integrated Testing Prods. Corp.)*, 69 B.R. 901, 904 (D.N.J. 1987) (finding that only the trustee, acting on behalf of all creditors, has a right to recover payments made as preferences); *Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery (In re Cybergenics Corp.)*, 226 F.3d 237, 243-47 (3d Cir. 2000) (holding that a fraudulent transfer claim belongs to creditors and not the debtor).

[43] *Id.* at Article I (emphasis added).

providing clarity, this definition leaves the Committee guessing regarding what claims are intended to be acquired.

41.  The simple solution is for Antares to agree to limit the acquired causes of actions to those related to the go-forward business.  This would preserve potentially valuable claims for the benefit of the estates with no impact on the sale.  To the extent Antares refuses, however, the Court should require Antares to specifically identify the causes of action it seeks to acquire so the Committee can conduct an immediate investigation as to the appropriateness of the credit bid for such assets and the underlying value of such claims.

42.  Third, Section 2.2(l) of the Stalking Horse Agreement purportedly excludes the Debtors' directors' and officers' liability insurance policies from the list of acquired assets, but provides that any proceeds of such policies shall be payable to Antares.[44]  Given the lack of value being proposed for other stakeholders from the credit bid, D&O recoveries could be one of the only sources of unsecured creditor recoveries in these cases to the extent valid claims exist.  The Committee is in the process of conducting an investigation into such claims and has requested informal discovery from Sun Capital.  There is simply no basis to unilaterally assign all D&O insurance proceeds to Antares in connection with the purchase of assets that have nothing to do with potentially actionable conduct by the Debtors' directors and officers.

43.  Exacerbating the lack of clarity is the fact that while the Sale Procedures require third-parties, as part of their bid, to allocate the proposed consideration to each asset, no such requirement exists for Antares.[45]  Antares should be required, like all other prospective bidders, to allocate the credit-bid among the assets proposed to be acquired.

---

[44]    *Id.* § 2.2(l).

[45]    *See* Motion, ¶ 19(e)(viii)(3).

**CONCLUSION**

WHEREFORE, the Committee respectfully requests that the Court (i) deny the Motion unless modified as set forth herein; and (ii) grant such other and further relief as the Court deems just and proper.

Dated:   Wilmington, Delaware
         February 21, 2020

WOMBLE BOND DICKINSON (US) LLP

By: */s/ Morgan L. Patterson*
Matthew P. Ward (DE Bar No. 4471)
Morgan L. Patterson (DE Bar No. 5388)
1313 North Market Street
Suite 1200
Wilmington, DE 19801
Telephone: (302) 252-4320
Facsimile: (302) 252-4330
matthew.ward@wbd-us.com
morgan.patterson@wbd-us.com

and

KELLEY DRYE & WARREN LLP
Eric R. Wilson (admitted *pro hac vice*)
Jason R. Adams (admitted *pro hac vice*)
Lauren S. Schlussel (admitted *pro hac vice*)
Kayci G. Hines
101 Park Avenue
New York, New York 10178
Tel: (212) 808-7800
Fax: (212) 808-7897
ewilson@kelleydrye.com
jadams@kelleydrye.com
lschlussel@kelleydrye.com

*Proposed Counsel to the Official Committee of Unsecured Creditors of BL Restaurants Holding, LLC, et al.*