## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| BL RESTAURANTS HOLDING, LLC, *et al.*,[1] | Case No. 20-10156 (MFW) |
| Debtors. | (Jointly Administered) |
| | **Re: Docket Nos. 7 and 59** |
| | **Hearing Date: February 27, 2020 at 2:00 p.m.** |
| | **Objection Deadline: February 21, 2020 at 5:00 p.m.**[2] |

## OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO DEBTORS' MOTION SEEKING ENTRY OF A FINAL ORDER AUTHORIZING DEBTORS TO OBTAIN POSTPETITION FINANCING, THE USE OF CASH COLLATERAL AND GRANTING RELATED RELIEF

The Official Committee of Unsecured Creditors (the "Committee") of BL Restaurants Holding, LLC, *et al.*, the above-captioned debtors and debtors-in-possession (collectively, the "Debtors"), by and through its proposed undersigned counsel, hereby files this objection (the "Objection") to *Debtors' Motion for Interim and Final Orders (I) Authorizing Debtors to Obtain Postpetition Financing Pursuant to Section 364 of the Bankruptcy Code, (II) Authorizing the Use of Cash Collateral, (III) Granting Adequate Protection to the Prepetition Secured Parties Pursuant to Sections 361, 362, 363 and 364 of the Bankruptcy Code, (IV) Granting Liens and Superpriority Claims, (V) Modifying Automatic Stay, and (VI) Scheduling a Final Hearing* (the "Motion").[3]  In support of this Objection, the Committee respectfully states as follows:

---

[1]    The Debtors in these cases are: BL Restaurants Holding, LLC; BL Restaurant Operations, LLC; BL Restaurant Franchises, LLC; and BL Hunt Valley, LLC.

[2]    Extended as to the Committee with the consent of the Debtors and senior lenders.

[3]    Docket No. 7.  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

## PRELIMINARY STATEMENT

1. The Committee supports the Debtors' strategy to pursue a sale that will maintain operations and maximize value for all stakeholders. While this strategy requires incremental funding through the sale process, the protections afforded the prepetition lenders, which include affiliates of the Debtors' equity sponsor Sun Capital, must be narrowly tailored to safeguard the interests of all creditors and not simply those of the lenders. Instead, the DIP order seeks to strip unsecured creditors of value and creates a series of unnecessary restrictions and roadblocks for the Committee to realize such value. As a result, the DIP should not be approved in its current form.

2. The Debtors' unsecured creditors are not simply an out of the money constituency in these cases. The Debtors operate and franchise a series of bars that historically generated more than 55% of their sales from liquor, beer and wine. To do so, the Debtors have various liquor licenses, many of which are not subject to encumbrance under applicable state law. More specifically, of the 26 states (and the District of Columbia) in which the Debtors' bars are located, 10 states (and the District of Columbia) do not permit a debtor to grant a lien on liquor licenses. These 10 states (and the District of Columbia) include 39 of the Debtors' go-forward locations and 27 closed locations. The liquor licenses associated with the Debtors' locations in at least New Jersey (3) and Ohio (11) can be very valuable, as such states limit the number of licenses that can be issued.

3. As a result, the Debtors have valuable liquor licenses that are not, and cannot, be subject to the liens of the Prepetition Secured Parties or DIP Secured Parties and should provide baseline recoveries for unsecured creditors. Rather than preserving this value for unsecured creditors, however, the Debtors: (i) incorrectly stipulate that the Prepetition Secured

Parties have valid and properly perfected security interests in substantially all of the Debtors' assets; and (ii) broadly release the Prepetition Secured Parties from any and all claims.

4.    In addition to the value attributable to these liquor licenses, the DIP further seeks to strip unsecured creditors of other unencumbered value through a series of DIP liens, adequate protection liens, superiority claims and adequate protection claims.  These assets include chapter 5 avoidance actions, commercial tort claims and postpetition tax refunds.  The DIP Secured Parties further exacerbate the erosion of this unencumbered value by seeking a roll-up of $62 million of prepetition debt, while only providing $22 million of availability.  The proposed roll-up serves no purposes other than to cure prior security deficiencies and eliminate the likelihood the previously unencumbered assets will be available to fund unsecured creditor recoveries.

5.    At the same time, the DIP Facility deliberately seeks to inhibit the Committee's ability to safeguard unsecured creditor rights in these cases and will force the Committee to pursue needless, time consuming and expensive litigation.  First, the DIP Secured Parties seek to shorten the Committee's challenge period from 60 days to less than 45 days through unnecessary expedited sale milestones, including a March 20 auction date.  Second, rather than limit the challenge to the Prepetition First Lien Secured Obligations, the DIP seeks to unnecessarily impose on the Committee the same expedited challenge deadline with respect to all matters related to Sun Capital and its affiliates.  Given Sun Capital's role as both subordinated lender and equity sponsor, the Committee questions the litany of protections afforded Sun Capital.  Sun Capital is not providing any financing under the DIP.  While it may be entitled to some form of adequate protection, there is no basis for the Debtors' broad stipulations and

limitations on the Committee's challenge rights with respect to Sun Capital.  To the extent Sun Capital desires a release, the proper place to seek one is through a chapter 11 plan.

6.     The Prepetition Secured Parties further seek to limit the Committee's ability to function in these cases through an insufficient carve-out, investigation cap and seemingly boundless restrictions on the Committee's use of the carve out.  The proposed budget is clearly designed to hamstring the Committee by proposing a carve out for Committee professionals that is less than 20% of the amounts allocated to the Debtors' professionals.  Such allocation is insufficient for the Committee to fulfill its statutory duties and adequately represent the interest of unsecured creditors.  The $50,000 investigation budget is similarly insufficient, especially in light of the fact that such investigation would need to include all potential claims regarding Sun Capital and its affiliates.  Finally, the DIP order improperly contains over two pages of restrictions on the Committee's use of proceeds that reaches any conduct the Prepetition Secured Parties deem adverse to their interests in any capacity.

7.     The Committee further objects to the advance waivers of sections 506(c), 552(b) and marshalling.  The Committee acknowledges and appreciates the fact that the DIP budget includes payment of 503(b)(9) claims, PACA/PASA claims and other priority claims. Certain of such claims, however, are not slated to be paid until the first week of April.  The waivers, however, are effective upon entry of the Final Order, leaving creditors exposed to the risk that the amounts are never paid in the event of a default or if the sale is not consummated. To prevent this result, the waivers should be conditioned on payment of the administrative claims which, given the timeline, represents only a minor delay for the Prepetition Secured Parties.

## BACKGROUND

### I.    General Case Background

8.    On January 27, 2020 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with this Court.  Since the Petition Date, the Debtors have remained in possession of their assets and have continued to operate and manage their businesses as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

9.    On February 5, 2020, the Office of the United States Trustee for Region 3 appointed a five-member Committee consisting of: (i) A&Z Novi, LLC; (ii) Bradley Alverson; (iii) Brookfield Property REIT, Inc.; (iv) Edward Don & Company; and (v) NCR Corporation.[4]

10.    The Committee selected Kelley Drye & Warren LLP as its lead counsel and Womble Bond Dickinson (US) LLP as Delaware counsel.  The Committee also selected Province, Inc. to serve as its financial advisor.

### II.    The Debtors' Corporate History and Capital Structure

11.    Founded in 1991 in Chicago, Illinois, the Debtors' predecessor owned and operated locally themed bars that catered to the demographics of the location.[5]

12.    In 2010, affiliates of Sun Capital Partners, Inc. ("Sun Capital") acquired the company from Restaurant America for an undisclosed price.  Between 2010 and 2019, Sun Capital significantly expanded the company, from 31 to 135 locations, more than quadrupling its footprint.[6]

---

[4]    Docket No. 98.

[5]    *See Declaration of Howard Meitiner in Support of Debtors' First Day Motions and Applications* (the "Meitiner Declaration"), ¶ 3.  Docket No. 4.

[6]    *Id.*

13.     To finance the restaurant expansion and refinance approximately $20 million of existing indebtedness, the Debtors entered into a Credit Agreement, dated March 27, 2014 (as amended, the "Senior Credit Agreement") with Antares Capital LP (formerly General Electric Capital Corporation) and the other lenders party thereto (collectively, the "Senior Creditors"), providing for a $32 million credit facility.[7]  The obligations under the Senior Credit Agreement are by certain of the Debtors' assets.

14.     Also on March 27, 2014, the Debtors entered into a Second Amended and Restated Subordinated Credit Agreement with a Sun Capital affiliate (the "Original Subordinated Credit Agreement").    The Original Subordinated Credit Agreement refinanced existing indebtedness under a September 2011 credit facility.[8]

15.     On August 30, 2017, the Debtors entered into: (i) a ninth amendment to the Senior Credit Agreement, which refinanced the obligations under the Original Subordinated Credit Agreement; and (ii) a new Subordinated Credit Agreement, (as amended, the "Subordinated Credit Agreement") with a different Sun Capital affiliate, providing a $6 million term loan purportedly secured by a second lien on substantially all of the Debtors' assets.[9]

16.     Through a series of amendments, the obligations under the Subordinated Credit Agreement ballooned to $25 million.    As of the Petition Date, approximately: (i) $62.4 million was due under the Senior Credit Agreement; and (ii) $23.6 million was due under the Subordinated Credit Agreement.[10]

---

[7]     *Id.* ¶ 9.

[8]     The obligations under the September 2011 credit facility refinanced obligations under a Credit Agreement, dated December 20, 2009, which were assumed by the Debtors in May 2010 in connection with the Sun Capital acquisition.

[9]     Meitiner Declaration, ¶ 17.

[10]    *Id.* ¶¶ 11, 16.

17.     The Senior Creditors and Sun Capital are party to an Intercreditor Agreement, dated August 30, 2017 (as amended, the "Intercreditor Agreement"), providing for the relative rights and priorities of the Senior Creditors and Sun Capital.[11]  Among other things, the Intercreditor Agreement provides that Sun Capital shall be deemed to consent to the incurrence of DIP financing and the Debtors' use of cash collateral in a bankruptcy proceeding.

## III.     The Debtors' Restructuring Efforts

18.     Although the addition of new locations added to the company's revenue, which grew from $216 million in 2016 to $262 million in 2018, increased costs let to liquidity constraints, making it difficult for the Debtors to reinvest in the business, including refreshes to existing locations and advertising.[12]  For the year ending 2016, the Debtors operated at a $6.6 million operating loss, which increased to an $11 million loss for 2018.

19.     In 2018, the Debtors hired a new CEO and management team to implement a turnaround strategy, including improvements to the guest experience, food quality and investments in advertising, as well as initiatives to increase same store sales.[13] Although these initiatives reportedly benefited approximately two-thirds of the Debtors' locations, 38 locations continued to suffer, generating a 10.9% SSS decline and $4 million loss in 2019.[14]

20.     In September 2019, the Debtors retained Carl Marx Advisors and Configure Partners to explore strategic alternatives, including a sale process.[15]  In October 2019, the Senior Creditors agreed to provide $3 million of incremental financing to fund the process.[16]

---

[11]     *Id.* ¶ 14.
[12]     *Id.* ¶ 18.
[13]     *Id.* ¶ 19.
[14]     *Id.* ¶ 20.
[15]     *Id.* ¶ 22.
[16]     *Id.* ¶ 23.

21.     Although the prepetition sale process resulted in numerous indications of interest and receipt of three letters of intent in December 2019, the Debtors were unable to reach agreement with any third parties.[17]  Instead, the Debtors pivoted and, on January 26, 2020, only one day prior to the Petition Date, entered into a stalking horse agreement with the Senior Creditors (the "Stalking Horse Agreement").  Pursuant to the Stalking Horse Agreement, the Senior Creditors propose to purchase certain of the Debtors' assets for an $82.5 million credit bid, plus the assumption of certain liabilities.[18]

## IV.     The Proposed DIP Financing

22.     To finance the bankruptcy and sale process, the Senior Creditors agreed to provide $22 million of new money.  Upon entry of the Final Order, the Senior Creditors will be granted a full roll-up of their more than $62 million of prepetition debt, secured by postpetition superpriority liens and claims against all of the Debtors' assets, including previously unencumbered property.[19]  In exchange:

- the Debtors will stipulate that the obligations owing to the Senior Creditors and Sun Capital will constitute legal, valid and binding obligations of the Debtors, each of which are nonavoidable, against "substantially all" of the Prepetition Collateral of the Debtors, notwithstanding the fact that Sun Capital is not a lender under, and is deemed to consent to, the DIP Facility;[20]

- If the Committee does not commence a Challenge, the Senior Creditors and Sun Capital, in its capacity as lender and equity sponsor, and each of their respective members, affiliates, agents, attorneys, officers, directors, employees and other representatives, among others, will receive a full release;[21]

---

[17]     *Id.* ¶ 24.

[18]     Stalking Horse Agreement, § 2.5.

[19]     *See* Motion, ¶ 1(a).

[20]     Final Order, ¶ E.

[21]     *See Id.* ¶¶ D(iv), E(iv).

- the DIP Liens, Adequate Protection Liens and superpriority claims will encumber previously unencumbered assets, including the proceeds of leases, proceeds of chapter 5 avoidance actions (the "Avoidance Actions") and the Debtors' rights under section 506(c) of the Bankruptcy Code;[22]

- the Debtors' estates will waive all rights under sections 506(c) and 552(b) of the Bankrutpcy Code against both the Senior Creditors and Sun Capital;[23]

- the Committee will be limited in its use of cash collateral, including with respect to the assertion, commencement or prosecution of any claim against or adverse to the Prepetition Secured Parties and DIP Lenders, which would include the prosecution of this Objection;[24]

- the Committee will be given less than 45 days from formation (April 6) and only $50,000 to investigate the Senior Creditors and Sun Capital, both in its capacity as lender and equity sponsor;[25] and

- the Committee's carve-out will be limited to $428,000, as compared to nearly $2.2 million allocated to the Debtors' professionals (excluding Configure's transaction fee and nearly $2 million of fees incurred by the Debtors' professionals prior to the Petition Date).[26]

## OBJECTION

23.    To obtain postpetition financing under section 364(d) of the Bankruptcy Code, a debtor must prove: (i) it is unable to obtain unsecured credit; (ii) the proposed credit is necessary to preserve the assets of the estate; and (iii) the terms of the financing are fair, reasonable and adequate.[27]  The Court should only approve postpetition financing to the extent it is "in the best interests of the general creditor body."[28]

---

[22]    *See id.* ¶¶ 2(j), 4(b), 5(a)

[23]    *See id.* ¶¶ 9, 10.

[24]    *See id.* ¶¶ 7, 8(a).

[25]    *See id.* ¶ 16.

[26]    *See* Interim Order, Ex. A – Initial Approved Budget.  Docket No. 59.

[27]    *In re Ames Dept. Stores, Inc.*, 115 B.R. 34, 37 (Bankr. S.D.N.Y. 1990).

[28]    *In re Roblin Indus.*, 52 B.R. 241, 244 (Bankr. W.D.N.Y. 1985).

24.     The Committee recognizes the Debtors' liquidity constraints and the need for incremental financing to preserve operations through the sale process.  As currently structured, however, the DIP Facility confers unfair advantages and provides excessive protections to not only the Senior Creditors, as the prepetition lenders, DIP Lenders and stalking horse purchaser, but to Sun Capital, who is both the subordinated lender and the Debtors' equity sponsor.  Such enhancements and protections strip unsecured creditors of fundamental bankruptcy protections and eliminate unencumbered value, which may be the only source of value for unsecured creditors in these cases.  Unless modified as set forth herein, therefore, the DIP Facility should not be approved.

## I.     The Debtors' Stipulations Are Overbroad And Must Be Carved-Back

25.     Pursuant to the Final Order, the Debtors stipulate to the validity of the liens and claims of the Senior Creditors and Sun Capital on "substantially all" of the Debtors' assets, and all "proceeds, products, accessions, and profits thereof."[29]  If a challenge is not commenced against the Senior Creditors and/or Sun Capital in accordance with the limitations imposed under the Final Order, the Debtors' stipulations will be binding on the Debtors, their estates and all creditors.  There are, however, meaningful unencumbered assets, which should not be in dispute and must be preserved for unsecured creditors.

26.     As an initial matter, there are various states that prohibit a debtor from granting a lien in liquor licenses or their proceeds, as they are seen as a privilege and not as personal property subject to perfection pursuant to Article 9 of the Uniform Commercial Code.[30]

---

[29]     Final Order, ¶¶ D(ii), E(ii).

[30]     *See e.g.*, *In Re Circle 10 Restaurant LLC*, 519 B.R. 95, 137 (Bankr. D. N.J. 2014) (holding that under New Jersey law, a private creditor cannot obtain a security interest in any right associated with a liquor license, including the proceeds of its sale); *Banc of America Strategic Solutions, Inc. v. Cooker Rest. Corp.*, No. 05AP-1126, 2006 Ohio App. LEXIS 4507, *7 (Ohio Ct. App. Sept. 5, 2006) (holding that liquor licenses are not property which can be mortgaged or seized under execution or court order for debt satisfaction).

Based upon the Committee's initial research, the Debtors own liquor licenses for 39 open and 28 closed locations across 10 states (and the District of Columbia) that prohibit a debtor from granting a lien in a liquor license or its proceeds. To the extent the Prepetition Secured Creditors are unable to obtain a lien in any of the Debtors' liquor licenses under applicable state law, the Final Order cannot and should not override this prohibition.

27.     The Prepetition Secured Parties similarly do not have a lien in the Debtors' Avoidance Actions or their proceeds, as such actions do not arise until a debtor files for bankruptcy.[31]   Nor is it appropriate for the Debtors to grant a lien in such actions or their proceeds.[32]  Further, the Prepetition Secured Parties do not have a lien in previously unidentified commercial tort claims. To perfect a security interest in a commercial tort claim, the security agreement and the UCC-1 must identify the claim specifically; a general identification of "commercial tort claims" is insufficient.[33]  Additionally, the claim must be in existence at the time it is encumbered, and an after acquired property clause is ineffective with respect to a commercial tort claim that arises after a UCC-1 is filed.[34]  The financing statements filed by the Prepetition Secured Parties do not list any commercial tort claims, and therefore, do not provide the specificity required to perfect their prepetition lien in any such claims.

---

[31]     *See PAH Litig. Trust v. Water St. Healthcare Partners L.P. (In re Physiotherapy Holdings, Inc.)*, Case No. 13-12965, 2016 Bankr. LEXIS 2810, *53-54 (Bankr. D. Del. June 20, 2016) ("Post-petition avoidance actions can only be brought by the trustee after the petition is filed").

[32]     *See In re Nuo Therapeutics, Inc., et al.* Case No. 16-10192 (MFW), Hr'g Tr. (Docket No. 147) at 246:6-246:10 (Bankr. D. Del. February 22, 2016) ("The lien on avoidance actions, I would disallow that anyway. That is all the unsecureds, typically have and I'm not prepared to give it away for nothing in the face of an objection by the Official Creditors Committee."). An excerpt from the transcript is attached hereto as <u>Exhibit A</u>.

[33]     *See* U.C.C. § 9-108(e) (a description only by type of collateral is insufficient for a commercial tort claim).

[34]     *See* U.C.C. § 9-204(b)(2) ("[a] security interest does not attach under a term constituting an after-acquired property clause to . . . a commercial tort claim"); *See Bayer Cropscience v. Steanrs Bank Nat. Ass'n.*, 837 F.3d 911, 916 (8th Cir. 2016) ("We hold that the drafters of the UCC, in implementing the heightened identification requirements of commercial tort claims including the requirement that the commercial tort claim be in existence at the time it is encumbered, intended for the proceeds of a commercial tort claim to be excluded from an after-acquired general intangibles clause").

28.     Taken together, the Debtors' stipulations are overbroad and inaccurate with respect to certain of the Debtors' assets, some of which could generate value for the Debtors' estates.  Rather than require the Committee to jump through the hoop of commencing a challenge to dispute the Prepetition Secured Parties' liens in such assets, the Debtors' stipulations should be revised to accurately reflect the extent of such liens.

## II.     The Challenge And Release Provisions Are Overreaching

29.     The inaccuracy of the Debtors' stipulations are exacerbated by the challenge provisions and proposed release of both the Senior Creditors and Sun Capital, as well as third-party releasees, "arising out of or related to the Prepetition Secured Obligations **or otherwise** …"[35]  The nature and extent of these protections are improper and must be denied.

30.     As an initial matter, Sun Capital should be excluded entirely from the Debtors' stipulations, the challenge provisions and accompanying release.  Sun Capital is not a lender under the DIP Facility or otherwise providing financing to the Debtors.  Sun Capital and its affiliates are already receiving the only protection they are entitled to under the Final Order—adequate protection to the extent of any diminution in the value of their prepetition collateral.  No further protections are authorized or appropriate given their role as equity sponsor.

31.     Even if the inclusion of Sun Capital as lender were appropriate, there is no basis to require the Committee to conduct an analysis of potential claims and causes of action against Sun Capital as equity owner, let alone Sun Capital's "members, managers, equity security holders, affiliates, agents, attorneys, financial advisors, consultants, officers, directors, employees and other representatives."[36]  The Committee is currently undertaking an investigation into the circumstances that led the Debtors to file bankruptcy and the various

---

[35]     *See* Final Order, ¶ 7 (emphasis added).

[36]     *See id.* ¶¶ D(iv), E(iv).

transactions entered into by the Debtors prior to the Petition Date.  At this juncture and in the context of these cases, however, there is no basis for such a broad release.  To the extent Sun Capital is seeking a release in connection with these cases, the only appropriate place to do so is in a chapter 11 plan.

### III.     The Final Order Proposes Inadequate Investigation And Challenge Rights

32.     The breadth of the stipulations and release provisions are further exacerbated by the illusory 60 day challenge deadline provided to the Committee to conduct its investigation, obtain standing and commence an adversary proceeding.[37]  Although the Final Order purports to provide the Committee until April 6, the sale procedures impose a March 18 bid deadline and March 20 auction, more than two weeks before the Committee's challenge deadline expires.  The Senior Creditors and Sun Capital further seek to improperly curtail the Committee's ability to investigate and challenge their prepetition liens and claims through an insufficient $50,000 investigation budget.[38]  Given the scope of the investigation mandated by the Final Order and the expedited sale timeline, the $50,000 budget and mere 44 days from the Committee's formation through the proposed March 20 auction, is woefully insufficient and designed to hinder the Committee's ability to undertake a thorough investigation.[39]

33.     The Senior Creditors further seek to curtail the Committee from undertaking its duty in these cases through an insufficient budget.  In addition to the investigations required to be commenced under the Final Order with respect to the Senior Creditors and Sun Capital, the Committee's professionals are already addressing: (i) the DIP

---

[37]     *See id.* ¶ 7.

[38]     *See id.* ¶ 8(a).

[39]     *See In re Tenney Village Co., Inc.,* 104 B.R. 562, 568-69 (Bankr. D. N.H. 1989) (refusing to approve postpetition financing because a fee cap unacceptably limited the right of debtor's counsel to payment for bringing actions against the prepetition lenders, creating an economic incentive for the debtor to avoid brining such actions in disregard of its fiduciary duties to the estate).

Facility; (ii) the sale procedures, including the expedited sale timeline; (iii) the proposed key employee incentive and retention plans; and (iv) various first day motions.

34. The Committee is allocated $428,000 for the initial 16 week period, less than 20% of the nearly $2.2 million allocated for the Debtors' professionals.[40] This excludes the approximately $2 million of fees paid to Debtors' professionals prior to the Petition Date in preparation for these chapter 11 cases. The allocation is not only inequitable, but prevents the Committee from fulfilling its fiduciary duty to unsecured creditors.[41] The Committee's budget therefore, must be increased, or all of the professionals should be required to share *pro rata* in the amounts allocated for estate retained professionals.[42]

35. Additionally, the limitations on the use of cash collateral are overly broad. As currently drafted, the Committee and other parties in interest may not use cash collateral to, among other things:

> (i) request authorization to obtain postpetition loans or other financial accommodations pursuant to Bankruptcy Code section 364(d) or (d), or otherwise, other than from the DIP Secured Parties; (ii) assert, join, commence, support or prosecute any claim, action, proceeding, or other contested matter seeking any order, judgment, determination, or similar relief against, or adverse to the interests of, in any capacity, any and all DIP Secured Parties, the Prepetition Secured Parties, and their respective officers, directors, employees, agents, attorneys, affiliates, assigns, or successors, with respect to any transaction, occurrence, omission, action, or other matter, (including formal discovery proceedings in anticipation thereof), including, without limitation, …[43]

---

[40]    *See* Interim Order, Ex. A – Initial Approved Budget.

[41]    *See Value Prop. Trust v. Zim Co. (In re Mortg. & Realty Trust),* 212 B.R. 649, 653 (Bankr. C.D. Cal. 1997) (noting that the committee has many functions … "it investigates, it appears, it negotiates, it may litigate, and it is at all times intimately involved in the reorganization").

[42]    *See In re Orchids Paper Products Company, et al*., Case No. 19-10729 (MFW) (Bankr. D. Del. May 30, 2019); Hr'g Tr. at 186:18-186:25 ("I have always taken the position that I don't care what a line item is for committee professionals or debtors' professionals. That if there's not sufficient funds to pay professionals, generally, that they will be paid pro rata, regardless of what limits the DIP may place on that. I consider the line items for professionals to be an aggregate and it's inappropriate to have line items."). An excerpt from the transcript is attached hereto as Exhibit B.

[43]    Final Order, ¶ 16.

Such limitations, which would seemingly include the Committee's prosecution of this Objection, exceed the appropriate scope of a financing order.[44]  The only limitation should be an appropriate cap on the Committee's investigation and an exclusion with respect to the Committee's prosecution of any claims and causes of action against the Prepetition Secured Parties in their capacities as lenders.

36.     Finally, the Final Order must also be revised to account for the fact that each of the Debtors is a limited liability company.  In a recent decision, Judge Carey ruled that because the committee was neither a member nor an assignee of the limited liability company debtor, the Delaware Limited Liability Company Act precluded the committee from being able to bring a breach of fiduciary claim derivatively.[45]  The Final Order must appropriately preserve the Committee's ability to bring such claims in the event a colorful challenge exists.

37.     Taken together, the Final Order should: (ii) provide that the filing of a motion for standing by April 6 automatically tolls the challenge period; (iii) increase the Committee's investigation budget with respect to the Senior Creditors to $125,000; (iv) increase the Committee's budget commensurate with the budget provided for the Debtors' professionals; (v) rationalize the limitations on the Committee's use of proceeds; and (vi) provide that to the extent necessary to pursue estate claims, the Debtors are deemed to assign the estates' rights with respect to such claims to the Committee.

---

[44]     *See In Re IPIC-Gold Class Entertainment LLC, et al.,* Case No. 19-11739 (LSS) Hr'g Tr. (Docket No. 294) at 12:17-12:23 (Bankr. D. Del. September 17, 2019) (The prohibited-purposes provision, I will not approve the lengthy paragraph describing prohibited purposes for which cash collateral cannot be used or DIP financing cannot be used. I think this type of provision is exactly the type of provision that Ames suggests is inappropriate.  I will approve a customary provision that the DIP collateral may not be used to sue the DIP lender.").  An excerpt of the transcript is attached hereto as Exhibit C.

[45]     *See Official Comm. of Unsecured Creditors v. Convest Group Holdings, LLC (In re HH Liquidation, LLC),* 590 B.R. 221, 283-285 (Bankr. D. Del. 2018).

**IV.    The Proceeds of Avoidance Actions Should Be Preserved For Unsecured Creditors**

38.    The Final Order seeks to encumber the proceeds of avoidance actions to secure the DIP Liens, Superpriority Claims and Adequate Protection Claims.  Avoidance actions should not be pursued for the exclusive benefit of the Prepetition Secured Creditors.  Avoidance powers are intended to allow a debtor-in-possession or a trustee to recover certain payments for the benefit of unsecured creditors.[46]  Moreover, avoidance actions belong to the Debtors' creditors, not the Debtors.[47]  For this reason, any grant by the Debtors of a lien in their avoidance actions or their proceeds is inappropriate and contrary to the interests of the Debtors' estates and unsecured creditors.[48]

**V.    The Roll-Up Should Not Be Approved**

39.    The breadth of the Debtors' stipulations, releases and the limitations on the use of cash collateral are further exacerbated by the proposed roll-up, which will convert at least $62.4 million of prepetition debt into postpetition debt allowed on a superpriority basis, including against previously unencumbered property.  Courts generally are reluctant to approve postpetition financing that converts prepetition debt into postpetition obligations, as it is viewed

---

[46]    *See Buncher Co. v. Official Comm. of Unsecured Creditors of GenFarm Ltd. Partnership IV,* 229 F.3d 245, 250 (3d Cir. 2000) (stating, "when recovery is sought under section 544(b) of the Bankruptcy Code, any recovery is for the benefit of all unsecured creditors").

[47]    *See Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery (In re Cybergenics Corp.),* 226 F.3d 237, 243-47 (3d Cir. 2000) (holding that a fraudulent transfer claim belongs to creditors and not to a chapter 11 debtor-in-possession); *Official Comm. of Unsecured Creditors  v. Gold Electronics Corp. (In re Gold Electronics Corp.),* 1993 WL 408366, *3-4 (N.D. Ill. Sept. 22, 1993) (vacating lien on preference actions granted under financing order).

[48]    *See In re Nuo Therapeutics, Inc., et al.* Case No. 16-10192 (MFW), Hr'g Tr. (Docket No. 147) at 246:6-246:10 (Bankr. D. Del. February 22, 2016) ("The lien on avoidance actions, I would disallow that anyway. That is all the unsecureds, typically, have and I'm not prepared to give it away for nothing in the face of an objection by the Official Creditors Committee.").  An excerpt from the transcript is attached hereto as <u>Exhibit A</u>.

as a form of cross-collateralization that circumvents the Bankruptcy Code's priority scheme.[49]  In

*Nuo Therapeutics,* this Court disallowed a roll-up similar to the one at issue here:

> First, the rollup is not, I think, appropriate. Deerfield asserts that it's not more than the amount of the DIP loan, but I don't know why any lender should, in essence, be given a post-petition secured claim for 200% of the amount lent. You're getting a post-petition lien for the post-petition money you lent. There is no business justification for it.[50]

40.     As in *Nuo Therapeutics,* the Debtors have not provided any evidence

supporting the business justification for the proposed roll-up.  Where, as here, the DIP Lenders

are also the prepetition senior lenders, there can be no legitimate objection to the priming of their

prepetition obligations and therefore, no basis for the roll-up.  The only conclusion to be drawn is

that the Senior Creditors are seeking to cure any deficiencies in their prepetition collateral

through the roll-up and/or eliminate any potential risk over just the next two months of these

cases by converting prepetition claims into postpetition claims allowed on a superpriority basis.

This level of protection is inappropriate and should not be countenanced.

41.     The roll-up is additionally improper as the entire DIP Facility will be

secured by liens on previously unencumbered property, including the proceeds of avoidance

actions, which belong to the Debtors' creditors, not the Debtors.[51]

---

[49]     *See, e.g., Official Comm. of Unsecured Creditors of New World Pasta Co. v. New World Pasta Co*., 322 B.R. 560, 569 n.4 (M.D. Pa. 2005) (noting that roll-up provisions "have the effect of improving the priority of a prepetition creditor"); *In re Tenney Vill. Co.*, 104 B.R. 562, 570 (Bankr. D.N.H. 1989) (holding that Bankruptcy Code section 364 does not authorize the granting of administrative expense priority for prepetition debt).

[50]     *In re Nuo Therapeutics, Inc., et al.,* Case No. 16-10192 (MFW), Hr'g Tr. (Docket No. 147) at 245:16-246:1 (Bankr. D. Del. February 22, 2016).  An excerpt from the transcript is attached hereto as Exhibit A.

[51]     *See Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery (In re Cybergenics Corp.),* 226 F.3d 237, 243-47 (3d Cir. 2000) (holding that a fraudulent transfer claim belongs to creditors and not to a chapter 11 debtor-in-possession).

42.     Taken together, the roll-up amounts to the very protections courts routinely ward against—cross collateralization that circumvents the Bankruptcy Code's priority schemes.  The Final Order, therefore, should: (i) limit the DIP liens and superpriority claims solely with respect to any incremental financing under the DIP Facility; (ii) limit the liens on unencumbered assets (excluding the proceeds of Avoidance Actions) solely to the extent of the new money portion of the DIP Facility; and (iii) exclude the proceeds of Avoidance Actions from the DIP Liens, superpriority claims and any adequate protection claims.  In the event the Court is inclined to approve the roll-up, the Final Order should clarify that in the event of a successful challenge by the Committee, the roll-up of the prepetition debt into the DIP Facility will not cleanse any deficiencies in the collateral package.

## VI.     The 506(c)/552(b) Waivers Cannot Be Unconditionally Approved

43.     Section 506(c) of the Bankruptcy Code allows a debtor to charge the costs of preserving or disposing of a secured lender's collateral to the collateral itself.[52]  This provision ensures that the cost of liquidating a secured lender's collateral is not paid from unsecured creditor recoveries.[53]  Courts have widely recognized that section 506(c) waivers are not to be granted lightly.[54]  Indeed, in this jurisdiction, courts have explicitly provided that the waiver is not permitted without the consent of the committee.[55]  Similarly, the "equities of the case" exception in section 552(b) of the Bankruptcy Code allows a debtor, committee or other party-in-

---

[52]     *See* 11 U.S.C. § 506(c).

[53]     *See, e.g., Precision Steel Shearing v. Fremont Fin. Corp. (In re Visual Indus., Inc.),* 57 F.3d 321, 325 (3d Cir. 1995) ("section 506(c) is designed to prevent a windfall to the secured creditor"); *Kivitz v. CIT Group/Sales Fin., Inc.,* 272 B.R. 332, 334 (D. Md. 2000) ("the reason for [section 506(c)] is that unsecured creditors should not be required to bear the cost of protecting property that is not theirs").

[54]     *See, e.g., Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.,* 530 U.S. 1, 12 (2000) (finding that section 506(c) is a rule of fundamental fairness for all parties in interest and authorizing the surcharge of a secured lender's collateral where reasonable and appropriate).

[55]     *See In re Mortgage Lenders Network USA, Inc.,* Case No. 07-10146 (PJW), Hr'g Tr. (Docket No. 346) at 21 (Bankr. D. Del. March 20, 2007) (noting that without the committee's prior approval, the 506(c) waiver may not be approved).  Excerpts from the transcript are attached hereto as Exhibit D.

interest to exclude postpetition proceeds from prepetition collateral on equitable grounds, including to avoid having unencumbered assets fund the cost of a secured lender's foreclosure.[56]

44.     The quid pro quo for conducting the sale of a lender's collateral in bankruptcy is, at a minimum, the establishment of a proper budget that pays the costs associated with such process.  The detailed DIP budget provided to the Committee projects paying section 503(b)(9) claims and other priority claims the first week of April.  The advance 506(c) and 552(b) waivers, however, will be granted upon entry of the Final Order.  Accordingly, if the sale process fails and the DIP Facility terminates, the budgeted amounts will never be paid.  To avoid this inequitable result, and assuming the Committee can verify the budgeted amounts, the Final Order should condition the 506(c) and 552(b) waivers on the payment of such amounts.

## VII.     **Additional Objectionable Provisions**

45.     In addition to the foregoing, the following provisions of the Final Order are objectionable to the Committee for the reasons stated below:

- Credit Bid Rights:  The rights of the Senior Creditors and Sun Capital to credit bid must expressly be conditioned on the Committee's challenge rights.

- Reports:  All reports provided to the Senior Creditors pursuant to the Final Order must also be provided to the Committee.

---

[56]     *See* 11 U.S.C. § 552(b).

## **CONCLUSION**

WHEREFORE, the Committee respectfully requests that the Court (i) deny the Motion

unless modified as set forth herein; and (ii) grant such other and further relief as the Court deems

just and proper.

Dated:    Wilmington, Delaware
          February 21, 2020

          WOMBLE BOND DICKINSON (US) LLP

          By: */s/ Morgan L. Patterson*
          Matthew P. Ward (DE Bar No. 4471)
          Morgan L. Patterson (DE Bar No. 5388)
          1313 North Market Street
          Suite 1200
          Wilmington, DE 19801
          Telephone: (302) 252-4320
          Facsimile: (302) 252-4330
          matthew.ward@wbd-us.com
          morgan.patterson@wbd-us.com

          and

          KELLEY DRYE & WARREN LLP
          Eric R. Wilson (admitted *pro hac vice*)
          Jason R. Adams (admitted *pro hac vice*)
          Lauren S. Schlussel (admitted *pro hac vice*)
          101 Park Avenue
          New York, New York 10178
          Tel: (212) 808-7800
          Fax: (212) 808-7897
          ewilson@kelleydrye.com
          jadams@kelleydrye.com
          lschlussel@kelleydrye.com

          *Proposed Counsel to the Official Committee of Unsecured*
          *Creditors of BL Restaurants Holding, LLC, et al.*